**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| LINDSAY HUTHNANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-CV-1871 (HKK) |
| | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MOTION TO COMPEL DISCOVERY</u>

Plaintiff Lindsay Huthnance, through counsel, respectfully moves under Fed. R. Civ. P. 37(a)(3)(B) that the Court compel Defendant District of Columbia immediately to produce discovery responsive to her Rule 33 Interrogatories and Rule 34 requests for production, which the District has wrongfully withheld, and that it charge the District with all of Plaintiff's expenses associated with obtaining compliance with the District's discovery obligations and impose other sanctions authorized by Fed. R. Civ. P. 37 as would be just and fair.

DATED:  June 6, 2008

Respectfully submitted,

_____//s//_____
John Moustakas (DC Bar # 422076)
Sarah Keast (DC Bar # 493632)
Goodwin | Procter LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 346 – 4000
(202) 346 – 4444 (fax)

Arthur B. Spitzer (DC Bar #235960)
Frederick V. Mulhauser (DC Bar # 455377)
American Civil Liberties Union
      of the National Capital Area
1400 20th Street, NW, Suite 119
Washington, DC 20036
(202) 457-0800
(202) 452-1868 (fax)

Attorneys for Plaintiff Lindsay Huthnance

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| LINDSAY HUTHNANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-CV-1871 (HKK) |
| | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO**
**COMPEL DISCOVERY**

Plaintiff Lindsay Huthnance, through counsel, respectfully moves under Rule 37(a)(3)(B) that the Court compel Defendant District of Columbia immediately to produce discovery it has wrongfully withheld, charge it with all of Plaintiff's costs associated with obtaining compliance with the District's discovery obligations, and impose other sanctions authorized by Fed. R. Civ. P. 37 as would be just and fair.

**INTRODUCTION**

Up to its old tricks, the District continues to express its contempt for the Federal Rules of Civil Procedure, Local Rules and court orders that govern the conduct of litigation in this Court. Chronically engaged in dilatory litigation tactics – ignoring deadlines, losing evidence by its delays, wrongfully withholding discovery, to name a few – the District has chosen to follow its typical tact of delay in this case, including failing to meet any of the original deadlines in this case. Notwithstanding the Plaintiff's legitimate desire for a timely resolution of her claims, *every* occasion calling for some action by the District has been met with a request to counsel or the Court for an extension – and often, for multiple extensions.

Now, however, the District has cut out the middle-man. Conscious that it has run out of excuses and aware that further requests for extension would be denied, the District's lawyers have arrogated to themselves the right to extend their client's own deadlines whenever they choose. Thus, when the District's back-to-back extensions of time to answer Plaintiff's first round of discovery expired on April 23, 2008, its lawyers simply gave the District an indefinite extension of time to answer by simply serving papers captioned as Responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents ("RPD") that were anything but.

As we demonstrate below, the District has flagrantly violated its discovery obligations in myriad ways. First, it claims the right to answer many of Plaintiff's requests whenever it gets around to obtaining the necessary information from the Metropolitan Police Department, essentially taking an indefinite extension of time for which it sought no permission. Thus, for some eight requests it produces no information or documents, speciously claiming that "[d]iscovery is ongoing and information will be provided as it becomes available." Second, in other instances, it provides woefully incomplete responses without any explanation for not answering fully or not producing all the discoverable materials within its possession, custody, and control. Third, it has interposed unsupportable and unavailing objections as justification for failing to provide other responses.

All in all, the District has adequately responded to only the smallest fraction of requests. In doing so, the District's lawyers have willfully taken positions that have been repeatedly rejected by this Court. And it has continued to demonstrate its arrogant belief that, as lawyers for the sovereign, it is unfettered by the rules and procedures that apply to all litigants before the Court. Mindful of the objective to involve the Court in only those disputes that cannot otherwise

be reasonably resolved by the parties, Plaintiff is constrained to seek the Court's assistance in compelling discovery and imposing costs under Rule 27(a)(5)(A) because, even after lengthy "meet-and-confer" sessions, the District's lawyers continue to give no assurances when or if the requested discovery will be produced.

## BACKGROUND

### Events Preceding the District's Inadequate Discovery Responses

On December 14, 2006, Plaintiff Lindsay Huthnance filed a Complaint against the District of Columbia and three unknown police officers of the Metropolitan Police Department ("MPD"), arising out of her illegal arrest and subsequent detention on November 15 and 16 2005. (Dkt. #1). On January 8, 2007, the District sought an extension of time to file a motion to dismiss. (Dkt. #4). When it failed to prepare its motion by the amended date, it sought a second extension of time (Dkt. # 5), finally serving its motion on March 15, 2007 – three months after the original complaint was filed. (Dkt. # 6, 7). Without any delay, Plaintiff opposed the motion on March 29, 2007. (Dkt. #8). Failing to follow the example of Plaintiff's prompt response, the District sought an extension on April 3, 2007, of the deadline for filing a Reply Brief. (Dkt. # 9). Rather than file its Reply Brief by the April 19, 2007 deadline established by this Court, the District, instead, sought an additional extension to file its Reply Brief (Dkt. #10), which, for the first time, was opposed by Plaintiff.

By this point, the District had been called upon to make but two filings in the case, yet it had taken four extensions of the original deadlines to complete them. Plaintiff, who wants her day in Court before the fading of memories and the loss of evidence, asked that the District's second request for an extension of the deadline for filing a Reply Brief be denied and that the

District "be precluded from filing any more [] requests [for extension], barring *bona fide* emergencies." (Dkt. # 11).

In the meantime, Plaintiff identified from the District's motion to dismiss officers L. Acebal, J. Antonio, and J. Morales as the officers who participated in her arrest. Consequently, she filed an Amended Complaint naming them as individual defendants on May 7, 2007. Like clockwork, the District moved on May 21, 2007 for an extension of the time for filing a motion to dismiss the Amended Complaint. (Dkt. # 15). Plaintiff, again, opposed. (Dkt. # 16). The District was given an additional 14 days to file a renewed motion to dismiss and did so on the last possible day. (Dkt. # 17).

But the District's dilatory conduct was not limited to litigation deadlines. The case was further stalled by the District's willful failure to implement the Metropolitan Police Department Amendment Act of 2006 (the "Act"), D.C. Code § 5-105.09, requiring the MPD to designate an office to receive service on behalf its officers. This statute was enacted in recognition of MPD's longstanding role in stymieing the service of officers with legal process arising out of the employment as police officers. Because of this it took Plaintiff fully until November 30, 2007, to secure the Individual Defendants' service with process. During this period, the District's motion to dismiss was denied, requiring it to answer the Amended Complaint – but not without yet another request for extension of time for three of the four defendants (Dkt. # 23) and a still further extension to answer for the last of the defendants (Dkt. # 29).

As a result of the numerous s extensions the District sought and received, some of which Plaintiff consented to and some of which Plaintiff opposed, the initial status conference in this case did not occur until January 10, 2008, over one year after Plaintiff filed her initial Complaint.

On February 15, 2008, Plaintiff hand-served her First Set of Interrogatories and Requests for Production ("RFPs") on the District. Not surprisingly, no responses were produced by the deadline. Instead, on March 14, 2008, the District's counsel requested of Plaintiff an extension due to extenuating personal circumstances with one of his paralegals who had been tasked with obtaining answers to Interrogatories and collecting documents and other materials to be produced in response to Plaintiff's RFPs. Plaintiff agreed to a two-week extension. Predictably, no discovery responses were served on or before the new deadline. Instead, the District informed Plaintiff that it would be seeking a second extension of time to respond to Plaintiff's first set of discovery. (Dkt. # 38-40).

In an effort to avoid unnecessary motion practice, Plaintiff reluctantly suggested a willingness to agree to another extension, subject to an inquiry into the status of the discovery responses, what had been done during the previous two-week extension, and how much additional time the District required. Shockingly, counsel could not state that a single thing had been done during the first two-week extension. In fact, he had no knowledge of whether anything had yet been done to begin gathering responsive materials from the client. He also could not even state how much additional time he needed. (Indeed, Plaintiff learned that the District was seeking a three-week extension only when it filed its motion with the Court.) The Court granted the extension.

### The District's Incomplete Responses Intended to Create *De Facto* Extension of Discovery

The District finally served responses to Plaintiff's first set of discovery requests on April 23, 2008 – nearly ten weeks after discovery was served. See Exhibit A (Responses to Interrogatories) and Exhibit B (Responses to Request for Production).[1] Providing the tiniest

---

[1] The District mis-numbered its responses to Plaintiff's RFPs 13-16. Plaintiff refers to the requests by their correct numbers throughout this motion.

fraction of the information sought by Plaintiff's requests, the District simply asserted that it would respond to the requests when it was good and ready, and no sooner, claiming that it "does not have any responsive information at this time. Discovery is ongoing and information will be provided as it becomes available." *See*, *e.g.*, *Defendant District of Columbia's Responses to Plaintiffs' First Set of Interrogatories* ¶ 13. The District invokes this specious justification for its stunning failure to provide many of the most crucial details regarding Plaintiff's claims some two and one-half years into the litigation, granting itself, in effect, a *de facto* extension of time until it gets around to answering Plaintiff's discovery requests.[2]

The consequences of this delay is both real and compounding constantly: by Plaintiff's inability to notice depositions for want of documentary evidence needed for adequate preparation; by Plaintiff's inability to make any headway in its expert case; by Plaintiff's inability to respond to contention interrogatories, to name a few. The District has been similarly unresponsive across the range of Plaintiff's discovery requests, as will be discussed in detail below.

### Plaintiff Initiates a Detailed "Meet-and-Confer" Session

Plaintiff's counsel initiated a "meet-and-confer" session in the hope of resolving the vast shortcomings in the District's discovery responses without Court intervention. The session spanned parts of April 29, 2008, and April 30, 2008. During those discussions, Plaintiff's

---

[2] To give some flavor of the significance of the District's position: this case is about the use of the post-and-forfeit procedure to resolve disorderly conduct arrests, and Plaintiff requested the District's policies and procedure, as well as its training materials, on post-and-forfeit and on the disorderly conduct offense. Despite the simplicity of this request – and its place at the core of this case – the District has produced no responsive documents on these seminal topics. Further it has invoked this contrived right to produce discovery on a rolling basis as a means for refusing to disclose police officers on duty in the relevant Patrol Service Area (PSA 301) on the night of Plaintiff's unlawful arrest; the history of complaints concerning these post-and-forfeit procedures; and evidence of the training received by the Individual Defendants. See, *e.g.*, *Defendant District of Columbia's Responses to Plaintiffs' First Set of Requests for Production of Documents* ¶¶ 3, 8, 9, 13; see also *Defendant District of Columbia's Responses to Plaintiffs' First Set of Interrogatories* ¶ 13. Despite having several months to obtain it, until very recently the District even claimed a present inability to identify the station crew on duty when Plaintiff was transported to the Third District stationhouse – an indisputably simple task given the multiple sources of such information in the District's possession, including historically well-maintained time and attendance records.

counsel pointed out in considerable detail the deficiencies in each and every one of the District's

twenty-nine discovery responses.  In light of its occasional invocation of privilege, Plaintiff also

requested that the District provide a privilege log, as required by Rule 26(b)(5)(A), that

"describe[s] the nature of the documents, communications, or tangible things, not produced or

disclosed."

        During the "meet-and-confer" sessions the District's counsel acknowledged the

deficiency of the District's responses to many of the requests, and agreed to seek out information

responsive to the majority (eighteen) of Plaintiff's requests.  He also agreed to raise certain

requests with his supervisor (primarily, Plaintiff's contention that the District's privilege

objections based on certain privacy provisions were inapplicable).  He had no knowledge of what

documents the District had or why it would be difficult for the District to provide them, despite

having interposed objections to various requests that gathering the materials was "burdensome."

        Plaintiff was left with great concern that little or nothing had been done to gather

responsive information.  Yet, Plaintiff took the District at its word that it would attempt to

remedy its deficiencies, among other things, by communicating again to MPD the Plaintiff's

requests.  Because counsel suggested that he would provide a plain-English summary of

Plaintiff's requests that he had been generating during the course of our discussions and because

we had not seen his abbreviation or translation of those requests, we asked that District counsel

permit us to review any such submission to insure the accuracy thereof in order to avoid further

delays associated with subsequent disputes over, the "translation."

        In addition, Plaintiff asked to be that the District keep Plaintiff informed of the District's

progress in complying with the discovery request (including by providing an update by May 7);

that the District provide the responsive material by May 14, 2008; and that, if the District could

not provide any part of the additional information by May 14, 2008, to let Plaintiff know the nature of the delay as to the specific documents or request so that the parties could negotiate a resolution. Plaintiff made these requests and memorialized the substance of the "meet-and-confer" session, including identifying the areas in which additional information was needed, in a letter, attached as Exhibit C. Without even the courtesy of a reply, District counsel failed to accede to any of these reasonable requests.

### The District's Most Recent Discovery Supplements Betray the Inadequacy of its Responses

Finally, on May 15, 2008, a full three months after discovery was served, the District provided "supplemental" discovery responses with extraordinarily minimal additional information in response to a mere **two** of Plaintiff's discovery requests (Int. 1 and RFP 4). *See* Exhibit D. Specifically, the District has now provided criminal history printouts that have been explicitly generated for discovery, rather than the ones created in connection with Plaintiff's unlawful arrest (as requested). This could have taken no more than five minutes to produce and more likely far less time than that. And, for the first time, the District identified, by name alone, four of the officers that were on duty at the station on the night of Plaintiff's arrest. Both of these items were easily within the District's possession, custody, or control and took next to no effort to produce; one can only speculate at how little the District and its lawyers did in order to make their initial production of discovery or this supplementation.

Despite providing this shockingly small "supplementation," the District's counsel provided no explanation for the continuing deficiency of the other twenty-seven requests. The District also failed to provide a privilege log to support its claims of privilege.

**A Final Attempt to Resolve the Discovery Disputes without Court Intervention**

When, despite its promise to redouble his efforts to obtain responses to Plaintiff's requests, District counsel forwarded no further discovery materials, Plaintiff again contacted the District's counsel on June 3, 2008.  With 34 days after the "meet-and-confer" sessions (now for a total of one hundred and nine days), District counsel had gathered no further responsive information – including basic, fundamental, and easily-obtainable information – ***and claims to have no idea when or if further material would be forthcoming***.  Counsel claims to have requested responsive materials from the District repeatedly and yet had not received them.  Ignoring their relationship as attorney and client, counsel essentially throws up his hands as if to suggest that there is nothing more than he can do, and disclaiming knowledge of virtually all of his client's positions.  In fact, the only point he was able to discuss specifically was his client's position that Interrogatories 9 and 10 were "burdensome."  He had nothing to say about the other two dozen requests.  Further, he was unable to discuss what it would take to get the information sought by Interrogatory 9 and 10 or how Plaintiff might get this information in a less burdensome way.

At this time – 112 days after discovery was served – Plaintiff is owed substantial discovery which the District continues to fail to provide, although it offers no explanation its failure.

## ARGUMENT

The District must produce information that is "relevant" to the claims and defenses in this case.  *See* Fed. R. Civ. P. 26(b)(1).  With respect to the bulk of Plaintiff's discovery requests, the District has either refused to provide responsive information or has stonewalled by promising to search for responsive information but in fact producing nothing for months.  For the majority of

Plaintiff's discovery requests, the District has simply not provided any responsive information, with no real explanation, despite that these discovery requests have been outstanding for 112 days.

All the information and documents sought by Plaintiff are within the District's possession, custody, or control. The District's circular conception that the lawyer's failure to obtain discovery responses from his client within the allotted time period is a sufficient excuse for extending its deadline for doing so cannot be credited as made in good faith. Simply put, the District is asserting nothing less than its right to furnish discovery whenever it sees fit and without regard to the Lilliputian rules that apply to the rest of us.

To put the most charitable light on the District's argument is to understand it as the simple truism it asserts in this case: that one cannot reasonably expect documents and information that have not yet been identified to be produced. From this logic comes the District's assertion that "[d]iscovery is ongoing and information will be provided as it becomes available." But this argument must fail. "Discovery" connotes information, documents, materials obtained from one's opponent or some third party. Thus, at least with respect to discovery requests that do not call for a party's contentions, the claim that "[d]iscovery is ongoing and information will be provided as it becomes available" is simply inapplicable to a party whose response requires nothing more than a probing of its own memory, knowledge, and files. When District lawyers probe their client for the information with which to answer Interrogatories or for the documents and materials necessary to satisfy Requests for Production, it is not conducting discovery whose ongoing status justifies production on a rolling or supplementary basis. Otherwise, the concept of discovery deadlines would quickly become an

anachronism and the possibility of litigating cases efficiently – not to mention the evenhanded administration of justice – would be forever lost.

The District and its lawyers know better. The facile notion that the District's discovery obligations can be simply satisfied by the blithe assertion that "discovery is ongoing" or "we're looking into it" has been long since rejected by this Court. In *Webb* v. *District of Columbia*, 175 F.R.D. 128, 147 (D.D.C. 1997), the Court rejected the District's attempt to rely on "its rolling supplemental responses as evidence that it was providing discovery in good faith" was rejected as "without support in the law." As the Court explained:

> "In response to numerous of plaintiff's document requests, the District initially responded that 'a request has been made to the appropriate agency for additional documents responsive' to the request. If the District was unable to respond to the document request, the proper response was to file a motion for an enlargement of time with the court. Instead, the District arrogated to itself the right to provide a cursory, incomplete response with a promise to update in the future. This is totally improper, and this court has previously used similar conduct to support a finding of discovery misconduct by the District in another case. *Monroe* v. *Ridley*, 135 F.R.D. 1, 4 (D.D.C. 1990). See also *Green* v. *Blazer Diamond Products, Inc*., 1994 U.S. Dist. LEXIS 21346, 1994 WL 715632 (D.D.C.)."

*Webb* and the cases it cites apply with equal force here. Any claim that additional time is legitimately needed in order to comply with discovery requests must be susceptible to adversary testing and a determination by the Court lest the system be exposed to even greater abuse.

The long history of the District's chronic litigation misconduct cannot be understated. Virtually every judge of this Court – past and present – has acknowledged the District's defiance of and contempt for the rules of litigation. *See*, *e.g.*, *Green* v. *District of Columbia*, 134 F.R.D. 1, 4 (D.D.C. 1991)(Hogan, J.)(acknowledging that "dilatory tactics have become part and parcel of [the District's] litigation techniques"); *Webb* v. *District of Columbia*, 189 F.R.D. 180, 186 (D.D.C. 1999)(Lamberth, J.)(blaming the failure to adequately punish the District's chronic discovery abuses for instilling in its lawyers "a certain arrogance and belief that the District of

Columbia plays by different rules then those applicable to other litigants"); *Heard* v. *District of Columbia*, No. 02-296 (October 6, 2005 Order)(Kollar-Kotelly, J.)("The only conclusion that this Court can reach is that the defense counsel in this case and the Attorney General's Office have little regard for court orders and deadlines."); *McDowell* v. *District of Columbia*, 2006 U.S. Dist. LEXIS 89138, at *2 (D.D.C. July 11, 2006)(Roberts, J.)(recognizing the District's "indefensible failure to comply conscientiously with its discovery production obligations"); *Bolger* v. *District of Columbia*, 2008 U.S. Dist. LEXIS 20134, at * 26 (D.D.C. March 17 2008)(Bates, J.)(finding that "record here clearly demonstrates that the District violated orders of this Court in failing to produce responsive documents in a timely manner"); *District of Columbia Hosp. Ass'n* v. *District of Columbia*, 73 F. Supp. 2d 8, 16-17 (D.D.C. 1999)(Sporkin, J.)(considering imposition of sanctions against Office of Corporation Counsel for making "bogus and frivolous arguments;" wrongfully presenting a "totally baseless legal position" at the District's request; and engaging in a 'win at any cost strategy' irrespective of the merits); *Jackson* v. *District of Columbia*, 1990 U.S. Dist. LEXIS 21037, at *6 (D.D.C. Oct. 31, 1990) (Lamberth, J.)("chronic problem of [District's] failure to timely respond to service of process, motions, discovery, etc., in this court" permits conclusion that it "has deliberately chosen to handle its litigation in the way it has here as a means of frustrating *pro se* plaintiffs and discouraging litigation"); *Covington, et al.*, v. *District of Columbia, et al.*, No. 87-2658, 1990 U.S. Dist. LEXIS 2017, *18-19 (D.D.C. Feb. 26, 1990) (Lamberth, J.) (sanctioning Corporation counsel "fail[ing] to obey court-ordered discovery deadlines, repeatedly delay[ing] trials, and single-handedly deny[ing] plaintiffs, their rights to their day in court" and for "fail[ing] demonstrate that any corrective action whatsoever has been taken to preclude recurrence of the same derelictions in this and other cases"); *Sir Charles 2X* v. *District of Columbia*, 1990 U.S.

Dist. LEXIS 16731, at * 5 (D.D.C. December 4, 1990)(Oberdorfer, J.) (finding "a pattern of late filings which support plaintiff's assertion that defendant's counsel habitually files late and ignores courts deadlines"); *Neal* v. *Director, D.C. Dep't of Corrections*, 1995 U.S. Dist. LEXIS 11461, at * 19 (D.D.C. August 9, 1995) (Lamberth, J.) ("Government defendants cannot place themselves above the law and make themselves unaccountable for their conduct because they are too busy to meet judicial deadlines. Whatever priorities the District has elected to establish for dealing with this type of litigation, it will have to endure the repercussions.").

As indicated in the introduction, a second category of discovery requests involves woefully incomplete responses. That is, there are many examples of the District producing only a small number of the full universe of documents responsive to a particular discovery request or failing to produce the most important piece of evidence within a category of responsive documents. For instance, Plaintiff has asked for all documents relating to her arrest and detention on November 15 and 16, 2005, including, among other things, all police reports and all radio transmissions. It is beyond all doubt that radio transmissions concerning Plaintiff's arrest were made: Plaintiff's driver's license number would have been read to a dispatcher to determine her record on the scene; officers responding to the scene and clearing the scene would have announced both statuses to dispatch; transport would have been summoned through dispatch. As we demonstrate below, there are many examples of the District's failure, without any explanation, to produce such materials.

A third category of discovery shortcomings involve the District's improper assertions of privilege to withhold rightly discoverable materials. For one thing, as we explain below, the District has waived its privileges by failing to timely assert them and by failing to produce a privilege log to preserve them. Moreover, as we also demonstrate, the District has both

manufactured privileges that simply do not apply to shield information and documents from disclosure in litigation and has misapplied or misconstrued others with the same effect.

Very little discovery of any consequence has been provided to Plaintiff. Counsel cannot account for the failure to provide documents that he himself acknowledges are responsive except to say that he has "asked" the MPD for responsive documents repeatedly. None of counsel's representations offer hope that any further documents would be forthcoming or, if so, when they might be forthcoming. Consequently, Plaintiff has no choice but to seek the Court's assistance.

For these reasons, Plaintiff respectfully requests that the Court compel the District to produce responsive materials immediately to each of the requests below, among other things, to deprive the District of the *de facto* extension that it wrongfully contrived to take. Plaintiff further asks this Court to compel District counsel to make an accounting of all efforts undertaken to date and from here forward to comply with his and the District's discovery obligations, so the District's compliance can be gauged and so Plaintiff and the Court can have reasonable confidence in the completeness of future productions in this case. Finally, we ask for the expenses incurred in making this motion as authorized by Rule 37(a)(5)(A) – both to fully compensate Plaintiff and to deter future discovery violations in this and other cases. An unrepentant repeat offender, the District clearly has not yet gotten the message that its repeated discovery misconduct will not be tolerated by the Court. Consequently, only by means of ever-increasing sanctions is there any hope of jarring the District into compliance with the litigation and ethical obligations that apply universally to ***all*** parties (and their lawyers) who come before the Court.

**A.**              ***Requests for Production ("RFPs")***

•    <u>RFP No. 1</u>:  All Documents referring or relating to Plaintiff, whether by name, Social Security number, or any other means of identification, including all police paperwork filled out in connection with Plaintiffs arrest and the results of any NCIC, WALES, or similar queries respecting Plaintiffs prior arrest record.

> RESPONSE: Objection as overly broad and burdensome. Notwithstanding the objections and without waiver thereto, see Attachment 1, PD 163-MPD Arrest/Prosecution Report (previously provided), Attachment 2, PD 168-MPD Court Case Review Form (previously provided), Attachment 3, PD 67-MPD Collateral/Bond Receipt (previously provided), and Attachment 7 Columbo and Wales printouts.

Plaintiff is not moving to compel regarding RFP No. 1, subsequent to the District's supplementation of its response.  (This is the only RFP response that the District supplemented.) We list it here because various of the District's subsequent responses refer to this response and the attachments in it.[3]

•    <u>RFP No. 2</u>:  All Documents referring or relating to the arrest and detention of Plaintiff (and any encounter that preceded it) on November 15th and 16th, 2005, including, without limitation, any police reports, witness statements, log entries, video recordings, post and forfeit paperwork, and all radio communications / transmissions relating to Plaintiff's arrest, detention, and transportation and identifying all MPD personnel on the scene of Plaintiff's arrest, detention and transportation (and any encounter that preceded it) and returning to service thereafter.

> RESPONSE: See Response #1.

---

[3] Plaintiff also reminds the District that it is under a continuing obligation to supplement, and must produce, for example, the contemporaneous Columbo and Wales printouts, when it finds them.

In response to RFP No. 2, the District merely referred to its boilerplate objections[4] in response to RFP 1 and failed to provide documents responsive to this request.  During the parties' meet and confer, Plaintiff's counsel accepted the District's counsel's assertion that there were no witness statements, but specifically requested radio communications and log entries, in particular.  Counsel for the District acknowledged that he did not know how these documents were retained, but he agreed to look into the matter.  To date, Plaintiff has received no supplemental response to this request.  The District should be ordered to provide responsive materials forthwith.

    •   <u>RFP 3</u>:  All Documents identifying MPD officers working in PSA 301 on November 15th and 16th, 2005 (3-11 shift 11/15; midnight shift 11/15-16; day shift 11/16), and any other MPD officers on special assignments, details, initiatives, or shifts that involved deployment within or around PSA 301 on those dates, including but not limited to any log books entries, rosters, roll call attendance sheets, time and attendance records for the Third District Station and Substations, and any dispatcher records.

> RESPONSE: This defendant does not have any responsive
> information at this time. Discovery is ongoing and information will
> be provided as it becomes available.

The District interposed no objections to this request, but merely declined to produce documents that are certainly within its possession "at this time."  Counsel for the District could not assert that any search had been done, other than his passing the request on to the MPD. When Plaintiff complained about the District's failure to produce documents in its possession, counsel for the District agreed to find and produce such documents.  To date, however, the District has failed to produce documents in its possession which are responsive to this Request.

---

[4] Documents and things related to the arrest and detention at issue cannot be overbroad, and an "overly burdensome" objection cannot be interposed before counsel has even determined what it would take to find the materials.

- **RFP 4**:  For each of the Individual Defendants, all Documents constituting their personnel records, including all Documents constituting, referring to, or relating to their performance evaluations, informal and formal complaints filed against them, and any disciplinary actions taken against them.

> RESPONSE: Objection, seeks confidential personnel information protected under DC Official Code §1-631.01, §1-632.03, §5-113.01, §5-113.06 and 3102.01 of the District Personnel Manual, and as it constitutes as unwarranted invasion of personal privacy.

The District objects to responding to this relevant discovery request solely on the basis of D.C. Code sections which the District claims create a privilege from discovery.[5]  This contention must be rejected and discovery compelled.  First, this court has already rejected that these types of code sections create a privilege.  *See Truelove v. Trustees of Univ. of D.C.,* 1991 U.S. Dist. LEXIS 1512 (D.D.C. 1991) (construing § 1-631.03, which was then numbered § 1-632.3). Second, these code sections, on their face, do not purport to create a privilege from discovery. Third, the District has waived any claim of privilege, even if one existed, by failing to provide a privilege log.

The personnel records of the three individual defendants (including performance evaluations, complaints against the officers, and disciplinary actions) are relevant discovery – indeed, not even the District has objected to the relevance of these documents – to which Plaintiff is otherwise entitled.  Yet, the District claims that it can withhold this information based on D.C. Code §§ 1-601.01, 1-631.03, 5-113.01, and 5-113.06 and District Personnel Manual Section 3102.01.

These D.C. Code sections do not, however, create a privilege from discovery.  They simply lay out generally policies instructing the District to take care in handling personnel

---

[5] The District interposes a similar objection to RFP 14 and Interrogatories 1 and 12.

information.

D.C. Code § 1-631.01 states that the District's records

"shall be established, maintained, and disposed of in a manner designed to ensure the greatest degree of applicant or employee privacy while providing adequate, necessary, and complete information for the District to carry out its responsibilities . . . ."

Nothing in this provision purports to create a *discovery privilege*, allowing the district to decline to respond to relevant discovery requests.

Even less applicable, D.C. Code § 1-631.03 (as well as the identical language in District Personnel Manual § 3102.01) instructs the District to make personnel information available **to law enforcement authorities**, "except if such disclosure would constitute an unwarranted invasion of personal privacy or is prohibited under law or rules and regulations pursuant thereto." D.C. Code § 1-631.03 (2008). This provision has no applicability to civil litigation. Even if it did, responding to relevant discovery is not ever "an unwarranted invasion of personal privacy." It is certainly not "an unwarranted invasion of personal privacy" where the employees at issue are also individual defendants in the lawsuit.

D.C. Code § 5-113.01 merely lists the types of records the MPD must keep. D.C. Code § 5-113.06 indentifies which of the documents listed in § 5-113.01 **must** be available for public inspection. Here, the District appears to be trying to create a discovery privilege from the fact that the personnel records that it is required to maintain under § 5-113.01 are not required to be open for public inspection under § 5-113.06. But a code section that *requires* certain documents to be open for inspection by the general public certainly does not operate by the inverse to create a *discovery* privilege for relevant documents in civil litigation.

Plaintiff not only asks this Court to compel discovery but also to rule definitively that these D.C. Code sections do not create a discovery privilege, so as to avoid further assertions of

this privilege in this case, such as, for example, during depositions. In the experience of the law firm of the undersigned, the District has begun to raise these sections as a D.C. Code "privilege" objection as a standard practice, including in depositions to such standard questions as a request for a deponent's work history, despite that these provisions cannot reasonably be read, under any principles of statutory interpretation, to create a discovery privilege. The assertion of this nonexistent privilege has caused unnecessary delay and expense in this case, and should not be considered a standard litigation tactic by the District.

- <u>RFP 5</u>: A copy of the MPD General Orders.

    RESPONSE: Objection as to overly broad, vague. Further objection as to relevance. Notwithstanding the objections, see Attachments 4 and 5, and Special Order at Attachment 6.

The MPD operates on a general order system. Plaintiff has requested all of the General Orders so that she may review both the General Orders specifically relating to the procedures used in her attest, detention, and release, and so that she compare the nature of the guidance and supervision provided for post-and-forfeit and disorderly conduct, as compared to that provided on other topics. The *absence* of a General Order on post-and-forfeit may say as much as the presence of one (thus far, Plaintiff does not know whether one exists because defendant has declined to produce that discovery). Similarly, the existence of a comparatively thin General Order would also be revealing of an inadequate policy.

These documents are easily obtained and provided by the District. According to a private company selling the General Orders as a service to members of the Fraternal Order of Police, these orders fit on one disc.[6] They are available to the public through FOIA requests, and the Police Complaints Board has recommended that these documents be placed on the MPD website.

---

[6] *See* http://www.laborcops.com/

*See* Exhibit E.  While this recommendation has not yet been followed, it helps illustrate that

these documents are not secret, protected, or especially onerous to manage.

> •   <u>RFP 6</u>:  All Documents constituting, referring to, or relating to any formal
or informal MPD general orders, rules, regulations, policies, procedures, or practices in effect or
under consideration at any time that concern post and forfeit or citation and release.

> RESPONSE: Objection as overly broad and burdensome.
> Notwithstanding the objections, see Attachment 4, General Order
> 502-06 – Citation Release Program, Attachment 5 – PD Form 61D
> (Violation Citation) and Attachment 6, SO-02-06 – Citation
> Release Processing.

One of the core issues in this case is the use of the post-and-forfeit procedure to hide

inappropriate disorderly conduct arrests, and the failure to offer the alternative citation and

release procedure.  The District has produced **<u>zero</u>** documents regarding its policies and

procedures for the post-and-forfeit procedure.  It not possible that the District has no documents

related to the post-and-forfeit procedure for resolving an arrest.[7]  Indeed, the Citizen Complaint

Review Board and the Police Complaints Board have issued several reports on the topic of

misuse of the disorderly conduct offense, specifically including the use of the post-and-forfeit

procedure in conjunction with those arrests (reports within the District's control which the

District failed to provide in discovery and which Plaintiff only discovered through alternative

sources).  See Exhibits F, G, H, I, and J.  As these documents make clear, after the initial Citizen

Complaint Review Board report was issued on November 19, 2003, the MPD has spent

considerable time revising its policies, procedures, and training materials for the post-and-forfeit

procedure and the disorderly conduct offense.[8]  Plaintiff is entitled to these materials, and they

---

[7] The documents produced either applied to citation release or a non-arrest procedure (violation citation) not applied
in this case.
[8] *See, e.g.,* Ex. I (2005 OPC Annual Report) ("In January 2004, in a meeting with Chief Ramsey, he indicated to
OPC that MPD would take steps to implement recommendations . . . . In December 2004, MPD indicated that it had

should be ordered produced forthwith. Indeed, the District's counsel agreed, during the meet and confer to try to obtain responsive materials from his client, but has failed to do so without explanation other than that he has asked repeatedly and that has client has sent him nothing.

Although the District has not pressed its boilerplate objections during the meet and confer, they should nonetheless be overruled. The District's burdensomeness objection should be overruled because it was made without knowledge of whether the request was burdensome, and to this day the District's counsel cannot explain why the request is burdensome. The over breadth objection should also be overruled. If the objection is temporally based, Plaintiff suggests documents created or in use in 2003 (the year of the Citizen Complaint Review Board report) through 2006 (one year beyond Plaintiff's arrest, to investigate changes in policies and procedures designed to cure the defects that led to her wrongful arrest) be provided.

- RFP 7: All Documents constituting, referring to, or relating to any formal or informal MPD general orders, rule, regulations, policies, procedures, or practices in effect or under consideration defining or otherwise giving meaning to the offense of disorderly conduct, including any guidance provided on the appropriate use of the designation "Disorderly Conduct - Loud & Boisterous" and under what circumstances such behavior warrants detention or arrest.

> RESPONSE: Objection as vague, ambiguous, and overly broad and burdensome. Further objection under the deliberative process privilege. Notwithstanding the objections, see as Attachment 1, PD 163-MPD Arrest/Prosecution Report, Attachment 5 PD Form 61D (Violation Citation). See also, D.C. Official Code § 5-335.01, § 22-1321.

---

taken the following steps in response to PCB's recommendations: (1) prisoner processing procedures were revised in 2004 to incorporate "post and forfeit" information on the collateral receipt prepared to document posting or forfeiture of collateral, and the arrestee's collateral options would be printed and placed in a visible location at all facilities where arrests are processed; (2) refresher training on disorderly conduct law and procedures would be included as a topic area in the annual inservice and roll call training plans for all officers, and training tapes produced for the in-service training component on disorderly conduct would include an introduction from Chief Ramsey; and (3) consistent with Department policy, a sustained allegation that an arrest was improper would result in a recommendation for disciplinary action against the officer(s) involved.")

As noted above, one of the core issues in this case is the misuse of the disorderly conduct offense, and yet the District has produced **<u>zero</u>** documents regarding its policies and procedures for use of the disorderly conduct offense.  The District raised boilerplate objections and the deliberative process privilege.  The boilerplate objections should be rejected because what the request seeks is reasonably clear, the District's counsel has provided no explanation as to why it is unduly burdensome to provide the documents, and Plaintiff once again suggests a 2003-2006 time restriction.  As discussed above, following the November 19, 2003, Citizen Complaint Review Board report on the use of disorderly conduct arrests, the MPD spent (as reflected in its representations to the Police Complaints Board) considerable efforts revising its procedures and training for use of the disorderly conduct offense.  Plaintiff is entitled to these materials and they should be produced forthwith.

The District has also asserted an inapplicable deliberative process privilege. [9]  First, even the District cannot be asserting that this deliberative privilege applies to general orders, rule, regulations, policies, procedures, or practices <u>actually in effect</u>, yet the District provides no explanation for its failure to provide even these documents.  Second, the District has waived any possible claim of privilege by failing to provide a privilege log as required by Rule 26(b)(5)(A) and by failing to have an appropriate official assert the privilege based on personal consideration.[10]  Finally, even if some of the documents sought are "pre-decisional and deliberative" – a claim that Plaintiff cannot evaluate due to the absence of a privilege log – any

---

[9] Further, it is not clear that this privilege is recognized in the District of Columbia, as no D.C. Court of Appeals opinions discuss it.  *See In Re: Sealed Case (Medical Records)*, 381F.3d 1205, 1212 (D.C. Cir. 2004) ("[W]hen a Plaintiff asserts federal claims, federal privilege law governs, but when he asserts state claims, state privilege law applies.  What is unclear is the proper resolution in a case like this, where the Plaintiffs assert both federal and state claims, and relevant evidence may be privileged under one but not the other.").

[10] *See Landry v. FDIC*, 204 F.3d 1125, 1135 (D.C. Cir. 2000) (citing *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 399 (D.C. Cir. 1984)).

such deliberation are genuinely at issue in this case and therefore discoverable in spite of the privilege, which is a qualified one.

Courts applying the deliberative process privilege have recognized an exception where the deliberations sought are genuinely at issue. "Where the deliberations of the government are genuinely at issue, privileges designed to shield the deliberative process from public scrutiny 'may not be raised as a bar against disclosure.'" *Dept. of Economic Devel. v. Andersen*, 139 F.R.D. 295, 299 (S.D.N.Y. 1991) (citations omitted); *see also Dominion Cogen, D.C., Inc. v. District of Columbia*, 878 F. Supp. 258, 268 (D.D.C. 1995) (recognizing an exception to the deliberative process privilege where "the deliberative process itself [is] directly in issue"). In *Andersen*, the court found that government deliberations were at issue where analysis of fraud allegations required consideration of the government's knowledge of the defendant's activities and its reliance on the defendant's reports in deciding whether to approve grants. *Id.*

The District's decision-making process with regard to its policies, trainings, and practices for use of the disorderly conduct offense, post and forfeit procedure, and citation release procedure are directly put into issue by Plaintiff's claim of liability under the standards of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691. To establish § 1983 liability under *Monell*, Plaintiff must show that a District "policy or custom" that resulted in injury to her. *Id.* at 694. This policy or custom can include a failure to train or supervise its officers. It is not enough to merely prove that isolated acts of individual District employees led to her unlawful incarceration. As such, Plaintiff needs to take – and has attempted to take – discovery concerning the District's policies and customs surrounding the procedures utilized during her arrest and detention. This includes problems identified but not corrected and corrective actions considered but not taken by the District, especially once it had been notified of the problems with the MPDs use of disorderly

conduct and post and forfeit by the November 19, 2003, Citizen Complaint Review Board report.

Plaintiff is not shooting in the dark. The District was made explicitly aware of its problematic

policies and customs related to disorderly conduct and post and forfeit. Plaintiff's attempt to

establish *Monell* liability may very well turn on what the District knew, considered, and did in

response to Citizen Complaint Review Board's warnings.[11]

Furthermore, the deliberative process privilege, being a qualified privilege, can be

overcome by a sufficient showing of need. *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir.

1997). The court must balance competing interests, "taking into account factors such as the

availability of other evidence, the seriousness of the litigation, the role of the government, and

the possibility of future timidity by government employees." *Id.* Here, all of these factors weigh

in favor of disclosure, because the information sought is not available from any other source and

because governmental misconduct is at the heart of the matter. Indeed, "the privilege is routinely

denied" where there is reason to believe the documents sought may shed light on government

misconduct." *Id.* at 738-739 (quoting *Texaco Puerto Rico, Inc. v. Dep't. of Consumer Affairs*, 60

F.3d 867, 885 (1st Cir. 1995) (privilege not applied where it does not serve "the people's interest

in honest, effective government") and *In re Comptroller of the Currency*, 967 F.2d at 634 ("the

privilege may be overridden where necessary … to 'shed light on alleged government

malfeasance'"). Here, the District seeks to invoke this privilege in a manner that would prevent

the exposure of potential civil rights violations. Such shielding must give way to the public

interest in protecting basic civil rights, where, as here, the matter is serious and the role of the

government so central. *See Scott v. Bd. of Educ. of the City of East Orange*, 219 F.R.D. 333, 228

---

[11] If this Court declines to find that the District has waived its privilege through its failure to assert it properly or concludes that the documents requested are not at issue in this litigation, Plaintiff requests that the Court require the District to provide a privilege log and she reserves her right to challenge whether documents are actually predecisional and deliberative. *See In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *National Congress for Puerto Rican Rights ex rel. Perez v. City of New York*, 194 F.R.D. 88, 92 (S.D.N.Y. 2000).

(D.N.J. 2004) (deliberative process privilege unavailable where outweighed by the public interest in exposing civil rights violations).

Plaintiff therefore requests that the Court overrule the claim of privilege and order production of all responsive materials forthwith.

• <u>RFP 8</u>:  All Documents constituting, referring to, or relating to any formal or informal MPD general orders, rules, regulations, policies, procedures, or practices in effect or under consideration concerning the training or supervision of MPD officers regarding the post and forfeit procedure; including any training materials, and any Documents identifying the times, dates, and content of any such training.

> RESPONSE: Objection as overly broad and burdensome, and not related to any specific time period. Notwithstanding the objections, see Attachment 4, and 5.  This defendant does not have any responsive information at this time related to training. Discovery is ongoing and information will be provided as it becomes available.

This request seeks documents related to the training or supervision of MPD officers' use of the post and forfeit procedure.  The District has provided no responsive documents, and no explanation as to why it cannot do so.  It is unfathomable that the District does not have any training materials regarding the use of post and forfeit "at this time."  Presumably this response simply means that Counsel did not yet get the responsive documents from his client (the District), and that is not an acceptable response to discovery.  The District's counsel promised at the April 29-30 meet and confer to request them once again from his client, and yet, to date, has not provided them.  Plaintiff would, however, accept in lieu of responsive discovery a stipulation for purposes of this lawsuit that the District does not train or supervise its MPD officers in their use of the post-and-forfeit procedure.  The District's boiler plate objections are unsupported, except the time period objection, and Plaintiff once again suggests a 2003-2006 time period. Production of the responsive materials should be ordered forthwith.

•    <u>RFP 9</u>:  All Documents constituting, referring to, or relating to any records reflecting training actually received by the Individual Defendants and all of their supervisors relating to: post and forfeit procedure, citation release procedure, or the bases for arrest for the offense of disorderly conduct, and the times, dates, and content of any such training.

RESPONSE: See Response #8.

Plaintiff seeks the records of the training the individual defendants and their supervisors actually received on post-and-forfeit, citation release, and disorderly conduct.  The District merely references its response to RFP #8, which, after boiler plate objections, stated in essence that the District had not pulled together the responsive materials "at this time."  This response is utterly inadequate.  The District has provided no explanation for its failure to provide the individual defendant's and their supervisor's training records, either initially or after the District's counsel promised, during the April 29-30 meet and confer, to ask for them once again.

The District's boilerplate objections are meritless and unsupported, and should be stricken.  As Plaintiff's counsel explained during the meet and confer, the request was not overly broad or burdensome in that the request was tailored as to the three individual defendants and their supervisors and is legitimately unlimited as to a time period because training of these officers on these topics at any point in the individual defendants' careers is plainly relevant to Plaintiff's claims.

•    <u>RFP 10</u>:  All reports, studies, evaluations, recommendations or data compilations created by any individual, group, or entity concerning the post and forfeit or citation release procedures.

RESPONSE: Objection as overly broad and burdensome and as to relevance.  Further objection under the deliberative process privilege. This defendant does not have any responsive information.

The District boilerplate objections should be rejected since they are not made with sufficient specificity and because the requested documents are highly relevant to Plaintiff's claims, especially her claims against the District.[12]

The District's claim of the deliberative process privilege should also be overruled. As discussed more extensively above, the District has waived the privilege by failing to provide a privilege log or follow the proper procedures for claiming it. Further, it is unlikely that the privilege applies to the documents sought by this request, which are primarily factual documents. *See, e.g., Broderick v. Shad*, 117 F.R.D. 306 (D.D.C. 1987) (factual materials that do not reflect deliberative processes are not protected by the privilege). Further, the documents are also plainly at issue in this litigation because the District's knowledge of the "customs" of the MPD in employing post-and-forfeit (if those customs make out a violation) will establish the District's *Monell* liability.

Finally, the District's claim that it "does not have any responsive information" is implausible, especially in light of the Office of Police Complaints documents attached to this motion and in light of the *statutory requirement* that the Mayor produce an annual report to the City Council on this topic, *see* D.C. Code § 5-335.01(h). Those documents themselves were responsive to this request and not produced. It is likely that the MPD, the Office of Police Complaints, the Mayor's Office, and the City Council all have documents responsive to this request. During the meet and confer discussions, counsel for the District agreed to search for responsive materials, but has provided nothing further. The Court, therefore, should order the District to locate and produce responsive materials forthwith.

---

[12] If time period is a concern, Plaintiff again proposes 2003-2006 as a reasonable time period given the facts of this case.

• <u>RFP 11</u>:  All Documents constituting, referring to, or relating to the annual public reports submitted by the Mayor to the D.C. Council as required by D.C. Code § 5-335.01(h).

> RESPONSE: Objection as to relevance, vagueness, and overly broad, and as to relevance.

D.C. Code § 5-335.01(h) requires the Mayor to submit to the D.C. Counsel an annual report regarding the use of post-and-forfeit.  Plaintiff seeks this report and any documents the district prepared or submitted in conjunction with this report.  The District's objections are almost unfathomable.  The request – made with citation to the specific statutory requirement – cannot be called vague and is surely narrowly tailored.  It's relevance should be plain in a case where the Plaintiff seeks to prove that the District has failed to train or supervise its employees use of the post-and-forfeit procedure.  (Indeed, the City Council passed this requirement to help limit abuse of this procedure.)  The District should be required to produce the materials forthwith or state plainly that the Mayor has failed to comply with the statutory requirement.

• <u>RFPs 12 & 13</u>:

RFP 12:  All Documents related to arrests made between November 15, 2003 and November 16, 2007 involving either post and forfeit release, citation release, or arrest for Disorderly Conduct.

> RESPONSE: Objection as overly broad and burdensome, and as to relevance.  Notwithstanding the objections, see Responses 1, 5, 6 and 7.  Discovery is ongoing and additional information will be provided as it becomes available.

RFP 13:  All Documents referring or relating to arrests made by or involving the participation of any of the Individual Defendants in the following circumstances: (a) where post-and forfeit release was either offered or utilized; (b) where citation release

was either offered or utilized; or (c) where arrestees were charged with Disorderly

Conduct.

> RESPONSE: Objection as overly broad and burdensome, and as to
> relevance.  At this time, this defendant is unable to produce the
> requested information.  Discovery is ongoing and information will
> be provided as it becomes available.

The documents requested are essential to Plaintiff to establish the District's municipal

liability under § 1983 by showing that the District "policy or custom" – not merely the isolated

acts of certain officers – injured her.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691.  The

documents requested in RFPs 12 and 13 will be provided to Plaintiff's expert for statistical or

expert analysis to determine whether the type of misuse of post-and-forfeit and the disorderly

conduct offense at issue in this case rise to the level of "policy or custom."  The requested

information is therefore relevant, and the time period requested is reasonable for determining

whether a policy or custom exists.

The District's primary objection, from the meet and confer sessions, appears to be to the

burden of this request.  Plaintiff is willing to work with the District to make this request

reasonable, and has even offered to limit it to a one year period between November 2004 and

November 2005.  Plaintiff also proposed negotiating a more limited universe of documents

(perhaps, the form PD-163s and PD 67s for each arrest).  Yet the District's counsel, now over

three and a half months after discovery was served cannot tell Plaintiff's counsel how the

information is stored or why it would be difficult to comply with this request, which is necessary

so that the parties can figure out the least burdensome way for Plaintiff to get the information to

which she is entitled.

In the absence of explanation of why the District cannot comply with the request or reasonable engagement in determining a less burdensome way to provide the information, Plaintiff requests that the Court order the District to provide all of the information requested.

    •    <u>RFP 14</u>: Except in the instant case, all Documents related to any civil, criminal or other actions (including citizen complaints) against any of the Individual Defendants.

> RESPONSE: Objection as to relevance, and as overly broad and burdensome and it does not relate to any specific time period. Further objection as this defendant may be precluded from providing the requested information based on statute. See D.C. Official Code § 1-631.01, and 1-631.03.

This RFP requests all documents from any previous actions (including citizen complaints) against any of the individual defendants. This is a police misconduct case and it includes claims related to the District's failure to train and supervise its employees. The history of past complaints against the individual defendants is highly relevant to this lawsuit. Similarly, the breadth and burden objections are without merit. Plaintiff seeks actions and complaints against the individual defendants for their entire careers as MPD officers because actions and complaints against them at any time during their careers are potentially relevant. Nor can it be particularly burdensome to gather the complaints made against a mere three employees (certainly, the District's counsel has been unable to articulate why it should be unduly burdensome). The only remaining objection is that defendant "may be" precluded from providing the information by D.C. code. As discussed, above, this simply is not so. The District should be ordered to produce this material forthwith.

### B.    *Interrogatories*

    •    <u>Interrogatory No. 1.</u> This Interrogatory states: List the current home address of each of the Individual Defendants.

> ANSWER:  Objection as the request constitutes as unwarranted
> invasion of personal privacy, and is not relevant, nor will it lead to
> relevant evidence.  See Fed. R. Civ. P. 33.  Further objection as
> this defendant is precluded by statute from disclosing the requested
> information.  See D.C. Official Code § 1-631.01, and 1-631.03.

The information sought – the individual defendants' home addresses – is basic information that a court reporter would ask for, before a deposition even began.  It aids Plaintiff in investigating the background of the individual defendants.  It is also necessary so that Plaintiff can effectuate service on the individual defendants, for example, should she need to enforce a judgment.  An address to effectuate service is especially important in this case where the individual defendants have declined to authorize the MPD to receive service on their behalf.  As this Court is aware from the multiple extensions of time to serve the Complaint, it has been extremely difficult for Plaintiff to serve the individual defendants in this case.

Since no valid privilege protects this information, the District should be required to provide it forthwith.

• 	Interrogatory No. 2.  This Interrogatory states:  Identify the immediate supervisors of each of the Individual Defendants on November 15th and 16th, 2005.  Plaintiff's Instructions[13] requested that the District identify individuals by providing:  his or her name, present or last known address, present or last known employer, and, for MPD employees, badge number, position or job title at time of employment with the District of Columbia (whether as a consultant, part-time employee, full-time employee, or other type of employment) and dates of employment with the District of Columbia.

> ANSWER:  Objection as to relevance.  Notwithstanding the
> objection and further answering, Sgt. Smith of the 301 Substation
> was the immediate supervisor of the individually named

---

[13] The District has not objected to the Plaintiff's Interrogatory instructions, and so has waived any objections to them.

defendants on the nights of November 15, 2005, and November 16, 2005.

The individual defendants' immediate supervisors on the night of the incident at issue in this litigation ("the incident") can reasonably be expected to have information relevant to Plaintiff's claims. Furthermore, the individual defendants' supervisor (and his/her background) is relevant to Plaintiff's failure to supervise claims against the District. The District's relevance objection is plainly unfounded. The District identification of "Sgt. Smith," with none of the further identifying information requested, not even a first name, is simply not a good-faith attempt to comply with discovery. The District should be ordered to provide the responsive information forthwith.

• Interrogatory No.3. This Interrogatory states: Identify each MPD officer present in the 3100 Block of Mount Pleasant NW, Washington, DC, whether inside the 7-Eleven, on the street, or elsewhere, from any time between 11:00 p.m. on November 15, 2005 through 3:00 a.m. on November 16, 2005, and describe what, if any, contact each had with Plaintiff.

> ANSWER: Objection as overly broad and burdensome, and as to relevance. Notwithstanding the objections and further answering, Officers L. Acebal, J. Antonio and J. Morales, Sgt Smith and Officer Paige of the Substation 301 were in the vicinity of the 7-11. Officer Acebal was the arresting officer, while Officers Antonio and Morales assisted.

The District's boilerplate objections should be overruled. The officers who were at the location of the incident during the timeframe it occurred can reasonably be expected to have witnessed the incident, and therefore the request is plainly relevant to Plaintiff's claims. Nor is obtaining the information unduly burdensome[14]: the District's counsel can start by talking to the

---

[14] These objections are clearly boilerplate and made without investigation of the burdensomeness of obtaining the information. During the party's telephone conferences, the District's counsel could at no point articulate why the District could not provide this information (or the information responsive to any other request), and promised to request it again from the MPD.

individual defendants and their supervisor, "Sgt. Smith."  He can also consult duty logs and ask officers on duty whether they were at the location and who else was at the location.  This is not an unduly burdensome task.  Further, the time period is not overly broad – there is some dispute as to the exact time of the incident, and the District should not have difficulty identifying the officers for this narrowly-tailored four hour window.

Responding to this request, the District identified the individual defendants and their supervisor "Sgt. Smith."  One of Plaintiff's witnesses has stated that there were several other officers who were at the scene and who stood around and watched the incident.  If, contrary to this witness, the District is going to take the position in this litigation that there were no other officers at the location of the incident besides the individual defendants and their immediate supervisor, then it should plainly state so rather than hiding behind inapplicable relevance, breadth, and burden objections.  Plaintiff also requests that the District provide all of the information requested for each individual identified – <u>full</u> name, present or last known address, present or last known employer, and, for MPD employees, badge number, position or job title at time of employment with the District of Columbia (whether as a consultant, part-time employee, full-time employee, or other type of employment) and dates of employment with the District of Columbia.

• <u>Interrogatory No. 4.</u>  This Interrogatory states:  Identify the station crew on duty at the time of Plaintiff's transportation to the MPD station or substation to which she was brought on November 16, 2005.

ANSWER:[15] Objection as overly broad and burdensome, and as to relevance.  Notwithstanding the objections and further answering, upon information and belief, Toniere Lee, David Anderson, Latrice

---

[15] This response is the District's amended response provided on May 15, 2008.  It is the only Interrogatory for which the District provided an amended response.

> Washington-Burney and Everette Copelan were the station crew
> during the midnight tour (2200-0630) on November 15, 2005.

The District's relevance and burden objections are clearly boilerplate, and of no applicability. The length and circumstance of Plaintiff's detention and the timing and method of her release are at issue in this case. The station crew, with many of whom Plaintiff or Plaintiff's friend Mr. Marsoni (who went to the stationhouse to obtain her release) interacted, have or may have relevant information. Identifying the station crew is not unduly burdensome; the District undoubtedly has duty logs or other records of the staffing of its stationhouses. Further, the District's response should not be "on information and belief." If the four individuals identified constitute the *entire* station crew, the District should say so plainly or resubmit their responses without the boilerplate objections. If this is not the full crew, the District should identify the full crew.

The District's over breadth objection is apparently directed to the time frame of the request. The District answered as to the midnight shift only (2200 to 0630). Because there is currently some dispute as to the time of Plaintiff's release, which may have occurred after 0630 on November 16, 2005, Plaintiff needs the District to identify the station crew for the shift beginning at 0630. Plaintiff does not need information on any other shifts. Additionally, Plaintiff requests that the District provide all of the information requested in her instructions for each individual identified.

• <u>Interrogatory No. 5</u>. This Interrogatory states: Identify each individual who interacted with Plaintiff or authored any of the police paperwork relating to her arrest or release between November 15th and 16th, 2005.

> ANSWER: Objection as overly broad and burdensome, and as to
> relevance. Notwithstanding the objections and further answering,
> Officer L. Acebal completed the Arrest/Prosecution Report related

> to the Plaintiffs November 16, 2005, arrest and Station Clerk T.
> Lee completed the Plaintiff's Collateral Bond Receipt.

In response to this Interrogatory, the District raised boilerplate objections and declined to answer the interrogatory beyond identifying the two officers who signed paperwork related to Plaintiff. The District's boilerplate objections should be overruled and the District should be required to respond fully to the Interrogatory. (Defendant's counsel can find the answer to this question by talking to the individual defendants and the other officers identified and to be identified in response to Interrogatories 2 through 4.) The District should also be required to provide all of the information requested in Plaintiff's instructions for each individual identified.

- Interrogatory No. 6 and 7.

Interrogatory 6 states: Identify anyone involved in informing Plaintiff or Adrien Marsoni that Plaintiffs release could be secured by payment of a $25.00 bond on the scene.

> ANSWER: Objection as overly broad and burdensome.
> Notwithstanding the objections and further answering, upon
> information and belief, Officer J. Antonio informed both the
> Plaintiff and Adrien Marsoni that the Plaintiff could be bailed out
> at the Third District Stationhouse.

Interrogatory 7 states: Explain whether it was consistent with MPD policies, procedures, and practices for officers to solicit payment of a $25.00 bond on the scene of the arrest to obtain Plaintiffs immediate release and, if so, how.

> ANSWER: Objection as this request seeks a conclusion. Further
> objection as to form. This defendant did not solicit payment of any
> kind. Notification was made to Plaintiff of the option to post and
> forfeit.

The District's responses to these two Interrogatories are contradictory, confusing, and nonresponsive. Taken together these interrogatories seek information about who talked to Plaintiff and her companion about posting a bond pursuant to the "post-and-forfeit" procedures, whether any such discussion occurred on the scene of the arrest, and whether MPD policies

permit the payment of such bond to be made on the scene of any arrest. The District's responses are incongruous. On the one hand, it is undisputed that Plaintiff paid (*i.e.*, "posted and forfeited") a $25 bond. Yet the District's response to Int. 7 is: "This defendant did not solicit payment of any kind," and its response to Int. 6 states that Officer Antonio informed the Plaintiff and her companion that they could be "bailed out" at the stationhouse. The responses use different terms – "bailed out" and "post and forfeit" – in a manner that makes it impossible for Plaintiff to know if these terms describe the same procedure, which is a central issue to Plaintiff's Complaint. During the parties' meet and confer discussions, the District's counsel agreed to ascertain whether a more precise response could be given. Nevertheless, the District has failed to supplement its responses. The District should be ordered to clarify these responses.

•    <u>Interrogatory No. 8</u>. This Interrogatory states: For each of the years 2004-2007, provide the total number of MPD arrests for Disorderly Conduct: (a) in which the post and forfeit was involved; or (b) in which citation release was involved; or (c) in which neither procedure was utilized.

> ANSWER: Objection as overly broad and burdensome, and as to relevance. Notwithstanding the objections and without waiver thereto, upon information and belief, the MPD cases involving post and forfeit were as follows: 2004 = 1,397; 2005 = 1,194; 2006 = 1,411; 2007 = 1,326. MPD arrest involving citation releases were as follows: 2004 = 0; 2005 = 0; 2006 = 5; 2007 = 6. In addition, MPD arrests involving neither were as follows: 2004 = 9,340; 2005 = 10,709; 2006 = 13,362; 2007 = 13,273.

Plaintiff requires the District to clarify whether the statistics provided in response to Interrogatory 8 are statistics for *disorderly conduct* arrests or all MPD arrests. The District's counsel promised to clarify this during meet and confer, but has failed to do so. If the statistics provided are the latter (all MPD arrests), the District should be compelled to provide the information requested (the statistics for disorderly conduct arrests). Plaintiff also requests that

the Court order the District to amend its response so that it is no longer made "upon information and belief."  There is no basis for the District to be providing arrest statistics "upon information and belief."[16]

- Interrogatories No. 9 and 10.

Interrogatory 9 states:  For each of the arrests identified in response to Interrogatory 8, provide the following information:

      a.      Name of Arrestee
      b.      Date and Time of Arrest
      c.      Arrest Number
      d.      Location of Arrest
      e.      Name of Arresting Officer (AO) and Assisting Arresting Officer (AAO)
      f.      Whether Arrestee was permitted to post and forfeit, was given citation release, or neither.

      ANSWER: Objection as to relevance, vagueness, and overly broad. See Fed. R. Civ. P. 33.

Interrogatory 10 states:  For every arrest between November 15, 2003 and November 16, 2007 involving post and forfeit or citation release for all offenses other than Disorderly Conduct, provide the following information:

      a.      Name of Arrestee
      b.      Date and Time of Arrest
      c.      Arrest Number
      d.      Location of Arrest
      e.      Name of Arresting Officer (AO) and Assisting Arresting Officer (AAO)
      f.      Whether Arrestee was permitted to post and forfeit, was given citation release, or was held.

      ANSWER: Objection as to relevance, vagueness, and overly broad. See Fed. R. Civ. P. 33. Further objecting, this interrogatory seeks information that could be a matter of public record and thereby equally accessible to all parties.

---

[16] Plaintiff also notes that she raised concerns that these figures are somewhat inconsistent with publicly available statistics for previous years and asked the District to verify the figures.  So far, she has received no response. Plaintiff plans to provide these statistics to her expert.  Plaintiff will (as counsel stated during the April 29-30 meet-and-confer) seek costs for her expert's time if she provides these figures to her expert and they later turn out to be materially incorrect.

The information sought by Interrogatories 9 and 10 is critical for establishing the District's municipal liability under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691. The information sought in Interrogatories 9 and 10 will be used by Plaintiff's expert for statistical or expert analysis to determine whether the type of misuse of post-and-forfeit and the disorderly conduct offense at issue in this case rises to the level of "policy or custom."

The District has not made a burden objection to these two interrogatories, and therefore has waived any such objection. Because the Interrogatories are relevant, not at all vague, and reasonably tailored as to time, a response to the Interrogatories should be compelled. The District has indicated in meet and confer sessions that it is concerned about the burden of these requests, despite that it has waived any objection on those grounds. Plaintiff is nonetheless willing to work with defendant, and has offered to accept information for only November 2004 through November 2005, and to accept documents (such as form PD-163s and PD 67s for these arrests) in lieu of an Interrogatory response.[17] Whether by Interrogatory response or document production, Plaintiff requests that the Court order the District to produce the relevant information.

The District explained during the April 29-30 meet and confer, that its objection on the grounds that "this interrogatory seeks information that could be a matter of public record and thereby equally accessible to all parties" was made because Plaintiff was entitled to ask for this information through a FOIA request. Of course, that Plaintiff could request under FOIA much of

---

[17] It is also difficult to know how much to credit Plaintiff's belated claims on burden since the District has been unable to provide responsive information to even Plaintiff's *least* burdensome requests. Since counsel for the District has no knowledge of how this information is kept or what would be needed to assemble it, it is impossible to evaluate whether it would be *unduly* burdensome for the District to render a response.

the information she is seeking in discovery in no way relieves the District of its discovery

obligations.[18]

•    Interrogatory No. 11. This Interrogatory states: Including the arrests

identified in Interrogatories 7 and 9, provide the total number of MPD arrests that involved the

post and forfeit procedure between November 15, 2003and November 16, 2007.

> ANSWER: Objection as overly broad and burdensome.
> Notwithstanding the objections and without waiver thereto, upon
> information and belief, 5,393.

Plaintiff accepts the District's response to Interrogatory 11 in substance, but requests that

the Court order the District to amend its response so that it is no longer made "upon information

and belief." There is no basis for the District to be providing arrest statistics "upon information

and belief."[19]

•    Interrogatory No. 12. This Interrogatory states: For each Complaint that

has been made to or filed with the MPD, the Office of Police Complaints, or the Office of

Professional Responsibility (or any other municipal entity) about or against any of the Individual

Defendants, provide the following information:

> a.    Name and Address of Complainant
> b.    Date of Complaint
> c.    Nature of the Complaint
> d.    Date of Incident about which Complaint was made
> e.    Name and Badge Number of each MPD Officer, including any of the
>       Individual Defendants, named in Complaint
> f.    Disposition of Complaint, including any disciplinary action taken

> ANSWER: Objection as to relevance, vagueness, and overly
> broad. See Fed. R. Civ. 33. Further objecting, this defendant is

---

[18] The District's suggestion that Plaintiff could FOIA this information does, however, undercut its argument that the information cannot be assembled.

[19] As with Interrogatory 8, Plaintiff also raised concerns that this figure is inconsistent with publicly available statistics for previous years and asked the District to verify the figures. She has received no response. Plaintiff will seek costs for her expert's time if she provides these figures to her expert and they later turn out to be materially incorrect.

precluded by statute from disclosing the requested information.
See D.C. Official Code § 1-631.01, and 1-631.03.

The District's boilerplate relevance, vagueness, and over breadth objections should be overruled. Prior complaints against the individual defendants are highly relevant, especially to Plaintiff's failure to supervise and failure to train claims against the District. The request is not vague, and its breadth is reasonably limited to formal complaints against these three officers. Finally, as discussed above, the cited code sections simply do not prohibit the District from providing this information. The Court should compel its production forthwith.

• Interrogatory No. 13: This Interrogatory states: Identify whether the date and time an individual who is arrested is released is recorded, and, if so, identify where and for how long this information is stored.

ANSWER: Objection, as it vague and ambiguous. Notwithstanding the objection and further answering, at this time, this defendant lacks sufficient information to respond to this request. Should information become available, this defendant will supplement the response.

This Interrogatory seeks to determine whether and in what form the MPD records the time at which an arrestee is released and, further, to determine the document retention policy for that information. This request is reasonably clear and, if the District suffered any genuine confusion as to the information sought, it was cleared up during the April 29-30 meet and confer. The District has nonetheless continued to fail to provide this simple information which should be easy to obtain.

C.      *Overall Conduct and Expenses*

Not to be lost in the minutiae of these individual requests is that the District has failed to provide responsive, relevant material to which it has claimed no privilege and which even the District's counsel acknowledges must be produced. This, despite 112 days since the discovery

requests were served.  The District has provided no responsive information to the majority of

Plaintiff's requests.  The only documents that the District has produced are the documents from

Plaintiff's arrest (responsive to RFP 1, the only RFP on which Plaintiff has not been forced to

move to compel), and three procedure documents, none of which relate to the procedures at the

core of this case.[20]  This is an astonishing approach to discovery obligations.

Given the egregious nature of the District's approach to discovery thus far, Plaintiff prays

that the Court take a firm hand managing discovery going forward.  The District should provide

its belated discovery quickly and by a date certain.  Plaintiff also requests that the District be

required to document its efforts to find the responsive documents and information, in case it fails

to produce the required material or makes a paltry and incomplete production.  Plaintiff fears she

will end up back in the position she is in today—not only without documents but also without

knowledge as to why those documents are not being obtained by counsel from his client.

Finally, Plaintiff prays for the expenses associated with preparing this motion, in

accordance with Federal Rule of Civil Procedure 37(a)(5).

## **CONCLUSION**

For these reasons, the Motion should be granted and the District should be compelled to

comply with its discovery obligations forthwith.  Plaintiff further prays for the expenses

associated with drafting and filing this motion.

DATED:  June 6, 2008

Respectfully submitted,

_____//s//_____

John Moustakas (D.C. Bar No. 442076)

---

[20] Two of these documents relate to citation release, which Plaintiff asked for because Plaintiff maintains that this is an alternative procedure that should have been offered to her.  The third document related to Violation Citation (essentially, a ticket), a non-arrest procedure which Plaintiff did not ask for and which is not applicable to Plaintiff's situation.

Sarah Keast (D.C. Bar No. 493632)
Goodwin Procter LLP
901 New York Ave., N.W.
Washington, D.C.  20001
Tel.: (202) 346-4000
Fax: (202) 346-4444

Arthur B. Spitzer (DC Bar #235960)
Frederick V. Mulhauser (DC Bar # 455377)
American Civil Liberties Union
      of the National Capital Area
1400 20th Street, NW, Suite 119
Washington, DC 20036
(202) 457-0800
(202) 452-1868 (fax)

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | | |
|---|---|---|
| LINDSAY HUTHNANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-CV-1871 (HKK) |
| | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## [PROPOSED] ORDER

Before the Court is Plaintiff Lindsay Huthnance's motion to compel made

pursuant to Rule 37(a)(3)(B) the Defendant District of Columbia to provide responses to

her Rule 33 Interrogatories and to produce documents responsive to her Rule 34 requests

for production.

The Court hereby orders that the Defendant District of Columbia's claims of

privilege are overruled.

The Court hereby orders the District of Columbia to produce all information or

documents in its possession, custody, or control which are responsive to Plaintiff's

discovery requests within 14 days of this Order.

The Court hereby orders that counsel for the District of Columbia document the

efforts undertaken to obtain responsive information and documents to date and those

taken subsequent to this Order.

The Court hereby orders the District of Columbia pay Plaintiff's expenses

associated with obtaining compliance with the District's discovery obligations.

DATED:

So ORDERED:

_____

# EXHIBIT A

### UNITED STATES DISTRICT COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | | |
|---|---|---|
| LINDSAY HUTHNANCE, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case Number: 06-CV-1871 (HKK) |
| | ) | |
| DISTRICT OF COLUMBIA, *et. al.,* | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT DISTRICT OF COLUMBIA'S RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant District of Columbia (hereafter "the District"), by and through, LaShawna Lynch, Paralegal Specialist, Office of the Attorney General, 441 4th Street, N.W. Washington, D.C., 20001, pursuant to Fed. R. Civ. P. 33, having been first duly sworn under oath, upon information and belief, gives the following answers to interrogatories propounded to this defendant by plaintiff:

(a) The information supplied in these answers is not based solely on the knowledge of the executing party, but includes knowledge of the party, its agents, representatives, and attorneys, unless privileged.

(b) The word usage and sentence structure may be that of the attorney assisting in the preparation of these answers and thus, does not necessarily purport to be the precise language of the executing party.

(c) Defendant reserves the right to amend, revise, or supplement its answers to these interrogatories if and when new or different information becomes available.

(d) For any additional responsive information made available through deposition testimony, the defendant incorporates such information for the purposes of giving the

plaintiff notice that such information exists, but does not adopt such testimony as accurate and complete.

(e) Defendant may provide documents which will answer plaintiff's interrogatory in accordance with Fed. R. Civ. P. 33.

## General Objections

Defendant objects to the production of any documents or information, which is protected by the attorney-client privilege, deliberative process privilege, work product doctrine or any similarly recognized privilege. Inadvertent production of any information or documents so privileged does not constitute a waiver of such privilege or any other grounds for objecting to the discovery request. Additionally, defendant objects to any part of the plaintiff's instructions which seeks to impose any discovery requirements outside the scope of the rules, especially any obligation to produce information not in the defendant's control or not currently known to it after reasonable inquiry.

## INTERROGATORIES

1.     List the current home addresses of each of the Individual Defendants.

**ANSWER:  Objection as the request constitutes as unwarranted invasion of personal privacy, and is not relevant, nor will it lead to relevant evidence.  See Fed. R. Civ. P. 33.  Further objection as this defendant is precluded by statute from disclosing the requested information.  See D.C. Official Code §§ 1-631.01, and 1-631.03.**

2.     Identify the immediate supervisors of each of the Individual Defendants on November 15th and 16th, 2005.

**ANSWER: Objection as to relevance.   Notwithstanding the objection and further answering, Sgt. Smith of the 301 Substation was the immediate supervisor of the individually named defendants on the nights of November 15, 2005, and November 16, 2005.**

3.      Identify each MPD officer present in the 3100 Block of Mount Pleasant NW, Washington, D.C., whether inside the 7-Eleven, on the street, or elsewhere, from any time between 11:00 p.m. on November 15, 2005 through 3:00 a.m. on November 16, 2005, and describe what, if any, contact each had with Plaintiff.

**ANSWER: Objection as overly broad and burdensome, and as to relevance. Notwithstanding the objections and further answering, Officers L. Acebal, J. Antonio and J. Morales, Sgt Smith and Officer Paige of the Substation 301 were in the vicinity of the 7-11. Officer Acebal was the arresting officer, while Officers Antonio and Morales assisted.**

4.      Identify the station crew on duty at the time of Plaintiff's transportation to the MPD station or substation to which she was brought on November 16, 2005.

**ANSWER: Objection as overly broad and burdensome, and as to relevance. Notwithstanding the objections and further answering, upon information and belief, Officer Paige of Substation 301 transported the plaintiff to the Third District Stationhouse. At this time, this defendant lacks sufficient information to identify who was on duty when plaintiff was taken to the substation on or about November 16, 2005. Should information become available, this defendant will supplement the response.**

5.    Identify each individual who interacted with Plaintiff or authored any of the police paperwork relating to her arrest or release between November 15th and 16th, 2005.

**ANSWER: Objection as overly broad and burdensome, and as to relevance. Notwithstanding the objections and further answering, Officer L. Acebal completed the Arrest/Prosecution Report related to the plaintiff's November 16, 2005, arrest and Station Clerk T. Lee completed the plaintiff's Collateral Bond Receipt.**

6.    Identify anyone involved in informing Plaintiff or Adrien Marsoni that Plaintiffs release could be secured by payment of a $25.00 bond on the scene.

**ANSWER: Objection as overly broad and burdensome. Notwithstanding the objections and further answering, upon information and belief, Officer J. Antonio informed both the plaintiff and Adrien Marsoni that the plaintiff could be bailed out at the Third District Stationhouse.**

7.    Explain whether it was consistent with MPD policies, procedures, and practices officers to solicit payment of a $25.00 bond on the scene of the arrest to obtain Plaintiffs immediate release and, if so, how.

**ANSWER: Objection as this request seeks a conclusion. Further objection as to form. This defendant did not solicit payment of any kind. Notification was made to plaintiff of the option to post and forfeit.**

8.    For each of the years 2004-2007, provide the total number of MPD arrests for Disorderly Conduct: (a) in which the post and forfeit was involved; or (b) in which citation release was involved; or (c) in which neither procedure was utilized.

**ANSWER: Objection as overly broad and burdensome, and as to relevance. Notwithstanding the objections and without waiver thereto, upon information and**

belief, the MPD cases involving post and forfeit were as follows: 2004 = 1,397; 2005 = 1,194; 2006 = 1,411; 2007 = 1,326. MPD arrest involving citation releases were as follows: 2004 = 0; 2005 = 0; 2006 = 5; 2007 = 6. In addition, MPD arrests involving neither were as follows: 2004 = 9,340; 2005 = 10,709; 2006 = 13,362; 2007 = 13,273.

9.      For each of the arrests identified in response to Interrogatory 8, provide the following information:

        a.  Name of Arrestee
        b.  Date and Time of Arrest
        c.  Arrest Number
        d.  Location of Arrest
        e.  Name of Arresting Officer (AO) and Assisting Arresting Officer (AAO)
        f.  Whether Arrestee was permitted to post and forfeit, was given citation release, or neither.

**ANSWER: Objection as to relevance, vagueness, and overly broad. See Fed. R. Civ. P. 33.**

10.     For every arrest between November 15, 2003 and November 16, 2007 involving post and forfeit or citation release for all offenses other than Disorderly Conduct, provide the following information:

        a.  Name of Arrestee
        b.  Date and Time of Arrest
        c.  Arrest Number
        d.  Location of Arrest
        e.  Name of Arresting Officer (AO) and Assisting Arresting Officer (AAO)
        f.  Whether Arrestee was permitted to post and forfeit, was given citation release, or was held.

**ANSWER: Objection as to relevance, vagueness, and overly broad. See Fed. R. Civ. P. 33. Further objecting, this interrogatory seeks information that could be a matter of public record and thereby equally accessible to all parties.**

11.    Including the arrests identified in Interrogatories 7 and 9, provide the total number of MPD arrests that involved the post and forfeit procedure between November 15, 2003 and November 16, 2007.

**ANSWER:  Objection as overly broad and burdensome.  Notwithstanding the objections and without waiver thereto, upon information and belief, 5,393.**

12.    For each Complaint that has been made to or filed with the MPD, the Office of Police Complaints, or the Office of Professional Responsibility (or any other municipal entity) about or against any of the Individual Defendants, provide the following information:

> a.  Name and Address of Complainant
> b.  Date of Complaint
> c.  Nature of the Complaint
> d.  Date of Incident about which Complaint was made
> e.  Name and Badge Number of each MPD Officer, including any of the Individual Defendants, named in Complaint
> f.  Disposition of Complaint, including any disciplinary action taken

**ANSWER:  Objection as to relevance, vagueness, and overly broad.  See Fed. R. Civ. 33.  Further objecting, this defendant is precluded by statute from disclosing the requested information.  See D.C. Official Code §§ 1-631.01, and 1-631.03.**

13.    Identify whether the date and time an individual who is arrested is released is recorded, and if so, identify where and for how long this information is stored.

**ANSWER:  Objection, as it vague and ambiguous.  Notwithstanding the objection and further answering, at this time, this defendant lacks sufficient information to respond to this request.  Should information become available, this defendant will supplement the response.**

14.     Identify any statement made by the District of Columbia and its agents and the

Individual Defendants, relating to Plaintiff's arrest, detention and release or the litigation

that resulted therefrom.

**ANSWER:  Objection as ambiguous, vague, and overly broad.  Notwithstanding the**

**objections, see police report, Attachment 1 enclosed with the Request For**

**Production Documents.**

Pursuant to Fed. P. Civ. R. 33, I have been designated by the District to respond

to the above discovery requests.  I have read the foregoing answers to interrogatories, and

they are true to the best of my knowledge, information and belief.

LaShawna Lynch
Paralegal Specialist

SWORN AND SUBSCRIBED before me, a Notary Public, this *18th* day of

April 2008.

Notary Public, DC

My Commission Expires: *March 31st, 2013*

As to objections:                         Respectfully submitted:

PETER J. NICKLES
Interim Attorney General for the District of
Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

_Eric Glover / B_

ERIC S. GLOVER [83200]
Assistant Attorney General
441 4th Street, N.W., 6th Floor North
Washington, DC 20001
(202) 442-9754; (202) 724-6295
(202) 727-3625 (fax)
E-mail: eric.glover@dc.gov

## CERTIFICATE OF SERVICE

I hereby certify that true copies of the foregoing responses to plaintiff's

interrogatories were mailed first-class this _18th_ day of April 2008, to:

_Eric Glover / B_

ERIC GLOVER
Assistant Attorney General

# EXHIBIT B

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | | |
|---|---|---|
| LINDSAY HUTHNANCE, *et al.,* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case Number: 06-C1871 (HKK) |
| | ) | |
| DISTRICT OF COLUMBIA, *et. al.* | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT DISTRICT OF COLUMBIA RESPONSES TO PLAINTIFFS' FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Fed. R. Civ. P. 34, defendant **DISTRICT OF COLUMBIA** responds to plaintiff's Request for Production of Documents as follows:

### General Objections

Defendant objects to the production of any documents or information which is protected by the attorney-client privilege, deliberative process privilege, work product doctrine or any similarly recognized privilege. Inadvertent production of any information or documents so privileged does not constitute a waiver of such privilege or any other grounds for objecting to the discovery request. Additionally, defendant objects to any part of the plaintiff's instructions which seeks to impose any discovery requirements outside the scope of the rules, especially any obligation to product information not in the defendant's control or not currently known to it after reasonable inquiry.

1

## RESPONSES TO DOCUMENT REQUESTS

1.    All Documents referring or relating to Plaintiff, whether by name, Social Security number, or any other means of identification, including all police paperwork filled out in connection with Plaintiffs arrest and the results of any NCIC, WALES, or similar queries respecting Plaintiffs prior arrest record.

**RESPONSE: Objection as overly broad and burdensome. Notwithstanding the objections and without waiver thereto, see Attachment 1, PD 163-MPD Arrest/ Prosecution Report, Attachment 2, PD 168-MPD Court Case Review Form, and PD 67-MPD Collateral/Bond Receipt.**

2.    All Documents referring or relating to the arrest and detention of Plaintiff (and any encounter that preceded it) on November 15th and 16th, 2005, including, without limitation, any police reports, witness statements, log entries, video recordings, post and forfeit paperwork, and all radio communications/transmissions relating to Plaintiffs arrest, detention, and transportation and identifying all MPD personnel on the scene of Plaintiffs arrest, detention and transportation (and any encounter that preceded it) and returning to service thereafter.

**RESPONSE: See Response #1.**

3.    All Documents identifying MPD officers working in PSA 301 on November 15th and 16th, 2005 (3-11 shift 11/15; midnight shift 11/15-16; day shift 11/16), and any other MPD officers on special assignments, details, initiatives, or shifts that involved deployment within or around PSA 301 on those dates, including but not limited to any log books entries, rosters, roll call attendance sheets, time and attendance records for the Third District Station and Substations, and any dispatcher records.

**RESPONSE: This defendant does not have any responsive information at this time. Discovery is ongoing and information will be provided as it becomes available.**

4.    For each of the Individual Defendants, all Documents constituting their personnel records, including all Documents constituting, referring to, or relating to their performance evaluations, informal and formal complaints filed against them, and any disciplinary actions taken against them.

**RESPONSE:  Objection, seeks confidential personnel information protected under DC Official Code §1-631.01, §1-632.03, §5-113.01, §5-113.06 and 3102.01 of the District Personnel Manual, and as it constitutes as unwarranted invasion of personal privacy.**

5.    A copy of the MPD General Orders.

**RESPONSE:  Objection as to overly broad, vague.  Further objection as to relevance.  Notwithstanding the objections, see Attachments 4 and 5, and Special Order at Attachment 6.**

6.    All Documents constituting, referring to, or relating to any formal or informal MPD general orders, rule, regulations, policies, procedures, or practices in effect or under consideration at any time that concern post and forfeit or citation release procedures.

**RESPONSE: Objection as overly broad and burdensome.  Notwithstanding the objections, see Attachment 4, General Order 502-06 – Citation Release Program, Attachment 5 – PD Form 61D (Violation Citation) and Attachment 6, SO-02-06 – Citation Release Processing.**

7. All Documents constituting, referring to, or relating to any formal or informal MPD general orders, rule, regulations, policies, procedures, or practices in effect or under consideration defining or otherwise giving meaning to the offense of disorderly conduct, including any guidance provided on the appropriate use of the designation "Disorderly Conduct - Loud & Boisterous" and under what circumstances such behavior warrants detention or arrest.

**RESPONSE: Objection as vague, ambiguous, and overly broad and burdensome. Further objection under the deliberative process privilege. Notwithstanding the objections, see as Attachment 1, PD 163-MPD Arrest/ Prosecution Report, Attachment 5 PD Form 61D (Violation Citation). See also, D.C. Official Code § 5-335.01, § 22-1321.**

8. All Documents constituting, referring to, or relating to any formal or informal MPD general orders, rules, regulations, policies, procedures, or practices in effect or under consideration concerning the training or supervision of MPD officers regarding the post and forfeit procedure; including any training materials, and any Documents identifying the times, dates, and content of any such training.

**RESPONSE: Objection as overly broad and burdensome, and not related to any specific time period. Notwithstanding the objections, see Attachment 4, and 5. This defendant does not have any responsive information at this time related to training. Discovery is ongoing and information will be provided as it becomes available.**

9. All Documents constituting, referring to, or relating to any records reflecting training actually received by the Individual Defendants and all of their supervisors

4

relating to: post and forfeit procedure, citation release procedure, or the bases for arrest for the offense of disorderly conduct, and the times, dates, and content of any such training.

**RESPONSE:  See Response #8.**

10.     All reports, studies, evaluations, recommendations or data compilations created by any individual, group, or entity concerning the post and forfeit or citation release procedures.

**RESPONSE:  Objection as overly broad and burdensome and as to relevance. Further objection under the deliberative process privilege.  This defendant does not have any responsive information.**

11.     All Documents constituting, referring to, or relating to the annual public reports submitted by the Mayor to the D.C. Council as required by D.C. Code § 5-335.01(h).

**RESPONSE:  Objection as to relevance, vagueness, and overly broad, and as to relevance.**

12.     All Documents related to arrests made between November 15, 2003 and November 16, 2007 involving either post and forfeit release, citation release, or arrest for Disorderly Conduct.

**RESPONSE:  Objection as overly broad and burdensome, and as to relevance. Notwithstanding the objections, see Responses 1, 5, 6 and 7.  Discovery is ongoing and additional information will be provided as it becomes available.**

11.     All Documents referring or relating to arrests made by or involving the participation of any of the Individual Defendants in the following circumstances: (a)

where post-and forfeit release was either offered or utilized; (b) where citation release

was either offered or utilized; or (c) where arrestees were charged with Disorderly

Conduct.

**RESPONSE: Objection as overly broad and burdensome, and as to relevance.**

**At this time, this defendant is unable to produce the requested information.**

**Discovery is ongoing and information will be provided as it becomes**

**available.**

12.    All Documents, including statistics, compilations, studies, reports, data,

guidelines referring or relating to the policy regarding the time elapsed between when a

person electing to post and forfeit provides the post money and the time that person is

released from custody.

**RESPONSE: Objection as vague and ambiguous.**

13.    Except in the instant case, all Documents related to any civil actions, or other

complaint, criticisms, and challenges, arising from the use of MPD's post and forfeit

procedures.

**RESPONSE: Objection as overly broad and burdensome as it is not related to**

**any specific time period. Further objection as to relevance. This defendant is**

**unable to produce any responsive information at this time. Discovery is**

**ongoing and information will be provided as it becomes available.**

14.    Except in the instant case, all Documents related to any civil, criminal or other

actions (including citizen complaints) against any of the Individual Defendants.

**RESPONSE: Objection as to relevance, and as overly broad and burdensome**

**and it does not relate to any specific time period. Further objection as this**

6

**defendant may be precluded from providing the requested information based on**

**statute.  See D.C. Official Code §§ 1-631.01, and 1-631.03.**

Respectfully submitted:

PETER J. NICKLES
Interim Attorney General for the District of
Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

ERIC S. GLOVER [83200]
Assistant Attorney General
441 4th Street, N.W., 6th Floor North
Washington, DC 20001
(202) 442-9754; (202) 724-6295
(202) 727-3625 (fax)
E-mail:  eric.glover@dc.gov

## CERTIFICATE OF SERVICE

I hereby certify that true copies of the foregoing responses to plaintiff's

interrogatories were mailed first-class this 18th day of April 2008, to:

John Moustakas, Esq.
Sarah Keast, Esq.
Goodwin Procter LLP
901 New York Avenue, NW
Washington, DC 20001

Arthur B. Spitzer, Esq.
Frederick V. Mulhauser, Esq.
American Civil Liberties Union of the National Capital Area
1400 20th Street, NW, Suite 119
Washington, DC 20036

ERIC GLOVER
Assistant Attorney General

7

# EXHIBIT C

# GOODWIN | PROCTER

John Moustakas
202.346.4236
jmoustakas@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
901 New York Avenue NW
Washington, DC 20001
T: 202.346.4000
F: 202.346.4444

May 5, 2008

Eric S. Glover, Esq.
Assistant Attorney General
   for the District of Columbia
441 4th Street, N.W.
6th Floor North
Washington, D.C. 20001

Re: **_Huthnance v. District of Columbia, et al._, 06-1871 (HKK)**

Dear Mr. Glover:

As you will recall, immediately upon receiving the Defendants' responses to Ms. Huthnance's Interrogatories and Requests for Production of Documents ("RFP"), we contacted you to complain about the shortcomings in those responses – many of which had not been satisfied even *after an additional two extensions of time were granted* – and to schedule a time to "meet and confer." We began our telephonic "meet and confer" in the late afternoon of April 29, 2008 and resumed on the morning of April 30, 2008. We are writing to memorialize the substance of those discussions.

The need to memorialize these discussions is especially keen in this case. That is because at the conclusion of our "meet and confer," you indicated that you would be recasting our discovery requests and resubmitting them to the Metropolitan Police Department ("MPD") in a "simplified" form. As our requests were relevant, proper and clear, we took exception to the need to recast anything and expressed concern about counsel exercising any editorial power over our requests – not out of pride of authorship, but out of fear that a misconstruction of our requests might be the basis for yet another series of delays. This, quite plainly, would be intolerable.

As a compromise, we suggested that, before forwarding to MPD anything that purported to be an interpretation of Plaintiff's discovery requests, counsel send Plaintiff a copy to review as a way of insuring everyone is on the same page. You have apparently declined to do so. Although we cannot force you to confirm with us the accuracy of your summaries of our requests, Defendants can be held responsible for any additional delays occasioned by the failure to do so. In the end, your client remains responsible for giving full responses to Plaintiff's questions and requests, not your recapitulation of them.

GOODWIN | PROCTER

Eric S. Glover, Esq.
May 5, 2008
Page 2


**<u>Waiver of Objections</u>**

We indicated in detail the improper use of inapt, boilerplate objections during our "meet and confer" and generally will not repeat ourselves again here except where especially illustrative. Suffice it to say that the District's routine practice of reflexively interposing ill-founded objections is a chronic one that our client will not abide. In any case, a discussion about the state of the Defendants' objections is essentially rendered moot by their waiver. Specifically, in requesting more time to respond to discovery on two occasions, Defendants invoked the personal circumstances of an OAG paralegal. While your paralegal's unavailability may have made it difficult for her to collect the information and documents necessary to timely comply with Plaintiff's discovery requests, it did not relieve *counsel* of the obligation to make any proper objections on a timely basis. Since you did not, Defendants' objections have been waived.

**<u>Summary of Discussions re:  Interrogatory Responses</u>**:

**<u>Int. 1</u>**:  We explained our belief that the information requested is relevant and that the D.C. Code sections you cite provide no basis for refusing to provide the information. You agreed to raise the matter with your supervisor.

**<u>Int. 2</u>**:  We stated the information you provided – the last name only of the Individual Defendants' supervisor – was completely insufficient. In our Interrogatory instructions, we requested that you provide several identifying characteristics when you identify an individual. You routinely failed to even give the most basic information, including first names and badge numbers of individual police officers. Thus, for example, you identified the Individual Defendants' supervisor as "Sgt. Smith," as if to ignore the fact that there is no more ubiquitous name in the English language. In any case, we explained that, since you did not object to this instruction, we consider this objection waived. You agreed to seek further information.

**<u>Int. 3</u>**:  This request sought the identity of all officers in the vicinity of the 3100 block of Mount Pleasant NW. Your response identified only those individuals involved in Plaintiff's arrest. We expressed concern because the answer is inconsistent with other accounts of the evening. You stated your belief that individuals other than those involved in the Plaintiff's arrest were irrelevant to this action, and that it was your belief that there was no one else present. You also expressed that your relevance objection was addressed to the time period (11 p.m. until 3 a.m. on the night of the incident). We explained that witnesses to the events in the complaint are certainly relevant regardless of whether they participated in Plaintiff's arrest, and that the time period is reasonably tailored. You agreed to check again regarding other officers who may have been present.

GOODWIN | PROCTER

Eric S. Glover, Esq.
May 5, 2008
Page 3

**Int. 4**:  We raised your failure to respond to this relevant and straightforward request for the identities of those officers on duty at the stationhouse on the evening of Plaintiff's arrest.  You stated that you were unable to get this information and were unable to explain why your client was unable to provide this information before the deadline for responding lapsed.  We raised the fact that there are schedules and log books, at least, for each day, which you acknowledged.  You agreed to seek this information.

**Int. 5**:  We raised that you had not answered the first clause of the question and we stated that we needed you to fully identify all individuals as per our instructions.  See *supra*.  You stated that you would look for further information, and discuss providing the addresses and other personnel information with your supervisor.

**Int. 6 & 7**:  Taken together these interrogatories seek information about who talked to Plaintiff and her companion about posting a bond pursuant to the "post-and-forfeit" procedures, whether any such discussion occurred on the scene of the arrest, and whether MPD policies permit the payment of such bond to be made on the scene of any arrest.  Defendants' responses are incongruous.  On the one hand, it is undisputed that Plaintiff paid (*i.e.*, posted and, by way of a fiction, forfeited) a $25 bond.  Yet Defendants' response to Int. 7 is:  "This defendant did not solicit payment of any kind."  The responses use different terms – "bailed out" and "post and forfeit" – in a manner than makes it impossible for Plaintiff to know if these are the same thing or not.  In sum, we made clear our belief that these two questions were not fairly answered.  You agreed to ascertain whether a more precise response could be given.

**Int. 8**:  We expressed concern about the statistics in this response due to their variance from publicly available statistics for other years, and expressed concern about the needless expense that would be incurred (for which Plaintiff would hold Defendants responsible) if expert testimony about them had to be eventually amended because of data errors.  You agreed to verify these numbers.

**Ints. 9 & 10**:  We explained that the information sought is a crucial element of Plaintiff's *Monell* claims in this case.  You explained that your objection to Interrogatory 10 based on equal accessibility was based on our ability to submit a FOIA request for this information.  We stated our position that this is not a valid objection to proper civil discovery.  We would be willing to accept the PD-163s and PD 67s for these arrests in lieu of written responses, so long as these documents are grouped in such a way that we can identify whether each arrest was resolved by post and forfeit, citation release, or neither.  You agreed to talk to your supervisor about these responses.

**Int. 11**:  We expressed the same concerns as we did for Interrogatory 8.  You agreed to verify the numbers.

GOODWIN | PROCTER

Eric S. Glover, Esq.
May 5, 2008
Page 4

**Int. 12**:  We explained why the requested documents are relevant and why the D.C. Code section you cite provide no basis for withholding them.  You agreed to discuss this with your supervisor.

**Int. 13**:  We complained about the failure to respond to this interrogatory, and you agreed to revisit your answer.

**Summary of Discussions re: RFP Responses**:

**RFP 1**:  You agreed that you would pursue the criminal history/prior arrest documents.

**RFP 2**:  We raised your failure to provide various types of documents responsive to this request. You confirmed that there are no witness statements.  We asked for radio communications and log reports in particular.  You acknowledged that you did not know how these documents are retained, and agreed to look into the matter.

**RFP 3**:  We raised your complete failure to provide responsive documents in your possession, and you agreed to find and produce them.

**RFP 4**:  We stated our position that the D.C. Code provisions you cite do not provide a basis for withholding relevant, responsive information.  You agreed to discuss the issue with your supervisor.

**RFP 5**:  We explained why the request for the General Orders is relevant and why it should be easy to provide.  We also stated that there is nothing vague about the request.  You agreed to consider the request.

**RFP 6**:  We objected to your complete failure to provide any documents regarding post-and-forfeit, the procedure at the heart of this lawsuit.  We are expecting there to be General Orders, Standard Operating Procedures, rules, regulations, policies, procedures, and practices relevant to post and forfeit and cannot imagine why we have been given nothing.  In addition, we also told you we need a list of the offenses for which post and forfeit was available at the time and is available now.  Further, we did receive a Form 61D, but that was dated November 17, 2005 – one day *after* Plaintiff's arrest.  We need a copy of that form in effect on the actual date of Plaintiff's arrest.

**RFP 7**:  Remarkably, although it is one of the most common criminal charges for which District residents are arrested, you have provided no documents constituting, referring to, or relating to General Orders, Standard Operating Procedures, rules, regulations, policies, procedures, and practices that define or give meaning to the conduct prohibited by the Disorderly Conduct offense.  We cannot believe that there are no General Orders, SOPs, rules, guidance and the like dealing with this common topic.  Indeed, we are well aware of the fact that there has been

GOODWIN | PROCTER

Eric S. Glover, Esq.
May 5, 2008
Page 5

considerable criticism of the MPD's track record with respect to disorderly conduct. Thus, we are convinced that Defendants have within their possession, custody or control many documents responsive to this request and demand they all be produced. You have agreed to gather the materials and produce them.

**RFP 8**: You claim to have found no documents constituting, referring to, or relating to training regarding post and forfeit; yet, you refused to stipulate that there is no training on that topic. This, as we have already told you, indicates to us that Defendants did not adequately discharge their discovery obligations before time ran out. But, when asked, you refused to disclose what efforts were made in order to comply with your discovery obligations. In the meantime, you agreed to search for and produce any responsive documents.

**RFP 9**: You have provided no documentation relating to the training of the Individual Defendants and their supervisors as to (i) post-and-forfeit procedure; (ii) citation release procedure; (iii) the bases for making a Disorderly Conduct arrest. You claimed the request was overly broad and burdensome. Neither is true. This is a tailored request as to the three Individual Defendants and their supervisor(s) and it is legitimately unlimited as to time because training on these topics at any point in their careers is plainly relevant. You have agreed to search for and produce any responsive documents.

**RFP 10**: To our request for reports and the like concerning post-and-forfeit or citation release procedures – irrespective of source – you have provided nothing, invoking the deliberative process privilege and claiming to have no responsive documents. First of all, we demand a privilege log for any document withheld on the basis of any privilege in connection with this or any other request. Second, the deliberative process privilege is an extremely limited privilege and certainly does not apply to finished products. Third, it is inconceivable that the MPD does not have such materials. Among other things, the Office of Police Complaints has been active in this area; MPD must have not only these reports generated by OPC, but also its own reactions thereto. You agreed to follow up.

**RFP 11**: You have surprisingly interposed specious objections – relevance, vagueness, and overbreadth – to our requests for any of the reports produced by the Mayor in connection with statutory obligation to make an annual report concerning the post-and-forfeit practices. There is no good faith basis for these objections. Given that there is a specific statutory obligation, the request can hardly be overbroad or vague. And it is certainly relevant since the use of post and forfeit is at the heart of this case. You agreed to follow up.

**RFP 12 & 13**: We explained the necessity of arrest documents for all Disorderly Conduct arrests in connection with our *Monell* claim. See *supra,* Int. 9 &10. While we indicated some flexibility with respect to the time period (shorter) and the universe of documents (limited to PD-163 and PD-67 in the first instance), we are insistent upon the production of this category of

GOODWIN | PROCTER

Eric S. Glover, Esq.
May 5, 2008
Page 6

discovery. Nothing has been produced thus far in response to this request; however, you have indicated that "[d]iscovery is ongoing and additional information will be provided as it becomes available." We explained that this is not an appropriate response. You also raised during our call, though not in the written responses themselves certain privacy concerns with regard to other arrestees. First of all, this objection is doubly waived since you didn't even include it your twice delayed responses. Second, you told us that this very information was publicly available when noting different objections to our interrogatories. This form of shell game is utterly unacceptable under the discovery rules and the ethical rules. You indicated that you would followup with your supervisor and get back to us presently.

**RFP 14**: We explained that we are looking for any guidance on the length of detention after a bond has been posted and the rules, regulations, etc. governing that. Understanding that, you agreed to search for responsive documents.

**RFP 15**: To our request for documents relating to other complaints concerning MPD's use of post and forfeit – among other things to show the District's knowledge of the problem – you have claimed irrelevance. It is clearly relevant. You indicated that you would produce it "as it becomes available."

**RFP 16**: We have asked for all complaints (etc) against the Individual Defendants. You say this is irrelevant, overly broad, and burdensome and that it is not limited in time. These are invalid objections. So is the objection based on privacy provisions in the D.C. Code. These do not trump the Federal Rules of Civil Procedure. Most simply put, the evidence is in the nature of FRE 404(b) evidence and is, as a result, highly relevant. In addition, it could adduce evidence of bias. Moreover, it related directly to Plaintiff's training claim.

As is obvious from this summary, Defendants responses are wholly inadequate and, as you acknowledged repeatedly during our conference, you understood they were wholly inadequate when you submitted them. Rather than a good faith response to discovery, Defendants' responses in this case are nothing short of a *de facto* extension of time – and one taken with no one's permission. Even after receiving two extensions of time, it is apparent that your office waited until the eleventh hour to discharge its discovery obligations. Knowing that it could not expect Plaintiff to accede to a third request for extension, you purported to respond, assuming it would buy additional time given the prerequisites to filing a motion to compel and the costs associated with such peripheral litigation. But this is a response only in name, for the most cursory review demonstrates how little effort was put forth into actually responding.

For example, with respect to six (6) of sixteen (16) RFP responses (or 37.5%), you claim that Defendants are "unable to produce the requested information" and assert that "[d]iscovery is ongoing and information will be provided as it becomes available." See Nos. 3, 8, 9, 12, 13, and 15. For another five (5) RFPs (or 31.25%), you fail to produce documents within the Defendants

# GOODWIN | PROCTER

Eric S. Glover, Esq.
May 5, 2008
Page 7

possession, custody and control without justification.  See Nos. 2 (*e.g.*, log entries, radio communications); 5 (MPD General Orders); 6 (*e.g.*, post-and-forfeit documents);  7 (*e.g.*, training materials re: disorderly conduct; 2003 OPC Report re: Disorderly Conduct Arrests); 10 (*e.g.*, annual OPC reports and MPD responses).  For another four (4) responses (or 25%) you purport to withhold documents on specious and unsupportable grounds.  See Nos. 4 & 16 (*e.g.*, Defendants disciplinary records purportedly withheld on privacy grounds); 11 (*e.g.*, annual reports Mayor required to file by statute); and 14 (*e.g.*, permissible "hold" times after posting deemed vague and ambiguous).  In other words, you have made only a colorably proper production on 1 of 16 RFPs (or 6.25%).

On the heels of acceding to two requests for extensions, our client feels particularly aggrieved that the Defendants have chosen to take a third one without asking.  You have indicated that you would inform us of your progress in filling the substantial holes in your discovery.  We have heard nothing from you since we last spoke.  We request that you contact us by the close of business on Wednesday, May 7, 2008 to inform us of your progress.   Furthermore, we expect you to provide reasonable and complete responses by May 14, 2008, with materials being produced on a rolling basis in advance of that date as they become available.  If there are any discovery requests you cannot respond to by May 14th, we expect an explanation as to why responsive documents and information cannot be obtained by that date and what is being done to obtain that information.

Although we submitted Plaintiff's discovery responses on March 10, 2008, it was not until after we contacted you about Defendants' inadequate responses that you, for the very first time, alleged shortcomings in Plaintiff's responses to contention interrogatories.  (We deferred responses until receipt of the Defendants' discovery.)  As you can imagine, it is hard for us to take these criticisms seriously in light of their opportunistic timing.  As we explained, it is customary for contention interrogations to be deferred.  And given the extremely detailed complaint that Plaintiff filed, we are confident that the Court would agree with us that Defendants would be hardly disadvantaged by a deferral of responses until we have had the Defendants discovery.  That said, we will consider whether there are any contention interrogatories that can, at this stage, be answered.

GOODWIN | PROCTER

Eric S. Glover, Esq.
May 5, 2008
Page 8


We would prefer to resolve these issues without the need to file a Motion to Compel, but given the excessive delay and want of good faith that is sadly a hallmark of the OAG's practice of law, be assured that we will file a Motion to Compel and ask for sanctions to be imposed if you do not meet these reasonable requests.


Respectfully submitted,

John Moustakas
Sarah Keast

# EXHIBIT D

**UNITED STATES DISTRICT COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| LINDSAY HUTHNANCE, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case Number: 06-CV-1871 (HKK) |
| | ) | |
| DISTRICT OF COLUMBIA, *et. al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT DISTRICT OF COLUMBIA'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant District of Columbia (hereafter "the District"), by and through, LaShawna Lynch, Paralegal Specialist, Office of the Attorney General, 441 4th Street, N.W. Washington, D.C., 20001, pursuant to Fed. R. Civ. P. 33, having been first duly sworn under oath, upon information and belief, gives the following answers to interrogatories propounded to this defendant by plaintiff:

(a) The information supplied in these answers is not based solely on the knowledge of the executing party, but includes knowledge of the party, its agents, representatives, and attorneys, unless privileged.

(b) The word usage and sentence structure may be that of the attorney assisting in the preparation of these answers and thus, does not necessarily purport to be the precise language of the executing party.

(c) Defendant reserves the right to amend, revise, or supplement its answers to these interrogatories if and when new or different information becomes available.

(d) For any additional responsive information made available through deposition testimony, the defendant incorporates such information for the purposes of giving the

plaintiff notice that such information exists, but does not adopt such testimony as accurate and complete.

(e) Defendant may provide documents which will answer plaintiff's interrogatory in accordance with Fed. R. Civ. P. 33.

## General Objections

Defendant objects to the production of any documents or information, which is protected by the attorney-client privilege, deliberative process privilege, work product doctrine or any similarly recognized privilege. Inadvertent production of any information or documents so privileged does not constitute a waiver of such privilege or any other grounds for objecting to the discovery request. Additionally, defendant objects to any part of the plaintiff's instructions which seeks to impose any discovery requirements outside the scope of the rules, especially any obligation to produce information not in the defendant's control or not currently known to it after reasonable inquiry.

## INTERROGATORIES

4.      Identify the station crew on duty at the time of Plaintiff's transportation to the MPD station or substation to which she was brought on November 16, 2005.

**ANSWER:  Objection as overly broad and burdensome, and as to relevance. Notwithstanding the objections and further answering, upon information and belief, Toniere Lee, David Anderson, Latrice Washington-Burney and Everette Copelan were the station crew during the midnight tour (2200-0630) on November 15, 2005.**

Pursuant to Fed. P. Civ. R. 33, I have been designated by the District of Columbia to respond to the above discovery requests. I have read the foregoing supplemental answer to interrogatories, and they are true to the best of my knowledge, information and

2

belief.

_[signature]_

LaShawna Lynch
Paralegal Specialist

SWORN AND SUBSCRIBED before me, a Notary Public, this __15__ day of

May 2008.

_[signature]_

Notary Public, DC

My Commission Expires: _March 3, 2010_

As to objections:                    Respectfully submitted:

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

ERIC S. GLOVER [83200]
Assistant Attorney General
441 4th Street, N.W., 6th Floor North
Washington, DC 20001
(202) 442-9754; (202) 724-6295
(202) 727-3625 (fax)
E-mail: eric.glover@dc.gov

## CERTIFICATE OF SERVICE

I hereby certify that true copies of the foregoing supplemental response to

plaintiff's interrogatories were mailed first-class this 15ᵗʰ day of May 2008, to:

ERIC GLOVER
Assistant Attorney General

4

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| LINDSAY HUTHNANCE | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case Number: 06-C1871 |
| | ) | Judge: HKK |
| DISTRICT OF COLUMBIA, *et. al.* | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT DISTRICT OF COLUMBIA SUPPLEMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Fed. R. Civ. P. 34, defendant District Of Columbia responds to plaintiff's Request for Production of Documents as follows:

### General Objections

Defendant objects to the production of any documents or information which is protected by the attorney-client privilege, deliberative process privilege, work product doctrine or any similarly recognized privilege. Inadvertent production of any information or documents so privileged does not constitute a waiver of such privilege or any other grounds for objecting to the discovery request. Additionally, defendant objects to any part of the plaintiff's instructions which seeks to impose any discovery requirements outside the scope of the rules, especially any obligation to product information not in the defendant's control or not currently known to it after reasonable inquiry.

## RESPONSES TO DOCUMENT REQUESTS

1.     All Documents referring or relating to Plaintiff, whether by name, Social

Security number, or any other means of identification, including all police paperwork

filled out in connection with Plaintiffs arrest and the results of any NCIC, WALES, or

similar queries respecting Plaintiffs prior arrest record.

**RESPONSE:  Objection as overly broad and burdensome.  Notwithstanding the**

**objections and without waiver thereto, see Attachment 1, PD 163-MPD Arrest/**

**Prosecution Report (previously provided), Attachment 2, PD 168-MPD Court Case**

**Review Form (previously provided), Attachment 3, PD 67-MPD Collateral/Bond**

**Receipt (previously provided), and Attachment 7 Columbo and Wales printouts.**

<div style="margin-left: 40%">

Respectfully submitted:

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

ERIC S. GLOVER [83200]
Assistant Attorney General
441 4th Street, N.W., 6th Floor North
Washington, DC 20001
(202) 442-9754; (202) 724-6295
(202) 727-3625 (fax)
E-mail:  eric.glover@dc.gov

</div>

## CERTIFICATE OF SERVICE

I hereby certify that true copies of the foregoing supplemental response to plaintiff's interrogatories were mailed first-class this _15th_ day of May 2008, to:

John Moustakas, Esq.
/s/ Sarah Keast, Esq.
Goodwin Procter LLP
901 New York Avenue, NW
Washington, DC 20001

Arthur B. Spitzer, Esq.
Frederick V. Mulhauser, Esq.
American Civil Liberties Union of the National Capital Area
1400 20th Street, NW, Suite 119
Washington, DC 20036

ERIC S. GLOVER
Assistant Attorney General

# EXHIBIT E

# Publication of MPD Orders on the Internet



**Recommendation of the**

**Police Complaints Board**

to

**Mayor Anthony A. Williams,
The Council of the District of Columbia, and
Chief of Police Charles H. Ramsey**

**July 14, 2005**

**Police Complaints Board**

**Maria-Cristina Fernández, Chair
Dr. Patricia Fisher
Michael Sainte-Andress
Marc Schindler**

730 11th Street, N.W., Suite 500
Washington D.C.  20001
(202) 727-3838
Website:  policecomplaints.dc.gov

## I.     INTRODUCTION

The Metropolitan Police Department (MPD) uses a "directive system" to issue departmental policies, procedures, and other information.  The components of the system include MPD's general orders (GO) and special orders (SO).  These orders set forth policies and procedures regarding a wide range of MPD activities, many of which involve encounters with citizens, from "Conduct Toward the Public" (GO 201.26, Part I, Section C) to requirements for officers conducting stops of individuals and frisking them (GO 304.10).  Currently, MPD's general and special orders are not available to the public, except through Freedom of Information Act (FOIA) requests.  The Department's website does not contain the orders.  The Police Complaints Board (PCB), consistent with its policy review function,[1] recommends that MPD post all of its orders, and a corresponding index, on the MPD website.

## II.     BEST PRACTICES

MPD would not be the first department to make its policies and guidelines fully available to the public.  In 2001, the Seattle Police Department Office of Professional Accountability (OPA) recommended that the Seattle Police Department (SPD) publish its entire department manual on the World Wide Web.  Chief Gil Kerlikowske of the SPD "readily agreed and directed the posting."[2]

As a result of that decision, SPD was praised by an expert in police accountability, Professor Samuel Walker of the University of Nebraska at Omaha.  In *The New World of Police Accountability*, Professor Walker recognized SPD for bucking the traditional "attitude of secrecy" that "not only denies to the public basic information about official police policies, but aggravates community relations by sending a message to people that they have no right to know how the department operates."[3]  Some major cities whose police departments have made their policies and procedures available online include the following:

- Seattle, WA[4]

---

[1]  PCB "shall, where appropriate, make recommendations to [the Mayor, the Council, and the Chief of MPD] concerning those elements of management of the MPD affecting the incidence of police misconduct, such as the recruitment, training, evaluation, discipline, and supervision of police officers."  D.C. Official Code § 5-1104(d).  PCB would like to acknowledge the assistance of the Office of Police Complaints (OPC), which is overseen by PCB, in preparing this recommendation under the guidance of the agency's executive director, Philip K. Eure, and deputy director, Thomas E. Sharp.  OPC's summer law clerk, Thomas Moir, who is enrolled at the George Washington University Law School, performed research and provided other valuable assistance.

[2]  Seattle Police Department Office of Professional Accountability, *OPA's Role in Policy Review and Risk Management at SPD*  8 n.4 (2004).  Available at http://www.ci.seattle.wa.us/police/opa/Default.htm.

[3]  Samuel Walker, *The New World of Police Accountability* 190 (2004).

[4]  The Seattle Police Department's orders are available at: http://www.cityofseattle.net/police/publications/.

- Minneapolis, MN[5]

- Denver, CO[6]

- Colorado Springs, CO[7]

- Cincinnati, OH[8]

- Portland, OR[9]

OPA has seen tangible benefits from SPD's publication of its manual on the Internet.  Media inquiries into police conduct have been more informed, as have community interactions with OPA, because the public and news outlets can develop a better sense of how the department operates prior to contacting OPA or SPD.  When the situation allows, OPA can direct citizens to the website for examination of relevant policies at their convenience.  Community outreach is made more meaningful by the ability to reference the publicly available manual.[10]

MPD's orders are not restricted documents; any citizen can request copies of most, if not all, orders under the auspices of FOIA.[11]  Routing such requests through FOIA, however, creates extra paperwork, adds unnecessary cost and labor, and decreases the likelihood that citizens will inquire into the policies of their police department when, in fact, they have every right to do so.  Posting the orders on MPD's website would eliminate the FOIA "middleman," allowing citizens to review MPD policies that affect their encounters with police officers, such as stop-and-frisk procedures (GO 304.10), the taking of traffic accident (GO 401.03) and missing persons (GO 304.03) reports, issuing traffic tickets (GO 303.1), traffic enforcement (GO 303.1), use of oleoresin capsicum or

---

[5]  The Minneapolis Police Department's orders are available at: http://www.ci.minneapolis.mn.us/mpdpolicy.

[6]  The Denver Police Department's orders are available at: http://198.202.202.66/Police/template311677.asp.

[7]  The Colorado Springs Police Department's orders are available at: http://www.springsgov.com/Page.asp?NavID=1472.

[8]  The Cincinnati Police Department's orders are available at:  http://www.cincinnati-oh.gov/police/pages/-5109-/.

[9]  The Portland Police Bureau's orders are available at: http://www.portlandonline.com/police/index.cfm?c=29867.  Other notable cities include Olympia, WA, and Iowa City, IA.

[10]  Conversation with Sam Pailca, director of OPA, June 21, 2005.

[11]  The orders are also available for sale from Laborcops.com, a "professional organization of attorneys and labor consultants who are experienced in representing law enforcement unions," at http://www.laborcops.com.  PCB believes that the public should not have to seek out and pay a third party for access to police policies that could be posted on the Internet at virtually no cost to the government.

"pepper" spray (GO 901.04), and the processing of persons with mental illness (GO 308.4).

The publication of the orders on the Department's website would also be consistent with MPD's goal to ensure the online availability of the orders to its own employees. As PCB understands it, MPD is currently in the process of revising and updating the Department's orders and directives, which MPD then intends to make available online to its employees. PCB further understands that MPD first wants to make the materials available online to its own employees before considering public access on the Internet. As far back as 1998, a special committee of the Council of the District of Columbia had recommended that MPD "investigate the possibility of making the General Orders accessible by mobile digital computer. The current three-volume set of the General Orders is much too bulky to be of any use to the officer in the field. By placing the General Orders online, officers can take advantage of their guidance as the need arises."[12] While the fulfillment of MPD's goal to allow employees to have online access to the Department's directives will be an important step forward, PCB cannot think of any legitimate reason why citizens and police officers alike should not have the same online access to these materials right from the start, given the benefits to both groups.

The publication of the orders on the Department's website would also provide a showcase for MPD's development of model use-of-force policies and other "best practices" policies. Because of the increasing use of the Internet, other police departments would be able to improve their own policies by considering those of MPD, and vice-versa should other departments follow suit by also publishing their directives online. The result would be to promote best practices and greater accountability in law enforcement within the District and beyond.

## III.    RECOMMENDATION

PCB recommends that MPD publish its orders and directives, including an index, on the MPD website. Publication of the orders in a conspicuous manner would signal that MPD respects and values the community's interest in a cooperative, mutually-beneficial relationship between citizens and police. MPD has already taken important steps toward openness on its website, which contains information about how citizens can file complaints against the police, including a link to OPC's website, helpful information on a wide range of MPD programs, and a comprehensive "newsroom." PCB believes that MPD should extend that openness by making its orders and directives more accessible to the public.

---

[12]   Council of the District of Columbia, *Report of the Special Committee on Police Misconduct and Personnel Management of the Council of the District of Columbia*  35 (1998).

EXHIBIT F



# Disorderly Conduct Arrests Made by Metropolitan Police Department Officers

Report and Recommendations of the

## Citizen Complaint Review Board

to

## Mayor Anthony A. Williams, The Council of the District of Columbia, and Chief of Police Charles H. Ramsey

**November 19, 2003**

**Citizen Complaint Review Board**

**Maria-Cristina Fernández, Chair**
**Dr. Patricia Fisher**
**Michael Sainte-Andress**
**Inspector Stanly Wigenton**
**Marc Schindler**

730 11th Street, N.W., Suite 500
Washington D.C.  20001
(202) 727-3838
Website:  www.occr.dc.gov

# Table of Contents

I.      Introduction and Overview ................................................................................. 1

II.     The Disorderly Conduct Statute and Related Cases ....................................... 3

III.    MPD Procedure for Making a Disorderly Conduct Arrest ............................. 5

IV.     OCCR Decisions Involving Disorderly Conduct Arrests ............................... 7

V.      MPD and Nationwide Arrest Statistics ........................................................ 10

VI.     Resolution of MPD Disorderly Conduct Arrests .......................................... 15

VII.    MPD Training ................................................................................................ 18

VIII.   Recommendations .......................................................................................... 19

    A.    Modify Arrest Procedure ........................................................................ 20

    B.    Training .................................................................................................... 20

    C.    Message from the Chief Reinforcing Officer and Supervisor Responsibilities ............... 20

    D.    Examine Sample of Disorderly Conduct Arrests .................................. 20

    E.    Review and Consider Revising Relevant Law and Rules ...................... 21

IX.     Conclusion .................................................................................................... 21

## I.    INTRODUCTION AND OVERVIEW

Since the Office of Citizen Complaint Review (OCCR) opened in January 2001, the office has regularly received police misconduct complaints that involve arrests for disorderly conduct.[1]  Four of OCCR's first 19 decisions, or over 20% of the decisions, dealt with allegations of an improper disorderly conduct arrest, and the allegations were sustained in all four cases.  In each of these decisions, the complaint examiner concluded that the officer harassed the citizen by arresting him for disorderly conduct because the facts developed in investigation did not justify the citizen's arrest.  The officer either did not understand or ignored the law regarding disorderly conduct in each of these situations, and appeared to be retaliating against the citizen for his behavior during the encounter with the officer.  These decisions, together with the allegations made in other complaints currently under investigation by OCCR, prompted the Citizen Complaint Review Board (CCRB), OCCR's governing body, to further examine disorderly conduct arrests made by Metropolitan Police Department (MPD) officers.[2]  Consistent with its obligation to make recommendations to the Mayor, the Council of the District of Columbia, and the Chief of Police that, if implemented, may lower the occurrence of police misconduct,[3] CCRB submits this report and accompanying recommendations based on its examination of the issue.

CCRB's principal objectives for this report were to gather as much information as possible to develop a better understanding of disorderly conduct arrests made by MPD officers, and to consider whether any actions or changes by MPD might reduce the occurrence of improper disorderly conduct arrests.  Although there were practical constraints in terms of staff and access to some information that limited how far CCRB could carry its review of disorderly conduct arrests, CCRB examined a variety of information, which is summarized in this report.  The information included the disorderly conduct statute and related case law, MPD's procedure for making a disorderly conduct arrest, OCCR's decisions involving disorderly conduct arrests, MPD and nationwide arrests statistics, information and statistics regarding the resolution of MPD's disorderly conduct arrests, and MPD training materials.

---

[1]    Disorderly conduct is a violation of District of Columbia law.  *See* D.C. Official Code § 22-1321.

[2]    CCRB would like to acknowledge the assistance of OCCR's staff in preparing this report and accompanying recommendations.  OCCR's executive director, Philip K. Eure, and deputy director, Thomas E. Sharp, managed the project.  OCCR's management analyst, Samuel L. McFerran, also worked on the report, and OCCR summer law clerk, Andrew Szekely, who is enrolled at the George Washington University Law School, performed the initial research and provided other valuable assistance.  We also are grateful to MPD for its cooperation in providing information for and comments regarding the report, and to the Office of Corporation Counsel for providing information to CCRB.  We also appreciate the efforts of everyone else who contributed to the report.

[3]    When CCRB was created, it was vested with the responsibility to make recommendations, where appropriate, to the Mayor, the Council of the District of Columbia, and the Chief of Police "concerning those elements of management of the MPD affecting the incidence of police misconduct, such as the recruitment, training, evaluation, discipline, and supervision of police officers."  D.C. Official Code § 5-1104(d).  CCRB is able to gather information about the incidence of police misconduct through the work of OCCR, which has the authority to receive, investigate, and resolve "citizen complaint[s] against a member or members of the MPD … that allege[] abuse or misuse of police powers by such member or members."  D.C. Official Code § 5-1107(a).

As a result of its examination, CCRB believes that the OCCR decisions and the other complaints being investigated by OCCR may be a warning sign of a larger problem with disorderly conduct arrests made by MPD officers.  Four decisions have already concluded that officers harassed citizens because they made improper disorderly conduct arrests, and many other complaints alleging similar misconduct are currently under investigation.  Overall, disorderly conduct arrests are very common in the District of Columbia.  MPD officers made 10,600 disorderly conduct arrests in 2000, which accounted for more than one in five arrests that year, and constituted the single largest category of arrests, nearly twice the number for the next largest category.[4]  MPD's disorderly conduct arrest rate is significantly higher than the rate in nationwide statistics, ranging from two to four times the nationwide rate during the period from 1996 to 2000.[5]  The high number of disorderly conduct arrests, combined with an arrest procedure that allows citizens arrested for disorderly conduct to "post and forfeit" a $25 "collateral"[6] at the police station at the time of the arrest without receiving any written notice about the collateral forfeiture process or its consequences, and without signing any acknowledgement of their choice of this option over the others available to them, leaves the majority of disorderly conduct arrests with little or no review after the arrest is concluded.  Consequently, CCRB is concerned that there is the potential for a large number of improper or unlawful disorderly conduct arrests in Washington, D.C.

In light of the outcomes of the OCCR decisions, and the large number of disorderly conduct arrests that receive little or no review after the arrest is completed, CCRB recommends that MPD take steps that will help minimize the likelihood of improper disorderly conduct arrests, including changing its procedures, providing additional training to its officers, and reviewing a sample of disorderly conduct arrests to ensure that they comply with the law and MPD procedure.  CCRB believes that failing to take these steps will adversely affect confidence in MPD and in its goal of providing fair law enforcement.

CCRB's specific recommendations are that the Mayor, the Council, and MPD should: (1) modify MPD's arrest procedure to ensure that all citizens who pay $25 to resolve their arrest are provided with written notice about the collateral forfeiture process and its consequences and that they sign an acknowledgment of their choice to pay the $25 collateral; (2) immediately begin providing additional training to all MPD officers and supervisors regarding the law and procedure related to disorderly conduct arrests; (3) distribute a videotape message from the Chief of Police reinforcing the responsibilities of all members of the Department when making disorderly conduct arrests; (4) examine a sample of the disorderly conduct arrests made by MPD officers that is significant enough to allow MPD to determine if there are any widespread problems in the entire pool of disorderly conduct arrests; and (5) review the criminal code regarding disturbances of the public peace, particularly disorderly conduct, and the rules regarding collateral forfeiture and consider whether the code or rules need to be revised, updated,

---

[4]     These statistics are drawn from MPD's arrest statistics for 2000, the most recent year for which this information is publicly available.  *See* Metropolitan Police Department, Washington, D.C., *2000 Annual Report*, at 20-21 (2001).

[5]     The nationwide statistics are discussed in detail in Section V of this report, beginning on page 10.

[6]     The collateral essentially amounts to a fine for the offense, and, after it is posted and forfeited, it ends the arrest without any obligation for the person to appear in court at a later date to answer the disorderly conduct charge.

or changed, and also consider specific reforms, such as decriminalizing disorderly conduct and allowing individuals 15 days to decide whether to forfeit collateral or challenge their arrest.

## II.    THE DISORDERLY CONDUCT STATUTE AND RELATED CASES

Disorderly conduct is distinct from many other statutes in that most criminal prohibitions are intended to punish and deter crimes, whereas disorderly conduct is meant to give police the power to defuse a situation that disturbs the public.[7]  The goal of restoring public order comes from the concern that citizens who are being bothered or annoyed might choose violent self-help when someone is being loud on the street or otherwise causing a disturbance.[8]

The District of Columbia, like most jurisdictions in the United States, has a chapter in its criminal code that covers disturbances of the public peace.[9]  The D.C. Official Code divides disturbances of the public peace into several different offenses, one of which is disorderly conduct.[10]  The District's disorderly conduct statute provides:

> Whoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby:  (1) acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others; (2) congregates with others on a public street and refuses to move on when ordered by the police; (3) shouts or makes a noise either outside or inside a

---

[7]    Robert Force, *Decriminalization of Breach of Peace Statutes:  A Nonpenal Approach to Order Maintenance*, 46 Tul. L. Rev. 367, 373 (1972).

[8]    *Id.* at 373-74.

[9]    Most of the provisions in the criminal code chapter covering disturbances of the public peace were enacted around the turn of the 20th century.  The chapter includes a number of offenses that may have been relevant many years ago, but seem less relevant today, such as Dueling challenges, § 22-1302, Assault for refusal to accept a challenge, § 22-1303, Leaving the District to give or receive challenge, § 22-1304, Playing games in streets, § 22-1308, Throwing stones or other missiles, § 22-1309, Urging dogs to fight or create disorder, § 22-1310, Allowing dogs to go at large, § 22-1311, Kindling bonfires, § 22-1313, Flying fire balloons or parachutes, § 22-1317, and Driving or riding on footways in public grounds, § 22-1318.  The language of the disorderly conduct statute also is dated, although it appears to have been enacted in 1953.

[10]    Although not the focus of this report, modernization of the District's criminal code chapter covering disturbances of the public peace might be in order.  To the extent the Mayor and the Council undertake this work, we strongly encourage them to consider the changes proposed in the Model Penal Code, particularly insofar as they clarify and organize the offenses in this chapter, and decriminalize offenses whose purpose is to maintain order and not punish the people arrested under those provisions.

The Model Penal Code, which was completed in 1962, provides guidance for criminal law reform and modernization through a review of the prohibitions the criminal law contains, the excuses it admits, the sanctions it imposes, and the range of the authority that it distributes and confers.  Article 250 of the Model Penal Code covers riot, disorderly conduct, and related offenses, and is designed to assist jurisdictions in developing their law regarding this "vast area of penal law."  Model Penal Code, § 250.2, Explanatory Note for Sections 250.1-250.12.  As the Explanatory Note to Article 250 indicates, "disorderly conduct and related offenses form a critically important area of the criminal justice system.  Offenses in this category affect a large number of defendants, involve a great proportion of public activity, and powerfully influence the view of public justice held by millions of people."  *Id.*  Consequently, the Model Penal Code works to systematize the relevant provisions of the law, provide rational penalties for offenses, including decriminalizing some of them, eliminate overlap of offenses, and modernize the offenses to remove obsolete provisions and cover behavior not previously covered.

building during the nighttime to the annoyance or disturbance of any considerable number of persons; (4) interferes with any person in any place by jostling against such person or unnecessarily crowding such person or by placing a hand in the proximity of such person's pocketbook, or handbag; or (5) causes a disturbance in any streetcar, railroad car, omnibus, or other public conveyance, by running through it, climbing through windows or upon the seats, or otherwise annoying passengers or employees, shall be fined not more than $250 or imprisoned not more than 90 days, or both.[11]

As the language of the statute plainly indicates, either "intent to provoke a breach of the peace" or "circumstances such that a breach of the peace may be occasioned thereby," is a necessary element of the disorderly conduct offense, along with engaging in one of the five proscribed activities. Over the years, a series of cases has helped define the scope of the statute, including the meaning of "breach of the peace," and outlined the proper enforcement of the statute. In *Williams v. District of Columbia*, the D.C. Circuit held that a breach of the peace occurs only when profane language "creates a substantial risk of provoking violence, or because it is, under 'contemporary community standards,' so grossly offensive to members of the public who actually overhear it as to amount to a nuisance."[12] The reasoning of *Williams* was extended to the disorderly conduct statute eight years later in *Washington Mobilization Committee v. Cullinane*, where the court made it clear that both words and actions could cause a breach of the peace by provoking violence or creating a nuisance.[13]

Over the years, there have been challenges to the validity of the statute alleging, among other things, that it is too vague, and therefore violates the U.S. Constitution. These challenges have regularly been rejected. In 1962, in *Scott v. District of Columbia*,[14] the District of Columbia Court of Appeals held that the statute's "incommoding" language, which prohibits "congregat[ing] with others on a public street and refus[ing] to move on when ordered by the police,"[15] was not so vague as to constitute a threat to First Amendment rights.[16] Similarly, in 1978, the court rejected a challenge to sub-section (4) of the disorderly conduct statute in *In the Matter of A.B., Jr.*,[17] holding that the language "jostling against such person or unnecessarily crowding such person or by placing a hand in the proximity of such person's pocketbook, or handbag,"[18] was sufficiently clear to give notice to members of the public of the conduct being proscribed.[19]

---

[11]    D.C. Official Code § 22-1321.

[12]    418 F.2d 638, 646 (D.C. Cir. 1969) (footnotes omitted). The court was interpreting a different section of the D.C. Official Code, § 22-1307, criminalizing a breach of the peace caused by the use of profane language.

[13]    566 F.2d 107, 116 (D.C. Cir. 1977).

[14]    184 A.2d 849 (D.C. 1962).

[15]    D.C. Official Code § 22-1321(2).

[16]    *Scott*, 184 A.2d at 851.

[17]    385 A.2d 59 (D.C. 1978).

[18]    D.C. Official Code § 22-1321(4).

[19]    *In the Matter of A.B., Jr.*, 385 A.2d at 62.

In another line of cases, the District of Columbia Court of Appeals further defined the elements of disorderly conduct and explained what was sufficient evidence for a conviction. To have probable cause to make an arrest for disorderly conduct, proof of an actual or impending breach of the peace is not necessary; however, the conduct must make a breach of the peace likely to occur.[20] In *Chemalali v. District of Columbia*, the conduct that supported the defendant's conviction was "kicking and jabbing at pedestrians on the street" and both the trial and appellate courts found that the defendant's actions were "offensive actions which would tend to disturb, annoy, and interfere with [the pedestrians]."[21]

In a more recent case, the same court held that there was not enough evidence to convict a defendant for swearing at a several police officers who were in the process of searching a group of men suspected of being a part of a shooting.[22] The juvenile defendant rode his bicycle behind the officers and "spoke in a loud voice to the officer, 'Y'all petty as s---. F y'all.'" The defendant then entered a store and upon exiting was confronted by an officer who accused him of stealing a bicycle. He again began to swear at the officers, at which point a crowd formed around the defendant and the officers. The court overturned the trial judge's conviction on the grounds that the swearing of the defendant was not likely to create violence on the part of the crowd, just on the part of the officers, who are "trained to deal with unruly and uncooperative members of the public … [and are] expected to have a greater tolerance for verbal assaults."[23] The court identified the difference between the instant case and *Chemalali* as being the difference between directing conduct at the police and directing conduct toward the public.[24]

In light of the statute and the cases interpreting it, the law regarding disorderly conduct arrests is clear. To violate the disorderly conduct statute, a person must be engaging in one of the five proscribed activities either with the intent to cause a breach of the peace, or in such a way that may cause a breach of the peace or be so offensive as to amount to a nuisance. Directing conduct at police officers alone is not sufficient to violate the statute. Enforcing the disorderly conduct law may require making some challenging judgments, like what circumstances may cause a breach of the peace, and when an action is so offensive that it amounts to a nuisance, but case law provides sufficient guidance to assist with making these judgments.

## III.    MPD PROCEDURE FOR MAKING A DISORDERLY CONDUCT ARREST

At CCRB's request, MPD provided a basic description of the Department's procedure for making a disorderly conduct arrest, along with the forms and notices used in this process. This description represents CCRB's understanding of the procedure from encounter on the street to arrest to release from custody, and is not meant to capture every eventuality that may arise in an arrest.

---

[20]    *Chemalali v. District of Columbia*, 655 A.2d 1226, 1228 (D.C. 1995) (citation omitted).

[21]    *Id.*

[22]    *See In re:  W.H.L.*, 743 A.2d 1226, 1226 (D.C. 2000).

[23]    *Id.* (citations omitted).

[24]    *Id.* at 1229.

A disorderly conduct arrest begins when an officer encounters a person engaged in the following behavior:  (1) the person is behaving in a way that is annoying, disturbing, or offensive to others, or that interferes with the actions of others; and (2) the person is intending to provoke or may provoke others to react or respond in violent or dangerous way, or is so offensive as to amount to a nuisance.[25]  MPD's training recommends that officers use warnings and other attempts to encourage people to stop the actions that may lead to a breach of the peace, but once an officer has identified these circumstances, he or she can place the person under arrest for disorderly conduct.  After the person is arrested, the individual is transported to the police station for processing of the arrest.

At the station, the officer places the person in a holding cell.  The officer follows the procedure for collecting information from the individual.  After gathering the information, the officer completes the arrest paperwork, which, in most cases, would be only an Arrest/Prosecution Report.[26]  The Arrest/Prosecution Report is then reviewed by the officer's supervisor, typically his or her first-line supervisor, who ensures that all of the elements of the offense, as well as the probable cause for the arrest, are reflected in the report narrative.  If the supervisor approves the report, the station staff then processes the arrest paperwork.  If the supervisor does not approve the report, it may need to be revised or corrected.

After the report is approved, a member of the station staff reviews the information in the report with the person arrested for disorderly conduct to confirm that it is accurate, and then the staff verifies that the individual does not constitute a flight risk.  Assuming that the person has no outstanding warrants, or that there are no other reasons to detain the person, the arrest process is completed and the person is released in one of two ways.  The first is that the person may opt for citation release.[27]  In this case, the station staff would complete the citation release paperwork, which includes a Citation Release Determination Report and a Citation to Appear.[28]  The citation release paperwork assigns a court date on which the person has to appear to answer the disorderly conduct charge, and allows for the person's release on his or her own recognizance.  Both forms have an acknowledgement that the person must review and sign indicating he or she has received the paperwork and agrees to return for the appearance in court.

The second and more common way that the arrest process is completed is that the person may opt to post and forfeit collateral, which essentially amounts to paying a fine for the offense, and which ends the arrest without any obligation for the person to appear in court at a later date to answer the disorderly conduct charge.  In this case, the station staff takes the person's money for the collateral, and gives him or her a Collateral Receipt.[29]  MPD indicated that there is no other paperwork in the collateral forfeiture process that is completed by the station staff or that is

---

[25]    This is a general description of the elements of the disorderly conduct offense, and does not necessarily reflect all of the types of conduct that may warrant a disorderly conduct arrest.

[26]    P.D. Form 163.  The Department's policy and procedures for completing the P.D. Form 163 are contained in MPD General Order 401.05.

[27]    The Department's policy and procedures for citation release are contained in MPD General Order 502.06.

[28]    P.D. Form 778 and P.D. Form 799.  In addition to the P.D. 799, which is an MPD form, D.C. Superior Court also has a Citation to Appear form that may be used in addition to, or instead of, the P.D. 799.

[29]    P.D. Form 67.

given to or signed by a person who opts to pay the $25 collateral to resolve a disorderly conduct arrest. After this process is completed, the person is released.

## IV.    OCCR DECISIONS INVOLVING DISORDERLY CONDUCT ARRESTS

OCCR's complaint examiner decisions were the starting point for CCRB's effort to gather further information about disorderly conduct arrests made by MPD officers. Four of the first 19 decisions dealt with allegations of an improper disorderly conduct arrest, and each of these decisions sustained the allegations.[30] In each of these decisions, the complaint examiner concluded that the officer harassed the citizen by arresting him for disorderly conduct because the facts developed in investigation did not justify the citizen's arrest. The officer either did not understand or ignored the law regarding disorderly conduct in each of these cases, and appeared to be retaliating against the citizen for his behavior during the encounter with the officer. The following is a short synopsis of the facts found by the complaint examiner in these four matters, as well as the complaint examiner's decision:

- During a late-night traffic stop, the complainant and the subject officer had a "prolonged, heated and profane exchange" in which the complainant demanded to know why he had been stopped. The complainant had been removed from the car and handcuffed, and was standing on the sidewalk. As the encounter progressed, the officer insisted that the complainant be quiet, and when he refused, the officer arrested the complainant for disorderly conduct, and also issued him a ticket related to the traffic stop.

  The complaint examiner concluded that the subject officer harassed the complainant because "[t]he evidence gathered by the investigator established that [the complainant] used profanity and spoke loudly, but there is no indication that his conduct met the requirements for a violation of the disorderly conduct statute. First, there is no evidence that he acted in such a way as to disturb or be offensive to others, since it was uncontroverted that the incident involved only [the complainant] and the four police officers. Second, although the incident occurred late at night and [the complainant] did engage in loud and obscenity-laden discussion, it occurred on a sidewalk which was set back from the nearest building, it was cold out and most windows presumably would be closed, there were no pedestrians and few cars passing in the vicinity, and the police officers observed at most only a few individuals looking out their windows at the scene. Thus, it cannot be found that [the subject officer] at the time legitimately contemplated that [the complainant] was annoying or disturbing 'any considerable number of persons,' as required by D.C. Code § 22-1321(3). Although an officer need not wait until an actual breach of the peace occurs before making an arrest for disorderly conduct … there is no evidence that the conduct occurred under 'circumstances such that a breach of the peace may be occasioned thereby.' In the absence of evidence of annoyance to others, the mere acts of yelling or using

---

[30]    The complaint examiner decisions discussed below are available on OCCR's website at www.occr.dc.gov. All personal information regarding the parties and witnesses to each complaint has been removed from the discussion of the decisions.

profane language toward police officers, or repeatedly demanding to know the purpose of being stopped, do not constitute disorderly conduct."[31]

- While the subject officer was discussing a parking violation with the complainant's fiancée, the complainant came out of a store and asked the subject officer if he had "nothing better to do." The subject officer told the complainant to return to the store, which he did. The subject officer then entered the store, and followed the complainant around the store threatening to arrest him if he continued to make comments to the subject officer. The complainant's comments back to the subject officer resulted in the subject officer continuing to follow and threaten him, and eventually arresting him for disorderly conduct. The owners of the store had not indicated that the complainant was being disruptive in the store, and one witness said that the subject officer told him that he had arrested the complainant for "running his mouth."

  The complaint examiner concluded that the subject officer harassed the complainant by arresting him for disorderly conduct because the evidence clearly indicated that the subject officer "arrested [the complainant] for actions that occurred inside the store. These actions did not fall within the definition of disorderly conduct, as provided in D.C. Code § 22-1321. [The subject officer] himself said that he gave [the complainant] a specific order to return to the store and that [the complainant] complied. [The subject officer] told OCCR investigators that he entered the store to make sure that [the complainant] was not disturbing customers, while in the P.D. 163 Arrest/Prosecution report, he stated that he entered the store to inform [the complainant] about parking regulations. In either case, [the subject officer] clearly did not enter the store to arrest [the complainant] for any conduct that occurred outside. There were no other customers in the store, and as [the subject officer] himself acknowledged, no store employee indicated that [the complainant] was causing a disturbance or annoying them in any way. [The subject officer] admitted that he did not have adequate legal justification to arrest [the complainant] for disorderly conduct."[32]

- While out for a walk in his neighborhood at approximately 7:00 p.m., the complainant passed close to a house where officers had responded to a call for violation of a civil protective order (CPO). The woman who had the CPO pointed out her window toward a man standing on the street, who she identified as the subject of the CPO. She described the man as black, 6'4" tall, 180 pounds, and wearing a green army jacket, blue jeans, and a cap. The man also was smoking a cigarette. As the police searched for the alleged CPO violator, they came upon the complainant, who was walking nearby smoking a cigarette. The complainant is a black man, 5'6" tall, and was wearing a brown coat, purple shirt, and black pants at the time of the incident. The subject officer stopped the complainant to determine if he was the man they were searching for. The complainant did not

---

[31]    OCCR Complaint No. 02-0041, Findings of Fact and Merits Determination (July 9, 2003).

[32]    OCCR Complaint No. 02-0090, Findings of Fact and Merits Determination (September 12, 2003).

know why he had been stopped, and kept asking the subject officer. He also objected to being stopped, questioned, and handcuffed, and may have used obscenity, including calling the subject officer a "motherfucker." Several people came out of their houses across the street to watch the encounter, which lasted less than five minutes, and ended with the subject officer arresting the complainant for disorderly conduct before even determining his name and whether he was the man the officers were searching for.

The complaint examiner concluded that the subject officer harassed the complainant by arresting him for disorderly conduct because "[a]lthough the complainant's attitude toward [the subject officer] may have been disrespectful and annoying, his behavior did not justify an arrest for disorderly conduct, given the statutory definition set forth above. [The complainant] had no intent to provoke a breach of the peace; his behavior was offensive to no one but the officers; and, if people came out to see what was going on, they were likely drawn by the flashing lights just as much if not more than any yelling, and there is no evidence that a 'considerable number of persons' gathered. The officers may have had a legitimate reason to stop [the complainant], but instead of quickly ruling him out as the suspect … [the subject officer] arrested him. In so doing, he committed harassment, because this action clearly 'interfered with . . . [the complainant's] ability to go about lawful business normally, in the absence of a specific law enforcement purpose.'"[33]

- While responding to a call from an address down the street from the complainant's house, the subject officer and his partner came upon the complainant and a group of friends standing around a car in front of one friend's house. The officers instructed the group to be quiet and disband. Some of the people left, while the complainant and one friend went inside the fenced front yard of the friend's house. The exchange between the officers and the complainant continued as the complainant and his friend protested the officers' orders to be quiet and go inside, and the officers continued to give orders and made some derogatory comments. The exchange escalated to a confrontation after the complainant used profane language toward the officers, and the subject officer struck the complainant, knocking him into a fence and injuring him. The subject officer then entered the yard and placed the complainant under arrest for disorderly conduct.

The complaint examiner concluded that the subject officer harassed the complainant because the facts did not support a disorderly conduct arrest since the evidence gathered during the investigation showed only that there was a group of people standing in front of one friend's house, and that the complainant and his friend responded verbally to the orders and insulting remarks made by the officers, neither of which rise to the level of disorderly conduct. Furthermore,

---

[33]    OCCR Complaint No. 01-0099, Findings of Fact and Merits Determination (November 5, 2003).

during their own interviews and in their reports about the incident, neither of the officers identified any other facts that would support a disorderly conduct arrest.[34]

Beyond the complaint examiner decisions, OCCR also is investigating a number of other complaints that involve disorderly conduct arrests. While many of the complaints appear to involve proper disorderly conduct arrests, a significant number resemble the fact patterns in the decisions where the officer made an arrest either incorrectly or without regard for the law, and appeared to be retaliating against the citizen for his or her behavior during the encounter with the officer. Up to this point, OCCR has not been keeping statistical information regarding complaints that involve a disorderly conduct arrest. In the future, however, OCCR will keep this statistical information so that it can report about the complaints in a more systematic and thorough manner.

The complaint examiner decisions indicate that there are instances where officers do not know or are not following the law when making disorderly conduct arrests. These decisions and the allegations in other complaints under investigation by OCCR suggest that there will likely be more instances in which it is confirmed that improper arrests for disorderly conduct have been made. Such improper arrests, whether the result of lack of knowledge or intentional action, are intolerable, and, depending on the circumstances, may constitute an abuse or misuse of police power. CCRB believes that these complaints are an important warning sign that requires action.

## V.    MPD AND NATIONWIDE ARREST STATISTICS

CCRB examined MPD's arrest statistics from 1995 to 2000 to determine the frequency with which MDP officers make disorderly conduct arrests.[35] CCRB also looked at nationwide data and statistics for cities with a population of 250,000 or greater to have some basis for comparison with the MPD statistics. The nationwide and large city statistics cover the same six-year period and were taken from the Uniform Crime Reports (UCR) prepared by the Federal Bureau of Investigation (FBI).[36]

---

[34]    OCCR Consolidated Complaint Nos. 02-0318 & 02-0319, Findings of Fact and Merits Determination (August 21, 2003).

[35]    MPD's Office of Organizational Development provided disorderly conduct arrest statistics to OCCR on July 29, 2003. The remaining statistics regarding MPD arrests were taken from MPD's 1998, 1999, and 2000 Annual Reports, which are available on MPD's website, www.mpdc.dc.gov. *See* Metropolitan Police Department, Washington, D.C., *1998 Annual Report*, at 22-23 (1999); Metropolitan Police Department, Washington, D.C., *1999 Annual Report*, at 24-25 (2000); Metropolitan Police Department, Washington, D.C., *2000 Annual Report*, at 20-21 (2001). Population information for the District of Columbia was obtained from the U.S. Census Bureau website, www.census.gov, and is taken from the 2000 Census.

[36]    The Uniform Crime Reports are available on the FBI website, http://www.fbi.gov/ucr/ucr.htm. CCRB took statistical data from the 1995 through 2000 reports. *See* Federal Bureau of Investigation, Uniform Crime Reports for the United States 1995 (1996), Table 31, at 210-11; Federal Bureau of Investigation, Uniform Crime Reports for the United States 1996 (1997), Table 31, at 216-17; Federal Bureau of Investigation, Uniform Crime Reports for the United States 1997 (1998), Table 31, at 224-25; Federal Bureau of Investigation, Crime in the United States 1998, Uniform Crime Reports (1999), Table 31, at 212-13; Federal Bureau of Investigation, Crime in the United States 1999, Uniform Crime Reports (2000), Table 31, at 214-15; Federal Bureau of Investigation, Crime in the United States 2000, Uniform Crime Reports (2001), Table 31, at 218-19.

The number of disorderly conduct arrests made by MPD officers grew from 6,616 in 1995 to 10,600 in 2000.  In addition, the rate of disorderly conduct arrests per 100,000 residents in the District increased by approximately 60% from 1,157 in 1995 to 1,853 in 2000.  To compare the increase in the disorderly conduct arrest rate with any changes that may have occurred in the rate of other arrests made by MPD, CCRB also examined the rate of all arrests made by MPD and the rate of all arrests excluding disorderly conduct arrests.  Over the same period, the rate of all arrests increased only by approximately 7% from 7,524 in 1995 to 8,028 in 2000, and the rate of all arrests except disorderly conduct fell by approximately 3% from 6,367 in 1995 to 6,175 in 2000.  In general, the number of arrests in all three of these categories increased in 1996 and 1997.  Although all three categories decreased after 1997, the number of disorderly conduct arrests was still significantly higher in 2000 than in 1995.  In contrast, total arrests excluding disorderly conduct were actually lower in 2000 than in 1995.  The following table reflects the data collected by CCRB regarding MPD arrests:

### Arrests Made by MPD Officers

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|
| Total Arrests | 43,040 | 46,884 | 57,678 | 50,660 | 45,950 | 45,924 |
| *Arrests per 100,000 Residents* | 7,524 | 8,196 | 10,083 | 8,856 | 8,032 | 8,028 |
| Disorderly Arrests | 6,616 | 7,478 | 13,811 | 9,758 | 10,715 | 10,600 |
| *Disorderly per 100,000* | 1,157 | 1,307 | 2,414 | 1,706 | 1,873 | 1,853 |
| Total Arrests Excluding Disorderly Arrests | 36,424 | 39,406 | 43,867 | 40,902 | 35,235 | 35,324 |
| *Total Excluding Disorderly per 100,000* | 6,367 | 6,888 | 7,668 | 7,150 | 6,159 | 6,175 |
| D.C. Population (2000 Census) | 572,059 | 572,059 | 572,059 | 572,059 | 572,059 | 572,059 |

By way of comparison, CCRB examined UCR arrest statistics from 1995 to 2000 for the entire nation and for cities with a population of 250,000 or greater.  CCRB initially focused on the UCR statistics for disorderly conduct arrests alone, but, in response to comments from MPD, CCRB also examined the UCR statistics for disorderly conduct and drunkenness arrests combined.[37]

---

[37]    In its comments to a draft of this report, MPD indicated that the District's disorderly conduct statute includes several offenses that may not be included in other jurisdictions' statutes, such as drinking in public, possession of an open container of alcohol, urinating in public, and affrays, among other things.  Consequently, MPD argued that its statistics for disorderly conduct arrests alone might not be a fair comparison with other jurisdictions.

First, it is not clear to CCRB that all of the offenses identified by MPD properly fall under the disorderly conduct statute because there is a separate provision of the criminal code that covers affrays, § 22-1301, and the other offenses do not necessarily create circumstances that may provoke a breach of the peace or amount to a nuisance.  Second, even to the extent that the District's law differs from that of other jurisdictions, CCRB notes that the UCR contains the following comment about its statistics:

> To ensure these data are uniformly reported, the FBI provides contributing law enforcement agencies with a handbook that explains how to classify and score offenses and provides uniform crime offense definitions.  Acknowledging that offense definitions may vary from state to state, the FBI cautions agencies to report offenses not according to local or state statutes but according to those guidelines provided in the handbook.  Most agencies make a good faith effort to comply with established guidelines.

In general, the nationwide and large city rates for disorderly conduct arrests and disorderly conduct and drunkenness arrests combined increased slightly in 1996 and 1997, but then decreased from 1998 through 2000, ending up at a rate that was noticeably lower in 2000 than it was in 1995.  Over the same period, the nationwide and large city rates for all arrests, all arrests except disorderly conduct, and all arrests except disorderly conduct and drunkenness showed a steady decline from 1995 to 2000, decreasing by anywhere from 13% to 21%.  The following tables reflect the data collected by CCRB regarding arrests made nationwide and in large cities:

### Arrests Made Nationwide

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|
| Total Arrests | 11,407,288 | 11,088,352 | 10,540,215 | 10,291,317 | 9,136,294 | 9,123,428 |
| *Arrests per 100,000 Residents* | 5,807 | 5,838 | 5,752 | 5,534 | 5,317 | 5,010 |
| Disorderly Arrests | 561,642 | 626,918 | 561,621 | 501,866 | 421,662 | 421,542 |
| *Disorderly per 100,000* | 286 | 330 | 306 | 270 | 245 | 232 |
| Drunkenness Arrests | 527,200 | 522,869 | 509,764 | 510,318 | 437,153 | 423,310 |
| Disorderly & Drunkenness Arrests | 1,088,842 | 1,149,787 | 1,071,385 | 1,012,184 | 858,815 | 844,852 |
| *Disorderly & Drunkenness per 100,000* | 554 | 605 | 585 | 544 | 500 | 464 |
| Total Arrests Excluding Disorderly Arrests | 10,845,646 | 10,461,434 | 9,978,594 | 9,789,451 | 8,714,632 | 8,701,886 |
| *Total Excluding Disorderly per 100,000* | 5,521 | 5,508 | 5,446 | 5,264 | 5,072 | 4,779 |
| Total Arrests Excluding Disorderly & Drunkenness Arrests | 10,318,446 | 9,938,565 | 9,468,830 | 9,279,133 | 8,277,479 | 8,278,576 |
| *Total Excluding Disorderly & Drunkenness per 100,000* | 5,253 | 5,233 | 5,167 | 4,990 | 4,817 | 4,546 |
| Population in UCR | 196,440,000 | 189,927,000 | 183,240,000 | 185,964,000 | 171,831,000 | 182,090,101 |

---

FBI website, www.fbi.gov/ucr/word.htm.

Nonetheless, CCRB reviewed the other statistical categories contained in the UCR and determined that the only other category that would likely include the offenses identified by MPD would be drunkenness arrests, which is a category that is listed as having zero arrests in MPD's annual reports for the relevant years.  Consequently, to ensure a fair comparison with MPD statistics, CCRB examined both disorderly conduct arrests and disorderly conduct and drunkenness arrests combined.  The nationwide and large city tables reflect both of these sets of data.

**Arrests Made in Large Cities**

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|
| Total Arrests | 3,021,325 | 3,074,699 | 2,480,043 | 2,456,806 | 2,163,849 | 2,145,369 |
| *Arrests per 100,000 Residents* | 7,783 | 7,700 | 7,491 | 7,024 | 6,402 | 6,107 |
| Disorderly Arrests | 159,705 | 207,900 | 156,834 | 116,899 | 93,002 | 106,445 |
| *Disorderly per 100,000* | 411 | 521 | 474 | 334 | 275 | 303 |
| Drunkenness Arrests | 106,029 | 107,265 | 114,005 | 107,533 | 98,622 | 92,271 |
| Disorderly & Drunkenness Arrests | 265,734 | 315,165 | 270,839 | 224,432 | 191,624 | 198,716 |
| *Disorderly & Drunkenness per 100,000* | 685 | 789 | 818 | 642 | 567 | 566 |
| Total Arrests Excluding Disorderly Arrests | 2,861,620 | 2,866,799 | 2,323,209 | 2,339,907 | 2,070,847 | 2,038,924 |
| *Total Excluding Disorderly per 100,000* | 7,372 | 7,179 | 7,017 | 6,690 | 6,127 | 5,804 |
| Total Arrests Excluding Disorderly & Drunkenness Arrests | 2,755,591 | 2,759,534 | 2,209,204 | 2,232,374 | 1,972,225 | 1,946,653 |
| *Total Excluding Disorderly & Drunkenness per 100,000* | 7,098 | 6,911 | 6,673 | 6,382 | 5,835 | 5,541 |
| Population in UCR | 38,820,000 | 39,932,000 | 33,106,000 | 34,978,000 | 33,801,000 | 35,131,894 |

As seen in the comparison of the tables above, MPD's rate of disorderly conduct arrests is significantly higher than both the nationwide and large city disorderly conduct arrest rates, even when drunkenness arrests are included. While the MPD, nationwide, and large city rates were closer to one another in 1995 and 1996, from 1997 through 2000, the MPD rate was 2.5 to four times the nationwide and large city rates for disorderly conduct and drunkenness arrests and five to eight times the nationwide and large city rates for disorderly conduct arrests.[38] The chart below depicts the different disorderly conduct and disorderly conduct and drunkenness arrest rates for the period from 1995 to 2000.

---

[38]    In its comments to a draft of this report, MPD indicated that its rate of disorderly conduct arrests is driven, at least in part, by community requests for enforcement of the law.  CCRB recognizes that the arrest rate for minor crimes may increase as a result of community requests for enforcement of the law and through the implementation of community policing programs, which are being used in the District.  *See generally*, Debra Livingston, *Police Discretion and the Quality of Life in Public Places: Courts, Communities, and the New Policing*, 97 Colum. L. Rev. 551 (1997).  The arrest rate alone, however, is not CCRB's concern, especially to the extent that the arrests are proper and for actual violations of the disorderly conduct statute.  Rather, CCRB's concern is that MPD's high rate of disorderly conduct arrests creates a much greater potential for improper arrests, and when considered together with OCCR's decisions, raises an inference that the higher rate may be, at least in part, the result of improper arrests.



To examine the larger context for MPD's disorderly conduct arrest rate, CCRB compared MPD's rate for all arrests except disorderly conduct with the nationwide and large city rates for all arrests except disorderly conduct arrests and all arrests except disorderly conduct and drunkenness arrests. MPD's rate for all arrests except disorderly conduct was consistently higher than the nationwide rates, ranging from approximately 15% to 50% higher in a given year. In contrast, MPD's disorderly conduct arrest rate was a remarkable 100% to 700% higher than the nationwide rates. MPD's rate for all arrests except disorderly conduct was much closer to the large city rates, with MPD's rate being lower than the large city rates in 1995 and 1996, and MPD's rate being anywhere from approximately 0.5% to 15% higher during the period from 1997 to 2000. Again, however, when comparing disorderly conduct arrests, MPD's rate was many times greater at 65% to 580% higher than the rates found in other large cities.

The chart below depicts the different arrest rates excluding disorderly conduct arrests or disorderly conduct and drunkenness arrests for the period from 1995 to 2000.





**Total Arrest Rates Excluding Disorderly and Disorderly & Drunkenness Arrests per 100,000 Residents**

MPD's disorderly conduct arrest rate stands in sharp contrast to the nationwide and large city disorderly conduct arrest rates, even when drunkenness arrests are included. The contrast is particularly stark when the difference between MPD's rate for all arrests except disorderly conduct is compared with the similar nationwide and large city rates, which are much closer to MPD's rate. CCRB believes that MPD's high rate of disorderly conduct arrests creates a much greater potential for improper arrests, and believes that MPD should take steps to understand why its statistics differ so significantly from nationwide and large city statistics, to ensure that the difference in the rates is not the result of improper arrests.[39]

## VI.    RESOLUTION OF MPD DISORDERLY CONDUCT ARRESTS

Beyond looking at MPD's arrest statistics, CCRB also looked at information and statistics regarding the resolution of MPD's disorderly conduct arrests. As described in Section III above, there are two ways in which a disorderly conduct arrest can be resolved and the citizen released from custody promptly. The first is citation release, where the citizen is released from police custody on his or her own recognizance with a later date on which he or she must appear in court to answer the disorderly conduct charge. The authority to issue citations is given to police station staff by statute,[40] and the policy and procedures for citation release are set out in an MPD general order.[41] The citation release procedure includes the completion of paperwork by

---

[39]    Another concern is to ensure that the District's police resources are deployed in the most effective manner possible. To the extent improper arrests are being made, they are consuming officer and station staff time that would be much better used on patrol or addressing other issues that citizens bring to the police on a regular basis.

[40]    *See* D.C. Official Code § 23-1110.

[41]    *See* MPD General Order 502.06.

the station staff that must be signed by the person arrested for disorderly conduct, in addition to paperwork that is given to the person indicating his or her court date and the consequences of failing to appear in court.[42]

The second way for a person to be released from custody promptly is for the individual to post and forfeit collateral, which essentially amounts to paying a fine for the offense, and which ends the arrest without any obligation for the person to appear in court at a later date to answer the disorderly conduct charge.  The post and forfeit process for disorderly conduct arrests is not specifically authorized by statute, regulation, or court rule; rather, it appears to be a practice that has developed over time through the cooperation of the courts, prosecutors, police, and arrestees.[43]  The consequences of collateral forfeiture are not clear.  It appears that a person who opts to post and forfeit might have an arrest record, but would not have a conviction record, because the agreement implicit in the process is that the prosecutor will not prosecute if the person posts and forfeits the collateral, which essentially amounts to paying a fine.[44]  However, being allowed to post and forfeit is a privilege and not a right, so, for a period of time after the collateral is forfeited, the prosecutor has the option to prosecute any of these cases, although this appears to happen only very rarely.[45]  MPD has a general order that lists the collateral amounts for various offenses, but the Department does not appear to have one that sets out the procedures for processing a collateral forfeiture.[46]  Other than a receipt for payment of the collateral, the station staff does not complete any paperwork, require any acknowledgment by the arrestee of the choice to post and forfeit collateral, or give the arrestee any paperwork that explains the collateral forfeiture process or any related information.

The following table reflects how frequently citizens chose citation release and collateral forfeiture in response to MPD's disorderly conduct arrests during the period from 1995 to 2000.

---

[42]    *See* P.D. Form 778 and P.D. Form 799.

[43]    *See District of Columbia v. Baylor*, 125 Daily Wash. L. Rep. 1665 (D.C. Super. Ct. Aug. 25 & Aug. 26, 1997) (Cr. Nos. D-1114-96, D-3504-96, D-3956-96, D-3125-96, T-6033-96, and T-6817-96).

[44]    *Id.* at 1670.  CCRB had a difficult time finding a conclusive answer about the consequences of opting to post and forfeit collateral, but getting a conclusive answer is very important.  Depending on the answer, many individuals who post and forfeit could face difficulties when applying for a job, a security clearance, rental housing, or a loan or with their immigration status because of their arrest or other record.

[45]    *Id.* at 1678-79.

[46]    *See* MPD General Order 503.03.  CCRB requested general orders containing procedures for collateral forfeiture from MPD, and was given only General Order 503.03.  There may be procedures relating to collateral forfeiture contained in other general orders, but CCRB was not able to identify them, and there does not appear to be a general order specifically devoted to processing a collateral forfeiture.

## Resolution of MPD Disorderly Conduct Arrests[47]

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|
| Total Disorderly Arrests | 6,616 | 7,478 | 13,811 | 9,758 | 10,715 | 10,600 |
|  |  |  |  |  |  |  |
| Total Citation Release (CR) | 700 | 711 | 1430 | 844 | 698 | 576 |
| % CR of Total Disorderly Arrests | 10.6% | 9.5% | 10.4% | 8.6% | 6.5% | 5.4% |
| Total Collateral Forfeiture (CF) | 3595 | 4029 | 7724 | 5366 | 7258 | 6498 |
| % CF of Total Disorderly Arrests | 54.3% | 53.9% | 55.9% | 55.0% | 67.7% | 61.3% |

Citizens chose collateral forfeiture at least five times more often, and as high as ten times more often, than citation release in the six years for which CCRB obtained statistics. The ability to post and forfeit collateral allows the citizen to pay $25 to end his or her arrest without an obligation to appear in court, which may make the option more attractive than citation release because citation release requires the citizen to appear before a judge at a later date to answer the disorderly conduct charge.[48]

CCRB has two principal concerns based on the information and statistics above. First, with so many citizens choosing collateral forfeiture, over 50%, and sometimes as high as 67%, of disorderly conduct arrests are receiving little or no review after the arrest is completed, contributing to a greater potential for improper disorderly conduct arrests that may go unnoticed. Without any further review, an improper disorderly conduct arrest can more easily pass through the system without being scrutinized. Second, the process for and consequences of collateral forfeiture are vague and unclear, and the absence of clear rules and procedures to govern collateral forfeiture creates several potential problems. Without clear rules, citizens who opt to post and forfeit cannot be fully advised of how the process works and what their rights are in the process. In addition, the lack of explicit procedures allows for the possibility that citizens who opt to post and forfeit may be treated differently as they go through the same process. Finally, without procedures, it is difficult to ensure that all citizens are being properly advised of how the process works and what their options are so that they can make an informed decision to post and forfeit collateral. Thus, CCRB is concerned that thousands of arrestees each year are opting to post and forfeit collateral without a clear understanding of the process or consequences, and with no written acknowledgment of their choice to post and forfeit over the other options available to

---

[47]     The sum of the number of citation releases and collateral forfeitures does not add up to the total number of disorderly conduct arrests because there are other outcomes for the arrests, the most significant of which is that the citizen is held in lock-up for reasons not necessarily related to the disorderly conduct arrest.

[48]     Anecdotal evidence from citizen complaints and interviews suggests that some citizens may choose collateral forfeiture instead of citation release because collateral forfeiture may be presented to them as the only way to be released from custody promptly. Citizens have reported to OCCR that they are given the option of either paying the $25 collateral and being released from jail or spending the night in jail so they can appear in court the next day. In these cases, citation release is never presented to the citizen as an option, so the coercive effect of possibly spending more time in custody tilts the scales heavily in favor of paying the $25 collateral at the police station for many citizens.

them.[49]  Consequently, CCRB believes that the collateral forfeiture process needs to be clarified and systematized to ensure that individuals are being properly advised about the process and that they are making an informed decision to post and forfeit.

## VII.    MPD TRAINING

CCRB also reviewed the materials that MPD uses to train its officer recruits regarding disorderly conduct.  The materials indicated that a new recruit at the MPD police academy receives approximately four hours of training on disorderly conduct as a part of his or her 80-hour training on the D.C. Official Code.  The lesson consists of a lecture, a handout, and a brief video.  The heart of the lesson is the lecture, while the handout and video provide reinforcement.

The lecture combines a description of the applicable D.C. Official Code provisions and examples that reflect situations that officers might face while on patrol.  The first point the instructor makes during the lecture is, "[u]nless the facts clearly show that the defendant intended to breach the peace, or that the offending conduct was committed under circumstances such that a breach of the peace might be occasioned, there can be no violation of the disorderly conduct law."[50]  The lesson plan further states that disorderly conduct is a difficult area in which to exercise police powers because, "these types of offenses are frequently committed by persons who do not regard themselves as criminals and who regard these laws, and police enforcement of these laws, as an intrusion of their rights."  Another theme in the lesson plan is the idea that where a breach of peace can be resolved without an arrest, that is the preferred method of handling the situation.[51]

The lesson plan includes numerous examples, the general theme of which is that the charge of disorderly conduct relates largely to the time, the place, and the person committing the act.  One example involves a group of drunken citizens singing loudly on a street corner.  The scenario contrasts the proper response if the citizens were in Georgetown on the corner of M Street and Wisconsin Avenue, N.W., on a Saturday night, as opposed to when the citizens are in a residential neighborhood doing the same thing, and points out that the same conduct would not necessarily disturb the peace in Georgetown even if it could disturb the peace in the residential neighborhood.[52]

---

[49]     The lack of paperwork and information provided to the citizen in the collateral forfeiture process contrasts sharply with the information provided when a person is issued a ticket for a parking violation.  The front of the ticket indicates the offense and the penalty and has a blank for the recipient to sign and date the ticket acknowledging receipt of it.  The back of the ticket has instructions for responding to the ticket.  The instructions state that the recipient has 15 days to respond, and indicate the penalties for failing to respond and the procedures for admitting the infraction or denying the infraction and challenging it.  The back of the ticket also includes a box where the recipient indicates his or her answer to the ticket, either admitting or denying liability, and must sign and date it before submitting it.  On the other hand, a person who posts and forfeits collateral in response to a disorderly conduct arrest, a misdemeanor offense, does not receive any of the information or protections that are provided to people charged with parking violations.

[50]     Metropolitan Police Department, Training Materials for D.C. Official Code Part I (emphasis in the original).

[51]     *Id.*

[52]     *Id.*

Instructors at MPD's Institute of Police Science supplement the disorderly conduct lesson plan with a 25-page handout on the D.C. Official Code that reinforces the lesson plan.[53]  The general format is to quote a section of the code and then explain the elements to the officers.  The handout features the same examples found in the lesson plan, and emphasizes that the officer should review the handout semiannually.  Finally, the handout has several special orders at the end.[54]  These orders remind officers to properly process all arrests,[55] emphasize the importance of enforcing disorderly conduct even though enforcement is often unpopular,[56] and further refines the definition of "incommoding" and the failure to move on charges.[57]  The special orders serve to remind recruit officers that their training is meant to be integrated into their patrol practices.  Furthermore, the special orders are on the "A" distribution schedule, meaning it is to be "posted on all bulletin boards, read at roll calls, and issued to individual sworn members of the department."[58]

The final part of the disorderly conduct training is a 13-minute training video.[59]  The video uses examples from the lesson plan to show how an actual officer would handle particular situations.  As was the case with the handout, the video closely follows the lesson plan and reinforces the major themes of the lesson on disorderly conduct – there must be an actual or likely breach of the public peace and that officers should try to resolve the situation without making an arrest if possible.

Taken as a whole, the lesson on disorderly conduct aims to teach recruits how to handle disorderly conduct situations.  The lesson integrates the holdings from cases that have interpreted and clarified the statute, and it consistently reminds recruit officers of the elements of the offense.  Although the materials appear to be substantively sound, CCRB cannot comment on their effectiveness because CCRB has not observed MPD providing the training, nor is CCRB aware of how widely the information contained in the lesson materials is distributed to officers other than recruits.

## VIII.   RECOMMENDATIONS

Based on the information included in this report, CCRB makes the following recommendations to address the issues it has identified regarding disorderly conduct arrests made by MPD officers:

---

[53]     Metropolitan Police Department, D.C. Criminal Code Handout (March 2001).

[54]     *Id.*

[55]     Metropolitan Police Department, Special Order 92.8 (1992)

[56]     Metropolitan Police Department, Special Order 92.1 (1992)

[57]     Metropolitan Police Department, Special Order 92.9 (1992); Metropolitan Police Department, D.C. Criminal Code Handout (March 2001).

[58]     Metropolitan Police Department, Operation Handbook Introduction, 4 (January 1, 1991).

[59]     Videotape:  Enforcement of the Disorderly Conduct Statutes (Metropolitan Police Department Media Production Unit 1996) (on file with the Maurice T. Turner, Jr., Institute of Police Science).

### A.    Modify Arrest Procedure

MPD should review its arrest procedure, and modify it to ensure that citizens are provided with written notice about the collateral forfeiture process that describes how it operates and the consequences of choosing to post and forfeit.  In addition, each person who opts to post and forfeit should be required to sign an acknowledgement that he or she knowingly chose to post and forfeit over the other options available.  These changes will give the collateral forfeiture process protections that are similar to those in the citation release and parking ticket processes.

### B.    Training

MPD should provide additional instruction to its officers about the law and procedure related to disorderly conduct arrests.  Taking steps to implement the training immediately will communicate important information to officers that they need to do their jobs on a daily basis.  Considering the large number of disorderly conduct arrests made by MPD officers, ensuring that all officers are current in their knowledge of the law and procedure for these arrests ought to be a high priority.  To the extent that any improper disorderly conduct arrests are being made as a result an officer's lack of knowledge, additional training should eliminate these improper arrests.

MPD could undertake this effort through training at roll call or adding a lesson on disorderly conduct to annual in-service training attended by all officers.  MPD may incorporate its existing disorderly conduct materials in the additional training, but CCRB recommends that MPD examine different methods of instruction to determine which method will be most effective for its officers.  Some issues that MPD should consider are the extent to which any educational lessons or programs provide realistic examples to guide officers, allow officers to ask questions and raise issues regarding the law and procedures, and test each officer's knowledge of the material covered in the instruction.

### C.    Message from the Chief Reinforcing Officer and Supervisor Responsibilities

The Chief of Police should distribute a videotape message to all officers and supervisors reinforcing their responsibilities in conducting disorderly conduct arrests.  A communication from the Chief will notify all MPD members that disorderly conduct arrests are being reviewed from the highest levels in the Department, and that every officer and supervisor has an important role to play in making and reviewing arrests.  The Chief also should emphasize that MPD members will be held accountable to the extent that they are not following the law or procedure regarding disorderly conduct arrests because MPD relies heavily on its officers and first-line supervisors to ensure that the law and procedure are being followed.

### D.    Examine Sample of Disorderly Conduct Arrests

MPD should examine a sample of the disorderly conduct arrests made by its officers that is significant enough to allow MPD to determine if there are any widespread problems in the entire pool of disorderly conduct arrests.  As part of its examination, MPD should independently verify the facts underlying each arrest in the sample, rather than relying solely on the narrative in the P.D. Form 163.

CCRB believes that this review is critical to ensuring that OCCR's decisions are not a warning sign of a larger problem with MPD's disorderly conduct arrests. Beyond the examination, MPD should pursue appropriate discipline against officers who are making improper disorderly conduct arrests, as well as the supervisors who are not adequately monitoring the work done by these officers. CCRB believes that following through with appropriate discipline is an indispensable part of reducing the occurrence of any problems uncovered by MPD's examination.

Based on its review, MPD should consider whether any additional steps need to be taken to address any problems uncovered by the examination.

### E.    Review and Consider Revising Relevant Law and Rules

The Mayor, the Council, and MPD should review the criminal law chapter covering breaches of the public peace, with a focus on the disorderly conduct provision, as well as the rules governing collateral forfeiture, to determine if the chapter and rules are adequate to meet the needs of the public. Based on their own review, as well as MPD's review of disorderly conduct complaints, the Mayor and Council should consider whether the code and rules need to be revised, updated, or changed. In addition, the Mayor and Council should consider specific reforms, such as whether disorderly conduct and other offenses should be decriminalized, and whether the collateral forfeiture process should be modified to mirror the response process for a parking violation, which allows 15 days for the recipient of a ticket to decide how he or she wants to respond to the charged offense.

### IX.    CONCLUSION

Based on its examination of disorderly conduct arrests made by MPD officers and a comparison with arrest rates in other jurisdictions, CCRB believes that the Department should take steps to ensure that officers are fully trained about, and adhering to, the law and procedure governing disorderly conduct arrests. Because of the large number of disorderly conduct arrests made by MPD officers compared to other large cities, and because the majority of these are resolved by paying $25 at the police station with little or no review after the arrest is completed, CCRB believes that there is the potential for a significant number of improper or unlawful disorderly conduct arrests in the District that could go unnoticed. The Mayor, the Council, and MPD should take steps to ensure that disorderly conduct arrests are made only when authorized under the law, and consistent with MPD's procedures.

# EXHIBIT G



# GOVERNMENT OF THE DISTRICT OF COLUMBIA
# CITIZEN COMPLAINT REVIEW BOARD
# OFFICE OF CITIZEN COMPLAINT REVIEW



# ANNUAL REPORT
## FISCAL YEAR 2003

730 11th Street, NW, Suite 500
Washington, DC  20001
(202) 727-3838
Fax (202) 727-7638
Website:  www.occr.dc.gov



# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## CITIZEN COMPLAINT REVIEW BOARD
## OFFICE OF CITIZEN COMPLAINT REVIEW



January 22, 2004

Dear Mayor Williams, Members of the District of Columbia Council, and Chief Ramsey:

We are pleased to submit the 2003 Annual Report for the Office of Citizen Complaint Review (OCCR) and its governing body, the Citizen Complaint Review Board (CCRB).  This report covers the agency's operations during the District of Columbia Government's fiscal year from October 1, 2002, through September 30, 2003.

This is the third annual report of the agency, which opened its doors to the public on January 8, 2001.  Our goal has been to establish an agency that provides the District of Columbia with an independent and impartial forum for the investigation and timely resolution of police misconduct complaints filed by the public against Metropolitan Police Department (MPD) officers.  We made substantial progress over the course of the year, and achieved several notable accomplishments, which include:

- Six hundred thirteen people contacted OCCR to inquire about filing a complaint.  The agency received 361 complaints, and closed 235.  OCCR completed full investigative reports for 106 complaints, adjudicated 19, and mediated 21.  Fifteen decisions sustaining police misconduct allegations were forwarded to MPD, and the Chief of Police has taken steps to impose discipline for all of the decisions.

- OCCR launched its complaint examination process, which was the final part of OCCR's overall complaint process, and allows the agency to issue decisions sustaining police misconduct complaints.  Each complaint is reviewed by one of OCCR's 16 complaint examiners, who issues a written decision resolving the complaint.  OCCR referred 31 complaints into the complaint examination process, and resolved 19 of the complaints by the end of the year.  The decisions regarding these complaints are posted on OCCR's website, www.occr.dc.gov.

- OCCR referred 31 complaints to mediation, and completed 21 mediation sessions in fiscal year 2003.  Since the agency opened, OCCR has referred 78 complaints to mediation, and mediated 46, with an overall success rate of 76%.  The overwhelming majority of participants in the process who have been surveyed continue to be satisfied with the services provided by the mediator, the mediation sessions, and the resulting settlements.

- OCCR wrote to members of Congress regarding the "State and Local Law Enforcement Discipline, Accountability, and Due Process Act of 2003," met with Congressional staff about the bill, and encouraged other police oversight and law

enforcement agencies to contact Congress about the legislation. This bill seeks to address issues affecting state and local law enforcement officers. However, several provisions of the bill would have a negative impact on OCCR and other agencies that investigate complaints against the police by requiring changes to each agency's complaint process and imposing costs on the process, among other things.

- OCCR implemented its Community Outreach Strategic Plan for 2003, which included a very successful student interactive training program. In addition, OCCR gave presentations to groups throughout the District, participated in forums related to police accountability and criminal justice issues, and gave media interviews to discuss the agency and its work. OCCR also translated its complaint form and information sheet into 13 languages and distributed these materials to 117 embassies in Washington, and made many changes to its website to increase the information available to the public about the agency.

- OCCR completed much of the supporting research and analysis for a detailed policy recommendation regarding disorderly conduct arrests made by MPD officers, which CCRB ultimately issued on November 19, 2003.

- OCCR significantly improved its information technology (IT) infrastructure and support by obtaining new complaint management software, changing its e-mail service, purchasing and installing a new network server, tape backup system, and uninterrupted power supply in its offices, and making arrangements for regular computer support to maintain its IT systems and address any IT issues that arise.

One of the key elements of OCCR's accomplishments has been the steps the agency has taken to stretch its limited resources and develop creative ways to enhance the agency at low or no cost to the District. For example, OCCR entered into contracts with a complaint examination service and a mediation service, which engage highly skilled attorneys and mediators in the complaint resolution process at a cost well below the market, and at less expense than having full-time staff with comparable experience. OCCR arranged for the assistance of a Washington-based law firm to provide counsel for its complainants at no cost to ensure that they are adequately represented in the complaint process and that OCCR's evidentiary hearings develop full and fair evidentiary records. OCCR began participating in the District's Capital City Fellows Program, which allows the agency to hire recent public policy school graduates at a relatively low cost to OCCR. Finally, OCCR continued its internship program, which has brought talented college and law school students to work at the agency for academic credit or modest pay and expanded the agency's capacity to perform its work.

We are pleased with these accomplishments, and believe that they set the stage for even greater progress in fiscal year 2004. However, as the statistics in this annual report indicate, OCCR is faced with a growing number of complaints being received by the agency that is consistently larger than the number of complaints the agency is able to resolve with the resources it currently has available. The persistent difference between the number of complaints received and the number of complaints resolved, which has become more apparent as the agency has been open for a longer period of time, has caused the number of open complaints to grow, and is beginning to result in a backlog that will only grow as more time passes. There are structural

limits to the number of complaints OCCR can resolve with its current staffing and funding levels. OCCR's experience, along with the standards for funding and staffing used by comparable police oversight agencies, clearly indicate that without more resources to devote to the investigation and resolution of complaints, this trend threatens to overwhelm the agency and undermine its complaint resolution process.

OCCR has an excellent staff and the entire team will be working in fiscal year 2004 to be as efficient as possible, and to resolve as many complaints as possible. Even so, as the statistics in this report illustrate, OCCR needs additional resources simply to keep up with the complaints that the agency is receiving. Such an increase does not even take account of the resources that OCCR needs to resolve the cases that are currently backlogged, to offer competitive salaries that will allow OCCR to retain its staff and attract talented new employees, to expand its capacity to receive and resolve complaints, to increase community outreach, or to develop additional policy recommendations. In general, now that OCCR is a fully operational agency, it needs resources sufficient to allow it to adequately perform its various functions.

During our fourth year of operation, CCRB and OCCR look forward to working with the Mayor, the Council, and MPD to ensure that the agency has the resources it needs to carry out its mission. The support we have received from the Mayor and the Council, as well as the cooperation shown by MPD over the past three years, have made our success to this point possible. We will continue to pursue our goal of establishing an agency that provides the District of Columbia with an independent and impartial forum for the investigation and timely resolution of police misconduct complaints, and to be a positive force for better policing.

Respectfully submitted,

Maria-Cristina Fernández
Chair
Citizen Complaint Review Board

Philip K. Eure
Executive Director
Office of Citizen Complaint Review

# Table of Contents

I.     Agency Overview ....................................................................................... 1

    A.    Introduction ........................................................................................ 1

    B.    Citizen Complaint Review Board ....................................................... 1

    C.    Office of Citizen Complaint Review ................................................. 2

    D.    Interns and Law Clerks at OCCR ...................................................... 4

    E.    Complaint Process .............................................................................. 4

        1.    Dismissal ................................................................................... 5

        2.    Mediation ................................................................................... 6

        3.    Complaint Examination ............................................................ 6

II.    The Year in Review ....................................................................................... 7

    A.    Introduction ........................................................................................ 7

    B.    Complaint Examination ...................................................................... 8

    C.    Mediation .......................................................................................... 12

        1.    Mediation Example #1 ............................................................ 12

        2.    Mediation Example #2 ............................................................ 13

    D.    Investigations ................................................................................... 14

    E.    Statistics ........................................................................................... 14

        1.    Contacts and Formal Complaints ........................................... 15

        2.    Disposition of Formal Complaints ......................................... 17

        3.    Status of Pending Formal Complaints at the End of Each Fiscal Year ................... 17

        4.    OCCR Workload ..................................................................... 18

        5.    Allegations in Formal Complaints .......................................... 21

        6.    Race or National Origin of Complainants .............................. 22

        7.    Gender of Complainants ......................................................... 25

        8.    Age of Complainants .............................................................. 26

        9.    Race or National Origin of Subject Officers .......................... 28

        10.   Gender of Subject Officers ..................................................... 30

        11.   Police Districts and Units ....................................................... 31

        12.   City Wards .............................................................................. 34

F.    State and Local Law Enforcement Discipline, Accountability, and Due Process Act of 2003 ........................................................................................................................ 35

G.    Outreach ............................................................................................................... 36

    1.    Fiscal Year 2003 ........................................................................................ 36

    2.    Community Outreach Strategic Plan for 2004 ........................................... 38

    3.    Website ...................................................................................................... 38

H.    Professional Police Oversight Organizations ..................................................... 39

I.    Policy Recommendations .................................................................................... 39

J.    Information Technology ...................................................................................... 40

III.    The Future .................................................................................................................. 40

# I.    AGENCY OVERVIEW

## A.    Introduction

The Office of Citizen Complaint Review (OCCR) and its governing body, the Citizen Complaint Review Board (CCRB), were created by statute in 1999, and OCCR opened to the public on January 8, 2001.  The agency is independent of the Metropolitan Police Department (MPD), the District of Columbia's 3,700-member police force, and its mission is to receive, investigate, and resolve police misconduct complaints filed by the public against MPD officers. The agency was created by the District to fill the void left by the 1995 abolition of the Civilian Complaint Review Board, which was plagued by inadequate funding and staff, resulting in lengthy delays in the processing and resolution of police misconduct complaints.  The District's new police oversight office was the product of extensive research and careful thought by District officials.  The result was an agency with board members and staff who seek to employ the best practices of citizen oversight of law enforcement, and whose ultimate goal is to provide the public with an independent and impartial forum for the investigation and timely resolution of police misconduct complaints.

## B.    Citizen Complaint Review Board

According to its enabling statute, CCRB is composed of five members, one of whom must be a member of MPD, while the other four must have no current affiliation with any law enforcement agency.  All Board members must be residents of the District of Columbia, and they serve staggered three-year terms.  The current Board members are:

*Maria-Cristina "Mai" Fernández*, the Chair of the Board, is the Managing Director for Program Operations at the Latin American Youth Center (LAYC).  Prior to joining LAYC, Ms. Fernández was an associate with a local law firm and worked as a Special Assistant to the Assistant Attorney General for the Office of Justice Programs at the U.S. Department of Justice. Ms. Fernández also spent two years as a prosecutor with the Manhattan District Attorney's Office following her graduation from American University's Washington College of Law.  She received her undergraduate degree from Dickinson College, and is enrolled in a graduate program at Harvard University's Kennedy School of Government during the 2003-2004 academic year.  Ms. Fernández's term expires on January 12, 2005.

*Dr. Patricia Fisher* is a licensed counseling and clinical psychologist with over 30 years of experience in the mental health and substance abuse fields.  She has worked in and served as a consultant to a variety of governmental, private, and public organizations.  Dr. Fisher, a native Washingtonian, has maintained a private practice in Washington for over 20 years and has been involved in several professional and community organizations.  She received her undergraduate and master's degrees from Howard University, and she earned her doctorate in counseling psychology from the University of Minnesota.  Dr. Fisher's term expires on January 12, 2004.

*Michael Sainte-Andress* is a community activist who has served as an appointee of two former mayors on the District's Ryan White HIV Health Services Planning Council.  Mr. Sainte-

Andress has been an advocate on many issues affecting the District, including human and civil rights, voter registration, adult literacy education, arts education in public schools, HIV/AIDS issues, and gay/lesbian/bisexual/transgender issues. He is a motivational speaker and cultural diversity workshop facilitator, and has been a teacher, dancer, singer, actor, writer, and producer. He is a graduate of Lincoln University in Pennsylvania, and has served in the U.S. Navy. Mr. Sainte-Andress's term expires on January 12, 2005.

*Marc Schindler* is a staff attorney with the Youth Law Center. Before joining the Youth Law Center, he served as an assistant public defender in Baltimore, where he represented children in juvenile delinquency proceedings. In 1996, Mr. Schindler received the Cahill Award, presented annually to an outstanding public defender in Maryland. He has conducted workshops throughout the United States and has written several publications dealing with legal issues related to children, with particular emphasis on improving the conditions of confinement for institutionalized children. Mr. Schindler received his undergraduate degree from Yale University and his law degree from the University of Maryland School of Law. His term expires on January 12, 2006.

*Inspector Stanly Wigenton* is a 25-year veteran of the Metropolitan Police Department and the director of Internal Affairs in MPD's Office of Professional Responsibility, where he previously served as a lieutenant and a captain. Inspector Wigenton has served as an officer and lieutenant in the Second District, a sergeant and captain in the Fourth District, a captain and commanding officer in the Sixth District, and an inspector in the Communications, Business Services, and Special Operations divisions. He attended the University of the District of Columbia. Inspector Wigenton's term expires on January 12, 2006.

The Board meets on the first Monday evening of every other month. At these meetings, OCCR management updates Board members about various issues, including developments in office infrastructure, outreach, and personnel matters. In addition, the Board is provided with a report of the complaints received by OCCR, along with the disposition of these complaints. The Board takes an active role in the work of OCCR, offering guidance on many issues affecting the operation of the office. The Board also is charged with reviewing the executive director's determinations regarding the dismissal of complaints, as well as making recommendations to the Mayor, the Council of the District of Columbia, and MPD, where appropriate, regarding recruitment, training, evaluation, discipline, and supervision of police officers where changes may decrease the incidence of police misconduct.

## C.    Office of Citizen Complaint Review

OCCR operates under the supervision of its executive director, who is appointed by the Board. The executive director is assisted with the management of OCCR by a deputy director, chief investigator, and assistant chief investigator. The office has its own investigative staff, which consists of one senior investigator and five staff investigators, all of whom take in and investigate complaints. The management team and investigators are assisted by an administrative officer, public affairs specialist, staff assistant, investigative clerk, and receptionist. In addition, OCCR funds the employment of a fellow assigned to the agency from the District's Capital City Fellows Program, and the agency has developed an internship program

that brings in college and law students year-round to assist the staff with its regular duties and special projects.  The current members of OCCR's staff are:

**Philip K. Eure** became OCCR's first executive director in July 2000 after working as a senior attorney in the Civil Rights Division at the U.S. Department of Justice, where he litigated on behalf of victims of employment discrimination.  While at the Department, Mr. Eure was detailed in 1997-1998 to Port-au-Prince as an adviser to the Government of Haiti on a project to reform the criminal justice system.  Mr. Eure received his undergraduate degree from Stanford University and his law degree from Harvard Law School.

**Thomas E. Sharp**, the deputy director, joined OCCR in October 2002 from the law firm of Wilmer, Cutler & Pickering, where he was an associate in the firm's securities enforcement and regulatory practice.  Prior to joining the firm, he served as staff counsel to Newark, New Jersey, City Councilman Cory Booker and as a law clerk to U.S. District Judge Myron H. Thompson in Montgomery, Alabama.  Mr. Sharp has a bachelor's degree from the State University of New York at Buffalo and a law degree from Yale Law School.

**Clifford C. Stoddard, Jr.,** the chief investigator, was appointed to his position in June 2003.  Mr. Stoddard is a retired Special Agent from the U.S. Air Force Office of Special Investigations and former Assistant State's Attorney and Chief of the White-Collar and Computer Crime Division of the Anne Arundel County State's Attorney's Office in Annapolis, Maryland.  He was an adjunct faculty member at the National Advocacy Center and has taught nationally for the National District Attorney's Association and the American Prosecutor's Research Institute on white-collar and computer crime subjects.  Mr. Stoddard has a bachelor's degree from Southern Illinois University, Carbondale, and a law degree from the Georgetown University Law Center.

**Kesha Taylor**, the assistant chief investigator, was hired in July 2002.  Prior to joining OCCR, Ms. Taylor worked with the Investigations Division of the Public Defender Service for the District of Columbia for seven years.  While there, Ms. Taylor served most recently as a Staff Investigator and as the Coordinator of the Internship Program.  Ms. Taylor obtained her undergraduate degree in political science and English from the University of Vermont.  She also received a master's degree in higher education from Cornell University.

As of the issuance of this report, OCCR's other staff members are:

| | |
|---|---|
| Anthony Lawrence | Senior Investigator |
| Natasha Bryan | Investigator |
| Sean Mornan | Investigator |
| Megan Rowan | Investigator |
| Andrea Del Pinal | Investigator |
| Sherry Meshesha | Investigative Clerk |
| | |
| Melanie Deggins | Public Affairs Specialist |

Stephanie Banks              Administrative Officer
Sonja Wingfield              Staff Assistant
Audrey Jewell                Receptionist

Samuel L. McFerran           Management Analyst / Capital City Fellow

OCCR staff development and training are a high priority for the agency.  All employees go through a training program that instructs them on the goals and purpose of the office, as well as the specific functions related to their jobs.  Investigators attend training provided by MPD's Institute of Police Science and the Institute of Police Technology and Management at the University of North Florida in Jacksonville, Florida.  In addition, all staff members are eligible for, and encouraged to attend, training programs and courses offered through the District Government's Center for Workforce Development, as well as other specialized training given by private entities and other District or federal agencies.  The specific training described above is supplemented by weekly staff meetings where all employees are informed about issues that are important to the mission of OCCR, and the staff discusses different issues that arise in carrying out OCCR's work.

### D.    Interns and Law Clerks at OCCR

In the summer of 2001, OCCR established a year-round internship program for both college and law school students.  College interns assist with investigations, community outreach, and other projects in the office, while law school interns perform legal research on various policy issues.  Interns volunteer their time and receive academic credit for their work during the academic year.  Over the summer, budget permitting, interns receive a salary for full-time work.  OCCR's internship program has been an excellent way for the agency to stretch its limited budget by engaging talented students in the agency's work, while giving them valuable practical experience in exchange.  The program has also been a valuable recruitment tool for the agency, with two former interns currently employed by the agency as investigators.

Since the internship program began, OCCR has attracted many outstanding students.  Through the fall of 2003, 21 college students and nine law students have participated in the program.  The college students have come from a variety of schools, including American, George Mason, George Washington, Howard, and Niagara Universities and the University of the District of Columbia.  The law students have come from the Catholic University of America's Columbus School of Law, the Georgetown University Law Center, the George Washington University Law School, the Howard University School of Law, and the University of the District of Columbia's David A. Clarke School of Law.  The internship program has provided substantial benefits to OCCR and the District, and the office plans to continue hiring interns during each semester and the summer.

### E.    Complaint Process

OCCR's work centers around the complaint process, which is set forth in the statute and regulations governing the agency.  The public initiates the complaint process, so it begins only after a person has filed a written, signed complaint with the agency.  OCCR has the authority to

investigate complaints that are received within 45 days of the alleged misconduct and that allege abuse or misuse of police powers by MPD officers, including:

    (1)    Harassment;
    (2)    Use of insulting, demeaning, or humiliating language or conduct;
    (3)    Retaliation for filing a complaint with OCCR;
    (4)    Use of excessive or unnecessary force; or
    (5)    Discriminatory treatment.

       To ensure ease of access to its process, OCCR has taken steps to facilitate the filing of a complaint. First, OCCR's office is physically located away from MPD and other government offices to provide the public with a less intimidating environment in which to file a complaint. Second, to make it as convenient as possible to file a complaint, complainants may file in person at OCCR's office or at any MPD district station, or they may initiate a complaint by mail, telephone, fax, or e-mail. Third, to ensure that non-English-speaking residents of and visitors to the District are able to get information about the agency and file complaints, OCCR's information sheets and complaint forms have been translated into 13 foreign languages. Finally, a duty investigator is always available when the agency is open to assist the public with filing complaints, and to interview them about the allegations in their complaints.

       After a complaint is received, the executive director reviews it to confirm that it is in OCCR's jurisdiction, and to determine how to proceed with the processing of the complaint. If a complaint is outside OCCR's jurisdiction, the executive director refers it to MPD's Office of Professional Responsibility for investigation or to the appropriate agency. Also, if the complaint alleges conduct by an officer that may be criminal in nature, the executive director refers the complaint to the U.S. Attorney for the District of Columbia for possible criminal prosecution. For the remaining complaints, the executive director determines whether they should be investigated or mediated.

       When a complaint is sent for investigation, it is assigned to one of OCCR's staff investigators. The investigator interviews the complainant, subject officer, and any witnesses the complainant identifies, in addition to attempting to locate and interview any other police or non-police witnesses who may be able to provide relevant information. The investigator also collects and reviews other evidence, including MPD documents, hospital records, materials from other sources, the scene of the incident, and any other relevant information. When the investigation is complete, the investigator drafts an investigative report, which, along with all the evidence gathered in the investigation, is reviewed by a supervisor. The executive director then reviews the report of the findings of the investigation, and determines if the complaint should be dismissed, which requires the concurrence of one CCRB member, or referred to a complaint examiner for review and a decision on the merits of the complaint. OCCR's three principal methods of resolving complaints – dismissal, mediation, and complaint examination – are discussed in more detail below.

      ***1.    Dismissal***

       The statute and regulations governing OCCR allow for the dismissal of complaints under three sets of circumstances: (1) the complaint is deemed to lack merit; (2) the complainant

refuses to cooperate with the investigation; or (3) if, after the executive director refers a complaint for mediation, the complainant willfully fails to participate in good faith in the mediation process.  Based on information gathered during OCCR's investigation of a complaint, and with the concurrence of one CCRB member, the executive director may dismiss a complaint when these circumstances arise.  The dismissal process allows OCCR to conserve resources and more efficiently handle complaints.

### 2.    Mediation

OCCR's complaint process includes mediation as a method for resolving complaints and, because OCCR firmly believes in the benefits of mediation, appropriate complaints are forwarded to mediation on a regular basis.  Mediation allows the complainant and the subject officer to meet face-to-face to attempt to resolve the issues raised in a complaint.  The goal of OCCR's mediation program is to give both parties a chance to work together to achieve a mutual understanding of what happened during their interaction and work out their differences without the stress and expense of a formal investigation and hearing.

A mediation service, the Community Dispute Resolution Center (CDRC), administers OCCR's mediation program, assigning complaints to be mediated by a pool of well trained, experienced, and diverse mediators.  There is no cost to the complainant or the subject officer to participate in mediation, but both parties must sign a confidentiality agreement that provides that anything said by either party during the mediation session will not be disclosed outside of the session.  The confidentiality agreement is required to encourage parties to be honest and open in attempting to resolve the dispute.

The decision to refer a complaint to mediation is made by the executive director, and not by the parties.  If the executive director refers a complaint to mediation, both the complainant and the subject officer are required to participate in the mediation in good faith.  Failure to participate in good faith constitutes cause for discipline of the subject officer and grounds for dismissal of the person's complaint.  However, even though participation of the parties is required, the outcome of the mediation is completely voluntary because neither the complainant nor the officer is required to reach an agreement or settle the dispute during mediation.

There are some restrictions as to which complaints may be referred to mediation.  OCCR will not refer complaints involving allegations of the use of excessive or unnecessary force that result in physical injury.  In addition, an officer may not mediate a complaint if he or she has mediated a complaint alleging similar misconduct or has had a complaint sustained by OCCR for similar misconduct in the past twelve months.

### 3.    Complaint Examination

The complaint examination process is used to resolve complaints where the executive director determines that there is "reasonable cause to believe" that police misconduct occurred.  When the executive director reaches this determination, the complaint is referred to a complaint examiner who reviews it, along with OCCR's investigative report, and issues a written decision regarding the merits of the complaint.  The complaint examiner may resolve the complaint based on OCCR's investigative report alone, or, if necessary, may conduct an evidentiary hearing to

further develop the factual record. In practice, complaints that are neither dismissed nor successfully mediated are resolved through complaint examination, which is the only means by which OCCR can issue a decision sustaining a complaint against an officer, although not all complaints that are referred to complaint examination are necessarily sustained.

If a complaint examiner sustains any allegation in a complaint, the executive director forwards the complaint examiner's decision to the Chief of Police for review and imposition of discipline. Under certain limited circumstances, the Chief may send a decision back to OCCR for further review, but, otherwise, the Chief is bound by the decision and must impose discipline on the officer as a result of the decision. If the complaint examiner does not sustain any allegation in a complaint, the executive director dismisses the complaint based on the decision.

The complaint examination process is administered by an outside service, ADR Associates, L.L.C. ADR Associates works directly with the members of the complaint examiner pool, who are responsible for rendering final decisions on the complaints referred to them by OCCR. To carry out this important function, CCRB and OCCR assembled a pool of distinguished attorneys who live in the District of Columbia. In addition to having a reputation for competence, impartiality, and integrity, the complaint examiners must be members of the District of Columbia Bar, have practiced for five years or more, and have litigation or arbitration experience. At the end of fiscal year 2003, OCCR's complaint examiner pool had 16 members. The pool includes attorneys who work in private practice, government, non-profit organizations, and academia, and have a variety of other experiences.

Based on its experience with the operation of the complaint examination process, OCCR fine-tunes and modifies the process to ensure that it operates smoothly and provides adequate protections to officers and complainants. One change OCCR implemented early in the process was an opportunity for officers to submit written objections to the complaint examiner about OCCR's investigative report so the objections can be considered with the report. The objections ensure that the subject officer has an opportunity to raise any issues regarding the investigation before the complaint examiner takes any action. In addition, if a complaint examiner determines that an evidentiary hearing is necessary to resolve a complaint, OCCR has taken steps to ensure that complainants have counsel available to assist them at no cost during hearings. In general, because officers are represented by attorneys provided to them by the police union, the Fraternal Order of Police, OCCR made arrangements with a Washington-based law firm, Howrey Simon Arnold & White, to provide free counsel for complainants. Howrey is an international law firm that is based in Washington, D.C. The firm has over 600 attorneys worldwide, and more than 250 in Washington.

## II.    THE YEAR IN REVIEW

### A.    Introduction

Fiscal year 2003 was a very productive year for OCCR. After the agency moved through the startup and early operations phases of its development in fiscal years 2001 and 2002, OCCR came into its stride in fiscal year 2003. The agency launched its complaint examination process, and started issuing final decisions regarding complaints. The complaint examination process

was the final part of OCCR's overall complaint process that will handle the approximately 20% of complaints that are not resolved by dismissal or successful mediation.  Since August 2003, OCCR has been posting all of its complaint examiner decisions on its website to make this information available to the public, as well as the parties to the complaint.  OCCR also referred 31 complaints to mediation and completed 21 mediation sessions, giving the complainants and officers involved in these complaints the opportunity to meet face-to-face in an attempt to resolve the issues raised in the complaint.  In addition, OCCR made improvements to its investigative process to facilitate interviews and the collection of other evidence.

During the year, OCCR spearheaded a national effort to notify other police oversight and law enforcement agencies around the country about a bill pending before Congress that would negatively impact the work of these agencies, and contacted Congress to express its views about the bill.  OCCR expanded its community outreach efforts, starting a student interactive training program that provides information to District students about their rights and about the work of the agency.  OCCR also expanded the information available on its website and developed new outreach materials, which are translated into 13 foreign languages, to help disseminate information about the agency.  The agency continued to monitor the racial profiling policy recommendation it issued in January 2002, and worked on new policy recommendations, one of which, regarding disorderly conduct arrests, was issued in November 2003 after the fiscal year ended.  Finally, OCCR made several much-needed changes to its computer infrastructure and purchased new complaint management software to collect information about complaints and help manage complaint investigations.

These developments and others are discussed in more detail below, along with statistics regarding complaints received by OCCR in fiscal year 2003.  While there were many accomplishments over the course of the last year, the statistics compiled indicate that OCCR is facing a complaint load that, without additional resources to devote to the investigation and resolution of complaints, threatens to overwhelm the agency and undermine its complaint resolution process.  The agency has a growing number of complaints being received by the agency that is consistently larger than the number of complaints the agency is able to resolve with resources it currently has available.  This persistent difference, which has become more apparent as the agency has been open for a longer period of time, has caused the number of open complaints to grow, and is beginning to result in a backlog that will only grow as more time passes.  This is a trend that needs to be addressed to ensure the continued, successful operation of the agency.

### B.    Complaint Examination

In fiscal year 2003, OCCR launched its complaint examination process.  The complaint examination process was the final part of OCCR's overall complaint process, which also allows for complaints to be resolved through dismissal or successful mediation.  The significance of the complaint examination process is that it is the only means by which OCCR can issue a decision sustaining a complaint against an officer, although not all complaints that are referred to complaint examination are necessarily sustained.  The launching of the complaint examination process was the culmination of a complex and thoughtful series of steps that were needed to develop an adjudication process from beginning to end, along with the other aspects of the agency's operations.  These steps included completing investigations, preparing reports for

referral to complaint examination, drafting and promulgating regulations for the agency to guide the complaint examination process, recruiting a diverse pool of accomplished attorneys to serve as complaint examiners, and developing procedures to guide the complaint examiners' work.

With all of these steps complete, OCCR referred 31 complaints into the complaint examination process during fiscal year 2003, and the agency expects that it will have a regular flow of complaints being referred in the future. As of the end of fiscal year 2003, 19 complaints had been resolved in the complaint examination process. One of the complaints was withdrawn midway through the process, and the remaining 18 were resolved in 17 different decisions.[1] Table A-1 lists each of the complaints that was resolved, and identifies the allegations in the complaint, as well as the decision reached by the complaint examiner for each allegation.

### Table A-1:  Complaint Examiner Decisions

|  | Language / Conduct | Harassment | Excessive Force | Discriminatory Treatment | Retaliation |
|---|---|---|---|---|---|
| 01-0041 | Insufficient Facts | Sustained | -- | -- | -- |
| 01-0058 | Sustained | -- | -- | -- | -- |
| 01-0150 | Sustained | Sustained | -- | -- | -- |
| 01-0309 | -- | Sustained | -- | -- | -- |
| 01-0431 | Sustained | -- | -- | -- | -- |
| 02-0381 | Exonerated | -- | Sustained | -- | -- |
| 02-0153 | Exonerated | -- | -- | -- | -- |
| 01-0332 | Sustained | -- | -- | -- | -- |
| 02-0041 | Sustained | Sustained in Part | Sustained in Part | -- | -- |
| 02-0042 | Sustained in Part | Exonerated | Sustained in Part | -- | -- |
| 02-0112 | -- | -- | Sustained | -- | -- |
| 02-0476 | Exonerated | -- | -- | -- | -- |
| 01-0286 | Withdrawn | -- | Withdrawn | -- | -- |
| 01-0242 | Sustained | -- | -- | -- | -- |
| 02-0396 | Unfounded | -- | -- | -- | -- |
| 02-0318 | -- | Sustained | Sustained | -- | -- |
| 02-0319 | -- | Sustained | Sustained | -- | -- |
| 02-0090 | Insufficient Facts | Sustained | Sustained | -- | -- |
| 02-0116 | -- | Sustained | -- | -- | -- |

The full text of each decision is available on OCCR's website, www.occr.dc.gov. As Table A-1 indicates, complaint examiners resolved 31 allegations contained in the 19 complaints. To this point, the decisions have reflected all possible outcomes,[2] and, although no decisions

---

[1]     Two of the complaints related to the same underlying events, and, therefore, were resolved in one decision.

[2]     The four possible outcomes that a complaint examiner may reach are:

have resolved discriminatory treatment or retaliation allegations yet, the withdrawn complaint raised discriminatory treatment issues, and OCCR anticipates that its decisions will eventually address all types of allegations.

Table A-2 summarizes the decisions reached by the complaint examiners, identifying the frequency of the different outcomes. The table reflects the overall outcome for each complaint, and the individual outcome for each allegation in the complaints. Please note that when counting the overall outcome for a complaint, a complaint that has at least one sustained allegation is counted as a sustained complaint. The number of sustained complaints is determined by this method because if a complaint has at least one sustained allegation, it must be forwarded to the Chief of Police for imposition of discipline, even if the other allegations are not sustained. The only time that a complaint is not forwarded to the Chief of Police for discipline is when no allegations are sustained. In these cases, the complaint is dismissed after the complaint examiner issues his or her decision.

**Table A-2:  Complaint Examiner Decisions**

|  | Complaints | | Allegations | |
|---|---|---|---|---|
| Sustained | 15 | 78.9% | 22 | 71.0% |
| Exonerated | 2 | 10.5% | 4 | 12.9% |
| Insufficient Facts | -- | -- | 2 | 6.5% |
| Unfounded | 1 | 5.3% | 1 | 3.2% |
| Withdrawn | 1 | 5.3% | 2 | 6.5% |
|  |  |  |  |  |
| Total | 19 | | 31 | |

Looking at the decisions reached by complaint examiners, 15 of the 19 decisions, or 78.9%, sustained at least one allegation in the underlying complaint. Four of the 15 decisions had a split outcome where at least one allegation was sustained, and the outcome for at least one other allegation was exonerated or insufficient facts. There were three decisions, or 15.8%, where the officer was either completely exonerated or the complaint examiner concluded that the allegations in the underlying complaint were unfounded. This year's decisions also included two noteworthy occurrences. First, one of the complaints sent to complaint examination was

---

Sustained – where the complainant's allegation is supported by sufficient evidence to determine that the incident occurred and the actions of the officer were improper;

Exonerated – where a preponderance of the evidence shows that the alleged conduct did occur but did not violate MPD policies, procedures, or training;

Insufficient Facts – where there are insufficient facts to decide whether the alleged misconduct occurred; or

Unfounded – where the investigation determined no facts to support that the incident complained of actually occurred.

originally prepared for dismissal by OCCR's executive director.[3]  The CCRB member reviewing the dismissal did not concur with the executive director's determination, so, under the agency's system of checks and balances, the complaint was sent forward for review and final determination by a complaint examiner.  The complaint examiner ultimately exonerated the officer.  Second, one of the complaint examiner decisions sustained a complaint based on OCCR's investigation after an internal MPD investigation had exonerated the officer.[4]  Although it is not common, complaints can be filed with both OCCR and MPD, and because of the independence of OCCR's process, the complaint examiner is free to reach a conclusion contrary to MPD's if the evidence collected in OCCR's investigation supports the other conclusion.

Although the rate of sustained complaints may appear to be high – approximately 80% – one must remember that this is not 80% of all complaints, but 80% of the approximately 20% of complaints that are referred to complaint examination.  In all of these complaints referred to complaint examination, the executive director has found that there is "reasonable cause to believe" that police misconduct occurred, so one would anticipate a relatively high sustain rate for this specific group of complaints.  When the sustained complaints are considered as part of all of the complaints resolved by OCCR through adjudication, dismissal, and successful mediation, sustained complaints make up 14% of this group (or 15 of 107).  OCCR's overall sustain rate of 14% is slightly higher than the rate that experts anticipate for police oversight agencies (12% to 13%) and police internal affairs offices (10%) nationwide.[5]

All of the decisions that sustain at least one allegation were forwarded to the Chief of Police for imposition of discipline, and the Chief has not returned any of the decisions for reconsideration.  One hundred percent acceptance of decisions by a chief from an independent police oversight agency is exceptional,[6] and is a positive reflection on the District Government's statute creating OCCR, which limits the circumstances under which a complaint may be returned for reconsideration, as well as on the quality of OCCR's investigations and decisions.  As of the date of issuance of this report, three decisions were pending in the discipline process.  Of the remaining decisions, the Chief issued a letter of reprimand for one, and imposed suspensions without pay ranging from three days to 15 days.  OCCR will continue to track the discipline imposed by the Chief so that the agency is informed about how MPD handles the decisions

---

[3]     OCCR Complaint No. 02-0476.

[4]     OCCR Complaint No. 01-0332.

[5]     *See* Samuel Walker, Police Accountability:  The Role of Citizen Oversight (2001), at 120.

[6]     *See id.* at 75-77 (discussing the increase from 49% in 1994 to over 90% in more recent years for the rate at which the police chief takes disciplinary action on sustained cases from San Francisco's Office of Citizen Complaints); New York City Civilian Complaint Review Board, CCRB Performance, at http://www.nyc.gov/html/ccrb/html/about.html (discussing the increase from 31% in 1995 to 74% in 2000 for the rate at which the police department disciplines officers based on substantiated CCRB cases); Brian D. Crecente, Police Mostly Reject Review Panel's Advice; Chiefs Have Spurned 70% of Suggestions by Group Since 1992, Rocky Mountain News, December 22, 2003, at A4 (discussing the relationship between Denver's police department and the city's police oversight panel).

referred to it by OCCR, but early indications are that the decisions are being taken seriously, and meaningful discipline is resulting from them.

### C.    Mediation

In fiscal year 2003, OCCR mediated 21 complaints, bringing the total number of complaints mediated to 46.  Thirty-five of the mediation sessions (or 76%) were successful and resulted in an agreement between the complainant and the subject officer.  Eleven of the sessions (or 24%) were unsuccessful, and the underlying complaints were referred back to the executive director for appropriate action.  To date, mediators have helped resolve complaints that allege harassment, the use of language or conduct that is insulting, demeaning, or humiliating, or a combination of both.

In addition to the statistical success rate, survey results indicate that the program has been well received.  A survey of the participants in mediation indicates that the overwhelming majority of complainants and subject officers who responded to the survey found the mediator to be helpful or very helpful, the mediation session to be satisfactory or very satisfactory, and the resulting agreement to be fair or very fair.  In addition, over one-third of the respondents left their mediation session with more positive feelings about the other party, while only 11% had more negative feelings, and 52% indicated no change in their feelings.  Finally, OCCR is proactively taking steps to protect the integrity of the mediation process by dismissing complaints and pursuing discipline of officers when one of the parties fails to appear for mediation or refuses to participate in the mediation process in good faith.

OCCR has been very pleased with the success of the mediation program, and plans to continue to use it regularly.  The number of complaints referred to mediation has steadily grown over the three years OCCR has been open from 19 in fiscal year 2001 to 28 in fiscal year 2002 to 31 in fiscal year 2003.  For fiscal year 2004, OCCR aims to continue the growth in complaints referred to mediation, and to seek out new and different ways to use the mediation program, like the situation described in the first mediation example below.

As an illustration of the type of complaints that were mediated in fiscal year 2003, following are two examples that describe the complaint and the mediation session:

### 1.    *Mediation Example #1*

Three students at a District charter school filed complaints alleging that a group of MPD officers harassed them and used inappropriate language toward them while the officers stopped and searched the students after they left a convenience store near school.  The police officers informed the students that they matched the description of people selling drugs.  These complaints were referred to mediation, and OCCR and the Community Dispute Resolution Center developed a special plan for the mediation, which involved three students, school officials, and over 15 officers.  The plan involved holding a number of individual meetings with the students and the officers before bringing them all together in a joint mediation session that lasted several hours.

At the start of the mediation process, the students believed that the officers should: (1) acknowledge that they have treated youth differently at the inner-city charter school than youth attending schools in more upscale neighborhoods, (2) admit to racial profiling, and (3) work with students to build a more positive relationship through a dialogue. At the outset, the officers believed that the students: (1) must do something to differentiate themselves from the neighborhood drug dealers and hoodlums because the school is located in a high-crime district with heavy drug use and frequent drive-by shootings, (2) need to work with the police to clean up the community, and (3) should follow officer instructions to defuse tensions during police stops.

The joint mediation session allowed both the students and officers to vent their frustrations and gain a better understanding of the other's perspective. The students and the MPD sergeant in charge of the officers understood that the longstanding issues would not be resolved in one joint session. Acknowledging the need for an iterative process, the students and the sergeant agreed to set up a future meeting with the goal of forming a working group between the charter school and the police department in an effort to improve the relationship among the police, the students of the charter school, and the residents in the community surrounding the school. Satisfied with this joint commitment to cooperate in the future, the students and the sergeant signed an agreement releasing each other from any future administrative or legal claims related to the incident, and agreed that the mediation successfully resolved the issues raised in the complaints.

### 2.    *Mediation Example #2*

The complainant filed a complaint against an officer for harassment and use of disrespectful language. The complainant alleged that she was stopped at a traffic light near her daughter's school when an officer asked her to pull over in an extremely rude and intimidating manner. The officer pulled her over to warn her about not wearing her seatbelt and gave her a written warning. Following the incident, the complainant wrote to the Mayor's office to express her concern and anger regarding the officer's behavior, which she described as verbal and physical intimidation. The Mayor's office referred her to the Office of Citizen Complaint Review.

The complainant is an immigrant from Central America. At the mediation she explained that she felt harassed and that she was shown a lack of respect by the officer when he stopped her in her car on her way to pick up her daughter from school. The incident was frightening to her, and she wanted to address it and not let it pass without taking some action. That is why she took time off from work to participate in mediation. She explained that since coming to the United States, she has taught her daughter to respect the police in this country. She said that she had suffered greatly because of the excesses of power by law enforcement officers in her own country, and that she had come to the United States to escape abuses by the police and the military. She wanted her daughter to know that it was different in the United States, and she was concerned that the behavior of this officer would undermine her message.

Initially the officer was defensive, but, as the complainant explained her feelings, he listened and understood her concerns. After they both had the opportunity to talk about the incident and how each of them felt about it, the officer apologized to the complainant and

admitted that he had had problems dealing with anger in the past. He told her that he would try to work on this problem. They agreed that the matter was resolved and signed a mediation agreement acknowledging that they had settled their issues, and that they both value professional, respectful, and educational approaches to law enforcement.

### D.    Investigations

Over the course of fiscal year 2003, OCCR made changes and improvements to its complaint investigation process to help the agency conduct investigations more efficiently and quickly. The most significant change was that OCCR purchased new complaint management software at the end of the fiscal year. Although the software implementation was still in progress during the first few months of fiscal year 2004, the early signs were good. OCCR's old software served only as a database to collect information about complaints. Consequently, it was only tangentially connected to the investigative process and filled only the limited role of collecting data. The new software will be much more central to the investigative process, allowing investigators and supervisors to manage the investigation of complaints. The new software will collect data, allow for planning of investigative tasks, store and organize documents, pictures, and other electronic files, generate letters and other documents from templates, and allow for more sophisticated analysis of complaints and data. OCCR has been devoting significant time and resources to implementing the new complaint management software, and has already started to realize its benefits.

In addition to the new complaint management software, OCCR also began electronic notification of officers to appear for interviews and other OCCR proceedings. MPD gave OCCR access to its pre-existing electronic system for summoning officers for court appearances, and worked with OCCR to make the system meet OCCR's needs. The electronic notification is much faster and more reliable than the paper-based notification system OCCR had been using, and is much more efficient because it capitalizes on a pre-existing infrastructure that MPD already had in place.

In fiscal year 2004, OCCR will continue the full implementation of these changes to its investigative process, and will continue to look for other changes, both large and small, that will allow the agency to more efficiently investigate complaints.

### E.    Statistics

In an effort to describe the work performed by OCCR, the nature and location of the complaints that the office received, and the characteristics of the complainants and subject officers, OCCR has collected the statistics included in this section. These statistics also reflect the data that OCCR has been able to capture most reliably about its complaints, and the data it has been tracking through the end of fiscal year 2003.[7] OCCR expects that its statistical

---

[7]    As described above, OCCR purchased new complaint management software at the end of fiscal year 2003, and has been working to implement the software during the first few months of fiscal year

reporting will develop and improve over time as it implements its new complaint management software and explores new ways to provide a more vivid picture of its work and what it has learned about interactions between the public and the police, and patterns and trends in these interactions.

At the end of OCCR's third year of operation, the statistics the agency has collected take on more meaning because they begin to reflect enough data to allow for analysis of the development of the agency, its workload, and its capacity for resolving complaints. These statistics present some cause for concern because they identify a growing number of complaints being received by the agency that is consistently larger than the number of complaints the agency is capable of resolving with resources it currently has available. The persistent difference between the number of complaints received and the number of complaints resolved has caused the number of open complaints to grow, and is beginning to result in a backlog that will only grow as more time passes.[8] In fiscal year 2004, OCCR will be working to become as efficient as possible to minimize the difference between the number of complaints received and the number of complaints resolved, as well as the growth of the backlog, but there are limits to what the agency can accomplish with its current funding and staffing levels. These statistics are discussed in more detail in this section, and OCCR believes that the statistics, along with the best practices for funding and staffing used by comparable police oversight agencies, are a warning sign that additional resources are needed to keep the agency from becoming overwhelmed by a backlog that could undermine police accountability in the District.

## 1.      *Contacts and Formal Complaints*

Under the statute and regulations governing OCCR, all complaints must be reduced to writing and signed by the complainant, who must certify the truth of the statements in the complaint. Once a complaint has met these requirements, it is referred to as a "formal complaint." Frequently, OCCR is contacted by people who inquire about filing a complaint, but who have not yet submitted a signed complaint form. Where possible, OCCR opens a file for each one of these contacts and attempts to obtain a formal complaint by mailing a form to the

---

2004. The transition to the new software has made the compilation of these statistics difficult because the agency stopped using its old software as of September 30, 2003, and devoted its effort to entering data into the new software beginning in October 2003. Consequently, these statistics may be subject to minor changes once the data entry process has been completed, and statistics can be compiled using the new software. Although the process had not been completed when the statistics for this annual report were compiled, OCCR expects that re-entering its data into the new software will improve the quality of the data and allow OCCR to capture additional data. In addition, OCCR expects that the full implementation of the new software will allow the agency to develop new and different ways of reporting about the complaints it receives.

[8]      Once OCCR has completed entering and verifying the data in its new complaint management software, it will be able to more accurately calculate the age of its complaints without a significant manual effort. OCCR's old software did not allow for the collection of multiple dates, and, most importantly, the date a formal complaint was received by OCCR, for each complaint, so the information would have to be gathered manually.

person or giving him or her instructions about filing a complaint in person. If no formal complaint is received, the file related to that contact is closed. In addition, contacts may be closed for administrative reasons or may be referred to MPD or another law enforcement agency when the contact clearly relates to an issue outside OCCR's jurisdiction.

Table 1-1 indicates the number of contacts received by OCCR in fiscal years 2001,[9] 2002, and 2003, the number of formal complaints that resulted in each year, and the disposition of each contact that did not result in a formal complaint. The table also includes a total for all three years in each category. In fiscal year 2003, OCCR experienced significant growth in both the number of contacts and the number of formal complaints. The number of contacts increased by 14.6% (from 535 to 613) and the number of formal complaints increased by 13.5% (from 318 to 361) from fiscal year 2002 to fiscal year 2003. This growth is not surprising considering that OCCR is a relatively new agency that is actively working to educate people in the District about the agency and the process for filing a complaint. OCCR expects further growth in the future as the agency continues its community outreach efforts and considers changes to its process that will increase the number of complaints filed with OCCR.

In addition to the growth in the number of contacts and the number of formal complaints, the statistics also show growth in the number of contacts referred to MPD. These statistics must be considered in conjunction with the statistics in the next section of the report regarding referral of formal complaints to MPD. When considered together, they indicate growth of approximately 9.5% for referrals to MPD overall (from 116 to 127) from fiscal year 2002 to fiscal year 2003. Because the number of referrals grew at rate lower than the rate of growth for contacts and formal complaints in fiscal year 2003, OCCR investigated a larger percentage of the complaints it received, and referred a smaller percentage to MPD.

### Table 1-1:  Contacts and Formal Complaints

|  | FY01 | FY02 | FY03 | Total |
|---|---|---|---|---|
| **Total Contacts** | 477 | 535 | 613 | 1625 |
|  |  |  |  |  |
| **Contact Closed – No Formal Complaint** | 158 | 181 | 197 | 536 |
| **Contact Closed – Administrative Reasons** | 8 | 3 | 8 | 19 |
| **Referred to MPD** | 1 | 28 | 37 | 66 |
| **Referred to Other Agencies** | -- | 5 | 10 | 15 |
|  |  |  |  |  |
| **Total Formal Complaints** | 310 | 318 | 361 | 989 |

---

[9]     Please note that all of the statistics for fiscal year 2001 cover only a nine-month period. OCCR opened to the public on January 8, 2001, which was three months into fiscal year 2001.

### 2.    *Disposition of Formal Complaints*

Each year, OCCR works to resolve as many formal complaints as possible.  Complaints are closed because they have been resolved by OCCR, which includes being dismissed in accordance with the OCCR statute, successfully mediated, or adjudicated through OCCR's complaint examination process.  Complaints are also referred to MPD because they contain allegations that are not within OCCR's jurisdiction to investigate or they were filed more than 45 days after the incident occurred, and some complaints are referred to other law enforcement agencies when the complaints relate to another agency's officers.  Finally, a small number of complaints are withdrawn by the complainant or closed for administrative reasons.

Table 2-1 indicates the total number of formal complaints that were closed in fiscal years 2001, 2002, and 2003, as well as the specific disposition of each complaint.  The table also includes a total for all three years in each category.  From fiscal year 2002 to fiscal year 2003, the number of formal complaints closed by OCCR grew by approximately 5.9% (from 222 to 235).  The relative consistency between the number of complaints closed in fiscal years 2002 and 2003 gives a good indication of the number of complaints the agency realistically can close during any given year with its current level of resources.  Nonetheless, OCCR has implemented some changes, such as new report formats and a streamlined review process, and is exploring other methods to become more efficient and close a larger number of complaints.

### Table 2-1:  Disposition of Formal Complaints

|  | FY01 | FY02 | FY03 | Total |
|---|---|---|---|---|
| Adjudicated | -- | -- | 19 | 19 |
| Dismissed | 21 | 91 | 75 | 187 |
| Successfully Mediated Complaints | 7 | 13 | 15 | 35 |
| Withdrawn by Complainant | 11 | 17 | 9 | 37 |
| Referred to MPD | 107 | 88 | 90 | 285 |
| Referred to Other Police Agencies | 3 | 1 | 18 | 22 |
| Administrative Closures | 12 | 12 | 9 | 33 |
|  |  |  |  |  |
| Closed Formal Complaints | 161 | 222 | 235 | 618 |

### 3.    *Status of Pending Formal Complaints at the End of Each Fiscal Year*

At the end of each fiscal year, there are a number of formal complaints that are still pending.  Table 3-1 indicates the total number of complaints from all years that were open at the end of fiscal years 2001, 2002, and 2003.  The table also indicates the general status of the open complaints, which may be assigned to a complaint examiner and awaiting a decision, referred to mediation and awaiting action, referred to the U.S.  Attorney's Office for possible criminal prosecution and awaiting action, currently under investigation, currently under investigation with a preliminary investigative report drafted and being reviewed, or awaiting the initial executive decision about how to proceed with a new complaint.

The most noteworthy change for fiscal year 2003 is the substantial growth in the number of complaints under investigation.  Generally speaking, the number of complaints in all of the

other categories remained consistent from the end of fiscal year 2002 to the end of fiscal year 2003. As a consequence, the number of complaints under investigation reflects most of the growth that resulted from the growing number of complaints received by the agency and the steady number of complaints OCCR is able to resolve with its current funding and staffing levels. One consequence of the growth in the number of complaints under investigation is that the average number of complaints under investigation per investigator increased from 41.2 in fiscal year 2002 (five investigators with 206 complaints), to 52.5 in fiscal year (six investigators with 315 complaints).

**Table 3-1: Status of Pending Formal Complaints at the End of Each Fiscal Year**

|  | FY01 | FY02 | FY03 |
|---|---|---|---|
| **Assigned to Complaint Examiner** | -- | -- | 12 |
| **Referred for Mediation** | 15 | 10 | 11 |
| **Referred to U.S. Attorney's Office** | 20 | 15 | 18 |
| **Under Investigation by OCCR** | 99 | 130 | 232 |
| **Under Investigation / Report Drafted** | 15 | 80 | 79 |
| **Executive Decision** | -- | 4 | 7 |
|  |  |  |  |
| **Total Number of Open Complaints** | 149 | 239 | 359 |

### 4.    OCCR Workload

OCCR closes complaints each year at one of three different points in the life of the complaint. First, complaints are closed shortly after they are received because they are referred to MPD or another police agency. These are complaints that are outside OCCR's jurisdiction and that OCCR does not have the authority to investigate. In general, the only work that OCCR performs on these complaints is to conduct an initial investigation to confirm the nature of the complaint, and then prepare and send the complaint and related materials to the appropriate agency. Second, complaints are closed because the complainant withdraws the complaint or for other administrative reasons. These complaints require varying amounts of work by OCCR depending on when the complainant withdraws the complaint, which may occur at any point up through a final decision, or when the event occurs that triggers administrative closure. Some of the events that trigger administrative closure, which also may occur at any time, include the resignation of an officer from MPD, or the completion of an investigation by MPD into the same allegations that results in the discipline of the officer. Finally, complaints are closed after they have been resolved by OCCR. OCCR resolves complaints by adjudication, dismissal, or successful mediation. These complaints generally require the most work, including a full investigation, the completion of an investigative report, and any other related adjudication, dismissal, or mediation processes.

Table 4-1 collects statistics from the three preceding sections of this part of the report to illustrate the proportion of complaints that are closed at the three different points in the life of a complaint. First, the table shows the number of formal complaints that OCCR received in all three fiscal years. Next, the table subtracts the number of complaints referred to MPD or another police agency to arrive at the number of formal complaints that fall within OCCR's jurisdiction.

After that, Table 4-1 subtracts the complaints that reach a point short of final resolution where they require no further action, such as those that are withdrawn or administratively closed, to arrive at the number of complaints that require resolution by OCCR. Finally, the table subtracts the number of complaints resolved in each fiscal year to show the number of complaints that require resolution by OCCR, but that are carried over to the next fiscal year unresolved. Thus, each fiscal year begins with a number of complaints already open that need to be resolved. New complaints are received over the course of the fiscal year. For a graphical depiction, Chart 4-1 includes lines indicating the number of complaints that require resolution by OCCR and the number of complaints resolved by OCCR. The area between the two lines on Chart 4-1 represents the number of complaints that are carried over to the next fiscal year unresolved.

These statistics demonstrate the effect of a persistent difference between a growing number of complaints being received by the agency that is consistently larger than the number of complaints the agency is able to resolve with its current funding and staffing levels. The result is a greater number of complaints open, with an increasing number of them getting older, and, therefore, the agency's backlog of complaints growing. Most of the complaints are still relatively recent, but the agency will continue to fall behind without additional staff to investigate the complaints. Although OCCR will strive to improve its efficiency, the similarity between the number of complaints resolved in fiscal years 2002 and 2003 suggests that this level may be a reasonable benchmark for the quantity of complaints that can be resolved with OCCR's current staffing level, which is a ratio of 617 sworn officers for each line investigator. OCCR's ratio of sworn officers is significantly greater than the ratio in other cities, such as New York, Detroit, and San Francisco, all of which have comparable agencies with their own investigative staff, and have ratios of 409:1, 225:1, and 150:1, respectively. If OCCR had the same ratio as these other agencies, the number of line investigators employed by OCCR would increase by anywhere from three to 18 investigators. The increased staffing would alleviate the danger that OCCR will be overwhelmed by a steadily increasing caseload, like the one that eventually led to the failure in 1995 of OCCR's predecessor agency, the Civilian Complaint Review Board.[10]

---

[10]    The history of the Civilian Complaint Review Board that eventually led to the agency being abolished is described in detail in the court's decision in *Cox v. District of Columbia*, 821 F. Supp. 1, 7-9 (D.D.C. 1993). The *Cox* case illustrates the importance of attention by all branches of the government to the functioning of the District's police oversight agency, as well as the importance of vigilance to ensure that the agency has adequate resources to carry out its mission.

**Table 4-1:  OCCR Workload**

|  | FY01 | FY02 | FY03 | Total |
|---|---|---|---|---|
| **Total Formal Complaints** | 310 | 318 | 361 | 989 |
|  |  |  |  |  |
| **Referred to MPD or Other Agency** | 110 | 89 | 108 | 307 |
| **Complaints in OCCR's Jurisdiction** | 200 | 229 | 253 | 682 |
|  |  |  |  |  |
| **Complaints Requiring No Further Action (Withdrawn or Administratively Closed)** | 23 | 29 | 18 | 70 |
| **Complaints Requiring Resolution by OCCR** | 177 | 202 | 233 | 612 |
|  |  |  |  |  |
| **Complaints Resolved (Adjudication, Dismissal, and Successful Mediation)** | 28 | 104 | 109 | 241 |
| **Unresolved Complaints Each Fiscal Year** | 149 | 98 | 124 | 371[11] |

**Chart 4-1:  OCCR Workload**



---

[11]      The overall total of the unresolved complaints each fiscal year should be equal to the number of complaints open at the end of fiscal year 2003, as shown in Table 3-1, because the number of unresolved complaints from each fiscal year represents a net number of open complaints that are carried over to subsequent fiscal years.  There is a difference of 12 between the totals in the two tables (359 versus 371), which OCCR believes is an error that occurred during regular record keeping and the compilation of statistics.  OCCR will attempt to resolve the discrepancy once its complaint data is entered into its new complaint management software.

5.    *Allegations in Formal Complaints*

Each formal complaint may contain allegations of more than one type of misconduct, including harassment, use of language or conduct that is insulting, demeaning, or humiliating, retaliation for filing a complaint with OCCR, use of excessive or unnecessary force, or discriminatory treatment.  In addition, complainants often allege other conduct that does not fall within the five types of misconduct under OCCR's jurisdiction.

Table 5-1 indicates the total number of allegations contained in all of the formal complaints received in fiscal years 2001, 2002, and 2003, as well as the number of each type of allegation made, and a total for all three years in each category.  Table 5-1 and Chart 5-1 also indicate the percentage of the total number of allegations that each type of allegation constitutes. The statistics show that each type of allegation maintained a relatively consistent percentage of the overall number of allegations made in all three years.  One noteworthy change was the decrease in the percentage of excessive force allegations in fiscal year 2003 to the same level as fiscal year 2001 after a noticeable spike in fiscal year 2002.

**Table 5-1:  Allegations in Formal Complaints**

|  | FY01 | | FY02 | | FY03 | | Total | |
|---|---|---|---|---|---|---|---|---|
| **Language/Conduct** | 148 | 34.6% | 154 | 34.5% | 197 | 37.2% | 499 | 35.6% |
| **Harassment** | 109 | 25.5% | 125 | 28.0% | 136 | 25.7% | 370 | 26.4% |
| **Excessive Force** | 73 | 17.1% | 104 | 23.3% | 99 | 18.7% | 276 | 19.7% |
| **Discrimination** | 36 | 8.4% | 18 | 4.0% | 30 | 5.7% | 84 | 6.0% |
| **Retaliation** | -- | 0.0% | 5 | 1.1% | 6 | 1.1% | 11 | 0.8% |
| **Other** | 62 | 14.5% | 40 | 9.0% | 61 | 11.5% | 163 | 11.6% |
| | | | | | | | | |
| **Total Allegations** | 428 | | 446 | | 529 | | 1403 | |

Chart 5-1:  Allegations in Formal Complaints (as a Percentage)



### 6.    *Race or National Origin of Complainants*

When a person files a complaint, the person is asked to identify his or her race or national origin. Table 6-1 reflects the race or national origin indicated by each complainant.[12] The FY01, FY02, and FY03 columns reflect the race or national origin of the complainant for each complaint filed in fiscal years 2001, 2002, and 2003, not eliminating duplicates of complainants who filed multiple complaints. Stated differently, if one African-American man filed two separate complaints in 2003, the FY03 column would reflect two African-American complainants. The statistics show that the race or national origin of complainants had noticeable changes from fiscal year 2002 to fiscal year 2003, generally moving closer to the racial breakdown in the District's population. The one exception was Latino complainants, who made up a smaller percentage of all complainants and moved further away from the percentage of Latino residents in the District.

In addition, Table 6-1 and Chart 6-1 indicate the percentage of the total number of complaints (excluding complaints with an unreported complainant race or national origin) that were filed by members of each racial group for fiscal years 2001, 2002, and 2003. The table and chart also includes the racial composition of the population of the District of Columbia as a whole.[13] The data regarding the composition of the population of the District is included for reference purposes. It should be noted that anyone, whether a resident of the District or not, may file a complaint with OCCR.

---

[12]    In some cases, the person is unwilling to provide race or gender information or fails to include it when completing the complaint form. Complainants in these complaints are counted in the "unreported" category. Considering the larger number of complainants who did not report their race or national original in fiscal year 2003, OCCR is going to make efforts to improve the voluntary race or national origin reporting of complainants, and, where justified, may rely on visual inspection when the information is not volunteered.

[13]    The racial breakdown of the District population data was obtained from the 2000 Census data available on the U.S. Census website, http://quickfacts.census.gov/qfd/states/11000.html.

**Table 6-1:  Race or National Origin of Complainants**

|  | FY01 | | FY02 | | FY03 | | District Pop. |
|---|---|---|---|---|---|---|---|
| African-American | 199 | 77.1% | 219 | 76.0% | 197 | 67.5% | 60.0% |
| White | 36 | 14.0% | 46 | 16.0% | 62 | 21.2% | 27.8% |
| Latino | 14 | 5.4% | 16 | 5.6% | 14 | 4.8% | 7.9% |
| Asian | 4 | 1.6% | 4 | 1.4% | 7 | 2.4% | 2.7% |
| Middle Eastern | 5 | 1.9% | 1 | 0.3% | 10 | 3.4% | -- |
| Native American | -- | -- | 1 | 0.3% | 1 | 0.3% | 0.3% |
| Multiracial / Other | -- | -- | 1 | 0.3% | 1 | 0.3% | 2.4% |
| Unreported | 52 | | 30 | | 69 | | |
|  | | | | | | | |
| Total | 310 | | 318 | | 361 | | |



Chart 6-1:  Race or National Origin of Complainants (as a Percentage)

Each complainant may file multiple complaints with OCCR.  For fiscal years 2002 and 2003, Table 6-2 adds FY02 Different Complaints and FY03 Different Complainants columns, which reflect the race or national origin of each unique complainant, eliminating duplicates of complainants who filed multiple complaints.  Stated differently, if one African-American man filed two or more separate complaints in 2003, the FY03 Different Complainants column would count that complainant only once.  One other way to look at the statistics would be that 190 different African-American complainants filed 197 complaints in fiscal year 2003.

Looking at the statistics, they show that there were only 16 complaints that were filed by a person who also filed another complaint.  Except for one person who filed five separate complaints, no other single person filed more than a two complaints and over 96% of the complaints received by OCCR came from different people.  These statistics indicate that, with

- 23 -

one possible exception, people are not abusing OCCR's complaint process by the repeated filing of complaints.

**Table 6-2:  Race or National Origin of Complainants**

|  | FY02 | FY02 Different Complainants | FY03 | FY03 Different Complainants |
|---|---|---|---|---|
| **African-American** | 219 | 208 | 197 | 190 |
| **White** | 46 | 46 | 62 | 59 |
| **Latino** | 16 | 16 | 14 | 14 |
| **Asian** | 4 | 4 | 7 | 6 |
| **Middle Eastern** | 1 | 1 | 10 | 6 |
| **Native American** | 1 | 1 | 1 | 1 |
| **Multiracial / Other** | 1 | 1 | 1 | 1 |
| **Unreported** | 30 | 30 | 69 | 68 |
|  |  |  |  |  |
| **Total** | 318 | 307 | 361 | 345 |

7.      *Gender of Complainants*

When a person files a complaint, the person is asked to identify his or her gender.  Table 7-1 reflects the gender indicated by each complainant.  The FY01, FY02, and FY03 columns reflect the gender of the complainant for each complaint filed in fiscal years 2001, 2002, and 2003, not eliminating duplicates of complainants who filed multiple complaints.  Stated differently, if one female filed two separate complaints in 2003, the FY03 column would reflect two female complainants.

In addition, Table 7-1 and Chart 7-1 indicate the percentage of the total number of complaints that were filed by male and female complainants for fiscal years 2001, 2002, and 2003.  The table and chart also includes the gender breakdown of the population of the District of Columbia as a whole.[14]  The statistics show that the gender of complainants remained relatively consistent in all three years.

### Table 7-1:  Gender of Complainants

|  | FY01 |  | FY02 |  | FY03 |  | District Pop. |
|---|---|---|---|---|---|---|---|
| Male | 173 | 56.2% | 174 | 54.9% | 201 | 55.7% | 47.1% |
| Female | 135 | 43.8% | 143 | 45.1% | 160 | 44.3% | 52.9% |
| Unreported | 2 |  | 1 |  | 0 |  |  |
|  |  |  |  |  |  |  |  |
| Total | 310 |  | 318 |  | 361 |  |  |

---

[14]     The gender breakdown of the District population data was obtained from the 2000 Census data available on the U.S. Census website, http://quickfacts.census.gov/qfd/states/11000.html.



Chart 7-1:  Gender of Complainants (as a Percentage)

Each complainant may file multiple complaints with OCCR.  For fiscal years 2002 and 2003, Table 7-2 adds FY02 Different Complainants and FY03 Different Complainants columns, which reflect the gender of each unique complainant, eliminating duplicates of complainants who filed multiple complaints.  Stated differently, if one female filed two or more separate complaints in 2003, the FY03 Different Complainants column would count that complainant only once.  One other way to look at the statistics is that 155 different female complainants filed 160 complaints in fiscal year 2003.

**Table 7-2:  Gender of Complainants**

|  | FY02 | FY02 Different Complainants | FY03 | FY03 Different Complainants |
|---|---|---|---|---|
| **Male** | 174 | 166 | 201 | 190 |
| **Female** | 143 | 140 | 160 | 155 |
| **Unreported** | 1 | 1 | -- | -- |
|  |  |  |  |  |
| **Total** | 318 | 307 | 361 | 345 |

8.    *Age of Complainants*

When a person files a complaint, the person is asked to identify his or her date of birth.  OCCR collected date of birth information for 57% of its complaints (206 of 361) in fiscal year 2003, and the agency will work to collect more complete date of birth information for its complaints in the future.  Table 8-1 reflects the age that corresponds with the date of birth reported by each complainant in fiscal year 2003.  In addition, Table 8-1 and Chart 8-1 indicate the percentage of the total number of complaints that were filed by complainants in each age

group, as well as the age breakdown of the District's population.[15]  Please note that the age of OCCR complainants is generally skewed toward older ages because minors may not file complaints on their own.  Instead, a parent or guardian must file the complaint, and they are considered the complainant, even though they are acting on behalf of a minor.

**Table 8-1:  Age of Complainants**

|  | FY03 |  | District Population |
|---|---|---|---|
| **Under 15** | -- | -- | 17.1% |
| **15-24** | 37 | 18.0% | 15.7% |
| **25-34** | 53 | 25.7% | 17.8% |
| **35-44** | 56 | 27.2% | 15.3% |
| **45-54** | 46 | 22.3% | 13.2% |
| **55-64** | 10 | 4.9% | 8.7% |
| **65 and Older** | 4 | 1.9% | 12.3% |
| **Total** | 206 |  |  |



---

[15]    The age breakdown of the District population data was obtained from the 2000 Census data available at the General Demographic Characteristics link on the U.S. Census website, http://quickfacts.census.gov/qfd/states/11000lk.html.

### 9. *Race or National Origin of Subject Officers*

When a person files a complaint, OCCR records the race or national origin of the subject officer in the complaint. In some instances the complainant is able to identify the officer's race, and in others, OCCR determines the identity of the officer and his or her race during the course of its investigation. In other instances, the complainant is not able to identify the race of the officer and the identity of the officer remains unknown. Table 9-1 reflects the race or national origin for officers who could be identified or whose race or national origin was reported by the complainant. The FY01, FY02, and FY03 columns reflect the race or national origin of the officer for each complaint filed in fiscal years 2001, 2002 and 2003, not eliminating duplicates of officers who were the subject of multiple complaints. Stated differently, if one African-American officer was the subject of two separate complaints in 2003, the FY03 column would reflect two African-American officers.

In addition, Table 9-1 and Chart 9-1 indicate the percentage of the total number of subject officers (excluding complaints with an unidentified subject officer race or national origin) who were members of each racial group for all three years. The table and chart also indicate the racial composition of the entire work force of MPD officers.[16]

### Table 9-1:  Race or National Origin of Subject Officers

|  | FY01 | | FY02 | | FY03 | | Entire Police Force |
|---|---|---|---|---|---|---|---|
| African-American | 233 | 65.6% | 221 | 62.8% | 205 | 59.1% | 66.5% |
| White | 106 | 29.9% | 98 | 27.8% | 112 | 32.6% | 27.7% |
| Latino | 15 | 4.2% | 26 | 7.4% | 18 | 5.2% | 4.9% |
| Asian | 1 | 0.3% | 6 | 1.7% | 6 | 1.7% | 0.9% |
| Other | -- | -- | 1 | 0.3% | 5 | 1.4% | -- |
| Unidentified | 52 | | 48 | | 71 | | |
| | | | | | | | |
| Total | 407 | | 400 | | 417 | | |

---

[16]     The racial breakdown of MPD officers was obtained from MPD's 2000 annual report, which was the most recent one available. At the end of 2000, MPD had 3,614 sworn officers. 2,404 were African-American, 1,001 were white, 176 were Latino, and 33 were Asian.



Each police officer may be the subject of multiple complaints filed with OCCR. For fiscal years 2002 and 2003, Table 9-2 adds FY02 Different Officers and FY03 Different Officers columns, which reflect the race or national origin of each unique officer, eliminating duplicates of officers who were the subject of multiple complaints. Stated differently, if one African-American officer was the subject of two or more separate complaints in 2003, the FY03 Different Officers column would count that officer only once. One other way to look at the statistics is that 165 different African-American officers were the subject of 205 complaints in fiscal year 2002.

The statistics show that there were 45 different officers who were the subject of multiple complaints. Most of these officers were the subject of only two complaints, but there were two officers who were the subject of four complaints, one officer was the subject of five complaints, and two officers who were the subject of six complaints.

**Table 9-2:  Race or National Origin of Subject Officers**

|  | FY02 | FY02 Different Officers | FY03 | FY03 Different Officers |
|---|---|---|---|---|
| **African-American** | 221 | 176 | 205 | 165 |
| **White** | 98 | 73 | 112 | 85 |
| **Latino** | 26 | 14 | 18 | 15 |
| **Asian** | 6 | 3 | 6 | 5 |
| **Other** | 1 | 1 | 5 | 3 |
| **Unidentified** | 48 | 48 | 71 | 71 |
|  |  |  |  |  |
| **Total** | 400 | 315 | 417 | 344 |

### 10.    *Gender of Subject Officers*

When a person files a complaint, OCCR records the gender of the officer.  Table 10-1 reflects the gender for officers who could be identified or whose gender was reported by the complainant.  The FY01, FY02, and FY03 columns reflect the gender of the officer for each complaint filed in fiscal years 2001, 2002, and 2003, not eliminating duplicates of officers who were the subject of multiple complaints.  Stated differently, if one female officer was the subject of two separate complaints in 2003, the FY03 column would reflect two female officers.

In addition, Table 10-1 and Chart 10-1 indicate the percentage of the total number of subject officers (excluding complaints with an unidentified subject officer gender) who were either male or female for fiscal years 2001, 2002, and 2003.  The table and chart also indicate the gender composition of the entire work force of MPD officers.[17]  The statistics show that the gender breakdown of subject officers was generally consistent from fiscal year 2002 to fiscal year 2003.

### Table 10-1:  Gender of Subject Officers

|  | FY01 | | FY02 | | FY03 | | Entire Police Force |
|---|---|---|---|---|---|---|---|
| Male | 321 | 86.8% | 300 | 84.0% | 293 | 83.0% | 75.7% |
| Female | 49 | 13.2% | 57 | 16.0% | 60 | 17.0% | 24.3% |
| Unidentified | 37 | | 43 | | 64 | | |
| | | | | | | | |
| Total | 407 | | 400 | | 417 | | |

---

[17]    The gender breakdown of MPD officers was obtained from MPD's 2000 annual report, which was the most recent one available.  At the end of 2000, MPD had 3,614 sworn officers.  2,737 were men and 877 were women.



Each police officer may be the subject of multiple complaints filed with OCCR. For fiscal years 2002 and 2003, Table 10-2 adds FY02 Different Officers and FY03 Different Officers columns, which reflect the gender of each unique officer, eliminating duplicates of officers who were the subject of multiple complaints. Stated differently, if one female officer was the subject of two or more separate complaints in 2003, the FY03 Different Officers column would count that officer only once. One other way to look at the statistics is that 49 different female officers were the subject of 60 complaints in fiscal year 2003.

**Table 10-2: Gender of Subject Officers**

|  | FY02 | FY02 Different Officers | FY03 | FY03 Different Officers |
|---|---|---|---|---|
| **Male** | 300 | 228 | 293 | 231 |
| **Female** | 57 | 44 | 60 | 49 |
| **Unidentified** | 43 | 43 | 64 | 64 |
|  |  |  |  |  |
| **Total** | 400 | 315 | 417 | 344 |

## 11. *Police Districts and Units*

The officers who were the subject of complaints came from police districts throughout the city, as well as several other MPD units. When a person files a complaint and the district or unit of the officer can be identified, OCCR records this information. Table 11-1 reflects the district or unit of the officer in each complaint. The FY01, FY02, and FY03 columns reflect the district or unit of the officer for each complaint filed in fiscal years 2001, 2002, and 2003, not eliminating duplicates of officers who were the subject of multiple complaints. Stated

differently, if one First District officer was the subject of two separate complaints in 2003, the FY03 column would reflect two First District officers. Table 11-1 and Chart 11-1 also indicate the percentage of all subject officers who came from each district or unit (excluding complaints with an unidentified district or unit).

Special care should be taken when attempting to draw conclusions regarding the year-to-year changes from fiscal year 2001 to fiscal year 2002 for each district or unit. The statistics for fiscal year 2001 do not include district or unit information for every officer who was the subject of a complaint, so some of the numbers are understated. Instead, the district or unit was noted for each complaint in fiscal year 2001 and counted only once even if multiple officers were the subject of the complaint. At this point in time, OCCR is not able to recalculate the statistics for fiscal year 2001.

The most notable change in fiscal year 2003 was the increase in the percentage of subject officers from the Special Services Command. The Special Services Command conducts investigations for special citywide functions. It has units whose specialties range from canine and emergency response/SWAT team to forensic science and investigation of violent crimes. The fiscal year 2003 statistics also show an increase in the percentage of subject officers from the First District, which covers the White House, the U.S. Capitol, and the downtown business district, as well as Capitol Hill, the waterfront, and the Washington Navy Yard. There was a noticeable reduction of the percentage of subject officers in both the Third District, which covers portions of the Adams Morgan, Columbia Heights, LeDroit Park, and Dupont Circle areas, and the Fourth District, which covers much of the Northwest quadrant of the city east of Rock Creek Park, including Mount Pleasant, Brightwood, Columbia Heights, Fort Totten, Shepherd Park, and Petworth.

**Table 11-1:  Police Districts and Units**

|  | FY01 | | FY02 | | FY03 | |
|---|---|---|---|---|---|---|
| **First District (1D)** | 35 | 12.0% | 27 | 7.5% | 34 | 9.7% |
| **Second District (2D)** | 30 | 10.2% | 38 | 10.5% | 37 | 10.6% |
| **Third District (3D)** | 73 | 24.9% | 108 | 29.8% | 92 | 26.4% |
| **Fourth District (4D)** | 44 | 15.0% | 57 | 15.8% | 37 | 10.6% |
| **Fifth District (5D)** | 61 | 20.8% | 51 | 14.1% | 52 | 14.9% |
| **Sixth District (6D)** | 29 | 9.9% | 21 | 5.8% | 24 | 6.9% |
| **Seventh District (7D)** | 17 | 5.8% | 40 | 11.1% | 23 | 6.6% |
| **Special Services Command** | 1 | 0.3% | 4 | 1.1% | 24 | 6.9% |
| **Other**[18] | 3 | 1.0% | 16 | 4.4% | 26 | 7.4% |
| **Unidentified** | 21 | | 38 | | 68 | |
| | | | | | | |
| **Total** | 314 | | 400 | | 417 | |

Chart 11-1: Police Districts and Units (as a Percentage)



        Each police officer may be the subject of multiple complaints filed with OCCR.  For
fiscal years 2002 and 2003, Table 11-2 adds FY02 Different Officers and FY03 Different
Officers columns, which reflect the district or unit of each unique officer, eliminating duplicates

---

[18]     Other includes MPD Headquarters, the Office of Professional Responsibility, Major Narcotics
Branch, the Major Crash Investigations unit, the Maurice T. Turner, Jr., Institute of Police Science,
Emergency/Non-Emergency Communications, the Air Support Unit, the Regional Operations Command
– Central, the Juvenile Processing Center, and the District of Columbia Housing Authority.

of officers who were the subject of multiple complaints.  Stated differently, if one First District officer was the subject of two or more separate complaints in 2003, the FY03 Different Officers column would count that officer only once.  One other way to look at the statistics is that 29 different First District officers were the subject of 34 complaints in fiscal year 2003.

**Table 11-2:  Police Districts and Units**

|  | FY02 | FY02 Different Officers | FY03 | FY03 Different Officers |
|---|---|---|---|---|
| First District (1D) | 27 | 24 | 34 | 29 |
| Second District (2D) | 38 | 29 | 37 | 28 |
| Third District (3D) | 108 | 73 | 92 | 61 |
| Fourth District (4D) | 57 | 45 | 37 | 29 |
| Fifth District (5D) | 51 | 41 | 52 | 40 |
| Sixth District (6D) | 21 | 21 | 24 | 23 |
| Seventh District (7D) | 40 | 28 | 23 | 22 |
| Special Services Command | 4 | 4 | 24 | 23 |
| Other | 16 | 13 | 26 | 21 |
| Unidentified | 38 | 38 | 68 | 68 |
|  |  |  |  |  |
| Total | 400 | 316 | 417 | 344 |

## 12.    *City Wards*

When a complaint is filed, OCCR records the city ward in which the underlying incident occurred.  Table 12-1 reflects the ward that was the site of each complaint filed in fiscal years 2001, 2002, and 2003.  Table 12-1 and Chart 12-1 also reflect the percentage of all complaints that occurred in each ward.  The statistics show some notable trends.  Over the course of the three fiscal years, Ward 3, which covers a large section of the Northwest quadrant of the city, including the Friendship Heights, Chevy Chase, Tenleytown and Spring Valley neighborhoods, and Ward 7, which covers east of the Anacostia portions of the Southeast and Northeast quadrants of the city, have shown steady growth in the percentage of complaints occurring in these wards, while Ward 5, which covers Brookland, Michigan Park, Trinidad, and Ivy City, has shown a steady decline.  The percentage of complaints occurring in the other wards has fluctuated up and down over the course of the three years.  OCCR will continue to monitor the trends to try to determine what causes any year-to-year fluctuations among the wards.

**Table 12-1:  City Wards**

|  | FY01 | | FY02 | | FY03 | |
|---|---|---|---|---|---|---|
| 1 | 52 | 18.1% | 66 | 21.2% | 65 | 18.7% |
| 2 | 65 | 22.7% | 43 | 13.8% | 62 | 17.8% |
| 3 | 15 | 5.2% | 23 | 7.4% | 36 | 10.3% |
| 4 | 29 | 10.1% | 37 | 11.9% | 33 | 9.5% |
| 5 | 60 | 20.9% | 56 | 18.0% | 58 | 16.7% |
| 6 | 31 | 10.8% | 30 | 9.7% | 43 | 12.4% |
| 7 | 16 | 5.6% | 23 | 7.4% | 30 | 8.6% |
| 8 | 19 | 6.6% | 33 | 10.6% | 21 | 6.0% |
| Unidentified / Not in D.C. | 21 | | 7 | | 13 | |
| | | | | | | |
| Total Formal Complaints | 308 | | 318 | | 361 | |

Chart 12-1:  City Wards (as a Percentage)



## F.    State and Local Law Enforcement Discipline, Accountability, and Due Process Act of 2003

In June and July 2003, the "State and Local Law Enforcement Discipline, Accountability, and Due Process Act of 2003" was introduced in both the United States Senate and the United States House of Representatives.  This bill seeks to address issues affecting state and local law enforcement officers, but would have a negative impact on OCCR and other agencies, including police departments, that investigate complaints against the police.  While the bill includes some provisions that provide important protections for law enforcement officers, the bill also contains

several provisions that would fundamentally alter OCCR and impose significant financial costs on the agency that would limit its ability to function. Beyond these specific changes, other provisions of the bill are confusing and contradictory, and would introduce uncertainty into the work of police oversight agencies because it would not be clear how the provisions would affect them. In general, the bill is an unsuccessful attempt to address a variety of issues, in a huge variety of agencies – police and non-police, large and small, and urban and rural – with an inadequate one-size-fits-all solution.

After learning about the bill, OCCR conducted research about the bill and studied its impact on the agency. Based on its research, OCCR's executive director wrote to the sponsors of the bill in the Senate and the House, as well as other members of Congress, to express OCCR's concerns about the bill. OCCR provided the senators and representatives with a section-by-section analysis of the bill that identified specific problems with the bill and its impact on OCCR and other agencies, including police departments, that investigate police officer misconduct. After sending its letter, OCCR met with the staff of three senators to discuss the bill and provide additional information about OCCR's concerns, and also encouraged other agencies around the country to write to Congress to share their views on the legislation. So far, the Los Angeles County Sheriff's Department, the Portland, Oregon, City Auditor, the San Jose, California, Independent Police Auditor, and the National Association of Civilian Oversight of Law Enforcement (NACOLE) have submitted letters.

To date, the bill has not moved forward in the legislative process since its introduction. OCCR will continue to monitor this legislation and oppose it. In short, the bill would not increase police accountability, but, rather, would directly limit OCCR's ability to achieve its mandate of providing the District of Columbia with effective, meaningful, independent oversight of the police force. In addition, the bill would limit the autonomy of the District and other local jurisdictions to decide how to structure their police oversight mechanisms.

### G.  Outreach

#### 1.  *Fiscal Year 2003*

Over the past year, OCCR implemented its Community Outreach Strategic Plan for 2003. The aim of the plan was to target communities that may be underrepresented in their use of the OCCR process. The communities that were the focus of the plan were the District's youth population, Latino community, and residents who live east of the Anacostia River in Wards 7 and 8. OCCR had great success with some parts of the plan, and will be continuing to work on other parts of the plan in 2004. Overall, OCCR had a very good year with its community outreach efforts, engaging its entire staff in the process, including its executive director, deputy director, public affairs specialist, investigators, and interns, and made the most of its limited resources.

OCCR's greatest success was its student interactive training program. This targeted outreach program engages teachers and students in an interactive session about a person's rights during a police stop. The program includes an overview of the agency, as well as role-playing scenarios that give students the opportunity to evaluate public and police behavior in various

encounters.  OCCR conducted the program six times with students at Anacostia Senior High School's Public Service Academy, the Youth Court program sponsored by University of the District of Columbia's David A. Clarke School of Law, and the Street Law program.  The program was well received on each of these occasions, and has generated return invitations and additional invitations from other organizations.  OCCR also was successful with scheduling presentations to three community groups in Wards 7 and 8 to share information with them about the agency.  Finally, OCCR is still attempting to hold training sessions with the staff of organizations that serve the Latino community to provide them with information they could share with their clients, and supplemented this aspect of its Latino outreach with participation in four different forums that provided information about government services.

Beyond the strategic plan, OCCR conducted a variety of other outreach activities.  OCCR gave presentations to community groups throughout the District, met with professional and college groups to discuss the agency's work, participated in forums related to crime and criminal justice issues, and gave radio interviews to discuss the agency and its work.  OCCR also made a special effort to increase its outreach to residents and visitors who do not speak English as their primary language.  OCCR translated its complaint form and information sheet into 13 foreign languages, which include Arabic, Chinese Simplified Text, French, German, Haitian Creole, Italian, Japanese, Korean, Portuguese, Russian, Spanish, Tagalog, and Vietnamese.  OCCR is not aware of any police accountability office that has translated its complaint materials into as many languages.  In addition to making these materials available at its office and on its website, OCCR sent these materials to 117 embassies in Washington so they would be able to provide the materials to the people they serve.

In general, the agency has limited resources, but community outreach resources are stretched even further because of the high number of Freedom of Information Act (FOIA) requests the agency receives each year.  FOIA requests affect community outreach activities because OCCR's public affairs specialist is responsible for coordinating community outreach and for FOIA.  To the extent that the number of FOIA requests increases, it takes staff away from community outreach.  In fiscal year 2003, OCCR's public affairs specialist responded to 297 requests, up from 258 in fiscal year 2002.  The 258 requests that OCCR received in fiscal year 2002 accounted for approximately 7% of all FOIA requests received by the District, and the requests were processed primarily by one member of OCCR's 16-person staff.[19]  Processing each request is labor intensive, and requires searching for complaints for multiple officers in OCCR's files and the files of OCCR's predecessor agency, the Civilian Complaint Review Board, gathering and redacting any responsive documents, preparing and sending a response letter along with the documents, and recording information about the requests made to the agency, in addition to a review by OCCR management before the responses are sent out.  OCCR has attempted to limit the impact that FOIA requests have on community outreach and the other work of the agency by developing better systems for processing requests, and by using interns to

---

[19]    During fiscal year 2002, MPD reported to the Secretary of the District of Columbia that it processed 224 FOIA requests using three full-time and 27 part-time staff members.

conserve other staff time.  Nevertheless, FOIA requests significantly limit the staff available for community outreach and other work at OCCR.

## 2.     Community Outreach Strategic Plan for 2004

For 2004, OCCR is going to continue some of the elements of its 2003 Strategic Plan, expand or change other elements, and add new elements.  Based on the success of the student interactive training program, OCCR will continue to conduct these sessions.  OCCR will make some return visits to schools and organizations that took part in the program in 2003 and will pursue opportunities to work with students in other schools and organizations throughout the District.  In addition, OCCR will continue to pursue opportunities to give presentations to community groups throughout the District and to attempt to arrange training sessions with service providers who can pass information about the agency along to their clients who may need the information.  With respect to new activities, OCCR is going to work to develop a public education program for the Latino community to disseminate information about the agency. Although OCCR has worked to share information throughout the city, the agency believes that special effort is needed in the Latino community to overcome past difficulties with MPD and the District Government, as well as the language barrier, which may prevent members of the community from filing complaints with OCCR.  OCCR also is going to reinvigorate its efforts to reach out to police groups.  OCCR plans to meet with MPD supervisor, officer, and recruit classes to introduce them to the agency, explain the complaint process, and answer any questions they may have.

## 3.     Website

OCCR made significant changes to its website, www.occr.dc.gov, during fiscal year 2003.  As described in earlier sections of this report, OCCR began publishing its complaint examiner decisions on its website in August 2003, making this information available to the public, as well as to the parties to the complaint.  By publishing its decisions, Washington, D.C., joins Philadelphia and Boise, Idaho, as the only cities in the United States that publish their police misconduct decisions online.  OCCR also translated its complaint form and information sheet into 13 foreign languages to serve residents and visitors who do not speak English as their primary language, and these materials are available on the agency's website.  In addition, OCCR added a link with information about the agency's community outreach activities and services, and added Spanish-language prompts that will take Spanish-speaking users of the website to materials available in Spanish.  Finally, OCCR regularly updated its news items to keep the public informed about developments at the agency, and its links to assist the public in finding police oversight resources in the United States and worldwide.

Since it was created, the agency's website has served as an important community outreach tool.  OCCR made significant changes and improvements to the website during fiscal year 2003, and will continue to use the website as a tool to make information about the agency and police accountability available to the public.

### H.    Professional Police Oversight Organizations

As in previous years, OCCR responded to inquiries about the agency from jurisdictions seeking to create or reform their police accountability process in fiscal year 2003.  In addition, since the agency opened, OCCR staff members have played an active role in professional organizations related to citizen review of law enforcement and have learned from and contributed to the discussions and training seminars conducted by these organizations. Employees have attended the annual conferences in 2001, 2002, and 2003 of the National Association for Civilian Oversight of Law Enforcement (NACOLE).  At the 2003 NACOLE conference, which was held in September 2003, OCCR staff members made presentations on two panels at the conference.  OCCR's executive director, Philip K. Eure, gave a presentation on a panel entitled "Success in Civilian Oversight:  Best Practices and Strategies to Counter Resistance," and OCCR's deputy director, Thomas E. Sharp, gave a presentation on a panel entitled "Mediation in Oversight:  A Means for Changing Behavior."  On both of these panels, OCCR was featured along with only one other oversight agency – San Jose, California, on the first panel, and Portland, Oregon, on the second.  OCCR plans to continue its involvement with these professional organizations to learn from, and share with, other police oversight agencies around the country and the world.

### I.    Policy Recommendations

The statute creating CCRB places an obligation on the Board to, "where appropriate, make recommendations" to the Mayor, District Council, and Chief of Police "concerning those elements of management of the MPD affecting the incidence of police misconduct, such as the recruitment, training, evaluation, discipline, and supervision of police officers."  In fiscal year 2003, OCCR completed much of the supporting research and analysis for a detailed policy recommendation regarding disorderly conduct arrests made by MPD officers, which CCRB ultimately issued on November 19, 2003.  The report, which is available on OCCR's website, detailed a variety of information regarding disorderly conduct arrests and decisions that had been issued by OCCR complaint examiners sustaining harassment allegations prompted by improper disorderly conduct arrests.  The recommendations accompanying the report suggested steps that MPD should take to examine the large number of disorderly conduct arrests made by its officers to ensure that improper arrests identified in the complaint examiner decisions are not a sign of a larger problem with improper arrests.  At present, OCCR does not have comprehensive statistics regarding complaints alleging improper disorderly conduct arrests, but OCCR will track this information in the future and report on it in more detail in next year's annual report.  In addition, OCCR will report on developments and action taken by the Mayor, Council, and MPD in response to the report and recommendations.

In January 2002, the Board also issued a policy recommendation regarding the identification and prevention of racial profiling by police officers in the District of Columbia, which is also available on OCCR's website, www.occr.dc.gov.  Specifically, CCRB recommended five specific policy changes that MPD should implement to identify and prevent racial profiling:  (1) collect data on traffic stops; (2) implement a simple and inexpensive paper-based system of data collection; (3) ensure the statistical reliability of the data by including experts on data collection and analysis, chosen by community groups, civil liberties organizations, OCCR, and MPD; (4) implement officer education and training on laws against

racially biased policing; and (5) adopt a racial profiling policy and data collection system by June 1, 2002.  OCCR has been participating in the task force formed by MPD to examine biased policing issues.  To date, however, MPD has not taken steps to implement OCCR's five specific recommendations on racial profiling.

## J.     Information Technology

In fiscal year 2003, OCCR made significant progress in resolving several persistent problems with its information technology (IT) infrastructure and support.  During the year, OCCR moved its e-mail service off of the Office of the Corporation Counsel's (OCC) mail servers onto the mail servers maintained by the Office of the Chief Technology Officer.  In addition, OCCR purchased its own network server that the agency maintains in its offices, and left OCC's network servers.  OCCR also added a tape backup system and uninterrupted power supply to its server to ensure the continued operation and protection of OCCR's network.

As described above, OCCR purchased new complaint management software toward the end of the fiscal year and began the process of implementing it in the early months of fiscal year 2004.  Finally, thanks to additional money allocated to OCCR's fiscal year 2004 budget by the Mayor and the Council, OCCR made arrangements for regular computer support to maintain its IT systems and address any IT issues that arise.

## III.     THE FUTURE

In fiscal year 2004, OCCR is poised to make even greater progress than it did this year.  OCCR's entire staff will be working to be as efficient as possible, and to resolve as many complaints as possible.  In addition, the agency will try to conduct as much community outreach and take on as many other special projects as its staffing and funding will allow.  As this report indicates, however, OCCR's number of open cases and backlog of complaints is growing, and this presents a problem that needs to be addressed.  If the agency does not receive any additional resources to devote to the investigation and resolution of complaints, the trend threatens to overwhelm the agency and undermine its complaint resolution process in the not-too-distant future.  While the outlook is good, CCRB and OCCR will be working closely with the Mayor and the Council to ensure adequate staffing and funding for the continued successful operation of OCCR through fiscal year 2004 and beyond.

# EXHIBIT H

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## POLICE COMPLAINTS BOARD
## OFFICE OF POLICE COMPLAINTS



# ANNUAL REPORT
## FISCAL YEAR 2004

730 11th Street, NW, Suite 500 ★ Washington, DC  20001
(202) 727-3838 ★ Fax (202) 727-7638 ★ Toll-Free 24-Hour Hotline (866) 588-0569
Website:  policecomplaints.dc.gov



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**POLICE COMPLAINTS BOARD**
**OFFICE OF POLICE COMPLAINTS**

January 11, 2005

Dear Mayor Williams, Members of the District of Columbia Council,
 Chief Ramsey, and Chief Pittman:

We are pleased to submit the 2004 Annual Report for the Office of Police Complaints (OPC) and its governing body, the Police Complaints Board (PCB). This report covers the agency's operations during the District of Columbia Government's fiscal year from October 1, 2003, through September 30, 2004.

Fiscal year 2004 was the last full year that the agency operated under its old names, the Office of Citizen Complaint Review (OCCR) and the Citizen Complaint Review Board (CCRB). The District passed a law that took effect on September 30, 2004, changing the agency names to OPC and PCB. Beginning on January 1, 2005, following a period to allow for implementation of the new names, the office and board began to be known as OPC and PCB. For purposes of this report, we generally refer to the agency by its old names when discussing its work in fiscal year 2004 because those were the names that were in use during the relevant time period.

The introduction of the new names, occurring almost four years after the agency opened to the public on January 8, 2001, comes at a significant point in the life of the agency, and follows another successful year. The agency achieved several notable accomplishments, which include the following:

- Six hundred ninety-nine people contacted OCCR to inquire about filing a complaint. The agency received 262 complaints, and closed 312, making fiscal year 2004 the first year that the agency closed more complaints than it received. The increase in the number of closed complaints was driven by a 71% increase (to 186) in the number of complaints resolved by OCCR through adjudication, dismissal, and successful mediation. Fifteen of these complaints were adjudicated, resulting in nine decisions sustaining police misconduct allegations. All of the decisions were forwarded to the Metropolitan Police Department (MPD), and the Chief of Police has taken steps to impose discipline for all of the decisions.

- OCCR's number of open complaints was lower at the end of the year for the first time since the agency opened, decreasing by 11%. The decrease was driven by OCCR's greater efficiency and productivity with its limited resources, a smaller number of complaints being received by the agency, and a complete review and reprioritization of all open complaints.

- OCCR increased the number of complaints referred to mediation to 55, a 77% increase, and completed 31 mediation sessions, a 48% increase. Since the agency opened, OCCR has referred 133 complaints to mediation, and mediated 77, with an overall success rate of 78%.

- OCCR purchased a variety of new tools to improve the quality and ease of investigations, including complaint management software, which allows for more effective tracking and management of investigations, a digital video camera, an additional digital camera, a photo printer, and document scanners, among other things.

- OCCR improved the resources and training available to investigators by completing the second version of its investigation manual, introducing weekly investigative unit meetings, and conducting regular internal training. The agency also arranged extensive outside training for investigators, including nine days provided by MPD instructors along with interview and interrogation training provided by John E. Reid and Associates, among other courses.

- CCRB issued a detailed report and recommendations to the Mayor, the Council, and Chief Ramsey in November 2003 regarding disorderly conduct arrests made by MPD officers. The report discussed CCRB's examination of the issue and the recommendations included changes designed to reduce the occurrence of improper or unlawful disorderly conduct arrests in the District. In response to the report and recommendations, the District took steps to address several of the issues raised by CCRB.

- OCCR continued to work with MPD's Community-Police Task Force, which the Department formed as part of its Biased Policing Project (BPP) after CCRB issued its January 2002 report and recommendations regarding racial profiling in Washington, D.C. Consistent with CCRB's recommendation, OCCR strongly encouraged the Mayor, the Council, and Chief Ramsey to follow the recommendation in the BPP final report to establish a stop data collection program to detect any racial profiling or other forms of police bias that may exist in the District. MPD announced in December 2004 that it would go forward with the stop data collection program.

- OCCR implemented its Community Outreach Strategic Plan for 2004. The plan continued the very successful student interactive training program, and expanded outreach to social service providers and community groups, which allows them to share information with their clients and members. OCCR also significantly increased its outreach to MPD, meeting with several classes of recruits and newly promoted officials, and the Fraternal Order of Police (FOP), meeting with the group's executive committee and newly elected shop stewards.

In addition to these developments, the introduction of the new agency names comes at the beginning of the first expansion of the agency's staff since it opened. For fiscal year 2005, the Mayor and the Council increased OPC's budget to allow for the hiring of three additional

investigators.  These much-needed investigators will improve OPC's ratio of investigators to sworn-officers, moving it closer to the ratio in other agencies that investigate police misconduct complaints, and will allow OPC to decrease the time it takes to complete investigations.  The new investigators will also further enhance OPC's talented and racially diverse staff, which the agency has actively recruited and hired.

By the end of January 2005, OPC expects to have hired the new investigators and will put them to full use as soon as they are on board.  Together with the agency's other efforts to increase efficiency and productivity by making the most of its limited resources, we expect that fiscal year 2005 will be another successful year that will advance our goal of developing an agency that provides the District of Columbia with an independent and impartial forum for the investigation and timely resolution of police misconduct complaints filed by the public against MPD and D.C. Housing Authority Police Department (DCHAPD) officers.

Even with the additional resources provided to the agency in fiscal year 2005, PCB and OPC will continue to monitor the agency's overall resource needs.  While the fiscal year 2005 increase is appreciated and will help, the agency still must ensure that it has adequate resources to investigate, mediate, and adjudicate complaints in a timely manner, including complaints that are currently backlogged, and to offer competitive salaries that will allow OPC to retain its staff and attract talented new employees, expand its capacity to receive and resolve complaints, increase community outreach, and develop additional policy recommendations.  Having resources for all of these needs is important to allowing the agency to adequately perform its various functions.

During our fifth year of operation, the newly named PCB and OPC look forward to continuing to work with the Mayor, the Council, MPD, and DCHAPD to ensure that the agency has the resources it needs to carry out its mission.  The support we have received from the Mayor and the Council, as well as the cooperation shown by MPD and DCHAPD over the past four years, have made our success possible, and have allowed us to be a positive force for better policing in the District of Columbia.

Respectfully submitted,

Maria-Cristina Fernández
Chair
Police Complaints Board

Philip K. Eure
Executive Director
Office of Police Complaints

# Table of Contents

Report Graphics, Tables & Charts ........................................................................... iii

I.    Agency Overview ..................................................................................... 1

  A.    Introduction ..................................................................................... 1

  B.    Agency Name Change ......................................................................... 1

  C.    Police Complaints Board ..................................................................... 2

  D.    Office of Police Complaints ................................................................. 3

  E.    Interns and Law Clerks at OPC ........................................................... 5

  F.    Complaint Process ............................................................................. 5

    1.    Dismissal ..................................................................................... 7

    2.    Mediation ..................................................................................... 7

    3.    Complaint Examination ................................................................... 7

II.   The Year in Review ................................................................................. 9

  A.    Introduction ..................................................................................... 9

  B.    Complaint Examination ....................................................................... 9

  C.    Mediation ....................................................................................... 11

    1.    Mediation Example #1 ................................................................. 12

    2.    Mediation Example #2 ................................................................. 13

    3.    Mediation Example #3 ................................................................. 13

  D.    Investigations ................................................................................. 14

  E.    Statistics ....................................................................................... 15

    1.    Contacts and Formal Complaints ................................................... 15

    2.    Disposition of Formal Complaints ................................................. 16

    3.    Status of Pending Formal Complaints at the End of Each Fiscal Year ... 17

    4.    OCCR Workload ......................................................................... 18

    5.    Allegations in Formal Complaints ................................................. 20

    6.    Complainant Race or National Origin, Gender, and Age .................... 21

    7.    Subject Officer Race or National Origin, Gender, and Assignment ...... 25

    8.    City Wards ................................................................................. 29

  F.    Outreach ....................................................................................... 30

    1.    Fiscal Year 2004 ........................................................................ 30

     2.      Community Outreach Strategic Plan for 2005 ...................................................... 31

     3.      Website ................................................................................................................... 32

  G.     Professional Police Oversight Organizations ................................................................ 32

  H.     Policy Recommendations ............................................................................................... 32

     1.      Racial Profiling .................................................................................................... 32

     2.      Disorderly Conduct Arrests ................................................................................. 33

III.    The Future ................................................................................................................................. 34

Endnotes .......................................................................................................................................... 35

Appendix A:  District of Columbia Police Districts

Appendix B:  District of Columbia Wards

## Report Graphics, Tables & Charts

Graphic A:  Office of Police Complaints Logo ........................................................................... 1

Graphic B:  OPC Complaint Process ......................................................................................... 6

Table 1:  Complaint Examiner Decisions ................................................................................ 10

Table 2:  Complaint Examiner Decisions ................................................................................ 10

Table 3:  Discipline for Sustained Complaints ....................................................................... 11

Table 4:  Contacts and Formal Complaints ............................................................................ 16

Table 5:  Disposition of Formal Complaints .......................................................................... 17

Table 6:  Status of Pending Formal Complaints at the End of Each Fiscal Year ........................ 17

Chart 6:  Number of Open Formal Complaints at the End of Each Fiscal Year ......................... 18

Table 7:  OCCR Workload ....................................................................................................... 19

Chart 7:  OCCR Workload ....................................................................................................... 20

Table 8:  Allegations in Formal Complaints ........................................................................... 20

Chart 8:  Allegations in Formal Complaints (as a Percentage) ................................................. 21

Table 9:  Complainant Race or National Origin ...................................................................... 22

Chart 9:  Complainant Race or National Origin (as a Percentage) ........................................... 22

Table 10:  Complainant Gender .............................................................................................. 22

Chart 10:  Complainant Gender (as a Percentage) ................................................................... 23

Table 11:  Complainant Age .................................................................................................... 23

Chart 11:  Complainant Age (as a Percentage) ........................................................................ 24

Table 12:  Complainant Race or National Origin with "Unique Complainant" Information ....... 24

Table 13:  Complainant Gender with "Unique Complainant" Information ................................ 24

Table 14:  Subject Officer Race or National Origin ................................................................. 26

Chart 14:  Subject Officer Race or National Origin (as a Percentage) ...................................... 26

Table 15:  Subject Officer Gender ........................................................................................... 26

Chart 15:  Subject Officer Gender (as a Percentage) ............................................................... 27

Table 16:  Subject Officer Assignment ................................................................................... 27

Chart 16:  Subject Officer Assignment (as a Percentage) ......................................................... 28

Table 17:  Subject Officer Race or National Origin with "Unique Officer" Information ............. 28

Table 18:  Subject Officer Gender with "Unique Officer" Information ...................................... 28

Table 19:  Subject Officer Assignment with "Unique Officer" Information ................................ 29

Table 20:  City Wards ............................................................................................................... 29

Chart 20:  City Wards (as a Percentage) ................................................................................... 30

## I.    AGENCY OVERVIEW

### A.    Introduction

The Office of Citizen Complaint Review (OCCR) and its governing body, the Citizen Complaint Review Board (CCRB), were created by statute in 1999,[1] and OCCR opened to the public on January 8, 2001.  The agency is independent of the Metropolitan Police Department (MPD), the District of Columbia's 3,800-member police force, and the D.C. Housing Authority Police Department (DCHAPD), the Housing Authority's 75-member police force, and its mission is to receive, investigate, and resolve police misconduct complaints filed by the public against MPD and DCHAPD officers.  The agency was created by the District to fill the void left by the 1995 abolition of the Civilian Complaint Review Board, which was plagued by inadequate funding and staff, resulting in lengthy delays in the processing and resolution of complaints.  The District's new police oversight office was the product of extensive research and careful thought by District officials and advocacy groups.  The result was an agency with board members and staff who seek to employ the best practices of citizen oversight of law enforcement, and whose ultimate goal is to provide the public with an independent and impartial forum for the investigation and timely resolution of police misconduct complaints.

### B.    Agency Name Change

In 2004, the Mayor and the Council of the District of Columbia passed the "Omnibus Public Safety Agency Reform Amendment Act of 2004,"[2] which included provisions renaming OCCR and CCRB.  The law, which took effect on September 30, 2004, renamed the office and the board to the Office of Police Complaints (OPC) and the Police Complaints Board (PCB). The Mayor and the Council renamed the agency in order to more clearly convey its mission.

Beginning on January 1, 2005, following a period to allow for implementation of the new names, OCCR and CCRB began to be known as OPC and PCB.  When the new names were introduced, the agency's old logo was replaced with the logo depicted in Graphic A, which clearly displays the new agency name and includes two easily identifiable symbols of the District of Columbia – the stars and stripes from the District flag and the outline of the District.

**Graphic A:  Office of Police Complaints Logo**



### C.    Police Complaints Board

According to its enabling statute, PCB is composed of five members, one of whom must be a member of MPD, while the other four must have no current affiliation with any law enforcement agency.  All Board members must be residents of the District of Columbia, and they serve staggered three-year terms.  The seat held by the MPD member was recently vacated by Inspector Stanly Wigenton, who served on the Board with distinction since it was created.  After 26 years of service to MPD, and five years of service to the Board, Inspector Wigenton retired on December 11, 2004.  In accordance with District law, the Mayor will nominate a new MPD member, who must then be confirmed by the Council, to fill the vacant seat.  The other four members of the Board are as follows:

*Maria-Cristina "Mai" Fernández,* the Chair of the Board, is the Chief Operating Officer at the Latin American Youth Center (LAYC).  Prior to joining LAYC, Ms. Fernández was an associate with a local law firm and worked as a Special Assistant to the Assistant Attorney General for the Office of Justice Programs at the U.S. Department of Justice.  Ms. Fernández also spent two years as a prosecutor with the Manhattan District Attorney's Office following her graduation from American University's Washington College of Law.  She received her undergraduate degree from Dickinson College and a master's degree in Public Administration from Harvard University's Kennedy School of Government.  Ms. Fernández's term expires on January 12, 2005.

*Dr. Patricia Fisher* is a licensed counseling and clinical psychologist with over 30 years of experience in the mental health and substance abuse fields.  She has worked in and served as a consultant to a variety of governmental, private, and public organizations.  Dr. Fisher, a native Washingtonian, has maintained a private practice in Washington for over 20 years and has been involved in several professional and community organizations.  She received her undergraduate and master's degrees from Howard University, and she earned her doctorate in counseling psychology from the University of Minnesota.  Dr. Fisher's term expires on January 12, 2007.

*Michael Sainte-Andress* is a community activist who has served as an appointee of two former mayors on the District's Ryan White HIV Health Services Planning Council.  Mr. Sainte-Andress has been an advocate on many issues affecting the District, including human and civil rights, voter registration, adult literacy education, arts education in public schools, HIV/AIDS issues, and gay/lesbian/bisexual/transgender issues.  He is a motivational speaker and cultural diversity workshop facilitator, and has been a teacher, dancer, singer, actor, writer, and producer. He is a graduate of Lincoln University in Pennsylvania, and has served in the U.S. Navy. Mr. Sainte-Andress's term expires on January 12, 2005.

*Marc Schindler* is a staff attorney with the Youth Law Center.  Before joining the Youth Law Center, he served as an assistant public defender in Baltimore, where he represented children in juvenile delinquency proceedings.  In 1996, Mr. Schindler received the Cahill Award, presented annually to an outstanding public defender in Maryland.  He has conducted workshops throughout the United States and has written several publications dealing with legal issues related to children, with particular emphasis on improving the conditions of confinement for institutionalized children.  Mr. Schindler received his undergraduate degree from Yale

University and his law degree from the University of Maryland School of Law.  His term expires on January 12, 2006.

The Board meets on the first Monday evening of every other month.  At these meetings, OPC management updates Board members about various issues, including developments in office infrastructure, outreach, and personnel matters.  In addition, the Board is provided with a report of the complaints received by OPC, along with the disposition of these complaints.  The Board takes an active role in the work of OPC, offering guidance on many issues affecting the operation of the office.  The Board also is charged with reviewing the executive director's determinations regarding the dismissal of complaints, as well as making recommendations to the Mayor, the Council, MPD, and DCHAPD, where appropriate, regarding changes in policy that may decrease the level of police misconduct.

### D.      Office of Police Complaints

OPC operates under the supervision of its executive director, who is appointed by the Board.  The executive director is assisted with the management of OPC by a deputy director, chief investigator, and assistant chief investigator.  The office has its own investigative staff, which currently consists of three senior investigators and four staff investigators, all of whom take in and investigate complaints.  By the end of January 2005, OPC expects to have hired three additional staff members into its investigative unit, including a fourth senior investigator, a fifth staff investigator, and a paralegal.  The management team and investigators are assisted by an administrative officer, public affairs specialist, staff assistant, and investigative clerk/receptionist.  In addition, OPC funds the employment of a recent public policy school graduate assigned to the agency from the District's Capital City Fellows Program, and the agency has developed an internship program that brings in college and law students year-round to assist the staff with its regular duties and special projects.  Overall, the agency has worked to develop a racially diverse staff, which will only be enhanced with the addition of the new staff members.  The diversity of the office generally mirrors the District's population, and includes a staff that is 52% African-American, 32% white, 11% Latino, and 5% multiracial.

The current members of OPC's staff are as follows:

**Philip K. Eure** became the agency's first executive director in July 2000 after working as a senior attorney in the Civil Rights Division at the U.S. Department of Justice, where he litigated on behalf of victims of employment discrimination.  While at the Department, Mr. Eure was detailed in 1997-1998 to Port-au-Prince as an adviser to the Government of Haiti on a project to reform the criminal justice system.  He has spoken at various forums in the District and around the country on a wide variety of police accountability issues.  Mr. Eure received his undergraduate degree from Stanford University and his law degree from Harvard Law School.

**Thomas E. Sharp**, the deputy director, joined the agency in October 2002 from the law firm of Wilmer, Cutler & Pickering, where he was an associate in the firm's securities enforcement and regulatory practice.  Prior to joining the firm, he served as staff counsel to Newark, New Jersey, City Councilman Cory Booker and as a law clerk to U.S. District Judge Myron H. Thompson in Montgomery, Alabama.  Mr. Sharp has a bachelor's degree from the State University of New York at Buffalo and a law degree from Yale Law School.

**Clifford C. Stoddard, Jr.,** the chief investigator, was appointed to his position in June 2003. Mr. Stoddard is a retired Special Agent from the U.S. Air Force Office of Special Investigations and former Assistant State's Attorney and Chief of the White-Collar and Computer Crime Division of the Anne Arundel County State's Attorney's Office in Annapolis, Maryland. He was an adjunct faculty member at the National Advocacy Center and has taught nationally for the National District Attorney's Association and the American Prosecutor's Research Institute on white-collar and computer crime subjects. Mr. Stoddard has a bachelor's degree from Southern Illinois University, Carbondale, and a law degree from the Georgetown University Law Center.

**Kesha Taylor**, the assistant chief investigator, was hired in July 2002. Prior to joining the agency, Ms. Taylor worked with the Investigations Division of the Public Defender Service for the District of Columbia for seven years. While there, Ms. Taylor served most recently as a Staff Investigator and as the Coordinator of the Internship Program. Ms. Taylor obtained her undergraduate degree in political science and English from the University of Vermont. She also received a master's degree in higher education from Cornell University.

As of the issuance of this report, OPC's other staff members are as follows:

| | |
|---|---|
| Anthony Lawrence | Senior Investigator |
| Natasha Bryan | Senior Investigator |
| Mona Andrews | Senior Investigator |
| Megan Rowan | Investigator |
| Andrea Del Pinal | Investigator |
| Laura Longhenry | Investigator |
| Jorge Correa | Investigator |
| Sherry Meshesha | Investigative Clerk/Receptionist |
| Melanie Deggins | Public Affairs Specialist |
| Stephanie Banks | Administrative Officer |
| Sonja Wingfield | Staff Assistant |
| Bradley R. Hicks | Management Analyst/Capital City Fellow |

OPC staff development and training are a high priority for the agency. All employees go through a training program that instructs them on the goals and purpose of the office, as well as the specific functions related to their jobs. Investigators attend training provided by MPD's Institute of Police Science, John E. Reid and Associates, and the Institute of Police Technology and Management at the University of North Florida in Jacksonville, Florida. In addition, all staff members are eligible for, and encouraged to attend, training programs and courses offered through the District Government's Center for Workforce Development, as well as other specialized training given by private entities and other District or federal agencies. The specific training described above is supplemented by bi-weekly staff meetings and weekly investigator meetings where the staff discusses different issues that arise in carrying out OPC's work.

E.    Interns and Law Clerks at OPC

In the summer of 2001, the agency established a year-round internship program for both college and law school students.  College interns assist with investigations, community outreach, and other projects in the office, while law school interns perform legal research on various policy issues.  Interns volunteer their time and receive academic credit for their work during the academic year.  Over the summer, budget permitting, interns receive a salary for full-time work.  OPC's internship program has been an excellent way for the agency to stretch its limited budget by engaging talented students in the agency's work, while giving them valuable practical experience in exchange.  The program has also been a valuable recruitment tool for the agency, with two former interns currently employed by the agency as investigators.

Since the internship program began, the agency has attracted many outstanding students.  Through the fall of 2004, 30 college students and eleven law students have participated in the program.  The college students have come from a variety of schools, including American, George Mason, George Washington, Harvard, Howard, and Niagara Universities, the University of the District of Columbia, the John Jay College of Criminal Justice, and St. Mary's College of Maryland.  The law students have come from American University's Washington College of Law, Catholic University of America's Columbus School of Law, the Georgetown University Law Center, the George Washington University Law School, the Howard University School of Law, and the University of the District of Columbia's David A. Clarke School of Law.  The internship program has provided substantial benefits to OPC and the District, and the office plans to continue hiring interns during each semester and the summer.

F.    Complaint Process

OPC's work centers on the complaint process, which is set forth in the statute and regulations governing the agency.  The public initiates the complaint process, so it begins only after a person has filed a written, signed complaint form with the agency.  OPC has the authority to investigate complaints that are received within 45 days of the alleged misconduct and that allege abuse or misuse of police powers by MPD or DCHAPD officers, including:

     (1)    Harassment;
     (2)    Use of language or conduct that is insulting, demeaning, or humiliating;
     (3)    Retaliation for filing a complaint with OPC;
     (4)    Use of unnecessary or excessive force; or
     (5)    Discriminatory treatment.

To ensure ease of access to its process, OPC has taken steps to facilitate the filing of a complaint.  First, OPC's office is physically located away from MPD, DCHAPD, and other government offices to provide the public with a less intimidating environment in which to file a complaint.  Second, to make it as convenient as possible to file a complaint, complainants may file in person at OPC's office or at any MPD district station, or they may initiate a complaint by mail, telephone, fax, or e-mail.  Third, to ensure that non-English-speaking residents of and visitors to the District are able to get information about the agency and file complaints, OPC's information sheet and complaint form have been translated into 13 foreign languages.[3]  Finally, a

duty investigator is always available when the agency is open to assist the public with filing complaints, and to interview them about the allegations in their complaints.

After a complaint is received, the executive director reviews it to confirm that it is in OPC's jurisdiction, and to determine how to proceed with the processing of the complaint. If a complaint is outside OPC's jurisdiction, the executive director refers it to MPD's Office of Professional Responsibility, DCHAPD, or the appropriate agency for investigation. Also, if the complaint alleges conduct by an officer that may be criminal in nature, the executive director refers the complaint to the U.S. Attorney for the District of Columbia for possible criminal prosecution of the officer. For the remaining complaints, the executive director determines whether they should be investigated or mediated.

When a complaint is sent for investigation, it is assigned to one of OPC's staff investigators. The investigator interviews the complainant, subject officer, and any witnesses the complainant identifies, in addition to attempting to locate and interview any other police or non-police witnesses who may be able to provide relevant information. The investigator also collects and reviews other evidence, including MPD documents, hospital records, materials from other sources, the scene of the incident, and any other relevant information. When the investigation is complete, the investigator drafts an investigative report, which, along with all the evidence gathered in the investigation, is reviewed by a supervisor. The executive director then reviews the report of the findings of the investigation, and determines if the complaint should be dismissed, which requires the concurrence of one PCB member, or referred to a complaint examiner for review and a decision on the merits of the complaint. A flow chart depicting the complaint process is included in Graphic B. In addition, OPC's three principal methods of resolving complaints – dismissal, mediation, and complaint examination – are discussed in more detail below.

**Graphic B: OPC Complaint Process**



### 1.    *Dismissal*

The statute and regulations governing OPC allow for the dismissal of complaints under three sets of circumstances:  (1) the complaint is deemed to lack merit; (2) the complainant refuses to cooperate with the investigation; or (3) if, after the executive director refers a complaint for mediation, the complainant willfully fails to participate in good faith in the mediation process.  Based on information gathered during OPC's investigation of a complaint, and with the concurrence of one PCB member, the executive director may dismiss a complaint when these circumstances arise.  The dismissal process allows OPC to conserve resources and more efficiently handle complaints.

### 2.    *Mediation*

OPC's complaint process includes mediation as a method for resolving complaints and, because OPC firmly believes in the benefits of mediation, appropriate complaints are forwarded to mediation on a regular basis.  Mediation allows the complainant and the subject officer to meet face-to-face to attempt to resolve the issues raised in a complaint.  The goal of OPC's mediation program is to give both parties a chance to work together to achieve a mutual understanding of what happened during their interaction and work out their differences without the stress and expense of a formal investigation and hearing.

A mediation service, the Community Dispute Resolution Center (CDRC), administers OPC's mediation program, assigning complaints to be mediated by a pool of well-trained, experienced, and diverse mediators.  There is no cost to the complainant or the subject officer to participate in mediation, but both parties must sign a confidentiality agreement that provides that anything said by either party during the mediation session will not be disclosed outside of the session.  The confidentiality agreement is required to encourage parties to be honest and open in attempting to resolve the dispute.

The decision to refer a complaint to mediation is made by the executive director, and not by the parties.  If the executive director refers a complaint to mediation, both the complainant and the subject officer are required to participate in the mediation process in good faith.  Failure to participate in good faith constitutes cause for discipline of the subject officer and grounds for dismissal of the complaint.  However, even though participation of the parties is required, the outcome of the mediation is completely voluntary because neither the complainant nor the officer is required to reach an agreement or settle the dispute during mediation.

There are some restrictions as to which complaints may be referred to mediation.  OPC will not refer complaints involving allegations of the use of unnecessary or excessive force that results in physical injury.  In addition, an officer may not mediate a complaint if he or she has mediated a complaint alleging similar misconduct or has had a complaint sustained by OPC for similar misconduct in the past twelve months.

### 3.    *Complaint Examination*

The complaint examination process is used to resolve complaints where the executive director determines that there is "reasonable cause to believe" that police misconduct occurred.

When the executive director reaches this determination, the complaint is referred to a complaint examiner who reviews it, along with OPC's investigative report, and issues a written decision regarding the merits of the complaint. The complaint examiner may resolve the complaint based on OPC's investigative report alone, or, if necessary, may conduct an evidentiary hearing to further develop the factual record. In practice, complaints that are neither dismissed nor successfully mediated are resolved through complaint examination, which is the only means by which OPC can issue a decision sustaining a complaint against an officer, although not all complaints that are referred to complaint examination are necessarily sustained.

If a complaint examiner sustains any allegation in a complaint, the executive director forwards the complaint examiner's decision to the Chief of Police for review and imposition of discipline. Under certain limited circumstances, the Chief may send a decision back to OPC for further review, but, otherwise, the Chief is bound by the decision and must impose discipline on the officer as a result of the decision. If the complaint examiner does not sustain any allegation in a complaint, the executive director dismisses the complaint based on the decision.

The complaint examination process is administered by JAMS, Inc., an outside alternative dispute resolution service. JAMS works directly with the members of the complaint examiner pool, who are responsible for rendering final decisions on the complaints referred to them by OPC. To carry out this important function, PCB and OPC assembled a pool of distinguished attorneys who live in the District of Columbia. In addition to having a reputation for competence, impartiality, and integrity, the complaint examiners must be members of the District of Columbia Bar, have practiced for five years or more, and have litigation or arbitration experience. At the end of fiscal year 2004, OPC's complaint examiner pool had 19 members. The pool includes attorneys who work in private practice, government, non-profit organizations, and academia, and have a variety of other experiences.

Based on its experience with the operation of the complaint examination process, OPC fine-tunes and modifies the process to ensure that it operates smoothly and provides adequate protections to officers and complainants. One change OPC implemented early in the process was an opportunity for officers to submit written objections to the complaint examiner about OPC's investigative report so the objections can be considered with the report. The objections ensure that the subject officer has an opportunity to raise any issues regarding the investigation before the complaint examiner takes any action. In addition, if a complaint examiner determines that an evidentiary hearing is necessary to resolve a complaint, OPC has taken steps to ensure that complainants have counsel available to assist them at no cost during hearings. In general, because officers are represented by attorneys provided to them by the police union, the Fraternal Order of Police (FOP), OPC made arrangements with a Washington-based law firm, Howrey Simon Arnold & White, to provide free counsel for complainants. Howrey is an international law firm that is based in Washington, D.C. The firm has over 600 attorneys worldwide, and more than 250 in Washington.

## II.     THE YEAR IN REVIEW

### A.     Introduction

Fiscal year 2004 was a productive and successful year for OCCR.  The agency was focused on increasing its efficiency and productivity with its limited resources, and achieved several notable accomplishments.  Fiscal year 2004 was the first year that the agency closed more complaints than it received, with significant increases in the overall number of complaints closed, the number of complaints for which full investigative reports were completed, and the number of complaints that were successfully mediated.  OCCR also adjudicated 15 complaints and forwarded nine decisions to MPD sustaining police misconduct allegations.  All of this work contributed to the agency having a lower number of open complaints at the end of the year for the first time since the agency opened.  That number decreased by 11%.

OCCR increased the number of complaints referred to mediation by 77%, and completed 48% more mediation sessions, giving the complainants and officers involved in these complaints the opportunity to meet face-to-face in an attempt to resolve the issues raised in the complaint. The agency purchased a variety of new tools to improve the quality and ease of investigations, and improved the resources and training available to investigators.

CCRB issued a detailed report and recommendations to the Mayor, the Council, and Chief Ramsey in November 2003 regarding disorderly conduct arrests made by MPD officers, recommending changes designed to reduce the occurrence of improper or unlawful disorderly conduct arrests in the District.  OCCR also implemented its Community Outreach Strategic Plan for 2004, continuing its successful student interactive training program, and expanding outreach to community groups, social service providers, MPD, and the FOP.

These developments and others are discussed in more detail below, along with statistics regarding complaints received and closed by OCCR in fiscal year 2004.  These statistics show significant progress by the agency, but also indicate that there is considerable work ahead.

### B.     Complaint Examination

In fiscal year 2004, OCCR continued the operation of its complaint examination process. The agency referred an additional 13 complaints into the process during the course of the year, and 16 complaints were resolved.  One of the complaints was withdrawn midway through the process, and the remaining 15 were resolved in 15 different decisions.  Table 1 lists each of the resolved complaints and identifies the allegations in the complaint and the decision reached by the complaint examiner for each allegation.

**Table 1:  Complaint Examiner Decisions**

|  | **Harassment** | **Excessive Force** | **Language / Conduct** | **Discriminatory Treatment** | **Retaliation** |
|---|---|---|---|---|---|
| **03-0291** | -- | -- | Sustained | -- | -- |
| **01-0099** | Sustained | -- | Sustained | -- | -- |
| **01-0120** | -- | Sustained | -- | -- | -- |
| **02-0128** | -- | Exonerated | -- | -- | -- |
| **01-0382** | Exonerated | -- | -- | -- | -- |
| **01-0110** | Sustained | -- | Sustained | -- | -- |
| **01-0405** | Sustained | Sustained | Insufficient Facts | -- | -- |
| **02-0289** | Sustained | Sustained | Sustained | -- | -- |
| **02-0254** | -- | -- | Insufficient Facts | -- | -- |
| **02-0261** | -- | -- | Withdrawn | -- | -- |
| **01-0172** | Exonerated / Insufficient Facts | Insufficient Facts | Insufficient Facts | -- | -- |
| **02-0030** | Insufficient Facts | -- | -- | -- | -- |
| **02-0336** | Sustained | Sustained | Sustained | -- | -- |
| **02-0509** | Sustained | -- | -- | -- | -- |
| **02-0421** | -- | -- | Sustained | -- | -- |
| **02-0468** | -- | -- | Unfounded | -- | -- |

The full text of each decision is available on OCCR's website, policecomplaints.dc.gov. As Table 1 indicates, complaint examiners resolved 26 allegations contained in the 16 complaints.  To this point, the decisions have reflected all possible outcomes.[4]

Table 2 summarizes the decisions reached by the complaint examiners, identifying the frequency of the different outcomes.  The table reflects the overall outcome for each complaint, and the individual outcome for each allegation in the complaints.[5]

**Table 2:  Complaint Examiner Decisions**

|  | **FY03** | | | | **FY04** | | | |
|---|---|---|---|---|---|---|---|---|
|  | **Complaints** | | **Allegations** | | **Complaints** | | **Allegations** | |
| **Sustained** | 15 | 78.9% | 22 | 71.0% | 9 | 56.3% | 16 | 61.5% |
| **Exonerated** | 2 | 10.5% | 4 | 12.9% | 2 | 12.5% | 3 | 11.5% |
| **Insufficient Facts** | -- | -- | 2 | 6.5% | 3 | 18.8% | 5 | 19.2% |
| **Unfounded** | 1 | 5.3% | 1 | 3.2% | 1 | 6.2% | 1 | 3.9% |
| **Withdrawn** | 1 | 5.3% | 2 | 6.5% | 1 | 6.2% | 1 | 3.9% |
|  |  |  |  |  |  |  |  |  |
| **Total** | 19 | | 31 | | 16 | | 26 | |

Looking at the decisions reached by complaint examiners, nine of the 16 decisions, or 56%, sustained at least one allegation in the underlying complaint.  Only one of the nine decisions had a split outcome where two allegations were sustained and the outcome for the third allegation was insufficient facts.  There were six decisions, or 38%, where the officer was

completely exonerated or the complaint examiner concluded that the allegations in the underlying complaint were unfounded or there were insufficient facts to resolve them.

When the sustained complaints are considered as part of all of the complaints resolved by OCCR through adjudication, dismissal, and successful mediation, sustained complaints make up 5% of this group (or 9 of 186). Five percent is a noticeable decrease from the 14% that sustained complaints made up in fiscal year 2003. Although there was a decrease in the number of sustained complaints in fiscal year 2004, as indicated in Table 2, the decrease in OCCR's overall sustain rate is primarily a function of the significant increase in dismissals and successful mediations than of any other factor. And the increase in dismissals and successful mediations resulted from OCCR's focus on completing and closing older complaints that had been determined to be probable dismissals but that had not had a completed investigative report, along with OCCR's efforts to identify and refer a larger number of complaints to mediation. In general, OCCR's overall sustain rate will fluctuate from year to year depending on a variety of factors not related directly to the complaint examination process.

As of the date of issuance of this report, all of the decisions forwarded to the Chief of Police had already had discipline imposed. The decisions included a total of 28 subject officers, and a summary of the discipline imposed on these officers is reflected in Table 3.

**Table 3:  Discipline for Sustained Complaints**

| Discipline or Action Taken | Total |
|---|---|
|  |  |
| Formal Counseling | 2 |
| Official Reprimand | 7 |
| 3-Day Suspension | 4 |
| 5-Day Suspension | 1 |
| 10-Day Suspension | 8 |
| 15-Day Suspension | 5 |
| Retired | 1 |
|  |  |
| Total | 28 |

OCCR will continue to track the discipline imposed by the Chief so that the agency is informed about how MPD handles the decisions referred to it by OCCR.

**C.    Mediation**

In fiscal year 2004, OCCR mediated 31 complaints, bringing the total number of complaints mediated to 77. Sixty of the mediation sessions (or 78%) were successful and resulted in an agreement between the complainant and the subject officer. Seventeen of the sessions (or 22%) were unsuccessful, and the underlying complaints were referred back to the executive director for appropriate action. To date, mediators have helped resolve complaints that allege harassment; the use of language or conduct that is insulting, demeaning, or humiliating; discrimination; or a combination of the three.

In addition to the statistical success rate, survey results indicate that the program has been well received. A survey of the participants in mediation indicates that the overwhelming majority of complainants and subject officers who responded to the survey found the mediator to be helpful or very helpful, the mediation session to be satisfactory or very satisfactory, and the resulting agreement to be fair or very fair. In addition, 42% of the respondents left their mediation session with more positive feelings about the other party, while only 11% had more negative feelings, and 47% indicated no change in their feelings. Finally, OCCR is proactively taking steps to protect the integrity of the mediation process by dismissing complaints and pursuing discipline of officers when one of the parties fails to appear for mediation or refuses to participate in the mediation process in good faith.

OCCR has been very pleased with the success of the mediation program, and plans to continue to use it regularly. The number of complaints referred to mediation has steadily grown over the four years OCCR has been open from 19 in fiscal year 2001 to 55 in fiscal year 2004. However, OCCR has also seen growth in the number of complainants who decline to participate in the mediation process altogether. Consequently, during fiscal year 2005, OCCR plans to conduct a complete review of the process, and to update all of its informational materials about mediation. OCCR hopes that having better information available, and ensuring that it is provided to participants, will encourage people to take part in the process and help reduce the number of instances where complainants refuse to participate.

As an illustration of the types of complaints that were mediated in fiscal year 2004, the following are three examples that describe the complaint and the mediation session:

### 1.    Mediation Example #1

A married couple filed a complaint against an officer for aggressive and hostile behavior and for behaving in an unprofessional manner. At the mediation, the husband explained that they had been called to the scene of an accident involving their only son. Upon their arrival, they saw that their son was not there so they approached the officer to find out where their son was and to ask about his condition. He said the officer spoke to them in a belligerent tone and was argumentative instead of being responsive to their needs. He felt that the officer's behavior made the situation even more difficult. He explained that since the officer would not give them information, his wife approached the other driver involved in the accident, at which point the officer became agitated and interfered with the conversation. The officer did provide some information, telling them the name of the hospital to which their son had been taken. Unfortunately, upon arrival at that hospital they learned that the information was incorrect and they were sent to another hospital. When they arrived at the second hospital, they learned that their son had died.

The officer expressed his sincere regret at their loss as well as for his behavior that added to their pain. He explained that he was alone that evening responding to a very bad accident in a tough neighborhood. He and the couple were able to share their perspectives about what happened and to talk about their feelings both at the time of the accident and after. It was a very emotional meeting for all of the parties. In the end, the parties came to an agreement in which the officer, working with his sergeant, would identify and complete an appropriate course in anger management or stress management.

## 2.    *Mediation Example #2*

The complaint was filed against a police detective for disrespectful language and behavior.  The complainant was angry about the manner in which the detective responded to his report that a thief had assaulted and stolen an expensive wristwatch from him.  He alleged that, when the detective arrived at his house to investigate, the detective told him that he should have done a better job defending himself from the attacker.  Also, the complainant stated that he did not appreciate being told by the detective that he was intoxicated, when in fact this was not the case.  The complainant further alleged that he was in close proximity to the detective when he overheard the detective telling another officer that he did not believe that the complainant was telling the truth about the alleged crime.

At the mediation session, the complainant first stated that two police officers did a good job responding in an appropriate amount of time to take a report about the crime.  However, he expected more respectful behavior from the detective when he arrived later in the evening.  The detective responded that he did not believe that his behavior was rude or inappropriate, as he operates under the same procedure in all of his investigations.  He stated that it was not his intention to offend the complainant, and explained that a large percentage of thefts in the District of Columbia turn out to be false reports, which he tries to expose through his questioning.  The detective further stated that his investigation had revealed that the complainant is subject to several outstanding debts.  The complainant stated his intention to request that his complaint be forwarded to a case examiner for a decision on the merits.  The detective responded that he intended to file a lawsuit against the complainant for harassment.  After private meetings with the complainant and the detective, the mediators and the parties jointly decided that it was time to end the mediation.

After the mediation, the mediators decided that some progress had been made during their conversation with the parties.  Specifically, the mediators thought that the detective had made a significant step by acknowledging that his behavior might have been interpreted to be offensive; the mediators also determined that the complainant had paid meaningful attention to the detective's description of his protocol in investigating cases.  As a result, the mediators requested that CDRC make attempts to obtain the parties' consent to return to OCCR for a subsequent mediation session.  CDRC was successful in bringing the parties back together.  At the mediation, the mediators highlighted the successes that the parties had made in the first mediation session.  The detective apologized if the complainant had found his behavior to be offensive.  The complainant responded that he had decided that he would rather not pursue his complaint any further.  The mediators also reminded the parties that a signed agreement entailed that the parties would not pursue any actions arising out of the events that were the subject of the complaint and mediation.  As a result, the parties shook hands and signed an agreement not to further pursue any matters relating to the complaint.

## 3.    *Mediation Example #3*

The complaint was filed against a police officer for alleged discrimination based on race.  On the morning in question, the police officer was directing traffic past a city block that had been closed off for purposes of a public event.  Her police vehicle blocked access to the street.

The entrance to the complainant's office building was also located on that street. As the complainant, who is white, approached the officer's vehicle, he observed that the officer, who is black, let several cars pass into the blocked street, while others were turned away. He observed that one of the individuals that the officer let pass was a black female and that an individual that the officer did not let pass was a white male. At a point where the officer moved her vehicle away from the street in order to let another vehicle pass, the complainant made an attempt to turn his vehicle into the street as well. As the complainant was moving his vehicle, the complainant's and officer's vehicles almost collided. A somewhat heated exchange between the two parties ensued, and the officer did not let the complainant pass. When the complainant filed his complaint, his view was that the officer's decision to allow entry to some individuals and exclude entry to others was discriminatory.

At the mediation session, the two parties had different recollections about what was said on that day. The complainant recalled that the officer told him, "discrimination does not matter," while the officer recalled that she allowed people to pass into the street only if they made clear that they worked there. As the parties talked, they discovered that the complainant had been angry at the officer because he believed that she intended to hit his vehicle as he tried to pass into the street; while the officer believed that the complainant deliberately tried to hit her vehicle as she attempted to block the street. In reality, the officer had been in the process of moving her vehicle back into a blockade position after she had allowed another vehicle to pass; and the complainant had been in the process of moving his vehicle into the street when he believed that the officer's vehicle had pulled away. Neither party had been aware of the other's actions prior to the point that their vehicles almost came into contact. In response to the complainant's concern, the officer made clear that discrimination in no way plays a role in her job. The complainant thanked her for making that clear, and stated that his concern about discrimination was the reason why he had filed his complaint. Then, the complainant and officer shook hands and declared the issue resolved.

### D.    Investigations

During fiscal year 2004, OCCR made many improvements to its investigative process. OCCR purchased a variety of new tools to improve the quality and ease of investigations, including a digital video camera, an additional digital camera, a photo printer, and document scanners, among other things. The agency also implemented new complaint management software (CMS), which allows supervisors and investigators to more effectively track and manage investigations. Some of the features of the software are that it collects data regarding complaints, allows for planning of investigative tasks, stores and organizes documents, pictures, and other electronic files, generates letters and other documents from templates, and allows for more sophisticated analysis of complaints and data.

Along with the implementation of the CMS, OCCR conducted a complete review of all open complaints. This review allowed the agency to reprioritize the handling of complaints to focus its resources on the complaints most in need of work to complete. In addition, OCCR improved the resources and training available to investigators by completing the second version of its investigation manual, introducing weekly investigative unit meetings, and conducting regular internal training. To supplement the internal training, the agency also arranged extensive outside training for investigators, including nine days of training provided by MPD instructors

along with interview and interrogation training provided by John E. Reid and Associates, among other courses.

In fiscal year 2005, OCCR will continue to consider other changes, both large and small, that will allow the agency to more thoroughly and efficiently investigate complaints.

### E.    Statistics

In an effort to describe the work performed by OCCR, the nature and location of the complaints the office received, and the characteristics of the complainants and subject officers, OCCR has collected the statistics included in this section.  Over the four years that OCCR has been open, its method of compiling statistics has changed significantly, moving from manual collection, to using OCCR's initial complaint tracking database, to using OCCR's new CMS, which was used for the first time this year.  The implementation of the CMS was also accompanied by the reentry of data regarding most of OCCR's complaints and several changes in the process of receiving and recording contacts and complaints.  Over the course of these several years, OCCR has ensured that the data were as accurate as possible and the presentation of the statistics was as consistent as possible.  With all of the changes this year, however – the CMS, the reentry of data, and the different processes – OCCR believes that the changes may have had an impact on some of the statistics, leading to noticeable fluctuations that the agency cannot account for in full.  OCCR notes the changes so that readers will be aware of them, and OCCR will monitor the statistics in years ahead to try to determine if any of the unusual changes resulted from changes in the process or were signs of other trends.

At the end of OCCR's fourth year of operation, the statistics collected by the agency have shown the pattern of growth of the agency, and the success that the agency has achieved in increasing its efficiency and productivity over the past couple of years.  The agency has increased the number of investigations completed and complaints closed, which, for the first time in fiscal year 2004, was larger than the number of complaints opened.  As a consequence, not only did OCCR's number of open complaints not grow as it has over the past three years, but the number of complaints went down by 11%.

### 1.    Contacts and Formal Complaints

Under the statute and regulations governing OCCR, all complaints must be reduced to writing and signed by the complainant, who must certify the truth of the statements in the complaint.  Once a complaint has met these requirements, it is referred to as a "formal complaint."  OCCR is regularly contacted by people who inquire about filing a complaint, but who have not yet submitted a signed complaint form.  Where appropriate, OCCR opens a file for each one of these contacts and attempts to obtain a formal complaint by mailing a form to the person or giving him or her instructions about filing a complaint in person.  If no formal complaint is received, the file related to that contact is closed.  OCCR also is contacted about a variety of issues that do not fall within the jurisdiction of the office.  The agency collects information about each contact, enters it into the CMS, and refers the person to the appropriate agency or office.  In fiscal year 2004, OCCR modified its process to more clearly separate and

track contacts that raise issues outside the agency's jurisdiction, which resulted in a noticeably larger number of these contacts being recorded during the year.

Table 4 indicates the number of contacts received by OCCR in fiscal years 2001 through 2004,[6] the number of formal complaints that resulted in each year, and the disposition of each contact that did not result in a formal complaint. The table also includes a total for all four years in each category. In fiscal year 2004, OCCR experienced significant growth in the number of contacts, some of which is attributable to the change in the tracking of contacts mentioned above, but a decline in the number of formal complaints, which OCCR cannot fully account for, but that allowed the agency to reduce its number of open complaints. The number of contacts increased by 14% (from 613 to 699) and the number of formal complaints decreased by 27% (from 361 to 262) from fiscal year 2003 to fiscal year 2004.

**Table 4:  Contacts and Formal Complaints**

|  | FY01 | FY02 | FY03 | FY04 | Total |
|---|---|---|---|---|---|
| **Total Contacts** | 477 | 535 | 613 | 699 | 2324 |
|  |  |  |  |  |  |
| **Closed – Outside Agency Jurisdiction, Etc.** | 9 | 36 | 55 | 297 | 397 |
| **Closed – No Formal Complaint** | 158 | 181 | 197 | 140 | 676 |
|  |  |  |  |  |  |
| **Total Formal Complaints** | 310 | 318 | 361 | 262 | 1251 |

### 2.    *Disposition of Formal Complaints*

Each year, OCCR works to resolve as many formal complaints as possible. Complaints are closed because they have been resolved by OCCR, which includes being dismissed in accordance with the OCCR statute, successfully mediated, or adjudicated through OCCR's complaint examination process. Complaints are also referred to MPD because they contain allegations that are not within OCCR's jurisdiction to investigate or they were filed more than 45 days after the incident occurred, and some complaints are referred to other law enforcement agencies when the complaints relate to another agency's officers. Finally, some complaints are withdrawn by the complainant or closed for administrative reasons.

Table 5 indicates the total number of formal complaints that were closed in fiscal years 2001 through 2004, as well as the specific disposition of each complaint. The table also includes a total for all four years in each category. From fiscal year 2003 to fiscal year 2004, the number of formal complaints closed by OCCR grew by approximately 33% (from 235 to 312). The significant increase in the number of complaints closed can be largely attributed to a 71% increase in complaints resolved by OCCR through adjudication, dismissal, or successful mediation. Another factor that contributed to the increase in the number of complaints closed was OCCR's full review of all of its complaints when entering data into OCCR's CMS, and the resulting clean up of its open complaints.

**Table 5: Disposition of Formal Complaints**

|  | FY01 | FY02 | FY03 | FY04 | Total |
|---|---|---|---|---|---|
| Adjudicated | -- | -- | 19 | 16 | 35 |
| Dismissed | 21 | 91 | 75 | 145 | 332 |
| Successfully Mediated | 7 | 13 | 15 | 25 | 60 |
| Withdrawn by Complainant | 11 | 17 | 9 | 26 | 63 |
| Referred to MPD | 107 | 88 | 90 | 62 | 347 |
| Referred to Other Police Agencies | 3 | 1 | 18 | 11 | 33 |
| Administrative Closures | 12 | 12 | 9 | 27 | 60 |
|  |  |  |  |  |  |
| Closed Formal Complaints | 161 | 222 | 235 | 312 | 930 |

### 3.    Status of Pending Formal Complaints at the End of Each Fiscal Year

At the end of each fiscal year, there are a number of formal complaints that are still pending. Table 6 indicates the total number of complaints from all years that were open at the end of fiscal years 2001 through 2004. The table also indicates the general status of the open complaints, which may be assigned to a complaint examiner and awaiting a decision, referred to mediation and awaiting action, referred to the U.S. Attorney's Office for possible criminal prosecution and awaiting action, currently under investigation, currently under investigation with a preliminary investigative report drafted and being reviewed, or awaiting the initial executive decision about how to proceed with a new complaint. Chart 6 depicts how the total number of complaints open at the end of each fiscal year has changed over the past four years.

The most noteworthy change for fiscal year 2004 is the decrease in the number of open complaints by 11%; in years past, the number of open complaints has steadily grown. For the first time ever, OCCR closed more complaints than it opened during the course of the year, in significant measure because of increased efficiency and productivity.

**Table 6: Status of Pending Formal Complaints at the End of Each Fiscal Year**

|  | FY01 | FY02 | FY03 | FY04 |
|---|---|---|---|---|
| Assigned to Complaint Examiner | -- | -- | 12 | 9 |
| Referred for Mediation | 15 | 10 | 11 | 5 |
| Referred to U.S. Attorney's Office | 20 | 15 | 18 | 10 |
| Under Investigation by OCCR | 99 | 130 | 232 | 224 |
| Under Investigation / Report Drafted | 15 | 80 | 79 | 73 |
| Executive Decision | -- | 4 | 7 | -- |
|  |  |  |  |  |
| Total Number of Open Complaints | 149 | 239 | 359 | 321 |

**Chart 6: Number of Open Formal Complaints at the End of Each Fiscal Year**



### 4.    OCCR Workload

OCCR closes complaints each year at one of three different points in the life of the complaint. First, complaints are closed shortly after they are received because they are referred to MPD or another police agency. These are complaints that are outside OCCR's jurisdiction. In general, the only work that OCCR performs on these complaints is to conduct an initial investigation to confirm the nature of the complaint, and then prepare and send the complaint and related materials to the appropriate agency. Second, complaints are closed because the complainant withdraws the complaint or for other administrative reasons. These complaints require varying amounts of work by OCCR depending on when the complainant withdraws the complaint, which may occur at any point up through a final decision, or when the event occurs that triggers administrative closure. Some of the events that trigger administrative closure, which also may occur at any time, include the resignation of an officer from MPD, or the completion of an investigation by MPD into the same allegations that results in the discipline of the officer. Finally, complaints are closed after they have been resolved by OCCR. OCCR resolves complaints by adjudication, dismissal, or successful mediation. These complaints generally require the most work, including a full investigation, the completion of an investigative report, and any other related adjudication, dismissal, or mediation processes.

Table 7 collects statistics from the three preceding sections of this part of the report to illustrate the proportion of complaints that are closed at the three different points in the life of a complaint. First, the table shows the number of formal complaints that OCCR received in all four fiscal years. Next, the table subtracts the number of complaints referred to MPD or another police agency to arrive at the number of formal complaints that fall within OCCR's jurisdiction. After that, Table 7 subtracts the complaints that reach a point short of final resolution where they require no further action, such as those that are withdrawn or administratively closed, to arrive at the number of complaints that require resolution by OCCR. Finally, the table subtracts the

- 18 -

number of complaints resolved in each fiscal year. The resulting number shows either: (1) the number of complaints that require resolution by OCCR but that are carried over to the next fiscal year unresolved; or (2) the number by which the total number of open complaints is reduced from one year to the next, which is indicated by parentheses. Thus, each fiscal year begins with a number of complaints already open that need to be resolved, and new complaints are received over the course of the fiscal year. For a graphical depiction, Chart 7 includes lines indicating the number of complaints that require resolution by OCCR and the number of complaints resolved by OCCR. The area between the two lines on Chart 7 represents the number of complaints that are carried over to the next fiscal year unresolved or the amount by which the number of open complaints is reduced.

OCCR's increased efficiency and productivity are clearly displayed in both the table and the chart. The increased efficiency and productivity, together with a smaller number of complaints received by the agency in fiscal year 2004, resulted in OCCR having its first year where it closed more complaints than it opened. With the addition of three new investigators in fiscal year 2005, OCCR hopes that this will be the beginning of a trend that will allow the agency to keep up with the new complaints it receives, as well as resolve the complaints that are currently backlogged.

**Table 7: OCCR Workload**

|  | FY01 | FY02 | FY03 | FY04 | Total |
|---|---|---|---|---|---|
| **Total Formal Complaints** | 310 | 318 | 361 | 262 | 1251 |
|  |  |  |  |  |  |
| **Referred to MPD or Other Agency** | 110 | 89 | 108 | 73 | 380 |
| **Complaints in OCCR's Jurisdiction** | 200 | 229 | 253 | 189 | 871 |
|  |  |  |  |  |  |
| **Complaints Requiring No Further Action (Withdrawn or Administratively Closed)** | 23 | 29 | 18 | 53 | 123 |
| **Complaints Requiring Resolution by OCCR** | 177 | 202 | 233 | 136 | 748 |
|  |  |  |  |  |  |
| **Complaints Resolved (Adjudication, Dismissal, and Successful Mediation)** | 28 | 104 | 109 | 186 | 427 |
| **Unresolved Complaints Each Fiscal Year** | 149 | 98 | 124 | (50) | 321 |

**Chart 7:  OCCR Workload**



Legend: Complaints Resolved (Adjudication, Dismissal, and Successful Mediation) — Complaints Requiring Resolution by OCCR

**5.    *Allegations in Formal Complaints***

Each formal complaint may contain allegations of more than one type of misconduct, including harassment, use of language or conduct that is insulting, demeaning, or humiliating, retaliation for filing a complaint with OCCR, use of unnecessary or excessive force, or discriminatory treatment.  In addition, complainants often allege other conduct that does not fall within the five types of misconduct under OCCR's jurisdiction.

Table 8 indicates the total number of allegations contained in all of the formal complaints received in fiscal years 2001 through 2004, as well as the number of each type of allegation made, and a total for all four years in each category.  Table 8 and Chart 8 also indicate the percentage of the total number of allegations that each type of allegation constitutes.

**Table 8:  Allegations in Formal Complaints**

|  | FY01 | | FY02 | | FY03 | | FY04 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Language/Conduct** | 148 | 34.6% | 154 | 34.5% | 197 | 37.2% | 180 | 37.0% | 679 | 35.9% |
| **Harassment** | 109 | 25.5% | 125 | 28.0% | 136 | 25.7% | 131 | 27.0% | 501 | 26.5% |
| **Excessive Force** | 73 | 17.1% | 104 | 23.3% | 99 | 18.7% | 97 | 20.0% | 373 | 19.8% |
| **Discrimination** | 36 | 8.4% | 18 | 4.0% | 30 | 5.7% | 42 | 8.6% | 126 | 6.7% |
| **Retaliation** | -- | -- | 5 | 1.1% | 6 | 1.1% | 6 | 1.2% | 17 | 0.9% |
| **Other** | 62 | 14.5% | 40 | 9.0% | 61 | 11.5% | 30 | 6.2% | 193 | 10.2% |
|  | | | | | | | | | | |
| **Total Allegations** | 428 | | 446 | | 529 | | 486 | | 1889 | |

- 20 -

**Chart 8: Allegations in Formal Complaints (as a Percentage)**



### 6.    *Complainant Race or National Origin, Gender, and Age*

When a person files a complaint, the person is asked to identify his or her race or national origin, gender, and date of birth. The following tables and charts reflect the information provided by each complainant. In general, the columns in the tables and the bars on the charts reflect the information for each complaint, not eliminating duplicates of complainants who filed multiple complaints. In some instances, OCCR was able to include information regarding the number of "unique complainants," meaning that OCCR eliminated duplicates of complainants who filed multiple complaints. Some tables and charts also include U.S. Census information regarding the composition of the population of the District of Columbia as a whole.[7]

In general, the proportions of complainants falling into the various race or national origin, gender, and age groups have remained consistent from fiscal year 2003 to fiscal year 2004. The race or national origin data continue to show some variation from the Districts population, including a higher proportion of African-American complainants and a lower proportion of white complainants. The gender data also continue to vary from the District population with a higher proportion of male complainants and a lower proportion of female complainants. The age data show the most significant variation from the District population, with a higher proportion of complainants in the middle age groups than the District population, and a lower proportion in the youngest and oldest age groups. To illustrate the divergence, the data from the age table is displayed on a line chart showing the proportions for each year and the District population in the different age groups.

**Table 9:  Complainant Race or National Origin**

| | FY01 | | FY02 | | FY03 | | FY04 | | District Pop. |
|---|---|---|---|---|---|---|---|---|---|
| African-American | 199 | 77.1% | 219 | 76.0% | 197 | 67.5% | 179 | 71.0% | 60.0% |
| White | 36 | 14.0% | 46 | 16.0% | 62 | 21.2% | 51 | 20.2% | 27.8% |
| Latino | 14 | 5.4% | 16 | 5.6% | 14 | 4.8% | 13 | 5.2% | 7.9% |
| Asian | 4 | 1.6% | 4 | 1.4% | 7 | 2.4% | 2 | 0.8% | 2.7% |
| Middle Eastern | 5 | 1.9% | 1 | 0.3% | 10 | 3.4% | 1 | 0.4% | -- |
| Native American | -- | -- | 1 | 0.3% | 1 | 0.3% | 6 | 2.4% | 0.3% |
| Multiracial / Other | -- | -- | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% | 2.4% |
| Unreported | 52 | | 30 | | 69 | | 10 | | |
| Total | 310 | | 318 | | 361 | | 262 | | |

**Chart 9:  Complainant Race or National Origin (as a Percentage)**



**Table 10:  Complainant Gender**

| | FY01 | | FY02 | | FY03 | | FY04 | | District Pop. |
|---|---|---|---|---|---|---|---|---|---|
| Male | 173 | 56.2% | 174 | 54.9% | 201 | 55.7% | 141 | 54.2% | 47.1% |
| Female | 135 | 43.8% | 143 | 45.1% | 160 | 44.3% | 119 | 45.8% | 52.9% |
| Unreported | 2 | | 1 | | -- | | 2 | | |
| Total | 310 | | 318 | | 361 | | 262 | | |

**Chart 10:  Complainant Gender (as a Percentage)**



**Table 11:  Complainant Age[8]**

|  | FY03 |  | FY04 |  | District Pop. |
|---|---|---|---|---|---|
| **Under 15** | -- | -- | 1 | 0.4% | 17.1% |
| **15-24** | 37 | 18.0% | 39 | 15.8% | 15.7% |
| **25-34** | 53 | 25.7% | 60 | 24.3% | 17.8% |
| **35-44** | 56 | 27.2% | 68 | 27.5% | 15.3% |
| **45-54** | 46 | 22.3% | 57 | 23.1% | 13.2% |
| **55-64** | 10 | 4.9% | 14 | 5.7% | 8.7% |
| **65 and Older** | 4 | 1.9% | 8 | 3.2% | 12.3% |
| **Total** | 206 |  | 247 |  |  |

**Chart 11:  Complainant Age (as a Percentage)**



**Table 12:  Complainant Race or National Origin with "Unique Complainant" Information**

|  | FY02 | FY02 Unique Complainants | FY03 | FY03 Unique Complainants | FY04 | FY04 Unique Complainants |
|---|---|---|---|---|---|---|
| African-American | 219 | 208 | 197 | 190 | 179 | 176 |
| White | 46 | 46 | 62 | 59 | 51 | 43 |
| Latino | 16 | 16 | 14 | 14 | 13 | 13 |
| Asian | 4 | 4 | 7 | 6 | 2 | 2 |
| Middle Eastern | 1 | 1 | 10 | 6 | 1 | 1 |
| Native American | 1 | 1 | 1 | 1 | 6 | 1 |
| Multiracial / Other | 1 | 1 | 1 | 1 | 0 | 0 |
| Unreported | 30 | 30 | 69 | 68 | 10 | 10 |
|  |  |  |  |  |  |  |
| Total | 318 | 307 | 361 | 345 | 262 | 246 |

**Table 13:  Complainant Gender with "Unique Complainant" Information**

|  | FY02 | FY02 Unique Complainants | FY03 | FY03 Unique Complainants | FY04 | FY04 Unique Complainants |
|---|---|---|---|---|---|---|
| Male | 174 | 166 | 201 | 190 | 141 | 126 |
| Female | 143 | 140 | 160 | 155 | 119 | 118 |
| Unreported | 1 | 1 | -- | -- | 2 | 2 |
|  |  |  |  |  |  |  |
| Total | 318 | 307 | 361 | 345 | 262 | 246 |

### 7.    *Subject Officer Race or National Origin, Gender, and Assignment*

When a person files a complaint, OCCR records the race or national origin, gender, and assignment of the subject officer in the complaint. In some instances the complainant is able to identify the subject officer, and in others, OCCR determines the identity of the officer during the course of its investigation. In other instances, the complainant is not able to identify the subject officer and the identity of the officer remains unknown. The following tables and charts reflect the information for officers who could be identified or whose information was reported by the complainant. In general, the columns in the tables and the bars on the charts reflect the information for each subject officer, not eliminating duplicates of officers who were the subject of multiple complaints. In some instances, OCCR was able to include information regarding the number of "unique officers," meaning that OCCR eliminated duplicates of officers who were the subject of multiple complaints. Some tables and charts also include information regarding the composition of the entire work force of MPD officers. [9]

In general, the proportions of subject officers falling into the various race or national origin and gender groups have remained consistent from fiscal year 2003 to fiscal year 2004. The race or national origin data continue to show some variation from the data regarding the entire police force, including a higher proportion of white subject officers and a lower proportion of African-American subject officers. The gender data also continue to vary from the entire police force with a noticeably higher proportion of male subject officers and noticeably lower proportion of female subject officers. The data regarding the assignments of subject officers has fluctuated from year to year. OCCR cannot fully account for the variation, and the data may be skewed as a result of the reentry of data in the CMS. When information regarding officers was reentered into the CMS, the current assignment for each officer was entered, and it may have changed from the assignment the officer had at the time of any particular complaint, so readers should use caution when attempting to draw conclusions from the year-to-year trends regarding the assignments of subject officers.

For reference purposes, a map indicating the location of the seven police districts used by MPD is included in Appendix A.

**Table 14:  Subject Officer Race or National Origin**

| | FY01 | | FY02 | | FY03 | | FY04 | | Entire Police Force |
|---|---|---|---|---|---|---|---|---|---|
| African-American | 233 | 65.6% | 221 | 62.8% | 205 | 59.1% | 170 | 59.4% | 66.5% |
| White | 106 | 29.9% | 98 | 27.8% | 112 | 32.6% | 94 | 32.9% | 27.7% |
| Latino | 15 | 4.2% | 26 | 7.4% | 18 | 5.2% | 17 | 5.9% | 4.9% |
| Asian | 1 | 0.3% | 6 | 1.7% | 6 | 1.7% | 4 | 1.4% | 0.9% |
| Other | -- | -- | 1 | 0.3% | 5 | 1.4% | 1 | 0.4% | -- |
| Unidentified | 52 | | 48 | | 71 | | 41 | | |
| | | | | | | | | | |
| Total | 407 | | 400 | | 417 | | 327 | | |

**Chart 14:  Subject Officer Race or National Origin (as a Percentage)**



**Table 15:  Subject Officer Gender**

| | FY01 | | FY02 | | FY03 | | FY04 | | Entire Police Force |
|---|---|---|---|---|---|---|---|---|---|
| Male | 321 | 86.8% | 300 | 84.0% | 293 | 83.0% | 266 | 85.0% | 75.7% |
| Female | 49 | 13.2% | 57 | 16.0% | 60 | 17.0% | 47 | 15.0% | 24.3% |
| Unidentified | 37 | | 43 | | 64 | | 14 | | |
| | | | | | | | | | |
| Total | 407 | | 400 | | 417 | | 327 | | |

**Chart 15:  Subject Officer Gender (as a Percentage)**



**Table 16:  Subject Officer Assignment[10]**

|  | FY02 | | FY03 | | FY04 | |
|---|---|---|---|---|---|---|
| First District (1D) | 27 | 7.5% | 34 | 9.7% | 36 | 11.1% |
| Second District (2D) | 38 | 10.5% | 37 | 10.6% | 34 | 10.5% |
| Third District (3D) | 108 | 29.8% | 92 | 26.4% | 56 | 17.3% |
| Fourth District (4D) | 57 | 15.8% | 37 | 10.6% | 62 | 19.1% |
| Fifth District (5D) | 51 | 14.1% | 52 | 14.9% | 45 | 13.9% |
| Sixth District (6D) | 21 | 5.8% | 24 | 6.9% | 36 | 11.1% |
| Seventh District (7D) | 40 | 11.1% | 23 | 6.6% | 28 | 8.6% |
| Special Services Command | 4 | 1.1% | 24 | 6.9% | 8 | 2.5% |
| D.C. Housing Authority | -- | 0.0% | 5 | 1.4% | 3 | 0.9% |
| Other[11] | 16 | 4.4% | 21 | 6.0% | 16 | 4.9% |
| Unidentified | 38 | | 68 | | 3 | |
| | | | | | | |
| Total | 400 | | 417 | | 327 | |

**Chart 16: Subject Officer Assignment (as a Percentage)**



**Table 17: Subject Officer Race or National Origin with "Unique Officer" Information**

|  | FY02 | FY02 Unique Officers | FY03 | FY03 Unique Officers | FY04 | FY04 Unique Officers |
|---|---|---|---|---|---|---|
| **African-American** | 221 | 176 | 205 | 165 | 170 | 147 |
| **White** | 98 | 73 | 112 | 85 | 94 | 74 |
| **Latino** | 26 | 14 | 18 | 15 | 17 | 15 |
| **Asian** | 6 | 3 | 6 | 5 | 4 | 4 |
| **Other** | 1 | 1 | 5 | 3 | 1 | 1 |
| **Unidentified** | 48 | 48 | 71 | 71 | 41 | 41 |
|  |  |  |  |  |  |  |
| **Total** | 400 | 315 | 417 | 344 | 327 | 282 |

**Table 18: Subject Officer Gender with "Unique Officer" Information**

|  | FY02 | FY02 Unique Officers | FY03 | FY03 Unique Officers | FY04 | FY04 Unique Officers |
|---|---|---|---|---|---|---|
| **Male** | 300 | 228 | 293 | 231 | 266 | 226 |
| **Female** | 57 | 44 | 60 | 49 | 47 | 42 |
| **Unidentified** | 43 | 43 | 64 | 64 | 14 | 14 |
|  |  |  |  |  |  |  |
| **Total** | 400 | 315 | 417 | 344 | 327 | 282 |

**Table 19:  Subject Officer Assignment with "Unique Officer" Information**

|  | FY02 | FY02 Unique Officers | FY03 | FY03 Unique Officers | FY04 | FY04 Unique Officers |
|---|---|---|---|---|---|---|
| First District (1D) | 27 | 24 | 34 | 29 | 36 | 33 |
| Second District (2D) | 38 | 29 | 37 | 28 | 34 | 31 |
| Third District (3D) | 108 | 73 | 92 | 61 | 56 | 52 |
| Fourth District (4D) | 57 | 45 | 37 | 29 | 62 | 45 |
| Fifth District (5D) | 51 | 41 | 52 | 40 | 45 | 40 |
| Sixth District (6D) | 21 | 21 | 24 | 23 | 36 | 29 |
| Seventh District (7D) | 40 | 28 | 23 | 22 | 28 | 26 |
| Special Services Command | 4 | 4 | 24 | 23 | 8 | 8 |
| D.C. Housing Authority | -- | -- | 5 | 5 | 3 | 3 |
| Other | 16 | 13 | 21 | 16 | 16 | 12 |
| Unidentified | 38 | 38 | 68 | 68 | 3 | 3 |
|  |  |  |  |  |  |  |
| Total | 400 | 316 | 417 | 344 | 327 | 282 |

8.    *City Wards*

When a complaint is filed, OCCR records the city ward in which the underlying incident occurred.  Table 20 reflects the ward that was the site of each complaint filed in fiscal years 2001 through 2004.  Table 20 and Chart 20 also reflect the percentages of all complaints that arose in each ward.  For fiscal year 2004, the data show a noticeable decrease in complaints from Ward 1 and noticeable increases in complaints from Wards 4 and 7.  The data also show a steady decline in the number of complaints from Ward 5 over the course of all four years, and a steady increase in the number of complaints from Ward 7 over the same period.

For reference purposes, a map indicating the location of the District of Columbia's eight wards is included in Appendix B.

**Table 20:  City Wards**

|  | FY01 | | FY02 | | FY03 | | FY04 | |
|---|---|---|---|---|---|---|---|---|
| 1 | 52 | 18.1% | 66 | 21.2% | 65 | 18.7% | 35 | 13.5% |
| 2 | 65 | 22.7% | 43 | 13.8% | 62 | 17.8% | 42 | 16.2% |
| 3 | 15 | 5.2% | 23 | 7.4% | 36 | 10.3% | 26 | 10.0% |
| 4 | 29 | 10.1% | 37 | 11.9% | 33 | 9.5% | 37 | 14.3% |
| 5 | 60 | 20.9% | 56 | 18.0% | 58 | 16.7% | 37 | 14.3% |
| 6 | 31 | 10.8% | 30 | 9.7% | 43 | 12.4% | 30 | 11.6% |
| 7 | 16 | 5.6% | 23 | 7.4% | 30 | 8.6% | 32 | 12.4% |
| 8 | 19 | 6.6% | 33 | 10.6% | 21 | 6.0% | 20 | 7.7% |
| Unidentified / Not in D.C. | 21 | | 7 | | 13 | | 3 | |
|  |  |  |  |  |  |  |  |  |
| Total | 308 | | 318 | | 361 | | 262 | |

**Chart 20: City Wards (as a Percentage)**



### F.    Outreach

####    1.    *Fiscal Year 2004*

Since January 1, 2004, OCCR has worked to carry out its Community Outreach Strategic Plan for 2004. The goal of the plan was to build and maintain relationships with communities that may be underrepresented in their use of the OCCR process. The communities OCCR focused on were the District's youth population, Latino community, residents who live east of the Anacostia River in Wards 7 and 8, and other historically underserved groups, such as the homeless and the gay/lesbian/bisexual/transgender community. OCCR made tremendous strides with the plan and had a highly successful year in its community outreach efforts, in part because the agency was able to increase its capacity for community outreach activities by engaging its entire staff in outreach events.

This year, OCCR made significant progress with its "training the providers" outreach program. This program involves sessions conducted by OCCR staff members to provide information about the agency to staff members of community-based organizations so that they may then share the information with their clients. Primarily focused on organizations that serve the District's Latino community, OCCR also was able to conduct this training at organizations that serve the homeless community. This year, OCCR conducted training sessions with Ayuda, Language ETC, and Neighbors' Consejo, which serve the Latino community, as well as Bread for the City, which serves the homeless community. The program was well received on each of these occasions, and has generated return invitations and referrals to partner organizations.

Because of the success of OCCR's student interactive training program last year, the agency was able to increase the number of sessions conducted this year. This program engages teachers and students in an interactive presentation about an individual's rights during encounters

with the police.  During fiscal year 2004, OCCR conducted training sessions with students at Anacostia Senior High School, Covenant House Washington's Street Law Program, School Without Walls, and Wilson High School.  OCCR also partnered with George Washington University's Student Voices Program to present the training program to Booker T. Washington Public Charter School and Thurgood Marshall Public Service Academy.  In addition to the student interactive training sessions, OCCR gave presentations about the agency to community groups in Wards 5, 7, and 8.

Beyond the strategic plan, OCCR conducted a variety of other outreach activities.  OCCR dramatically increased its outreach to MPD and the FOP over the course of the year, meeting with several classes of new recruits and newly promoted officials at MPD, as well as the FOP's executive committee and newly elected shop stewards.  During each of these sessions, OCCR staff provided information about the agency and answered questions raised by the groups.  The agency also met with professional and college groups to discuss the agency's work, participated in forums related to police accountability issues and mediation, and gave interviews with various media outlets to discuss the agency and its work.

As a part of OCCR's international outreach efforts, the agency continued to host guests from other countries.  In response to the agency's translation of its complaint form and fact sheet into 13 foreign languages, OCCR was contacted by officers from the Ecuadorian Embassy police force, who visited the agency.  The officers were interested in police oversight issues in the United States.  OCCR also participated in the Italian Customer Management Forum's "USA Study Tour 2004."  The group of Italian public administrators also visited OCCR and was particularly interested in the agency's use of e-government services to better serve individuals in the Washington Metropolitan Area.

## 2.     *Community Outreach Strategic Plan for 2005*

For 2005, OCCR will continue some elements of its 2004 Strategic Plan, expand or modify some programs, and add new programs.  Based on the success of the student interactive training program, OCCR will continue to conduct these sessions.  OCCR will make some return visits to schools and organizations that took part in the program throughout the past year and will pursue opportunities to work with students in other schools and organizations throughout the District.  In addition, OCCR will maintain its relationships with the community-based organizations it worked with in fiscal year 2004 and will pursue opportunities to meet with other social service providers throughout the District.  The agency will also continue its outreach to MPD and the FOP to ensure that officers are informed about the agency's process.

With respect to new activities, OCCR is planning a public education and awareness program regarding police accountability.  OCCR will use its name change as an opportunity to increase information available about the agency and its services.  Although OCCR has worked to disseminate information about the agency throughout the city, the agency believes there are still many people who are not fully informed about the agency and its work.  As part of the public education and awareness program, OCCR plans to disseminate information in a variety of forums and locations.

### 3.    *Website*

Since it was created, the agency's website has served as an important community outreach tool.  OCCR has regularly updated its news items to keep the public informed about developments at the agency, and added links to assist the public in finding police oversight resources in the United States and worldwide.  In addition to these ongoing steps, OCCR made significant changes to the mediation information available on the website so that the public will better understand the agency's mediation program.  OCCR made significant changes and improvements to the website during fiscal year 2004, and will continue to use the website as a tool to make information about the agency and police accountability available to the public.

### G.    **Professional Police Oversight Organizations**

As in previous years, OCCR responded to inquiries about the agency from jurisdictions seeking to create or reform their police accountability process in fiscal year 2004.  In addition, since the agency opened, OCCR staff members have played an active role in professional organizations related to citizen review of law enforcement and have learned from and contributed to the discussions and training seminars conducted by these organizations. Employees have attended and OCCR representatives have addressed the annual conferences each year since 2001 of the National Association for Civilian Oversight of Law Enforcement (NACOLE).  OCCR plans to continue its involvement with these professional organizations to learn from, and share with, other police oversight agencies around the country and the world.

### H.    **Policy Recommendations**

The statute creating CCRB places an obligation on the Board to, "where appropriate, make recommendations" to the Mayor, District Council, and Chief of Police "concerning those elements of management of the MPD affecting the incidence of police misconduct, such as the recruitment, training, evaluation, discipline, and supervision of police officers."  To date, CCRB has issued two detailed policy recommendations regarding racial profiling and disorderly conduct arrests.

### 1.    *Racial Profiling*

In January 2002, CCRB issued a policy recommendation regarding the identification and prevention of racial profiling by police officers in the District of Columbia, which is available on OCCR's website, policecomplaints.dc.gov.  Specifically, CCRB recommended five policy changes that MPD should implement to identify and prevent racial profiling:  (1) collect data on traffic stops; (2) implement a simple and inexpensive paper-based system of data collection; (3) ensure the statistical reliability of the data by including experts on data collection and analysis, chosen by community groups, civil liberties organizations, OCCR, and MPD; (4) implement officer education and training on laws against racially biased policing; and (5) adopt a racial profiling policy and data collection system by June 1, 2002.

Following CCRB's report and recommendations, MPD undertook its Biased Policing Project (BPP), which was designed to address issues regarding racial profiling and other forms of

police bias in the District.  As part of the BPP, and to serve in an advisory capacity, MPD formed a Community-Police Task Force, which OCCR has participated in since it was created.  After several years of work and some significant delays by the Department, the research organization hired by MPD to study biased policing issues completed its report regarding the District and recommended, among other things, that MPD implement a stop data collection program to detect any racial profiling or other forms of police bias.  Through its work on the task force, and in direct advocacy to the Mayor, the Council, and Chief Ramsey, OCCR strongly encouraged MPD to follow the recommendation regarding the collection of stop data.  MPD announced in December 2004 that it would go forward with the stop data collection program.

### 2.    *Disorderly Conduct Arrests*

In November 2003, CCRB issued a report and recommendations regarding disorderly conduct arrests made by MPD officers.  The report, which is also available on OCCR's website, detailed a variety of information regarding disorderly conduct arrests and decisions that had been issued by OCCR complaint examiners sustaining harassment allegations prompted by improper disorderly conduct arrests.  Based on the report, CCRB recommended that the Mayor, the Council, and MPD should:  (1) modify MPD's arrest procedure to ensure that all citizens who pay $25 to resolve their arrest are provided with written notice about the collateral forfeiture process and its consequences and that they sign an acknowledgment of their choice to pay the $25 collateral;[12] (2) immediately begin providing additional training to all MPD officers and supervisors regarding the law and procedure related to disorderly conduct arrests; (3) distribute a videotape message from the Chief of Police reinforcing the responsibilities of all members of the Department when making disorderly conduct arrests; (4) examine a sample of the disorderly conduct arrests made by MPD officers that is significant enough to allow MPD to determine if there are any widespread problems in the entire pool of disorderly conduct arrests; and (5) review the criminal code regarding disturbances of the public peace, particularly disorderly conduct, and the rules regarding collateral forfeiture and consider whether the code or rules need to be revised, updated, or changed, and also consider specific reforms, such as decriminalizing disorderly conduct and allowing individuals 15 days to decide whether to forfeit collateral or challenge their arrest.

In January 2004, OCCR's executive director and deputy director met with the Deputy Mayor for Public Safety and Justice, Council members, and Chief Ramsey regarding the disorderly conduct report and recommendations.  In the meeting with Chief Ramsey, he indicated that MPD would take steps to implement recommendations 1 through 4, which suggest changes that are in the control of the Department.  MPD has recently indicated that it has taken the following steps in response to CCRB's recommendations:  (1) prisoner processing procedures were revised in 2004 to incorporate "post and forfeit" information on the collateral receipt prepared to document posting or forfeiture of collateral, and the arrestee's collateral options will be printed and placed in a visible location at all facilities where arrests are processed; (2) refresher training on disorderly conduct law and procedures will be included as a topic area in the annual in-service and roll call training plans for all officers, and training tapes produced for the in-service training component on disorderly conduct will include an introduction from Chief Ramsey; and (3) consistent with Department policy, a sustained

allegation that an arrest was improper will result in a recommendation for disciplinary action against the officer(s) involved.

With respect to recommendation 5, the Mayor and the Council passed a bill repealing various sections of the criminal code, including several sections that were identified by CCRB in its disorderly conduct report as potentially obsolete. In the "Elimination of Outdated Crimes Amendment Act of 2003,"[13] which took effect on April 29, 2004, the District repealed the criminal code sections regarding Dueling challenges, § 22-1302, Assault for refusal to accept a challenge, § 22-1303, and Leaving the District to give or receive challenge, § 22-1304, among other sections.

In addition, the Council passed a bill in December 2004 that addressed many of the issues regarding collateral forfeiture that were raised by CCRB in its report. The "First Amendment Rights and Police Standards Act of 2004"[14] clarifies the legal status of collateral forfeiture, and requires that (1) a detailed written notice be given to anyone who elects collateral forfeiture, (2) an arrestee sign an acknowledgement of the choice to forfeit collateral, (3) the District develop standards and procedures to be used in administering the collateral forfeiture process, and (4) the Mayor submit an annual report to the Council regarding collateral forfeitures.

CCRB was pleased with the response by the District to its report and recommendations, and the Board commends the Mayor, the Council, and MPD for taking affirmative steps to address the issues raised in the report. CCRB and OCCR will continue to monitor and report on developments in response to CCRB's recommendations, and will further explore ways for the agency to assist in addressing the issues it identified regarding disorderly conduct arrests.

## III.    THE FUTURE

In fiscal year 2005, OPC expects to continue the progress it made this year. With three new investigators and improved processes, OCCR hopes to see noticeable gains in reducing the time it takes the agency to complete its investigations, along with a further reduction of its number of open complaints. In addition, the agency will continue to conduct as much community outreach and take on as many other special projects as its staffing and funding will allow. While the outlook is good, PCB and OPC will be working closely with the Mayor and the Council to ensure adequate staffing and funding for the continued successful operation of OPC through fiscal year 2005 and beyond.

# Endnotes

[1]    *See* D.C. Official Code § 5-1101, et seq.  CCRB also promulgated regulations regarding the operation of OCCR on August 30, 2002.  *See* D.C. Municipal Regulations, Title 6A, § 2100, et seq.

[2]    District of Columbia Act 15-463, 51 D.C. Reg. 9406 (2004); District of Columbia Law 15-194, 51 D.C. Reg. 9805 (2004).

[3]    The 13 foreign languages are Arabic, Chinese Simplified Text, French, German, Haitian Creole, Italian, Japanese, Korean, Portuguese, Russian, Spanish, Tagalog, and Vietnamese.

[4]    The four possible outcomes that a complaint examiner may reach are –

Sustained – where the complainant's allegation is supported by sufficient evidence to determine that the incident occurred and the actions of the officer were improper;

Exonerated – where a preponderance of the evidence shows that the alleged conduct did occur but did not violate MPD policies, procedures, or training;

Insufficient Facts – where there are insufficient facts to decide whether the alleged misconduct occurred; or

Unfounded – where the investigation determined no facts to support that the incident complained of actually occurred.

[5]    Please note that when counting the overall outcome for a complaint, a complaint that has at least one sustained allegation is counted as a sustained complaint.  The number of sustained complaints is determined by this method because if a complaint has at least one sustained allegation, it must be forwarded to the Chief of Police for imposition of discipline, even if the other allegations are not sustained.  The only time that a complaint is not forwarded to the Chief of Police for discipline is when no allegations are sustained.  In these cases, the complaint is dismissed after the complaint examiner issues his or her decision.

[6]    Please note that all of the statistics for fiscal year 2001 cover only a nine-month period.  OCCR opened to the public on January 8, 2001, which was three months into fiscal year 2001.

[7]    The data regarding the composition of the population of the District is included for reference purposes.  It should be noted that anyone, whether a resident of the District or not, may file a complaint with OCCR.

The breakdown of the District population data was obtained from the 2000 U.S. Census data available on the U.S. Census website, http://quickfacts.census.gov/qfd/states/11000.html and http://quickfacts.census.gov/qfd/states/11000lk.html.

[8]    OCCR collected date of birth information for only 57% of its complaints (206 of 361) in fiscal year 2003, but increased to collecting the information for 94% (247 of 262) in fiscal year 2004.

[9]    The racial and gender breakdowns of MPD officers were obtained from MPD's 2000 annual report, which was the most recent one available.  At the end of 2000, MPD had 3,614 sworn officers.  2,404 were African-American, 1,001 were white, 176 were Latino, and 33 were Asian.  2,737 were men and 877 were women.

[10]    The assignment data for fiscal year 2001 is not reported in this table because it was compiled using a different methodology from the other years, and cannot be used for comparison purposes.

[11]    Other includes MPD Headquarters, the Office of Professional Responsibility, Major Narcotics Branch, the Major Crash Investigations unit, the Maurice T. Turner, Jr., Institute of Police Science, Emergency/Non-Emergency Communications, the Air Support Unit, the Regional Operations Command – Central, and the Juvenile Processing Center.

[12]    "Collateral forfeiture" or "post and forfeit" involves paying a $25 "collateral" at the police station at the time of the arrest.  The collateral essentially amounts to a fine for the offense, and, after it is posted and forfeited, ends the arrest without any obligation for the person to appear in court at a later date to answer for the underlying charge.

[13]    District of Columbia Act 15-255, 50 D.C. Reg. 10996 (2003); District of Columbia Law 15-154, 51 D.C. Reg. 5691 (2004).

[14]    District of Columbia Bill 15-968, 51 D.C. Reg. 7176 (2004); District of Columbia Act (pending).

# Appendix A: District of Columbia Police Districts



**Police Districts**
- 1D
- 2D
- 3D
- 4D
- 5D
- 6D
- 7D
- Water
- Parks

Government of the District of Columbia
Anthony A. Williams, Mayor

Office of Police Complaints
January 3, 2005

0    1.25    2.5 Miles

# Appendix B: District of Columbia Wards



# EXHIBIT I

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
# POLICE COMPLAINTS BOARD
# OFFICE OF POLICE COMPLAINTS



# ANNUAL REPORT
## FISCAL YEAR 2005

**1400 I Street, NW, Suite 700 ★ Washington, DC 20005**
**Tel: (202) 727-3838 ★ Fax: (202) 727-7638 ★ Toll-Free 24-Hour Hotline (866) 588-0569**
**www.policecomplaints.dc.gov**



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**POLICE COMPLAINTS BOARD**
**OFFICE OF POLICE COMPLAINTS**

January 23, 2006

Dear Mayor Williams, Members of the District of Columbia Council,
 Chief Ramsey, and Chief Pittman:

We are pleased to submit the 2005 Annual Report for the Office of Police Complaints (OPC) and its governing body, the Police Complaints Board (PCB). This report covers the agency's operation during the District of Columbia Government's fiscal year from October 1, 2004, through September 30, 2005.

Fiscal year 2005 was the agency's fifth year of operation and a period of many significant developments for the agency. The year began with a name change for the office and the board from the Office of Citizen Complaint Review (OCCR) and the Citizen Complaint Review Board (CCRB) to OPC and PCB. In April 2005, the District of Columbia enacted a new law that expanded PCB's authority, allowing it to monitor and evaluate the Metropolitan Police Department's (MPD) handling of First Amendment assemblies held in the District. In addition, the law expanded OPC's jurisdiction, allowing it to investigate and resolve complaints alleging that officers failed to wear or display required identification or identify themselves by name and badge number when requested to do so by a member of the public. Over the course of the year, the agency planned for its relocation to new office space, which was finally completed on December 31, 2005. And as fiscal year 2006 began, the Mayor appointed three new PCB members to succeed three of the original members of the board. All of these developments led up to the fifth anniversary of the agency's opening to the public in January 2006.

In addition to the significant developments, the agency achieved several notable accomplishments over the course of the year, which included the following:

- Six hundred seventy-four people contacted OPC to inquire about filing a complaint. The agency received 326 complaints, which was a 24% increase over fiscal year 2004. This was a volume of complaints that was more in keeping with the number received in earlier years.

- OPC closed 368 complaints, which was an 18% increase over fiscal year 2004, making fiscal year 2005 the second year in a row that the agency closed more complaints than it received. The increase in the number of closed complaints was driven by a 27% increase (to 239) in the number of complaints resolved by OPC through adjudication, dismissal, or successful mediation. Seventeen of these complaints were adjudicated and 13 of the complaints had allegations that were sustained. All of these sustained decisions were forwarded to MPD, and MPD has taken steps to impose discipline for each one, continuing OPC's unbroken record of not having the Chief of Police return any of the decisions for reconsideration.

- OPC's number of open complaints was lower at the end of the year for the second year in a row, decreasing by an additional 13%. The decrease occurred despite the fact that the agency received 64 more complaints in fiscal year 2005, and was driven by OPC's greater efficiency and productivity and the effect of the new investigators added to OPC's staff.

- OPC conducted 19 mediation sessions, 13 of which were successful. Since opening, OPC has mediated 96 complaints, with an overall success rate of 76%.

- PCB issued four detailed reports and sets of recommendations to the Mayor, the Council, and MPD's Chief of Police over the course of the year addressing the handling of minors in the care of arrested persons, publication of MPD orders on the Internet, pretextual stops of bicyclists, and property damage caused by District of Columbia police action. The reports discussed PCB's examination of these issues and the recommendations included changes designed to reduce the occurrence of police misconduct in the future.

- Under the First Amendment Rights and Police Standards Act of 2004, which granted PCB the authority to monitor and evaluate MPD's handling of First Amendment assemblies held in the District of Columbia, OPC monitored MPD's handling of the antiwar and anti-globalization protests that occurred in Washington in September 2005. PCB issued its report on the monitoring effort on December 20, 2005.

- OPC expanded, reorganized, and implemented new procedures for its investigative unit. The agency added four new line investigators, bringing the total to ten, along with a paralegal specialist. OPC also reorganized its investigative staff into two teams, each headed by a lead investigator.

- OPC implemented its Community Outreach Strategic Plan for 2005. The plan continued many of OPC's successful programs and added a public education and awareness program, which included the production of a public service announcement (PSA) about the agency that is being aired regularly on City Cable Channel 16.

The developments and accomplishments described above, in addition to progress made in earlier years, have put the agency in a better position to carry out its mission as the agency passes its fifth anniversary. The agency name change gave the office and the board names that more clearly convey the agency's mission, while the relocation of the agency puts it in new office space that is easily accessible to the public, can accommodate the size of OPC's staff, and is better equipped for the agency to do its work. The expansion of PCB's authority and OPC's jurisdiction empowered the agency to play a role in monitoring and investigating some of the public's new and different concerns about its interactions with the police. And the addition of four new investigators to OPC's staff provided the agency with much-needed assistance in reducing the time it takes to complete investigations and decreasing the number of open complaints. The new investigators also further enhanced OPC's talented and diverse staff.

Even with the positive changes that occurred and the additional resources that were provided to the agency in fiscal year 2005, PCB and OPC will continue to monitor the agency's

overall needs.  The agency is becoming more widely known each day as a result of its efforts and those made by MPD, which contributed to a 24% increase in complaints this year.  The recent changes discussed above have added the responsibility for the Board to monitor MPD's handling of protests and demonstrations, which is labor-intensive work, and expanded the types of complaints that can be filed with OPC.  These new duties require resources above and beyond what the agency has to continue its regular work of investigating, mediating, and adjudicating complaints in a timely manner, expanding its capacity to receive and resolve complaints, increasing community outreach, developing additional policy recommendations, and responding to Freedom of Information Act (FOIA) requests, which increased noticeably in the last year. Having funding and staffing for all of these needs is important to allowing the agency to adequately perform its various functions.

As we begin our sixth year of operation, we look forward to building on the work that PCB and OPC have done and particularly the work of the departing PCB members, Maria-Cristina "Mai" Fernández, the former chair of the Board, Inspector Stanly Wigenton, the former MPD member of the Board, and Michael Sainte-Andress, who established the agency and helped it develop and advance to this point.  We thank them for their enormous contributions and dedication to achieving effective and responsible police oversight in Washington, D.C.

We also look forward to continuing to work with the Mayor, the Council, MPD, and D.C. Housing Authority Police Department (DCHAPD) to ensure that the agency has the resources it needs to carry out its mission.  Over the past five years, we believe that the agency has become an important forum where members of the public can raise concerns about their interactions with the police and seek protection of their rights when they may not have that opportunity to do so elsewhere.  The agency also has brought about police reform by detecting and examining patterns and trends in the complaints filed with the agency and issuing detailed policy recommendations based on this work.  In the year ahead, we plan to enhance and expand these roles to do our part to improve policing and ensure the public's confidence in the District's police force.

Respectfully submitted,

Kurt Vorndran
Chair
Police Complaints Board

Philip K. Eure
Executive Director
Office of Police Complaints

# Table of Contents

Report Graphics, Tables & Charts.................................................................................. iii

I.    Agency Overview ..................................................................................................1

    A.    Introduction ...................................................................................................1

    B.    Agency Name Change ...................................................................................1

    C.    Agency Relocation ........................................................................................1

    D.    Police Complaints Board ..............................................................................2

    E.    Office of Police Complaints .........................................................................4

    F.    Interns and Law Clerks at OPC ....................................................................6

    G.    Complaint Process .........................................................................................6

        1.    Dismissal ...............................................................................................8

        2.    Mediation ..............................................................................................8

        3.    Complaint Examination .........................................................................9

II.   The Year in Review ............................................................................................10

    A.    Introduction .................................................................................................10

    B.    Complaint Examination ...............................................................................11

        1.    Complaint Examination Example #1....................................................13

        2.    Complaint Examination Example #2....................................................14

        3.    Complaint Examination Example #3....................................................15

    C.    Mediation ....................................................................................................16

        1.    Mediation Example #1 .........................................................................17

        2.    Mediation Example #2 .........................................................................17

        3.    Mediation Example #3 .........................................................................18

    D.    Investigations..............................................................................................18

    E.    Statistics......................................................................................................19

        1.    Contacts and Formal Complaints .........................................................20

        2.    Disposition of Formal Complaints .......................................................21

        3.    Status of Pending Formal Complaints at the End of Each Fiscal Year .................21

        4.    OPC Workload .....................................................................................23

        5.    Allegations in Formal Complaints........................................................25

        6.    Complainant Race or National Origin, Gender, and Age......................26

|  | 7. | Subject Officer Race or National Origin, Gender, and Assignment | 31 |
|  | 8. | City Wards | 35 |
| F. | Outreach | | 36 |
|  | 1. | Fiscal Year 2005 | 36 |
|  | 2. | Community Outreach Strategic Plan for 2006 | 37 |
|  | 3. | Website | 38 |
| G. | Police Oversight and Law Enforcement Organizations | | 38 |
| H. | Policy Recommendations | | 38 |
|  | 1. | Fiscal Year 2005 | 39 |
|  |  | a. Minors in the Care of Arrested Persons | 39 |
|  |  | b. Publication of MPD Orders on the Internet | 39 |
|  |  | c. Pretextual Stops of Bicyclists | 40 |
|  |  | d. Property Damage Caused by District of Columbia Police Action | 41 |
|  | 2. | Prior Years | 41 |
|  |  | a. Racial Profiling in Washington, D.C. | 41 |
|  |  | b. Disorderly Conduct Arrests Made by MPD Officers | 42 |
| I. | Protest Monitoring | | 44 |
| III. | The Future | | 45 |
| Endnotes | | | 46 |
| Appendix A: District of Columbia Police Districts | | | |
| Appendix B: District of Columbia Wards | | | |

## Report Graphics, Tables & Charts

Graphic A:  OPC Complaint Process ........................................................................8

Table 1:  Complaint Examiner Decisions..................................................................11

Table 2:  Complaint Examiner Decisions..................................................................12

Table 3:  Discipline for Sustained Complaints.........................................................13

Table 4:  Contacts and Formal Complaints ..............................................................21

Table 5:  Disposition of Formal Complaints ............................................................21

Table 6:  Status of Pending Formal Complaints at the End of Each Fiscal Year........................22

Chart 6:  Number of Open Formal Complaints at the End of Each Fiscal Year ..........................23

Table 7:  OPC Workload ...........................................................................................24

Chart 7:  OPC Workload ...........................................................................................25

Table 8:  Allegations in Formal Complaints .............................................................25

Chart 8:  Allegations in Formal Complaints (as a Percentage) ................................26

Table 9:  Complainant Race or National Origin........................................................27

Chart 9:  Complainant Race or National Origin (as a Percentage)...........................28

Table 10:  Complainant Gender .................................................................................28

Chart 10:  Complainant Gender (as a Percentage) ...................................................29

Table 11:  Complainant Age......................................................................................29

Chart 11:  Complainant Age (as a Percentage) ........................................................30

Table 12:  Complainant Race or National Origin with "Unique Complainant" Information .......30

Table 13:  Complainant Gender with "Unique Complainant" Information .................................30

Table 14:  Subject Officer Race or National Origin..................................................32

Chart 14:  Subject Officer Race or National Origin (as a Percentage).......................32

Table 15:  Subject Officer Gender.............................................................................32

Chart 15:  Subject Officer Gender (as a Percentage) ...............................................33

Table 16:  Subject Officer Assignment .....................................................................33

Chart 16:  Subject Officer Assignment (as a Percentage) ........................................34

Table 17:  Subject Officer Race or National Origin with "Unique Officer" Information.............34

Table 18:  Subject Officer Gender with "Unique Officer" Information .......................34

Table 19:  Subject Officer Assignment with "Unique Officer" Information ................35

- iii -

Table 20:  City Wards ............................................................................................................ 35

Chart 20:  City Wards (as a Percentage) ........................................................................... 36

## I.     AGENCY OVERVIEW

### A.     Introduction

The Office of Citizen Complaint Review (OCCR) and its governing body, the Citizen Complaint Review Board (CCRB), were created by statute in 1999,[1] and OCCR opened to the public on January 8, 2001.  The agency is independent of the Metropolitan Police Department (MPD), the District of Columbia's 3,800-member police force, and the D.C. Housing Authority Police Department (DCHAPD), the Housing Authority's 75-member police force, and its mission is to receive, investigate, and resolve police misconduct complaints filed by the public against MPD and DCHAPD officers.  The agency was created by the District to fill the void left by the 1995 abolition of the Civilian Complaint Review Board, which was plagued by inadequate funding and staff, resulting in lengthy delays in the processing and resolution of complaints.  The District's new police oversight office was the product of extensive research and careful thought by District officials and advocacy groups.  The result was an agency with board members and staff who seek to employ the best practices of citizen oversight of law enforcement, and whose ultimate goal is to provide the public with an independent and impartial forum for the investigation and timely resolution of police misconduct complaints.

### B.     Agency Name Change

In 2004, the Mayor and the District Council passed the "Omnibus Public Safety Agency Reform Amendment Act of 2004,"[2] which included provisions renaming OCCR and CCRB.  The law, which took effect on September 30, 2004, renamed the office and the board to the Office of Police Complaints (OPC) and the Police Complaints Board (PCB).  The Mayor and the Council renamed the agency in order to more clearly convey its mission.  Beginning on January 1, 2005, OCCR and CCRB began to be known as OPC and PCB.

### C.     Agency Relocation

During fiscal year 2005, OPC planned for the relocation of the agency to new office space.  The planning process involved preserving the positive features of OPC's original offices on 11th Street, NW – being easily accessible to the public, but located away from MPD and DCHAPD buildings and stations and other government offices to provide the public with a less intimidating environment in which to file a complaint – while finding new offices that would accommodate the size of OPC's staff and be better equipped for the agency to do its work.  OPC found larger office space that met its needs at 1400 I Street, NW, Suite 700.  The new office space consolidated OPC's staff onto one floor and provided the agency with a larger waiting area, more interview rooms, larger conference rooms, a room to conduct training, space to properly house and protect IT and telephone equipment, and additional space to accommodate any future growth.

The agency's relocation to its new offices was finally completed on December 31, 2005.

D.    **Police Complaints Board**

According to its enabling statute, PCB is composed of five members, one of whom must be a member of MPD, while the other four must have no current affiliation with any law enforcement agency. All Board members must be residents of the District of Columbia, and they serve staggered three-year terms without compensation. The Mayor nominates members to the Board, who must then be confirmed by the Council. The current members of the Board are as follows:

**Kurt Vorndran,** the Chair of the Board, is a legislative liaison for the National Treasury Employees Union (NTEU). Prior to his work at NTEU, Mr. Vorndran served as a lobbyist for a variety of labor-oriented organizations including the International Union of Electronic Workers, AFL-CIO (IUE), and the National Council of Senior Citizens. Mr. Vorndran is currently the vice president of the Woodley Park Community Association and served as the president of the Gertrude Stein Democratic Club from 2000 to 2003 and an elected ANC Commissioner from 2001 to 2004. He received his undergraduate degree from the American University's School of Government and Public Administration and has taken graduate courses at American and the University of the District of Columbia. Mr. Vorndran was confirmed by the District Council on December 6, 2005, and sworn in as the new chair of the Board on January 12, 2006. His term expires on January 12, 2008.

**Inspector Patrick A. Burke** is a 16-year veteran of the Metropolitan Police Department and the commander of the Third District Substation. During his MPD career, Inspector Burke has served in four of the seven police districts, the Special Operations Division, Operations Command, and the Field and Tactical Support Unit. He received his undergraduate degree in criminal justice from the State University of New York College at Buffalo, a certificate of public management from the George Washington University, and a master's degree in management from the Johns Hopkins University. He is also a graduate of the Federal Bureau of Investigation's National Academy in Quantico, Virginia, and has received a variety of awards and commendations, including MPD's Achievement and Lifesaving Medals, the Cafritz Foundation Award for Distinguished District of Columbia Government Employees, and the National Highway Traffic Safety Administration Award for Public Service. Inspector Burke is an active member of numerous community and volunteer organizations in the District of Columbia, where he resides with his wife and four children. Inspector Burke was confirmed by the District Council as the second MPD member of the Board on January 3, 2006, and sworn in on January 12, 2006. His term expires on January 12, 2009.

**Dr. Patricia Fisher**, who has served as a PCB member since the Board was created in January 2000, is a licensed counseling and clinical psychologist with over 30 years of experience in the mental health and substance abuse fields. She has worked in and served as a consultant to a variety of governmental, private, and public organizations. Dr. Fisher, a native Washingtonian, has maintained a private practice in Washington for over 20 years and has been involved in several professional and community organizations. She received her undergraduate and master's degrees from Howard University, and she earned her doctorate in counseling psychology from the University of Minnesota. Dr. Fisher's term expires on January 12, 2007.

**Karl M. Fraser** is a toxicologist who performs biotechnological research at a genomic company in Gaithersburg, Maryland.  Mr. Fraser received his undergraduate degree in biology from Howard University and a master's degree in biotechnology from the Johns Hopkins University.  He has been active in his community, including serving as an elected ANC Commissioner.  Mr. Fraser was confirmed by the District Council on December 6, 2005, and sworn in on January 12, 2006.  His term expires on January 12, 2008.

**Marc Schindler** is the general counsel for the Department of Youth Rehabilitation Services (DYRS), the District of Columbia's cabinet-level juvenile justice agency.  As general counsel, Mr. Schindler is responsible for all legal matters related to the agency and leading the execution of legislative strategies to support DYRS's goals.  Prior to joining DYRS, he served as a staff attorney with the Youth Law Center (YLC) from 1997 to 2005.  YLC is a non-profit public interest law firm dedicated to protecting the rights of young people in juvenile justice and foster care systems nationwide.  While at YLC, Mr. Schindler was involved with training, technical assistance, law reform litigation, and legislative and administrative advocacy on legal issues related to children, with particular emphasis on improving the conditions of confinement for institutionalized children and addressing racial disparities in the justice system.  As an attorney with YLC, he was involved in extensive advocacy on behalf of children in juvenile justice systems in Maryland, Virginia, Florida, Kentucky, Illinois, South Dakota, Ohio, and the District of Columbia.  Mr. Schindler also served as co-chair of the national Juvenile Justice & Delinquency Prevention Coalition in Washington, D.C., taught children's rights at American University's Washington College of Law, and currently is a member of the ABA's Juvenile Justice Committee.  He previously worked as an assistant public defender in Baltimore's juvenile court representing children in delinquency proceedings, where he was the recipient of the Cahill Award for outstanding commitment to service and chaired the Juvenile Law Committee of the Baltimore City Bar Association.  Mr. Schindler is a graduate of Yale University and the University of Maryland School of Law.  His term expired on January 12, 2006, but he continues to serve until reappointed or until a successor is appointed.

The Board meets on the first Monday evening of every other month.  At these meetings, OPC management updates Board members about various issues, including developments in office infrastructure, outreach, and personnel matters.  In addition, the Board is provided with a report of the complaints received by OPC, along with the disposition of these complaints.  The Board takes an active role in the work of OPC, offering guidance on many issues affecting the operation of the office.  The Board also is charged with reviewing the executive director's determinations regarding the dismissal of complaints, making recommendations to the Mayor, the Council, MPD, and DCHAPD, where appropriate, regarding changes in policy that may decrease the level of police misconduct, and monitoring and evaluating MPD's handling of First Amendment assemblies held in the District of Columbia.

Over the last year, three of the original Board members, who served since the Board was created in January 2000, completed their service.  Maria-Cristina "Mai" Fernández, the former chair of the Board, and Michael Sainte-Andress ended their tenure on January 12, 2006, when Mr. Vorndran and Mr. Fraser were sworn in.  Inspector Stanly Wigenton, the former MPD member of the Board, left PCB when he retired from the Department on December 11, 2004.  Ms. Fernández, Mr. Sainte-Andress, and Inspector Wigenton, along with Dr. Fisher and Michael Selmi, a George Washington University Law School professor, formed the original Board and

hired OPC's first executive director, bringing the agency into existence. Over the years that followed, they devoted a considerable amount of their personal time and energy to the development and continued operation of the agency. Their hard work has helped Washington develop a police oversight agency that is regarded as one of the leading agencies in the United States, and the new PCB members and OPC staff salute them for their service to the agency and the District of Columbia.

### E.    Office of Police Complaints

OPC operates under the supervision of its executive director, who is appointed by the Board. The executive director is assisted with the management of OPC by a deputy director, chief investigator, assistant chief investigator, and special assistant. The office has its own investigative staff, which currently consists of two lead investigators, two senior investigators, six investigators, and a paralegal specialist. The management team and investigative staff are assisted by an administrative officer, public affairs specialist, staff assistant, and investigative clerk/receptionist. In addition, OPC has developed an internship program that brings in college and law students year-round to assist the staff with its regular duties and special projects. Overall, the agency has worked to recruit a very talented and racially and ethnically diverse staff. OPC's staff includes ten employees, or 50%, with graduate or law degrees, and six attorneys. The diversity of the office generally mirrors the District's population, and includes a staff that is 60% African-American, 25% white, 10% Latino, and 5% multiracial.

The current members of OPC's staff are as follows:

*Philip K. Eure* became the agency's first executive director in July 2000 after working as a senior attorney in the Civil Rights Division at the U.S. Department of Justice, where he litigated on behalf of victims of employment discrimination. While at the Department, Mr. Eure was detailed in 1997-1998 to Port-au-Prince as an adviser to the Government of Haiti on a project to reform the criminal justice system. He also serves on the board of directors of the National Association for Civilian Oversight of Law Enforcement and has spoken at various forums in the District and around the country on a wide variety of police accountability issues. Mr. Eure received his undergraduate degree from Stanford University and his law degree from Harvard Law School.

*Thomas E. Sharp*, the deputy director, joined the agency in October 2002 from the law firm of Wilmer, Cutler & Pickering, where he was an associate in the firm's securities enforcement and regulatory practice. Prior to joining the firm, he served as staff counsel to Newark, New Jersey, City Councilman Cory Booker and as a law clerk to U.S. District Judge Myron H. Thompson in Montgomery, Alabama. Mr. Sharp has a bachelor's degree from the State University of New York at Buffalo and a law degree from Yale Law School.

*Clifford C. Stoddard, Jr.,* the chief investigator, was appointed to his position in June 2003. Mr. Stoddard is a retired Special Agent from the U.S. Air Force Office of Special Investigations and former Assistant State's Attorney and Chief of the White-Collar and Computer Crime Division of the Anne Arundel County State's Attorney's Office in Annapolis, Maryland. He was an adjunct faculty member at the National Advocacy Center and has taught nationally for the National District Attorney's Association and the American Prosecutor's

Research Institute on white-collar and computer crime subjects. Mr. Stoddard has a bachelor's degree from Southern Illinois University, Carbondale, and a law degree from the Georgetown University Law Center.

**Kesha Taylor**, the assistant chief investigator, was hired in July 2002. Prior to joining the agency, Ms. Taylor worked with the Investigations Division of the Public Defender Service for the District of Columbia for seven years. While there, Ms. Taylor served most recently as a Staff Investigator and as the Coordinator of the Internship Program. Ms. Taylor obtained her undergraduate degree in political science and English from the University of Vermont. She also received a master's degree in higher education from Cornell University.

**Angela M. Kiper**, the agency's special assistant, was hired by OPC in June 2005. Prior to joining OPC, Ms. Kiper served for three years as an appellate staff attorney at the U.S. Court of Appeals for the District of Columbia Circuit, and for six years as a public defender at the Public Defender Service for the District of Columbia. She received her undergraduate degree from Xavier University and her law degree from Yale Law School.

As of the issuance of this report, OPC's other staff members are as follows:

| | |
|---|---|
| Natasha Bryan | Lead Investigator |
| Mona Andrews | Lead Investigator |
| Anthony Lawrence | Senior Investigator |
| Megan Rowan | Senior Investigator |
| Andrea Del Pinal | Investigator |
| Felicia M. Day | Investigator |
| David A. Curcio | Investigator |
| Alpha Griffin | Investigator |
| Alan Peyrouton | Investigator |
| Kevin T. Smith | Investigator |
| Takima Davis | Paralegal Specialist |
| Sherry Meshesha | Investigative Clerk/Receptionist |
| Melanie Deggins | Public Affairs Specialist |
| Stephanie Banks | Administrative Officer |
| Sonja Wingfield | Staff Assistant |

OPC staff development and training are a high priority for the agency. All employees go through a training program that instructs them on the goals and purpose of the office, as well as the specific functions related to their jobs. Investigators attend training provided by MPD's Institute of Police Science, John E. Reid and Associates, and the Institute of Police Technology and Management at the University of North Florida in Jacksonville, Florida. In addition, all staff members are eligible for, and encouraged to attend, training programs and courses offered through the District Government's Center for Workforce Development, as well as other specialized training given by private entities and other District or federal agencies. The specific training described above is supplemented by bi-weekly staff meetings and weekly investigator meetings where the staff discusses different issues that arise in carrying out OPC's work.

**F.    Interns and Law Clerks at OPC**

In the summer of 2001, the agency established a year-round internship program for both college and law school students.  College interns assist with investigations, community outreach, and other projects in the office, while law school interns perform legal research on various policy issues.  Interns volunteer their time and receive academic credit for their work during the academic year.  Over the summer, budget permitting, interns receive a salary for full-time work.  OPC's internship program has been an excellent way for the agency to stretch its limited budget by engaging talented students in the agency's work, while giving them valuable practical experience in exchange.  The program has also been a valuable recruitment tool for the agency, with two former interns currently employed by the agency as investigators.

Since the internship program began, the agency has attracted many outstanding students.  Through the fall of 2005, 39 college students and 12 law students have participated in the program.  The college students have come from a variety of schools, including American, Frostburg State, George Mason, George Washington, Harvard, Howard, Niagara, Santa Clara, and Southern Methodist universities, the University of the District of Columbia, the University of Maryland, the John Jay College of Criminal Justice, and St. Mary's College of Maryland.  The law students have come from American University's Washington College of Law, Catholic University of America's Columbus School of Law, the Georgetown University Law Center, the George Washington University Law School, the Howard University School of Law, and the University of the District of Columbia's David A. Clarke School of Law.  The internship program has provided substantial benefits to OPC and the District, and the office plans to continue hiring interns during each semester and the summer.

**G.    Complaint Process**

OPC's work centers on the complaint process, which is set forth in the statute and regulations governing the agency.  The public initiates the complaint process, so it begins only after a person has filed a written, signed complaint form with the agency.  OPC has the authority to investigate complaints that are received within 45 days of the alleged misconduct and that allege abuse or misuse of police powers by MPD or DCHAPD officers, including:

  (1) Harassment;
  (2) Use of unnecessary or excessive force;
  (3) Use of language or conduct that is insulting, demeaning, or humiliating;
  (4) Discriminatory treatment;
  (5) Retaliation for filing a complaint with OPC; or
  (6) Failure to wear or display required identification or to identify oneself by name and badge number when requested to do so by a member of the public.

To ensure ease of access to its process, OPC has taken steps to facilitate the filing of a complaint.  First, OPC's office is physically located away from MPD and DCHAPD buildings and stations and other government offices to provide the public with a less intimidating environment in which to file a complaint.  Second, to make it as convenient as possible to file a complaint, complainants may file in person at OPC's office or at any MPD district station, or

they may initiate a complaint by mail, telephone, fax, or e-mail.  Third, to ensure that non-English-speaking residents of and visitors to the District are able to get information about the agency and file complaints, OPC's information sheet and complaint form have been translated into 13 foreign languages.[3]  Finally, an investigator is always on duty when the agency is open to assist the public with filing complaints, and to interview them in English or Spanish about the allegations in their complaints.

After a complaint is received, the executive director reviews it to confirm that it is in OPC's jurisdiction, and to determine how to proceed with the processing of the complaint.  If a complaint is outside OPC's jurisdiction, the executive director refers it to MPD's Office of Professional Responsibility, DCHAPD, or the appropriate agency for investigation.  Also, if the complaint alleges conduct by an officer that may be criminal in nature, the executive director refers the complaint to the U.S. Attorney for the District of Columbia for possible criminal prosecution of the officer.  For the remaining complaints, the executive director determines whether they should be investigated or mediated.

When a complaint is sent for investigation, it is assigned to one of OPC's staff investigators.  The investigator interviews the complainant, subject officer, and any witnesses the complainant identifies, in addition to attempting to locate and interview any other police or non-police witnesses who may be able to provide relevant information.  The investigator also collects and reviews other evidence, including MPD documents, hospital records, materials from other sources, the scene of the incident, and any other relevant information.  When the investigation is complete, the investigator drafts an investigative report, which, along with all the evidence gathered in the investigation, is reviewed by a supervisor.  The executive director then reviews the report of the findings of the investigation, and determines if the complaint should be dismissed, which requires the concurrence of one PCB member, or referred to a complaint examiner for review and a decision on the merits of the complaint.  A flow chart depicting the complaint process is included in Graphic A.  In addition, OPC's three principal methods of resolving complaints – dismissal, mediation, and complaint examination – are discussed in more detail below.

**Graphic A:  OPC Complaint Process**



### 1.    *Dismissal*

The statute and regulations governing OPC allow for the dismissal of complaints under three sets of circumstances:  (1) the complaint is deemed to lack merit; (2) the complainant refuses to cooperate with the investigation; or (3) if, after the executive director refers a complaint for mediation, the complainant willfully fails to participate in good faith in the mediation process.  Based on information gathered during OPC's investigation of a complaint, and with the concurrence of one PCB member, the executive director may dismiss a complaint when these circumstances arise.  The dismissal process allows OPC to conserve resources and more efficiently handle complaints.

### 2.    *Mediation*

OPC's complaint process includes mediation as a method for resolving complaints and, because OPC firmly believes in the benefits of mediation, appropriate complaints are forwarded to mediation on a regular basis.  Mediation allows the complainant and the subject officer to meet face-to-face to attempt to resolve the issues raised in a complaint.  The goal of OPC's mediation program is to give both parties a chance to work together to achieve a mutual understanding of what happened during their interaction and work out their differences without the stress and expense of a formal investigation and hearing.

A mediation service, the Community Dispute Resolution Center (CDRC), administers OPC's mediation program, assigning complaints to be mediated by a pool of well-trained, experienced, and diverse mediators.  There is no cost to the complainant or the subject officer to participate in mediation, but both parties must sign a confidentiality agreement that provides that

anything said by either party during the mediation session will not be disclosed outside of the session.  The confidentiality agreement is required to encourage parties to be honest and open while attempting to resolve the dispute.

The decision to refer a complaint to mediation is made by the executive director and not by the parties.  If the executive director refers a complaint to mediation, both the complainant and the subject officer are required to participate in the mediation process in good faith.  Failure to participate in good faith constitutes cause for discipline of the subject officer and grounds for dismissal of the complaint.  However, even though participation of the parties is required, the outcome of the mediation is completely voluntary because neither the complainant nor the officer is required to reach an agreement or settle the dispute during mediation.

There are some restrictions as to which complaints may be referred to mediation.  OPC will not refer complaints involving allegations of the use of unnecessary or excessive force that results in physical injury.  In addition, an officer may not mediate a complaint if he or she has mediated a complaint alleging similar misconduct or has had a complaint sustained by OPC for similar misconduct in the preceding twelve months.

### 3.    *Complaint Examination*

The complaint examination process is used to resolve complaints where the executive director determines that there is "reasonable cause to believe" that police misconduct occurred.  When the executive director reaches this determination, the complaint is referred to a complaint examiner who reviews it, along with OPC's investigative report, and issues a written decision regarding the merits of the complaint.  The complaint examiner may resolve the complaint based on OPC's investigative report alone, or, if necessary, may conduct an evidentiary hearing to further develop the factual record.  In practice, complaints that are neither dismissed nor successfully mediated are resolved through complaint examination, which is the only means by which OPC can issue a decision sustaining a complaint against an officer, although not all complaints that are referred to complaint examination are necessarily sustained.

If a complaint examiner sustains any allegation in a complaint, the executive director forwards the complaint examiner's decision to the Chief of Police for review and imposition of discipline.  Under certain limited circumstances, the Chief may send a decision back to OPC for further review, but, otherwise, the Chief is bound by the decision and must impose discipline on the officer as a result of the decision.  If the complaint examiner does not sustain any allegation in a complaint, the executive director dismisses the complaint based on the decision.

The complaint examination process is administered by ADR Partners, LLC, an outside alternative dispute resolution service.  ADR works directly with the members of the complaint examiner pool, who are responsible for rendering final decisions on the complaints referred to them by OPC.  To carry out this important function, PCB and OPC assembled a pool of distinguished attorneys who live in the District of Columbia.  In addition to having a reputation for competence, impartiality, and integrity, and not being a current or former employee of MPD, the complaint examiners must be members of the District of Columbia Bar, have practiced for five years or more, and have litigation or arbitration experience.  At the end of fiscal year 2005, OPC's complaint examiner pool had 18 members.  The pool includes attorneys who work in

private practice, government, non-profit organizations, and academia, and have a variety of other experiences.

Based on its experience with the operation of the complaint examination process, OPC fine-tunes and modifies the process to ensure that it operates smoothly and provides adequate protections to officers and complainants. One change OPC implemented early in the process was an opportunity for officers to submit written objections to the complaint examiner about OPC's investigative report so the objections can be considered with the report. The objections ensure that the subject officer has an opportunity to raise any issues regarding the investigation before the complaint examiner takes any action. In addition, if a complaint examiner determines that an evidentiary hearing is necessary to resolve a complaint, OPC has taken steps to ensure that complainants have counsel available to assist them at no cost during hearings. In general, because officers are represented by attorneys or union representatives provided to them by the police union, the Fraternal Order of Police (FOP), OPC made arrangements with a Washington-based law firm, Howrey LLP, to provide free counsel for complainants. Howrey is an international law firm that is based in Washington, D.C. The firm has over 600 attorneys worldwide and more than 250 in Washington.

## II.    THE YEAR IN REVIEW

### A.    Introduction

Fiscal year 2005 was a productive and successful year for OPC, and the agency achieved several notable accomplishments. Fiscal year 2005 was the second year in a row that the agency closed more complaints than it received, with significant increases in the overall number of complaints closed and the number of complaints for which full investigative reports were completed. OPC also adjudicated 17 complaints, 13 of which had allegations that were sustained. All of this work contributed to the agency lowering its number of open complaints at the end of the year by an additional 13%.

PCB issued four detailed reports and sets of recommendations to the Mayor, the Council, and MPD's Chief of Police over the course of the year addressing minors in the care of arrested persons, publication of MPD orders on the Internet, pretextual stops of bicyclists, and property damage caused by District of Columbia police action. The reports discussed PCB's examination of these issues and the recommendations included changes designed to reduce the occurrence of police misconduct complaints in the future. The agency also monitored MPD's handling of antiwar and anti-globalization protests under PCB's new authority to monitor and evaluate MPD's handling of First Amendment demonstrations held in the District. In addition, OPC implemented its Community Outreach Strategic Plan for 2005, continuing several successful programs, and adding a public education and awareness program, which included the production of a public service announcement (PSA) about the agency that is being aired regularly on City Cable Channel 16.

These developments and others are discussed in more detail below, along with statistics regarding complaints received and closed by OPC in fiscal year 2005. These statistics show significant progress by the agency, but also indicate that there are still challenges ahead.

## B.     Complaint Examination

In fiscal year 2005, OPC continued the operation of its complaint examination process. As the decisions issued by OPC suggest, the complaint examination process has become an important forum where members of the public can raise concerns about possible abuse or misuse of police powers and seek protection of their rights when they may not have that opportunity to do so elsewhere.  In general, the other forums available – principally criminal and civil court – provide few opportunities to raise these issues or have barriers to entry that keep or inhibit people from pursuing them.  OPC referred an additional 13 complaints into the process over the course of the year, and 17 complaints were resolved.  Two of the complaints were withdrawn midway through the process, and the remaining 15 were resolved in 11 different decisions. Table 1 lists each of the resolved complaints and identifies the allegations in the complaint and the decision reached by the complaint examiner for each allegation.

**Table 1:  Complaint Examiner Decisions**

|  | Harassment | Excessive Force | Language / Conduct | Discriminatory Treatment | Retaliation |
|---|---|---|---|---|---|
| 03-0181 | Sustained / Exonerated | Sustained / Exonerated | Sustained / Exonerated | -- | -- |
| 03-0182 | Sustained / Exonerated | Sustained / Exonerated | Sustained / Exonerated | -- | -- |
| 03-0188 | Sustained / Exonerated | Sustained / Exonerated | Sustained / Exonerated | -- | -- |
| 03-0199 | Sustained / Exonerated | Sustained / Exonerated | Sustained / Exonerated | -- | -- |
| 03-0200 | Sustained / Exonerated | Sustained / Exonerated | Sustained / Exonerated | -- | -- |
| 03-0380 | -- | -- | Sustained | -- | -- |
| 02-0031 | -- | Sustained | Sustained | -- | -- |
| 03-0457 | Sustained | -- | Sustained | -- | -- |
| 02-0467 | Sustained | -- | Sustained | -- | -- |
| 04-0099 | Insufficient Facts | Insufficient Facts | Insufficient Facts | -- | -- |
| 02-0392 | Sustained | Insufficient Facts | -- | -- | -- |
| 02-0393 | Withdrawn | Withdrawn | -- | -- | -- |
| 02-0464 | Sustained / Insufficient Facts | -- | Insufficient Facts / Unfounded | -- | -- |
| 05-0037 | Withdrawn | -- | Withdrawn | -- | -- |
| 03-0243 | Sustained | -- | -- | -- | -- |
| 03-0459 | Exonerated | -- | Insufficient Facts | -- | -- |
| 05-0103 | -- | Sustained in Part | Insufficient Facts | -- | -- |

The full text of each decision is available on OPC's website, www.policecomplaints.dc.gov, and through the online legal databases maintained by LexisNexis and Westlaw.  LexisNexis began carrying OPC's decisions online in December 2005 while Westlaw will start including the decisions in the spring of 2006.  As Table 1 indicates, complaint examiners resolved 38 allegations contained in the 17 complaints.  To this point, the decisions have reflected all possible outcomes.[4]

Table 2 summarizes the decisions reached by the complaint examiners, identifying the frequency of the different outcomes. The table reflects the overall outcome for each complaint.[5]

**Table 2:  Complaint Examiner Decisions**

|  | FY03 | | FY04 | | FY05 | |
|---|---|---|---|---|---|---|
|  | Complaints | | Complaints | | Complaints | |
| Sustained | 15 | 78.9% | 9 | 56.3% | 13 | 76.5% |
| Exonerated | 2 | 10.5% | 2 | 12.5% | 1 | 5.9% |
| Insufficient Facts | -- | -- | 3 | 18.8% | 1 | 5.9% |
| Unfounded | 1 | 5.3% | 1 | 6.2% | -- | -- |
| Withdrawn | 1 | 5.3% | 1 | 6.2% | 2 | 11.8% |
|  |  |  |  |  |  |  |
| Total | 19 | | 16 | | 17 | |

Looking at the resolutions reached by complaint examiners, 13 of the 17 complaints, or 77%, had at least one allegation that was sustained. There were two complaints, or 12%, where the officer was completely exonerated or the complaint examiner concluded that there were insufficient facts to resolve the underlying allegations. Although the rate of sustained complaints may appear to be high – approximately 77% – it must be recalled that this is not 77% of all complaints resolved by OPC, but 77% of the 17 complaints resolved in the complaint examination process. The complaints referred to this process are a carefully selected group that excludes complaints that were successfully mediated and those that were dismissed because they lacked merit or because the complainant would not cooperate with OPC's process. In all of the complaints referred to complaint examination, the executive director has already found that there is "reasonable cause to believe" that police misconduct occurred, so one would anticipate a relatively high sustain rate for this specific group.

When the sustained complaints are considered as part of all of the complaints resolved by OPC through adjudication, dismissal, or successful mediation, sustained complaints make up 5% of this group (or 13 of 239). As Table 2 indicates, there was an increase in the number of complaints sustained in fiscal year 2005, but the corresponding proportion of the overall complaints resolved remained basically the same. This result occurred because the proportion of the total complaints resolved that the sustained complaints comprise depends heavily on the number of complaints that were dismissed, which also increased in fiscal year 2005. The increase in dismissals continues to result from OPC's focus on completing and closing older complaints that had been determined to be probable dismissals but that had not had a completed investigative report. In general, OPC's overall sustain rate will fluctuate from year to year depending on a variety of factors not related directly to the complaint examination process.

All of the decisions that sustained at least one allegation were forwarded to the Chief of Police for imposition of discipline, and the Chief has not returned any of the decisions for reconsideration. One hundred percent acceptance of decisions by a chief from an independent police oversight agency is exceptional,[6] and is a positive reflection on the District Government's statute creating OPC, which limits the circumstances under which a complaint may be returned for reconsideration, as well as on the quality of OPC's investigations and decisions. As of the issuance of this report, all of the decisions forwarded to the Chief of Police resulted in the

imposition of discipline.  The decisions included a total of 37 subject officers, and a summary of the discipline imposed on these officers is reflected in Table 3.

**Table 3:  Discipline for Sustained Complaints**

| Discipline or Action Taken | Total |
| --- | --- |
| | |
| Terminated | 1 |
| Retired | 1 |
| 20-Day Suspension | 2 |
| 15-Day Suspension | 6 |
| 10-Day Suspension | 10 |
| 5-Day Suspension | 1 |
| 3-Day Suspension | 4 |
| Official Reprimand | 7 |
| Formal Counseling | 5 |
| | |
| Total | 37 |

OPC will continue to track the discipline imposed by the Chief so that the agency is informed about how MPD handles the decisions referred to it by OPC.

As an illustration of the types of complaints that were resolved by complaint examiners in fiscal year 2005, the following are three examples that describe the complaint and the resulting decision:

### 1.    Complaint Examination Example #1

OPC received five complaints concerning two separate incidents that occurred in the early morning hours of a day in late January.[7]  Each incident involved the same two MPD patrol officers working together as partners, and the incidents took place minutes apart in an alley near the restaurant and bar district of the Adams Morgan neighborhood in Northwest Washington. The central allegation was that the two MPD officers abused their police powers when, after observing two men urinating in the alley in violation of District of Columbia law, the officers forced the men, under threat of arrest, to remove their coats or sweaters in below-freezing weather, mop up the urine with the clothes, then put back on the urine-soaked garments.  In addition to alleging that the officers had harassed the men, the complainants alleged that during these incidents the subject officers used insulting, demeaning, and humiliating language toward the men and used unnecessary or excessive force against an individual who had accompanied one of the men.  OPC consolidated the complaints and conducted an extensive investigation.

The subject officers denied having engaged in the acts alleged in the complaints.  The officer who was alleged to have been the primary actor contended that the men who had urinated in the alley, although unrelated, not traveling together, and completely unaware of each other's presence in the alley, had each voluntarily removed his outerwear, mopped up the urine, and then put the clothes back on.  The second officer claimed not to have seen or heard the acts alleged in the complaints.

- 13 -

Following completion of its investigation, OPC referred the matter to a complaint examiner. The complaint examiner issued a decision regarding the complaint without holding an evidentiary hearing after determining that she had all the evidence necessary to resolve the complaint. The complaint examiner did not believable the subject officers' statements regarding what had happened, and, instead, credited the story told by the complainants and several other witnesses. The complaint examiner sustained the allegations of harassment, use of language that was insulting, demeaning or humiliating, and use of unnecessary or excessive force against the subject officer whom the complainants had identified as the primary actor. However, the complaint examiner exonerated the second subject officer of all charges on the ground that although he was present, he had not engaged in or directed any of the key acts that were found to constitute violations of MPD's policies, procedures, and practices.

### 2. Complaint Examination Example #2

Two detectives from MPD's Youth and Preventive Services Division were investigating an allegation of sexual abuse against a child. Their investigation led them to the child's school in Southeast Washington, where they learned from the principal that one of the child's teachers possessed an audiotape made during class time that contained reference to the alleged abuse. Because the teacher had already left the school for the day, the officers went to the teacher's home in an effort to retrieve the tape. The officers succeeded in retrieving the tape, but the teacher filed a complaint with OPC against one of the detectives.[8]

The complainant alleged that the subject officer harassed her and subjected her to language that was insulting, demeaning or humiliating by coming to her home without a warrant, knocking loudly on her door, speaking to her in a loud and threatening manner, using profanity, and threatening to arrest her for obstruction of justice. The subject officer stated that he did not have a warrant because he did not intend to search the complainant's home. He also explained that he knocked loudly on the complainant's door only after his initial knocks went unanswered. He conceded that he raised his voice while talking to the complainant but stated that he did so only because the complainant was yelling during their meeting. The subject officer denied using profanity but admitted that he told the complainant she could be arrested for obstruction of justice if she refused to turn over the tape.

After reviewing the evidence gathered by OPC, the complaint examiner determined that it was not necessary to hold a hearing in order to resolve this complaint. The complaint examiner concluded that the harassment allegation hinged on whether the subject officer was authorized to obtain the audiotape without a warrant and whether he told the complainant she could be arrested for obstruction of justice in order to intimidate her. The complainant examiner determined that because the tape had been made at school and was labeled "classroom tape," it belonged to the school; therefore, the complainant did not have a right to refuse to surrender it. The complaint examiner further determined that the complainant voluntarily handed over the tape to the subject officer. The complaint examiner then concluded that because the tape was not the complainant's property and because she voluntarily relinquished it, the subject officer was authorized to take it without a warrant. After examining the language of the District of Columbia's obstruction of justice statute, the complaint examiner determined that the subject officer had a good faith basis for telling the complainant that she could be arrested for

obstruction of justice, and therefore the subject officer did not harass the complainant by informing her of that fact.

With respect to the allegation that the subject officer used language that was insulting, demeaning, or humiliating, the complaint examiner determined that there was insufficient evidence from which to conclude that the subject officer had used profanity. Accordingly, the subject officer was exonerated of both the harassment and language allegations.

### 3.    *Complaint Examination Example #3*

An MPD officer was called to the complainant's home by his live-in girlfriend to investigate a report of domestic violence. The complainant alleged that the subject officer, suddenly and without any threat of physical harm, lunged at the man as he sat at his dining room table, punched the man so hard that the chair he was sitting in broke and the man fell out, and then straddled the man and continued to hit him causing injuries to his face, neck, back, and arm, before arresting the man for simple assault against his girlfriend.[9] The complainant further alleged that in the minutes before the subject officer physically attacked him, the subject officer had called him a profane name, had told him to shut up several times, and had invited the man to hit him in an effort to goad the man into a physical altercation. OPC's investigation of this matter was suspended for over two years while the U.S. Attorney's Office (USAO) reviewed the matter for possible criminal prosecution of the subject officer. When the USAO declined to prosecute the matter, OPC resumed its investigation. OPC's investigation resulted in referral of the complaint to a complaint examiner for resolution of the use of unnecessary or excessive force and use of language or conduct that was insulting, demeaning, or humiliating allegations.

The complaint examiner in this case determined that a hearing was needed in order to resolve conflicts between statements that had been provided to OPC, the USAO, and MPD during their respective investigations of this matter. After a full hearing on the merits at which live testimony was taken, and after comparing the live testimony to the prior written statements and other evidence in the record, the complaint examiner found that the subject officer had used unnecessary or excessive force against the complainant and had used language and engaged in conduct that was insulting, demeaning, or humiliating.

The complaint examiner made several noteworthy findings in the course of reaching his decision. One was that the subject officer had gone alone to investigate the domestic violence matter and perhaps should have waited for back up assistance, particularly if he feared the complainant might become violent. The complaint examiner also found that it was anger and frustration, rather than reasonable fear of physical attack or physical resistance, that prompted the subject officer to punch the complainant and beat him up. Specifically, the complaint examiner found that the complainant was drunk and verbally uncooperative, and the subject officer's inability to handle a non-physically threatening though verbally uncooperative intoxicated person confounded the subject officer. The complaint examiner found that if the complainant's verbal uncooperativeness was impeding the investigation, the subject officer should have verbally apprised the complainant of this fact and should have warned the complainant he would be arrested if he persisted, before resorting to the use of force.

Regarding the use of force, the complaint examiner emphasized that MPD's Use of Force General Order and its Use of Force Continuum, dictate that officers use only such force as is reasonably necessary to de-escalate an incident. The complaint examiner found that, contrary to the applicable MPD policies and procedures, the subject officer did not employ force with de-escalation in mind and as a result, he escalated the incident and traumatized the witnesses, which included the three minor sons of the complainant's girlfriend. The complaint examiner's ultimate conclusion was impacted significantly by inconsistencies between the subject officer's testimony at the hearing, in which he asserted that the complainant had assumed an aggressive posture, and prior statements in which these assertions had not been made. The complaint examiner concluded that, taking into account the subject officer's live testimony that was not credible, a clear preponderance of the evidence compelled the conclusion that the subject officer had used excessive force against the complainant and also subjected him to insulting, demeaning, or humiliating language. Accordingly, the complaint examiner sustained both allegations against the subject officer.

C.    **Mediation**

In fiscal year 2005, OPC mediated 19 complaints, bringing the total number of complaints mediated to 96. Seventy-three of the mediation sessions (or 76%) were successful and resulted in an agreement between the complainant and the subject officer. Twenty-three of the sessions (or 24%) did not result in an agreement, and the underlying complaints were referred back to the executive director for appropriate action. To date, mediators have helped resolve complaints that allege harassment, the use of language or conduct that is insulting, demeaning, or humiliating, discrimination, the use of unnecessary or excessive force, or a combination of the four.

In addition to the statistical success rate, survey results indicate that the program has been well received. A survey of the participants in mediation indicates that the overwhelming majority of complainants and subject officers who responded to the survey found the mediator to be helpful or very helpful, the mediation session to be satisfactory or very satisfactory, and the resulting agreement to be fair or very fair. In addition, 43% of the respondents left their mediation session with more positive feelings about the other party, while only 10% had more negative feelings, and 46% indicated no change in their feelings. Finally, OPC is proactively taking steps to protect the integrity of the mediation process by dismissing complaints and pursuing discipline of officers when one of the parties fails to appear for mediation or refuses to participate in the mediation process in good faith.

OPC has been very pleased with the success of the mediation program, and plans to continue to use it regularly. The agency tries to identify and refer as many complaints as possible that are suitable for mediation, and despite the decline in the number of complaints mediated in fiscal year 2005, OPC is aiming to increase that number back to the level achieved in fiscal year 2004 or higher. As part of its effort, the agency will continue to work to minimize the number of complainants who decline to participate in the mediation process altogether by ensuring that they get better information about the process and are encouraged to take part.

As an illustration of the types of complaints that were referred to mediation in fiscal year 2005, the following are three examples that describe the complaint and the mediation session:

- 16 -

### 1.    *Mediation Example #1*

A citizen filed a complaint against an officer alleging rude behavior directed at the citizen and his friend.  The 75-year-old complainant was driving with his 80-year-old friend, who is nearly deaf, on Georgia Avenue, N.W.  The complainant pulled over into an open space so he could go into a nearby convenience store.  A sign next to the space stated, "No Loitering."  While paying for his purchase at the convenience store, the complainant noticed a police officer approaching his friend as the friend smoked a cigarette outside of the car.  The complainant observed the officer making excited hand gestures as he pointed at the friend and then at the car.  Finally, the officer placed a hand on the man's shoulder and started pushing him toward the door of the complainant's vehicle.  The complainant hurriedly walked toward the officer, yelling at him to take his hands off his friend and asking him what he thought he was doing.  The officer exclaimed back in a heated tone that the friend could not stand next to the car.  The complainant yelled back at the officer, to paraphrase his words, that the officer was not doing his job correctly.  The officer wrote both of the men a citation for loitering.

During the mediation session, the parties shared their perspectives on the situation.  The officer informed the complainant that he was trying to enforce the anti-loitering law in that section of town.  However, the officer had no idea at the time the complainant's friend was nearly deaf and slightly senile.  With that realization, the officer expressed his understanding that the older man was not being uncooperative because he simply did not hear and understand him clearly.  Likewise, the complainant had not understood that an anti-loitering rule was in place, and that it was necessary for his friend to step back into the car.  After the parties talked for over an hour, they shook hands and parted amicably.

### 2.    *Mediation Example #2*

A citizen filed a complaint against an officer alleging that the officer used inappropriate language and a disrespectful tone when speaking to the citizen, and harassed the citizen.  The complainant, a single mother with three young children, was seeking aid and advice from an officer at the local MPD district station to help with her troubled teenage daughter.  Over the past year, her daughter had become increasingly difficult to manage.  She had run away, been frequently absent from school, been involved with a dangerous crowd, and was generally disrespectful and rebellious.  The complainant had gone to the district station as a resource before.  One officer in particular had been of great help to her and had even spent time talking with her daughter, explaining the potential consequences of her actions, and had even had her write an essay about her behavior.  Because of the special attention and assistance she received, the complainant had very positive feelings about MPD officers and the officers at the district station.

In the incident that was the subject of the mediation, the complainant went to the district station seeking help after having a particularly difficult time with her daughter.  When she got to the station, she explained what was happening with her daughter and asked the officer at the front desk, who was the subject of the complaint and the officer involved in the mediation, for assistance.  The officer offered to refer her to Child Protective Services and gave her the phone number.  The complainant explained the help she had received in the past and that she needed more immediate help.  Because of the stress of the situation, the complainant and the officer

were unable to communicate effectively with one another. The officer tried to explain routine police procedure in these types of cases and the complainant tried to describe the type of help she was accustomed to receiving. Both parties left the situation feeling frustrated and the complainant felt she had been treated disrespectfully and harassed by the officer.

During the mediation session, the parties explained their recollections of the incident. Once the officer realized that the complainant thought that the assistance she had previously received was "normal police procedure," the officer understood the source of their miscommunication and was able to explain to the complainant that she was not used to interacting with citizens on such a personal level and that her training was to make referrals to agencies specializing in caring for children. The officer apologized for her behavior and acknowledged how frustrated the complainant must have been during their interaction. The complainant was able to express that she was just seeking help and wanted to be treated in a respectful manner. Both parties were pleased with the result and agreed to treat each other with respect in any future interactions.

### 3.    Mediation Example #3

A restaurant owner filed a complaint against two officers alleging that their routine, unannounced visits to his establishment were evidence of their intention to harass him by finding violations of the law and reporting his restaurant to the authorities.

During the mediation session, the officers explained that their visits were part of an overall effort to keep the peace in local bars and restaurants, not an attempt to cause him any harm. The complainant listened to the officers and, while initially skeptical, better understood by the end of the session their challenges in working to keep the neighborhood safe with inadequate resources. The officers assured the complainant that they had no intentions of reporting violations to cause him harm. They also indicated that the few times violations had been reported as a result of activity in or near the restaurant premises, the officers were required by law to report them.

The complainant and the officers then shifted their attention to the future, using the session to discuss their mutual concerns about managing the large crowds that descend on the area just outside the complainant's restaurant. The officers shared information about securing extra police coverage by private contract and the possibility of pooling resources with other establishments in the neighborhood to obtain such services. They also clarified their expectations about how they would communicate in the future so as to avoid misunderstandings of the sort that brought them to mediation.

### D.    Investigations

During fiscal year 2005, OPC expanded, reorganized, and implemented new procedures for its investigative unit. The most significant change to the investigative unit was the addition of four new line investigators, bringing the total to ten. These much-needed investigators were added with additional funds provided by the Mayor and the Council in OPC's fiscal year 2005 budget, and the resulting expansion of the agency's staff has helped reduce the amount of time it takes to investigate complaints and decreased the number of open complaints. OPC also

converted one of its positions to a paralegal specialist to provide support to the investigative unit in managing and conducting its investigations. With its larger investigative staff, OPC was able to reorganize the staff into two investigative teams each composed of a lead investigator, a senior investigator, and three line investigators. Under the new team structure, the lead investigator can provide more day-to-day management and supervision of the investigations assigned to the team, and can be more directly involved in the interviewing, investigative steps, and report writing of the team members. The lead investigator can also provide ongoing training and guidance to the members of the team and manage the completion of various team tasks and responsibilities. Overall, OPC expects the new team structure to enhance significantly the quality of OPC's investigative work.

In addition to the staff changes, OPC also made changes to its investigative procedures and practices. The most notable change was that, on October 1, 2004, OPC began taking signed, certified statements from all witnesses in OPC investigations. OPC investigators interview witnesses and then assist them with preparing statements based on the information provided during the interview. As part of the process, each witness has an opportunity to review and revise the statement to be sure that it is accurate and complete, and then the witness must certify the truth of the statement. OPC instituted the statement process in an effort to enhance the accuracy and thoroughness of the information gathered during interviews of witnesses. When a witness is unwilling to certify the truth of his or her statement, OPC draws an adverse inference against the evidence provided by that witness, thereby casting doubt on its credibility. In addition, based on the failure to cooperate with OPC's process by providing a signed, certified statement, the agency has dismissed citizen complaints and sought discipline of officers. The statements replaced interview summaries that had previously been prepared by investigators after interviewing witnesses.

In fiscal year 2006, OPC will continue to consider other changes, both large and small, that will allow the agency to more thoroughly and efficiently investigate complaints.

## E.    Statistics

In an effort to describe the work performed by OPC, the nature and location of the complaints that the office received, and the characteristics of the complainants and subject officers, OPC has collected the statistics included in this section. Over the five years that OPC has been open, its method of compiling statistics has changed significantly, moving from manual collection, to using OPC's initial complaint tracking database, to using OPC's new complaint management software (CMS), which was used for the first time in fiscal year 2004. The implementation of the CMS was also accompanied by the reentry of data for all of OPC's complaints and changes in the process of receiving and recording contacts and complaints. Over the course of these several years, OPC has ensured that the data were as accurate as possible and the presentation of the statistics was as consistent as possible. With all of the changes in fiscal year 2004, however – the CMS, the reentry of data, and the different processes – OPC believes that the changes may have had an impact on some of the statistics, leading to some fluctuations that the agency cannot account for in full. For example, with the new CMS, OPC gained the ability to record additional types of citizen contacts that it could not track in earlier years. In addition, when officer information was entered into the CMS, it reflected the then current assignment of the officer, which may not have been the same as it was at the time of an earlier

incident.  OPC notes the changes so that readers will be aware of them, and OPC will monitor the statistics in years ahead to try to determine if any of the unusual changes resulted from changes in the process or were signs of other trends.

At the end of OPC's fifth year of operation, the statistics collected by the agency have shown the pattern of growth of the agency, and the success that the agency has achieved in increasing its efficiency and productivity over the past couple of years.  The agency has increased the number of investigations completed and complaints closed, which, for fiscal year 2005, as in fiscal year 2004, was larger than the number of complaints opened.  As a consequence, OPC's number of open complaints went down by an additional 13% at the end of fiscal year 2005.

### 1.    *Contacts and Formal Complaints*

Under the statute and regulations governing OPC, all complaints must be reduced to writing and signed by the complainant, who must certify the truth of the statements in the complaint.  Once a complaint has met these requirements, it is referred to as a "formal complaint."  OPC is regularly contacted by people who inquire about filing a complaint, but who have not yet submitted a signed complaint form.  Where appropriate, OPC opens a file for each one of these contacts and attempts to obtain a formal complaint by mailing a form to the person or giving him or her instructions about filing a complaint in person.  If no formal complaint is received, the file related to that contact is closed.  OPC also is contacted about a variety of issues that do not fall within the jurisdiction of the office.  The agency collects information about each contact, enters it into the CMS, and refers the person to the appropriate agency or office.  In fiscal year 2004, OPC modified its process to more clearly separate and track contacts that raise issues outside the agency's jurisdiction, which resulted in a noticeably larger number of these contacts being recorded during fiscal years 2004 and 2005.

Table 4 indicates the total number of contacts received by OPC in fiscal years 2001 through 2005,[10] the number of formal complaints that resulted in each year, and the disposition of each contact that did not result in a formal complaint.  The table also includes a total for all five years in each category.  In fiscal year 2005, OPC received a relatively consistent number of contacts, but experienced a significant increase in the number of formal complaints.  The number of contacts decreased by 4% (from 699 to 674) and the number of formal complaints increased by 24% (from 262 to 326) from fiscal year 2004 to fiscal year 2005.  While the increase in the number of formal complaints seems dramatic, it actually returns OPC to receiving a number of formal complaints more in keeping with the number received in fiscal years 2001, 2002, and 2003, where the agency received 310, 318, and 361 formal complaints, respectively.  These numbers suggest that the decrease in the number of formal complaints in fiscal year 2004 was an outlier, and not the increase experienced in fiscal year 2005.

**Table 4: Contacts and Formal Complaints**

|  | FY01 | FY02 | FY03 | FY04 | FY05 | Total |
|---|---|---|---|---|---|---|
| **Total Contacts** | 477 | 535 | 613 | 699 | 674 | 2998 |
|  |  |  |  |  |  |  |
| **Closed – Outside Agency Jurisdiction, Etc.** | 9 | 36 | 55 | 297 | 184 | 581 |
| **Closed – No Formal Complaint** | 158 | 181 | 197 | 140 | 164 | 840 |
|  |  |  |  |  |  |  |
| **Total Formal Complaints** | 310 | 318 | 361 | 262 | 326 | 1577 |

## 2.    *Disposition of Formal Complaints*

Each year, OPC works to resolve as many formal complaints as possible. Complaints are closed because they have been resolved by OPC, which includes being dismissed in accordance with the OPC statute, successfully mediated, or adjudicated through OPC's complaint examination process. Complaints are also referred to MPD because they contain allegations that are not within OPC's jurisdiction to investigate or they were filed more than 45 days after the incident occurred, and some complaints are referred to other law enforcement agencies when the complaints relate to another agency's officers. Finally, some complaints are withdrawn by the complainant or closed for administrative reasons.

Table 5 indicates the total number of formal complaints that were closed in fiscal years 2001 through 2005, as well as the specific disposition of each complaint. The table also includes a total for all four years in each category. From fiscal year 2004 to fiscal year 2005, the number of formal complaints closed by OPC grew by approximately 18% (from 312 to 368). This is the second year in a row that OPC significantly increased the number of complaints it closed, and the increase was driven by a 28% increase in complaints resolved by OPC through adjudication, dismissal, or successful mediation.

**Table 5: Disposition of Formal Complaints**

|  | FY01 | FY02 | FY03 | FY04 | FY05 | Total |
|---|---|---|---|---|---|---|
| **Adjudicated** | -- | -- | 19 | 16 | 17 | 52 |
| **Dismissed** | 21 | 91 | 75 | 145 | 211 | 543 |
| **Successfully Mediated** | 7 | 13 | 15 | 25 | 13 | 73 |
| **Withdrawn by Complainant** | 11 | 17 | 9 | 26 | 25 | 88 |
| **Referred to MPD** | 107 | 88 | 90 | 62 | 65 | 412 |
| **Referred to Other Police Agencies** | 3 | 1 | 18 | 11 | 3 | 36 |
| **Administrative Closures** | 12 | 12 | 9 | 27 | 34 | 94 |
|  |  |  |  |  |  |  |
| **Closed Formal Complaints** | 161 | 222 | 235 | 312 | 368 | 1298 |

## 3.    *Status of Pending Formal Complaints at the End of Each Fiscal Year*

At the end of each fiscal year, there are a number of formal complaints that are still pending. Table 6 indicates the total number of complaints from all years that were open at the end of fiscal years 2001 through 2005. The table also indicates the general status of the open

complaints, which include assigned to a complaint examiner and awaiting a decision, referred into the mediation process, referred for review by the U.S. Attorney's Office for possible criminal prosecution of the subject officer, referred to a PCB member for review, awaiting the subject officer's objections to the investigative report before the complaint is assigned to a complaint examiner, currently under investigation, currently under investigation with a preliminary investigative report drafted and being reviewed, or awaiting the initial executive decision about how to proceed with a new complaint.  Chart 6 depicts how the total number of complaints open at the end of each fiscal year has changed over the past five years.

The most noteworthy change for fiscal year 2005 is the decrease in the number of open complaints by 13%.  This is the second year in a row that OPC closed more complaints than it opened during the course of the year, and the decrease occurred despite the fact that the agency received 64 more complaints in fiscal year 2005.  In addition, there was a 30% decrease in the number of complaints actively under investigation by OPC's investigators, and a 21% decrease in the number of complaints under investigation with a preliminary investigative report drafted and being reviewed.  These numbers reflect the effect of the new investigators added to OPC's staff, as well as the increased efficiency and productivity of the agency's investigative staff and management in conducting and reviewing investigations.  The lower number of complaints in the investigation and review process also creates a more manageable workload that allows investigators and managers to devote more time to each investigation.

**Table 6:  Status of Pending Formal Complaints at the End of Each Fiscal Year**

|  | FY01 | FY02 | FY03 | FY04 | FY05 |
|---|---|---|---|---|---|
| **Assigned to Complaint Examiner** | -- | -- | 12 | 9 | 5 |
| **Referred for Mediation** | 15 | 10 | 11 | 5 | 18 |
| **Referred to U.S. Attorney's Office** | 20 | 15 | 18 | 10 | 25 |
| **Referred to PCB Member** | -- | -- | -- | -- | 14 |
| **Awaiting Subject Officer Objections** | -- | -- | -- | -- | 2 |
| **Under Investigation by OPC** | 99 | 130 | 232 | 224 | 157 |
| **Under Investigation / Report Drafted** | 15 | 80 | 79 | 73 | 58 |
| **Executive Decision** | -- | 4 | 7 | -- | -- |
|  |  |  |  |  |  |
| **Total Number of Open Complaints** | 149 | 239 | 359 | 321 | 279 |

- 22 -

**Chart 6: Number of Open Formal Complaints at the End of Each Fiscal Year**



### 4. OPC Workload

OPC closes complaints each year at one of three different points in the life of the complaint. First, complaints are closed shortly after they are received because they are referred to MPD or another police agency. These are complaints that are outside OPC's jurisdiction. In general, the only work that OPC performs on these complaints is to conduct an initial investigation to confirm the nature of the complaint, and then prepare and send the complaint and related materials to the appropriate agency. Second, complaints are closed because the complainant withdraws the complaint or for other administrative reasons. These complaints require varying amounts of work by OPC depending on when the complainant withdraws the complaint, which may occur at any point up through a final decision, or when the event occurs that triggers administrative closure. Some of the events that trigger administrative closure, which also may occur at any time, include the resignation of an officer from MPD, or the completion of an investigation by MPD into the same allegations that results in the discipline of the officer. Finally, complaints are closed after they have been resolved by OPC. OPC resolves complaints by adjudication, dismissal, or successful mediation. These complaints generally require the most work, including a full investigation, the completion of an investigative report, and any other related adjudication, dismissal, or mediation processes.

Table 7 collects statistics from the three preceding sections of this part of the report to illustrate the proportion of complaints that are closed at the three different points in the life of a complaint. First, the table shows the number of formal complaints that OPC received in all five fiscal years. Next, the table subtracts the number of complaints referred to MPD or another police agency to arrive at the number of formal complaints that fall within OPC's jurisdiction. After that, Table 7 subtracts the complaints that reach a point short of final resolution where they require no further action, such as those that are withdrawn or are administratively closed, to

- 23 -

arrive at the number of complaints that require resolution by OPC. Finally, the table subtracts the number of complaints resolved in each fiscal year. The resulting number shows either: (1) the number of complaints that require resolution by OPC but that are carried over to the next fiscal year unresolved; or (2) the number by which the total number of open complaints is reduced from one year to the next, which is indicated by parentheses. Thus, each fiscal year begins with a number of complaints already open that need to be resolved, and new complaints are received over the course of the fiscal year. For a graphical depiction, Chart 7 includes lines indicating the number of complaints that require resolution by OPC and the number of complaints resolved by OPC. The distance between the two lines on Chart 7 represents the number of complaints that are carried over to the next fiscal year unresolved or the amount by which the number of open complaints is reduced.

OPC's increased efficiency and productivity are clearly displayed in both the table and the chart. In fiscal year 2004, the increased efficiency and productivity, together with a smaller number of complaints received by the agency, resulted in OPC having its first year where it closed more complaints than it opened. Further increases in efficiency and productivity are obvious in fiscal year 2005 as well, where OPC had its second year in a row where it closed more complaints than it opened. This happened despite the fact that the agency received 64 more complaints, of which 53 required resolution by the agency in fiscal year 2005. OPC is making every effort to continue to enhance its efficiency and productivity so the agency can keep up with the new complaints it receives, as well as resolve any complaints that are backlogged.

**Table 7: OPC Workload**

|  | FY01 | FY02 | FY03 | FY04 | FY05 | Total |
|---|---|---|---|---|---|---|
| **Total Formal Complaints** | 310 | 318 | 361 | 262 | 326 | 1577 |
|  |  |  |  |  |  |  |
| **Referred to MPD or Other Agency** | 110 | 89 | 108 | 73 | 68 | 448 |
| **Complaints in OPC's Jurisdiction** | 200 | 229 | 253 | 189 | 258 | 1129 |
|  |  |  |  |  |  |  |
| **Complaints Requiring No Further Action (Withdrawn or Administratively Closed)** | 23 | 29 | 18 | 53 | 61 | 184 |
| **Complaints Requiring Resolution by OPC** | 177 | 202 | 233 | 136 | 197 | 945 |
|  |  |  |  |  |  |  |
| **Complaints Resolved (Adjudication, Dismissal, and Successful Mediation)** | 28 | 104 | 109 | 186 | 239 | 666 |
| **Unresolved Complaints Each Fiscal Year** | 149 | 98 | 124 | (50) | (42) | 279 |

**Chart 7: OPC Workload**



### 5. Allegations in Formal Complaints

Each formal complaint may contain allegations of more than one type of misconduct, including harassment, use of unnecessary or excessive force, use of language or conduct that is insulting, demeaning, or humiliating, discriminatory treatment, retaliation for filing a complaint with OPC, or failure to wear or display required identification or to identify oneself by name and badge number when requested to do so by a member of the public. In addition, complainants often allege other conduct that does not fall within the six types of misconduct under OPC's jurisdiction.

Table 8 indicates the total number of allegations contained in all of the formal complaints received in fiscal years 2001 through 2005, as well as the number of each type of allegation made, and a total for all five years in each category. Table 8 and Chart 8 also indicate the percentage of the total number of allegations that each type of allegation constitutes.

**Table 8: Allegations in Formal Complaints**

|  | FY01 | | FY02 | | FY03 | | FY04 | | FY05 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Language/Conduct** | 148 | 34.6% | 154 | 34.5% | 197 | 37.2% | 180 | 37.0% | 188 | 34.4% | 867 | 35.6% |
| **Harassment** | 109 | 25.5% | 125 | 28.0% | 136 | 25.7% | 131 | 27.0% | 176 | 32.2% | 677 | 27.8% |
| **Excessive Force** | 73 | 17.1% | 104 | 23.3% | 99 | 18.7% | 97 | 20.0% | 101 | 18.5% | 474 | 19.5% |
| **Discrimination** | 36 | 8.4% | 18 | 4.0% | 30 | 5.7% | 42 | 8.6% | 39 | 7.1% | 165 | 6.8% |
| **Retaliation** | -- | -- | 5 | 1.1% | 6 | 1.1% | 6 | 1.2% | 4 | 0.7% | 21 | 0.9% |
| **FTP Identification** | -- | -- | -- | -- | -- | -- | -- | -- | 6 | 1.1% | 6 | 0.2% |
| **Other** | 62 | 14.5% | 40 | 9.0% | 61 | 11.5% | 30 | 6.2% | 33 | 6.0% | 226 | 9.26% |
| | | | | | | | | | | | | |
| **Total Allegations** | 428 | | 446 | | 529 | | 486 | | 547 | | 2436 | |

**Chart 8: Allegations in Formal Complaints (as a Percentage)**



### 6.    *Complainant Race or National Origin, Gender, and Age*

When a person files a complaint, the individual is asked to identify his or her race or national origin, gender, and date of birth. The following tables and charts reflect the information provided by each complainant. In general, the columns in the tables and the bars on the charts reflect the information for each complaint, not eliminating duplicates of complainants who filed multiple complaints. In some tables, OPC was able to include information regarding the number of "unique complainants," meaning that OPC eliminated duplicates of complainants who filed multiple complaints. Some tables and charts also include U.S. Census information regarding the composition of the population of the District of Columbia as a whole.

In fiscal year 2005, there was some noticeable fluctuation in the proportion of complainants falling into the various race or national origin groups, while the proportion of complainants falling into the various gender and age groups remained relatively consistent. The race or national origin data show a 7% increase in the proportion of African-American complainants, a 6% decrease in the proportion of white complainants, and a 2% decrease in the proportion of Latino complainants. These increases were occurring at the same time that the District's African-American population was decreasing and its white and Latino populations were increasing. In general, the race or national origin of OPC complainants has varied noticeably from the District's population each year and the fluctuations among the proportions of OPC complainants in fiscal year 2005 and the population further increase the variation. It is worth noting that although the fiscal year 2005 race or national origin proportions have fluctuated noticeably from fiscal years 2003 and 2004, they do resemble the proportions in fiscal years 2001 and 2002. This indicates that the current proportions are not totally out of character for OPC complainants, but renews concerns about the disproportionately high number of African-American complainants when compared with the District's population.

The gender data, which are relatively consistent from year to year, also continue to vary from the District population with a higher proportion of male complainants and a lower proportion of female complainants.  The age data, which are also consistent from year to year, show the most significant variation from the District population, with a higher proportion of complainants in the middle age groups than the District population, and a lower proportion in the youngest and oldest age groups.  To illustrate the divergence, the data from the age table is displayed on a line chart showing the proportions for each year and the District population in the different age groups.

With respect to "unique complainants," 310 different people filed the 326 complaints received by OPC, and there were ten complainants who filed multiple complaints in fiscal year 2005.  Seven people filed two complaints, two filed three complaints, and one filed six complaints.

**Table 9:  Complainant Race or National Origin**

|  | FY01 | | FY02 | | FY03 | | FY04 | | FY05 | | District Pop.[11] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **African-American** | 199 | 77.1% | 219 | 76.0% | 197 | 67.5% | 179 | 71.0% | 241 | 78.0% | 57.2% |
| **White** | 36 | 14.0% | 46 | 16.0% | 62 | 21.2% | 51 | 20.2% | 43 | 13.9% | 29.0% |
| **Latino** | 14 | 5.4% | 16 | 5.6% | 14 | 4.8% | 13 | 5.2% | 9 | 2.9% | 8.9% |
| **Asian** | 4 | 1.6% | 4 | 1.4% | 7 | 2.4% | 2 | 0.8% | 2 | 0.6% | 2.9% |
| **Middle Eastern** | 5 | 1.9% | 1 | 0.3% | 10 | 3.4% | 1 | 0.4% | 3 | 1.0% | -- |
| **Native American** | -- | -- | 1 | 0.3% | 1 | 0.3% | 6 | 2.4% | 1 | 0.3% | 0.2% |
| **Multiracial / Other** | -- | -- | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% | 10 | 3.2% | 1.7% |
| **Unreported** | 52 | | 30 | | 69 | | 10 | | 17 | | |
| **Total** | 310 | | 318 | | 361 | | 262 | | 326 | | |

**Chart 9: Complainant Race or National Origin (as a Percentage)**



**Table 10: Complainant Gender**

|  | FY01 | | FY02 | | FY03 | | FY04 | | FY05 | | District Pop.[11] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Male** | 173 | 56.2% | 174 | 54.9% | 201 | 55.7% | 141 | 54.2% | 176 | 54.0% | 47.0% |
| **Female** | 135 | 43.8% | 143 | 45.1% | 160 | 44.3% | 119 | 45.8% | 150 | 46.0% | 53.0% |
| **Unreported** | 2 | | 1 | | -- | | 2 | | -- | | |
| | | | | | | | | | | | |
| **Total** | 310 | | 318 | | 361 | | 262 | | 326 | | |

**Chart 10:  Complainant Gender (as a Percentage)**



**Table 11:  Complainant Age[12]**

|  | FY03 | | FY04 | | FY05 | | District Pop.[11] |
|---|---|---|---|---|---|---|---|
| **Under 15** | -- | -- | 1 | 0.4% | -- | -- | 18.0% |
| **15-24** | 37 | 18.0% | 39 | 15.8% | 57 | 17.9% | 10.1% |
| **25-34** | 53 | 25.7% | 60 | 24.3% | 82 | 25.8% | 20.4% |
| **35-44** | 56 | 27.2% | 68 | 27.5% | 78 | 24.5% | 15.3% |
| **45-54** | 46 | 22.3% | 57 | 23.1% | 72 | 22.6% | 13.6% |
| **55-64** | 10 | 4.9% | 14 | 5.7% | 21 | 6.6% | 10.5% |
| **65 and Older** | 4 | 1.9% | 8 | 3.2% | 8 | 2.5% | 12.1% |
| **Total** | 206 | | 247 | | 318 | | |

**Chart 11:  Complainant Age (as a Percentage)**



**Table 12:  Complainant Race or National Origin with "Unique Complainant" Information**

|  | FY02 | FY02 Unique Complainants | FY03 | FY03 Unique Complainants | FY04 | FY04 Unique Complainants | FY05 | FY05 Unique Complainants |
|---|---|---|---|---|---|---|---|---|
| African-American | 219 | 208 | 197 | 190 | 179 | 176 | 241 | 225 |
| White | 46 | 46 | 62 | 59 | 51 | 43 | 43 | 43 |
| Latino | 16 | 16 | 14 | 14 | 13 | 13 | 9 | 9 |
| Asian | 4 | 4 | 7 | 6 | 2 | 2 | 2 | 2 |
| Middle Eastern | 1 | 1 | 10 | 6 | 1 | 1 | 3 | 3 |
| Native American | 1 | 1 | 1 | 1 | 6 | 1 | 1 | 1 |
| Multiracial / Other | 1 | 1 | 1 | 1 | 0 | 0 | 10 | 10 |
| Unreported | 30 | 30 | 69 | 68 | 10 | 10 | 17 | 17 |
|  |  |  |  |  |  |  |  |  |
| **Total** | 318 | 307 | 361 | 345 | 262 | 246 | 326 | 310 |

**Table 13:  Complainant Gender with "Unique Complainant" Information**

|  | FY02 | FY02 Unique Complainants | FY03 | FY03 Unique Complainants | FY04 | FY04 Unique Complainants | FY05 | FY05 Unique Complainants |
|---|---|---|---|---|---|---|---|---|
| **Male** | 174 | 166 | 201 | 190 | 141 | 126 | 176 | 168 |
| **Female** | 143 | 140 | 160 | 155 | 119 | 118 | 150 | 142 |
| **Unreported** | 1 | 1 | -- | -- | 2 | 2 | -- | -- |
|  |  |  |  |  |  |  |  |  |
| **Total** | 318 | 307 | 361 | 345 | 262 | 246 | 326 | 310 |

### 7.    *Subject Officer Race or National Origin, Gender, and Assignment*

When a person files a complaint, OPC records the race or national origin, gender, and assignment of the subject officer in the complaint. In some instances the complainant is able to identify the subject officer, and in others, OPC determines the identity of the officer during the course of its investigation. In other instances, the complainant is not able to identify the subject officer and the identity of the officer remains unknown. The following tables and charts reflect the information for officers who could be identified or whose information was reported by the complainant. In general, the columns in the tables and the bars on the charts reflect the information for each subject officer, not eliminating duplicates of officers who were the subject of multiple complaints. In some tables, OPC was able to include information regarding the number of "unique officers," meaning that OPC eliminated duplicates of officers who were the subject of multiple complaints. Some tables and charts also include information regarding the composition of the entire work force of MPD officers.

From year to year, the proportions of subject officers falling into the various race or national origin and gender groups have remained relatively consistent. However, over the period from fiscal year 2001 to fiscal year 2005, the race or national origin of subject officers has been on a trend that has steadily decreased the proportion of African-American subject officers from 66% to 55% of the total, and increased the proportion of white subject officers from 30% to 34% and the proportion of Latino subject officers from 4% to 6% of the total. Over this same time period, the race or national breakdown of the entire police force was changing in the same way, although not to as great a degree. Nevertheless, the entire police force still has a lower proportion of white officers and a higher proportion of African-American officers than the subject officer proportions, like it has in most years. The gender data also continue to vary from the entire police force with a noticeably higher proportion of male subject officers and noticeably lower proportion of female subject officers. The data regarding the assignments of subject officers has fluctuated from year to year. OPC cannot fully account for the variation, and the data may be somewhat skewed as a result of the reentry of data in the CMS in fiscal year 2004. When information regarding officers was reentered into the CMS, the current assignment for each officer was entered, and it may have changed from the assignment the officer had at the time of any particular complaint, so readers should use caution when attempting to draw conclusions from the year-to-year trends regarding the assignments of subject officers.

With respect to "unique officers," 387 different officers were identified as the 468 subject officers in the complaints filed with OPC in fiscal year 2005. There were 39 officers who were identified as the subject officer in two different complaints, eight officers identified in three complaints, two officers identified in four complaints, and one officer each identified in six, seven, and ten different complaints.

For reference purposes, a map indicating the location of the seven police districts used by MPD is included in Appendix A.

- 31 -

**Table 14:  Subject Officer Race or National Origin**

|  | FY01 | | FY02 | | FY03 | | FY04 | | FY05 | | Entire Police Force[13] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| African-American | 233 | 65.6% | 221 | 62.8% | 205 | 59.1% | 170 | 59.4% | 219 | 55.3% | 62.9% |
| White | 106 | 29.9% | 98 | 27.8% | 112 | 32.6% | 94 | 32.9% | 135 | 34.1% | 29.3% |
| Latino | 15 | 4.2% | 26 | 7.4% | 18 | 5.2% | 17 | 5.9% | 25 | 6.3% | 6.4% |
| Asian | 1 | 0.3% | 6 | 1.7% | 6 | 1.7% | 4 | 1.4% | 9 | 2.3% | 1.4% |
| Other | -- | -- | 1 | 0.3% | 5 | 1.4% | 1 | 0.4% | 8 | 2.0% | -- |
| Unidentified | 52 | | 48 | | 71 | | 41 | | 72 | | |
| | | | | | | | | | | | |
| Total | 407 | | 400 | | 417 | | 327 | | 468 | | |

**Chart 14:  Subject Officer Race or National Origin (as a Percentage)**



**Table 15:  Subject Officer Gender**

|  | FY01 | | FY02 | | FY03 | | FY04 | | FY05 | | Entire Police Force[13] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Male | 321 | 86.8% | 300 | 84.0% | 293 | 83.0% | 266 | 85.0% | 330 | 83.3% | 76.0% |
| Female | 49 | 13.2% | 57 | 16.0% | 60 | 17.0% | 47 | 15.0% | 66 | 16.7% | 24.0% |
| Unidentified | 37 | | 43 | | 64 | | 14 | | 72 | | |
| | | | | | | | | | | | |
| Total | 407 | | 400 | | 417 | | 327 | | 468 | | |

**Chart 15:  Subject Officer Gender (as a Percentage)**



**Table 16:  Subject Officer Assignment[14]**

|  | FY02 | | FY03 | | FY04 | | FY05 | |
|---|---|---|---|---|---|---|---|---|
| **First District (1D)** | 27 | 7.5% | 34 | 9.7% | 36 | 11.1% | 67 | 14.8% |
| **Second District (2D)** | 38 | 10.5% | 37 | 10.6% | 34 | 10.5% | 27 | 5.9% |
| **Third District (3D)** | 108 | 29.8% | 92 | 26.4% | 56 | 17.3% | 82 | 18.1% |
| **Fourth District (4D)** | 57 | 15.8% | 37 | 10.6% | 62 | 19.1% | 84 | 18.5% |
| **Fifth District (5D)** | 51 | 14.1% | 52 | 14.9% | 45 | 13.9% | 50 | 11.0% |
| **Sixth District (6D)** | 21 | 5.8% | 24 | 6.9% | 36 | 11.1% | 56 | 12.3% |
| **Seventh District (7D)** | 40 | 11.1% | 23 | 6.6% | 28 | 8.6% | 69 | 15.2% |
| **Special Services Command** | 4 | 1.1% | 24 | 6.9% | 8 | 2.5% | 9 | 2.0% |
| **D.C. Housing Authority** | -- | 0.0% | 5 | 1.4% | 3 | 0.9% | 5 | 1.1% |
| **Other[15]** | 16 | 4.4% | 21 | 6.0% | 16 | 4.9% | 5 | 1.1% |
| **Unidentified** | 38 | | 68 | | 3 | | 14 | |
| | | | | | | | | |
| **Total** | 400 | | 417 | | 327 | | 468 | |

- 33 -

**Chart 16:  Subject Officer Assignment (as a Percentage)**



**Table 17:  Subject Officer Race or National Origin with "Unique Officer" Information**

|  | FY02 | FY02 Unique Officers | FY03 | FY03 Unique Officers | FY04 | FY04 Unique Officers | FY05 | FY05 Unique Officers |
|---|---|---|---|---|---|---|---|---|
| African-American | 221 | 176 | 205 | 165 | 170 | 147 | 219 | 172 |
| White | 98 | 73 | 112 | 85 | 94 | 74 | 135 | 111 |
| Latino | 26 | 14 | 18 | 15 | 17 | 15 | 25 | 17 |
| Asian | 6 | 3 | 6 | 5 | 4 | 4 | 9 | 8 |
| Other | 1 | 1 | 5 | 3 | 1 | 1 | 8 | 7 |
| Unidentified | 48 | 48 | 71 | 71 | 41 | 41 | 72 | 72 |
|  |  |  |  |  |  |  |  |  |
| Total | 400 | 315 | 417 | 344 | 327 | 282 | 468 | 387 |

**Table 18:  Subject Officer Gender with "Unique Officer" Information**

|  | FY02 | FY02 Unique Officers | FY03 | FY03 Unique Officers | FY04 | FY04 Unique Officers | FY05 | FY05 Unique Officers |
|---|---|---|---|---|---|---|---|---|
| Male | 300 | 228 | 293 | 231 | 266 | 226 | 330 | 257 |
| Female | 57 | 44 | 60 | 49 | 47 | 42 | 66 | 58 |
| Unidentified | 43 | 43 | 64 | 64 | 14 | 14 | 72 | 72 |
|  |  |  |  |  |  |  |  |  |
| Total | 400 | 315 | 417 | 344 | 327 | 282 | 468 | 387 |

**Table 19:  Subject Officer Assignment with "Unique Officer" Information**

|  | FY02 | FY02 Unique Officers | FY03 | FY03 Unique Officers | FY04 | FY04 Unique Officers | FY05 | FY05 Unique Officers |
|---|---|---|---|---|---|---|---|---|
| **First District (1D)** | 27 | 24 | 34 | 29 | 36 | 33 | 67 | 56 |
| **Second District (2D)** | 38 | 29 | 37 | 28 | 34 | 31 | 27 | 21 |
| **Third District (3D)** | 108 | 73 | 92 | 61 | 56 | 52 | 82 | 68 |
| **Fourth District (4D)** | 57 | 45 | 37 | 29 | 62 | 45 | 84 | 53 |
| **Fifth District (5D)** | 51 | 41 | 52 | 40 | 45 | 40 | 50 | 48 |
| **Sixth District (6D)** | 21 | 21 | 24 | 23 | 36 | 29 | 56 | 51 |
| **Seventh District (7D)** | 40 | 28 | 23 | 22 | 28 | 26 | 69 | 58 |
| **Special Services Command** | 4 | 4 | 24 | 23 | 8 | 8 | 9 | 9 |
| **D.C. Housing Authority** | -- | -- | 5 | 5 | 3 | 3 | 5 | 5 |
| **Other** | 16 | 13 | 21 | 16 | 16 | 12 | 5 | 4 |
| **Unidentified** | 38 | 38 | 68 | 68 | 3 | 3 | 14 | 14 |
|  |  |  |  |  |  |  |  |  |
| **Total** | 400 | 316 | 417 | 344 | 327 | 282 | 468 | 387 |

### 8.    City Wards

When a complaint is filed, OPC records the city ward in which the underlying incident occurred.  Table 20 reflects the ward that was the site of each complaint filed in fiscal years 2001 through 2005.[16]  Table 20 and Chart 20 also reflect the percentages of all complaints that arose in each ward.  For fiscal year 2005, the data show a noticeable decrease in complaints from Ward 3 and noticeable increases in complaints from Wards 6 and 8.  The data also show a noticeable overall decline in the number of complaints from Wards 2 and 5 over the course of all five years, and an overall increase in the number of complaints from Wards 7 and 8 over the same period.

For reference purposes, a map indicating the location of the District of Columbia's eight wards is included in Appendix B.

**Table 20:  City Wards**

|  | FY01 |  | FY02 |  | FY03 |  | FY04 |  | FY05 |  |
|---|---|---|---|---|---|---|---|---|---|---|
| **1** | 52 | 18.1% | 66 | 21.2% | 65 | 18.7% | 35 | 13.5% | 47 | 15.0% |
| **2** | 65 | 22.7% | 43 | 13.8% | 62 | 17.8% | 42 | 16.2% | 46 | 14.6% |
| **3** | 15 | 5.2% | 23 | 7.4% | 36 | 10.3% | 26 | 10.0% | 9 | 2.9% |
| **4** | 29 | 10.1% | 37 | 11.9% | 33 | 9.5% | 37 | 14.3% | 46 | 14.6% |
| **5** | 60 | 20.9% | 56 | 18.0% | 58 | 16.7% | 37 | 14.3% | 36 | 11.5% |
| **6** | 31 | 10.8% | 30 | 9.7% | 43 | 12.4% | 30 | 11.6% | 48 | 15.3% |
| **7** | 16 | 5.6% | 23 | 7.4% | 30 | 8.6% | 32 | 12.4% | 33 | 10.5% |
| **8** | 19 | 6.6% | 33 | 10.6% | 21 | 6.0% | 20 | 7.7% | 49 | 15.6% |
| **Unidentified / Not in D.C.** | 21 |  | 7 |  | 13 |  | 3 |  | 12 |  |
|  |  |  |  |  |  |  |  |  |  |  |
| **Total** | 308 |  | 318 |  | 361 |  | 262 |  | 326 |  |

**Chart 20:  City Wards (as a Percentage)**



## F.    Outreach

### 1.    Fiscal Year 2005

Over the past year, OPC worked to carry out its goals for outreach set forth in its Community Outreach Strategic Plan for 2005.  The plan not only continued to focus on building and maintaining relationships with communities that may be underrepresented in their use of the OPC process, but it added a public education and awareness program regarding police accountability.  As in previous years, OPC focused its outreach efforts on the District's youth population, Latino community, and residents who live east of the Anacostia River in Wards 7 and 8.  Overall, OPC had a good year with its community outreach and was able to implement some new outreach initiatives.  This is despite the fact that the agency received approximately 350 Freedom of Information Act (FOIA) requests, which, like in past years, took away from the amount of time that OPC's community affairs specialist could devote to conducting community outreach.

This year, OPC's public education and awareness campaign made significant progress with the production of the agency's first public service announcement (PSA).  The six-minute PSA provides the public with information about the agency and its function, and tells people how they may file a complaint and what happens to the complaint after it is filed.  The PSA was filmed and produced by the District's Office of Cable Television and Telecommunications and airs regularly on City Cable Channel 16, which is a local public access cable channel.  OPC also presented its "training the providers" outreach program to several community-based organizations throughout the District.  Training sessions were conducted with organizations that serve the Latino community, Asian community, and homeless population.  The agency also made

presentations to community groups whose membership included residents who live in Wards 7 and 8.

OPC conducted targeted outreach to a number of youth groups throughout the District as a part of its student interactive training program. The program, which focuses on reducing the number of negative encounters between young people and police officers, uses role-play scenarios to give students the opportunity evaluate their behavior and police behavior in different situations. In fiscal year 2005, OPC conducted student interactive sessions at Woodrow Wilson High School and Bell Multicultural High School, sponsored by the George Washington University Student Voices Program, and with the Time Dollar Youth Court Program and the Facilitating Leadership in Youth (FLY) Program, sponsored by American University.

Beyond implementing the strategic plan, OPC conducted a variety of other outreach activities. This year OPC provided information to groups and government officials in the United States and from around the world to assist them with developing or improving their own police accountability systems. Representatives of the Boston Police Department, along with researchers from Northeastern University, visited OPC as a part of their effort to advise Boston's police commissioner on the establishment of a police review entity. OPC, along with other oversight agencies around the country, served as technical advisers to the group, who were looking at best practices for review boards and oversight agencies. OPC also took part in the Uzbekistan Bilateral Exchange Program sponsored by the U.S. Department of Justice. As part of the program, a group of criminal justice officials from Uzbekistan visited law enforcement and police accountability offices in the United States to gather information and learn about the role that these agencies play in other countries. Finally, OPC responded to requests from the Government of Israel and the Police Ombudsman for Northern Ireland for information about OPC's mediation program.

## 2. *Community Outreach Strategic Plan for 2006*

For 2006, OPC will continue with most of the elements of its 2005 Strategic Plan, modifying and adding new programs as the agency assesses how best to use its limited community outreach resources. Based on the success of the student interactive training and "training the providers" programs, OPC will continue to conduct these sessions. OPC will make some return visits to schools and organizations that took part in the programs throughout the past year and will pursue opportunities to work with other schools and organizations throughout the District. In addition, OPC will also continue its outreach to MPD to ensure that officers and police supervisors are informed about the agency's process.

With respect to new activities, OPC is planning to expand on its public education and awareness program regarding police accountability. OPC will kick off 2006 with an agency open house to celebrate its fifth anniversary, recap the development and accomplishments of the agency during its first five years, and publicize the agency's relocation. OPC is also pursuing the distribution of information about the agency in the District's public libraries. Although OPC has worked to disseminate information about the agency throughout the city, OPC believes there are still many people who are not fully informed about the agency and its work, and the public education and awareness program will be seeking new methods to address this issue.

### 3.    *Website*

Since it was created, the agency's website has served as an important community outreach tool. OPC has regularly updated its news items to keep the public informed about developments at the agency, and added links to assist the public in finding police oversight resources in the United States and around the world. In addition to this ongoing work, OPC made significant changes to the mediation information available on the website so that the public will be better informed about the agency's mediation program. In fiscal year 2006, OPC will continue to use the website as a tool to make information about the agency and police accountability available to the public.

### G.    Police Oversight and Law Enforcement Organizations

Since the agency opened, OPC staff members have played an active role in professional organizations related to citizen review of law enforcement and have learned from and contributed to the discussions and training seminars conducted by these organizations. Employees have attended and OPC representatives have addressed the annual conferences each year since 2001 of the National Association for Civilian Oversight of Law Enforcement (NACOLE). At the October 2004 conference, OPC's executive director moderated and the agency's deputy director participated in a panel entitled, "Evaluating Claims of False Arrest and Harassment."

In addition, at the August 2005 annual conference of the National Black Police Association, OPC's executive director was invited to speak at a session that addressed best practices in the field of police oversight.

OPC plans to continue its involvement with these professional organizations to learn from, and share with, other police oversight agencies and law enforcement groups around the country and the world.

### H.    Policy Recommendations

The statute creating PCB authorizes the Board to, "where appropriate, make recommendations" to the Mayor, District Council, and Chief of Police "concerning those elements of management of the MPD affecting the incidence of police misconduct, such as the recruitment, training, evaluation, discipline, and supervision of police officers." This authority allows the agency to go beyond its day-to-day work investigating and resolving individual police misconduct complaints to examine systemic issues that lead to police misconduct complaints. To date, PCB has issued six detailed reports and sets of recommendations for police reform, including four during fiscal year 2005, regarding a variety of issues, all of which are available on OPC's website, www.policecomplaints.dc.gov. Each report and set of recommendations is discussed in more detail below.

####       1.       Fiscal Year 2005

#####         a.       Minors in the Care of Arrested Persons

On May 24, 2005, PCB issued a report and recommendations regarding the handling of minors in the care of arrested persons. OPC's investigation of a complaint filed with the office discovered that MPD did not have a written policy concerning the handling of juveniles who, although not involved in any criminal activity, are in the care of an adult who is arrested and, as a result of the arrest, are left unattended. Although many officers employ a common sense approach of seeking to unite these juveniles with another responsible adult, PCB found that this practice was neither universally employed nor adequate to ensure the safety of children who are left unattended when a parent or guardian is arrested.

Consequently, PCB recommended that MPD create a written policy to fill the gap identified by the Board that takes into consideration the following issues: the (1) identification, (2) transportation, and (3) location of origin of minors, the (4) reluctance on the part of the arrestee to identify minors in the arrestee's care, the (5) need to verify and document the identity of the adult to which the minor is released, and (6) the role and circumstances under which child protective services should become involved. The report also recommended that MPD then train its officers on the laws and procedures governing minors who are not involved in any criminality, and regularly monitor the policy to ensure its consistent application and to evaluate its effectiveness.

On October 11, 2005, MPD indicated to OCP that it had agreed to adopt the recommendations contained in the report that MPD was in the process of drafting a special order based on PCB's recommendations, which MPD anticipated would be finalized soon.

#####         b.       Publication of MPD Orders on the Internet

On July 14, 2005, PBC issued a report and recommendations regarding the publication of MPD orders on the Internet. PCB recommended that MPD publish its orders and directives, along with an index, on MPD's website, thereby making this information readily available to the public at no cost. PCB issued this recommendation after considering the benefits to the public and to MPD of having MPD's orders be easily accessible. The report noted that members of the public currently can purchase a set of MPD's orders from a professional organization called LaborCops, but argued that since this information governs such a wide range of police encounters with citizens, it would be advantageous for all citizens, including those without the financial resources to purchase the orders, to be able to easily locate and educate themselves about these directives. The report also pointed out that MPD officers would benefit because it would allow them to access orders governing their conduct from desktop computers and from mobile computers while in patrol cars, thus eliminating the need to carry around bulky manuals. PCB's report emphasized that MPD would not be alone if it were to publish its orders on the Internet, as several other large cities, including Cincinnati, Denver, Minneapolis, Portland, and Seattle, publish their departmental orders online.

On August 22, 2005, OPC received a letter from Chief Charles H. Ramsey indicating that MPD is currently not in a position to post its orders on the Internet because the orders are being

updated and because MPD is in the process of making the orders available to its own officers through the Department's intranet. He indicated that MPD would consider making the orders available to the public online after they have been updated and have been made fully accessible to MPD officers. In his testimony during a November 2005 hearing before the District Council's Judiciary Committee, Chief Ramsey appeared to indicate that MPD would go forward now with the publication of some general orders on the Internet.[17]

### c.    Pretextual Stops of Bicyclists

On August 4, 2005, PCB issued a report and recommendations regarding pretextual stops of bicyclists made in the District of Columbia. OPC had received numerous complaints that suggested that MPD selectively enforced the District of Columbia's mandatory bicycle registration requirement and other bicycle regulations either as a pretext to investigate suspected wrongdoing or for improper purposes, including harassment and punishment of individuals. The complaints further revealed that sporadic and inconsistent enforcement of the bicycle registration requirement and other bicycle regulations had increased the perception of biased policing on the part of citizens. The report recommended that the Mayor, the Council, and MPD: (1) replace mandatory, police-based bicycle registration with voluntary registration through a national registry; (2) collect bike stop data as part of MPD's Biased Policing Project in which car and pedestrian stop data is being collected in order to assess the issue of racial profiling; (3) provide better training for officers and recruits regarding the scope of the bicycle laws; and (4) take steps to better inform bike riders of their duties under the law.

On November 1, 2005, OPC received a letter from Chief Ramsey indicating that MPD agreed with PCB's recommendation to replace mandatory bicycle registration with voluntary registration in a national registry. He indicated that adoption of this recommendation would ease the burden of bike ownership in the District of Columbia without compromising law enforcement efforts. The letter acknowledged that the District of Columbia's Department of Transportation (DDOT), which has primary responsibility for bicycle regulations, has drafted proposed legislation recommending elimination of mandatory bicycle registration and stated that MPD would support this legislation when it is forwarded to the District Council.

In response to PCB's recommendation to collect bike stop data, Chief Ramsey stated that MPD currently is collecting this data on the MPD Form PD 76, which is the same form being used to record motor vehicle stop data for the Department's racial profiling study, and that MPD intends to publish the results of its data collection, including bike stops, in the summer of 2006.

Chief Ramsey's letter also stated that MPD concurs in PCB's recommendation to enhance officer training to include key bicycle regulations and agreed with the recommendation that MPD undertake efforts, such as creating and distributing pamphlets, to inform the public about bicycle registration requirements and other bicycle regulations. MPD noted that it already collaborates extensively with DDOT to distribute information to the public about bicycle regulations and bicycle safety. The letter stated that MPD will take the further step of adding information to MPD's website regarding bicycle registration and other bicycle regulations, such as changes in the helmet laws.

> ### d.  *Property Damage Caused by District of Columbia Police Action*

On September 28, 2005, OPC issued a report and recommendations regarding property damage caused by District of Columbia police action.  One of the inevitable consequences of police work is that it sometimes causes damage to homes, cars, and other property.  OPC learned through a several complaints from members of the public that citizens have experienced great difficulty in trying to obtain information from MPD about whether they are entitled to any compensation for property damaged by MPD officers in the course of carrying out their official duties.  Many citizens resort to filing police misconduct complaints merely because of the lack of clear information about filing property damage claims.  PCB undertook a review of MPD policies that address the issue of property damaged by MPD officers and discovered that while MPD has a policy for addressing property damage caused by forcible entry, it does not have a written policy for handling other kinds of property damage.

To address these issues, PCB recommended that the Mayor, the Council, and MPD: (1) revise MPD General Order 309.03 to require that officers making forcible entries leave an MPD Form PD 240A – a form that provides contact information for the officers who conducted the entry and some limited information about property damage claims – both when a location is occupied and unoccupied at the time of an entry; (2) create an official MPD policy for responding to property damage caused by police action other than forcible entries; (3) revise the PD 240A so that it informs citizens both that MPD officers conducted a forcible entry and that citizens may file a claim for compensation to the District of Columbia's Office of Risk Management (ORM); (4) add information about filing claims to MPD's and the city's websites; and (5) train MPD employees about MPD's procedures for filing property damage claims so they can accurately respond to requests for information from the public.

On October 27, 2005, OPC received a letter from Chief Ramsey indicating that MPD agreed to adopt all of PCB's recommendations regarding how MPD handles property damage. Specifically, MPD agreed to revise the PD 240A such that it would inform citizens that a property damage claim may be directed to ORM and would include all relevant contact information.  He also indicated that General Order 309.03 would be revised to require that a PD 240A form be left at any place that is forcibly entered whether or not the premises are occupied.  The letter further stated that the revision of MPD General Order 309.03 would create a policy for guiding MPD staff in responding to property damage caused by action other than forcible entries.  Additionally, MPD will provide training to its staff regarding MPD's procedures for property damage claims so that they can accurately respond to requests for information from the public.  Finally, MPD will add a section to its website that explains to the public the process for filing a property damage claim, including the need to contact ORM and how that office can be reached.

> ## 2.  *Prior Years*

> ### a.  *Racial Profiling in Washington, D.C.*

In January 2002, PCB issued a report and recommendations regarding the identification and prevention of racial profiling by police officers in the District of Columbia.  Specifically,

PCB recommended five policy changes that MPD should implement to identify and prevent racial profiling: (1) collect data on traffic stops; (2) implement a simple and inexpensive paper-based system of data collection; (3) ensure the statistical reliability of the data by including experts on data collection and analysis, chosen by community groups, civil liberties organizations, OPC, and MPD; (4) implement officer education and training on laws against racially biased policing; and (5) adopt a racial profiling policy and data collection system by June 1, 2002.

Following PCB's report and recommendations, MPD undertook its Biased Policing Project, which was designed to address issues regarding racial profiling and other forms of police bias in the District. As part of the project, and to serve in an advisory capacity, MPD formed a Community-Police Task Force, which OPC has participated in since it was created. After several years of work and some significant delays by the Department, the research organization hired by MPD to study biased policing issues, the Police Foundation, completed its report regarding the District and also recommended, among other things, that MPD implement a stop data collection program to detect any racial profiling and other forms of police bias. Through its work on the task force, and in direct advocacy to the Mayor, the Council, and Chief Ramsey, OPC strongly encouraged MPD to follow the recommendation regarding the collection of stop data. MPD announced in December 2004 that it would go forward with the stop data collection program.

On July 29, 2005, MPD convened a meeting of the task force to introduce Dr. John Lamberth, the expert retained by MPD to collect and analyze stop data. Dr. Lamberth explained that his study will assess stops of motorists and pedestrians made by the police, and that these stops will be measured against certain "benchmark data." This term refers to the control data against which stop data can be compared to determine if any racial or ethnic group is being stopped at a disproportionate rate. Dr. Lamberth explained that he would employ "observation surveys" to measure the traffic for motorists and pedestrians, broken down by race and ethnicity. OPC and other members of the task force objected when MPD indicated that the study would not include an analysis of post-stop data, such as whether citizens who were stopped were then searched or gave their consent to being searched. OPC set forth its concerns over this issue in a letter to Chief Ramsey dated August 9, 2005. Subsequently, MPD announced the inclusion of post-stop data and analysis in Dr. Lamberth's study.

The data collection and analysis project is expected to be completed by August 31, 2006, when the U.S. Department of Justice grant funding the study expires. OPC will continue to monitor closely the work performed by MPD and Dr. Lamberth on the project.

### b.      *Disorderly Conduct Arrests Made by MPD Officers*

In November 2003, PCB issued a report and recommendations regarding disorderly conduct arrests made by MPD officers. The report detailed a variety of information regarding disorderly conduct arrests and decisions that had been issued by OPC complaint examiners sustaining harassment allegations prompted by improper disorderly conduct arrests. Based on the report, PCB recommended that the Mayor, the Council, and MPD should: (1) modify MPD's arrest procedure to ensure that all citizens who pay $25 to resolve their arrest are provided with written notice about the collateral forfeiture process and its consequences and that they sign an

acknowledgment of their choice to pay the $25 collateral;[18] (2) immediately begin providing additional training to all MPD officers and supervisors regarding the law and procedure related to disorderly conduct arrests; (3) distribute a videotaped message from the Chief of Police reinforcing the responsibilities of all members of the Department when making disorderly conduct arrests; (4) examine a sample of the disorderly conduct arrests made by MPD officers that is significant enough to allow MPD to determine if there are any widespread problems in the entire pool of disorderly conduct arrests; and (5) review the criminal code regarding disturbances of the public peace, particularly disorderly conduct, and the rules regarding collateral forfeiture and consider whether the code or rules need to be revised, updated, or changed, and also consider specific reforms, such as decriminalizing disorderly conduct and allowing individuals 15 days to decide whether to forfeit collateral or challenge their arrest.

In January 2004, in a meeting with Chief Ramsey, he indicated to OPC that MPD would take steps to implement recommendations 1 through 4, which suggest changes that are in the control of the Department.  In December 2004, MPD indicated that it had taken the following steps in response to PCB's recommendations:  (1) prisoner processing procedures were revised in 2004 to incorporate "post and forfeit" information on the collateral receipt prepared to document posting or forfeiture of collateral, and the arrestee's collateral options would be printed and placed in a visible location at all facilities where arrests are processed; (2) refresher training on disorderly conduct law and procedures would be included as a topic area in the annual in-service and roll call training plans for all officers, and training tapes produced for the in-service training component on disorderly conduct would include an introduction from Chief Ramsey; and (3) consistent with Department policy, a sustained allegation that an arrest was improper would result in a recommendation for disciplinary action against the officer(s) involved.

With respect to recommendation 5, the Mayor and the Council passed a bill repealing various sections of the criminal code, including several sections that were identified by PCB in its disorderly conduct report as potentially obsolete.[19]  In addition, the Council passed a bill in December 2004 that addressed many of the issues regarding collateral forfeiture that were raised by PCB in its report.[20]

OPC followed up again with MPD in December 2005 for an update on any additional steps that had been taken over the preceding year in response to the disorderly conduct report and recommendations.  MPD indicated that the following steps had been taken:  (1) disorderly conduct arrests were a topic in the June 2005 daily roll call training module; (2) disorderly conduct arrests will be covered as part of the D.C. Code review section of the 2006 in-service training; and (3) the last training videotape on disorderly conduct arrests is being re-made and updated, and when it is completed, it will be used in future roll call and in-service training sessions.  OPC has requested and will review the lesson plans and any related materials for the roll call and upcoming in-service training sessions.  OPC also will request and review a copy of the training videotape when it is completed.  In addition, at the appropriate time, PCB plans to conduct another examination of OPC decisions, MPD procedures and statistics, and other information regarding disorderly conduct arrests to update its findings to cover the period since the report and recommendations were issued in November 2003.

I.    Protest Monitoring

Under the First Amendment Rights and Police Standards Act of 2004, which took effect in April 2005, the District of Columbia granted PCB the authority to monitor and evaluate MPD's handling of First Amendment assemblies held in the District.  The Act articulates the District's official policy on First Amendment assemblies and, among other things, establishes specific standards of police conduct when handling protests or demonstrations.  These standards prohibit MPD from employing crowd control tactics during protests that have the potential to deprive demonstrators of the right to assemble peaceably and express their views.  Under the provisions of the Act, OPC monitored MPD's interactions with protesters during antiwar and anti-globalization demonstrations that took place in Washington in September 2005.  The protests attracted an estimated 150,000 people from across the nation and were the first major events to take place in Washington following the enactment of the new law.

A total of 12 OPC employees, including many of the agency's investigators, monitored MPD's interactions with protesters throughout the day on Saturday, September 24, 2005.  OPC employees monitored in teams along the protest routes, as well as in the main command center and with police officials in the field.  The monitors recorded their observations, and those observations became the basis for a report and recommendations issued by PCB to the Mayor, the Council, and MPD on December 20, 2005.

PCB's report provided a detailed account of what OPC staff members saw during the protests.  PCB's overall impression was that MPD performed in a professional and commendable manner and effectively balanced the interests of public safety with the right to free expression.  Based on the OPC staff's observations, PCB recommended that:  (1) MPD continue to emphasize compliance with the First Amendment Rights and Police Standards Act using the manner in which it handled the September 24, 2005, protests as a model for future large protests; (2) MPD devise a way to make officers' names and badge numbers more visible, ensuring that officer identification remains visible even when vests and other covering are added, and that MPD consider adding marking to its uniforms that clearly distinguishes MPD officers from other law enforcement officers; (3) MPD examine its street closing procedures to better balance the interests of demonstrators and non-demonstrators; (4) MPD ensure that all of its officers, particularly non-supervisory officers, are informed of OPC's presence and role so that OPC's monitors will not be impeded in carrying out their monitoring of protest events; and (5) MPD and the District of Columbia Council consider whether it is possible to achieve a better balance between the rights of demonstrators and the rights of non-demonstrators where arrests for illegal activity, particularly property damage, are concerned, with the goal of determining whether it is possible for MPD to interrupt illegal activity more quickly than it did during the these protests without violating the Act's provisions.

Beyond evaluating MPD's interaction with protesters, OPC's participation in this event also was undertaken to develop an OPC monitoring protocol and to assess the agency's resource needs to carry out its monitoring function in the future.  One of the most important lessons OPC learned from its September 2005, monitoring exercise was that without a sufficient number of OPC employees to serve as monitors, OPC cannot carry out the function effectively.  Because the events that OPC is charged with monitoring occur primarily on weekends, OPC will not be able to use its employees to monitor during their normal work hours.  In addition, OPC will need

adequate equipment to effectively carry out the monitoring.  OPC has requested additional funding for this work in its fiscal year 2007 budget request.

## III.    THE FUTURE

In fiscal year 2006, OPC expects to continue the progress it made this year.  With its new offices and its new and reorganized staff, OPC anticipates additional gains in reducing the time it takes the agency to complete its investigations, along with a further reduction of its number of open complaints.  The agency will continue to review the patterns and trends that appear in its complaints and will prepare additional proposals for police reform based on the information it gathers.  And OPC will work to improve and enhance its programs and procedures to ensure the agency's continued successful operation through fiscal year 2006 and beyond.

# Endnotes

[1]      *See* D.C. Official Code § 5-1101, *et seq.*  PCB also promulgated regulations regarding the operation of OPC on August 30, 2002.  *See* D.C. Municipal Regulations, Title 6A, § 2100, *et seq.*

[2]      District of Columbia Act 15-463, 51 D.C. Reg. 9406 (2004); District of Columbia Law 15-194, 51 D.C. Reg. 9805 (2004).

[3]      The 13 foreign languages are Arabic, Chinese Simplified Text, French, German, Haitian Creole, Italian, Japanese, Korean, Portuguese, Russian, Spanish, Tagalog, and Vietnamese.

[4]      The four possible outcomes that a complaint examiner may reach are:

Sustained – where the complainant's allegation is supported by sufficient evidence to determine that the incident occurred and the actions of the officer were improper;

Exonerated – where a preponderance of the evidence shows that the alleged conduct did occur but did not violate MPD policies, procedures, or training;

Insufficient Facts – where there are insufficient facts to decide whether the alleged misconduct occurred; or

Unfounded – where the investigation determined no facts to support that the incident complained of actually occurred.

[5]      When counting the overall outcome for a complaint, a complaint that has at least one sustained allegation is counted as a sustained complaint.  The number of sustained complaints is determined by this method because if a complaint has at least one sustained allegation, it must be forwarded to the Chief of Police for imposition of discipline, even if the other allegations are not sustained.  The only time that a complaint is not forwarded to the Chief of Police for discipline is when no allegations are sustained.  In these cases, the complaint is dismissed after the complaint examiner issues his or her decision.

[6]      In 2002, 2003, and 2004, the New York Police Department (NYPD) imposed discipline for 62.8%, 76.6%, and 91.1%, respectively, of the complaints sustained by New York City's Civilian Complaint Review Board (CCRB).  More information about discipline imposed pursuant to sustained CCRB complaints can be found on the agency's website, http://www.nyc.gov/html/ccrb/html/depdispln.html.  In 2000 and 2001, the chief of police in San Francisco imposed discipline for 92.7% and 96.4%, respectively, of the sustained complaints submitted for discipline by San Francisco's Office of Citizen Complaints (OCC).  *See* OCC's 2001 Annual Report at 11, which is available at http://web.sfgov.org/site/uploadedfiles/occ/OCC_2001.pdf.

[7]      OPC Complaint Nos. 03-0181, 03-0182, 03-0188, 03-0199, and 03-0200.

[8]      OPC Complaint No. 03-0459.

[9]      OPC Complaint No. 02-0031.

[10]      Please note that all of the statistics for fiscal year 2001 cover only a nine-month period.  OPC opened to the public on January 8, 2001, which was three months into fiscal year 2001.

[11]      The "District Population" data included in Tables 9, 10, and 11 are included for reference purposes.  It should be noted that anyone, whether a resident of the District or not, may file a complaint with OPC.

The data in Tables 9, 10, and 11 were obtained from the "General Demographic Characteristics: 2004" table for the District of Columbia that is part of the "2004 American Community Survey" data set on the U.S. Census website, www.census.gov.  As of 2004, the District's population estimate was 553,523, but the race or national origin, gender, and age breakdowns were based on a population estimate of 518,074, which included only the household population and excluded the population living in institutions, college dormitories, and other group quarters.  Readers should be aware that the race or national origin, gender, and age breakdowns of the District population have changed some over time, so these data may have less value as a comparator for the earlier fiscal years reported in the tables.  In previous annual reports, OPC has included the race or national origin, gender, and age breakdowns that the Census reported for 2000.  At that time, the District had a population of 572,059, and the population's race or national origin, gender, and age was broken down as follows:

| | District Pop. | | | District Pop. | | | District Pop. |
|---|---|---|---|---|---|---|---|
| African-American | 60.0% | | Male | 47.1% | | Under 15 | 17.1% |
| White | 27.8% | | Female | 52.9% | | 15-24 | 15.7% |
| Latino | 7.9% | | | | | 25-34 | 17.8% |
| Asian | 2.7% | | | | | 35-44 | 15.3% |
| Middle Eastern | -- | | | | | 45-54 | 13.2% |
| Native American | 0.3% | | | | | 55-64 | 8.7% |
| Multiracial / Other | 2.4% | | | | | 65 and Older | 12.3% |

[12]    OPC collected date of birth information for only 57% of its complaints (206 of 361) in fiscal year 2003, but increased to collecting the information for 94% (247 of 262) in fiscal year 2004 and 98% (318 of 326) in fiscal year 2005.

[13]    The "Entire Police Force" data included in Tables 14 and 15 were obtained from MPD on January 13, 2006.  On that date, MPD had 3,764 sworn members, and the data reflect the race or national origin and gender breakdowns of those officers.  Readers should be aware that the race or national origin and gender breakdowns of MPD officers has changed some over time, so these data may have less value as a comparator for the earlier fiscal years reported in the tables.  In previous annual reports, OPC has included the race or national origin and gender breakdowns that MPD included in its 2000 annual report.  At the end of 2000, MPD had 3,614 sworn members, and their race or national origin and gender were broken down as follows:

| | Entire Police Force | | | Entire Police Force |
|---|---|---|---|---|
| African-American | 66.5% | | Male | 75.7% |
| White | 27.7% | | Female | 24.3% |
| Latino | 4.9% | | | |
| Asian | 0.9% | | | |

[14]    The assignment data for fiscal year 2001 is not reported in this table because it was compiled using a different methodology from the other years, and cannot be used for comparison purposes.

[15]    "Other" includes MPD Headquarters, the Office of Professional Responsibility, Major Narcotics Branch, the Major Crash Investigations unit, the Maurice T. Turner, Jr., Institute of Police Science, Emergency/Non-Emergency Communications, the Air Support Unit, the Regional Operations Command – Central, and the Juvenile Processing Center.

[16]    In June 2001, the District of Columbia approved new ward boundaries as part of its redistricting process following the 2000 U.S. Census.  The new ward boundaries took effect in January 2002.  Readers should be aware that the ward recorded for each complaint reflects the ward designation as it existed at the time of the complaint, and that the ward designation for some locations may have changed following the redistricting.  For specific details of how the redistricting affected the city's wards, *see* Sewell Chan, *How Redistricting Plan Affects City's 8 Wards*, Washington Post, June 28, 2001, at T9.

[17]    Although there is some ambiguity on this point, OPC plans to follow up with MPD in the hope that Chief Ramsey has modified the Department's position on this issue.  The video of the hearing is available on the website of the District's Office of Cable Television and Telecommunications, www.octt.dc.gov, on the "On Demand Video" page for City Cable Channel 13.  The Judiciary Committee hearing was conducted by Councilmember Phil Mendelson on November 10, 2005, and the relevant testimony begins at approximately 2:50:00 into the video.

[18]    "Collateral forfeiture" or "post and forfeit" involves paying a $25 "collateral" at the police station at the time of the arrest.  the collateral essentially amounts to a fine for the offense, and, after it is posted and forfeited,

ends the arrest without any obligation for the person to appear in court at a later date to answer for the underlying charge.

[19]     *See* the "Elimination of Outdated Crimes Amendment Act of 2003," District of Columbia Act 15-255, 50 D.C. Reg. 10996 (2003); District of Columbia Law 15-154, 51 D.C. Reg. 5691 (2004).  Effective April 29, 2004, the District repealed the criminal code sections regarding Dueling challenges, § 22-1302, Assault for refusal to accept a challenge, § 22-1303, and Leaving the District to give or receive challenge, § 22-1304, among other sections.

[20]     *See* the "First Amendment Rights and Police Standards Act of 2004," District of Columbia Act 15-757, 52 D.C. Reg. 2296 (2005); District of Columbia Law 15-352, 52 D.C. Reg. 5417 (2005).  The Act clarifies the legal status of collateral forfeiture, and requires that (1) a detailed written notice be given to anyone who elects collateral forfeiture, (2) an arrestee sign an acknowledgement of the choice to forfeit collateral, (3) the District develop standards and procedures to be used in administering the collateral forfeiture process, and (4) the Mayor submit an annual report to the Council regarding collateral forfeitures.

EXHIBIT J

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
# POLICE COMPLAINTS BOARD
# OFFICE OF POLICE COMPLAINTS



# ANNUAL REPORT
## FISCAL YEAR 2006

**1400 I Street, NW, Suite 700 ★ Washington, DC 20005**
**Tel: (202) 727-3838 ★ Fax: (202) 727-7638 ★ Toll-Free 24-Hour Hotline (866) 588-0569**
**www.policecomplaints.dc.gov**



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**POLICE COMPLAINTS BOARD**
**OFFICE OF POLICE COMPLAINTS**

January 8, 2007

Dear Mayor Fenty, Members of the District of Columbia Council,
 Acting Chief Lanier, and Chief Pittman:

We are pleased to submit the 2006 Annual Report for the Office of Police Complaints (OPC) and its governing body, the Police Complaints Board (PCB).  This report covers the agency's operations during the District of Columbia Government's fiscal year from October 1, 2005, through September 30, 2006.

Fiscal year 2006 was another successful year of growth, development, and change for the agency as it passed its fifth anniversary.  In terms of raw numbers, OPC received its highest number of complaints ever, with an increase of 27%.  Despite this large increase, OPC still closed more complaints than it opened for the third year in a row, further reducing its number of open complaints by 8%.

During the year, OPC conducted its 100th mediation session and issued its 50th adjudicated decision, while PCB issued its first report on its monitoring of the Metropolitan Police Department's (MPD) handling of antiwar and anti-globalization protests in Washington. The agency also held an open house to mark its anniversary and highlight several other significant developments, including the appointment of three new PCB members and the relocation of the agency to new office space.

The following is an overview of the developments and changes that occurred over the course of the year:

- Eight hundred and eighty-nine people contacted OPC to inquire about filing a complaint, which was a 32% increase over fiscal year 2005.  The agency received 414 complaints, which was a 27% increase over the year before.  The increase in the number of complaints this year followed a 24% increase from fiscal year 2004 to fiscal year 2005.  In total, since the agency opened, it has had almost 4,000 contacts and received almost 2,000 complaints.

- OPC closed 435 complaints, which was an 18% increase over fiscal year 2005, making fiscal year 2006 the third year in a row that the agency closed more complaints than it received.  The increase in the number of closed complaints was driven by a 13% increase (to 272) in the number of complaints resolved by OPC through adjudication, dismissal, or successful mediation.  Nineteen of these complaints were adjudicated and 13 of the complaints had allegations that were sustained.  All of these sustained decisions were forwarded to MPD, and MPD has taken steps to impose discipline for each one.

- The online legal databases maintained by LexisNexis and Westlaw began carrying OPC's decisions this year. LexisNexis started carrying the decisions in December 2005 and Westlaw started in the spring of 2006.

- OPC's number of open complaints at the end of the year decreased by 8%. The decrease occurred despite the fact that the agency received 88 more complaints in fiscal year 2006, and was driven by the greater efficiency and productivity of OPC's investigative staff and management. As part of the investigations of these complaints, OPC's investigators conducted over 750 interviews, which included more than 400 police officer and 350 citizen interviews, and the agency completed 251 investigative reports.

- OPC conducted 34 mediation sessions, 21 of which were successful. Through a concerted effort to identify appropriate complaints for mediation, OPC increased the number of mediation sessions by 79% over fiscal year 2005. Since opening, OPC has mediated 130 complaints, with an overall success rate of 72%.

- PCB issued three detailed reports and sets of recommendations to the Mayor, the Council, and MPD's Chief of Police over the course of the year, bringing its total number of policy recommendations to ten. This year's policy recommendations addressed enhancing police response to people with mental illness in the District of Columbia by incorporating the Crisis Intervention Team (CIT) community policing model, police service to disabled persons who use service animals, and business cards for MPD officers. The reports discussed PCB's examination of these issues and the recommendations included changes designed to reduce officer misconduct while improving police service in Washington.

- Under the First Amendment Rights and Police Standards Act of 2004, which granted PCB the authority to monitor and evaluate MPD's handling of protests and demonstrations held in the District of Columbia, PCB issued its report on the agency's monitoring of MPD's handling of the antiwar and anti-globalization protests that occurred in Washington in September 2005.

- OPC implemented its Community Outreach Strategic Plan for 2006. The plan continued many of OPC's successful programs and featured an open house and visits by delegations from Norway and Sweden that were interested in police accountability issues.

As the agency embarks on another year, we are looking forward to continued progress and advancement. We believe that the work done by PCB members and OPC staff over the past six years has situated the agency well to carry out its mission in the years ahead, even though there are important challenges that will need to be addressed. For the past two years, OPC has seen dramatic increases in the number of complaints filed with the agency. We believe that the increases have been driven primarily by the wider availability of OPC's complaint forms and materials, which has made filing a complaint with our agency an option for more people, and the District's crime emergencies, which have increased the number of officer-citizen contacts. No matter what the cause, however, we expect the higher number of complaints to continue, and we

need to ensure that the agency has adequate resources to handle this volume of complaints. We will be monitoring our number of investigators to be sure we have enough staff to investigate complaints in a timely and thorough manner. We also will be tracking our funding for mediation sessions, hearings, court reporting, and other services to be sure that it is adequate to process these complaints promptly. Beyond our work investigating and resolving complaints, we also must ensure that the agency can adequately perform its other duties, which include monitoring MPD's handling of protests and demonstrations, performing community outreach, developing additional recommendations for police reform, and responding to Freedom of Information Act (FOIA) requests, which increased noticeably again this past year.

In addition to staffing and resource concerns, the agency also will have to address challenges that may hinder OPC's ability to gather the facts in its investigations or jeopardize the agency's independence. One such challenge is ensuring that all MPD employees cooperate fully with OPC's investigation, adjudication, or mediation of complaints, which is required by District law. While the Department and most MPD employees have cooperated with the agency, OPC reported more than 51 instances of non-cooperation to MPD in 2006, and the Department did not take disciplinary action in 92% of the cases that had been reviewed as of the issuance of this report. The number of instances of non-cooperation has risen dramatically over the past few years, and MPD's failure to take disciplinary action has had significant negative consequences for the District's police accountability system. We have written to MPD about this issue recently and will be focused on ensuring that MPD takes corrective action in 2007.

We anticipate exciting things as the District's new Mayor, Council Chairman, Council Members, and Chief of Police take office, and look forward to working with these leaders to continue our agency's important work and address the challenges that lie ahead. Over the past six years, we believe that the agency has become an important forum where members of the public can raise concerns about their interactions with the police and seek protection of their rights when they may not have that opportunity to do so elsewhere. The agency also has advanced police reform by detecting and examining patterns and trends in the complaints filed with the agency and issuing detailed policy recommendations based on this work. In the year ahead, we plan to enhance and expand these roles to do our part to improve policing and ensure the public's confidence in the District's police force.

Respectfully submitted,

Kurt Vorndran
Chair
Police Complaints Board

Philip K. Eure
Executive Director
Office of Police Complaints

## Table of Contents

Report Tables and Charts ............................................................................................ iii

I.    Agency Information ................................................................................................ 1

A.    Agency Structure and Complaint Process ....................................................... 1

B.    Police Complaints Board Members ................................................................. 1

C.    Office of Police Complaints Staff ................................................................... 2

II.   The Year in Review ............................................................................................... 3

A.    Introduction .................................................................................................... 3

B.    Complaint Examination .................................................................................. 4

1.    Complaint Examination Example #1 ........................................................ 6

2.    Complaint Examination Example #2 ........................................................ 7

3.    Complaint Examination Example #3 ........................................................ 8

C.    Discipline ....................................................................................................... 8

1.    Complaint Examiner Decisions ................................................................ 8

2.    Failure to Cooperate by MPD Officers .................................................... 9

D.    Mediation ..................................................................................................... 11

1.    Mediation Example #1 ........................................................................... 11

2.    Mediation Example #2 ........................................................................... 12

3.    Mediation Example #3 ........................................................................... 13

E.    Investigations ............................................................................................... 14

F.    Statistics ....................................................................................................... 15

1.    Contacts and Formal Complaints ........................................................... 15

2.    Disposition of Formal Complaints ......................................................... 17

3.    Status of Pending Formal Complaints at the End of Each Fiscal Year ... 18

4.    OPC Workload ...................................................................................... 19

5.    Allegations in Formal Complaints ......................................................... 21

6.    Complainant Race or National Origin, Gender, and Age ........................ 22

7.    Subject Officer Race or National Origin, Gender, and Assignment ........ 26

8.    City Wards ............................................................................................. 30

G.    Outreach ....................................................................................................... 31

1.    Fiscal Year 2006 .................................................................................... 31

2.    Community Outreach Strategic Plan for 2007 ...................................................... 32

3.    Website ................................................................................................................... 32

H.    Police Oversight and Law Enforcement Organizations ................................................ 33

I.    Policy Recommendations ............................................................................................... 33

1.    Fiscal Year 2006 ................................................................................................... 33

a.    Enhancing Police Response to People with Mental Illness in the District of Columbia by Incorporating the Crisis Intervention Team (CIT) Community Policing Model .................................................................................................. 33

b.    Police Service to Disabled Persons Who Use Service Animals ...................... 36

c.    Business Cards for MPD Officers ................................................................... 36

2.    Status Update for Earlier Policy Recommendations ............................................. 37

a.    Property Damage Caused by District of Columbia Police Action .................. 37

b.    Pretextual Stops of Bicyclists ......................................................................... 38

c.    Publication of MPD Orders on the Internet .................................................... 38

d.    Minors in the Care of Arrested Persons .......................................................... 39

e.    Disorderly Conduct Arrests Made by MPD Officers ...................................... 39

f.    Racial Profiling in Washington, D.C. ............................................................. 40

J.    Protest Monitoring ......................................................................................................... 40

III.    The Future .............................................................................................................................. 41

Endnotes ....................................................................................................................................... 42

Appendix A:  District of Columbia Police Districts

Appendix B:  District of Columbia Wards

**Report Tables and Charts**

Table 1:  Complaint Examiner Decisions.................................................................5

Table 2:  Complaint Examiner Decisions.................................................................5

Table 3:  Discipline for Sustained Complaints........................................................9

Table 4:  Contacts and Formal Complaints ...........................................................16

Table 5:  Formal Complaints per Month ...............................................................16

Chart 5:  Formal Complaints per Month ...............................................................17

Table 6:  Disposition of Formal Complaints .........................................................18

Table 7:  Status of Pending Formal Complaints at the End of Each Fiscal Year........................19

Chart 7:  Number of Open Formal Complaints at the End of Each Fiscal Year ..........................19

Table 8:  OPC Workload ......................................................................................21

Chart 8:  OPC Workload ......................................................................................21

Table 9:  Allegations in Formal Complaints ..........................................................22

Chart 9:  Allegations in Formal Complaints (as a Percentage) ..............................22

Table 10:  Complainant Race or National Origin....................................................23

Chart 10:  Complainant Race or National Origin (as a Percentage)...........................24

Table 11:  Complainant Gender .............................................................................24

Chart 11:  Complainant Gender (as a Percentage) ..................................................24

Table 12:  Complainant Age..................................................................................25

Chart 12:  Complainant Age (as a Percentage) .......................................................25

Table 13:  Complainant Race or National Origin with "Unique Complainant" Information .......25

Table 14:  Complainant Gender with "Unique Complainant" Information .................26

Table 15:  Subject Officer Race or National Origin.................................................27

Chart 15:  Subject Officer Race or National Origin (as a Percentage)...........................27

Table 16:  Subject Officer Gender..........................................................................28

Chart 16:  Subject Officer Gender (as a Percentage) ..............................................28

Table 17:  Subject Officer Assignment ..................................................................28

Chart 17:  Subject Officer Assignment (as a Percentage) .......................................29

Table 18:  Subject Officer Race or National Origin with "Unique Officer" Information.............29

Table 19:  Subject Officer Gender with "Unique Officer" Information .......................29

Table 20:  Subject Officer Assignment with "Unique Officer" Information ............................... 30

Table 21:  City Wards ............................................................................................................ 30

Chart 21:  City Wards (as a Percentage) .................................................................................. 31

Table 22:  Enhancing Police Response to People with Mental Illness in the District of Columbia by Incorporating the Crisis Intervention Team (CIT) Community Policing Model (September 7, 2006) .................................................................................................. 34

Table 23:  Police Service to Disabled Persons Who Use Service Animals (August 17, 2006) .... 36

Table 24:  Business Cards for MPD Officers (July 24, 2006) ..................................................... 37

Table 25:  Property Damage Caused by District of Columbia Police Action (September 28, 2005) .................................................................................................. 37

Table 26:  Pretextual Stops of Bicyclists (August 4, 2005) ........................................................ 38

Table 27:  Publication of MPD Orders on the Internet (July 14, 2005) ....................................... 38

Table 28:  Minors in the Care of Arrested Persons (May 24, 2005) ............................................ 39

Table 29:  Disorderly Conduct Arrests Made by MPD Officers (November 19, 2003) ............... 39

Table 30:  Racial Profiling in Washington, D.C. (January 7, 2002) ............................................ 40

Table 31:  Protest Monitoring (December 20, 2005) .................................................................. 41

## I.     AGENCY INFORMATION

### A.     Agency Structure and Complaint Process

Information about the structure and operation of the Police Complaints Board (PCB) and the Office of Police Complaints (OPC), the agency's history, and the complaint process can be found on OPC's website, www.policecomplaints.dc.gov.  This information was also included in the agency's annual reports issued for fiscal years 2001 through 2005.

### B.     Police Complaints Board Members

The current members of the Board are as follows:

*Kurt Vorndran*, the Chair of the Board, is a legislative representative for the National Treasury Employees Union (NTEU).  Prior to his work at NTEU, Mr. Vorndran served as a lobbyist for a variety of labor-oriented organizations including the International Union of Electronic Workers, AFL-CIO (IUE), and the National Council of Senior Citizens. Mr. Vorndran served as the president of the Gertrude Stein Democratic Club from 2000 to 2003 and an elected ANC Commissioner from 2001 to 2004.  He received his undergraduate degree from the American University's School of Government and Public Administration and has taken graduate courses at American and the University of the District of Columbia.  Mr. Vorndran was confirmed by the District Council on December 6, 2005, and sworn in as the new chair of the Board on January 12, 2006.  His term expires on January 12, 2008.

*Inspector Patrick A. Burke* is a 17-year veteran of the Metropolitan Police Department (MPD) and the commander the Third District Substation.  During his MPD career, Inspector Burke has served in four of the seven police districts, the Special Operations Division, Operations Command, and the Field and Tactical Support Unit.  He received his undergraduate degree in criminal justice from the State University of New York College at Buffalo, a certificate of public management from the George Washington University, and a master's degree in management from the Johns Hopkins University.  He is also a graduate of the Federal Bureau of Investigation's National Academy in Quantico, Virginia, and the Senior Management Institute for Police (SMIP) in Boston, Massachusetts.  Inspector Burke has received a variety of awards and commendations, including MPD's Achievement, Meritorious Service, and Lifesaving Medals, the Cafritz Foundation Award for Distinguished District of Columbia Government Employees, and the National Highway Traffic Safety Administration Award for Public Service.  In addition, he is an active member of numerous community and volunteer organizations within the District of Columbia, where he resides with his wife and four children.  Inspector Burke was confirmed by the District Council as the second MPD member of the Board on January 3, 2006, and sworn in on January 12, 2006.  His term expires on January 12, 2009.

*Karl M. Fraser* is a project manager who oversees clinical oncology research at a biotech company in Rockville, Maryland.  Mr. Fraser received his undergraduate degree in biology from Howard University and a master's degree in biotechnology from the Johns Hopkins University. He has been active in his community, including serving as an elected ANC Commissioner.

Mr. Fraser was confirmed by the District Council on December 6, 2005, and sworn in on January 12, 2006. His term expires on January 12, 2008.

Over the past year, two PCB members, Dr. Patricia Fisher and Marc Schindler, completed their service on the Board. Dr. Fisher, who was an original PCB member and served since the Board was created in January 2000, and Mr. Schindler, who served on the Board for more than three years, devoted a considerable amount of their personal time and energy to the development and continued operation of the agency. Their hard work helped shape and improve the agency over the years, and the PCB members and OPC staff salute them for their service to the agency and the District of Columbia.

Dr. Fisher's and Mr. Schindler's seats on the Board are currently vacant. One seat has a term that expired on January 12, 2006, and the other seat has a term that will expire on January 12, 2007.

### C.    Office of Police Complaints Staff

OPC has a talented and diverse staff of 19 that includes eight employees, or 42%, with graduate or law degrees, and five attorneys. The diversity of the office generally mirrors the District's population, and includes a staff that is 58% African-American, 32% white, 5% Latino, and 5% multiracial. In addition, since it opened in 2001, OPC has administered an internship program that has attracted many outstanding students from schools in the Washington area and beyond. Through the fall of 2006, 43 college students and 18 law students have participated in the program.

The current members of OPC's staff are as follows:

**Philip K. Eure** became the agency's first executive director in July 2000 after working as a senior attorney in the Civil Rights Division at the U.S. Department of Justice, where he litigated on behalf of victims of employment discrimination. While at the Department, Mr. Eure was detailed in 1997-1998 to Port-au-Prince as an adviser to the Government of Haiti on a project to reform the criminal justice system. He also serves on the board of directors of the National Association for Civilian Oversight of Law Enforcement (NACOLE) and has spoken at various forums in the District, around the country, and outside the United States on a wide range of police accountability issues. Mr. Eure received his undergraduate degree from Stanford University and his law degree from Harvard Law School.

**Thomas E. Sharp**, the deputy director, joined the agency in October 2002 from the law firm of Wilmer, Cutler & Pickering, where he was an associate in the firm's securities enforcement and regulatory practice. Prior to joining the firm, he served as staff counsel to Newark, New Jersey, City Councilman Cory Booker and as a law clerk to U.S. District Judge Myron H. Thompson in Montgomery, Alabama. Mr. Sharp has a bachelor's degree from the State University of New York at Buffalo and a law degree from Yale Law School.

**Clifford C. Stoddard, Jr.,** the chief investigator, was appointed to his position in June 2003. Mr. Stoddard is a retired Special Agent from the U.S. Air Force Office of Special Investigations and former Assistant State's Attorney and Chief of the White-Collar and

Computer Crime Division of the Anne Arundel County State's Attorney's Office in Annapolis, Maryland. He was an adjunct faculty member at the National Advocacy Center and has taught nationally for the National District Attorney's Association and the American Prosecutor's Research Institute on white-collar and computer crime subjects. Mr. Stoddard has a bachelor's degree from Southern Illinois University, Carbondale, and a law degree from the Georgetown University Law Center.

*Kesha Taylor*, the assistant chief investigator, was hired in July 2002. Prior to joining the agency, Ms. Taylor worked with the Investigations Division of the Public Defender Service for the District of Columbia for seven years. While there, Ms. Taylor served most recently as a Staff Investigator and as the Coordinator of the Internship Program. Ms. Taylor obtained her undergraduate degree in political science and English from the University of Vermont. She also received a master's degree in higher education from Cornell University.

*Nicole Porter*, the agency's special assistant, joined OPC in August 2006. Ms. Porter came to the office from the U.S. Department of Justice's Civil Rights Division, where she worked on police misconduct, disability, and housing discrimination issues. Prior to her tenure with the Justice Department, she served as an attorney with the American Civil Liberties Union of Maryland. Ms. Porter received her bachelor's degree from Tennessee State University and her law degree from the University of Tennessee.

As of the issuance of this report, OPC's other staff members are as follows:

| | |
|---|---|
| Natasha Bryan | Lead Investigator |
| Mona Andrews | Lead Investigator |
| Anthony Lawrence | Senior Investigator |
| Megan Rowan | Senior Investigator |
| Andrea Del Pinal | Investigator |
| David A. Curcio | Investigator |
| Alpha Griffin | Investigator |
| Kevin T. Smith | Investigator |
| John R. Brunza | Investigator |
| Takima Davis | Paralegal Specialist |
| Sherry Meshesha | Investigative Clerk/Receptionist |
| | |
| Melanie Deggins | Public Affairs Specialist |
| | |
| Stephanie Banks | Administrative Officer |
| Sonja Wingfield | Staff Assistant |

## II.    THE YEAR IN REVIEW

### A.    Introduction

Fiscal year 2006 was a year of growth, development, and change for OPC as the agency passed its fifth anniversary. OPC received its highest number of complaints ever, with an

increase of 27%. Despite these large increases, OPC still closed more complaints than it opened for the third year in a row, further reducing its number of open complaints by 8%. This accomplishment was driven by an 18% increase in the overall number of complaints closed and a 13% increase in the number of complaints resolved by OPC through adjudication, dismissal, or successful mediation.

During the year, OPC conducted its 100th mediation session and issued its 50th adjudicated decision, while PCB issued its first report on its monitoring of MPD's handling of antiwar and anti-globalization protests in Washington. PCB also issued three detailed reports and sets of recommendations to the Mayor, the Council, and MPD's Chief of Police over the course of the year that addressed enhancing police response to people with mental illness in the District of Columbia by incorporating the Crisis Intervention Team (CIT) community policing model, police service to disabled persons who use service animals, and business cards for MPD officers. The reports proposed changes designed to improve police service while reducing the number of police misconduct complaints in the future. In addition, OPC implemented its Community Outreach Strategic Plan for 2006, continuing several successful programs and featuring an open house and visits by delegations from Europe that were interested in police accountability issues.

These developments and others are discussed in more detail below, along with statistics regarding complaints received and closed by OPC in fiscal year 2006.

### B.    Complaint Examination

In fiscal year 2006, OPC continued the operation of its complaint examination process. The agency's pool of 16 complaint examiners, all of whom are distinguished attorneys living in the District of Columbia, includes individuals with backgrounds in private practice, government, non-profit organizations, and academia, as well as a variety of other experiences.

If a complaint examiner determines that an evidentiary hearing is necessary to resolve a complaint, OPC has taken steps to ensure that complainants have counsel available to assist them at no cost during the hearings. In general, because officers are represented by attorneys or union representatives provided to them by the police union, the Fraternal Order of Police (FOP), OPC has had an arrangement since 2003 with a Washington-based law firm, Howrey L.L.P, to provide free counsel to complainants.

As the decisions issued by OPC suggest, the complaint examination process has become an important forum where members of the public can raise concerns about possible abuse or misuse of police powers and seek protection of their rights when they may not have that opportunity to do so elsewhere. In general, the other forums available – principally criminal and civil court – provide few opportunities to raise these issues or have barriers to entry that keep or inhibit people from pursuing them. OPC referred an additional 18 complaints into the process over the course of the year, and 19 complaints, involving 32 officers, were resolved. Four of the complaints were withdrawn midway through the process, and the remaining 15 were resolved in 15 different decisions. Table 1 lists each of the resolved complaints in the order in which they were resolved and identifies the allegations in the complaint and the decision reached by the complaint examiner for each allegation.[1]

**Table 1:  Complaint Examiner Decisions**

| | Harassment | Excessive Force | Language / Conduct | Discriminatory Treatment | Retaliation |
|---|---|---|---|---|---|
| 01-0411 | Sustained | Exonerated | -- | -- | -- |
| 03-0463 | Sustained | Sustained | Sustained | -- | -- |
| 03-0399 | -- | -- | Withdrawn | -- | -- |
| 02-0327 | Unfounded | Unfounded | -- | -- | -- |
| 05-0110 | Sustained | Sustained | -- | -- | -- |
| 02-0507 | -- | Sustained / Exonerated | -- | -- | -- |
| 05-0262 | Sustained | -- | Sustained | -- | -- |
| 05-0228 | -- | -- | Sustained | -- | -- |
| 02-0361 | -- | -- | Sustained | Sustained | -- |
| 03-0410 | Sustained | -- | -- | -- | -- |
| 03-0525 | Sustained | -- | Sustained | -- | -- |
| 03-0313 | Sustained | -- | Sustained | -- | -- |
| 02-0167 | Withdrawn | -- | Withdrawn | -- | -- |
| 03-0590 | Withdrawn | -- | Withdrawn | -- | -- |
| 04-0389 | -- | -- | Withdrawn | -- | -- |
| 04-0132 | Sustained | Sustained / Unfounded | Sustained | -- | -- |
| 05-0373 | -- | -- | Unfounded | -- | -- |
| 04-0055 | Sustained | Insufficient Facts | Insufficient Facts | Unfounded | -- |
| 05-0375 | -- | -- | Sustained | -- | -- |

The full text of each decision is available on OPC's website, www.policecomplaints.dc.gov, and through the online legal databases maintained by LexisNexis and Westlaw.  LexisNexis began carrying OPC's decisions in December 2005 while Westlaw started in the spring of 2006.  The addition of OPC's decisions to the two largest online legal databases in the United States marks an important step in the development of the agency, making OPC the first and only police oversight agency in the nation to have its decisions published by either LexisNexis or Westlaw.

Table 2 summarizes the decisions reached by the complaint examiners, identifying the frequency of the different outcomes.  The table reflects the overall outcome for each complaint.

**Table 2:  Complaint Examiner Decisions**

| | FY03 | | FY04 | | FY05 | | FY06 | |
|---|---|---|---|---|---|---|---|---|
| | Complaints | | Complaints | | Complaints | | Complaints | |
| Sustained | 15 | 78.9% | 9 | 56.3% | 13 | 76.5% | 13 | 68.4% |
| Exonerated | 2 | 10.5% | 2 | 12.5% | 1 | 5.9% | -- | -- |
| Insufficient Facts | -- | -- | 3 | 18.8% | 1 | 5.9% | -- | -- |
| Unfounded | 1 | 5.3% | 1 | 6.2% | -- | -- | 2 | 10.5% |
| Withdrawn | 1 | 5.3% | 1 | 6.2% | 2 | 11.8% | 4 | 21.1% |
| | | | | | | | | |
| Total | 19 | | 16 | | 17 | | 19 | |

Looking at the resolutions reached by complaint examiners, 13 of the 19 complaints, or 68%, had at least one allegation that was sustained.[2]  There were two complaints, or 11%, where

the complaint examiner concluded that underlying allegations were unfounded. Four complaints, or 21%, were withdrawn. Please note that the sustain rate is not 68% of all complaints resolved by OPC, but 68% of the 19 complaints resolved in the complaint examination process, which does not include complaints that were successfully mediated or complaints that were dismissed because they lacked merit or the complainant would not cooperate with OPC's process. When the sustained complaints are considered as part of all complaints resolved by OPC through adjudication, dismissal, and successful mediation, sustained complaints make up 5% of this group (or 13 of 272). In general, OPC's overall sustain rate will fluctuate from year to year depending on a variety of factors, such as the number of dismissals and successful mediations, which are not directly related to the complaint examination process.

Among these resolutions, withdrawn complaints are the greatest cause for concern. OPC's process is complainant initiated and the complainant currently has the option to withdraw at any point in the process up through the issuance of a decision. OPC always attempts to ensure that complainants are not coerced or intimidated out of pursuing their complaints. Beyond that, a complainant's reasons for withdrawing a complaint vary and may be legitimate and reasonable. Nevertheless, halting the process so close to the end has significant consequences, such as wasted time and resources investigating and adjudicating the complaint and a lack of a resolution for potentially serious police misconduct allegations that may affect the public in general. OPC has been examining these and other withdrawals and looking at its regulations, policies, and procedures in an attempt to reduce the number of withdrawals and eliminate the waste and other negative consequences that result from them. Over the next year, OPC will be considering changes to its statute to create more effective ways of resolving minor complaints that do not require the time and resources currently needed, changes to its regulations to modify and introduce more controls into the rules governing withdrawals by complainants, and changes to its policies and procedures to ensure prompt and efficient investigation and adjudication of complaints when the participation of the parties in the process can most easily be obtained.

To illustrate the types of complaints that were resolved by complaint examiners in fiscal year 2006, the following are three examples of complaints and the resulting decisions:

### 1.     *Complaint Examination Example #1*

The complainant alleged that while he was walking in a Northeast Washington neighborhood, several MPD officers jumped out of their cars with their guns drawn and ordered the complainant to put up his hands. The two subject officers reportedly frisked the complainant at gunpoint, referring to him as "nigger" during the frisk and threatening to plant evidence of illegal activity on him in order to force him to talk. The subject officers also allegedly ordered the complainant to kneel on the ground and place his hands behind his head. According to the complainant, one of the subject officers then put a gun to his head, and the two subject officers threatened to shoot the complainant and dump his body in Northwest Washington. The complainant stated that at the conclusion of the stop, the subject officers ordered the complainant to run away, and when he did so, the subject officers chased after the complainant in their police cars, causing the complainant to narrowly miss being hit by a truck and a car. The complainant was not found in possession of any illegal substances and was not arrested or cited for any crime. Later that day, the complainant filed a complaint with OPC alleging that the subject officers

harassed him, used unnecessary or excessive force against him, and used language or engaged in conduct toward him that was insulting, demeaning, or humiliating.

In interviews with OPC, the subject officers denied having engaged in the acts alleged by the complainant. The officers stated that they stopped the complainant because he exhibited suspicious behavior, and, after frisking the complainant for weapons and running a check on the complainant's identification, they informed the complainant that he could leave.

Following completion of its investigation, OPC referred the matter to a complaint examiner. The complaint examiner issued a decision without holding an evidentiary hearing after determining that she had all the evidence necessary to resolve the complaint. The complaint examiner did not find believable the subject officers' statements regarding what had happened, and, instead, credited the story told by the complainant and the complainant's witness. The complaint examiner sustained the harassment and language or conduct allegations against both officers, and sustained the unnecessary or excessive force allegation against the subject officer who held a gun against the complainant's head.

### 2.    *Complaint Examination Example #2*

Two MPD officers came to the complainant's front porch to investigate a verbal disagreement between the complainant and his cousin. At the time of the incident, the complainant and his cousin were 15 years old. The disagreement between the complainant and his cousin quickly ceased upon the arrival of the officers. However, shortly after the officers arrived, the subject officer and the complainant began to argue. As the argument escalated, the subject officer allegedly removed his gun, radio, and police belt and punched the complainant in the face several times. The officer's punches allegedly initiated a fight between the officer and complainant that spilled onto the sidewalk in front of his home and reportedly resulted in the complainant's injury. The complainant was arrested for assault on a police officer and threats to do bodily harm, but the charges were later dropped.

The teenaged complainant alleged that the officer used unnecessary or excessive force against him during the incident. The complainant also alleged that the second MPD officer assisted the subject officer in removing his police belt, and held his police belt while the officer assaulted the complainant, thereby engaging in excessive force against the complainant by failing to intervene in the matter. The subject officer denied striking or fighting the complainant at any time. The second officer stated that the complainant and subject officer engaged in a fight, but claimed that the fight was initiated by the complainant and denied that the subject officer removed his belt.

Following completion of its investigation, OPC referred the matter to a complaint examiner. The complaint examiner issued a decision without holding an evidentiary hearing after determining that she had all the evidence necessary to resolve the complaint. The complaint examiner sustained the allegation of the use of unnecessary or excessive force against the subject officer, determining that the subject officer used unjustified force to bring what he perceived to be an unlawful disorderly situation under control. The complaint examiner found that the subject officer's use of force was unnecessary even if the complainant initiated the fight because the force was so far beyond what was required. However, the complaint examiner

exonerated the second officer on the force allegation, finding that although the second officer was present during the incident, the officer did not have a meaningful opportunity to intervene and prevent the unnecessary use of force.

### 3.    *Complaint Examination Example #3*

The complainant alleged that an MPD officer used language or engaged in conduct toward him that was insulting, demeaning, or humiliating by shouting at him and humiliating him after he failed to move his car in accordance with posted "No Parking" signs. According to the complainant, while parking his car on the side of the street to help his daughter move her belongings out of her apartment following college graduation ceremonies, he was told by the subject officer to "get the hell out of here." The complainant stated that he did as he was ordered, but stopped the car on a nearby street to allow his family to put his daughter's belongings in the trunk and get in the car. The subject officer witnessed the second stop, and the complainant was subsequently arrested by the officer for failure to obey a police order. The complainant alleged that the officer demeaned and humiliated him in front of his family during these two encounters. The subject officer stated that she did not use rude or offensive language toward the complainant when she asked him to move his car, and that there were "No Parking" signs clearly posted on the streets where the complainant stopped.

The complaint examiner conducted an evidentiary hearing, and found that the complainant's language or conduct allegations against the officer were unfounded. The complaint examiner determined that the evidence gathered during the investigation and presented at the hearing did not support the complainant's allegation that the subject officer used demeaning and humiliating language when she instructed him to move his car in accordance with posted "No Parking" signs.

### C.    Discipline

### 1.    *Complaint Examiner Decisions*

All of the decisions that sustained at least one allegation were forwarded to MPD's Chief of Police and the Chief of Police for the D.C. Housing Authority Police Department (DCHAPD) for imposition of discipline, and neither chief has returned any of the decisions for reconsideration yet. One hundred percent acceptance of decisions by a chief from an independent police review agency is exceptional,[3] and is a positive reflection on the quality of OPC's investigations and decisions, as well as the District Government's statute creating OPC, which limits the circumstances under which a complaint may be returned for reconsideration. As of the issuance of this report, the disciplinary process was completed for all but two of the decisions that were issued by the end of fiscal year 2006. The disciplinary process was still pending for one of the decisions, and the DCHAPD Chief of Police was considering requesting reconsideration by a final review panel for the other decision. The final review panel is the only type of appeal of a complaint examiner's decision allowed by OPC's statute and would be the first one ever requested. The process for these two complaints is ongoing and will be completed sometime during fiscal year 2007.

The remaining decisions for which discipline has been imposed included a total of 51 subject officers and a summary of the discipline imposed on these officers is included in Table 3.

**Table 3:  Discipline for Sustained Complaints**

| Discipline or Action Taken | Total |
|---|---|
| | |
| Terminated | 1 |
| Resigned | 1 |
| Retired | 1 |
| 20-Day Suspension | 2 |
| 15-Day Suspension | 6 |
| 10-Day Suspension | 12 |
| 5-Day Suspension | 2 |
| 3-Day Suspension | 4 |
| Official Reprimand | 12 |
| Formal Counseling | 10 |
| | |
| Total | 51 |

OPC will continue to track the discipline imposed by the Chief so that the agency is informed about how MPD handles the decisions referred to it by OPC.

### 2.    *Failure to Cooperate by MPD Officers*

The statute that created OPC requires that MPD employees cooperate fully as requested with OPC's investigation and adjudication of a complaint,[4] and that officers participate in good faith in the mediation process when OPC refers a complaint to mediation.[5]  In 2006, MPD failed or refused to take disciplinary action against officers in an alarmingly high proportion – 92% – of the cases where OPC found that officers had not cooperated with OPC's investigation or mediation of police misconduct complaints.  OPC recently wrote a letter to MPD and pointed out that MPD's inaction violates District of Columbia law, hinders OPC's ability to gather the facts in its investigations, jeopardizes the agency's independence, and has had the effect of encouraging further non-cooperation by officers.

OPC notified MPD of more than 51 separate instances in 2006 where MPD officers failed to cooperate with OPC's investigation, adjudication, or mediation of a police misconduct complaint.  In these cases, some officers have repeatedly failed to appear for an interview at OPC, refused to answer questions asked by investigators, terminated interviews or mediation sessions, refused to provide a statement regarding an incident, or refused to sign a statement certifying the truth of the information they provided.  In 2005, OPC reported 19 similar instances.

In late 2006, MPD reported to OPC that the Department did not take any disciplinary action against the officers in 35 of the 38 cases, or 92%, that had been reviewed by MPD during 2006.  In 22 instances, or 57%, MPD indicated that it could not take disciplinary action against the officers because it was barred from doing so by the Fire and Police Disciplinary Action Procedure Act of 2004.[6]  In 13 instances, or 34%, MPD apparently concluded that disciplinary

action was not warranted despite the information that OPC provided to the Department about the officers' failures to cooperate. The Office of the Independent Monitor also reported on October 30, 2006, that MPD did not take any disciplinary action in 14 of 19 cases, or 73%, reported by OPC to the Department in 2005.[7]

For the 22 notifications where disciplinary action was barred by the Fire and Police Disciplinary Action Procedure Act, which prohibits MPD from imposing discipline on any sworn member of the Department more than 90 business days after the Department is notified of the action leading to the discipline, the only reason that this law was a factor in these cases was because MPD failed to act on the notifications after it received them. Disciplinary action could have, and should have, been taken for the failures to cooperate at issue here, and no discipline was imposed because of MPD's neglect. For the 13 notifications where MPD considered the matters and exonerated the officers, OPC does not know how MPD could have concluded that the conduct in question occurred but did not violate MPD's procedures. In each instance, OPC specifically notified MPD that the officer did not cooperate fully as requested with OPC's investigation. With the possible exception of an officer's failure to appear for an interview where the agency was not aware of circumstances that legitimately prevented the appearance, OPC does not know how a failure to comply with OPC's procedures could not be a violation that warrants discipline by MPD.

While the Department and most MPD officers have cooperated with OPC's investigations, MPD's failure to take disciplinary action in the 49 cases mentioned above has had significant negative consequences for the District's police accountability system by fostering more non-cooperation. These failures to cooperate arose in serious matters reported to OPC alleging unnecessary or excessive use of force, harassment, discrimination, and other possible police misconduct. OPC's ability to investigate these complaints was hindered by MPD allowing some officers to thwart OPC's investigations and by sending a message to other officers that they need not take the process seriously because MPD will not stand behind its legal obligation to ensure that they cooperate. The effects are clear when one considers that OPC sent three notifications to MPD in 2004, 19 in 2005, and more than 51 in 2006. OPC believes that many of the later notifications would not have been necessary if MPD had taken action in response to the earlier ones, thereby sending a clear message about what the Department expects of its officers.

This is a matter of the utmost importance to OPC and OPC's recent letter to MPD seeks corrective action to remedy the situation. Specifically, OPC asked MPD to take the following steps as soon as possible: (1) the Department will promptly review and act upon all notifications from OPC; (2) MPD will take disciplinary action in cases where OPC has determined that an officer has not cooperated fully as requested with OPC's investigation, adjudication, or mediation of a complaint; (3) where MPD's review or investigation of a matter suggests that an officer may have cooperated fully as requested, the Department will promptly share this information with OPC so that the agency can be sure it has reached the appropriate conclusion and is pursing discipline only in cases where it is warranted; and (4) the Department will communicate by directive, postings, or some other means to its employees that they are required by law to cooperate with OPC's investigation, adjudication, or mediation of a police misconduct complaint and that they will be disciplined if they do not.

OPC will continue to pursue this issue with MPD, representatives of the new Mayor's administration, and the District Council in fiscal year 2007.

### D.    Mediation

In fiscal year 2006, OPC, through its mediation service, the Community Dispute Resolution Center (CDRC), mediated 34 complaints, bringing the grand total to 130 complaints mediated. The parties reached an agreement in 21 of the 34 mediation sessions, and these agreements accounted for 8% of all complaints resolved by OPC through adjudication, dismissal, or successful mediation in fiscal year 2006. OPC made considerable efforts to identify appropriate complaints for mediation and increase the number of mediation sessions, which led to a 79% increase this year. Since the program began, 94 of the 130 mediation sessions (or 72%) were successful and resulted in an agreement between the parties that resolved the complaint. The remaining 36 sessions (or 28%) did not result in an agreement, and the underlying complaints were referred back to the executive director for appropriate action. To date, mediators have helped resolve complaints that allege harassment, the use of language or conduct that is insulting, demeaning, or humiliating, discrimination, the use of unnecessary or excessive force not resulting in injury, failure to provide identification, or a combination of the five.

In addition to the statistical success rate, OPC's mediation program was recognized and discussed in a recent American Bar Association (ABA) book published to assist police oversight agencies.[8] The publication described OPC's program and how it compares to others around the country. Participants in the program have also reported positively on the program. A survey of the participants conducted by CDRC indicated that the overwhelming majority of complainants and subject officers who responded found the mediator to be helpful or very helpful, the mediation session to be satisfactory or very satisfactory, and the resulting agreement to be fair or very fair. In addition, 48% of the respondents left their mediation session with more positive feelings about the other party, while only 9% had more negative feelings, and 43% indicated no change in their feelings. Finally, OPC is proactively taking steps to protect the integrity of the mediation process by dismissing complaints and pursuing discipline of officers when one of the parties fails to appear for mediation or refuses to participate in the mediation process in good faith.

OPC has been very pleased with the success of the mediation program, and plans to continue to use it regularly. The main challenge will be to identify enough complaints suitable for mediation to maintain the high number of mediation sessions that the agency held in fiscal year 2006.

As an illustration of the types of complaints that were referred to mediation in fiscal year 2006, the following are three examples that describe the complaint and the mediation session:

### 1.    Mediation Example #1

A citizen filed a complaint after being stopped for allegedly talking on her cellular telephone while driving. When she arrived for the mediation, the complainant was very upset and angry. She began by loudly accusing the officer of inappropriately stopping her and wrongly accusing her of using her cellular telephone. She explained that, at the time, she was not using

the telephone and was a victim of police harassment. She went on in a loud voice and angry tone to accuse the officer of inappropriately pulling her over and giving her a ticket.

The officer responded in a similar tone. He said he was angry at being accused and attacked for just doing his job. He remembered the incident very clearly and was certain he had seen her on the telephone. Both the complainant and the officer yelled and accused each other of not telling the truth.

The mediator met privately with both the complainant and the officer. The complainant explained that she was especially distressed when the officer pulled her over because it brought back memories of a previous incident in which she was pulled over and falsely accused by a police officer. She recalled that, because of the previous incident, she became very agitated and yelled at the officer. She maintained that she was not using her telephone, and could prove it with billing records. After having the opportunity to vent for a while, the complainant acknowledged that her behavior had contributed to the escalation of the incident.

In a private meeting with the mediator, the officer explained that when he stopped the complainant he was certain that she was using her cellular telephone, and had intended to issue her only a warning. It was only after she became so angry and verbally out of control that he gave her the ticket. He could not understand why she was so enraged and believed her accusations were completely unfounded and inappropriate. When he learned of her previous experience and her explanation as to why she was so upset, he was willing to consider the situation from her perspective.

Both the complainant and the officer then talked to each other about how the situation had escalated. The complainant acknowledged that she spoke inappropriately and would make an effort to control her anger in the future. She apologized to the officer. They agreed to put the incident behind them. The officer agreed to appear in traffic court with the complainant and assist her in responding to the ticket.

## 2.    *Mediation Example #2*

A woman filed a complaint alleging that an officer discriminated against her and her male friend because of their sexual orientation and used language that was insulting, demeaning, and humiliating. She recounted that she and her friend were walking from a Metro station after work when they were harassed and threatened by some teenagers who chased them with a gun. She called 911 and an officer appeared shortly thereafter. However, she said that when she tried to explain what happened, the officer would not let her talk and yelled at her and her friend. She believed that the officer made disparaging comments about her and her friend because they were gay and accused them of not telling the truth when the officer was unable to find a gun on the teenagers.

At the mediation, the officer listened to the woman describe the incident and explain why she was so upset about his behavior and language. He then recounted how chaotic the situation was with several people at the scene and conflicting stories from different people. He apologized immediately for not listening to her at the time. He said that he normally tries to listen to people and remembers that on this particular occasion there was so much confusion that he did not pay

as much attention as he should have. As they talked, the citizen explained that this was not the first time the teens had harassed her and that she uses this Metro station regularly. That, and her belief that they did have a gun, was why she was so upset at the time. She acknowledged that because she was upset, she was talking very fast and interrupting the officer, which may have made it harder for him to hear her.

The officer explained the comments that he had made that evening and the citizen realized that she had misinterpreted what he had said. Each of them apologized to the other for the miscommunication. The officer provided his contact information so that the citizen could contact him if these teenagers bothered her again. The citizen expressed appreciation for the officer's willingness to participate in the mediation and for the good work that MPD officers do for all citizens of the District of Columbia.

### 3.    *Mediation Example #3*

A citizen filed a complaint against an officer alleging harassment and intimidation directed at her and her daughter. The complainant was driving with her four-year-old daughter on West Virginia Avenue, N.E., and was pulled over by an officer for traveling 40 miles per hour in a 25 m.p.h. zone. Soon after she was pulled over, four additional squad cars arrived. The complainant felt overwhelmed and intimidated by all of the officers and thought it was excessive for a speeding violation. The officer told the complainant that she had been speeding and that her car windows were illegally tinted. The complainant was unaware of tint laws in the District and tried to explain to the officer that she had recently purchased the car from the dealer directly from the manufacturer and had not altered the windows in any way. The officer appeared to be more concerned about the illegal tint than the speeding violation.

When the parties entered the mediation room, they were both agitated and defensive. As the complainant related what had happened to her, she accused the officer of harassment, racial profiling, intimidation, and rude behavior and language. She felt that having so many officers at the scene threatened her and her daughter when it was obvious that a single mother driving with a four-year-old was not a threat to anyone's safety. She thought the officer was rude and offensive because he kept insisting she had added illegal tint to her windows.

The officer had little patience with the complainant and was adamant that all drivers should know all District regulations including those covering illegal tint. He stated that had the complainant not had such a bad attitude during their interaction, he would only have given her a speeding ticket and not fined her for the illegal tint. He also explained that safety was a huge concern for officers, especially in the neighborhood of the stop, and that when cars have illegally tinted windows, it is impossible to see who is in the vehicle and impossible to determine whether any of the passengers are armed.

The mediator asked about the safety issues concerning tinted windows and the officer mentioned that another officer had recently been shot and killed through a tinted back window when he was unable to see that the passenger had a gun. He stated that since then officers have been on high alert when dealing with vehicles with tinted windows. The complainant was surprised to hear that tinted windows were such a concern but she was also still frustrated that the officer felt she had deliberately added extra tint to her windows.

The mediator asked the complainant about the purchase of the vehicle and the status of the windows. The complainant showed the officer and the mediator her bill of sale, including a description of the tint. A discussion ensued where the officer explained that there were various degrees of tint that were legal and that there were actually machines that measured the percentage of tint on a window. In addition, the tint laws vary from state to state, and are different in the District, Maryland, and Virginia. The complainant stated that the vehicle had been purchased in Maryland and she asked the officer how she could determine whether the tint percentage of her windows was legal in the District. The officer asked to look at the description on the bill of sale and saw that the windows were directly from the manufacturer as she had previously stated.

At this point, both the officer and complainant seemed to relax and shifted from an accusatory, defensive posture to an inquisitive one. The complainant used the mediation as a time to become more informed about the tint laws and to ask the officer's assistance in determining the percentage of her windows as well as what she could do to correct the situation. The officer explained a few different options and they began to speak directly to each other, politely and with respect. The complainant said she was sorry she had not realized the danger that tinted windows presented for officers and that she had been defensive because she had not understood and actually thought the speeding violation was the greater infraction.

The officer then asked the complainant when her hearing was and told her to bring the bill of sale and description of the vehicle with her. He then promised to be present at the hearing to seek to dismiss the charges or waive the tickets. By this time, the mood and tone of the session had completely transformed. Both parties were smiling and at ease and the complainant actually apologized to the officer for filing the complaint and wasting his valuable time and taking time away from his job. The officer also apologized for anything he may have done to make the complainant feel scared or intimidated. At the end of the session, the complainant agreed to not pursue her complaint and the parties shook hands and said they would see each other at the traffic hearing.

Following the mediation, the officer took the time to call both OPC and CDRC to express his gratitude to the mediator and for the opportunity to participate in mediation. He also stated he would tell his fellow officers about his positive experience.

### E.    Investigations

OPC's investigative unit continued its critical work collecting the facts about and analyzing the allegations contained in the police misconduct complaints received by the agency. The organization and operation of the unit was generally the same this year after several years that saw the expansion, reorganization, and enhancement of the unit. To give a sense of the work done by OPC's investigators in fiscal year 2006, they conducted over 750 interviews during the year, which included more than 400 police officer and 350 citizen interviews. In approximately half of the interviews, a second investigator participated consistent with OPC's policy. From the interviews and other investigative work, the agency completed 251 investigative reports, which was a 5% increase over fiscal year 2005. The increase in the number of completed reports can be partially attributed to OPC's continued work evaluating and improving its report formats.

Among all of the complaints received by OPC in fiscal year 2006, the agency had one that was particularly noteworthy. Even though the agency is required to refer approximately 15% of its complaints each year to the U.S. Attorney's Office for the District of Columbia for review for possible criminal prosecution of the subject officers, OPC had its first complaint this year that led to an indictment of a police officer by a grand jury in the District.[9] In November 2006, an MPD officer was indicted on charges that he sexually assaulted a woman after pulling her over for a traffic stop. The traffic stop occurred in the fall of 2005 in the early morning hours. After learning that the woman, who spoke only Spanish, did not have a driver's license, the officer told the woman to drive to Rock Creek Park so they could resolve the matter. The officer then forced the woman to engage in various sex acts. After receiving the complaint, OPC promptly notified MPD's Internal Affairs Division, which investigated the matter and pursued the prosecution with the U.S. Attorney's Office. While the indictment is a significant development in this particular case, the fact that there has been only one indictment returned among the hundreds of complaints referred to the U.S. Attorney's Office by OPC in the six years that the agency has been open also highlights the importance of OPC as a forum to seek redress of police misconduct allegations that are not pursued by the U.S. Attorney's Office.

**F.    Statistics**

In an effort to describe the work performed by OPC, the nature and location of the complaints that the office received, and the characteristics of the complainants and subject officers, OPC has collected the statistics included in this section.[10] At the end of OPC's sixth year of operation, the statistics collected by the agency show significant growth in the number of contacts and complaints received by the agency, and the success that the agency has achieved in increasing its efficiency and productivity over the past few years. The agency has increased the number of investigations completed and complaints closed, which, for fiscal year 2006, as in fiscal years 2004 and 2005, was larger than the number of complaints opened. As a consequence, OPC's number of open complaints went down by an additional 8% at the end of fiscal year 2006.

### *1.    Contacts and Formal Complaints*

Under the statute and regulations governing OPC, all complaints must be reduced to writing and signed by the complainant, who must certify the truth of the statements in the complaint. Once a complaint has met these requirements, it is referred to as a "formal complaint." OPC is regularly contacted by people who inquire about filing a complaint, but who have not yet submitted a signed complaint form. When this happens, OPC contacts the person and attempts to obtain a formal complaint by mailing a form to the person or giving him or her instructions about filing a complaint in person. If no formal complaint is received, the file related to that contact is closed. OPC is also contacted about a variety of issues that do not fall within the jurisdiction of the office. The agency collects information about each contact, enters it into its complaint management software (CMS), and refers the person to the appropriate agency or office. In fiscal year 2004, OPC modified its process to more clearly separate and track contacts that raise issues outside the agency's jurisdiction, which resulted in a noticeably larger number of these contacts being recorded during fiscal years 2004, 2005, and 2006.

- 15 -

Table 4 indicates the total number of contacts received by OPC in fiscal years 2002 through 2006, the number of formal complaints that resulted in each year, and the disposition of each contact that did not result in a formal complaint. Since the agency opened in January 2001, it has had 3,887 contacts and received 1,991 complaints. In fiscal year 2006, OPC saw significant increases in both the number of contacts and the number of formal complaints. The number of contacts increased by 32% (from 674 to 889) and the number of complaints increased by 27% (from 326 to 414) from fiscal year 2005 to fiscal year 2006. It is difficult to know what caused such large increases this year, but there are two factors that seem likely to have contributed to the size of the increases. Through efforts made by MPD to make complaint forms available to the public, OPC's complaint forms and materials became more widely available, which has made filing a complaint with our agency an option for more people. The District also declared a crime emergency this summer, which likely increased the number of officer-citizen contacts that occurred during July, August, and September.

**Table 4:  Contacts and Formal Complaints**

|  | FY02 | FY03 | FY04 | FY05 | FY06 |
|---|---|---|---|---|---|
| **Total Contacts** | 535 | 613 | 699 | 674 | 889 |
|  |  |  |  |  |  |
| **Closed – Outside Agency Jurisdiction, Etc.** | 36 | 55 | 297 | 184 | 232 |
| **Closed – No Formal Complaint** | 181 | 197 | 140 | 164 | 243 |
|  |  |  |  |  |  |
| **Total Formal Complaints** | 318 | 361 | 262 | 326 | 414 |

To illustrate the increases over the last two years in the number of formal complaints, Table 5 and Chart 5 indicate the number of complaints received each month during fiscal years 2004 through 2006. This table and chart give some sense of when the increases took place that led to 24% and 27% increases for the last two years. The data here are depicted on an area chart that shows a line connecting the number of complaints received each month with a colored area under the line. Fiscal year 2004 is the shaded area that is completely visible on the chart, and it is laid over the top of the areas that represent fiscal years 2005 and 2006. For the later years, only the months where OPC received more complaints than in the earlier years are visible.

**Table 5:  Formal Complaints per Month**

|  | FY04 | FY05 | FY06 |
|---|---|---|---|
| **October** | 28 | 23 | 25 |
| **November** | 38 | 19 | 24 |
| **December** | 15 | 21 | 26 |
| **January** | 21 | 13 | 27 |
| **February** | 21 | 30 | 26 |
| **March** | 21 | 34 | 40 |
| **April** | 24 | 26 | 33 |
| **May** | 17 | 41 | 39 |
| **June** | 33 | 34 | 28 |
| **July** | 21 | 27 | 50 |
| **August** | 22 | 44 | 51 |
| **September** | 24 | 18 | 45 |

**Chart 5: Formal Complaints per Month**



2.    *Disposition of Formal Complaints*

Each year, OPC works to resolve as many formal complaints as possible. Complaints are closed because they were dismissed in accordance with the OPC statute, successfully mediated, or adjudicated through OPC's complaint examination process. Complaints are also referred to MPD because they contain allegations that are not within OPC's jurisdiction to investigate or they were filed more than 45 days after the incident occurred, and some complaints are referred to other law enforcement agencies when the complaints relate to another agency's officers. Finally, some complaints are withdrawn by the complainant or closed for administrative reasons.

Table 6 indicates the total number of formal complaints that were closed in fiscal years 2002 through 2006, as well as the specific disposition of each complaint. In fiscal years 2004, 2005, and 2006, the total number of complaints closed by OPC grew by 33%, 18%, and 18%, respectively. This year's increase was driven by a 13% increase in complaints resolved by OPC through adjudication, dismissal, or successful mediation. The progress illustrated by this table reflects OPC's increased efficiency in handling the complaints filed with the agency and shows changes that have been instrumental in allowing the agency to close more complaints than it opened for the past three years.

**Table 6:  Disposition of Formal Complaints**

|  | FY02 | FY03 | FY04 | FY05 | FY06 |
|---|---|---|---|---|---|
| Adjudicated | -- | 19 | 16 | 17 | 19 |
| Dismissed | 91 | 75 | 145 | 211 | 232 |
| Successfully Mediated | 13 | 15 | 25 | 13 | 21 |
| Withdrawn by Complainant | 17 | 9 | 26 | 25 | 24 |
| Referred to MPD | 88 | 90 | 62 | 65 | 93 |
| Referred to Other Police Agencies | 1 | 18 | 11 | 3 | 3 |
| Administrative Closures | 12 | 9 | 27 | 34 | 43 |
|  |  |  |  |  |  |
| Closed Formal Complaints | 222 | 235 | 312 | 368 | 435 |

### 3.    Status of Pending Formal Complaints at the End of Each Fiscal Year

At the end of each fiscal year, there are a number of formal complaints that are still pending.  Table 7 indicates the total number of complaints from all years that were open at the end of fiscal years 2002 through 2006.  The table also indicates the general status of the open complaints, which includes assigned to a complaint examiner and awaiting a decision, referred into the mediation process, referred for review by the U.S. Attorney's Office for possible criminal prosecution of the subject officer, referred to a PCB member for review, awaiting the subject officer's objections to the investigative report before the complaint is assigned to a complaint examiner, currently under investigation, currently under investigation with a preliminary investigative report drafted and being reviewed, or awaiting the initial executive decision about how to proceed with a new complaint.  Chart 7 depicts how the total number of complaints open at the end of each fiscal year has changed over the past five years.

The most noteworthy change for fiscal year 2006 is the decrease in the number of open complaints by 8%.  This is the third year in a row that OPC closed more complaints than it opened during the course of the year, and the decrease occurred despite the fact that the agency received 88 more complaints in fiscal year 2006.  The data also show that OPC's investigators held the number of complaints under investigation constant, despite the increase in the number of complaints received by OPC.  This reflects well on the investigators' efficiency, but shows the additional burden they must bear as OPC receives a higher number of complaints.  Had OPC received a similar number of complaints as last year, the decrease in the number of open complaints would have been much larger this year and investigators would have had a much more manageable caseload that would have allowed them to spend more time on each investigation and complete it more quickly.  There was also a 40% decrease in the number of complaints that had a preliminary investigative report drafted and under review.  This number shows the increased efficiency and productivity of the agency's investigative staff and management in reviewing and finalizing investigations.

**Table 7:  Status of Pending Formal Complaints at the End of Each Fiscal Year**

|  | FY02 | FY03 | FY04 | FY05 | FY06 |
|---|---|---|---|---|---|
| **Assigned to Complaint Examiner** | -- | 12 | 9 | 5 | 4 |
| **Referred for Mediation** | 10 | 11 | 5 | 18 | 12 |
| **Referred to U.S. Attorney's Office** | 15 | 18 | 10 | 25 | 30 |
| **Referred to PCB Member** | -- | -- | -- | 14 | 12 |
| **Awaiting Subject Officer Objections** | -- | -- | -- | 2 | 2 |
| **Under Investigation by OPC** | 130 | 232 | 224 | 157 | 160 |
| **Under Investigation / Report Drafted** | 80 | 79 | 73 | 58 | 35 |
| **Executive Decision** | 4 | 7 | -- | -- | 3 |
|  |  |  |  |  |  |
| **Total Number of Open Complaints** | 239 | 359 | 321 | 279 | 258 |

**Chart 7:  Number of Open Formal Complaints at the End of Each Fiscal Year**



### 4.    OPC Workload

OPC closes complaints each year at one of three different points in the life of the complaint.  First, complaints are closed shortly after they are received because they are referred to MPD or another police agency.  These are complaints that are outside OPC's jurisdiction.  In general, the only work that OPC performs on these complaints is to conduct an initial investigation to confirm the nature of the complaint, and then prepare and send the complaint and related materials to the appropriate agency.  Second, complaints are closed because the complainant withdraws the complaint or for other administrative reasons.  These complaints require varying amounts of work by OPC depending on when the complainant withdraws the complaint, which may occur at any point up through a final decision, or when the event occurs that triggers administrative closure.  Some of the events that trigger administrative closure, which also may occur at any time, include the resignation of an officer from MPD or the

completion of an investigation by MPD into the same allegations that results in the discipline of the officer. Finally, complaints are closed after they have been resolved by OPC. OPC resolves complaints by adjudication, dismissal, or successful mediation. These complaints generally require the most work, including a full investigation, the completion of an investigative report, and any other related adjudication, dismissal, or mediation processes.

Table 8 collects statistics from the three preceding sections of this part of the report to illustrate the proportion of complaints that are closed at the three different points in the life of a complaint. First, the table shows the number of formal complaints that OPC received each fiscal year. Next, the table subtracts the number of complaints referred to MPD or another police agency to arrive at the number of formal complaints that fall within OPC's jurisdiction. After that, Table 8 subtracts the complaints that reach a point short of final resolution where they require no further action, such as those that are withdrawn or are administratively closed, to arrive at the number of complaints that require resolution by OPC. Finally, the table subtracts the number of complaints resolved in each fiscal year. The resulting number shows either: (1) the number of complaints that require resolution by OPC but that are carried over to the next fiscal year unresolved; or (2) the number by which the total number of open complaints is reduced from one year to the next, which is a negative number signified with parentheses. Thus, each fiscal year begins with a number of complaints already open that need to be resolved, and new complaints are received over the course of the fiscal year. For a graphical depiction, Chart 8 includes lines indicating the number of complaints that require resolution by OPC and the number of complaints resolved by OPC. The distance between the two lines on Chart 8 represents the number of complaints that are carried over to the next fiscal year unresolved or the amount by which the number of open complaints is reduced.

OPC's increased efficiency and productivity are clearly displayed in both the table and the chart. In fiscal year 2004, the increased efficiency and productivity, together with a smaller number of complaints received by the agency, resulted in OPC having its first year where it closed more complaints than it opened. Further increases in efficiency and productivity are obvious in fiscal years 2005 and 2006 as well, where OPC had its second and third years in a row where it closed more complaints than it opened. This happened despite the fact that the agency received 64 more complaints in fiscal year 2005 and 88 more in fiscal year 2006, of which 61 and 54, respectively, required resolution by the agency. OPC is making every effort to continue to enhance its efficiency and productivity so the agency can keep up with the new complaints it receives, as well as resolve any complaints that are backlogged.

**Table 8:  OPC Workload**

|  | FY02 | FY03 | FY04 | FY05 | FY06 |
|---|---|---|---|---|---|
| **Total Formal Complaints** | 318 | 361 | 262 | 326 | 414 |
|  |  |  |  |  |  |
| **Referred to MPD or Other Agency** | 89 | 108 | 73 | 68 | 96 |
| **Complaints in OPC's Jurisdiction** | 229 | 253 | 189 | 258 | 318 |
|  |  |  |  |  |  |
| **Complaints Requiring No Further Action (Withdrawn or Administratively Closed)** | 29 | 18 | 53 | 59 | 67 |
| **Complaints Requiring Resolution by OPC** | 200 | 235 | 136 | 199 | 251 |
|  |  |  |  |  |  |
| **Complaints Resolved (Adjudication, Dismissal, and Successful Mediation)** | 104 | 109 | 186 | 241 | 272 |
| **Unresolved Complaints Each Fiscal Year** | 96 | 126 | (50) | (42) | (21) |

**Chart 8:  OPC Workload**



Complaints Resolved (Adjudication, Dismissal, and Successful Mediation) — Complaints Requiring Resolution by OPC

### 5.     Allegations in Formal Complaints

Each formal complaint may contain allegations of more than one type of misconduct, including harassment, the use of unnecessary or excessive force, the use of language or conduct that is insulting, demeaning, or humiliating, discriminatory treatment, retaliation for filing a complaint with OPC, or failure to wear or display required identification or to identify oneself by name and badge number when requested to do so by a member of the public.  In addition, complainants often allege other conduct that does not fall within the six types of misconduct under OPC's jurisdiction.

Table 9 indicates the total number of allegations contained in all of the formal complaints received in fiscal years 2002 through 2006.  In total, since the agency opened, the 1,991

complaints received by OPC have contained 3,173 allegations. Table 9 and Chart 9 also indicate the percentage of the total number of allegations that each type of allegation constitutes.

**Table 9: Allegations in Formal Complaints**

|  | FY02 | | FY03 | | FY04 | | FY05 | | FY06 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Language/Conduct | 154 | 34.5% | 197 | 37.2% | 180 | 37.0% | 188 | 34.4% | 234 | 31.8% |
| Harassment | 125 | 28.0% | 136 | 25.7% | 131 | 27.0% | 176 | 32.2% | 222 | 30.1% |
| Excessive Force | 104 | 23.3% | 99 | 18.7% | 97 | 20.0% | 101 | 18.5% | 107 | 14.5% |
| Discrimination | 18 | 4.0% | 30 | 5.7% | 42 | 8.6% | 39 | 7.1% | 71 | 9.6% |
| Retaliation | 5 | 1.1% | 6 | 1.1% | 6 | 1.2% | 4 | 0.7% | 3 | 0.4% |
| FTP Identification | -- | -- | -- | -- | -- | -- | 6 | 1.1% | 34 | 4.6% |
| Other | 40 | 9.0% | 61 | 11.5% | 30 | 6.2% | 33 | 6.0% | 66 | 9.0% |
|  |  |  |  |  |  |  |  |  |  |  |
| Total Allegations | 446 | | 529 | | 486 | | 547 | | 737 | |

**Chart 9: Allegations in Formal Complaints (as a Percentage)**



## 6.    *Complainant Race or National Origin, Gender, and Age*

When a person files a complaint, the individual is asked to identify his or her race or national origin, gender, and date of birth.[11] The following tables and charts reflect the information provided by each complainant. In general, the columns in the tables and the bars on the charts reflect the information for each complaint, not eliminating duplicates of complainants who filed multiple complaints. In some tables, OPC was able to include information regarding the number of "unique complainants," meaning that OPC eliminated duplicate complainants. Some tables and charts also include U.S. Census information regarding the composition of the population of the District of Columbia as a whole.[12]

In fiscal year 2006, there was some noticeable fluctuation in the proportion of complainants falling into the various race or national origin groups, while the proportion of complainants falling into the various gender and age groups remained relatively consistent. The race or national origin data show a 5% decrease in the proportion of African-American complainants, a 5% increase in the proportion of white complainants, and 1% increases in the proportions of Latino and Asian complainants. These changes were occurring at the same time that the District's African-American population was decreasing and its white, Latino, and Asian populations were increasing. In general, the race or national origin of OPC complainants has varied noticeably from the District's population each year but the changes in fiscal year 2006 brought the proportions of OPC complainants closer to the proportions in the population. Nevertheless, OPC will continue to monitor the disproportionately high number of African-American complainants when compared with the District's population.

The gender data, which are relatively consistent from year to year, also continue to vary from the District population with a higher proportion of male complainants and a lower proportion of female complainants. The age data were generally consistent in fiscal year 2006 with one noticeable exception; complaints between the ages of 15 and 24 dropped by 8%. This change makes the variation between the age of complainants and the age of the District population even sharper among people under 25. Based on information learned during its outreach programs and other anecdotal information, OPC would expect younger people to make up a larger proportion of complainants. OPC will continue to monitor these statistics for any patterns and for any guidance on populations that may require more outreach by the agency. To illustrate the relationship between age of complainants and the age of the District population, the data is displayed on a line chart showing the proportions of complainants for each year and the District population in the different age groups.

With respect to "unique complainants," 402 different people filed the 414 complaints received by OPC, and there were 12 complainants who filed two complaints in fiscal year 2006.

**Table 10: Complainant Race or National Origin**

|  | FY02 | | FY03 | | FY04 | | FY05 | | FY06 | | District Pop. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| African-American | 219 | 76.0% | 197 | 67.5% | 179 | 71.0% | 241 | 78.0% | 287 | 73.0% | 57.2% |
| White | 46 | 16.0% | 62 | 21.2% | 51 | 20.2% | 43 | 13.9% | 73 | 18.6% | 29.0% |
| Latino | 16 | 5.6% | 14 | 4.8% | 13 | 5.2% | 9 | 2.9% | 17 | 4.3% | 8.9% |
| Asian | 4 | 1.4% | 7 | 2.4% | 2 | 0.8% | 2 | 0.6% | 6 | 1.5% | 2.9% |
| Middle Eastern | 1 | 0.3% | 10 | 3.4% | 1 | 0.4% | 3 | 1.0% | 2 | 0.5% | -- |
| Native American | 1 | 0.3% | 1 | 0.3% | 6 | 2.4% | 1 | 0.3% | 1 | 0.3% | 0.2% |
| Multiracial / Other | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% | 10 | 3.2% | 7 | 1.8% | 1.7% |
| Unreported | 30 | | 69 | | 10 | | 17 | | 21 | | |
| | | | | | | | | | | | |
| Total | 318 | | 361 | | 262 | | 326 | | 414 | | |

**Chart 10: Complainant Race or National Origin (as a Percentage)**



**Table 11: Complainant Gender**

|  | FY02 | | FY03 | | FY04 | | FY05 | | FY06 | | District Pop. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Male** | 174 | 54.9% | 201 | 55.7% | 141 | 54.2% | 176 | 54.0% | 222 | 53.6% | 47.0% |
| **Female** | 143 | 45.1% | 160 | 44.3% | 119 | 45.8% | 150 | 46.0% | 192 | 46.4% | 53.0% |
| **Unreported** | 1 | | -- | | 2 | | -- | | -- | | |
| **Total** | 318 | | 361 | | 262 | | 326 | | 414 | | |

**Chart 11: Complainant Gender (as a Percentage)**



**Table 12:  Complainant Age**

|  | FY03 | | FY04 | | FY05 | | FY06 | | District Pop. |
|---|---|---|---|---|---|---|---|---|---|
| Under 15 | -- | -- | 1 | 0.4% | -- | -- | 1 | 0.3% | 18.0% |
| 15-24 | 37 | 18.0% | 39 | 15.8% | 57 | 17.9% | 39 | 10.0% | 10.1% |
| 25-34 | 53 | 25.7% | 60 | 24.3% | 82 | 25.8% | 109 | 27.9% | 20.4% |
| 35-44 | 56 | 27.2% | 68 | 27.5% | 78 | 24.5% | 110 | 28.1% | 15.3% |
| 45-54 | 46 | 22.3% | 57 | 23.1% | 72 | 22.6% | 86 | 22.0% | 13.6% |
| 55-64 | 10 | 4.9% | 14 | 5.7% | 21 | 6.6% | 30 | 7.7% | 10.5% |
| 65 and Older | 4 | 1.9% | 8 | 3.2% | 8 | 2.5% | 16 | 4.1% | 12.1% |
| Total | 206 | | 247 | | 318 | | 391 | | |

**Chart 12:  Complainant Age (as a Percentage)**



**Table 13:  Complainant Race or National Origin with "Unique Complainant" Information**

|  | FY02 | FY02 Unique Comp. | FY03 | FY03 Unique Comp. | FY04 | FY04 Unique Comp. | FY05 | FY05 Unique Comp. | FY06 | FY06 Unique Comp. |
|---|---|---|---|---|---|---|---|---|---|---|
| African-American | 219 | 208 | 197 | 190 | 179 | 176 | 241 | 225 | 287 | 280 |
| White | 46 | 46 | 62 | 59 | 51 | 43 | 43 | 43 | 73 | 71 |
| Latino | 16 | 16 | 14 | 14 | 13 | 13 | 9 | 9 | 17 | 17 |
| Asian | 4 | 4 | 7 | 6 | 2 | 2 | 2 | 2 | 6 | 6 |
| Middle Eastern | 1 | 1 | 10 | 6 | 1 | 1 | 3 | 3 | 2 | 2 |
| Native American | 1 | 1 | 1 | 1 | 6 | 1 | 1 | 1 | 1 | 1 |
| Multiracial / Other | 1 | 1 | 1 | 1 | 0 | 0 | 10 | 10 | 7 | 5 |
| Unreported | 30 | 30 | 69 | 68 | 10 | 10 | 17 | 17 | 21 | 20 |
|  | | | | | | | | | | |
| Total | 318 | 307 | 361 | 345 | 262 | 246 | 326 | 310 | 414 | 402 |

**Table 14:  Complainant Gender with "Unique Complainant" Information**

|  | FY02 | FY02 Unique Comp. | FY03 | FY03 Unique Comp. | FY04 | FY04 Unique Comp. | FY05 | FY05 Unique Comp. | FY06 | FY06 Unique Comp. |
|---|---|---|---|---|---|---|---|---|---|---|
| **Male** | 174 | 166 | 201 | 190 | 141 | 126 | 176 | 168 | 222 | 218 |
| **Female** | 143 | 140 | 160 | 155 | 119 | 118 | 150 | 142 | 192 | 184 |
| **Unreported** | 1 | 1 | -- | -- | 2 | 2 | -- | -- |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
| **Total** | 318 | 307 | 361 | 345 | 262 | 246 | 326 | 310 | 414 | 402 |

### 7.    Subject Officer Race or National Origin, Gender, and Assignment

When a person files a complaint, OPC records the race or national origin, gender, and assignment of the subject officer in the complaint.  In some instances the complainant is able to identify the subject officer, and in others, OPC determines the identity of the officer during the course of its investigation.  In other instances, the complainant is not able to identify the subject officer and the identity of the officer remains unknown.  The following tables and charts reflect the information for officers who could be identified or whose information was reported by the complainant.  In general, the columns in the tables and the bars on the charts reflect the information for each subject officer, not eliminating duplicates of officers who were the subject of multiple complaints.  In some tables, OPC was able to include information regarding the number of "unique officers," meaning that OPC eliminated duplicate officers.  Some tables and charts also include information regarding the composition of the entire work force of MPD officers.[13]

From year to year, the proportions of subject officers falling into the various race or national origin and gender groups have remained relatively consistent.  However, over the period from fiscal year 2002 to fiscal year 2006, the race or national origin of subject officers has been on a trend that has steadily decreased the proportion of African-American subject officers from 63% to 56% of the total and increased the proportion of white subject officers from 28% to 33% of the total.  Over this same time period, the race or national breakdown of the entire police force was changing in the same way, although not to as great a degree.  Nevertheless, the entire police force still has a lower proportion of white officers and a higher proportion of African-American officers than the subject officer proportions, as it has in most years.  The gender data also continue to vary from the entire police force with a noticeably higher proportion of male subject officers and noticeably lower proportion of female subject officers.  The data regarding the assignments of subject officers have fluctuated from year to year, as they did again this year.  OPC cannot fully account for the variation, and the data may be somewhat skewed as a result of the reentry of data in the CMS in fiscal year 2004 or the accuracy of the assignment data available to OPC at any given time.  Another factor that may be relevant is the reorganization of the Department's Police Service Areas (PSAs) in May 2004.  In any event, readers should use caution when attempting to draw conclusions from the year-to-year trends regarding the assignments of subject officers.

With respect to "unique officers," 484 different officers were identified as the 597 subject officers in the complaints filed with OPC in fiscal year 2006.  There were 53 officers who were identified as the subject officer in two different complaints, 21 officers identified in three

complaints, two officers identified in four complaints, and three officers identified in five complaints.

For reference purposes, a map indicating the location of the seven police districts used by MPD is included in Appendix A. In this year's report, to help give a better sense of where complaint incidents occurred around the city, the police district map also indicates these locations.

**Table 15: Subject Officer Race or National Origin**

|  | FY02 | | FY03 | | FY04 | | FY05 | | FY06 | | Entire Police Force |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **African-American** | 221 | 62.8% | 205 | 59.1% | 170 | 59.4% | 219 | 55.3% | 270 | 55.8% | 62.6% |
| **White** | 98 | 27.8% | 112 | 32.6% | 94 | 32.9% | 135 | 34.1% | 161 | 33.3% | 29.3% |
| **Latino** | 26 | 7.4% | 18 | 5.2% | 17 | 5.9% | 25 | 6.3% | 31 | 6.4% | 6.7% |
| **Asian** | 6 | 1.7% | 6 | 1.7% | 4 | 1.4% | 9 | 2.3% | 15 | 3.1% | 1.4% |
| **Other** | 1 | 0.3% | 5 | 1.4% | 1 | 0.4% | 8 | 2.0% | 7 | 1.4% | -- |
| **Unidentified** | 48 | | 71 | | 41 | | 72 | | 113 | | |
| **Total** | 400 | | 417 | | 327 | | 468 | | 597 | | |

**Chart 15: Subject Officer Race or National Origin (as a Percentage)**



**Table 16:  Subject Officer Gender**

| | FY02 | | FY03 | | FY04 | | FY05 | | FY06 | | Entire Police Force |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Male** | 300 | 84.0% | 293 | 83.0% | 266 | 85.0% | 330 | 83.3% | 396 | 81.8% | 76.4% |
| **Female** | 57 | 16.0% | 60 | 17.0% | 47 | 15.0% | 66 | 16.7% | 88 | 18.2% | 23.6% |
| **Unidentified** | 43 | | 64 | | 14 | | 72 | | 113 | | |
| **Total** | 400 | | 417 | | 327 | | 468 | | 597 | | |

**Chart 16:  Subject Officer Gender (as a Percentage)**



**Table 17:  Subject Officer Assignment**

| | FY02 | | FY03 | | FY04 | | FY05 | | FY06 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **First District (1D)** | 27 | 7.5% | 34 | 9.7% | 36 | 11.1% | 67 | 14.8% | 93 | 16.6% |
| **Second District (2D)** | 38 | 10.5% | 37 | 10.6% | 34 | 10.5% | 27 | 5.9% | 35 | 6.3% |
| **Third District (3D)** | 108 | 29.8% | 92 | 26.4% | 56 | 17.3% | 82 | 18.1% | 128 | 22.9% |
| **Fourth District (4D)** | 57 | 15.8% | 37 | 10.6% | 62 | 19.1% | 84 | 18.5% | 87 | 15.5% |
| **Fifth District (5D)** | 51 | 14.1% | 52 | 14.9% | 45 | 13.9% | 50 | 11.0% | 55 | 9.8% |
| **Sixth District (6D)** | 21 | 5.8% | 24 | 6.9% | 36 | 11.1% | 56 | 12.3% | 54 | 9.6% |
| **Seventh District (7D)** | 40 | 11.1% | 23 | 6.6% | 28 | 8.6% | 69 | 15.2% | 57 | 10.2% |
| **Other[14]** | 20 | 5.5% | 45 | 12.9% | 24 | 7.4% | 14 | 3.1% | 47 | 8.4% |
| **D.C. Housing Authority** | -- | 0.0% | 5 | 1.4% | 3 | 0.9% | 5 | 1.1% | 4 | 0.7% |
| **Unidentified** | 38 | | 68 | | 3 | | 14 | | 37 | |
| **Total** | 400 | | 417 | | 327 | | 468 | | 597 | |

**Chart 17:  Subject Officer Assignment (as a Percentage)**



**Table 18:  Subject Officer Race or National Origin with "Unique Officer" Information**

| | FY02 | FY02 Unique Officers | FY03 | FY03 Unique Officers | FY04 | FY04 Unique Officers | FY05 | FY05 Unique Officers | FY06 | FY06 Unique Officers |
|---|---|---|---|---|---|---|---|---|---|---|
| **African-American** | 221 | 176 | 205 | 165 | 170 | 147 | 219 | 172 | 270 | 215 |
| **White** | 98 | 73 | 112 | 85 | 94 | 74 | 135 | 111 | 161 | 122 |
| **Latino** | 26 | 14 | 18 | 15 | 17 | 15 | 25 | 17 | 31 | 20 |
| **Asian** | 6 | 3 | 6 | 5 | 4 | 4 | 9 | 8 | 15 | 9 |
| **Other** | 1 | 1 | 5 | 3 | 1 | 1 | 8 | 7 | 7 | 5 |
| **Unidentified** | 48 | 48 | 71 | 71 | 41 | 41 | 72 | 72 | 113 | 113 |
| | | | | | | | | | | |
| **Total** | 400 | 315 | 417 | 344 | 327 | 282 | 468 | 387 | 597 | 484 |

**Table 19:  Subject Officer Gender with "Unique Officer" Information**

| | FY02 | FY02 Unique Officers | FY03 | FY03 Unique Officers | FY04 | FY04 Unique Officers | FY05 | FY05 Unique Officers | FY06 | FY06 Unique Officers |
|---|---|---|---|---|---|---|---|---|---|---|
| **Male** | 300 | 228 | 293 | 231 | 266 | 226 | 330 | 257 | 396 | 297 |
| **Female** | 57 | 44 | 60 | 49 | 47 | 42 | 66 | 58 | 88 | 74 |
| **Unidentified** | 43 | 43 | 64 | 64 | 14 | 14 | 72 | 72 | 113 | 113 |
| | | | | | | | | | | |
| **Total** | 400 | 315 | 417 | 344 | 327 | 282 | 468 | 387 | 597 | 484 |

**Table 20:  Subject Officer Assignment with "Unique Officer" Information**

| | FY02 | FY02 Unique Officers | FY03 | FY03 Unique Officers | FY04 | FY04 Unique Officers | FY05 | FY05 Unique Officers | FY06 | FY06 Unique Officers |
|---|---|---|---|---|---|---|---|---|---|---|
| First District (1D) | 27 | 24 | 34 | 29 | 36 | 33 | 67 | 56 | 93 | 73 |
| Second District (2D) | 38 | 29 | 37 | 28 | 34 | 31 | 27 | 21 | 35 | 32 |
| Third District (3D) | 108 | 73 | 92 | 61 | 56 | 52 | 82 | 68 | 128 | 92 |
| Fourth District (4D) | 57 | 45 | 37 | 29 | 62 | 45 | 84 | 53 | 87 | 63 |
| Fifth District (5D) | 51 | 41 | 52 | 40 | 45 | 40 | 50 | 48 | 55 | 48 |
| Sixth District (6D) | 21 | 21 | 24 | 23 | 36 | 29 | 56 | 51 | 54 | 44 |
| Seventh District (7D) | 40 | 28 | 23 | 22 | 28 | 26 | 69 | 58 | 57 | 50 |
| Other | 20 | 17 | 45 | 39 | 24 | 20 | 14 | 13 | 47 | 43 |
| D.C. Housing Authority | -- | -- | 5 | 5 | 3 | 3 | 5 | 5 | 4 | 2 |
| Unidentified | 38 | 38 | 68 | 68 | 3 | 3 | 14 | 14 | 37 | 37 |
| | | | | | | | | | | |
| Total | 400 | 316 | 417 | 344 | 327 | 282 | 468 | 387 | 597 | 484 |

### 8.    City Wards

When a complaint is filed, OPC records the city ward in which the underlying incident occurred.  Table 21 reflects the ward that was the site of each complaint filed in fiscal years 2002 through 2006.[15]  Table 21 and Chart 21 also reflect the percentages of all complaints that arose in each ward.  For fiscal year 2006, the data show a noticeable decrease in complaints from Ward 8 and noticeable increases in complaints from Ward 2.  The data also show a noticeable overall decline in the number of complaints from Wards 1 and 5 over the course of all five years, and an overall increase in the number of complaints from Wards 2 and 6 over the same period.

For reference purposes, a map indicating the location of the District of Columbia's eight wards is included in Appendix B.  Like the police district map in Appendix A, the ward map also indicates the locations where this year's complaint incidents occurred.

**Table 21:  City Wards**

| | FY02 | | FY03 | | FY04 | | FY05 | | FY06 | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 66 | 21.2% | 65 | 18.7% | 35 | 13.5% | 47 | 15.0% | 57 | 14.3% |
| 2 | 43 | 13.8% | 62 | 17.8% | 42 | 16.2% | 46 | 14.6% | 76 | 19.1% |
| 3 | 23 | 7.4% | 36 | 10.3% | 26 | 10.0% | 9 | 2.9% | 19 | 4.8% |
| 4 | 37 | 11.9% | 33 | 9.5% | 37 | 14.3% | 46 | 14.6% | 52 | 13.0% |
| 5 | 56 | 18.0% | 58 | 16.7% | 37 | 14.3% | 36 | 11.5% | 51 | 12.8% |
| 6 | 30 | 9.7% | 43 | 12.4% | 30 | 11.6% | 48 | 15.3% | 54 | 13.5% |
| 7 | 23 | 7.4% | 30 | 8.6% | 32 | 12.4% | 33 | 10.5% | 44 | 11.0% |
| 8 | 33 | 10.6% | 21 | 6.0% | 20 | 7.7% | 49 | 15.6% | 46 | 11.5% |
| Unidentified / Not in D.C. | 7 | | 13 | | 3 | | 12 | | 15 | |
| | | | | | | | | | | |
| Total | 318 | | 361 | | 262 | | 326 | | 414 | |

**Chart 21: City Wards (as a Percentage)**



G.     **Outreach**

1.     *Fiscal Year 2006*

Since January 1, 2006, OPC has worked to carry out its Community Outreach Strategic Plan for 2006.  The goal of the plan has been to expand OPC's public education and awareness program, while continuing to maintain relationships with communities that may be underrepresented in their use of the OPC process.  As in previous years, OPC focused its outreach efforts on the District's youth population, Latino community, and residents who live in areas with a high number of police encounters.  OPC was able to engage in a number of highly successful outreach activities this year, as well as implement some new outreach initiatives.  This work occurred despite the fact that the agency received 446 Freedom of Information Act (FOIA) requests, which was a 25% increase over fiscal year 2005 and the highest number of requests ever.  Like in past years, responding to such a large number of FOIA requests limited the amount of time that the OPC's public affairs specialist could devote to conducting community outreach.

This year, OPC began its public education and awareness campaign with an open house, which celebrated the agency's fifth anniversary and publicized the agency's relocation to new office space.  In addition to staff members, participants in OPC's open house included PCB members, District Government officials, MPD officials, and community leaders.  Beyond the open house, OPC conducted targeted outreach to a number of youth groups throughout the District as a part of its student interactive training program.  The program, which focuses on reducing the number of negative encounters between adolescents and police officers, uses role-play scenarios to give students the opportunity to evaluate their behavior and police conduct in different situations.  In fiscal year 2006, OPC conducted student interactive training sessions at Covenant House Washington, Friendship Edison Public Charter School, and the Time Dollar Youth Court.

OPC made significant progress with its "training the providers" outreach program. This program involves sessions conducted by OPC staff members to provide information about the agency to staff members of community-based organizations so that they may then share this information with their clients. OPC was able to conduct training sessions at CARECEN, which is the Central American Resource Center of Washington, the Equal Rights Center, and One Economy Corporation, all of which serve populations that are underrepresented in their use of the OPC complaint process. The agency also made presentations to the D.C. Taxicab Commission and community groups whose memberships include residents who live in the areas covered by MPD's First and Third Districts.

In addition to implementing the strategic plan, OPC conducted a variety of other outreach activities. Over the course of the year, OPC met with several classes of new recruits and newly promoted officials at MPD. During these sessions, OPC staff provided information about the agency and answered questions raised by the officers. As a part of OPC's international outreach efforts, the agency continued to host government officials and guests from around the world and assist them with developing or improving their own police accountability systems. Specifically, OPC participated in the International Visitor Leadership Program administered by the U.S. Department of State. One of the groups included government and civil rights leaders from Norway interested in strategies for combating racial profiling. The agency also hosted senior officials from the Swedish National Police, who were exploring the possibility of establishing an independent police oversight agency to handle citizen complaints in Stockholm, the capital of Sweden.

### 2. Community Outreach Strategic Plan for 2007

For 2007, OPC will continue most of the elements of its 2006 Strategic Plan, modifying and adding new programs as the agency assesses how best to use its limited community outreach resources. Based on the success of the student interactive training program, OPC will continue to conduct these sessions. OPC will pursue opportunities to work with students in other schools and organizations throughout the District, as well as make some return visits to the schools and organizations that took part in the program this year. In addition, OPC will maintain its relationships with the community-based organizations and neighborhood associations it worked with in the past and work to develop new partnerships. Finally, the agency will continue its outreach to MPD to ensure that officers and police supervisors are informed about the agency's process.

With respect to new activities, OPC is planning to create an informational video regarding police accountability and OPC's process. This training aid will assist the agency in its ongoing public education campaign regarding police accountability by allowing information about OPC to reach more audiences when OPC's staff is not available to give a presentation.

### 3. Website

OPC continues to make changes to the agency's website so that it provides the public with reliable information regarding police accountability in the District of Columbia. Since it was created, the agency's website has served as an important community outreach tool. In

addition to ongoing work, OPC regularly updates its news items to keep the public informed about developments at the agency.  In fiscal year 2007, OPC will continue to use it website as a tool to make information available to the public.

### H.   Police Oversight and Law Enforcement Organizations

Since the agency opened, OPC staff members have played an active role in professional organizations related to citizen review of law enforcement and have learned from and contributed to the discussions and training seminars conducted by these organizations.  Since December 2005, OPC's executive director has served on the board of directors of the National Association for Civilian Oversight of Law Enforcement (NACOLE).  In addition, employees have attended and OPC representatives have addressed NACOLE's annual conferences each year since 2001.  At the December 2005 conference, OPC's executive director participated in two panels entitled "Transparency in Reporting" and "Mediation."  At the September 2006 conference, OPC's deputy director moderated and the agency's executive director participated in a panel entitled "How to Make Policy Recommendations."  In addition, OPC's assistant chief investigator was part of a working group and helped coordinate NACOLE's town hall meeting about establishing professional standards for oversight professionals.  The assistant chief investigator also conducted two training sessions with two of OPC's investigators that covered basic skills for conducting and reviewing investigations.

### I.   Policy Recommendations

The statute creating PCB authorizes the Board to, "where appropriate, make recommendations" to the Mayor, District Council, and Chief of Police "concerning those elements of management of the MPD affecting the incidence of police misconduct, such as the recruitment, training, evaluation, discipline, and supervision of police officers."  This authority allows the agency to go beyond its day-to-day work investigating and resolving individual police misconduct complaints to examine systemic issues that lead to the abuse or misuse of police powers.  To date, PCB has issued ten detailed reports and sets of recommendations for police reform, all of which are available on OPC's website, www.policecomplaints.dc.gov.  The reports and recommendations are discussed in more detail below with an update on the implementation of the recommendations where available.

#### 1.   Fiscal Year 2006

##### a.   Enhancing Police Response to People with Mental Illness in the District of Columbia by Incorporating the Crisis Intervention Team (CIT) Community Policing Model

On September 7, 2006, PCB issued a report and recommendations regarding police response to people with mental illness and the use of Crisis Intervention Team (CIT) community policing model in Washington.  Since OPC opened to the public in January 2001, it has regularly received complaints about MPD officer treatment of people suffering from mental illness.  In some cases, individuals have been arrested and subjected to police use of force for engaging in behavior that is symptomatic or otherwise the product of mental illness or mental health

problems. In other cases, officers allegedly have refused to assist or have treated disrespectfully members of the public suspected of being mentally ill. As a result of these complaints, PCB examined MPD's policies, procedures, and training on handling persons who suffer from mental illness and looked at alternative that could improve MPD officer response to these situations.

In order to gain a better understanding of the issues presented by these complaints and how best to address them, PCB consulted several officials from MPD and the D.C. Department of Mental Health (DMH), and an array of Washington-based mental health advocates and criminal justice experts, many of whom have worked cooperatively with MPD on related issues. At the same time that PCB gathered information about how components of the criminal justice and mental health systems in the District have worked together to address the needs of people with mental illness, PCB examined police department best practices from around the country. PCB found innovative models in which police officers develop expertise in recognizing and responding appropriately to people with mental illness and partner closely with mental health professionals in ways that reduce arrests of individuals suffering from mental illness, reduce injuries to police officers and citizens, and link people in need of mental health treatment with mental health services.

Of the different models examined, PCB believed that the CIT model, pioneered by the Memphis Police Department in 1988, would best serve the District of Columbia. In addition to studying how this model operates and has been implemented in other places, including nearby Montgomery County and Baltimore, two OPC staff members visited Memphis and met with representatives of the Memphis Police Department, the Memphis mental health system, and Memphis-based advocates for consumers of mental health services. The OPC staff members also participated in full-shift, CIT officer ride-alongs, in an effort to gain first-hand knowledge of how this model works in practice. Based on the information gathered by PCB and its examination of the various issues presented, the Board proposed the implementation of CIT in Washington and made the specific recommendations included in Table 22. On September 28, 2006, MPD sent OPC a detailed letter responding to each of the recommendations, which is also reflected in Table 22.

**Table 22: Enhancing Police Response to People with Mental Illness in the District of Columbia by Incorporating the Crisis Intervention Team (CIT) Community Policing Model (September 7, 2006)**

| Recommendation | Status |
|---|---|
| The District Government should designate a subgroup of the Criminal Justice Coordinating Council's (CJCC) Substance Abuse and Mental Health Workgroup (SAMHW) to serve as the District's CIT task force. | **Adopted in part.** On August 30, 2006, the CJCC's SAMHW established a subgroup to examine all of the alternatives available for responding to people with mental illness to create a model unique to the District. The subgroup is called the D.C. Crisis Evaluation Task Force. |
| MPD should select a CIT coordinator now so this person can participate in the development of the program. | **Adopted in part.** A member of MPD's command staff is a co-chair of the D.C. Crisis Evaluation Task Force and serves as MPD's liaison concerning mental health and related issues. His role is to represent MPD in examining best practices and developing a plan for MPD to address mental health and other issues together. |

| Recommendation | Status |
|---|---|
| The District should apply for CIT grant funds. | **Adopted in part.** MPD agrees with this recommendation and MPD and DMH have already identified and obtained some grant funds to begin examining police response to people with mental illness and related issues. |
| A subcommittee of the CIT task force should participate in a two-day planning workshop in Memphis. | **Pending.** MPD agrees with this recommendation and expects to look at the Memphis CIT model and other models being used around the country. |
| Following receipt of the subcommittee's report, the CIT task force should outline key elements of the District's CIT program. | **Pending.** MPD agrees with this recommendation and the D.C. Crisis Evaluation Task Force expects to issue a report to the CJCC's SAMHW outlining the steps it has taken and the future initiatives planned. |
| Task force members responsible for CIT officer training should participate in 40-hour training program in Memphis. | **Pending.** MPD believes that this recommendation should be considered by the D.C. Crisis Evaluation Task Force as it carries out its work. |
| The District should prepare dispatch operations for changes necessitated by CIT. | **Pending.** MPD agrees with this recommendation and will submit it to the Office of Unified Communications recommending that it be adopted. Changes to dispatch operations are a key to whatever model is ultimately adopted. |
| The District should coordinate with the Emergency Medical Services Bureau (EMS) of the D.C. Fire and Emergency Services Department. | **Adopted.** MPD agrees with this recommendation and EMS is already part of the CJCC's SAMHW will be included in the District of Columbia model for addressing these issues. |
| MPD should prepare to collect and analyze CIT service call data. | **Pending.** MPD agrees with this recommendation and grant funds will be used in conjunction with ongoing work to collect and analyze call data. |
| DMH should prepare to collect and analyze data on outcome of CIT officer referrals. | **Pending.** MPD agrees with this recommendation and expects that data regarding MPD referrals and transports will be collected and analyzed along with other related incidents and services. |
| MPD should ensure that CIT officers develop knowledge of and a close working relationship with community-based mental health service providers. | **Pending.** MPD agrees with this recommendation in part and believes that DMH and other partner organizations should work to find alternatives or expand the services that MPD and other organizations will need when making referrals. |
| DMH should strengthen and expand its mobile crisis unit. | **Pending.** MPD agrees with this recommendation and believes that it should be part of whatever model is adopted in the District because following this recommendation will provide important assistance to MPD officers at the scene of a mental health crisis. |
| DMH's Comprehensive Psychiatric Emergency Program (CPEP) should be relocated to a facility that includes emergency medical treatment and alcohol and drug detoxification services. | **Pending.** MPD agrees with this recommendation, sees this as one of the areas that most needs to be addressed, and wants the D.C. Crisis Evaluation Task Force to explore possible solutions. |
| DMH should ensure that CPEP policies emphasize use of community-based resources and outpatient observation, evaluation, and treatment to the greatest extent possible. | **Pending.** MPD agrees with this recommendation and wants the D.C. Crisis Evaluation Task Force to explore this issue. |

### b.    Police Service to Disabled Persons Who Use Service Animals

On August 17, 2006, PCB issued a report and recommendations about providing police service to disabled persons who use service animals.  In the course of investigating a complaint filed with the agency, OPC discovered that MPD did not have a written policy or training on an officer's obligations to people with disabilities who use service animals.  In light of this discovery, PCB made the recommendations included in Table 23.  The Board believed that adopting recommendations would ensure that the Department was in compliance with the relevant provisions of federal disability rights law, provide importance guidance to officers about interacting with people with disabilities who use service animals, and enhance MPD's overall commitment to professionalism in providing police service.

**Table 23:  Police Service to Disabled Persons Who Use Service Animals (August 17, 2006)**

| Recommendation | Status |
|---|---|
| MPD should issue a general order that provides information to officers on handling requests for service that involve service animals. | **Adopted.**  On November 14, 2006, MPD informed OPC that it was in the process of developing a directive that would address service to and interactions with persons with disabilities who use service animals, and that the directive would incorporate PCB's recommendations. |
| MPD should include a specific section on service animals in training on disabilities and ADA compliance. | **Pending.**  OPC will inquire about training sessions and materials after the new directive is completed. |
| MPD should conduct a roll-call training lesson for all officers on service animals as soon as possible. | |

### c.    Business Cards for MPD Officers

On July 24, 2006, PCB issued a report and recommendations regarding the issuance of business cards to all MPD officers.  In April 2005, the District enacted a law that codified requirements for MPD officers to clearly display their nameplates and badges while in uniform, among other things.  The law also expanded OPC's jurisdiction to include complaints alleging that an officer failed to wear or display required identification or identify him or herself by name and badge number when requested to do so by a member of the public.  Since the new law took effect, OPC has received complaints alleging that officers have refused to identify themselves when asked or were not wearing their nameplate or badge.  OPC also has received complaints where officers have attempted to identify themselves, but the information was not successfully conveyed to the person because of a miscommunication, illegible handwriting, lack of paper or a pen, or for other reasons.

In light of the new law and the complaints received by OPC, PCB made the recommendations included in Table 24.  The Board believed that adopting the recommendations would facilitate the ability of officers to identify themselves as required by the new law and MPD general orders.  In addition, PCB believed that following the recommendations would improve community policing in the District by assisting officers with identifying themselves in the neighborhoods in which they work and fostering relationships with the public so that citizens

will have law enforcement officials to whom they can ask questions, provide information, or report crimes.

**Table 24: Business Cards for MPD Officers (July 24, 2006)**

| Recommendation | Status |
|---|---|
| MPD should provide business cards to all of its officers. | **Adopted.** On August 29, 2006, MPD informed OPC that it would provide officers with generic business cards to provide their contact information. The use of the cards would be optional. |
| MPD should ensure that, at a minimum, the cards include the name of the police department, along with the officer's name, rank, badge number, and assignment with address and telephone number. | **Pending.** OPC will inquire about the content of the business cards after the generic form has been created. |

## 2.     Status Update for Earlier Policy Recommendations

The information in this section provides an update on the status of each of the policy recommendations issued by PCB before fiscal year 2006. Included below is a table for each one that lists the specific recommendations made by the Board and the status of the implementation of those recommendations. The full reports and any updates that were included in earlier annual reports are available on OPC's website, www.policecomplaints.dc.gov.

### a.     Property Damage Caused by District of Columbia Police Action

**Table 25: Property Damage Caused by District of Columbia Police Action (September 28, 2005)**

| Recommendation | Status |
|---|---|
| MPD should revise MPD General Order 309.03 to require that officers making forcible entries leave an MPD Form PD 240A, which is a form that provides contact information for the officers who conducted the entry and some limited information about property damage claims, both when a location is occupied and unoccupied at the time of an entry. | **Adopted.** In April 2006, MPD revised General Order 309.03 and the PD 240A based on PCB's policy recommendation. |
| MPD should revise the PD 240A so that it informs citizens both that MPD officers conducted a forcible entry and that citizens may file a claim for compensation with the District of Columbia's Office of Risk Management (ORM). | |
| MPD should create an official MPD policy for responding to property damage caused by police action other than forcible entries. | |
| The District Government and MPD should add information about filing claims to MPD's and the city's websites. | **Adopted.** MPD added a link to ORM that includes information about filing a claim to the "Complaints/ Commendations" section of its website. The Office of the Attorney General also added a link to the main page of its website and this information was easily searchable from the city's website. |

| Recommendation | Status |
|---|---|
| MPD should train its employees about MPD's procedures for filing property damage claims so they can accurately respond to requests for information from the public. | **Adopted.**  The revised order directs the police academy to develop and conduct training on the topic covered by the order.  OPC will request to review training materials when they are available. |

### b.    Pretextual Stops of Bicyclists

### Table 26:  Pretextual Stops of Bicyclists (August 4, 2005)

| Recommendation | Status |
|---|---|
| The District Government should replace mandatory, police-based bicycle registration with voluntary registration through a national registry. | **Pending.**  In December 2006, the District's Department of Transportation (DDOT) notified OPC that it would be submitting proposed legislation to the District Council during its next term that would eliminate the mandatory bicycle registration requirement.  On November 1, 2005, MPD informed OPC that it would support this legislation. |
| MPD should collect bike stop data as part of the Department's Biased Policing Project to assess the issue of racial profiling in bicycle stops. | **Adopted.**  On November 1, 2005, MPD informed OPC that it was collecting this data on the MPD Form PD 76, which is the same form being used to record motor vehicle stop data for the Department's racial profiling study, and that MPD intended to publish the results of its data collection, including bike stops, in the summer of 2006. |
| MPD should provide better training for officers and recruits regarding the scope of the bicycle laws. | **Pending.**  On November 1, 2005, MPD informed OPC that it agreed with this recommendation.  OPC will inquire about training sessions and materials after the changes to District law are adopted. |
| The District Government and MPD should take steps to better inform bike riders of their duties under the law. | **Adopted in part.**  MPD informed OPC that it agreed with this recommendation and would undertake efforts, such as creating and distributing pamphlets about bicycle registration requirements and regulations and adding information to MPD's website regarding bicycle registration and regulations, such as changes in the helmet laws.  Information about the helmet laws is linked to the "Traffic Safety" section of its website. |

### c.    Publication of MPD Orders on the Internet

### Table 27:  Publication of MPD Orders on the Internet (July 14, 2005)

| Recommendation | Status |
|---|---|
| MPD should publish its orders and directives, along with an index, on the Department's website to make this information readily available to the public at no cost. | **Pending.**  In August 2005, MPD informed OPC that it was not then in a position to post its orders on the Internet because the orders were being updated and because MPD was in the process of making the orders available to its own officers through MPD's intranet.  During testimony in November 2005, MPD indicated to the District Council that it would go forward with the publication of some general orders on the Internet. |

#### d.    Minors in the Care of Arrested Persons

**Table 28:  Minors in the Care of Arrested Persons (May 24, 2005)**

| Recommendation | Status |
|---|---|
| MPD should create a written policy that takes into consideration the following issues:  (1) identification, (2) transportation, and (3) location of origin of minors, (4) the reluctance on the part of the arrestee to identify minors in the arrestee's care, the (5) the need to verify and document the identity of the adult to which the minor is released, and (6) the role and circumstances under which child protective services should become involved. | **Adopted.**  In March 2006, MPD issued a special order addressing the care of minors in the custody of arrested or hospitalized persons. |
| MPD should train its officers on the laws and procedures governing minors who are not involved in any criminality. | **Adopted.**  The new order directs the police academy to develop and conduct training on the topic covered by the order.  OPC will request to review training materials when they are available. |
| MPD should regularly monitor the policy to ensure its consistent application and to evaluate its effectiveness. | **Pending.**  OPC will inquire about monitoring related to the new directive. |

#### e.    Disorderly Conduct Arrests Made by MPD Officers

**Table 29:  Disorderly Conduct Arrests Made by MPD Officers (November 19, 2003)**

| Recommendation | Status |
|---|---|
| MPD should modify its arrest procedure to ensure that all citizens who pay $25 to resolve their arrest are provided with written notice about the collateral forfeiture process and its consequences and that they sign an acknowledgment of their choice to pay the $25 collateral. | **Adopted.**  In July 2004 MPD issued a directive that revised its collateral/bond receipt consistent with PCB's recommendations. |
| MPD should immediately begin providing additional training to all MPD officers and supervisors regarding the law and procedure related to disorderly conduct arrests. | **Adopted.**  Disorderly conduct arrests were a topic in MPD's June 2005 roll call training, and disorderly conduct arrests were covered as part of the D.C. Code review section of the 2006 in-service training. |
| MPD should distribute a videotaped message from the Chief of Police reinforcing the responsibilities of all members of the Department when making disorderly conduct arrests. | **Pending.**  MPD informed OPC that its training videotape on disorderly conduct arrests was being re-made and updated, and when it is completed, it will be used in future roll call and in-service training sessions. |
| MPD should examine a sample of the disorderly conduct arrests made by MPD officers that is significant enough to allow MPD to determine if there are any widespread problems in the entire pool of disorderly conduct arrests. | **Pending.**  OPC will inquire if any examination has been conducted. |
| The District Government should review the criminal code on disturbances of the public peace, particularly disorderly conduct, and the rules regarding collateral forfeiture and consider whether the code or rules need to be revised, updated, or changed, and also consider specific reforms, such as decriminalizing disorderly conduct and allowing individuals 15 days to decide whether to forfeit collateral or challenge their arrest. | **Adopted.**  The District enacted a law repealing various sections of the criminal code, including several sections that were identified by PCB as potentially obsolete.  In addition, the District enacted a law that addressed many of the issues regarding collateral forfeiture that were raised by PCB in its report. |

### f.    Racial Profiling in Washington, D.C.

**Table 30:  Racial Profiling in Washington, D.C. (January 7, 2002)**

| Recommendation | Status |
|---|---|
| MPD should collect data on traffic stops. | **Adopted.**  MPD hired a consultant to oversee the collection and analysis of traffic stop and pedestrian stop data.  Data were collected between February 2005 and January 2006.  Although MPD indicated it would release the consultant's report analyzing the data during the summer of 2006, as of the date this annual report was sent to the printer (December 27, 2006), the consultant's final report had not been released to the public. |
| MPD should implement a simple and inexpensive paper-based system of data collection. | **Adopted.**  MPD adapted its MPD Form PD 76 to collect the data. |
| MPD should ensure the statistical reliability of the data by including experts on data collection and analysis, chosen by community groups, civil liberties organizations, OPC, and MPD. | **Adopted.**  Community and civil liberties groups, part of a Community-Police Task Force on Biased Policing formed by MPD, weighed in on MPD's selection of its consultant.  OPC also serves on the task force.  In order to preserve OPC's independence, however, OPC did not participate in the selection of the consultant. |
| MPD should implement officer education and training on laws against racially biased policing. | **Pending.**  OPC will inquire about training sessions and materials after the consultant's report has been released to the public. |
| MPD should adopt a racial profiling policy and data collection system by June 1, 2002. | **Adopted.**  MPD issued General Order 304.15, entitled "Unbiased Policing," on June 6, 2002.  The data collection for this project ended in January 2006. |

### J.    Protest Monitoring

Under the First Amendment Rights and Police Standards Act of 2004, which took effect in April 2005, the District of Columbia granted PCB the authority to monitor and evaluate MPD's handling of First Amendment assemblies held in the District.  The Act articulated the District's official policy on First Amendment assemblies and, among other things, established specific standards of police conduct when handling protests or demonstrations.  These standards prohibit MPD from employing crowd control tactics during protests that have the potential to deprive demonstrators of the right to assemble peaceably and express their views.  Under the provisions of the Act, OPC monitored MPD's interactions with protesters during antiwar and anti-globalization demonstrations that took place in Washington in September 2005.  The protests attracted an estimated 150,000 people from across the nation and were the first major events to take place in Washington following the enactment of the new law.  PCB's overall impression was that MPD performed in a professional and commendable manner and effectively balanced the interests of public safety with the right to free expression.  On December 20, 2005, PCB issued its report on the monitoring effort, which included the recommendations set forth in Table 31.

**Table 31:  Protest Monitoring (December 20, 2005)**

| Recommendation | Status |
|---|---|
| MPD should continue to emphasize compliance with the First Amendment Rights and Police Standards Act using the manner in which it handled the September 2005 protests as a model for future large protests. | **Adopted.**  On January 13, 2006, MPD informed OPC that it agrees with this recommendation and would be using the experience gained in September 2005 when planning and training for handling future protests. |
| MPD should devise a way to make officers' names and badge numbers more visible, ensuring that officer identification remains visible even when vests and other covering are added, and that MPD consider adding marking to its uniforms that clearly distinguishes MPD officers from other law enforcement officers. | **Adopted in part.**  MPD informed OPC that it thought that current methods of identification were sufficient, but that officers would be reminded to transfer nameplates and badges to any outer garments during protests. |
| MPD should examine its street closing procedures to better balance the interests of demonstrators and non-demonstrators. | **Adopted.**  MPD informed OPC that it will continue its current planning method for protests that attempts to strike a balance between the interests of all parties and announces any street closures to the public. |
| MPD should ensure that all of its officers, particularly non-supervisory officers, are informed of OPC's presence and role so that OPC's monitors will not be impeded in carrying out their monitoring of protest events. | **Adopted.**  MPD informed OPC that, in the future, it would announce to its members during roll calls and pre-event planning sessions that OPC monitors will be present so that the monitors will not be impeded in carrying out their monitoring activities. |
| The District Government and MPD should consider whether it is possible to achieve a better balance between the rights of demonstrators and the rights of non-demonstrators where arrests for illegal activity, particularly property damage, are concerned, with the goal of determining whether it is possible for MPD to interrupt illegal activity more quickly than it did during these protests without violating the Act's provisions. | **Pending.**  MPD informed OPC that, considering the importance of the exercise of First Amendment rights, and unless circumstances dictate otherwise, MPD would continue its policy of having an official responsible for authorizing arrests in mass demonstrations. |

## III.    THE FUTURE

In fiscal year 2007, OPC expects to continue the progress it made this year.  Definite challenges lie ahead for the agency if OPC continues to experience the same rate of growth in the number of complaints received, which appears to be the case based on the first few months of the new year.  Consequently, PCB and OPC will carefully monitor the agency's workload to be sure that OPC has sufficient resources to investigate, mediate, and adjudicate the complaints it receives, as well as carry out its other duties through fiscal year 2007 and beyond.  As part of this effort, OPC also plans to explore changes to its statute that would allow new and different ways of handling a larger volume of complaints, and the agency will focus on ensuring the cooperation of all MPD employees and addressing other challenges that may delay or affect the completion of thorough and timely investigations.

# Endnotes

[1]    The four possible outcomes that a complaint examiner may reach are:

Sustained – where the complainant's allegation is supported by sufficient evidence to determine that the incident occurred and the actions of the officer were improper;

Exonerated – where a preponderance of the evidence shows that the alleged conduct did occur but did not violate MPD policies, procedures, or training;

Insufficient Facts – where there are insufficient facts to decide whether the alleged misconduct occurred; or

Unfounded – where the investigation determined no facts to support that the incident complained of actually occurred.

[2]    When counting the overall outcome for a complaint, a complaint that has at least one sustained allegation is counted as a sustained complaint.  The number of sustained complaints is determined by this method because if a complaint has at least one sustained allegation, it must be forwarded to the Chief of Police for imposition of discipline, even if the other allegations are not sustained.  The only time that a complaint is not forwarded to the Chief of Police for discipline is when no allegations are sustained.  In these cases, the complaint is dismissed after the complaint examiner issues his or her decision.

[3]    In 2003, 2004, and 2005, the New York Police Department (NYPD) imposed discipline for 70.4%, 74.2%, and 73.6%, respectively, of the complaints sustained by New York City's Civilian Complaint Review Board (CCRB).  *See* CCRB's Status Report January-December 2005 (June 2006), Table 32A, which is available at http://www.nyc.gov/html/ccrb/html/reports.html.  In 2000 and 2001, the chief of police in San Francisco imposed discipline for 92.7% and 96.4%, respectively, of the sustained complaints submitted for discipline by San Francisco's Office of Citizen Complaints (OCC).  *See* OCC's 2001 Annual Report at 11, which is available at http://web.sfgov.org/site/uploadedfiles/occ/OCC_2001.pdf.

[4]    *See* D.C. Official Code § 5-1111(d).

[5]    *See* D.C. Official Code § 5-1110(k).

[6]    *See* Omnibus Public Safety Agency Reform Amendment Act of 2004, Title V, District of Columbia Act 15-463, 51 D.C. Reg. 9406 (2004), District of Columbia Law 15-194, 51 D.C. Reg. 9805 (2004)

[7]    *See* Michael R. Bromwich, *Eighteenth Quarterly Report of the Independent Monitor for the Metropolitan Police Department* (Oct. 30, 2006), at 3-4, 92-94, available at http://www.policemonitor.org/reports.html.

[8]    *See Citizen Oversight of Law Enforcement* (Justina Cintrón Perino ed., 2006) at 137.

[9]    *See* Henri E. Cauvin, *District Briefing*, Washington Post, Nov. 28, 2006, at B4.

[10]    Over the six years that OPC has been open, its method of compiling statistics has changed significantly, moving from manual collection, to using OPC's initial complaint tracking database, to using OPC's current complaint management software (CMS), which was used for the first time in fiscal year 2004.  The implementation of the CMS was also accompanied by the reentry of data for all of OPC's complaints and changes in the process of receiving and recording contacts and complaints.  Over the course of these several years, OPC has ensured that the data were as accurate as possible and the presentation of the statistics was as consistent as possible.  With all of the changes in fiscal year 2004, however – the CMS, the reentry of data, and the different processes – OPC believes that the changes may have had an impact on some of the statistics, leading to some fluctuations that the agency cannot account for in full.  For example, with the new CMS, OPC gained the ability to record additional types of citizen contacts that it could not track in earlier years.  In addition, when officer information was entered into the CMS, it reflected the then current assignment of the officer, which may not have been the same as it was at the time of an earlier incident.  OPC notes the changes so that readers will be aware of them, and OPC will monitor the statistics in years ahead to try to determine if any of the unusual changes resulted from changes in the process or were signs of other trends.

[11]    OPC collected date of birth information for only 57% of its complainants (206 of 361) in fiscal year 2003, but increased to collecting the information for 94% (247 of 262) in fiscal year 2004, 98% (318 of 326) in fiscal year 2005, and 94% (391 of 414)in fiscal year 2006.

[12]     The "District Population" data included in Tables 9, 10, and 11 are included for reference purposes.  It should be noted that anyone, whether a resident of the District or not, may file a complaint with OPC.

     The data in Tables 10, 11, and 12 were obtained from the "General Demographic Characteristics: 2004" table for the District of Columbia that is part of the "2004 American Community Survey" data set on the U.S. Census website, www.census.gov.  As of 2004, the District's population estimate was 553,523, but the race or national origin, gender, and age breakdowns were based on a population estimate of 518,074, which included only the household population and excluded the population living in institutions, college dormitories, and other group quarters.  Readers should be aware that the race or national origin, gender, and age breakdowns of the District population have changed some over time, so these data may have less value as a comparator for the earlier fiscal years reported in the tables.  In previous annual reports, OPC has included the race or national origin, gender, and age breakdowns that the Census reported for 2000.  At that time, the District had a population of 572,059, and the population's race or national origin, gender, and age was broken down as follows:

| | District Pop. | | | District Pop. | | | District Pop. |
|---|---|---|---|---|---|---|---|
| African-American | 60.0% | | Male | 47.1% | | Under 15 | 17.1% |
| White | 27.8% | | Female | 52.9% | | 15-24 | 15.7% |
| Latino | 7.9% | | | | | 25-34 | 17.8% |
| Asian | 2.7% | | | | | 35-44 | 15.3% |
| Middle Eastern | -- | | | | | 45-54 | 13.2% |
| Native American | 0.3% | | | | | 55-64 | 8.7% |
| Multiracial / Other | 2.4% | | | | | 65 and Older | 12.3% |

[13]     The "Entire Police Force" data included in Tables 15 and 16 were obtained from MPD on December 11, 2006.  On that date, MPD had 3,805 sworn members, and the data reflect the race or national origin and gender breakdowns of those officers.  Readers should be aware that the race or national origin and gender breakdowns of MPD officers have changed some over time, so these data may have less value as a comparator for the earlier fiscal years reported in the tables.  In previous annual reports, OPC has included the race or national origin and gender breakdowns that MPD included in its 2000 annual report.  At the end of 2000, MPD had 3,614 sworn members, and their race or national origin and gender were broken down as follows:

| | Entire Police Force | | | Entire Police Force |
|---|---|---|---|---|
| African-American | 66.5% | | Male | 75.7% |
| White | 27.7% | | Female | 24.3% |
| Latino | 4.9% | | | |
| Asian | 0.9% | | | |

[14]     "Other" includes MPD Headquarters, the Office of Professional Responsibility, the Regional Operations Command – Central, the Regional Operations Command – East, the Superintendent of Detectives Division, the Violent Crimes Branch, the Major Narcotics Investigations Branch, the Major Crash Investigations Unit, the Youth Investigations Branch, the Emergency Response Team, the Air Support Unit, the Harbor Patrol, the Canine Unit, the Environmental Crimes Unit, the Maurice T. Turner, Jr., Institute of Police Science, Emergency/Non-Emergency Communications, the Central Cell Block, and the Juvenile Processing Center.

[15]     In June 2001, the District of Columbia approved new ward boundaries as part of its redistricting process following the 2000 U.S. Census.  The new ward boundaries took effect in January 2002.  Readers should be aware that the ward recorded for each complaint reflects the ward designation as it existed at the time of the complaint, and that the ward designation for some locations may have changed following the redistricting.  For specific details of how the redistricting affected the city's wards, *see* Sewell Chan, *How Redistricting Plan Affects City's 8 Wards*, Washington Post, June 28, 2001, at T9.