**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | | |
|---|---|---|
| LINDSAY HUTHNANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-CV-1871 (HKK) |
| | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S OPPOSITION TO THE DISTRICT'S JUNE 11 MOTION
FOR A PROTECTIVE ORDER**

Plaintiff, through undersigned counsel, respectfully opposes the District's duplicative

motion for a protective order. The bases for relief listed here are the same objections the District

made to Plaintiff's discovery requests, which are now the subject of Plaintiff's motion to compel,

and the relief requested is the same (that no discovery be had). The District's attempt to

introduce a couple of new objections is belated; the District has already waived them.

On the merits, the Court should reject the District's attempt to exclude from discovery the

individual defendants' personnel files and addresses because the "discovery privileges" claimed

by the District do not exist. The Court should similarly reject the District's arguments of undue

burden. Two of Plaintiff's requests (Interrogatory 12 and Request for Production 13) covered by

this motion ask for complaints about or arrests by the individual defendants, and yet the District

makes no arguments and presents no evidence why it would be particularly burdensome to find

documents related to the three officers. A closer examination of the evidence the District did

submit reveals that responding to these two requests will not be especially burdensome, much

less unduly so. While the other three challenged requests may require the District to do some

work (although not as much as the District claims), the requested information is relevant, critical to Plaintiff's case, and much of the purported expense is of the District's own making. Under these circumstances, there is nothing *undue* about the burden of responding. The District's motion should be denied in its entirety.

## BACKGROUND

The lengthy and difficult progress of discovery thus far in this case is laid out in Plaintiff's Motion to Compel [Rec. Doc. 43.] The District has further multiplied that process by filing this unnecessary motion for a protective order. This motion consists entirely of reiterations of discovery objections that the District made in written discovery responses which are now the subject of Plaintiff's motion to compel [Rec. Doc. 43] and a handful of new objections that the District waived by failing to assert in a timely matter. Plaintiff pointed out these redundancies and the untimeliness of the new objections, and requested that the District deal with all of these issues in the context of responding to Plaintiff's Motion to Compel to avoid the costs of an additional round of briefing, especially since the District seeks no relief other than not to be compelled to produce responses.[1]

Not only are the District's arguments redundant of the ones the Court will have to deal with when ruling on Plaintiff's motion to compel, they are also meritless. The District seeks to

---

[1] As detailed in Plaintiff's Motion to Compel, on June 2, 2008, Plaintiff had one last call with the Assistant Attorney General ("AAG") assigned to this case in an attempt to resolve the deficiencies in the District's discovery responses. When it became clear that the District had made no progress toward fulfilling its discovery obligations, Plaintiff's counsel informed the AAG that Plaintiff would be moving to compel. That evening, timing that gave the move a flavor of tit-for-tat, the AAG sent an email "advising" Plaintiff that the District would be filing a motion for a protective order. [See June 3 email, attached as Ex. B.] Plaintiff responded that this email did not satisfy the meet-and-confer requirements, briefly pointed out the reasons why the motion for a protective order was unnecessarily, and requested that an actual meet and confer take place. The District did not respond until Plaintiff's counsel contacted the AAG on June 9 to discuss a scheduling matter. At that time, the AAG again raised his intention to file this motion. Plaintiff's counsel explained in greater detail the District's arguments could and properly should be dealt with in the context of the motion to compel, and that the parties could be spared the costs of an additional round of briefing. The AAG offered no explanation for the need to file this motion, and Plaintiff's counsel requested the AAG consider the matter further and discuss it with his supervisor if that was the issue. In lieu of discussion, the AAG then filed this motion.

be relieved from providing the addresses and personnel files of the three Individual Defendants without justification. Based on unsupported claims of "undue burden," the District seeks to be relieved from providing information on complaints and arrests made by the three Individual Defendants and information on other arrests for disorderly conduct and arrests resulting in post-and-forfeit release or citation release. Because the District's arguments are without merit, this motion for a protective order should be denied.

## ARGUMENT

**I.    The District has No Basis for Withholding the Relevant Personnel Files and Addresses, and No Basis for Requesting a Protective Order Totally Absolving it From Providing that Discovery.**

Defendant District of Columbia requests a protective order sanctioning the withholding of the Individual Defendants' home addresses and their personnel records (including performance evaluations, informal and formal complaints filed against them, and any disciplinary actions taken against them). Duplicating discovery objections already raised as defenses to Plaintiff's Motion to Compel, the District claims that the discovery should be prohibited because it is purportedly irrelevant and protected from disclosure in discovery or otherwise. Neither of these assertions stands up to scrutiny. Moreover, as we demonstrate, the District has waived the majority of its arguments.

A motion for a Fed. R. Civ. P. 26(c) protective order is not the place to make relevance objections. Rule 26(c) authorizes "an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden" – it is not a venue for second bites at run-of-the-mill discovery objections. The District was required to make its objections in its written responses to Plaintiff's Rule 33 Interrogatories and Rule 34 Requests for Production, within the time for doing so, or waive them. *See* Fed. R. Civ. P. 33(b)(4) and 34(b)(2)(B); *Peskoff v. Faber*, 244 F.R.D. 54, 64 (D.D.C. 2007). The District made no relevance objection to the request for

3

the personnel records and so has waived any such objection. The District did object to the relevance of the home addresses, and Plaintiff has asked the Court to overrule that objection in her motion to compel. That motion would have been the proper place to address this issue.

In any case, the information is relevant. The Individual Defendant's home addresses are important identifying information should Plaintiff choose to conduct a public-records background investigation of the Individual Defendants. Furthermore, the addresses are necessary so that Plaintiff can effectuate service on the Individual Defendants, for example, should she need to enforce a judgment. An address to effectuate service is especially important in this case where the Individual Defendants have declined to authorize the MPD to receive service on their behalf. They will also be necessary should the defendants choose to leave the MPD. The multiple extensions of time required in this lawsuit to serve the Amended Complaint on the Individual Defendants evidences the extreme difficulty of serving them without a home address.

Likewise, the Individual Defendants' personnel records – including the training they received, disciplinary actions taken against them, and complaints made against them – will reveal the training the received on matters relevant to this lawsuit; how much experience each Individual Defendant has; and whether they were ever disciplined for or have ever had people complain about retaliatory conduct, arrests without probable cause, aggressive or confrontational policing, use of the disorderly offense, use of post-and-forfeit, or similar conduct. Not only will this information relate to the Individual Defendants' liability in this case, but the District's actions in training, supervision, and discipline will help determine the District's liability in this case.

In the face of this evident relevance, the District makes no arguments in support of its claim that the materials are irrelevant. It simply (and unenlighteningly) states: "The home addresses and personnel records of the named defendants are not relevant to this litigation." This objection should be overruled.

What remains is the District's claim that it is "*precluded by statute* from releasing the home addresses or personnel records." The problems with the District's position are manifold. First, not one of the statutory sections prohibits the district from providing relevant information in civil discovery, much less creates a privilege against doing so. Second, the District, through its refusal to provide a privilege log adequate under Fed. R. Civ. P. 26(b)(5)(A), has waived any claim of privilege (and makes evaluations of the claims of privilege so abstract as to be meaningless). Third, the District has provided no evidence that the requested documents contain personal information, much less that producing such information would be a "clearly unwarranted invasion" of any personal privacy. Finally, the District states (at 5) that it is precluded from providing the requested discovery "absent Court order," but offers no explanation why a Court order should not be issued forthwith.

   1. *The D.C. Code sections do not create a privilege from discovery.* Plaintiff requests that this Court declare that the cited D.C. Code section do not create a ***discovery privilege***. At most, they caution care with personal information and may remind the District, where appropriate, to seek a confidentiality order or similar well-tailored relief under Rule 26(c). But there is not even a colorable argument that these sections create a discovery privilege shielding relevant materials from discovery. Indeed, the District cannot even settle on which Code provisions it basis this privilege. In its discovery objections, it cited §§ 1-601.01, 1-631.03, 5-

5

113.01, and 5-113.06.[2]  In this motion, the District seems to have abandoned its reliance on 5-

113.01 and 5-113.06, but added a claim of privilege based on § 2-534(a).[3]

Yet the District makes this claim of absolute privilege, as a matter of course, in case after

case, rather than pursuing confidentiality orders or other relief under the well-developed

standards of Rule 26(c).  This increases litigation costs unnecessarily.   A definitive ruling will

help prevent further similar assertions of "privilege" in this and other future lawsuits.

D.C. Code § 1-631.01 states that the District's records

"shall be established, maintained, and disposed of in a manner designed to ensure
the greatest degree of applicant or employee privacy while providing adequate,
necessary, and complete information for the District to carry out its
responsibilities . . . ."

Nothing in this provision purports to create a discovery privilege, allowing the District to decline

to respond to relevant discovery requests.  It merely lays out a general principle that the District,

as an employer, should take care in handling personnel information.  Thousands of personnel

manuals for private employers across the country presumably set forth similar guidance.

Even less applicable, D.C. Code § 1-631.03 (and the identical language in District

Personnel Manual § 3102.01) instructs the District to **make available** personnel information to

**law enforcement authorities**, "except if such disclosure would constitute an **unwarranted**

invasion of personal privacy or is prohibited under law or rules and regulations pursuant

thereto."  D.C. Code § 1-631.03 (2008) (emphasis added).  This provision has no applicability to

civil litigation, but rather to law enforcement requests, and is, in fact, an admonition to **cooperate**

in providing personnel information.  Even if the § 1-631.03 were not limited to law enforcement

---

[2] The District also based its claim of privilege on District Personnel Manual Section 3102.01, which is identical to
D.C. Code § 1-631.03.

[3] The District has surely waived any reliance on § 2-534(a), which, in any case, is an exception to D.C.'s FOIA
which has no relevance here.

LIBW/1681600.1

requests, it is unlikely that its one caveat to cooperation with authorities – "unwarranted invasion[s] of personal privacy" – would ever apply to relevant civil discovery.[4]  If the material is otherwise discoverable (i.e., relevant to a claim or defense and not otherwise objectionable), there is nothing "unwarranted" about the request.  There is certainly no "unwarranted invasion of personal privacy" where the employees at issue are also individual defendants in the lawsuit.

At least one court has previously rejected the District's attempt to apply now-§ 1-7731.03 as a privilege in civil litigation.  *See Truelove v. Trustees of Univ. of D.C.,* 1991 U.S. Dist. LEXIS 1512 (D.D.C. 1991).  That Court concluded that § 1-631.03 (which was then numbered § 1-632.3) does not create a discovery privilege.  It stated that the District "has not pointed to any valid state law privilege protecting this material from discovery [but merely referenced D.C. Code § 1-632.3 which] . . . "[b]y its own terms, this provision is only a policy concerning the provision of information to law-enforcement authorities and D.C. government personnel." *Id.* at *3.[5]

The District has also tried to build a discovery privilege from a pair of D.C. Code sections (§§ 5-113.01 and 5-113.06)[6] that instruct the MPD, respectively, to keep certain types records and to make a subset of those types of records available for public inspection.  That the D.C. Code requires some (but not all) types of records be available for ready public inspection does not mean that all of the other types of *are protected from discovery in civil litigation.*  It

---

[4] And if it did, the provisions of Rule 26(c), applicable to all litigants, provide courts and the District with ample procedure for balancing the needs of discovery and the protection of personal information.

[5] The Court did go on to say **even if** one credited the District's characterization of the rule as a "broad principle," that still did not save the District because the Court was issuing an Order and that that was, at most, what could be required.  *Id.* at *3-4.  This is not holding.  If it were, it would have the de facto effect of requiring all litigants against the District  have to go through the time and delay of moveing to compel the District every time any personnel documents are at issue.  The language of § 1-631.03 simply does not support that the legislature had any such intention in passing this very general (and non-discovery related) section of the D.C. Code.

[6] Although the District does not appear to be relying on these Code sections in this motion, it did do so in its discovery responses, which are also before this Court, and it would be efficient to deal with all of the Code sections at one time.

LIBW/1681600.1

merely means that the MPD need not have all records available for ready public inspection. If the District of Columbia wished to create a discovery privilege it could legislate to do so; it has not.

Finally, the District has raised § 2-534(a) as a basis of its privilege. First, such a claim has surely been waived by the District's failure to assert it in a timely manner. Second, although stated nowhere in the District's brief, § 2-534(a) *is an exception to D.C.'s FOIA law.* An exemption to FOIA simply does not, under any theory of statutory interpretation, create a privilege for relevant documents in civil discovery. Furthermore, the exemption from FOIA is a narrow one for "[i]nformation of a personal nature where the public disclosure thereof would constitute a *clearly unwarranted invasion of personal privacy*." This is an even narrower exemption to disclosure than § 1-631.03, discussed above. Responses to relevant discovery will never meet this standard, even if we posited that it had some applicability to civil discovery.

*2. The District has waived any claim of privilege.* The District has waived any possible claim of privilege by failing to provide a privilege log as required Fed. R. Civ. P. 26(b)(5)(A). The District did not produce a privilege log with its discovery responses and it did not produce a privilege log after Plaintiff requested one during the April 29 and 30 meet-and-confer call and it did not produce a privilege log when it filed this motion. Only on June 20, 2008, *after* Plaintiff filed her motion to compel and *after* the District filed this motion, the District finally produced what it claims is a privilege log. See Ex. A to this brief. This log has three entries. It lists "Employee Class History" (presumably, the personnel file) for each of the individual defendants. This log certainly does not describe the documents in the personnel files with the specificity required by Fed. R. Civ. P. 26(b)(5)(A)(ii). It is wholly insufficient for to "enable other parties to assess the claim [or privilege]." *Id.*

8

This belated and wholly inadequate gesture cannot save the District's unsupported claim of privilege. Providing a privilege log is no academic exercise; it is absolutely essential for evaluating a claim of privilege, which cannot be done in the abstract.

Hypothetically engaging the District's claim of privilege will illustrate why this is so. The "personnel files"[7] presumably contain numerous types of documents and information. Any discussion of whether a particular disclosure is "an unwarranted invasion of personal privacy," *see* D.C. Code § 1-631.03, depends on the character of the document. The only documents that Plaintiff knows for certain are part of the personnel records are the individual defendants' training records, which are the subject of the District's June 20, 2008, motion for a protective order offering to produce the individual defendants' (and their supervisors') training records subject to a confidentiality order.[8]

During the meet-and-confer call regarding that June 20, 2008, motion, Plaintiff's counsel learned that, while the AAG had not even seen the training records he was claiming were privileged, he believed them to be either a check list or list of trainings attended, or a page for each training certifying attendance. It is hard to imagine what an individual officer's "privacy interest" might be in what trainings he attended in his professional capacity. When Plaintiff's counsel put this question to the AAG, he had no answer, but stated only that his position was that training records were protected because they were part of the personnel file. It is also hard to imagine how learning what trainings and officer attended is an "***unwarranted*** invasion" of any

---

[7] Plaintiff **does not** concede that the listed "Employee Class History" necessarily constitutes the individual defendants' entire "personnel records." Personnel – including disciplinary, training, and complaint – records are required by Plaintiff's request, in whatever form they are kept.

[8] Pursuant to a proposed confidentiality order, the District has astonishingly offered to produce a sliver of the personnel records it claimed in this very motion it is "***precluded by statute*** from releasing." The District is either precluded by statute or it is not; this is not a cloak that can be donned and removed at will.

hypothetical privacy interest in case where the District's training and supervision of officers is at issue.

As this example illustrates, it is impossible to evaluate the so-called privilege in the abstract. Yet, despite numerous opportunities to provide a privilege log in compliance with 26(b)(5)(A)(ii), the District has not done so. It has waived any claim of privilege it might have had. See, *e.g.*, *Bregman v. District of Columbia*, 182 F.R.D. 352, 363 (D.D.C. 1998) ("[F]ailure to comply with Fed. R. Civ. P. 26(b)(5), requiring him to file a privilege log, bars in itself any claim of privilege, whatever its basis").

*3. There is no "unwarranted invasion of personal privacy."* Even if one engages this issue on the District's terms, the District has not established that the requested discovery is "an unwarranted invasion of personal privacy." Establishing the applicability of a privilege is, of course, the burden of the party claiming the privilege, and the District has offered no evidence. See, *e.g., Elkins v. District of Columbia*, 2008 U.S. Dist. LEXIS 41391, at *13 (D.D.C. May 28, 2008); *In re An Application to Enforce Admin. Subpoena of the United States CFTC v. McGraw-Hill Cos.*, 507 F. Supp. 2d 45, 50 (D.D.C. 2007). Furthermore, the personnel records are relevant to establishing both the liability of both the individual defendants and the District, as detailed above. As relevant discovery in litigation against defendant officers and the District, there is nothing **unwarranted** about their production, even if one presumes a "personal privacy" interest that the District has not carried its *evidentiary burden* of establishing.

*4. Court Order.* The District claims (at 5) that it could produce the requested information pursuant to a Court order.[9] It offers no reason whatsoever why this Court should not issue such an order. And the District's time for making such arguments is surely past. Plaintiff

---

[9] Plaintiff is unsure of where the District is deriving this requirement.

therefore requests that this Court, if it is necessary to resolve this issue, issue such an order forthwith.  However, Plaintiff does not believe that she or future litigants should be made to go to the burden and expense of seeking a Court order to obtain relevant discovery.

5. *Confidentiality.*  The District has not sought a confidentiality-type protective order, throwing all of its eggs in the basket of total privilege from discovery.  Plaintiff would be willing to accept the individual defendants' home addresses (as well as the addresses of any other officers sought in discovery) under a confidentiality agreement.  Similarly, any social security numbers and similar personal identification information should be subject to the confidentiality agreement.  This should obviate concerns (at 5) for "the safety of the named MPD officers."  However, the remaining documents subject to this motion should not be covered by a confidentiality order.  "[T]he presumption inherent in Rule 26(c) is that discovery should be open," *Avirgan v. Hull*, 118 F.R.D. 252, 255 (D.D.C. 1987), and the District has not asked for much less present the specific facts necessary to obtain a confidentiality order.

## II.      Responding to Plaintiff's Discovery Requests Does Not Constitute an Undue Burden Upon the District.

The District seeks to avoid producing relevant documents and information in this litigation through trumped-up arguments of "burden."  The District correctly identifies the analysis here as one of balancing Plaintiff's need for the requested discovery with the burden of complying with the requests.  *See, e.g., Peskoff v. Faber*, 244 F.R.D. 54, 59 (D.D.C. 2007).  Where the District goes wrong is in its willingness both to give short shrift to Plaintiff's need and exaggerated importance to the desire to be relieved of its burden.

### A.      Plaintiff's Claims.

Understanding the importance of Plaintiff's discovery requests begins with understanding her claims.  She has alleged that the Individual Defendants unlawfully arrested her on a charge of

disorderly conduct without probable cause because they did not appreciate her criticisms of

them. [Am. Compl. ¶¶ 48-52; 64-67.] Plaintiff further alleges that the Individual Defendants

believed that they could effectuate this illegal and unconstitutional arrest because they knew

there would be no further scrutiny of the arrest if Plaintiff posted and forfeited (that is, elected a

procedure whereby a person charged with certain misdemeanors may simultaneously post and

forfeit an amount as collateral – which otherwise would serve as security upon release to ensure

the arrestee's appearance at trial – and thereby obtain a full and final resolution of the criminal

charge). [*Id*. at ¶ 27, 35.] Offered only the option of post-and-forfeit release and **not** citation

release (a procedure whereby am arrestee is given a citation to appear in court at a later date and

is released on her own cognizance),Plaintiff's arrest would see no further judicial or

prosecutorial scrutiny in the normal course. [*Id*. at ¶ 25.]

But Plaintiff did not just bring claims against the Individual Defendants. She has also

sued the District of Columbia on a theory of respondiat superior for her common law claims and

under 42 U.S.C. § 1983 for her constitutional, or *Monell*, claims. Understanding Plaintiff's

constitutional claims requires an understanding of the District's history with disorderly conduct

arrests. In 2003, the Citizen Complaint Review Board ("CCRB") sustained several complaints

against officers who used disorderly conduct arrests as punishment for confrontational

interactions between citizens and the officers. [Ex. C, at 1, 7.] These complaints are shockingly

similar to Plaintiff's own Complaint. [*Id.* at 7-10.] Seeing a pattern, the Office of Citizen

Complaint Review ("OCCR"), the CCRB's governing body, conducted an investigation and

discovered that the District's rate of disorderly conduct rates was several times that of other

major cities. [*Id.* at 10-14.] The OCCR was also concerned that the post-and-forfeit procedure

might be contributing to the misuse of the disorderly conduct offense by some officers because

arrests where that procedure was utilized received no further scrutiny. [*Id.* at 2, 17.] Ultimately, the OCCR concluded: "The high number of disorderly conduct arrests, combined with an arrest procedure that allows citizens arrested for disorderly conduct to post-and-forfeit . . .[leaves] the potential for a large number of improper or unlawful disorderly conduct arrests in Washington, D.C." [*Id.* at 5.] The OCCR made several recommendation to the MPD for correcting the problem,[10] and recommended that the MPD monitor the use of disorderly conduct arrests through statistical sampling. [*Id.* at 20.] Plaintiff believes that the District failed to rectify these problems, and that its officers, through the time of Plaintiff's arrest and possibly to this day, customarily make retaliatory disorderly conduct arrests without probable cause, opening it up to § 1983 liability under *Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658 (1978) (holding that a municipality can be held liable for an official policy or a custom). Even if the District had not been previously warned about its disorderly arrest problem, Plaintiff would be entitled to try to show that the District had a pattern or practice of retaliatory disorderly conduct arrests without probable cause.

Most of the information and documents subject to this Motion go to establishing the District's § 1983 liability (although other complaints against and other arrests by the individual defendants also go to their individual liability). The discovery for which Defendant claims an "undue burden" falls into three categories. First is information about other disorderly conduct arrests (Interrogatory 9) and other arrests that were resolved with either post and forfeit or citation release (Interrogatory 10) and documents regarding the same (Request for Production 12). Second is complaints against the Individual Defendants (Interrogatory 12).[11] The third

---

[10] The extent of the MPD's compliance with the recommendations is unclear from future OCCR and OPC annual reports, and other of Plaintiff's discovery requests are aimed at determining that.

[11] This Interrogatory is misquoted by the District. It requests: For each Complaint that has been made to or filed with the MPD, the Office of Police Complaints, or the Office of Professional Responsibility (or any other municipal

category is all documents related to arrests *made by or involving the individual defendants* where a) post and forfeit was offered or utilized, b) citation release was offered or utilized, or c) the charge was disorderly conduct (Request for Production 13).

In its Motion, the District attempts to paint these distinct discovery requests with one broad brush despite the fact that these requests seek distinct responses. The District further focuses on a minor part of Plaintiff's Amended Complaint (the Individual Defendants' failure to offer Plaintiff citation release) in an unconvincingly attempt to try to paint Plaintiff's requests as irrelevant by focusing on their relevance to this one minor point (failure to offer citation release) rather than the whole of Plaintiff's allegations.[12]  This attempt to excise 95% of Plaintiff's allegations (including all of her allegations against the District) must be rejected.  Also, in advancing this unpersuasive argument, the District makes (at 7-8) several unsupported (and likely incorrect) statements about the post-and-forfeit procedure.[13]

---

entity) about or against any of the Individual Defendants, provide the following information:  a. Name and Address of Complainant; b. Date of Complaint; c. Nature of the Complaint; d. Date of Incident about which Complaint was made; e. Name and Badge Number of each MPD Officer, including any of the Individual Defendants, named in Complaint; f. Disposition of Complaint, including any disciplinary action taken.

[12] In particular, the District, somewhat irrelevantly, states that plaintiff was not "required" or "forced" to post and forfeit, but nowhere in Plaintiff's Amended Complaint did she allege that she was.  Rather, she complains that she was arrested without probable cause and that the Individual Defendants attempted to hide what they knew was an improper arrest by offering post-and-forfeit, but not citation release.  In any case, Plaintiff's requests do not relate primarily to individual decisions of officers, but to the District's management of the use of the disorderly conduct charge, the post-and-forfeit procedure, and the citation release procedure.

[13] While Plaintiff does not believe that these claims are legal relevant, in any event, it is worth noting that they are factually dubious to avoid confusion in this case.  The District claims that offering the post-and-forfeit procedure is "purely discretionary" (although the relevance of that point to the present motion remains unclear).  The Plaintiff has not yet seen the MPD policies and procedures in place at the time of Plaintiff's arrest because of the District's failure to comply with other relevant discovery requests.  But, suffice it to say, Plaintiff doubts that these policies and procedures awarded individual officers "pure discretion" to decide whether to offer post and forfeit (and if they did have "pure discretion" that would potentially raise a whole other set of constitutional infirmities).  Absent the relevant documents, the District has attached a General Order that it claims supports this "pure discretion" but 1.) the document never says anything of that sort; 2.) the portion referenced deals with Violation Citations (tickets) **not** arrests and so has no applicability to this case; and 3.) the document is dated June 20, 1980, well predating the 2004 post-and-forfeit reform statute, D.C. Code § 5-335.01, so it is very unlikely that it was in effect at the time of Plaintiff's arrest.  (Plaintiff also notes that the AAG appears – perhaps having failed to obtain documents from his client – to have obtained this order from a private website (www.lefande.com), and so its authenticity appears to be unverified.)  In addition, the offer of citation release is **certainly** not discretionary.  D.C. Code § 5-335.01(c) & (d)

B.    The District's Meritless Claims of Undue Burden.

With this context in mind, we turn to the District's claim that the requested discovery is "unduly burdensome."  Just because discovery will be costly or expensive does not make it unduly burdensome.  *See Fann v. Giant Food, Inc.*, 115 F.R.D. 593, 596 (D.D.C. 1987) ("[B]urden alone does not allow a party to avoid complying with a legitimate discovery request. Rather the burden must be *unduly* burdensome or expensive."); *see also United States v. Nysco Labs., Inc.*, 26 F.R.D. 159, 161-62 (E.D.N.Y. 1960) ("If the Interrogatories are relevant, the fact that they involve work, research, and expense is not sufficient to render them objectionable."); *Kozlowski v. Sears, Roebuck & Co.*, 73 F.R.D. 73, 76 (D. Mass 1976) ("Merely because compliance with a "Request for Production" would be costly or time-consuming is not ordinarily sufficient reason to grant a protective order where the requested material is relevant and necessary to the discovery of evidence.").

Federal Rule 26(b) makes clear that in deciding whether a request is *unduly* burdensome, the Court should balance the burden of production with the potential relevancy of, or need for, the documents. Fed. R. Civ. P. 26(b)(2)(C); *see also Peskoff v. Faber*, 244 F.R.D. 54,59 (D.D.C. 2007); *Alexander v. F.B.I.*, 194 F.R.D. 316, 325-26 (D.D.C. 2000).  This Court has traditionally interpreted relevancy broadly, to mean "any material that bears on, or that reasonably leads to other matters that could bear on, any issue that is or may be in the case."  *Alexander*, 194 F.R.D. at 325.

With this test in mind, the District has failed to demonstrate 1) that responding to all of the challenged requests requires any great burden at all; and 2) that any actual burden is excessive and "undue" under the balancing test.  Furthermore, where the "burden" arises because

---

**require** the officers to give a written notice which includes discussion of the availability of citation release to all arrestees offered post-and-forfeit.

of the District's failure to keep its records in a reasonable manner, then such a "burden" will not excuse production.

*Interrogatory 12*:  This request seeks information about complaints made against the individual defendants.  The District submitted an affidavit from Thomas Sharp of the Office of Police Complaints, but that declaration fails to address the OPC's ability to search for complaints by the *name* of an individual officer.[14]  Searching for the individual defendants' *names* should produce a completely manageable subset of documents.  In any case, the District has failed to provide any evidence that the search actually required by Interrogatory 12 would be even moderately burdensome.[15]  For this reason alone, the District's undue burden objection to Interrogatory 12 should be overruled.  Coupled with the relevance of the history of complaints to establishing the individual defendants' improper motives in arresting Plaintiff and to establishing the District's failure to supervise or train its officers, the District's motion must doubly be overruled.

*Request for Production 13*:  This request seeks documents related to arrests by or involving the individual defendants where either the charge was disorderly conduct, post and forfeit was offered, or citation release was offered.  Because this request covers arrests involving the three individual defendants only, it covers only a small universe of potentially responsive arrests.  The declaration from Deloris Hunter demonstrates how easy it would be to identify the relevant materials.  She declares (at ¶ 4) that "officer name and badge number" are searchable fields in the District's database system.  As a starting point, responsive material will be

---

[14] Mr. Sharp's declaration states that his office only handles complaints made to the Office of Police Complaints, and that the MPD handles complaints made directly to the MPD.  [Sharp Decl. ¶ 3.]  Plaintiff is, of course, entitled to these complaints as well, and so the AAG needs to find out who keeps complaints made to the MPD rather than the Office of Police Complaints, identify those complaints about the individual defendants, and produce them.

[15] Mr. Sharp's declaration appears to be aimed at Request for Production 12.

dramatically narrowed by simply searching for the individual defendants' names.  Since "charge" is also a searchable field, *id.*, it will be simple to identify the three individual officer's disorderly conduct arrests.[16]  It is likely that the number of disorderly conduct arrests involving these three officers is a manageable number (and the District has not put in any evidence to the contrary, which is its burden of proof).  That leaves identifying *non*-disorderly conduct arrests where post and forfeit or citation release was used or offered.  Unfortunately, the District's motion gives neither Plaintiff nor the Court the means of evaluating that burden since it has failed to put in evidence regarding how resolution of an arrest is stored, how long the individual defendants have been working, or how many non-disorderly arrests they participate in each year.  Even assuming the (unlikely) worst case scenario that there is no way for the District to electronically search by how a case was resolved to determine whether post and forfeit or citation release was offered, it would not seem to be an insurmountable task for someone at the District to pull whatever record shows the resolution of an arrest for all of the three individual defendants' non-disorderly conduct arrests and merely check whether post and forfeit or citation release was used (and, in any case, the District having failed to put in actual evidence, the Court is not required to assume the worst case).[17]  Absent evidence that there is an actual burden here, the District's motion should be denied as to Request for Production 13.

*Interrogatories 9 and 10*:  The District has waived its right to claim that these two Interrogatories are unduly burdensome because it failed to make the objection in its written objections to Plaintiff's discovery.  See Fed. R. Civ. P. 33(b)(2) ("The responding party must serve its answers ***and any objections*** within 30 days after being served with the interrogatories.

---

[16] This would include both arrest for which they were listed as an arresting officer (item 9 of the PD-163) and arrests for which they were listed as an assisting officer (item 42 of the PD-163).

[17] It may be as simple as looking for cases were a PD-67 was issued (Collateral Receipt) in the case of post and forfeit.  There is likely a corresponding form for citation releases.

A shorter or longer time may be stipulated to under Rule 29 or be ordered by the court") & (b)(4)

("***Any ground not stated in a timely objection is waived*** unless the court, for good cause,

excuses the failure.") (emphasis added).

Nonetheless, in the hopes of encouraging discovery cooperation, Plaintiff has

dramatically reduced what she is asking for in these requests.  She has narrowed her request to a

one year period between November 2004 and November 2005.  She has also offered to accept

PD-163s and whatever document shows whether the arrestee utilized post and forfeit or citation

release, if the District would prefer producing documents to writing out Interrogatory answers.

This information is very important to Plaintiff's case.  She (or her expert) will use it to

establish the District's *Monell* liability by showing a pattern and practice of retaliatory disorderly

conduct arrests without probable case.  She may also show a pattern and practice of officers

hiding those unconstitutional arrests by offering post and forfeit only, rather than offering both

post and forfeit and citation release.  In fact, the OCCR relied in part on statistical evidence to

conclude that the MPD had a problem with its disorderly arrests.  Plaintiff's evidentiary burdens

are higher than the OCCR's, and she is entitled to this evidence to develop her showing of the

District's *Monell* liability.

While it will undoubtedly be time consuming for the District to assemble the requested

information, it will not be nearly as time consuming as the District suggests and "burden alone

does not allow a party to avoid complying with a legitimate discovery request.  Rather the

burden must be *unduly* burdensome or expensive."  *Fann*, 115 F.R.D. at 596.

First, Interrogatory 9 requires the PD-163 and whatever document shows whether post-

and-forfeit or citation release was used be produced (or that the District write out information

from these forms) for each disorderly conduct arrest.  Since, according to Ms. Hunter, "charge"

is a searchable field in the District's data basis, the District should easily be able to identify all of the responsive arrests. Ms. Hunter states (at ¶ 6) that there are 22,640 arrests that fit this category. While Plaintiff has no direct basis to contest this number, she does note that 22,640 is more than twice the number of disorderly arrests than was made in almost every years between 1995-2000, a time period when the OCCR (now the Office of Police Complaints) was warning that the District's rate of disorderly conduct arrests was much higher than that of other large cities. [Ex. C, at 10-15.] Either Ms. Hunter has identified an incorrect number, or else the District's disorderly rate had skyrocketed by 2005. If the latter is true, then Plaintiff's requested discovery is all the more relevant, given that the OCCR believed that an excessively high disorderly rate was a warning sign of a systematic problem of improper disorderly arrests. [*Id.* at 21.]

The District complains that retrieving the documents will take many hours because it has not created an electronic recording system that allows for easy document retrieval. The District claims, through Ms. Hunter's Declaration, that the PD-163s are not stored and available electronically. [Hunter Decl. ¶ 4-5.] Therefore, the District claims, it will have to hand pull each of the files and copy the PD-163s.[18] [*Id.* ¶ 5.]

In the interest of a fair and open administration of justice, the District should not be permitted to evade discovery because of its own inefficient recording system. *See Fagan v. District of Columbia*, 136 F.R.D. 5,7 (D.D.C. 1991) ("Plaintiffs should not suffer if the information is not easily accessible because defendants have an inefficient filing system"); *Prouty v. Ntn'l Railroad Passenger Corp.*, 99 F.R.D. 545, 548 (D.D.C. 1983) ("[T]he fact that only a small portion of this information is on [opposing party's] computerized employee data

---

[18] The District also assigns a very high amount of time – 30 minutes – for copying each PD-163. [Hunter Decl. ¶ 7.] Presumably, this number could be dramatically reduced by establishing a reasonable routine.

system cannot immunize defendant from discovery."); *Kozlowski v. Sears, Roebuck & Co.*, 73 F.R.D. 73.76 (D. Mass 1976) ("The defendant may not excuse itself from compliance with [the Federal Rules of Civil Procedure] by utilizing a system of record keeping which . . . makes it unduly difficult to identity or locate [files], thus rendering the production of documents an excessively burdensome and costly expedition.").

For Plaintiff to be successful in her claim against the municipality District, it is imperative that Plaintiff shows that the misuse of the disorderly arrest (possibly in combination with post and forfeit) had risen to a level of "an official policy or custom." *See Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658 (1978). The disorderly arrest records she seeks will allow her to show a pattern or practice of retaliatory disorderly conduct arrests without probable case.[19] The fact that the District must search for the documents by hand because of its inefficient and un-standardized recording system should not prejudice Plaintiff's ability to gather the evidence necessary to bring her claim. *McDowell v. District of Columbia*, 233 F.R.D. 192, 201 (D.D.C. 2006) (holding that the District's withholding of discovery information was prejudicial to plaintiff's ability to establish the necessary elements of a *Monell* claim against the District for police abuse of the strip search).

Second, Interrogatory 10 seeks the same information regarding non-disorderly conduct arrests where post-and-forfeit or citation release was used. Plaintiff seeks this information to determine, by statistical analysis, whether post-and-forfeit is being applied (and citation release not offered) to disorderly arrests in particular (possibly to hide improper disorderly arrests), or whether it is being similarly employed in all types of arrests. Plaintiff and the Court have no

---

[19] These records for statistical analysis are made all the more imperative by the District's otherwise failure to participate in discovery. If, for example, studies have already been done of the MPD's disorderly arrests (as the OCCR recommended), the records at issue in the motion may be less important (depending on the content of any studies, which have not been produced to Plaintiff). If the District has failed to study and report on the MPD's disorderly arrests, then the records sought by Interrogatory 9 are paramount.

means of evaluating how burdensome it would be for the District to identify the responsive arrests since the District has failed to identify how the resolution of an arrest is stored. It also has failed to state how many arrests would be implicated by this request. Based on anecdotal evidence, Plaintiff does not believe that post-and-forfeit was widely used for arrests other than for disorderly conduct arrests, so this may not be a large number).[20]  Having failed to carry its burden of showing actual burden in complying with the discovery request, the motion for a protective order should be denied as to Interrogatory 10.

*Request for Production 12*:  This request seeks all documents related to arrests involving disorderly conduct, post-and-forfeit, or citation release. One category of documents covered by this request are the documents containing the same information sought by Interrogatories 9 and 10, which are in Ms. Hunter's province. For the reasons discussed above in the context of these Interrogatories, providing these documents is not unduly burdensome. For this portion of the request, as with the Interrogatories, Plaintiff is willing initially to accept the PD-163s and whatever document shows how the arrestee's release was processed.

What is covered by the request that has not previously been discussed is complaints about arrests involving disorderly conduct, post and forfeit, or citation release. The District complains about the burden of finding responsive documents in the possession of the Office of Police Complaints ("OPC"). Yet this burden does not bear up to scrutiny. According to Mr. Sharp, the OPC received approximately 340 complaints between November 15, 2004, and November 15, 2005. [Sharp Decl. ¶ 7.] The task for the District, then will be to identify which of these 340 complaints relate to either disorderly conduct charges, post and forfeit, or citation release. The

---

[20] Furthermore, § 5-305.1(h) of the D.C. Code requires the Mayor to annually report statistical data on the use of the post-and-forfeit procedure to the City Counsel. The District is required to separate the data on how many crimes were resolved using the post-and-forfeit procedure that year by specific charge. Certainly, the District's City Council would not require the District to produce this report if it believed the costs of doing so were "unduly burdensome" compared to the benefit of making sure the post-and-forfeit is not misused.

LIBW/1681600.1

District chose on its own a set of "key words," without consulting Plaintiff, including such absurdly broad words "arrest," "citation," and "conduct." [Sharp Decl. ¶ 10.] When these words were run through OPC's database, they turned up 160 potentially relevant complaints, which the District maintains would have to be hand reviewed. [*Id*.] If the District were to use reasonable search terms – Plaintiff proposes "disorderly conduct," "post and forfeit," "post-and-forfeit," "collateral forfeiture,"[21] "forfeit collateral," "post" within three words of "forfeit," and "citation release" – the number of potentially relevant complaints should be significantly reduced. Nor would a District employee need to review an entire complaint file (including videos, recordings, and other evidence gathered); he or she would only need to review the file far enough to see whether the complaint involved a disorderly conduct arrest, post and forfeit, or a citation release.

Furthermore, the OPC has stated its intention "to keep this statistical information [on disorderly conduct arrests] so that it can report about the complaints in a more systematic and thorough manner." [Ex. C, at 10.] The District may find that some of its work has already been done for it, if the OPC followed through on this promise.

Once OPC has identified the relevant complaints, the District would then need to spend some time copying the document and (it maintains) reviewing them for privilege. Mr. Sharp estimates that there will be approximately 80 responsive files (perhaps this assessment should be reevaluated after more reasonably search terms are run through OPC's system). [Sharp Decl. ¶ 12.] Mr. Sharp believes it will take 40 hours to copy these 80 files, and then another 15 to 20 hours to review them for privilege (he does not identify what privileges might apply). [*Id*. at 12-13.] Even if we take the District at its word regarding the time this will take, this is ***not*** an overwhelming amount of time for providing documents – complaints about the procedures that

---

[21] And alternative term for "post and forfeit."

Plaintiff has alleged the District has a custom of abusing – that are at the core of *Monell* liability. Given the constitutional questions this case implicates, and the concern about systematic abuse of the post-and-forfeit procedures to insidiously shield bad arrests from scrutiny, it is imperative that Plaintiff be able to receive her requested discovery.  In other words, there is nothing *undue* about the burden, under the balancing tests of *Peskoff v. Faber*, 244 F.R.D. 54, 59 (D.D.C. 2007) and similar cases.

Mr. Sharp also declared that the MPD itself investigates complaints.[22]  The District has not asserted and has provided no evidence that retrieving these complaints would be unduly burdensome.  Because these complaints are also responsive to Plaintiff's request, the AAG assigned to this must identify the proper record holder at MPD and obtain the documents.

Since Plaintiff's discovery requests are not *unduly* burdensome under Fed. R. Civ. P. 26(b)(2)(C), the District's motion for a protective order should be denied.

## CONCLUSION

For the above stated reasons, the District's motion for a protective order should be denied in its entirety.

DATED:  June 26, 2008

---

[22] "A member of the public who wishes to file a complaint against an MPD or DCHAPD officer may also choose to file a complaint directly with either police department that will be investigated and resolved by the police department."  Sharp Decl. ¶ 3.

Respectfully submitted,


_____//s//_____
John Moustakas (DC Bar # 422076)
Sarah Keast (DC Bar # 493632)
Goodwin | Procter LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 346 – 4000
(202) 346 – 4444 (fax)


Arthur B. Spitzer (DC Bar #235960)
Frederick V. Mulhauser (DC Bar # 455377)
American Civil Liberties Union
       of the National Capital Area
1400 20th Street, NW, Suite 119
Washington, DC 20036
(202) 457-0800
(202) 452-1868 (fax)


Attorneys for Plaintiff Lindsay Huthnance

LIBW/1681600.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| LINDSAY HUTHNANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-CV-1871 (HKK) |
| | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## [PROPOSED] ORDER

Before the Court is the District of Columbia's June 11, 2008, motion for a

protective order.  Upon consideration of the parties' submissions, the motion is hereby

DENIED.


DATED:

So ORDERED:


_____
United States Magistrate Judge
John M. Facciola

# Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LINDSAY HUTHNANCE, | ] |
| | ] |
| Plaintiff, | ] |
| | ] Civil Action No. 06-CV-1871 (HKK) |
| v. | ] |
| | ] |
| DISTRICT OF COLUMBIA, *et al.,* | ] |
| | ] |
| Defendants. | ] |
| | ] |

### DEFENDANT DISTRICT OF COLUMBIA'S S' LOG OF PRIVILEGED DOCUMENTS

TO:  John Moustakas, Esq.
Sarah Keast, Esq.
Goodwin Procter LLP
901 New York Avenue, NW
Washington, DC 20001

Arthur B. Spitzer, Esq.
Frederick V. Mulhauser, Esq.
American Civil Liberties Union of the National Capital Area
1400 20th Street, NW, Suite 119
Washington, DC 20036

Pursuant to Federal Rule of Civil Procedure 26(b)(5), defendant District of Columbia

provides the following log of privileged documents.

| Date | Author/Recipient | Document Type and Description | Privilege |
|---|---|---|---|
| June 12, 2008 | Unknown/Eric S. Glover | Employee Class History of Officer James P. Antonio | The District objects to production of the requested document as the document is confidential and the request for release is an unwarranted invasion of personal privacy. See D.C. Official Code §§ 1-631.01, and 1-631.03 (2001 ed.), 5-113.01, 5-113.06 and 3102.01 of the District Personnel Manual. |

| June 12, 2008 | Unknown/Eric S. Glover | Employee Class History of Officer Liliana Acebal | The District objects to production of the requested document as the document is confidential and the request for release is an unwarranted invasion of personal privacy. See D.C. Official Code §§ 1-631.01, and 1-631.03 (2001 ed.), 5-113.01, 5-113.06 and 3102.01 of the District Personnel Manual. |
| June 12, 2008 | Unknown/Eric S. Glover | Employee Class History of Officer Jose A. Morales, Jr. | The District objects to production of the requested document as the document is confidential and the request for release is an unwarranted invasion of personal privacy. See D.C. Official Code §§ 1-631.01, and 1-631.03 (2001 ed.), 5-113.01, 5-113.06 and 3102.01 of the District Personnel Manual |

Respectfully submitted,

PETER J. NICKES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

PATRICIA A. JONES [428132]
Chief, General Litigation, Sec. IV

ERIC S. GLOVER [978841]
Assistant Attorney General
441 4th Street, N.W., 6th Floor North
Washington, DC 20001
(202) 442-9754; (202) 727-6295
E-mail: eric.glover@dc.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that true copies of the foregoing Log of Privileged Documents were

mailed first-class this 20th day of June 20, 2008, to:

John Moustakas, Esq.
Sarah Keast, Esq.
Goodwin Procter LLP
901 New York Avenue, NW
Washington, DC 20001

ERIC S. GLOVER [978841]
ASSISTANT ATTORNEY GENERAL

# Exhibit B

**Keast, Sarah**

| | |
|---|---|
| **From:** | Keast, Sarah |
| **Sent:** | Wednesday, June 04, 2008 2:14 PM |
| **To:** | 'eric.glover@dc.gov' |
| **Cc:** | Moustakas, John |
| **Subject:** | Re: Lindsey Huthenance v. District of Columbia, et al |

Mr. Glover,

Please be advised that I do not consider your email below, sent after business hours on the day we informed you of our intention to file a motion to compel (which we twice met and conferred about), to satisfy your requirements to meet and confer under FRCP 26(c)(1) or LCvR 7(m).

The motion for a protective order that you propose is both untimely and duplicative of issues that, as you know, will be covered in our motion to compel.

We sincerely expect you will call to meet and confer about your motion, so that we might try to avoid this unnecessary and duplicative motions practice.

I will discuss availability for depositions with my client and get back to you.

Sarah S. Keast
**Goodwin Procter** LLP
901 New York Ave. NW
Washington, D.C. 20001
T: 202-346-4109
F: 202-346-4444
skeast@goodwinprocter.com

---

**From:** Glover, Eric (OAG) [mailto:eric.glover@dc.gov]
**Sent:** Tuesday, June 03, 2008 7:44 PM
**To:** Keast, Sarah
**Subject:** Lindsey Huthenance v. District of Columbia, et al

Ms. Keast,

Please be advised that the defendants will be filing a motion for a protective order with regard the exchanging of the home addresses of the individually named defendants as privileged and exchanging any information related to the names of arrestees, location of arrest, arrest number location of arrest, arresting and assisting officer and whether the arrestee was allowed to post and forfeit for all offenses related to any arrest for the years 2005-2007 as unduly burdensome. Additionally, please provide me with dates in which your client will be available for depositions within the next two weeks. Thank you.

**Eric S. Glover**
Assistant Attorney General
General Litigation Division, Section IV
Office of the Attorney General for the District of Columbia
441 Fourth Street, N.W. - Suite 600 North
Washington, D.C. 20001
Office: (202) 442-9754
Fax:  (202) 727-3625
eric.glover@dc.gov

6/25/2008

# Exhibit C



# Disorderly Conduct Arrests Made by Metropolitan Police Department Officers

Report and Recommendations of the

## Citizen Complaint Review Board

to

## Mayor Anthony A. Williams, The Council of the District of Columbia, and Chief of Police Charles H. Ramsey

**November 19, 2003**

**Citizen Complaint Review Board**

**Maria-Cristina Fernández, Chair
Dr. Patricia Fisher
Michael Sainte-Andress
Inspector Stanly Wigenton
Marc Schindler**

730 11th Street, N.W., Suite 500
Washington D.C.  20001
(202) 727-3838
Website:  www.occr.dc.gov

## Table of Contents

I.     Introduction and Overview .................................................................................... 1

II.    The Disorderly Conduct Statute and Related Cases ........................................... 3

III.   MPD Procedure for Making a Disorderly Conduct Arrest .................................. 5

IV.   OCCR Decisions Involving Disorderly Conduct Arrests .................................... 7

V.    MPD and Nationwide Arrest Statistics ............................................................. 10

VI.   Resolution of MPD Disorderly Conduct Arrests ............................................... 15

VII.  MPD Training ..................................................................................................... 18

VIII. Recommendations ............................................................................................... 19

    A.    Modify Arrest Procedure .............................................................................. 20

    B.    Training .......................................................................................................... 20

    C.    Message from the Chief Reinforcing Officer and Supervisor Responsibilities ............... 20

    D.    Examine Sample of Disorderly Conduct Arrests .......................................... 20

    E.    Review and Consider Revising Relevant Law and Rules .............................. 21

IX.   Conclusion ........................................................................................................... 21

## I.     INTRODUCTION AND OVERVIEW

Since the Office of Citizen Complaint Review (OCCR) opened in January 2001, the office has regularly received police misconduct complaints that involve arrests for disorderly conduct.[1] Four of OCCR's first 19 decisions, or over 20% of the decisions, dealt with allegations of an improper disorderly conduct arrest, and the allegations were sustained in all four cases.  In each of these decisions, the complaint examiner concluded that the officer harassed the citizen by arresting him for disorderly conduct because the facts developed in investigation did not justify the citizen's arrest.  The officer either did not understand or ignored the law regarding disorderly conduct in each of these situations, and appeared to be retaliating against the citizen for his behavior during the encounter with the officer.  These decisions, together with the allegations made in other complaints currently under investigation by OCCR, prompted the Citizen Complaint Review Board (CCRB), OCCR's governing body, to further examine disorderly conduct arrests made by Metropolitan Police Department (MPD) officers.[2] Consistent with its obligation to make recommendations to the Mayor, the Council of the District of Columbia, and the Chief of Police that, if implemented, may lower the occurrence of police misconduct,[3] CCRB submits this report and accompanying recommendations based on its examination of the issue.

CCRB's principal objectives for this report were to gather as much information as possible to develop a better understanding of disorderly conduct arrests made by MPD officers, and to consider whether any actions or changes by MPD might reduce the occurrence of improper disorderly conduct arrests.  Although there were practical constraints in terms of staff and access to some information that limited how far CCRB could carry its review of disorderly conduct arrests, CCRB examined a variety of information, which is summarized in this report.  The information included the disorderly conduct statute and related case law, MPD's procedure for making a disorderly conduct arrest, OCCR's decisions involving disorderly conduct arrests, MPD and nationwide arrests statistics, information and statistics regarding the resolution of MPD's disorderly conduct arrests, and MPD training materials.

---

[1]     Disorderly conduct is a violation of District of Columbia law.  *See* D.C. Official Code § 22-1321.

[2]     CCRB would like to acknowledge the assistance of OCCR's staff in preparing this report and accompanying recommendations.  OCCR's executive director, Philip K. Eure, and deputy director, Thomas E. Sharp, managed the project.  OCCR's management analyst, Samuel L. McFerran, also worked on the report, and OCCR summer law clerk, Andrew Szekely, who is enrolled at the George Washington University Law School, performed the initial research and provided other valuable assistance.  We also are grateful to MPD for its cooperation in providing information for and comments regarding the report, and to the Office of Corporation Counsel for providing information to CCRB.  We also appreciate the efforts of everyone else who contributed to the report.

[3]     When CCRB was created, it was vested with the responsibility to make recommendations, where appropriate, to the Mayor, the Council of the District of Columbia, and the Chief of Police "concerning those elements of management of the MPD affecting the incidence of police misconduct, such as the recruitment, training, evaluation, discipline, and supervision of police officers."  D.C. Official Code § 5-1104(d).  CCRB is able to gather information about the incidence of police misconduct through the work of OCCR, which has the authority to receive, investigate, and resolve "citizen complaint[s] against a member or members of the MPD … that allege[] abuse or misuse of police powers by such member or members."  D.C. Official Code § 5-1107(a).

As a result of its examination, CCRB believes that the OCCR decisions and the other complaints being investigated by OCCR may be a warning sign of a larger problem with disorderly conduct arrests made by MPD officers. Four decisions have already concluded that officers harassed citizens because they made improper disorderly conduct arrests, and many other complaints alleging similar misconduct are currently under investigation. Overall, disorderly conduct arrests are very common in the District of Columbia. MPD officers made 10,600 disorderly conduct arrests in 2000, which accounted for more than one in five arrests that year, and constituted the single largest category of arrests, nearly twice the number for the next largest category.[4] MPD's disorderly conduct arrest rate is significantly higher than the rate in nationwide statistics, ranging from two to four times the nationwide rate during the period from 1996 to 2000.[5] The high number of disorderly conduct arrests, combined with an arrest procedure that allows citizens arrested for disorderly conduct to "post and forfeit" a $25 "collateral"[6] at the police station at the time of the arrest without receiving any written notice about the collateral forfeiture process or its consequences, and without signing any acknowledgement of their choice of this option over the others available to them, leaves the majority of disorderly conduct arrests with little or no review after the arrest is concluded. Consequently, CCRB is concerned that there is the potential for a large number of improper or unlawful disorderly conduct arrests in Washington, D.C.

In light of the outcomes of the OCCR decisions, and the large number of disorderly conduct arrests that receive little or no review after the arrest is completed, CCRB recommends that MPD take steps that will help minimize the likelihood of improper disorderly conduct arrests, including changing its procedures, providing additional training to its officers, and reviewing a sample of disorderly conduct arrests to ensure that they comply with the law and MPD procedure. CCRB believes that failing to take these steps will adversely affect confidence in MPD and in its goal of providing fair law enforcement.

CCRB's specific recommendations are that the Mayor, the Council, and MPD should: (1) modify MPD's arrest procedure to ensure that all citizens who pay $25 to resolve their arrest are provided with written notice about the collateral forfeiture process and its consequences and that they sign an acknowledgment of their choice to pay the $25 collateral; (2) immediately begin providing additional training to all MPD officers and supervisors regarding the law and procedure related to disorderly conduct arrests; (3) distribute a videotape message from the Chief of Police reinforcing the responsibilities of all members of the Department when making disorderly conduct arrests; (4) examine a sample of the disorderly conduct arrests made by MPD officers that is significant enough to allow MPD to determine if there are any widespread problems in the entire pool of disorderly conduct arrests; and (5) review the criminal code regarding disturbances of the public peace, particularly disorderly conduct, and the rules regarding collateral forfeiture and consider whether the code or rules need to be revised, updated,

---

[4]     These statistics are drawn from MPD's arrest statistics for 2000, the most recent year for which this information is publicly available. *See* Metropolitan Police Department, Washington, D.C., *2000 Annual Report*, at 20-21 (2001).

[5]     The nationwide statistics are discussed in detail in Section V of this report, beginning on page 10.

[6]     The collateral essentially amounts to a fine for the offense, and, after it is posted and forfeited, it ends the arrest without any obligation for the person to appear in court at a later date to answer the disorderly conduct charge.

or changed, and also consider specific reforms, such as decriminalizing disorderly conduct and allowing individuals 15 days to decide whether to forfeit collateral or challenge their arrest.

## II.     THE DISORDERLY CONDUCT STATUTE AND RELATED CASES

Disorderly conduct is distinct from many other statutes in that most criminal prohibitions are intended to punish and deter crimes, whereas disorderly conduct is meant to give police the power to defuse a situation that disturbs the public.[7]  The goal of restoring public order comes from the concern that citizens who are being bothered or annoyed might choose violent self-help when someone is being loud on the street or otherwise causing a disturbance.[8]

The District of Columbia, like most jurisdictions in the United States, has a chapter in its criminal code that covers disturbances of the public peace.[9]  The D.C. Official Code divides disturbances of the public peace into several different offenses, one of which is disorderly conduct.[10]  The District's disorderly conduct statute provides:

> Whoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby:  (1) acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others; (2) congregates with others on a public street and refuses to move on when ordered by the police; (3) shouts or makes a noise either outside or inside a

---

[7]     Robert Force, *Decriminalization of Breach of Peace Statutes:  A Nonpenal Approach to Order Maintenance*, 46 Tul. L. Rev. 367, 373 (1972).

[8]     *Id.* at 373-74.

[9]     Most of the provisions in the criminal code chapter covering disturbances of the public peace were enacted around the turn of the 20th century.  The chapter includes a number of offenses that may have been relevant many years ago, but seem less relevant today, such as Dueling challenges, § 22-1302, Assault for refusal to accept a challenge, § 22-1303, Leaving the District to give or receive challenge, § 22-1304, Playing games in streets, § 22-1308, Throwing stones or other missiles, § 22-1309, Urging dogs to fight or create disorder, § 22-1310, Allowing dogs to go at large, § 22-1311, Kindling bonfires, § 22-1313, Flying fire balloons or parachutes, § 22-1317, and Driving or riding on footways in public grounds, § 22-1318.  The language of the disorderly conduct statute also is dated, although it appears to have been enacted in 1953.

[10]     Although not the focus of this report, modernization of the District's criminal code chapter covering disturbances of the public peace might be in order.  To the extent the Mayor and the Council undertake this work, we strongly encourage them to consider the changes proposed in the Model Penal Code, particularly insofar as they clarify and organize the offenses in this chapter, and decriminalize offenses whose purpose is to maintain order and not punish the people arrested under those provisions.

The Model Penal Code, which was completed in 1962, provides guidance for criminal law reform and modernization through a review of the prohibitions the criminal law contains, the excuses it admits, the sanctions it imposes, and the range of the authority that it distributes and confers.  Article 250 of the Model Penal Code covers riot, disorderly conduct, and related offenses, and is designed to assist jurisdictions in developing their law regarding this "vast area of penal law."  Model Penal Code, § 250.2, Explanatory Note for Sections 250.1-250.12.  As the Explanatory Note to Article 250 indicates, "disorderly conduct and related offenses form a critically important area of the criminal justice system.  Offenses in this category affect a large number of defendants, involve a great proportion of public activity, and powerfully influence the view of public justice held by millions of people."  *Id.* Consequently, the Model Penal Code works to systematize the relevant provisions of the law, provide rational penalties for offenses, including decriminalizing some of them, eliminate overlap of offenses, and modernize the offenses to remove obsolete provisions and cover behavior not previously covered.

building during the nighttime to the annoyance or disturbance of any considerable number of persons; (4) interferes with any person in any place by jostling against such person or unnecessarily crowding such person or by placing a hand in the proximity of such person's pocketbook, or handbag; or (5) causes a disturbance in any streetcar, railroad car, omnibus, or other public conveyance, by running through it, climbing through windows or upon the seats, or otherwise annoying passengers or employees, shall be fined not more than $250 or imprisoned not more than 90 days, or both.[11]

As the language of the statute plainly indicates, either "intent to provoke a breach of the peace" or "circumstances such that a breach of the peace may be occasioned thereby," is a necessary element of the disorderly conduct offense, along with engaging in one of the five proscribed activities.  Over the years, a series of cases has helped define the scope of the statute, including the meaning of "breach of the peace," and outlined the proper enforcement of the statute.  In *Williams v. District of Columbia*, the D.C. Circuit held that a breach of the peace occurs only when profane language "creates a substantial risk of provoking violence, or because it is, under 'contemporary community standards,' so grossly offensive to members of the public who actually overhear it as to amount to a nuisance."[12]  The reasoning of *Williams* was extended to the disorderly conduct statute eight years later in *Washington Mobilization Committee v. Cullinane*, where the court made it clear that both words and actions could cause a breach of the peace by provoking violence or creating a nuisance.[13]

Over the years, there have been challenges to the validity of the statute alleging, among other things, that it is too vague, and therefore violates the U.S. Constitution.  These challenges have regularly been rejected.  In 1962, in *Scott v. District of Columbia*,[14] the District of Columbia Court of Appeals held that the statute's "incommoding" language, which prohibits "congregat[ing] with others on a public street and refus[ing] to move on when ordered by the police,"[15] was not so vague as to constitute a threat to First Amendment rights.[16]  Similarly, in 1978, the court rejected a challenge to sub-section (4) of the disorderly conduct statute in *In the Matter of A.B., Jr.*,[17] holding that the language "jostling against such person or unnecessarily crowding such person or by placing a hand in the proximity of such person's pocketbook, or handbag,"[18] was sufficiently clear to give notice to members of the public of the conduct being proscribed.[19]

---

[11]    D.C. Official Code § 22-1321.

[12]    418 F.2d 638, 646 (D.C. Cir. 1969) (footnotes omitted).  The court was interpreting a different section of the D.C. Official Code, § 22-1307, criminalizing a breach of the peace caused by the use of profane language.

[13]    566 F.2d 107, 116 (D.C. Cir. 1977).

[14]    184 A.2d 849 (D.C. 1962).

[15]    D.C. Official Code § 22-1321(2).

[16]    *Scott*, 184 A.2d at 851.

[17]    385 A.2d 59 (D.C. 1978).

[18]    D.C. Official Code § 22-1321(4).

[19]    *In the Matter of A.B., Jr.*, 385 A.2d at 62.

In another line of cases, the District of Columbia Court of Appeals further defined the elements of disorderly conduct and explained what was sufficient evidence for a conviction.  To have probable cause to make an arrest for disorderly conduct, proof of an actual or impending breach of the peace is not necessary; however, the conduct must make a breach of the peace likely to occur.[20]  In *Chemalali v. District of Columbia*, the conduct that supported the defendant's conviction was "kicking and jabbing at pedestrians on the street" and both the trial and appellate courts found that the defendant's actions were "offensive actions which would tend to disturb, annoy, and interfere with [the pedestrians]."[21]

In a more recent case, the same court held that there was not enough evidence to convict a defendant for swearing at a several police officers who were in the process of searching a group of men suspected of being a part of a shooting.[22]  The juvenile defendant rode his bicycle behind the officers and "spoke in a loud voice to the officer, 'Y'all petty as s---.  F y'all.'"  The defendant then entered a store and upon exiting was confronted by an officer who accused him of stealing a bicycle.  He again began to swear at the officers, at which point a crowd formed around the defendant and the officers.  The court overturned the trial judge's conviction on the grounds that the swearing of the defendant was not likely to create violence on the part of the crowd, just on the part of the officers, who are "trained to deal with unruly and uncooperative members of the public … [and are] expected to have a greater tolerance for verbal assaults."[23]  The court identified the difference between the instant case and *Chemalali* as being the difference between directing conduct at the police and directing conduct toward the public.[24]

In light of the statute and the cases interpreting it, the law regarding disorderly conduct arrests is clear.  To violate the disorderly conduct statute, a person must be engaging in one of the five proscribed activities either with the intent to cause a breach of the peace, or in such a way that may cause a breach of the peace or be so offensive as to amount to a nuisance.  Directing conduct at police officers alone is not sufficient to violate the statute.  Enforcing the disorderly conduct law may require making some challenging judgments, like what circumstances may cause a breach of the peace, and when an action is so offensive that it amounts to a nuisance, but case law provides sufficient guidance to assist with making these judgments.

## III.    MPD PROCEDURE FOR MAKING A DISORDERLY CONDUCT ARREST

At CCRB's request, MPD provided a basic description of the Department's procedure for making a disorderly conduct arrest, along with the forms and notices used in this process.  This description represents CCRB's understanding of the procedure from encounter on the street to arrest to release from custody, and is not meant to capture every eventuality that may arise in an arrest.

---

[20]    *Chemalali v. District of Columbia*, 655 A.2d 1226, 1228 (D.C. 1995) (citation omitted).

[21]    *Id.*

[22]    *See In re:  W.H.L.*, 743 A.2d 1226, 1226 (D.C. 2000).

[23]    *Id.* (citations omitted).

[24]    *Id.* at 1229.

A disorderly conduct arrest begins when an officer encounters a person engaged in the following behavior: (1) the person is behaving in a way that is annoying, disturbing, or offensive to others, or that interferes with the actions of others; and (2) the person is intending to provoke or may provoke others to react or respond in violent or dangerous way, or is so offensive as to amount to a nuisance.[25] MPD's training recommends that officers use warnings and other attempts to encourage people to stop the actions that may lead to a breach of the peace, but once an officer has identified these circumstances, he or she can place the person under arrest for disorderly conduct. After the person is arrested, the individual is transported to the police station for processing of the arrest.

At the station, the officer places the person in a holding cell. The officer follows the procedure for collecting information from the individual. After gathering the information, the officer completes the arrest paperwork, which, in most cases, would be only an Arrest/Prosecution Report.[26] The Arrest/Prosecution Report is then reviewed by the officer's supervisor, typically his or her first-line supervisor, who ensures that all of the elements of the offense, as well as the probable cause for the arrest, are reflected in the report narrative. If the supervisor approves the report, the station staff then processes the arrest paperwork. If the supervisor does not approve the report, it may need to be revised or corrected.

After the report is approved, a member of the station staff reviews the information in the report with the person arrested for disorderly conduct to confirm that it is accurate, and then the staff verifies that the individual does not constitute a flight risk. Assuming that the person has no outstanding warrants, or that there are no other reasons to detain the person, the arrest process is completed and the person is released in one of two ways. The first is that the person may opt for citation release.[27] In this case, the station staff would complete the citation release paperwork, which includes a Citation Release Determination Report and a Citation to Appear.[28] The citation release paperwork assigns a court date on which the person has to appear to answer the disorderly conduct charge, and allows for the person's release on his or her own recognizance. Both forms have an acknowledgement that the person must review and sign indicating he or she has received the paperwork and agrees to return for the appearance in court.

The second and more common way that the arrest process is completed is that the person may opt to post and forfeit collateral, which essentially amounts to paying a fine for the offense, and which ends the arrest without any obligation for the person to appear in court at a later date to answer the disorderly conduct charge. In this case, the station staff takes the person's money for the collateral, and gives him or her a Collateral Receipt.[29] MPD indicated that there is no other paperwork in the collateral forfeiture process that is completed by the station staff or that is

---

[25]    This is a general description of the elements of the disorderly conduct offense, and does not necessarily reflect all of the types of conduct that may warrant a disorderly conduct arrest.

[26]    P.D. Form 163. The Department's policy and procedures for completing the P.D. Form 163 are contained in MPD General Order 401.05.

[27]    The Department's policy and procedures for citation release are contained in MPD General Order 502.06.

[28]    P.D. Form 778 and P.D. Form 799. In addition to the P.D. 799, which is an MPD form, D.C. Superior Court also has a Citation to Appear form that may be used in addition to, or instead of, the P.D. 799.

[29]    P.D. Form 67.

given to or signed by a person who opts to pay the $25 collateral to resolve a disorderly conduct arrest. After this process is completed, the person is released.

## IV.    OCCR DECISIONS INVOLVING DISORDERLY CONDUCT ARRESTS

OCCR's complaint examiner decisions were the starting point for CCRB's effort to gather further information about disorderly conduct arrests made by MPD officers. Four of the first 19 decisions dealt with allegations of an improper disorderly conduct arrest, and each of these decisions sustained the allegations.[30] In each of these decisions, the complaint examiner concluded that the officer harassed the citizen by arresting him for disorderly conduct because the facts developed in investigation did not justify the citizen's arrest. The officer either did not understand or ignored the law regarding disorderly conduct in each of these cases, and appeared to be retaliating against the citizen for his behavior during the encounter with the officer. The following is a short synopsis of the facts found by the complaint examiner in these four matters, as well as the complaint examiner's decision:

- During a late-night traffic stop, the complainant and the subject officer had a "prolonged, heated and profane exchange" in which the complainant demanded to know why he had been stopped. The complainant had been removed from the car and handcuffed, and was standing on the sidewalk. As the encounter progressed, the officer insisted that the complainant be quiet, and when he refused, the officer arrested the complainant for disorderly conduct, and also issued him a ticket related to the traffic stop.

  The complaint examiner concluded that the subject officer harassed the complainant because "[t]he evidence gathered by the investigator established that [the complainant] used profanity and spoke loudly, but there is no indication that his conduct met the requirements for a violation of the disorderly conduct statute. First, there is no evidence that he acted in such a way as to disturb or be offensive to others, since it was uncontroverted that the incident involved only [the complainant] and the four police officers. Second, although the incident occurred late at night and [the complainant] did engage in loud and obscenity-laden discussion, it occurred on a sidewalk which was set back from the nearest building, it was cold out and most windows presumably would be closed, there were no pedestrians and few cars passing in the vicinity, and the police officers observed at most only a few individuals looking out their windows at the scene. Thus, it cannot be found that [the subject officer] at the time legitimately contemplated that [the complainant] was annoying or disturbing 'any considerable number of persons,' as required by D.C. Code § 22-1321(3). Although an officer need not wait until an actual breach of the peace occurs before making an arrest for disorderly conduct … there is no evidence that the conduct occurred under 'circumstances such that a breach of the peace may be occasioned thereby.' In the absence of evidence of annoyance to others, the mere acts of yelling or using

---

[30]    The complaint examiner decisions discussed below are available on OCCR's website at www.occr.dc.gov. All personal information regarding the parties and witnesses to each complaint has been removed from the discussion of the decisions.

profane language toward police officers, or repeatedly demanding to know the purpose of being stopped, do not constitute disorderly conduct."[31]

- While the subject officer was discussing a parking violation with the complainant's fiancée, the complainant came out of a store and asked the subject officer if he had "nothing better to do." The subject officer told the complainant to return to the store, which he did. The subject officer then entered the store, and followed the complainant around the store threatening to arrest him if he continued to make comments to the subject officer. The complainant's comments back to the subject officer resulted in the subject officer continuing to follow and threaten him, and eventually arresting him for disorderly conduct. The owners of the store had not indicated that the complainant was being disruptive in the store, and one witness said that the subject officer told him that he had arrested the complainant for "running his mouth."

  The complaint examiner concluded that the subject officer harassed the complainant by arresting him for disorderly conduct because the evidence clearly indicated that the subject officer "arrested [the complainant] for actions that occurred inside the store. These actions did not fall within the definition of disorderly conduct, as provided in D.C. Code § 22-1321. [The subject officer] himself said that he gave [the complainant] a specific order to return to the store and that [the complainant] complied. [The subject officer] told OCCR investigators that he entered the store to make sure that [the complainant] was not disturbing customers, while in the P.D. 163 Arrest/Prosecution report, he stated that he entered the store to inform [the complainant] about parking regulations. In either case, [the subject officer] clearly did not enter the store to arrest [the complainant] for any conduct that occurred outside. There were no other customers in the store, and as [the subject officer] himself acknowledged, no store employee indicated that [the complainant] was causing a disturbance or annoying them in any way. [The subject officer] admitted that he did not have adequate legal justification to arrest [the complainant] for disorderly conduct."[32]

- While out for a walk in his neighborhood at approximately 7:00 p.m., the complainant passed close to a house where officers had responded to a call for violation of a civil protective order (CPO). The woman who had the CPO pointed out her window toward a man standing on the street, who she identified as the subject of the CPO. She described the man as black, 6'4" tall, 180 pounds, and wearing a green army jacket, blue jeans, and a cap. The man also was smoking a cigarette. As the police searched for the alleged CPO violator, they came upon the complainant, who was walking nearby smoking a cigarette. The complainant is a black man, 5'6" tall, and was wearing a brown coat, purple shirt, and black pants at the time of the incident. The subject officer stopped the complainant to determine if he was the man they were searching for. The complainant did not

---

[31]     OCCR Complaint No. 02-0041, Findings of Fact and Merits Determination (July 9, 2003).

[32]     OCCR Complaint No. 02-0090, Findings of Fact and Merits Determination (September 12, 2003).

know why he had been stopped, and kept asking the subject officer. He also objected to being stopped, questioned, and handcuffed, and may have used obscenity, including calling the subject officer a "motherfucker." Several people came out of their houses across the street to watch the encounter, which lasted less than five minutes, and ended with the subject officer arresting the complainant for disorderly conduct before even determining his name and whether he was the man the officers were searching for.

The complaint examiner concluded that the subject officer harassed the complainant by arresting him for disorderly conduct because "[a]lthough the complainant's attitude toward [the subject officer] may have been disrespectful and annoying, his behavior did not justify an arrest for disorderly conduct, given the statutory definition set forth above. [The complainant] had no intent to provoke a breach of the peace; his behavior was offensive to no one but the officers; and, if people came out to see what was going on, they were likely drawn by the flashing lights just as much if not more than any yelling, and there is no evidence that a 'considerable number of persons' gathered. The officers may have had a legitimate reason to stop [the complainant], but instead of quickly ruling him out as the suspect … [the subject officer] arrested him. In so doing, he committed harassment, because this action clearly 'interfered with . . . [the complainant's] ability to go about lawful business normally, in the absence of a specific law enforcement purpose.'"[33]

- While responding to a call from an address down the street from the complainant's house, the subject officer and his partner came upon the complainant and a group of friends standing around a car in front of one friend's house. The officers instructed the group to be quiet and disband. Some of the people left, while the complainant and one friend went inside the fenced front yard of the friend's house. The exchange between the officers and the complainant continued as the complainant and his friend protested the officers' orders to be quiet and go inside, and the officers continued to give orders and made some derogatory comments. The exchange escalated to a confrontation after the complainant used profane language toward the officers, and the subject officer struck the complainant, knocking him into a fence and injuring him. The subject officer then entered the yard and placed the complainant under arrest for disorderly conduct.

The complaint examiner concluded that the subject officer harassed the complainant because the facts did not support a disorderly conduct arrest since the evidence gathered during the investigation showed only that there was a group of people standing in front of one friend's house, and that the complainant and his friend responded verbally to the orders and insulting remarks made by the officers, neither of which rise to the level of disorderly conduct. Furthermore,

---

[33]    OCCR Complaint No. 01-0099, Findings of Fact and Merits Determination (November 5, 2003).

during their own interviews and in their reports about the incident, neither of the officers identified any other facts that would support a disorderly conduct arrest.[34]

Beyond the complaint examiner decisions, OCCR also is investigating a number of other complaints that involve disorderly conduct arrests. While many of the complaints appear to involve proper disorderly conduct arrests, a significant number resemble the fact patterns in the decisions where the officer made an arrest either incorrectly or without regard for the law, and appeared to be retaliating against the citizen for his or her behavior during the encounter with the officer. Up to this point, OCCR has not been keeping statistical information regarding complaints that involve a disorderly conduct arrest. In the future, however, OCCR will keep this statistical information so that it can report about the complaints in a more systematic and thorough manner.

The complaint examiner decisions indicate that there are instances where officers do not know or are not following the law when making disorderly conduct arrests. These decisions and the allegations in other complaints under investigation by OCCR suggest that there will likely be more instances in which it is confirmed that improper arrests for disorderly conduct have been made. Such improper arrests, whether the result of lack of knowledge or intentional action, are intolerable, and, depending on the circumstances, may constitute an abuse or misuse of police power. CCRB believes that these complaints are an important warning sign that requires action.

## V.    MPD AND NATIONWIDE ARREST STATISTICS

CCRB examined MPD's arrest statistics from 1995 to 2000 to determine the frequency with which MDP officers make disorderly conduct arrests.[35] CCRB also looked at nationwide data and statistics for cities with a population of 250,000 or greater to have some basis for comparison with the MPD statistics. The nationwide and large city statistics cover the same six-year period and were taken from the Uniform Crime Reports (UCR) prepared by the Federal Bureau of Investigation (FBI).[36]

---

[34]    OCCR Consolidated Complaint Nos. 02-0318 & 02-0319, Findings of Fact and Merits Determination (August 21, 2003).

[35]    MPD's Office of Organizational Development provided disorderly conduct arrest statistics to OCCR on July 29, 2003. The remaining statistics regarding MPD arrests were taken from MPD's 1998, 1999, and 2000 Annual Reports, which are available on MPD's website, www.mpdc.dc.gov. *See* Metropolitan Police Department, Washington, D.C., *1998 Annual Report*, at 22-23 (1999); Metropolitan Police Department, Washington, D.C., *1999 Annual Report*, at 24-25 (2000); Metropolitan Police Department, Washington, D.C., *2000 Annual Report*, at 20-21 (2001). Population information for the District of Columbia was obtained from the U.S. Census Bureau website, www.census.gov, and is taken from the 2000 Census.

[36]    The Uniform Crime Reports are available on the FBI website, http://www.fbi.gov/ucr/ucr.htm. CCRB took statistical data from the 1995 through 2000 reports. *See* Federal Bureau of Investigation, Uniform Crime Reports for the United States 1995 (1996), Table 31, at 210-11; Federal Bureau of Investigation, Uniform Crime Reports for the United States 1996 (1997), Table 31, at 216-17; Federal Bureau of Investigation, Uniform Crime Reports for the United States 1997 (1998), Table 31, at 224-25; Federal Bureau of Investigation, Crime in the United States 1998, Uniform Crime Reports (1999), Table 31, at 212-13; Federal Bureau of Investigation, Crime in the United States 1999, Uniform Crime Reports (2000), Table 31, at 214-15; Federal Bureau of Investigation, Crime in the United States 2000, Uniform Crime Reports (2001), Table 31, at 218-19.

The number of disorderly conduct arrests made by MPD officers grew from 6,616 in 1995 to 10,600 in 2000. In addition, the rate of disorderly conduct arrests per 100,000 residents in the District increased by approximately 60% from 1,157 in 1995 to 1,853 in 2000. To compare the increase in the disorderly conduct arrest rate with any changes that may have occurred in the rate of other arrests made by MPD, CCRB also examined the rate of all arrests made by MPD and the rate of all arrests excluding disorderly conduct arrests. Over the same period, the rate of all arrests increased only by approximately 7% from 7,524 in 1995 to 8,028 in 2000, and the rate of all arrests except disorderly conduct fell by approximately 3% from 6,367 in 1995 to 6,175 in 2000. In general, the number of arrests in all three of these categories increased in 1996 and 1997. Although all three categories decreased after 1997, the number of disorderly conduct arrests was still significantly higher in 2000 than in 1995. In contrast, total arrests excluding disorderly conduct were actually lower in 2000 than in 1995. The following table reflects the data collected by CCRB regarding MPD arrests:

### Arrests Made by MPD Officers

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|
| Total Arrests | 43,040 | 46,884 | 57,678 | 50,660 | 45,950 | 45,924 |
| *Arrests per 100,000 Residents* | 7,524 | 8,196 | 10,083 | 8,856 | 8,032 | 8,028 |
| Disorderly Arrests | 6,616 | 7,478 | 13,811 | 9,758 | 10,715 | 10,600 |
| *Disorderly per 100,000* | 1,157 | 1,307 | 2,414 | 1,706 | 1,873 | 1,853 |
| Total Arrests Excluding Disorderly Arrests | 36,424 | 39,406 | 43,867 | 40,902 | 35,235 | 35,324 |
| *Total Excluding Disorderly per 100,000* | 6,367 | 6,888 | 7,668 | 7,150 | 6,159 | 6,175 |
| D.C. Population (2000 Census) | 572,059 | 572,059 | 572,059 | 572,059 | 572,059 | 572,059 |

By way of comparison, CCRB examined UCR arrest statistics from 1995 to 2000 for the entire nation and for cities with a population of 250,000 or greater. CCRB initially focused on the UCR statistics for disorderly conduct arrests alone, but, in response to comments from MPD, CCRB also examined the UCR statistics for disorderly conduct and drunkenness arrests combined.[37]

---

[37]    In its comments to a draft of this report, MPD indicated that the District's disorderly conduct statute includes several offenses that may not be included in other jurisdictions' statutes, such as drinking in public, possession of an open container of alcohol, urinating in public, and affrays, among other things. Consequently, MPD argued that its statistics for disorderly conduct arrests alone might not be a fair comparison with other jurisdictions.

First, it is not clear to CCRB that all of the offenses identified by MPD properly fall under the disorderly conduct statute because there is a separate provision of the criminal code that covers affrays, § 22-1301, and the other offenses do not necessarily create circumstances that may provoke a breach of the peace or amount to a nuisance. Second, even to the extent that the District's law differs from that of other jurisdictions, CCRB notes that the UCR contains the following comment about its statistics:

To ensure these data are uniformly reported, the FBI provides contributing law enforcement agencies with a handbook that explains how to classify and score offenses and provides uniform crime offense definitions. Acknowledging that offense definitions may vary from state to state, the FBI cautions agencies to report offenses not according to local or state statutes but according to those guidelines provided in the handbook. Most agencies make a good faith effort to comply with established guidelines.

In general, the nationwide and large city rates for disorderly conduct arrests and disorderly conduct and drunkenness arrests combined increased slightly in 1996 and 1997, but then decreased from 1998 through 2000, ending up at a rate that was noticeably lower in 2000 than it was in 1995.  Over the same period, the nationwide and large city rates for all arrests, all arrests except disorderly conduct, and all arrests except disorderly conduct and drunkenness showed a steady decline from 1995 to 2000, decreasing by anywhere from 13% to 21%.  The following tables reflect the data collected by CCRB regarding arrests made nationwide and in large cities:

## Arrests Made Nationwide

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|
| **Total Arrests** | 11,407,288 | 11,088,352 | 10,540,215 | 10,291,317 | 9,136,294 | 9,123,428 |
| *Arrests per 100,000 Residents* | 5,807 | 5,838 | 5,752 | 5,534 | 5,317 | 5,010 |
| **Disorderly Arrests** | 561,642 | 626,918 | 561,621 | 501,866 | 421,662 | 421,542 |
| *Disorderly per 100,000* | 286 | 330 | 306 | 270 | 245 | 232 |
| **Drunkenness Arrests** | 527,200 | 522,869 | 509,764 | 510,318 | 437,153 | 423,310 |
| **Disorderly & Drunkenness Arrests** | 1,088,842 | 1,149,787 | 1,071,385 | 1,012,184 | 858,815 | 844,852 |
| *Disorderly & Drunkenness per 100,000* | 554 | 605 | 585 | 544 | 500 | 464 |
| **Total Arrests Excluding Disorderly Arrests** | 10,845,646 | 10,461,434 | 9,978,594 | 9,789,451 | 8,714,632 | 8,701,886 |
| *Total Excluding Disorderly per 100,000* | 5,521 | 5,508 | 5,446 | 5,264 | 5,072 | 4,779 |
| **Total Arrests Excluding Disorderly & Drunkenness Arrests** | 10,318,446 | 9,938,565 | 9,468,830 | 9,279,133 | 8,277,479 | 8,278,576 |
| *Total Excluding Disorderly & Drunkenness per 100,000* | 5,253 | 5,233 | 5,167 | 4,990 | 4,817 | 4,546 |
| **Population in UCR** | 196,440,000 | 189,927,000 | 183,240,000 | 185,964,000 | 171,831,000 | 182,090,101 |

FBI website, www.fbi.gov/ucr/word.htm.

Nonetheless, CCRB reviewed the other statistical categories contained in the UCR and determined that the only other category that would likely include the offenses identified by MPD would be drunkenness arrests, which is a category that is listed as having zero arrests in MPD's annual reports for the relevant years.  Consequently, to ensure a fair comparison with MPD statistics, CCRB examined both disorderly conduct arrests and disorderly conduct and drunkenness arrests combined.  The nationwide and large city tables reflect both of these sets of data.

**Arrests Made in Large Cities**

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|
| Total Arrests | 3,021,325 | 3,074,699 | 2,480,043 | 2,456,806 | 2,163,849 | 2,145,369 |
| *Arrests per 100,000 Residents* | 7,783 | 7,700 | 7,491 | 7,024 | 6,402 | 6,107 |
| Disorderly Arrests | 159,705 | 207,900 | 156,834 | 116,899 | 93,002 | 106,445 |
| *Disorderly per 100,000* | 411 | 521 | 474 | 334 | 275 | 303 |
| Drunkenness Arrests | 106,029 | 107,265 | 114,005 | 107,533 | 98,622 | 92,271 |
| Disorderly & Drunkenness Arrests | 265,734 | 315,165 | 270,839 | 224,432 | 191,624 | 198,716 |
| *Disorderly & Drunkenness per 100,000* | 685 | 789 | 818 | 642 | 567 | 566 |
| Total Arrests Excluding Disorderly Arrests | 2,861,620 | 2,866,799 | 2,323,209 | 2,339,907 | 2,070,847 | 2,038,924 |
| *Total Excluding Disorderly per 100,000* | 7,372 | 7,179 | 7,017 | 6,690 | 6,127 | 5,804 |
| Total Arrests Excluding Disorderly & Drunkenness Arrests | 2,755,591 | 2,759,534 | 2,209,204 | 2,232,374 | 1,972,225 | 1,946,653 |
| *Total Excluding Disorderly & Drunkenness per 100,000* | 7,098 | 6,911 | 6,673 | 6,382 | 5,835 | 5,541 |
| Population in UCR | 38,820,000 | 39,932,000 | 33,106,000 | 34,978,000 | 33,801,000 | 35,131,894 |

As seen in the comparison of the tables above, MPD's rate of disorderly conduct arrests is significantly higher than both the nationwide and large city disorderly conduct arrest rates, even when drunkenness arrests are included. While the MPD, nationwide, and large city rates were closer to one another in 1995 and 1996, from 1997 through 2000, the MPD rate was 2.5 to four times the nationwide and large city rates for disorderly conduct and drunkenness arrests and five to eight times the nationwide and large city rates for disorderly conduct arrests.[38] The chart below depicts the different disorderly conduct and disorderly conduct and drunkenness arrest rates for the period from 1995 to 2000.

---

[38]     In its comments to a draft of this report, MPD indicated that its rate of disorderly conduct arrests is driven, at least in part, by community requests for enforcement of the law. CCRB recognizes that the arrest rate for minor crimes may increase as a result of community requests for enforcement of the law and through the implementation of community policing programs, which are being used in the District. *See generally*, Debra Livingston, *Police Discretion and the Quality of Life in Public Places: Courts, Communities, and the New Policing*, 97 Colum. L. Rev. 551 (1997). The arrest rate alone, however, is not CCRB's concern, especially to the extent that the arrests are proper and for actual violations of the disorderly conduct statute. Rather, CCRB's concern is that MPD's high rate of disorderly conduct arrests creates a much greater potential for improper arrests, and when considered together with OCCR's decisions, raises an inference that the higher rate may be, at least in part, the result of improper arrests.



**Disorderly and Disorderly & Drunkenness Arrest Rates per 100,000 Residents**

To examine the larger context for MPD's disorderly conduct arrest rate, CCRB compared MPD's rate for all arrests except disorderly conduct with the nationwide and large city rates for all arrests except disorderly conduct arrests and all arrests except disorderly conduct and drunkenness arrests. MPD's rate for all arrests except disorderly conduct was consistently higher than the nationwide rates, ranging from approximately 15% to 50% higher in a given year. In contrast, MPD's disorderly conduct arrest rate was a remarkable 100% to 700% higher than the nationwide rates. MPD's rate for all arrests except disorderly conduct was much closer to the large city rates, with MPD's rate being lower than the large city rates in 1995 and 1996, and MPD's rate being anywhere from approximately 0.5% to 15% higher during the period from 1997 to 2000. Again, however, when comparing disorderly conduct arrests, MPD's rate was many times greater at 65% to 580% higher than the rates found in other large cities.

The chart below depicts the different arrest rates excluding disorderly conduct arrests or disorderly conduct and drunkenness arrests for the period from 1995 to 2000.

- 14 -





Total Arrest Rates Excluding Disorderly and Disorderly & Drunkenness Arrests per 100,000 Residents

MPD's disorderly conduct arrest rate stands in sharp contrast to the nationwide and large city disorderly conduct arrest rates, even when drunkenness arrests are included. The contrast is particularly stark when the difference between MPD's rate for all arrests except disorderly conduct is compared with the similar nationwide and large city rates, which are much closer to MPD's rate. CCRB believes that MPD's high rate of disorderly conduct arrests creates a much greater potential for improper arrests, and believes that MPD should take steps to understand why its statistics differ so significantly from nationwide and large city statistics, to ensure that the difference in the rates is not the result of improper arrests.[39]

## VI.    RESOLUTION OF MPD DISORDERLY CONDUCT ARRESTS

Beyond looking at MPD's arrest statistics, CCRB also looked at information and statistics regarding the resolution of MPD's disorderly conduct arrests. As described in Section III above, there are two ways in which a disorderly conduct arrest can be resolved and the citizen released from custody promptly. The first is citation release, where the citizen is released from police custody on his or her own recognizance with a later date on which he or she must appear in court to answer the disorderly conduct charge. The authority to issue citations is given to police station staff by statute,[40] and the policy and procedures for citation release are set out in an MPD general order.[41] The citation release procedure includes the completion of paperwork by

---

[39]    Another concern is to ensure that the District's police resources are deployed in the most effective manner possible. To the extent improper arrests are being made, they are consuming officer and station staff time that would be much better used on patrol or addressing other issues that citizens bring to the police on a regular basis.

[40]    *See* D.C. Official Code § 23-1110.

[41]    *See* MPD General Order 502.06.

the station staff that must be signed by the person arrested for disorderly conduct, in addition to paperwork that is given to the person indicating his or her court date and the consequences of failing to appear in court.[42]

The second way for a person to be released from custody promptly is for the individual to post and forfeit collateral, which essentially amounts to paying a fine for the offense, and which ends the arrest without any obligation for the person to appear in court at a later date to answer the disorderly conduct charge. The post and forfeit process for disorderly conduct arrests is not specifically authorized by statute, regulation, or court rule; rather, it appears to be a practice that has developed over time through the cooperation of the courts, prosecutors, police, and arrestees.[43] The consequences of collateral forfeiture are not clear. It appears that a person who opts to post and forfeit might have an arrest record, but would not have a conviction record, because the agreement implicit in the process is that the prosecutor will not prosecute if the person posts and forfeits the collateral, which essentially amounts to paying a fine.[44] However, being allowed to post and forfeit is a privilege and not a right, so, for a period of time after the collateral is forfeited, the prosecutor has the option to prosecute any of these cases, although this appears to happen only very rarely.[45] MPD has a general order that lists the collateral amounts for various offenses, but the Department does not appear to have one that sets out the procedures for processing a collateral forfeiture.[46] Other than a receipt for payment of the collateral, the station staff does not complete any paperwork, require any acknowledgment by the arrestee of the choice to post and forfeit collateral, or give the arrestee any paperwork that explains the collateral forfeiture process or any related information.

The following table reflects how frequently citizens chose citation release and collateral forfeiture in response to MPD's disorderly conduct arrests during the period from 1995 to 2000.

---

[42]    *See* P.D. Form 778 and P.D. Form 799.

[43]    *See District of Columbia v. Baylor*, 125 Daily Wash. L. Rep. 1665 (D.C. Super. Ct. Aug. 25 & Aug. 26, 1997) (Cr. Nos. D-1114-96, D-3504-96, D-3956-96, D-3125-96, T-6033-96, and T-6817-96).

[44]    *Id.* at 1670. CCRB had a difficult time finding a conclusive answer about the consequences of opting to post and forfeit collateral, but getting a conclusive answer is very important. Depending on the answer, many individuals who post and forfeit could face difficulties when applying for a job, a security clearance, rental housing, or a loan or with their immigration status because of their arrest or other record.

[45]    *Id.* at 1678-79.

[46]    *See* MPD General Order 503.03. CCRB requested general orders containing procedures for collateral forfeiture from MPD, and was given only General Order 503.03. There may be procedures relating to collateral forfeiture contained in other general orders, but CCRB was not able to identify them, and there does not appear to be a general order specifically devoted to processing a collateral forfeiture.

**Resolution of MPD Disorderly Conduct Arrests[47]**

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|
| Total Disorderly Arrests | 6,616 | 7,478 | 13,811 | 9,758 | 10,715 | 10,600 |
|  |  |  |  |  |  |  |
| Total Citation Release (CR) | 700 | 711 | 1430 | 844 | 698 | 576 |
| % CR of Total Disorderly Arrests | 10.6% | 9.5% | 10.4% | 8.6% | 6.5% | 5.4% |
| Total Collateral Forfeiture (CF) | 3595 | 4029 | 7724 | 5366 | 7258 | 6498 |
| % CF of Total Disorderly Arrests | 54.3% | 53.9% | 55.9% | 55.0% | 67.7% | 61.3% |

Citizens chose collateral forfeiture at least five times more often, and as high as ten times more often, than citation release in the six years for which CCRB obtained statistics. The ability to post and forfeit collateral allows the citizen to pay $25 to end his or her arrest without an obligation to appear in court, which may make the option more attractive than citation release because citation release requires the citizen to appear before a judge at a later date to answer the disorderly conduct charge.[48]

CCRB has two principal concerns based on the information and statistics above. First, with so many citizens choosing collateral forfeiture, over 50%, and sometimes as high as 67%, of disorderly conduct arrests are receiving little or no review after the arrest is completed, contributing to a greater potential for improper disorderly conduct arrests that may go unnoticed. Without any further review, an improper disorderly conduct arrest can more easily pass through the system without being scrutinized. Second, the process for and consequences of collateral forfeiture are vague and unclear, and the absence of clear rules and procedures to govern collateral forfeiture creates several potential problems. Without clear rules, citizens who opt to post and forfeit cannot be fully advised of how the process works and what their rights are in the process. In addition, the lack of explicit procedures allows for the possibility that citizens who opt to post and forfeit may be treated differently as they go through the same process. Finally, without procedures, it is difficult to ensure that all citizens are being properly advised of how the process works and what their options are so that they can make an informed decision to post and forfeit collateral. Thus, CCRB is concerned that thousands of arrestees each year are opting to post and forfeit collateral without a clear understanding of the process or consequences, and with no written acknowledgment of their choice to post and forfeit over the other options available to

---

[47]    The sum of the number of citation releases and collateral forfeitures does not add up to the total number of disorderly conduct arrests because there are other outcomes for the arrests, the most significant of which is that the citizen is held in lock-up for reasons not necessarily related to the disorderly conduct arrest.

[48]    Anecdotal evidence from citizen complaints and interviews suggests that some citizens may choose collateral forfeiture instead of citation release because collateral forfeiture may be presented to them as the only way to be released from custody promptly. Citizens have reported to OCCR that they are given the option of either paying the $25 collateral and being released from jail or spending the night in jail so they can appear in court the next day. In these cases, citation release is never presented to the citizen as an option, so the coercive effect of possibly spending more time in custody tilts the scales heavily in favor of paying the $25 collateral at the police station for many citizens.

them.[49]  Consequently, CCRB believes that the collateral forfeiture process needs to be clarified and systematized to ensure that individuals are being properly advised about the process and that they are making an informed decision to post and forfeit.

## VII.    MPD TRAINING

CCRB also reviewed the materials that MPD uses to train its officer recruits regarding disorderly conduct.  The materials indicated that a new recruit at the MPD police academy receives approximately four hours of training on disorderly conduct as a part of his or her 80-hour training on the D.C. Official Code.  The lesson consists of a lecture, a handout, and a brief video.  The heart of the lesson is the lecture, while the handout and video provide reinforcement.

The lecture combines a description of the applicable D.C. Official Code provisions and examples that reflect situations that officers might face while on patrol.  The first point the instructor makes during the lecture is, "[u]nless the facts clearly show that the defendant intended to breach the peace, or that the offending conduct was committed under circumstances such that a breach of the peace might be occasioned, there can be no violation of the disorderly conduct law."[50]  The lesson plan further states that disorderly conduct is a difficult area in which to exercise police powers because, "these types of offenses are frequently committed by persons who do not regard themselves as criminals and who regard these laws, and police enforcement of these laws, as an intrusion of their rights."  Another theme in the lesson plan is the idea that where a breach of peace can be resolved without an arrest, that is the preferred method of handling the situation.[51]

The lesson plan includes numerous examples, the general theme of which is that the charge of disorderly conduct relates largely to the time, the place, and the person committing the act.  One example involves a group of drunken citizens singing loudly on a street corner.  The scenario contrasts the proper response if the citizens were in Georgetown on the corner of M Street and Wisconsin Avenue, N.W., on a Saturday night, as opposed to when the citizens are in a residential neighborhood doing the same thing, and points out that the same conduct would not necessarily disturb the peace in Georgetown even if it could disturb the peace in the residential neighborhood.[52]

---

[49]    The lack of paperwork and information provided to the citizen in the collateral forfeiture process contrasts sharply with the information provided when a person is issued a ticket for a parking violation.  The front of the ticket indicates the offense and the penalty and has a blank for the recipient to sign and date the ticket acknowledging receipt of it.  The back of the ticket has instructions for responding to the ticket.  The instructions state that the recipient has 15 days to respond, and indicate the penalties for failing to respond and the procedures for admitting the infraction or denying the infraction and challenging it.  The back of the ticket also includes a box where the recipient indicates his or her answer to the ticket, either admitting or denying liability, and must sign and date it before submitting it.  On the other hand, a person who posts and forfeits collateral in response to a disorderly conduct arrest, a misdemeanor offense, does not receive any of the information or protections that are provided to people charged with parking violations.

[50]    Metropolitan Police Department, Training Materials for D.C. Official Code Part I (emphasis in original).

[51]    *Id.*

[52]    *Id.*

Instructors at MPD's Institute of Police Science supplement the disorderly conduct lesson plan with a 25-page handout on the D.C. Official Code that reinforces the lesson plan.[53]  The general format is to quote a section of the code and then explain the elements to the officers.  The handout features the same examples found in the lesson plan, and emphasizes that the officer should review the handout semiannually.  Finally, the handout has several special orders at the end.[54]  These orders remind officers to properly process all arrests,[55] emphasize the importance of enforcing disorderly conduct even though enforcement is often unpopular,[56] and further refines the definition of "incommoding" and the failure to move on charges.[57]  The special orders serve to remind recruit officers that their training is meant to be integrated into their patrol practices.  Furthermore, the special orders are on the "A" distribution schedule, meaning it is to be "posted on all bulletin boards, read at roll calls, and issued to individual sworn members of the department."[58]

The final part of the disorderly conduct training is a 13-minute training video.[59]  The video uses examples from the lesson plan to show how an actual officer would handle particular situations.  As was the case with the handout, the video closely follows the lesson plan and reinforces the major themes of the lesson on disorderly conduct – there must be an actual or likely breach of the public peace and that officers should try to resolve the situation without making an arrest if possible.

Taken as a whole, the lesson on disorderly conduct aims to teach recruits how to handle disorderly conduct situations.  The lesson integrates the holdings from cases that have interpreted and clarified the statute, and it consistently reminds recruit officers of the elements of the offense.  Although the materials appear to be substantively sound, CCRB cannot comment on their effectiveness because CCRB has not observed MPD providing the training, nor is CCRB aware of how widely the information contained in the lesson materials is distributed to officers other than recruits.

## VIII.  RECOMMENDATIONS

Based on the information included in this report, CCRB makes the following recommendations to address the issues it has identified regarding disorderly conduct arrests made by MPD officers:

---

[53]    Metropolitan Police Department, D.C. Criminal Code Handout (March 2001).

[54]    *Id.*

[55]    Metropolitan Police Department, Special Order 92.8 (1992)

[56]    Metropolitan Police Department, Special Order 92.1 (1992)

[57]    Metropolitan Police Department, Special Order 92.9 (1992); Metropolitan Police Department, D.C. Criminal Code Handout (March 2001).

[58]    Metropolitan Police Department, Operation Handbook Introduction, 4 (January 1, 1991).

[59]    Videotape:  Enforcement of the Disorderly Conduct Statutes (Metropolitan Police Department Media Production Unit 1996) (on file with the Maurice T. Turner, Jr., Institute of Police Science).

A.      **Modify Arrest Procedure**

MPD should review its arrest procedure, and modify it to ensure that citizens are provided with written notice about the collateral forfeiture process that describes how it operates and the consequences of choosing to post and forfeit. In addition, each person who opts to post and forfeit should be required to sign an acknowledgement that he or she knowingly chose to post and forfeit over the other options available. These changes will give the collateral forfeiture process protections that are similar to those in the citation release and parking ticket processes.

B.      **Training**

MPD should provide additional instruction to its officers about the law and procedure related to disorderly conduct arrests. Taking steps to implement the training immediately will communicate important information to officers that they need to do their jobs on a daily basis. Considering the large number of disorderly conduct arrests made by MPD officers, ensuring that all officers are current in their knowledge of the law and procedure for these arrests ought to be a high priority. To the extent that any improper disorderly conduct arrests are being made as a result an officer's lack of knowledge, additional training should eliminate these improper arrests.

MPD could undertake this effort through training at roll call or adding a lesson on disorderly conduct to annual in-service training attended by all officers. MPD may incorporate its existing disorderly conduct materials in the additional training, but CCRB recommends that MPD examine different methods of instruction to determine which method will be most effective for its officers. Some issues that MPD should consider are the extent to which any educational lessons or programs provide realistic examples to guide officers, allow officers to ask questions and raise issues regarding the law and procedures, and test each officer's knowledge of the material covered in the instruction.

C.      **Message from the Chief Reinforcing Officer and Supervisor Responsibilities**

The Chief of Police should distribute a videotape message to all officers and supervisors reinforcing their responsibilities in conducting disorderly conduct arrests. A communication from the Chief will notify all MPD members that disorderly conduct arrests are being reviewed from the highest levels in the Department, and that every officer and supervisor has an important role to play in making and reviewing arrests. The Chief also should emphasize that MPD members will be held accountable to the extent that they are not following the law or procedure regarding disorderly conduct arrests because MPD relies heavily on its officers and first-line supervisors to ensure that the law and procedure are being followed.

D.      **Examine Sample of Disorderly Conduct Arrests**

MPD should examine a sample of the disorderly conduct arrests made by its officers that is significant enough to allow MPD to determine if there are any widespread problems in the entire pool of disorderly conduct arrests. As part of its examination, MPD should independently verify the facts underlying each arrest in the sample, rather than relying solely on the narrative in the P.D. Form 163.

CCRB believes that this review is critical to ensuring that OCCR's decisions are not a warning sign of a larger problem with MPD's disorderly conduct arrests. Beyond the examination, MPD should pursue appropriate discipline against officers who are making improper disorderly conduct arrests, as well as the supervisors who are not adequately monitoring the work done by these officers. CCRB believes that following through with appropriate discipline is an indispensable part of reducing the occurrence of any problems uncovered by MPD's examination.

Based on its review, MPD should consider whether any additional steps need to be taken to address any problems uncovered by the examination.

### E.    Review and Consider Revising Relevant Law and Rules

The Mayor, the Council, and MPD should review the criminal law chapter covering breaches of the public peace, with a focus on the disorderly conduct provision, as well as the rules governing collateral forfeiture, to determine if the chapter and rules are adequate to meet the needs of the public. Based on their own review, as well as MPD's review of disorderly conduct complaints, the Mayor and Council should consider whether the code and rules need to be revised, updated, or changed. In addition, the Mayor and Council should consider specific reforms, such as whether disorderly conduct and other offenses should be decriminalized, and whether the collateral forfeiture process should be modified to mirror the response process for a parking violation, which allows 15 days for the recipient of a ticket to decide how he or she wants to respond to the charged offense.

## IX.    CONCLUSION

Based on its examination of disorderly conduct arrests made by MPD officers and a comparison with arrest rates in other jurisdictions, CCRB believes that the Department should take steps to ensure that officers are fully trained about, and adhering to, the law and procedure governing disorderly conduct arrests. Because of the large number of disorderly conduct arrests made by MPD officers compared to other large cities, and because the majority of these are resolved by paying $25 at the police station with little or no review after the arrest is completed, CCRB believes that there is the potential for a significant number of improper or unlawful disorderly conduct arrests in the District that could go unnoticed. The Mayor, the Council, and MPD should take steps to ensure that disorderly conduct arrests are made only when authorized under the law, and consistent with MPD's procedures.