**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
)
**LINDSAY HUTHNANCE,**                    )
    **Plaintiff,**                        )
                                          )
    **v.**                                )          **Civil Action No. 06-1871 (RCL)**
                                          )
**DISTRICT OF COLUMBIA,** *et al.*,       )
    **Defendants.**                       )
                                          )
_____)


## MEMORANDUM OPINION

On March 25, 2011 the jury returned a verdict in favor of Lindsay Huthnance, the

plaintiff in this case. Specifically, the jury found that Metropolitan Police Department Officers

Liliana Acebal and James Antonio falsely arrested Huthnance; that Acebal committed the tort of

assault and battery against Huthnance; that Acebal and Antonio violated Huthnance's First,

Fourth, and Fifth Amendment rights under the United States Constitution; that the District of

Columbia violated Huthnance's Fifth Amendment rights; that the District of Columbia was

deliberately indifferent to the constitutional First, Fourth, and Fifth Amendment rights of citizens

and that this deliberate indifference was a proximate cause of Huthnance's injuries. Verdict

Form, Mar. 25, 2011, ECF No. 229.  The jury awarded Huthnance $90,000 compensatory

damages and $7,500 punitive damages—$5,000 punitive damages against Acebal and $2,500

against Antonio. Currently before the Court is Defendants' District of Columbia, Liliana Acebal,

and James Antonio's Motion for Judgment As a Matter of Law, or for a New Trial, or for

Remittitur ("Motion for Judgment As a Matter of Law"). Apr. 28, 2011, ECF No. 241. Having

considered the Motion, the Opposition, the Reply, the record in this case—including the

evidence produced at trial—and the applicable law at length, the Court will grant the motion for judgment as a matter of law in part and deny it in part, and it will deny the motion for a new trial or remittitur for the reasons that follow.

## I.     Facts

Officers Acebal and Antonio arrested Huthnance on November 16, 2005[1] for disorderly conduct, loud and boisterous. Huthnance claims that she was a victim of "contempt of cop," meaning the officers didn't have probable cause to believe she had committed any crime and instead arrested her merely because she had criticized the police. After her arrest, officers transported her to the station and locked her in a cell while her arrest was processed. She resolved her arrest through the District's "post and forfeiture" procedure, meaning she posted $25 collateral and was released from custody several hours later. After posting and forfeiting, no criminal charges were ever brought against Huthnance, so no one ever reviewed her arrest. As a result of her arrest, Huthnance spent several hours in jail, paid $25 to secure her release, claims she experienced mental anguish, fear, and humiliation, and was saddled with a permanent arrest record she claims she didn't deserve.

Huthnance filed suit against Officers Acebal and Antonio[2] and the district of Columbia asserting claims of false imprisonment, intentional infliction of emotional distress, assault and battery, violations of her constitutional First, Fourth, Fifth, and Eighth Amendment rights, and

---

[1] Huthnance testified that she was arrested at "approximately midnight" on "November 15, 2005." Mar. 7, 2011 P.M. Trial Tr. 48. At times, Huthnance contended that her arrest was actually at 11:55 p.m. on November 15th. The District claimed that she was arrested at around 2:00 a.m. on the morning of the 16th. The Court's reference to November 16th as the arrest date isn't meant to take a side in that debate. Instead, because even Huthnance's earliest estimate of the time of her arrest is within five minutes of November 16th, the Court simply picks that date for convenience's sake.

[2] Huthnance also sued Officer J. Morales, but the jury did not find him liable for any of her claims. For that reason, the Court limits its discussion to Officers Acebal and Antonio.

violations of the Code of the District of Columbia, arising from her arrest and detention on November 15th and 16th, 2005. Am. Compl. 2, May 7, 2007, ECF No. 13. By the time the case went to the jury, several of Huthnance's original claims had been dismissed or abandoned, leaving the lay of the land at the time the jury was instructed:

- Claims against Officer Acebal: assault and battery; false arrest; and violations of Huthnance's constitutional First, Fourth, and Fifth Amendment Rights. Jury Instructions 7, Mar. 24, 2011, ECF No. 222.

- Claims against Officer Antonio: false arrest and violations of her First, Fourth, and Fifth Amendment rights. *Id.*

- Claims against the District of Columbia: violation of her Fifth Amendment rights associated with differential treatment in its official policy regarding whether or not to offer citizens citation release; violation of her First, Fourth, and Fifth Amendment rights due to inadequate training and supervision. *Id.* at 13–17.

### a. The Evidence at Trial

Huthnance testified that on the night of her arrest, she was having friends over for dinner at her apartment at around 8:00 p.m. Mar. 7, 2011 P.M. Trial Tr. 49. She testified that she and her three dinner companions split a bottle of wine between the four of them and that dinner ended at 10:00 p.m. *Id.* After dinner, she and her guests decided to take a ten-minute walk to a local bar called the Raven for drinks. *Id.* at 49–50. Huthnance testified that she had "a couple of beers" at the Raven and later clarified her testimony to specify that she had exactly two beers. *Id.* at 50. As midnight approached, Huthnance felt that it was time to return home because she had to go to work the next morning. *Id.* She and her boyfriend, Adrien Marsoni, left the Raven at around 11:45 p.m. *Id.* On their way home, Huthnance and Marsoni stopped at a 7-Eleven convenience store about half a block away from the Raven to buy cigarettes and noticed a slew of police officers and police vehicles outside the 7-Eleven. *Id.* at 51. She testified that she said

nothing to the police officers outside the 7-Eleven and proceeded inside to make her purchase. *Id.*

Once inside the store, Huthnance saw more police officers inside and asked "what was going on." *Id.* at 52. She testified that the police officers told her it was "none of [her] business and to move on." *Id.* at 52. What she didn't know was that MPD had recently made that 7-Eleven into a police substation in response to a rash of robberies in the Mount Pleasant neighborhood. There was a sign posted on the door to alert citizens and brigands alike to the convenience store's substation status, but Huthnance never noticed the sign. *Id.*

This is where, according to Huthnance, things get dicey. She testified that after being told to mind her own business, she turned to her boyfriend and said, "Wow, nice use of my tax dollars." *Id.* That observation prompted one of the officers—according to Huthnance—to respond confrontationally, demanding that she repeat what she had just said. *Id.* Huthnance declined that invitation and simply said, "I wasn't talking to you," and left the store. *Id.*

Huthnance claims her tax-dollars comment wasn't meant to goad the officers. She explained that this was her neighborhood, and she was naturally concerned to see such a heavy police presence there. She only asked why they were there out of that natural concern. *Id.* at 53. Huthnance testified that she didn't know which officer told her to mind her own business because she wasn't looking in their direction at the time that they said it. *Id.* Although she didn't take note of the officer's identity, she did testify that she was "quite shocked . . . and frustrated that they would talk to [her] that way." *Id.* at 54. Nevertheless, despite that frustration, she "didn't respond" and left. *Id.*

After exiting the 7-Eleven, Huthnance heard her boyfriend talking to someone and turned around just in time to hear him say "fuck off" to a police officer. *Id.* at 55. She testified that she

and Marsoni continued to walk up the street until they realized they were being followed and two officers told them to stop. *Id.* The officers asked for identification, and Huthnance asked why she was being stopped and whether she was under arrest. *Id.* at 54–55. The officers never responded to her questions. Huthnance testified that after continuously asking why they were being stopped and receiving no answer, she demanded one of the officer's badge numbers. *Id.* at 55. Huthnance testified that immediately after she requested the officer's badge number, she was "told to place [her] hands up against the wall and put in handcuffs." *Id.*

Huthnance testified that the officer her boyfriend had told to "fuck off" was Antonio. *Id.* at 57. She testified that she heard Marsoni say nothing else to Antonio and that it was her intention to continue walking home and not to have any more interactions with the police that night. They didn't get far, however, before they realized they were being followed and were told to stop by Officers Antonio and Acebal. *Id.* at 58. Acebal asked the couple for their identification. *Id.* at 59. Huthnance didn't give Acebal her license and instead asked why she was being stopped. *Id.* at 60. Officer Acebal didn't respond to Huthnance's questions, and after several rounds of this to-and-fro, Huthnance asked for Officer Acebal's badge number. *Id.* "That's when [she] was told to place [her] hands against the wall and [she] was put in handcuffs." *Id.*

Although Huthnance testified that she refused to hand over her identification, she also testified that she didn't refuse to place her hands against the wall when Officer Acebal ordered her to do so. *Id.* After Huthnance was told to place her hands against the wall, Officer Acebal patted her down. *Id.* at 61. Huthnance testified that she continued to ask why she had been stopped and if she was being arrested, but to no avail. *Id.* In fact, she testified that "at no time during any of this that happened was I told that I was arrested." *Id.* She testified that virtually all

of her interactions were with Officer Acebal. *Id.* Importantly, Huthnance concedes that she was "upset," and described her tone of voice throughout the encounter as follows:

> At first it was probably close to a normal tone of voice, but as I asked questions and got absolutely no answer or even was told that I was being arrested, I did raise my voice when I asked for the officer's badge number. . . . At no time was I screaming at the top of my lungs.

*Id.* at 61–62.

Huthnance testified that while she "can't be a hundred percent sure" because her head was against a brick wall and Marsoni was behind her "in [her] peripheral vision," she believed he was talking with Officer Antonio and had given him his identification. *Id.* at 62–63. She testified that she was not deferential to the officers, but Marsoni—who wasn't arrested that night—was. *Id.* at 63. After being placed in handcuffs, Huthnance was led to a police car and was driven to the station. *Id.* at 64.

Huthnance testified that although she did raise her voice when she demanded Officer Acebal's badge number, she neither yelled at nor cursed any of the officers at any point from the time she left the 7-Eleven until she was put into the squad car. *Id.* She also testified that she never saw any lights coming on in the apartment buildings across the street, people peering out of windows, or anyone gathering on the street to see what all the hubbub was about. *Id.* at 65.

Huthnance also testified to several problems with the narrative of her arrest contained in the PD-163 filled out at the station afterwards. She testified that it was inaccurate in several respects, including the following:

- The PD-163 said she was arrested at 1:45 a.m. on November 16, 2005, but she claims she was arrested around midnight. *Id.* at 69.

- The PD-163 claims she was yelling while inside the 7-Eleven, which she denies. *Id.* at 69.

- The PD-163 says that after she exited the 7-Eleven, she turned around, faced the store, extended her middle finger, and yelled to the officers: "Fuck you, mother fuckers!" Huthnance denies (1) turning around, (2) extending her middle finger, and (3) saying—much less yelling—any of those words. *Id.* at 70.

- The PD-163 says that after officers told Huthnance to move along, she continued to curse at officers. She denies that she cursed at any point. *Id.*

- The PD-163 says that Huthnance was stopped for identification purposes so she could be issued a 61D citation, but she claims that no one ever told her that she would get a ticket that night. *Id.*

- The PD-163 says that Huthnance turned around and yelled at the officer: "I want your fucking badge number." Huthnance concedes that she demanded the badge number but insists that she never yelled in anyone's face and never cursed. *Id.*

- The PD-163 says that the officer told her to place her hands on the wall and refrain from screaming, but Huthnance says she was never told to refrain from screaming because she never screamed. *Id.* at 72.

- The PD-163 says that Huthnance refused the officer's commands, yelled again in the officer's face, and refused to place her hands on the wall for safety. Huthnance, though, contends that she didn't yell in the officer's face and did put her hands on the wall when she was told to do so. That said, she admits that she didn't hand over her identification when it was requested. *Id.*

- The PD-163 says that the officer advised Huthnance for a third time to refrain from screaming, and her response was: "Fuck you, little bitch." Huthnance denies screaming, being told to stop screaming, and using the referenced abusive language. *Id.*

- The PD-163 says that Huthnance said several things that she denies ever saying, including: "Fuck you, bitch"; "I'm a citizen of this country"; and "What are you going to arrest me for, being drunk with a burrito?" She admits to saying "What a waste of my tax dollars" and "I know my rights." *Id.* at 72–73.

- The PD-163 also says that Huthnance was unemployed but (1) she wasn't, and (2) she never said she was. *Id.*

- The PD-163 misspelled Marsoni's name and gave an incorrect address for him. *Id.*

- The PD-163 reported that Huthnance hadn't made a telephone call, but she says that she did. *Id.*

- The PD-163 reported her telephone number incorrectly. *Id.* at 75.

- The PD-163 said Huthnance was a "female impersonator." Huthnance says she wasn't a female impersonator and was offended that the PD-163 said so. *Id.*

Huthnance was placed in a squad car in handcuffs and driven to the police station. *Id.* at 78. She testified that once she arrived at the station, she was handcuffed to a chair and left by herself. *Id.* at 79. She remained there for forty-five minutes, asking everyone she saw if she had been arrested. *Id.* Eventually, she needed to use the bathroom and was handed a roll of toilet paper, led to a cell, and told she could use a toilet in the cell. *Id.* The door was then closed and she was locked in the cell. *Id.* About an hour later Officer Antonio came back and offered her a phone call. *Id.* After that officer left, she was alone in the cell for another hour before she finally saw Officer Acebal. *Id.* at 80. Huthnance testified that Officer Acebal returned her identification and handed her a piece of paper. *Id.* Officer Acebal told Huthnance that if she signed it, she was free to go. *Id.*

Huthnance testified that she didn't read the piece of paper (nor was she told anything else about it) before she signed it because she "just wanted to get out of jail." *Id.* After she signed the form, she put it in her pocket thinking she was about to be released from jail, but she wasn't actually released until 7:00 a.m. *Id.* at 87. Huthnance testified that she never read the entire form and instead only read the part that said what she was charged with. *Id.* She testified that she "didn't know what it meant, to be honest." *Id.* She testified that she never told anyone that she wanted to pay a fine and have her case dropped, never asked for post and forfeit, never paid a fine, neither told nor asked anyone to pay a fine for her, and was never offered any alternative to the way she was released. *Id.* at 88. She testified that she wasn't offered citation release and didn't know what that was. *Id.* at 88–89. When asked if she would have preferred an option like citation release had it been offered, she testified that she would have. *Id.* at 89.

After Huthnance finished testifying, she called Philip Eure, the Executive Director of the D.C. Government's Office of Police Complaints. Mar. 8, 2011 A.M. Trial Tr. 14. He described the OPC's role as an independent agency tasked with advising MPD on identifying problems based on the complaints that come into its office and making new policy recommendations, *id.* at 19, and one of those recommendations in particular—the 2003 CCRB Report (technically titled "Disorderly Conduct Arrests Made by Metropolitan Police Department Officers"), which dealt with MPD disorderly conduct arrests. *Id.* at 42. He testified that this report described OPC's extensive study of disorderly conduct arrests in the District and made policy recommendations that went to the Mayor and the City Council. *Id.* at 43. The purpose of the study and the report was to

> bring primarily to MPD's attention the fact that [OPC] had received a number of complaints from citizens believing they had been wrongfully arrested for disorderly conduct, and [OPC] wanted to cite some of this anecdotal evidence, and really let MPD—bring to their attention and let them know that there was a problem that needed to be addressed.

*Id.* at 58. After extensive study, the OPC had concluded that a significant number of improper or unlawful disorderly conduct arrests might be going unnoticed and recommended several policy changes for MPD to address the problem. *See, e.g.*, *id.* at 101; Mar. 8, 2011 P.M. Trial Tr. 6.

Next, Huthnance's boyfriend, Adrien Marsoni, testified and corroborated much of her story. Mar. 8, 2011 P.M. Trial Tr. 63. Then Huthnance called Lieutenant Ralph A. Neal, who had served as an MPD officer for 32 years, to testify regarding MPD's training and supervision policies regarding disorderly conduct arrests and about Huthnance's arrest. Mar. 9, 2011 P.M. Trial Tr. 5. He was the supervising officer who had signed off on Huthnance's PD-163, and he testified as to why he believed that her arrest was based on probable cause.

After Lieutenant Neal's testimony, Huthnance called Inspector Michael I. Eldridge, the Director of MPD's Disciplinary Review Branch. *Id.* at 73. His office reviews and processes officer misconduct cases and proposes and carries out the disciplinary actions against officers, up to and including termination. *Id.* He testified about how complaints are filed and processed and discussed Huthnance's arrest and its documentation specifically. He testified that if he were the supervising officer reviewing Huthnance's PD-163, he wouldn't have found that it stated probable cause for a disorderly conduct arrest. *Id.* at 83.

Next, Sergeant Michael Smith testified by deposition designation. *Id.* at 114. He testified about his training on disorderly conduct arrests, how MPD higher-ups review PD-163s, and about his memory of what happened at the 7-Eleven the night of Huthnance's arrest. He recalled arriving at the 7-Eleven at approximately midnight and seeing officers Acebal and Antonio talking with a man and a woman about fifty feet away from the store. *Id.* at 128. He purchased a cup of coffee and left, but remembered that the woman wasn't in handcuffs when he saw her and wasn't screaming. *Id.* at 129. He testified that he was about fifty feet from them and couldn't hear their voices. *Id.* He also testified that at the time that he left, no crowd had formed on the street, and he didn't remember any cars slowing down to see what was going on. *Id.* at 130. He confirmed Inspector Eldridge's testimony that Huthnance's PD-163 was insufficient and too vague to state probable cause for a disorderly conduct arrest. *Id.* at 131–34.

Finally, Huthnance called Timothy J. Longo, her expert witness. Mar. 10, 2011 A.M. Trial Tr. 4. Mr. Longo is the Chief of Police for the City of Charlottesville, Virginia, but Huthnance called him to testify as her police practices expert. *Id.* at 5. Like Eldridge and Smith, Longo testified that there wasn't sufficient evidence for an officer to reasonably believe there was probable cause to arrest Huthnance for disorderly conduct. *Id.* at 49. Instead, he testified that

she was actually arrested "for challenging the police." *Id.* He also testified that the District was on notice of a potential problem with disorderly conduct arrests. *Id.* at 50. He went on to testify that "the post and forfeit process allows for potentially bad disorderly conduct arrests going undetected. They are not being reviewed for judicial scrutiny, if nothing else. A determination is not being made by a prosecutor to determine whether something is viable for prosecution. So I think that leads to a foreseeable risk of constitutional violations." *Id.* at 52. He also testified that MPD's response to this problem was inadequate. *Id.* at 52–53. Moreover, he testified that MPD has a practice of conducting and condoning unlawful contempt of cop arrests under the guise of disorderly conduct arrests. *Id.* at 53.

Longo explained that he felt that MPD was inadequately training its officers and cited Lieutenant Neal's testimony as proof of that opinion. *Id.* at 53–54. Specifically, he testified that Lieutenant Neal "failed to notice . . . glaring deficiencies in a document that is supposed to set out probable cause for arrest." *Id.* at 54. In fact, Longo testified that it was hard for him to believe Neal—the supervisor who signed off on Huthnance's PD-163—"had any training whatsoever in supervising PD 163s or in understanding the applicable rule of law as it pertains to disorderly conduct." *Id.* He even testified that "there is a tremendous possibility that had there been adequate training, that had supervision been in place, that not only would [Huthnance's] arrest been avoided, but this procedure." *Id.* at 55. He went on to testify in detail about exactly how he came to the conclusions discussed above. Once Longo's testimony finished, Huthnance rested her case.

With Huthnance's case complete, the District and the officer defendants orally moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).[3] Mar. 11, 2011 P.M.

---

[3] Federal Rule of Civil Procedure 50(a) provides:

Trial Tr. 138. Defense counsel's first argument was that "[t]hese individual officers, Acebal and Antonio and Morales, are shielded from liability because their alleged actions, or in the case of Officer Morales, lack thereof, were objectively reasonable." *Id.* at 139.[4] Huthnance testified that she was unaware whether Antonio actually did anything with respect to her arrest. Thus, there was no evidence upon which a jury could conclude that he should be held liable on any of Huthnance's allegations. *Id.* at 140. Also, defense counsel argued, with regard to the First Amendment claim, "there's a lack of evidence with respect to Officers Antonio and Acebal, that they were inside the 7-Eleven when she made these alleged provocative claims. . . . They can't be held liable for arresting her for something that they did not hear." *Id.*

> As to Acebal, defense counsel argued:
>
> The arrest by Officer Acebal was reasonable, even if later determined to be incorrect, given the facts that we've heard, the time of the occurrence, the proximity to the residential apartment buildings across the street, testimony that spectators were observed outside the 7-Eleven, Mr. Marsoni testified to that. And also to Mr. Marsoni's testimony that Ms. Huthnance was loud, that she was yelling, that she was argumentative. That he told her to calm down repeatedly. And her own admission that she did not present her ID when instructed to do so.

*Id.* at 140–41.

---

(a) Judgment as a Matter of Law
(1) In General. If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
(A)  resolve the issue against the party; and
(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
(2) Motion. A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

[4] The Court doesn't consider arguments made with regard to Morales because the jury didn't find him liable for anything, and therefore, the motion for judgment as a matter of law is moot as to him.

Regarding Huthnance's claims of post-arrest deprivations, "There's been no evidence that she had a constitutional right to citation release, which appears to be one of her claims or a claim central to her due process claim." *Id.* at 141. Moreover, defense counsel insisted that there was no evidence to suggest that Officers Acebal or Antonio were obligated to advise her of her right to citation release or to any other type of release. *Id.* Officer Antonio wasn't even placed at the police station by any of the witnesses presented during Huthnance's case in chief, according to defense counsel. *Id.*

Defense counsel went on to request judgment as a matter of law for the District on Huthnance's First, Fourth, and Fifth Amendment claims. First, defense counsel argued that Huthnance had failed to establish that a custom, policy, or practice of the District was the motivating force behind the alleged impingement of her constitutional right. *Id.* Defense counsel went on to argue that the district couldn't have been placed on notice by the CCRB report and cited case law as support. *Id.* at 141–42.

Next, defense counsel argued that Longo's testimony regarding the adequacy of the District's post-and-forfeit training was anecdotal and insufficient. He was required to come forward with "some study, some report, something that shows that he's looked cross-jurisdictionally at what others are doing with respect to training for disorderly conduct." *Id.* at 151.

Regarding respondeat superior liability against the District for the false arrest claim, defense counsel argued that "[t]here was 12-309 notice filed by the plaintiff so that any claim resounding in tort of this sort is improper." *Id.* at 152. This Court denied the Rule 50(a) motion,

and the defendants put on their case. Once all the evidence was in,[5] defense counsel moved for

judgment as a matter of law under Rule 50(a) once again. Counsel repeated most of the

arguments they had made after Huthnance rested but did raise a few additional arguments that

must be addressed.

First, defense counsel insisted that qualified immunity shielded Officers Antonio and

Acebal from liability for Huthnance's allegations. Mar. 23, 2011 A.M. Trial Tr. 129. Earlier,

defense counsel had argued that Officer Acebal's probable cause determination was reasonable

and extended that argument here, contending that Officer Antonio's probable cause

determination was similarly reasonable. *Id.* at 132.  Next, defense counsel argued that the

officers are "entitled to judgment as to the common law claim, the false arrest, based on the

partially subjective test, her false arrest claim fails as a matter of law because the officers'

testimony that they operated in good faith remains unrebutted." *Id.*  They argued that this "good

faith" defense extends to the assault and battery claim against Officer Acebal. *Id.* Finally,

defense counsel argued that neither Officer Antonio nor Officer Acebal was involved in the

decision to determine Huthnance's eligibility for various release options. *Id.*

Counsel also expounded upon their Rule 50(a) motion in favor of the District. First, they

argued that Longo's testimony should be rejected because he didn't consider much of the

evidence in the defendants' case in drawing his conclusions. *Id.* at 134–35. But because all

---

[5] The Supreme Court has made clear that at the Rule 50 stage, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (internal quotation marks and citations omitted). Therefore, the Court won't describe the defendants' evidence in detail and will only mention defense evidence as necessary in its analysis below, meaning when that evidence was uncontradicted, unimpeached, and from a disinterested witness.

inferences must be drawn in Huthnance's favor, and because the defense testimony at issue was contradicted, impeached, or from an interested witness, this argument is a non-starter. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.") (citations and internal quotation marks omitted).

Next, defense counsel argued that assuming the CCRB Report provided notice of a widespread constitutional problem, there was evidence that the District made affirmative changes in response to that report, rendering Huthnance's deliberate indifference argument insufficient. They also argued that Huthnance abandoned her due process right by failing to read the form that the officers presented to her. *Id.* at 137. Because those options were presented to her, she received due process, and her Fifth Amendment claim against the District on that score should fail. *Id.*

After closing arguments and deliberation, the jury returned the verdict discussed above. Defense counsel then timely renewed its Rule 50 motion—this time in writing and under Rule 50(b)—and moved in the alternative for a new trial and remittitur. Rule 50(b) provides:

> (b) Renewing the Motion After Trial; Alternative Motion for a New Trial
> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

(1) allow judgment on the verdict, if the jury returned a verdict;

(2) order a new trial; or

(3) direct the entry of judgment as a matter of law.

(c) Granting the Renewed Motion; Conditional Ruling on a Motion for a New Trial.

(1) In General
If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. The court must state the grounds for conditionally granting or denying the motion for a new trial.

(2) Effect of a Conditional Ruling
Conditionally granting the motion for a new trial does not affect the judgment's finality; if the judgment is reversed, the new trial must proceed unless the appellate court orders otherwise. If the motion for a new trial is conditionally denied, the appellee may assert error in that denial; if the judgment is reversed, the case must proceed as the appellate court orders.

## II.      Legal Standard

After a jury trial, the Court may grant a motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure only if it finds that "a reasonable jury would not have had a legally sufficient evidentiary basis to find for the party on that issue[.]" Fed. R. Civ. P. 50(a)(1). Judgment as a matter of law is proper, "considering the evidence in the light most favorable to the [non-movants] and making all reasonable inferences in their favor," if the Court concludes that there is no legally sufficient evidentiary basis for a reasonable jury to have found in their favor under controlling law. *Henry v. Pelland*, 73 F.3d 397 (D.C. Cir. 1996); *see Fox v. District of Columbia*, 990 F. Supp. 13, 19 (D.D.C. 1997). The jury's verdict must stand "unless the evidence, together with all inferences that can be reasonably drawn therefrom is so one-sided [in favor of the moving party] that reasonable persons could not disagree on the verdict," *Milone v. Washington Metropolitan Area Transit Auth.*, 91 F.3d 229, 231 (D.C. Cir. 1996), that is, unless the nonmovant's evidence is so insufficient that a reasonable finder of fact "could not

possibly find for the nonmovant." 9 Moore's Federal Practice § 50.60[1] at 50–87 (3d ed. 2002); *accord Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 165 (D.C. Cir. 2007).

In deciding a motion for judgment as a matter of law, the Court is not to resolve legitimately disputed issues of fact already decided by the jury. Even if the Court finds the evidence that led to the jury verdict unpersuasive, or that it would have reached a different result if it were sitting as the fact-finder, that is not a basis for overturning the jury's verdict and granting judgment as a matter of law. *Id.* The Court may not grant the motion unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998).

Importantly, the Supreme Court has made clear that at the Rule 50 stage, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (internal quotation marks and citations omitted).

Finally, because a post-trial Rule 50(b) motion is limited to a renewal of a Rule 50(a) motion for judgment as a matter of law, the post-trial motion is limited to those grounds that were specifically raised in the prior motion. *Thomas v. Mineta*, 310 F. Supp. 2d 198, 204 (D.D.C. 2004) (citing *Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir. 2001)); *see also Whelan v.*

*Abell*, 48 F.3d 1247, 1251 (D.C. Cir. 1995) (holding that a movant who omits a theory from his Rule 50(a) motion waives the theory as the basis for a Rule 50(b) motion).

### III.    Analysis

#### a.    Judgment As a Matter of Law

The District first argues that it's entitled to judgment as a matter of law on Huthnance's First and Fourth Amendment claims because she "did not establish deliberate indifference to a known problem by District policymakers." Mot. Judgment Matter of Law 9–10, Apr. 28, 011, ECF No. 241. Section 1 of the Civil Rights Act of 1871, now codified at 42 U.S.C. § 1983, provides a cause of action for monetary damages and injunctive relief against "[e]very person who, under color of [law] . . . subjects or caused to be subjected, any person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." In *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), the Supreme Court ruled that a municipality is a "person" who can be held liable under section 1983, but only when the municipality's "policy or custom . . . inflicts the injury." *Id.* at 694. In subsequent cases, the Supreme Court and the D.C. Circuit have held that a city's inaction, including its failure to train or supervise its employees adequately, constitutes a "policy or custom" under *Monell* when it can be said that the failure amounts to "'deliberate indifference' towards the constitutional rights of persons in its domain.'" *City of Canton v. Harris*, 489 U.S. 378, 388–89 & n.7 (1989) (recognizing municipal liability under section 1983 for failure to train adequately); *see Rogala v. District of Columbia*, 161 F.3d 44, 56 (D.C. Cir. 1998) (recognizing liability for failure to train or supervise); *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (noting that "inaction giving rise to or endorsing a custom" can be the basis for section 1983 liability).

The District makes three arguments against the deliberate indifference verdict. First, it argues that Huthnance presented insufficient evidence of a known problem of constitutional magnitude. Mot Judgment Matter of Law 9. Second, it argues that Huthnance presented insufficient evidence that the district was deliberately indifferent to a known problem. *Id.* at 11. Third, it argues that the District's failure to take specific steps was not the moving force behind Huthnance's constitutional deprivations. The Court will take these arguments up in turn.

The District argues that Huthnance failed to show that it was on notice of a widespread problem of improper disorderly conduct arrests by MPD officers. Relying on *Carter v. District of Columbia*, 795 F.2d 116, 124 (D.C. Cir. 1986), the District argues that the CCRB report didn't put it on notice. Mot. Judgment Matter of Law 10. In *Carter*, plaintiffs asserted constitutional and common law claims against five police officers, the police chief, and the District of Columbia. The trial judge directed verdicts for the police chief and two of the officers on all claims, and for the city on the constitutional tort claim asserted against it. The jury found liability and awarded damages on the remaining claims, and the district court entered judgments for plaintiffs. *Carter*, 795 F.2d at 118.

The *Carter* plaintiffs charged that the city and the police chief so neglected to train, supervise, investigate, and discipline police officers as to acquiesce in pervasive misconduct—including use of excessive force—that caused their constitutional deprivations. *Id.* at 122. To make their case, the plaintiffs offered, among other things, "21 citizen complaints, out of 1315 filed, sustained by the Civilian Complaint Review Board (CCRB) during the period August 1982 to February 1984, and referred to Police Chief Turner for action." *Id.* at n.6. The Court of Appeals found this evidence insufficient because it "does not show . . . which, if any, of the 21 complaints involved misconduct similar to the abuses alleged by plaintiffs; it reveals only—and

without detail—that some 428 of the 1315 complaints alleged the use of excessive force." *Id.* The plaintiffs also presented testimony and evidence of six isolated incidents of District police using excessive force. *Id.* at 123. It concluded that "the assorted actual instances of misconduct demonstrated in this case do not line up to compose a common or widespread pattern of police misbehavior adequate to establish § 1983 liability."

The District argues that, like *Carter*, "the four sustained complaints identified by the CCRB were scattered during the period FY 2001 through FY 2003, and did not evidence a widespread problem with disorderly conduct arrests." Mot. J. Matter of Law 13. It points out that the CCRB report only concluded that there was a potential problem with disorderly conduct arrests based on its comparison of MPD's total arrests rates for disorderly conduct with other jurisdictions. Pl.'s Ex. 4. Moreover, those statistics were drawn from 1995–2000, and plaintiff introduced no evidence to suggest that the difference in rates continued in the years immediately preceding her arrest in November 2005. *Id.*

The District's *Carter* argument fails for several reasons. First, the District assumes, without citation to authority, that to provide "notice," the CCRB report must comprehensively document a "widespread" problem of constitutional dimension. That assumption can't withstand scrutiny for two reasons: (1) the CCRB report could provide the District notice simply by giving it enough information that it "should have known" about the underlying constitutional problem; (2) the CCRB report wasn't the only evidence of this problem available to the District. The Court will explain each of these points in turn.

Deliberate indifference liability may "be premised on obliviousness or constructive notice." *Farmer v. Brennan*, 511 U.S. 825, 841 (1994); *see also Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011) ("[W]hen city policymakers are on actual or constructive notice that a

20

particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."); *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997) ("[C]ontinued adherence to an approach that they know or *should know* has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.") (emphasis added and citations omitted). In light of the CCRB report's discussion of several violations, the post and forfeit procedure's tendency to render citizens' constitutional rights vulnerable, its conclusion that "a significant number of improper or unlawful disorderly conduct arrests might be going unnoticed," and its recommendations to MPD to address the problem, the District can't put the blinders on and pretend that it didn't know there was a problem.

The District's argument invites this Court to ignore the reality of the CCRB's function as a notice-providing entity. Its very job is to continuously evaluate MPD's track record to identify problems just like the one it found here and to make recommendations for resolving those problems. The District makes the argument that if the CCRB report's conclusions about a few bad arrests put it on notice, then "'practically every large metropolitan police force, it would seem, could be targeted for liability,'" Mot. J. Matter Law 10 (quoting *Carter*, 795 F.2d at 123), but that gets it backwards; if a large metropolitan police force can ignore the thorough study and recommendations of an independent agency it created specifically to notify it of potential problems, then no large metropolitan police force—it would seem—could ever be "targeted" for liability. The Supreme Court has made clear that "notice" doesn't require actual knowledge of the precise extent and specific contours of a constitutional problem. It refers instead to a

municipality's possession of enough information that it "should have known" of a constitutional problem. The CCRB report provided the District with enough information that it should have known of the constitutional problem that resulted in violation of Huthnance's constitutional rights.

It's true that in *Carter* the Court of Appeals held that evidence from the CCRB report was insufficient to support a jury's verdict because it "does not show . . . which, if any, of the 21 complaints involved misconduct similar to the abuses alleged by plaintiffs; it reveals only—and without detail—that some 428 of the 1315 complaints alleged the use of excessive force." *Id.* But just because the Court of Appeals found particular CCRB evidence insufficient in one situation decades ago doesn't mean that all CCRB evidence is forever blackballed and incapable of putting the District on notice of a problem. The Court of Appeals in *Carter* had particular gripes with the CCRB evidence before it: (1) lack of detail, and (2) lack of evidence of similarity between the problems reported in the CCRB evidence and the plaintiffs' concerns. *Id.*

Here, the there are no such problems. Huthnance was the victim of the *exact same* problem the CCRB report warned about.  Nor was the CCRB report based on only a handful of "scattered" incidents of the type *Carter* found "not [to] coalesce into a discernable 'policy.'" *Id.* at 123. It also rested on (1) the disproportionately high percentage of the agency's initial group of police complaints  that involved wrongful disorderly conduct arrests, (2) that all fully-adjudicated complaints of wrongly disorderly conduct were sustained, (3) the existence of "a significant number" of yet-to-be adjudicated complaints that appeared consistent with the four unlawful and retaliatory disorderly conduct arrests the CCRB did adjudicate, (4) the possibility that the "challenging" subjective judgments called for by the disorderly conduct statute permit it to be used as a tool for retaliatory arrests, (5) the danger that the overwhelming use of post-and-

forfeit for disorderly conduct arrests shields them from review, thereby tacitly encouraging retaliatory arrests, and (6) the considerable unexplained disparity in arrest rates between the District and comparable jurisdictions. Pl.'s Ex. 4. These details separate this CCRB report evidence from that the Court of Appeals rejected in *Carter* and support the report's conclusion that "a significant number of improper or unlawful disorderly conduct arrests" might be going unnoticed, and that those thus far identified "are an important warning sign that requires action." Pl.'s Ex. 4 at 10, 21. The CCRB report thus provided the District with constructive notice of widespread constitutional violations.

As mentioned above, the CCRB Report wasn't the only source of notice to the District. Both experts testified about a study performed by Dr. James Ginger that found over 34% of disorderly conduct arrest reports from the first six months of 2005 failed to state probable cause for arrest. Mar. 10, 2011 P.M. Trial Tr. 75; Mar. 21, 2011 PM Trial Tr. 115–22. Both experts agreed that, had the District reviewed the PD-163s in a systematic fashion, these deficiencies— and the larger problem of unconstitutional arrests that they indicate—would have been identified. Mar. 10, 2011 A.M. Trial Tr. 50; Mar. 22, 2011 A.M. Trial Tr. 47–48. Both experts also testified that even without the CCRB Report, the District was on constructive notice because it should have been reviewing or sampling disorderly conduct arrest reports. Mar. 10, 2011 A.M. Trial Tr. 50; Mar. 10, 2011 P.M. Trial Tr. 81; Mar. 22, 2011 A.M. Trial Tr. 44, 47–48. This testimony was uncontradicted. The Court wants to be clear that it isn't saying that the District should have been on notice because of this expert testimony. Instead, the expert testimony reveals that had the District fulfilled its obligation to review its own arrest reports as the CCRB report recommended, it would have seen indisputable evidence of widespread constitutional violations. In short, it *should have known* of these problems even without the CCRB report. That said, the CCRB report

did a lot of the work for the District and put it in front of the Mayor, the City Council, and MPD on a silver platter. Thus, the jury plainly had sufficient evidence to conclude that the District was on notice of widespread constitutional violations related to the post-and-forfeit procedure.

Next, the District argues that Huthnance presented insufficient evidence that the District was deliberately indifferent to a known problem. It argues that in response to the CCRB Report, and prior to Huthnance's arrest, the District improved its training materials and modified its arrest procedure to ensure that citizens were provided with written notice about the collateral forfeiture process and that arrestees sign an acknowledgment of their choice to forfeit collateral. Mot. J. Matter Law 14. Thus, there was no basis for a finding of deliberate indifference. *Id.* The District cites the D.C. Circuit's decision in *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004), for the proposition that deliberate indifference "simply means" that "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, a municipality may not adopt a policy of inaction." Because it took some affirmative steps in response to the CCRB report's recommendations, the District argues that it clearly didn't adopt a "policy of inaction" and thus there was insufficient evidence to prove that it was deliberately indifferent. This argument fails as well.

The District bases its argument on an overly-narrow reading of "policy of inaction." The term "policy of inaction" doesn't refer exclusively to those municipalities that do literally nothing in response to a known problem. Instead, as the D.C. Circuit made clear in *Daskalea*, once the District and its policymakers "were on notice," "substantial intervention" was required to prevent liability for deliberate indifference. *Daskalea*, 227 F.3d at 441. In that case, like this one, the District argued that it couldn't be held liable for deliberate indifference because it had issued a policy in response to the problem. *Id.* at 442–43. The Court of Appeals rejected that

argument, holding that "a paper policy cannot insulate a municipality from liability where there is evidence, as there was here, that the municipality was deliberately indifferent to the policy's violation." *Id.* (citations omitted). The "affirmative steps" the District points to in this case are the same sort of "paper policy" that *Daskalea* makes clear doesn't—on its own—do the trick. Mot. J. Matter Law 15 ("The passage of a statute, modification of . . . procedures . . . and revision of . . . training materials . . . demonstrate that the District was not deliberately indifferent or indifferent at all to the CCRB's recommendations.")Thus, it can't be said that doing literally *anything* in response to a known problem is sufficient to avoid deliberate indifference liability. Indeed, in light of *Daskalea*, it's more accurate to equate a "policy of inaction" with a failure to undertake "substantial intervention." *Id.* at 441.

In this case, Huthnance presented a great deal of evidence at trial of the District's deliberate indifference. She demonstrated that the District made numerous representations to the CCRB about steps it would take to address the concerns raised and recommendations made in the 2003 Report. *See* Mar. 9, 2011 A.M. Trial Tr. 66–67, 71; Pl.'s Ex. 10 at 43. Huthnance also showed that the District in fact took almost none of the steps recommended to the CCRB, and may well have misrepresented those that it did take. Thus, it was undisputed that, despite the District's representations to the contrary:

- No sampling study of disorderly conduct arrests was performed, even though the CCRB stated that "this review is critical" (Mar. 23, 2011 A.M. Trial Tr. 128; Pl.'s Ex. 4 at 21; Pl.'s Ex. 104);

- No videotaped message from the MPD chief emphasizing the importance of properly applying the disorderly conduct statute was created (Mar. 11, 2011 P.M. Trial Tr. at 7–9; Pl.'s Ex. 11 at 39; Pl.'s Ex. 57 at 44 n.20);

- The dated and ineffective disorderly conduct training video was not revised (Mar. 11, 2011 P.M. Trial Tr. 7–9; Pl.'s Ex. 11 at 39);

- No roll call module on disorderly conduct was presented to incumbent officers in June 2005 or at any other time (Mar. 10, 2011 P.M. Trial Tr. 42–43; Pl.'s Ex. 11 at 39; Pl.'s Ex. 38);

- No in-service training on disorderly conduct was provided to incumbent officers until 2007, and the in-service training had no new or different information from what had been in the deficient academy training materials for years (Mar. 10, 2011 P.M. Trial Tr. 46–50; Pl.'s Ex. 11 at 39; Pl.'s Ex. 39); and

- The District's touted changes to the disorderly conduct statute occurred before the CCRB Report was issued, and didn't actually affect the disorderly conduct offense (Mar. 9, 2011 A.M. Trial Tr. 44–46).

The jury also heard evidence that the District's 30(b)(6) representative falsely testified under oath that both the revised training video and the video from the chief had been produced and shown to in-service MPD officers, and that the District didn't admit that these videos were never made until mere weeks before the original trial date. Mar. 11, 2011 PM Trial Tr. 3–5, 7–9. Both experts agreed that these misrepresentations and/or failures to act were strong evidence of the District's deliberate indifference. *Id.* at 18; Mar. 22, 2011 A.M. Trial Tr. 44, 47–48, 50–51. Mr. Gallagher went so far as to testify that the CCRB would have felt "duped" had it known just how little MPD actually did. Mar. 22, 2011 P.M. Trial Tr. 68–70. Thus, there was easily sufficient evidence upon which the jury could base its conclusion that the District was deliberately indifferent.

Finally, the District argues that Huthnance failed to prove that its deliberate indifference caused her wrongful arrest. Mot. J. Matter Law 14. The Court declines to address this argument, however, because the District failed to raise it in its Rule 50(a) Motion. *See* Mar. 11, 2011 P.M. Trial Tr. 138–53; *U.S. Indus., Inc. v. Blake Const. Co., Inc.*, 671 F.2d 539, 548 (D.C. Cir. 1982).

Next, the District argues that Huthnance's Fifth Amendment claim fails as a matter of law. Mot. J. Matter Law 15. Although the defendants raise several arguments, the only argument that they preserved by raising it at the Rule 50(a) stage was that Huthnance had no constitutional

right to citation release and waived any due process right she might have had by signing the form presented to her at the police station that contained fine print informing her of her release options. This argument succeeds, and the Court grants judgment as a matter of law in favor of the District and the officer defendants on Huthnance's Fifth Amendment claim for the reasons that follow.

The Fifth Amendment to the United States Constitution prohibits—among other things—differential treatment of similarly situated parties absent a sufficient governmental interest. *See, e.g.*, *Tele-Communications of Key West, Inc. V. United States*, 757 F.2d 1330, 1340 (D.C. Cir. 1985). The concept of "equal protection" embodied in the Fourteenth Amendment—which applies only against the states—is reflected in the Fifth Amendment's Due Process Clause, which is enforceable against the District of Columbia. *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954) (holding, through the doctrine that has come to be known as "reverse incorporation," that the Fifth Amendment rights of District of Columbia plaintiffs were violated because racial segregation cannot be justified by a legitimate government interest).

Huthnance has argued—for years now—that she has been the subject of unjustified *differential treatment* by the District in violation of her equal protection rights. She contends that the District treats citizens arrested with probable cause differently than those arrested without it and that it does so without a justifying legitimate government interest. MPD officers arrested her, she insists, without probable cause and then denied her information about her entitlement to citation release as a means of coercing her to choose the post-and-forfeit procedure. They did this, she contends, so that they could effectively shield her unlawful arrest from the scrutiny of later review. *See* Jury Instructions 12; Amended Compl. ¶¶ 27, 33, 43, 78–80, 101, 103. Not only is avoiding review *not* a legitimate government interest to justify this differential treatment, it

actually tends to impinge citizens' rights to be free from unlawful seizure (Fourth Amendment) and to protest unlawful arrests and criticize the police (First Amendment).

The District counters that Huthnance's argument fails because she was offered citation release in the fine print of a form she signed to accept the post-and-forfeit procedure at the police station on the night of her arrest. Huthnance says she never read the form because it was brought to her filled out with instructions to sign it so that she could go home. The Court need not resolve the question of whether the fine print provided Huthnance with notice, however, because even if it did, Huthnance's Fifth Amendment claim fails. In order to show that the unlawfully arrested were treated differently than those arrested with probable cause, Huthnance would have to have produced evidence that those arrested with probable cause were actually given more or better notice of their citation release option than she was. This is the very heart of differential treatment. She didn't produce a shred of such evidence. Therefore, even if this Court were to agree with her that the fine print on the form didn't provide her with any opportunity to choose citation release, without additional evidence that those arrested with probable cause were actually treated differently in any way, her Fifth Amendment equal protection claim must fail.

The Court notes that one might argue that—based on the jury instructions and the Amended Complaint—Huthnance's Fifth Amendment claim was actually a substantive due process claim based on violation of her right to citation release. Jury Instructions 12 ("She claims that because citation release is never presented to arrested citizens as an option, the coercive effect of possibly spending more time custody tilts the scales heavily in favor of paying the $25 collateral at the police station for many citizens."); Amended Compl. ¶ 76. Huthnance denies this characterization: "Nor may Defendants prevail based upon the only argument they did preserve: that Plaintiff was not constitutionally entitled to citation release. This argument fundamentally

misstates Plaintiff's Fifth Amendment claim." Opp'n Mot. J. Matter Law 9. Be that as it may, the Court—out of an abundance of caution—seeks to show why this claim couldn't succeed under the Fifth Amendment either. The reason it couldn't succeed is simply that there is no authority for the proposition that arrestees have a constitutional right to citation release. Indeed, the Supreme Court has established that the government may detain an arrestee for up to forty-eight hours prior to a probable cause determination. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). In light of that clear rule, it would be odd if the Constitution also *required* citation release. It is also clear that the many other jurisdictions that don't offer citation release aren't in standing violation of the Fifth Amendment simply because they don't offer that option. Thus, Huthnance can't persuasively argue that her Fifth Amendment rights were violated because she wasn't offered citation release.

Finally, she might argue that the Court still hasn't squarely addressed her precise Fifth Amendment claim. She could argue that she was making neither a differential treatment claim, nor a claim that she has a constitutional right to citation release. In her opposition, Huthnance also argues that her "Due Process rights were violated by the practice of covering up 'contempt of cop' arrests by funneling arrestees through the District's unique post-an-forfeit release procedure. . . . This practice deprived Plaintiff of the opportunity to make a knowing and voluntary choice with regard to her rights, and, indirectly, the right to rebut state allegations of criminal conduct through a trial and obtaining a binding, public judgment of acquittal from the state itself." Opp'n Mot. J. Matter Law 9. The problem with this phrasing is that it shows up in neither the jury instructions nor the Amended Complaint. The Amended Complaint surely can't cover this argument because it is clearly and explicitly premised on the equal protection principles of the Fifth Amendment's Due Process Clause. Amended Compl. 14. Thus, this novel

phraseology is foreign to this case as it has existed for several years and, more importantly, as it was presented to the jury. Thus, there wasn't sufficient evidence for any reasonable jury to have ruled in Huthnance's favor on such a theory.

For these reasons, the Court denies the District's argument for judgment as a matter of law in all respects except one. The motion is granted insofar as it applies to Huthnance's Fifth Amendment claim against the District and the defendant officers. Because she failed to produce sufficient evidence of differential treatment, no reasonable jury could have found an equal protection violation here.

### b.  Motion for a New Trial

The District has five sets of arguments that these defendants are entitled to a new trial: (1) the verdict was severely tainted by the failure to bifurcate; (2) improper admission of evidence; (3) improper exclusion of evidence; (4) the submission of erroneous legal theories to the jury; and (5) the submission of erroneous instructions to the jury. After explaining the legal standard for a motion for new trial, the Court will consider each of these arguments in turn.

### i.  Legal Standard for A Motion for New Trial

A district court should deny a motion for new trial unless "the court is convinced that the jury verdict was a seriously erroneous result where denial of the motion will result in a clear miscarriage of justice." *Webb v. Hyman*, 861 F. Supp. 1094, 1109–10 (D.D.C. 1994) (internal quotations omitted). Courts hesitate to disturb jury verdicts "to protect the jury's function in the judicial system." *Id.* at 1109. Indeed, a motion for a new trial asks the judge to "take[] over, if [] not usurp, the prime function of the jury as the trier of the facts." *Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997) (citations omitted).

Each of the bases of defendants' motion is committed to this Court's sound discretion as is the general decision about whether to order a new trial. *See, e.g.*, *Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 166 (D.C. Cir. 2007) (new trial and evidentiary rulings); *McLaughlin v. State Farm Mut. Auto. Ins. Co.*, 30 F.3d 861, 870 (7th Cir. 1994) (bifurcation); *United States v. Weisz*, 718 F.2d 413, 431 (D.C. Cir. 1983) (admission of evidence). Moreover, where an alleged error could have been cured at trial, but was not, the issue cannot be raised later. *See Dorocon, Inc. v. Burke*, NO. 02-2556, 2006 WL 468009, *3 (D.D.C. Feb. 27, 2006); *see also* Wright & Miller, 11 Federal Practice & Procedure Civ. §2805 (2d ed.). As discussed below, none of the defendants' many arguments justifies disturbing the jury's verdict and granting a new trial in this case.

## ii. Bifurcation

First defendants argue that the Court's denial of their motion to bifurcate entitles the defendant officers to a new trial because evidence relevant only to Huthnance's claims against the District unfairly prejudiced their case. The problem with this argument is that the decision whether to bifurcate a trial is left to this Court's sound discretion, and defendants have failed to show that they were actually prejudiced by the failure to bifurcate. Moreover, the defendants failed to take certain easy steps that would have gone a long way toward curing this error at trial. They didn't request limiting instructions with regard to any of the allegedly prejudicial evidence against the officers arising from the failure to bifurcate. Moreover, they didn't assign different lawyers to the officers and the district, thus exacerbating the alleged problem. Finally, while it may be true that *less* contempt of cop evidence would have been admissible in a trial against the individual officers by themselves, a good portion of it surely would have been relevant and admissible. After all, Huthnance was entitled to establish that she was a victim of that phenomenon, just as she was entitled to elicit evidence of deficient training and supervision to

prove that it was more likely than not that she was wrongly arrested because the officers were poorly trained and supervised. Therefore, bifurcation wouldn't have rendered all or necessarily even most of this evidence inadmissible. Simply put, the defendants have failed to prove that this Court's decision not to allow bifurcation in this case caused the sort of prejudice that requires a new trial. To the extent that there was any such damage, the District won't be heard to complain about it now in light of its failure to take obvious steps to mitigate that damage.

Relatedly, defendants argue that the District's discovery responses further unduly prejudice Antonio and Acebal. During discovery, Huthnance never served any written discovery on Acebal or Antonio. Instead, all written discovery was served upon the District. During trial, this Court allowed Huthnance to publish written discovery responses that the defendant officers argue prejudiced them and require a new trial. This argument fails because the Court allowed those defendants to testify that they didn't assist in preparing the District's written discovery responses *and* allowed a limiting jury instruction on this point. In light of those precautions and the lack of any evidence of actual prejudice, this Court will not disturb the jury's verdict in this case.

### iii. Exclusion of Evidence

The defendants next argue that they're entitled to a new trial because this Court improperly excluded: (1) a 2005 lesson plan used by MPD to train recruits at the Academy on disorderly conduct; (2) a "radio run log" that purportedly established that Huthnance was arrested at around 2:00 a.m. on November 16, 2005; and (3) a blank two-sided PD-67 form that defendants failed to produce until the weekend before trial. This Court finds that these exclusions were proper, and even if they weren't, they were harmless errors.

The defendants' argument regarding the 2005 lesson plan fails because defendants introduced a 2005 handout on disorderly conduct that contained almost identical information and was distributed to MPD recruits at the academy in conjunction with the lesson plan. Def.'s Ex. 3. Thus, the exclusion of the lesson plan itself couldn't have been the sort of prejudicial error that would merit a new trial. Moreover, this issue has already been briefed and argued by the parties and defendants offer no new reason for this Court to reconsider its decision to exclude the lesson plan (because of its introduction less than two weeks before trial). Thus, there is no reason to grant a new trial based on the exclusion of the 2005 lesson plan.

The exclusion of the radio run log has also already been briefed and argued by the parties. Emergency Mot. Exclude Purported Dispatcher's Report, Mar. 14, 2011, ECF No. 214; Mar. 14, 2011 A.M Trial Tr. 2–7. The defendants add nothing new to the arguments made then, and the Court rejects them again for the same reasons. The District's 30(b)(6) witness affirmatively represented that the log couldn't be conclusively linked to Huthnance's arrest. Emergency Mot. Exclude 4–6. Moreover, the exclusion of the run log—even if it was error— was harmless. There was no evidence that the call to the dispatch happened contemporaneously with the arrest, and the time of the arrest wasn't determinative of liability. Thus, there's no reason to believe that this exclusion—even if was error, which it wasn't—was prejudicial, and it certainly doesn't merit a new trial.

Defendants also complain about this Court's missing evidence instruction to the jury, which said:

> There has been testimony about a dispatcher's report that allegedly shows the time that the arresting officers reported Ms. Huthnance's arrest. However, the defendants did not introduce this document into evidence. You may infer that the dispatcher's report was not introduced into evidence because it does not exist or because it contains information that would have been unfavorable to the defendants' case.

Jury Instructions 3, ECF No. 222. Defendants fail to show that this instruction was unduly prejudicial to them. As discussed above, even if the radio run log had been admitted, it wouldn't necessarily have meant that Huthnance's time line was wrong or that defendants' was correct because there was no evidence that the call to dispatch happened contemporaneously with her arrest. Moreover, as mentioned above, the time of arrest wasn't a dispositive issue in this case. Thus, even if this instruction was error, which it wasn't, it was harmless and doesn't require disturbing the jury's verdict in favor of a new trial.

The exclusion of the blank two-sided PD-67 has also been briefed and argued by the parties, and defendants offer nothing new here to suggest that the exclusion was erroneous. Emergency Mot. Strike District's Amended Discovery Responses, Mar. 6, 2011, ECF No. 208; Mar. 7, 2011 A.M. Trial Tr. 102–04. Indeed, the defendants admit that there was "some basis for the exclusion." Mot. J. Matter Law 27. Moreover, its exclusion was harmless even if it was error. Defendants argue that "it would have been impossible for [Huthnance] to win" her Fifth Amendment claim had the two-sided PD-67 been admitted into evidence because the missing page described the citation release option. *Id.* But Huthnance testified emphatically that because Acebal told her that she'd be released if she signed the PD-67, she didn't read the form (including any back page that may have existed) and wasn't advised of her right to citation release in any other way. Indeed, even if the two-sided form had been produced, the defendants were unable to prove that the form Huthnance received had two sides. Thus, the exclusion of the two-sided form wasn't prejudicial, and the Court declines to grant a new trial on this ground.

The Court also notes that some of these documents were excluded because of defendants' discovery misconduct, and it's clear that the exclusion of relevant and highly probative evidence is a potential sanction for a litigant's failure to adhere to the discovery rules. Fed. R. Civ. P. 37.

This isn't to say that this Court excluded these documents to sanction defendants. Instead, the Court notes it merely to show that these problems—to the extent there is any problem—were preventable. All the District had to do in many instances was follow the rules. The new trial motion can't be used to fix problems that should have been resolved long before trial ever started.

### iv.  Inclusion of Evidence

Conversely, defendants object to testimony regarding the Ginger Report, all of Longo's testimony, all evidence relating to the post-and-forfeit procedure, all evidence regarding events after Huthnance's arrest, and all CCRB reports. Mot. J. Matter Law 28–38. These points have already been thoroughly briefed and argued by the parties and ruled on by this Court. Mot. Limine, Sept. 3, 2010, ECF No. 160; Mot. Limine, Sept. 10, 2010, ECF No. 161; Mot. Limine, Sept. 10, 2010, ECF No. 162; Mot. Expedite, Sept. 11, 2010, ECF No. 163; Pretrial Conf. Tr., Sept. 13, 2010. Defendants provide no new reasons to believe the Court's decisions on these matters were incorrect much less that they require a new trial.

Defendants raise several objections to the testimony regarding the Ginger Report. Mot. J. Matter Law 28–31: (1) Ginger wasn't subject to cross-examination; (2) "there was no testimony of an expert in statistics as to the validity of the methodology used to select the subset of reports" that he reviewed; (3) if Ginger had been presented as a testifying expert, he wouldn't have been allowed to testify; and (4) testimony regarding his report was irrelevant or more prejudicial than probative. *Id.*

The Court has already ruled on these objections and there is no need to go through every jot and tittle of the parties' arguments on this score again because it is abundantly clear that—in this case—even if allowing reliance on Ginger's report was error, it was harmless. Federal Rule

of Evidence 703 permits a testifying expert to rely on reports prepared by others for the specific purpose of providing a basis for the testifying expert's opinions as long as they are "of a type reasonably relied upon by experts in the particular field." Both experts testified that Ginger's report is of a type reasonably relied upon by experts in the field. Mar. 10, 2011 A.M. Trial Tr. 42; Mar. 21, 2011 P.M. Trial Tr. 123. Moreover, to the extent that the testifying experts "parroted" Ginger's conclusions, nothing prevented counsel from challenging those conclusions by cross-examining the parroting expert witness. True, that would have been difficult for defendants in light of the fact that *their own* expert endorsed Dr. Ginger's report, but that only shows that the defendants weren't at all prejudiced by the inclusion of this testimony. In short, the parties' reliance on the Ginger report simply doesn't require a new trial.

Defendants go on to argue that Longo's testimony should have been excluded because: (1) he was merely a "mouthpiece" for Dr. Ginger; (2) his testimony was "rife" with subjective opinions; (3) he made legal conclusions in violation of Federal Rule of Evidence 702; (4) he testified as to an ultimate issue; (5) his testimony wasn't based on a standard of care and/or wasn't based on a comparison with the practices of other jurisdictions; (6) his opinions regarding post-and-forfeit were "impermissibly subjective"; and (7) his testimony's unfair prejudice outweighed its probative value." Mot. J. Matter Law 31–35. These arguments all fail.

First, although it's true that Longo testified that he relied upon Ginger's report, he also testified that he performed his own independent review of the PD-163 arrest reports and extensive case materials in forming his opinion. Mar. 10, 2011 A.M. Trial Tr. 46; Mar. 10, 2011 P.M. Trial Tr. 9; Mar. 11, 2011 A.M. Trial Tr. 85. Moreover, his testimony was extensive and covered more ground than just Dr. Ginger's report.

Second, defendants provide no examples of Dr. Ginger's "subjective" opinions, nor any explanation of how those opinions had an impermissible effect on the jury. Mot. J. Matter Law 31. Without more, this bare bones conclusory argument is simply insufficient to merit a new trial.

Third, defendants' argument that Longo testified as to legal conclusions is unpersuasive. Although it's true that experts shouldn't testify as to legal conclusions, an expert may use terms such as "probable cause" or "deliberate indifference," as long as he or she uses them in a manner that is readily understood by the jury and not likely to cause confusion or lead the jury to an incorrect view of the law. *Burkhart v. WMATA*, 112 F.3d 1207, 1212–13; *see also Hayter v. City of Castle Rock*, 154 F.3d 269, 274 (5th Cir. 1998) (allowing police practices expert to conclude "that no reasonable officer could believe that he or she had probable cause" to make arrest at issue). Defendants fail to point to any instance in which Longo's testimony could have possibly led the jury to an incorrect legal conclusion or a conclusion inconsistent with the jury instructions. Indeed, it's hard to imagine how a plaintiff could ever make a case for a violation of the type alleged here without offering such testimony. Finally, to the extent there was error here despite the arguments above, that error was harmless, especially in light of the fact that defendants elicited the same sort of testimony from their own expert. Mar. 14, 2011 P.M. Trial Tr. 114–20.

Fourth, defendants also fail to cite any instance of Longo testifying to an ultimate issue, but even if they had, this argument would fail. Federal Rule of Evidence 704(a) makes clear that experts may testify to ultimate issues. Moreover, defendants fail to show how any such testimony was so prejudicial as to require a new trial.

Fifth, defendants argue that Longo's testimony was inadmissible because it wasn't based on a standard of care or grounded in a comparison of the District's practices with those of other jurisdictions. But Longo clearly had an adequate basis for his testimony: he had three decades of personal experience as a police officer, trainer, supervisor, and he was familiar with generally accepted police practices. Expertise gained through personal experience is a valid basis for expert testimony. *See, e.g.*, *United States v. Parra*, 402 F.3d 752, 758–60 (7th Cir. 2005). This Court accepted Longo's qualifications and admitted him as an expert to testify following defense counsel's *voir dire*. Mar. 10, 2011 A.M. Trial Tr. 41. Thus, defendants can't argue that Longo's testimony was without basis.

Moreover, the requirement that an expert articulate a "standard of care" applies to negligence cases, not § 1983 municipal liability cases under *Monell* and its progeny. The two cases defendants cite for the proposition that expert testimony must be based on a standard of care address negligence claims. Mot. J. Matter Law 32 (citing *Nat'l Tel. Coop. Ass'n v. Exxon Mobil Corp.*, 244 F.3d 153, 154, 157 (D.C. Cir. 2001); *Butera v. District of Columbia*, 235 F.3d 637, 659 & n.29 (D.C. Cir. 2001). Even if this weren't the case, nothing about this objection indicates the sort of serious prejudice that would require a new trial.

Defendants also argue that Longo's testimony should have been excluded because "he had not done any studies or any analyses to figure out what other jurisdictions did to train on either disorderly conduct or post-and-forfeit." Mot. J. Matter Law 32. But "deliberate indifference" liability isn't based on failure to abide by prevailing standards. It is premised on failing to provide training or supervision that is obviously necessary in light of the particular facts that are actually known of that should be known to the municipality. *City of Canton v.*

*Harris*, 489 U.S. 378, 390 (1989). Defendants' objection simply has no legal basis and even if it did, they're unable to show the sort of undue prejudice necessary to require a new trial.

Sixth, defendants object to Longo's testimony regarding the post-and-forfeit procedure because he had no personal experience with the procedure. Mot. J. Matter Law 32. But Longo did testify about his extensive experience arresting people, including reviewing arrest reports for adequacy of probable cause. Mar. 10, 2011 A.M. Trial Tr. 7, 12–13; Mar. 11, 2011 A.M. Trial Tr. 5–9, 20–27. These experiences and his review of materials explaining the nature of post-and-forfeit formed an adequate basis for his opinions. Importantly, if defendants were correct, no expert in police practices, no matter how well-qualified, could opine regarding post-and-forfeit unless he or she had worked as a police officer in the District of Columbia and used that procedure personally because the District of Columbia is the only jurisdiction in the country to use that procedure. Such a rule would insulate the most exotically unjust and newfangled of police practices from criticism because of the scarcity of police practices experts who had worked under them. It's unsurprising, then, that defendants' proposed rule—and its ironically unfortunate consequence—isn't the law.

Seventh, defendants' argument that Longo's testimony should be excluded under Rule 403 is unpersuasive. The only case the defendants cite holds that expert testimony should be excluded under Rule 403 if it's "on a subject that is well within the bounds of a jury's ordinary experience." *United States v. Montas*, 41 F.3d 775, 784 (1st Cir. 1994). In fact, even where that Court found such objectionable testimony, it still didn't require a new trial. *Id.* This Court concludes that new trial would be inappropriate here where there is no indication of undue prejudice.

Defendants go on to argue that all evidence of post-and-forfeit should have been excluded at trial. Mot. J. Matter Law 35. This argument fails before it gets started because it could have been cured at trial and was not. *Dorocon, Inc. v. Burke*, NO. 02-2556, 2006 WL 468009, *3 (D.D.C. Feb. 27, 2006); *see also* Wright & Miller, 11 Federal Practice & Procedure Civ. §2805 (2d ed.). Indeed it was never raised at trial. That said, it also fails because defendants fail to explain how the admission of post-and-forfeit evidence was prejudicial to them.

Next, defendants argue that evidence of post-2005 occurrences should have been excluded, and that its admission was prejudicial to them. Mot. J. Matter Law 35–36. There are several reasons to reject this argument, but the most obvious one is that defendants can't argue that this evidence was prejudicial to them because they included similar evidence on their exhibit list and introduced it at trial. Joint Pretrial Statement 19, Mar. 3, 2010, ECF No. 121; Notice of Filing, Nov. 3, 2010, ECF No. 186. Moreover, there's no legal basis for defendants' argument. A municipality's post-incident conduct is relevant and admissible on *Monell* claims because it can shed light on what policies existed at the time of the incident. *See, e.g.*, *Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989). Finally, even if defendants were correct, they've failed to show that the admission of this evidence was unduly prejudicial.

The defendants also argue that the CCRB reports and all testimony regarding them should have been excluded because the reports "contain hearsay." Mot. J. Matter Law 37. This argument is wholly unpersuasive. First, it wasn't raised before and is therefore barred at this stage. *Dorocon, Inc. v. Burke*, NO. 02-2556, 2006 WL 468009, *3 (D.D.C. Feb. 27, 2006); *see also* Wright & Miller, 11 Federal Practice & Procedure Civ. §2805 (2d ed.). Second, the hearsay rule doesn't bar admission of the CCRB reports because they're public records of a governmental agency, setting forth "factual findings resulting from an investigation made

pursuant to authority granted by law." Fed. R. Evid. 803(8)(C). Third, the reports aren't hearsay to the extent they're offered to show notice. Fed. R. Evid. 801(c).

### v. Jury Instructions

Defendants level three objections to the jury instructions. They claim that (1) the instruction on the disorderly conduct (loud and boisterous) statute is incorrect as a matter of law or, at the very least, not a "clearly established interpretation of the statute; (2) the Court erred in denying their proposed jury instruction on probable cause; and (3) the missing witness instruction was improper. None of these arguments is persuasive.

Defendants object to the instruction explaining the elements —and thus probable cause for arrest under—former D.C. Code § 22-1321(3), as interpreted by the D.C. Court of Appeals in *In re T.L.*, 996 A.2d 805 (D.C. 2010). They first argue that the instructions were wrong to state that Huthnance's alleged yelling wasn't a violation of the law if it was "a reasonable protest of the defendant officers' unlawful or improper restrictions" on her liberty. Mot. J. Matter Law 38. The problem with this argument is that the instruction properly captures, through the words "reasonable," "unlawful," and "improper," the balance between permitting protests of unlawful police action and protecting the peace of sleeping residents that the *T.L.* Court implied must be struck. 996 A.2d at 812–14.

Defendants also insist that the statute criminalized more than just "conduct disturbing those inside their homes," and that the inclusion of such a limitation in the instructions requires a new trial. Mot. J. Matter Law 38–39. Defendants raised this argument at the hearing on jury instructions on March 23, 2011. This Court rejected it then, and the defendants offer no new argument in support of it. Mar. 23, 2011 A.M. Trial Tr. 18–25. Moreover, there is no reason to believe that removal of the allegedly objectionable instruction would have altered the jury's

verdict. Huthnance and her fact witnesses—including one MPD supervisor—testified that she wasn't yelling or making loud noises of any kind, at any point. In any case, the jury affirmatively found that she was arrested because of the content of her speech, not its volume. Jury Instruction 10–11; Verdict Form 2.

Defendants' objection that the instruction interpreting D.C. Code § 22-1321 shouldn't have been given because it wasn't "clearly established law" is totally without merit. The "clearly established law" question has to do with the qualified immunity analysis, not whether Huthnance's rights were violated. In any event, defendants waived this objection by not raising it prior to the charging of the jury. Fed. R. Civ. P. 51(c)(1) & (d)(1)(A); *Parker v. District of Columbia*, 850 F.2d 708, 715 (D.C. Cir. 1988); *see also See Dorocon, Inc. v. Burke*, NO. 02-2556, 2006 WL 468009, *3 (D.D.C. Feb. 27, 2006); *see also* Wright & Miller, 11 Federal Practice & Procedure Civ. §2805 (2d ed.). The same is true of defendant's objection that this Court's failure to give their proposed instruction on probable cause requires a new trial. Fed. R. Civ. P. 51(c)(1) & (d)(1)(A); *Parker v. District of Columbia*, 850 F.2d 708, 715 (D.C. Cir. 1988); *see also See Dorocon, Inc. v. Burke*, NO. 02-2556, 2006 WL 468009, *3 (D.D.C. Feb. 27, 2006); *see also* Wright & Miller, 11 Federal Practice & Procedure Civ. §2805 (2d ed.).

Finally, defendants claim that a new trial is warranted because of an improper missing witness instruction. Mot. J. Matter Law 39–40. Antonio testified on cross-examination that two previously unidentified individuals—an MPD officer named Crowley and a neighborhood resident named Elena—were present in the vicinity of and witnessed Huthnance's arrest. Mar. 14, 2011 A.M. Trial Tr. 63–64, 80–81. Because these witnesses hadn't been disclosed in discovery, this Court granted a missing witness instruction. Mar. 23, 2011 A.M. Trial Tr. 13–16; Jury Instructions 3. Defendants claim that the instruction was improper because "the identity of

the person who transported plaintiff was of no (or limited) importance or relevance, and because plaintiff never sent any written discovery to defendant Antonio." Mot. J. Matter Law 39. These arguments fall short.

First, the fact that Huthnance didn't serve written discovery on Antonio is irrelevant because he was questioned during his deposition about MPD and civilian witnesses to the arrest, and testified that he didn't recall the names of any such persons. Mar. 23, 2011 A.M. Trial Tr. 14–15. Second, defendants' claim that Crowley's identity was of little or no relevance is flat wrong. Huthnance went to great lengths in discovery to identify and depose every individual with first-hand knowledge of her arrest because she was convinced that they would corroborate her position that she broke no law and was unconstitutionally arrested. The testimony of the only two neutral eyewitnesses in this case—Marsoni and MPD Sgt. Michael Smith—both strongly corroborated Huthnance's case, and there is no reason to believe that "Elena" and Crowley wouldn't have done the same. Antonio's testimony prejudiced Huthnance because it implied that Huthnance didn't call those witnesses because their testimony would be favorable to the defense, and because she was deprived of the opportunity to use them to bolster her defense. The missing witness instruction was therefore appropriate. Moreover, even if it were incorrect, defendants have failed to show that it caused them undue prejudice requiring this Court to disturb the jury's verdict and order a new trial.

### vi. Remittitur

Defendants argue that they're entitled to remittitur on the ground that the compensatory damages were excessive and that the evidence was insufficient to support punitive damages, but neither argument is persuasive.

The Court need not tarry long on defendants' objections to the amount of damages in this case. A defendant claiming that a jury returned an excessive verdict must show that the amount is "'beyond all reason' or 'so great as to shock the conscience.'" *Langevine v. District of Columbia*, 106 F.3d 1018, 1024 (D.C. Cir. 1997) (citation omitted). It isn't enough to claim that the award was "generous"; rather, it must constitute a "miscarriage of justice" to be reversible. *Id.* at 1024 (citations omitted). This is a "heavy burden." *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1239 (D.C. Cir. 1984). As the D.C. Circuit observed, the Court's role in a remittitur analysis is sharply limited:

> In reviewing the actual amount of a jury's award, our task is limited and a reluctance to interfere is our touchstone. This limited role reflects the obvious fact that we are not privy to the jury's deliberations. In reviewing the amount of the jury's award, we thus need not—and indeed cannot—reconstruct the precise mathematical formula that the jury adopted. Nor need we explore every possible quantitative analysis or compute the basis of each penny and dollar in the award. Our inquiry ends once we are satisfied that the award is within a reasonable range and that the jury did not engage in speculation or other improper activity.

*Id.* at 1238–39. Moreover, a jury's verdict is due particular deference "in cases involving intangible non-economic injuries." *Langevine*, 106 F.3d at 1024. Finally, a defendant alleging that improper considerations influenced the award cannot succeed without "affirmatively show[ing] . . . specific facts and circumstances from which [the court] may infer that the jury was influenced by passion, prejudice or bias." *Ortega v. Kansas City*, 659 F. Supp. 1201, 1212 (D. Kan. 1987).

Defendants here can make no affirmative showing that the jury was inflamed by passion or prejudice. The fact that the jury found Officer Morales not liable while finding Officers Antonio and Acebal liable actually indicates that the jury was thoughtful and reflective about its damages disbursement. If they were really inflamed with passion against the District and the

officers, then they would have blindly gone after all of them instead of carefully allotting specific liability and damages to each officer.

Defendants argue that "[d]uring closing argument, plaintiff's counsel impermissibly asked the jury to award plaintiff $100,000." Mot. J. Matter Law 40. There are at least two problems with this argument. First, defendants waived it by failing to timely object or seek a curative instruction. *Hooks v. Wash. Sheraton Corp.*, 578 F.2d 313, 317 (D.C. Cir. 1977) (holding that an objection to counsel's closing argument wasn't preserved where no timely objection was made); *see also Chicago & N.W. Ry. Co. v. Green*, 164 F.2d 55, 64 (8th Cir. 1947) ("A party is not entitled as a matter of right to seek a reversal for improper argument to the jury, where he fails to make objections during its course or to take exceptions promptly at its close.").

Second, even if the argument wasn't waived, it lacks merit. At closing argument, Huthnance's counsel stated, "you're going to hear that [Ms. Huthnance] doesn't care about whether you give her $1 or $1 million. What she cares about is reclaiming her name and her reputation and not having an arrest record . . . ." Mar. 23, 2011 P.M. Trial Tr. 11. Later he said:

> [Huthnance] would tell you . . . the money isn't what matters, the money isn't what matters. If you want to give her a dollar, if you want to give her a hundred dollars, if you want to give her $10,000, if you want to give her $100,000. What matters is a judgment in her favor for some monetary relief that shows that yes, her constitutional rights were violated. Yes, her right to not be falsely arrested was violated. We ask you to return a verdict on every single count in her favor. If it's only for a dollar, if it's for a thousand dollars, I ask you for a hundred thousand dollars, cumulatively. And I thank you for all of your attention in this case.

*Id.* at 97–98. Thus, Huthnance's counsel (1) stressed that the amount of monetary damages awarded was of minimal importance, (2) named numerous dollar amount ranging from one million dollars to one dollar, and (3) convinced the jury to award an amount of damages in the far low end of that range. This is not an indication of a jury that was acting out of inflamed

passions, and it is not an indication of a jury that was improperly influenced by plaintiff's counsel.

Furthermore, the damages award in this case was not excessive. Although Huthnance presented "no evidence of physical injury or loss in pay," she did testify to mental anguish caused by the trauma of the arrest and by her wrongful arrest record, and the burden of having to travel from New Zealand to the U.S. for the trial. Mot. J. Matter Law 40. The compensatory damages award is adequately supported by the jury's evaluation of her mental and emotional suffering alone. As mentioned above, such an evaluation receives particular deference from reviewing courts because it depends on the jury's evaluation of her demeanor and truthfulness. *Edman v. Marano*, 177 F. App'x 884, 888 (11th Cir. 2006). In short, this jury's determination is reasonable and should not be disturbed. *See, e.g.*, *Langevine*, 106 F.3d at 1020–21 (upholding a jury's award of $200,000 in a 1993 trial under facts strikingly similar to those presented here).

Regarding the punitive damages award, the evidence was ample to sustain the award. For example, in finding liability for First Amendment violations, the jury found that the defendant officers arrested Huthnance for the content of her speech. Defendants cannot, and indeed make no attempt to, explain how they could have arrested Huthnance based on the content of her speech and yet not acted with reckless disregard for her constitutional rights. *See, e.g.*, *Smith v. Wade*, 461 U.S. 30, 33 (1983) (holding that the standard for punitive damages is "reckless or callous indifference to the federally protected rights of others" shown by a preponderance of the evidence). In fact, the jury had ample evidence of actual animus before it. For instance, the arrest report falsely described Huthnance as a "female impersonator" and said that her *modus operandi* was hatred of police. Pl.'s Ex. 1 at 1. Antonio testified that this report was written while all three officers were present in a room, together, recalling the events of the arrest. Mar. 11, 2011 P.M.

Trial Tr. at 77, 117. The jury could properly infer that these inaccuracies weren't oversights, but were instead intentional jokes at Huthnance's expense by officers who were outraged by her speech and her challenge to their authority, and who had arrested her for that reason. The jury could have reasonably rejected the officers' denials of animus, based on their substantial impeachment on cross-examination with the inconsistencies between each officer's testimony and the changes in each officer's testimony over time. Mar. 23, 2011 P.M. Trial Tr. at 10–11, 19–21, 28–30. Based on all of the evidence before the jury, it could have reasonably concluded that the officers knowingly made an illegal arrest because they didn't like Huthnance's speech and her conduct and fabricated their testimony to the contrary. That finding sufficiently justifies the punitive damages award in this case, which was moderate and calibrated to a reasonable understanding of each officer's relative responsibility for Huthnance's injuries.

The Court notes that its decision to grant defendants' judgment as a matter of law on Huthnance's equal protection claim doesn't change its conclusion that the jury's damages award in this case was entirely reasonable and doesn't entitle defendants to any reduction in the amount of the award. The award in this case was moderate, and it remains unexceptionable even if none of it may be attributed to Huthnance's equal protection claim. The gravamen of her damages award clearly related to her false arrest and the constitutional violations related to it, not procedural niceties post-arrest.

## IV.     Conclusion

For the reasons discussed above, the defendants' Motion for Judgment as a Matter of Law is granted in part and denied in part, and their Motion for a New Trial or Remittitur is denied. A separate order memorializing this opinion's reasoning will issue today.

Signed by Royce C. Lamberth, Chief Judge, on July 19, 2011.