**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LINDSAY HUTHNANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-cv-1871 (RCL) (JMF) |
| | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF HER
MOTION FOR AWARD OF ATTORNEY'S FEES AND EXPENSES/COSTS**

Before submitting her fee petition to this Court, plaintiff exercised very extensive good

faith judgment by voluntarily reducing her petition for recovery of Goodwin Procter fees by

about 30% – amounting to some $800,000 – compared to the award for Goodwin Procter fees to

which plaintiff would be entitled under controlling precedent.  In particular, plaintiff voluntarily

(1) wrote off some 1,080 hours of time actually worked on this case, amounting to about

$385,000; (2) implemented a 10% discount to Goodwin Procter's usual rates, amounting to about

$215,000; and (3) is not seeking an increase to compensate for the lengthy delay between the

time the work was performed and the date of payment, even though controlling authority would

entitle her to such an increase, amounting to an additional $200,000.  Mem. at 6-7, 12-13.

Despite these extensive voluntarily reductions far above and beyond what the law

requires, defendants assert that the Court should impose an additional 50% reduction on

plaintiff's recovery of Goodwin Procter's fees.  That assertion is both wrong on its merits and

highly inequitable in light of the 30% reduction already voluntarily taken by plaintiff.

First, defendants wrongly assert that, even though plaintiff has submitted unrebutted

evidence establishing that the requested Goodwin Procter rates (1) are the firm's usual rates for

paying litigation clients and (2) are well within D.C. market rates for complex federal litigation, this Court should use the *Laffey* matrix to cap those rates. Controlling precedent establishes that, under § 1988, a prevailing litigant is entitled to her counsel's usual billing rates for paying clients as long as the plaintiff adduces evidence that those rates are consistent with market rates for similar litigation services, which plaintiff indisputably has done here. The *Laffey* matrix, by contrast, applies to attorneys who do not have (or do not prove that they have) usual billing rates for paying clients for similar litigation services. Furthermore, the District's *Laffey* argument is also barred by issue preclusion because the District made and lost this same argument in two recent cases, *Ricks* and *Heard*.

Second, defendants wrongly argue for an additional 15% across-the-board reduction in Goodwin Procter fees. That argument rests on erroneous legal and factual assertions and vainly attempts to transform issues concerning a few specific entries into an across-the-board reduction. Any across-the-board reduction, moreover, would be particularly inequitable given the 30% reduction that plaintiff already voluntarily made to the Goodwin Procter fee request.

Finally, defendants challenge certain of the specific billing entries. Plaintiff in good faith has carefully reviewed each of those objections and is reducing her fee request by an additional $12,117.15 to address the small number of defendants' specific objections that arguably have merit. The rest of defendants' objections, however, are wrong on the law, the facts, or both.

## I.   Plaintiff Is Entitled To An Award Of Fees Based On Her Counsel's Usual Billing Rates For Paying Clients

Defendants argue that the fee award for her attorneys with Goodwin Procter should be based on the *Laffey* matrix rather than Goodwin Procter's actual, usual billing rates for its paying clients. But defendants do not dispute that plaintiff has adduced evidence establishing that (1) the requested rates are Goodwin Procter's usual rates for federal litigation for paying clients and

(2) that those rates are well within the rates changed by other D.C. law firms for similar

litigation.  Instead, defendants argue that the *Laffey* matrix acts as a cap on hourly rates in fee

petition awards.  That argument is contrary to controlling authority and is wrong in all respects.

A.   **Under Controlling Precedent, Where Attorneys Have An Established Billing Rate For Paying Clients, That Rate Applies, Not the *Laffey* Matrix Rate**

Defendants' core argument (at 4-5) is that the *Laffey* matrix establishes the reasonable or

maximum rate under fee-shifting statutes.  That argument is (1) contrary to controlling caselaw

and (2) barred by issue preclusion.

1.   Defendants' Argument is Barred by Controlling Authority

Defendants' contention that plaintiff should recover at *Laffey* rates rather than Goodwin

Procter's usual rates for paying clients contravenes binding precedent that was quoted in

plaintiff's opening memorandum (at 4-5) and that defendants simply ignore in their opposition.

As that caselaw makes clear, (1) where attorneys have established billing rates for paying clients

for comparable litigation, those market rates presumptively apply, and (2) the *Laffey* rates

presumptively apply only where attorneys do not have (or fail to prove that they have)

established rates for paying clients.  This Court, indeed, has recognized and quoted the

controlling D.C. Circuit caselaw on this exact subject:

> In this Circuit, an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.  ...  [W]hen fixed market rates already exist, there is no good reason to tolerate the substantial costs of turning every attorneys fee case into a major ratemaking proceeding.  In almost every case, the firms' established billing rates will provide fair compensation.

*Miller v. Holzmann*, 575 F. Supp. 2d 2, 11-12 (D.D.C. 2008) (Lamberth, J.) (quoting *Kattan by*

*Thomas v. District of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993)) (emphasis added and

quotation marks omitted).  Accord *Heller v. District of Columbia*, 2011 WL 6826278, *2

(D.D.C. Dec. 29, 2011) ("an attorney's usual billing rate is presumptively the reasonable rate");
*Norden v. Clough*, 674 F. Supp. 2d 126, 130 (D.D.C. 2009) (quoting *Miller*); *Malede v. D.C. Jail
Facility*, 252 F.R.D. 63, 65 (D.D.C. 2008) (Magistrate Judge) (quoting *Kattan*).

   This Court has also recognized and quoted the D.C. Circuit's specification as to the
attorney's evidentiary burden of establishing that her usual billing rate is in line with those
prevailing in the community.  That burden does <u>not</u> involve the *Laffey* matrix.  To the contrary,
"'the burden is on the fee applicant to produce satisfactory evidence — in addition to the
attorney's own affidavits — that the requested rates' align with prevailing rates."  *Miller*, 575 F.
Supp. 2d at 12 (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)).  Here, plaintiff
satisfied that evidentiary burden through declarations from Carter Phillips of Sidley Austin LLP
and Peter Morgan of Dickstein Shapiro LLP that the usual billing rates of the Goodwin Procter
attorneys who worked on this matter are well within the range of rates charged by D.C. law firms
for similar litigation services.  *See* Dkt. #260-4 & 260-5 (9/8/2011).  Defendants do not challenge
that evidentiary showing.  (Moreover, plaintiff's proposed rates include a voluntary 10%
discount from Goodwin Procter's usual billing rates, based on the fact that some clients with
substantial volumes of work receive a modest discount to those hourly rates.  Mem. at 6.)

   By contrast, extensive caselaw makes clear that the *Laffey* matrix rates presumptively
apply to attorneys who do <u>not</u> have (or do not prove that they have) established rates for paying
clients for comparable litigation work.  See *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 774 F.
Supp. 2d 225, 232 (D.D.C. 2011) ("For public-interest or government lawyers who do not have
customary billing rates, courts in this circuit have frequently employed the '*Laffey* Matrix' ....")
(citations omitted); *Heller*, 2011 WL 6826278, at *2 (applying *Laffey* matrix because "[t]he

attorneys in this case ... do not have a usual billing rate.").[1]

In *Miller*, thus, this Court awarded fees for Wilmer Hale's work at that firm's usual hourly rates, rejecting the defendant's argument that the lower *Laffey* rates should apply.  As this Court said, "simple reference to the *Laffey* matrix cannot defeat the presumption of reasonableness accorded relator's requested rates."  *Miller*, 575 F. Supp. 2d at 15.

Defendants fail to cite any case holding that the *Laffey* matrix may be applied to reduce an attorney's usual rates for similar work for paying clients that has been shown to be consistent with prevailing rates in the relevant market.  Nor is undersigned counsel aware of any such case.  In this regard, defendants' reliance on *Blackman v. D.C.*, 677 F. Supp. 2d 169 (D.D.C. 2010), is misplaced.  In *Blackman*, the court applied *Laffey* rates where the attorneys' usual billing rates were for energy regulatory work, not complex federal litigation.  *Id*. at 174.  Here, by contrast, plaintiff has come forward with unrebutted evidence of her attorneys' usual billing rates for the same category of work into which this case falls: complex federal litigation.  Defendants also err by relying (at 10) on the fact that the fee petition in *ACLU v. U.S. Dep't of Homeland Security*, No. 1:08-cv-1100 (D.D.C.), sought recovery based on *Laffey* rates.  In that case, the plaintiff's attorneys were representing the plaintiff ACLU "in their individual capacities" (*Id*. Dkt. #43 at p. 25), and hence their law firm rates would not have applied.  Here, by contrast, plaintiff Huthnance retained the Goodwin Procter law firm.  Supplemental Declaration of John Moustakas ("Moustakas Suppl. Decl.") ¶ 2, attached hereto as Exhibit 1.  Furthermore, the plaintiff in *ACLU* chose to seek *Laffey* rates and did not come forward with evidence of the attorneys' usual rates or with market evidence.[2]  Thus, the case does not remotely suggest that

---

[1]  *See also Cobell v. Norton*, 407 F. Supp. 2d 140 (D.D.C. 2005); *Rooths v. D.C.*, 802 F. Supp. 2d 56 (D.D.C. 2011).

[2]  *See* Declaration of Lee Ann Anderson McCall, *ACLU v. Dep't. of Homeland Sec.*, No. 1:08-cv-1100, Dkt. #43-1, at ¶ 6 (D.D.C., May 13, 2011).

*Laffey* rates can be imposed as a cap on market rates that are requested and substantiated.

Finally, defendants' effort (at 10) to cap Goodwin Procter's rates by quoting Mr.
Spitzer's statement that the "ACLU sometimes handles these cases in-house" is unavailing.  As
detailed in Mr. Spitzer's accompanying Supplemental Declaration, the facts of this case, its
complexity, and the District's litigation strategy required counsel with a special combination of
resources, experience, skill, and tenacity impossible to find outside the context of a large firm
such as Goodwin Procter.  *See* Suppl. Decl. of Arthur B. Spitzer, attached hereto as Ex. 2.

2.    The District's Argument is Also Barred by Issue Preclusion.

The District's argument that the *Laffey* matrix acts as a cap on Goodwin Procter's fees is
also foreclosed by issue preclusion.  That is so because the District litigated and lost this exact
issue in *Ricks v. Barnes*, 2007 U.S. Dist. LEXIS 22410 (D.D.C. 2007) (Robinson, Mag.J.).  The
plaintiff there sought an award of fees under § 1988 for Goodwin Procter's work at its usual
hourly rates, and the District argued "that Plaintiff's counsel should be held to the United States
Attorney's Office *Laffey* matrix."  *Id*. at *13.  Magistrate Judge Robinson quoted Supreme Court
and D.C. Circuit precedent establishing (1) that "[t]he court should attempt to establish the
'reasonable hourly rates' as close as possible to 'the prevailing market rates in the relevant
community'" and (2) that "'[i]n determining the market rate for services of an attorney in private
practice, the attorney's customary billing rate will provide a presumptive measure.'"  *Id*. at *14
(citations omitted).  Noting that Goodwin Procter had submitted declarations of other local
attorneys (as it has here as well), Magistrate Judge Robinson held that "Plaintiff's counsel have
demonstrated the reasonableness of their billing rates in accordance with the applicable
precedent, and that Defendants' arguments to the contrary are wholly conclusory," and
consequently recommended that Mr. Ricks' fee petition be granted.  *Id*. at *16.  Defendants filed

6

objections to the Magistrate's Report and Recommendations, among other things, Mr. Ricks' fee petition should be governed by the *Laffey* Matrix.[3]  Judge Kennedy denied this objection and awarded fees against the District at Goodwin Procter's usual rates, not the *Laffey* rates.[4]

In sum, having previously litigated and lost this same issue of whether the *Laffey* matrix acts as a cap on hourly rates, the District is barred by issue preclusion from relitigating it here. *See Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*, 744 F.2d 118, 124 (D.C. Cir. 1984) ("a defendant is precluded from relitigating identical issues that the defendant litigated and lost against another plaintiff").[5]

## B.   *Perdue* Does Not Support Defendants' Position

Contrary to defendants' characterization (at 9), the Supreme Court's decision in *Perdue v. Kenny A.*, 130 S. Ct. 1662 (2010), does not give courts discretion to reject a lawyer's usual hourly rate because it is, supposedly, higher than the rate "sufficient to attract competent counsel."  *Perdue* addressed proposed <u>enhancements</u> above the lodestar amount calculated on the basis of an attorney's usual, market rates, not downward departures from those usual rates.

In *Perdue*, the district court calculated the lodestar amount <u>based on plaintiff's counsel's usual hourly rates</u> times the number of hours worked.  454 F. Supp. 2d 1260, (N.D. Ga. 2006). The district court, however, then added a 75% enhancement on top of that lodestar amount.  *Id.* at 1290.  The only issue before the Supreme Court was the validity of that enhancement beyond the lodestar.  The Court held that an enhancement above the lodestar amount is appropriate only

---

[3]  *Ricks v. Barnes*, No. 1:05-cv-1756, Dkt. #44, at 4-10 (5/4/2007).

[4]  Nor is the District's explanation of its reaction to these cases — to refuse to settle even a meritorious case (Opp. at 19 n.11) — at all  reasonable.  Losing their argument against Goodwin Procter's rates in *Ricks* would have motivated a <u>rational</u> litigant to make sure it settled meritorious claims early, rather than knowingly choosing to run up huge attorney's fees for itself with scorched-earth litigation tactics.  In fact, no offer of judgment was made in this case.

[5]  Although the individual defendants here were not parties in *Ricks*, they, too, are precluded as privies by virtue of the District's assumption of their defense and indemnification**.**

where the lodestar based on market rates is not "adequate to attract competent counsel."  130 S.

Ct. at 1674.  The sufficiency of rates to attract competent counsel, therefore, is only a factor in

considering whether an *enhancement above an attorney's ordinary billing rate is warranted*.

Otherwise, the prevailing market rate is the standard.

Indeed, emphasizing that a fee award is supposed to be based on the "market rate," the

Court explained that "an enhancement may be appropriate so that an attorney is compensated at

the rate that the attorney would receive in cases not governed by the federal fee-shifting statutes"

based on "specific proof linking the attorney's ability to a prevailing market rate."  *Id*. at 1674.

And the Court reiterated this point in applying its ruling to the case before it, rejecting the

enhancement because it was not based on objective evidence that departure from the lodestar

brought the fee award in line with "an appropriate figure for the relevant market."  *Id*. at 1676.

In short, far from establishing a rule that the hourly rate to be used in the lodestar

calculation is the lowest rate "sufficient to attract competent counsel," as defendants incorrectly

suggest, *Perdue* actually reaffirmed the long-settled principle that the lodestar calculation is to be

based on the attorney's "market rate."  As such, *Perdue* provides no basis for the District to

escape the controlling D.C. Circuit precedent, holding that the lodestar is to be based on market

rates, that this Court recognized and applied in *Miller*, as quoted on page 3 above.

**C.    The *Pro Bono* Nature of the Representation Provides No Basis To Depart From Counsel's Usual Hourly Rates**

Defendants argue (at 11) that the public interest or *pro bono* nature of the representation

justifies a departure from plaintiff's counsel's usual rates.  That argument has been rejected by

the Supreme Court and the D.C. Circuit.  In *Blum v. Stenson*, 465 U.S. 886, 895-96 (1984), the

Supreme Court rejected the argument that attorneys pursuing public interest litigation could not

recover fees at the prevailing market rate.  In doing so, the Court quoted with approval a decision

8

stating that courts "must avoid . . . decreasing reasonable fees because the attorneys conducted the litigation more as an act of pro bono publico than as an effort at securing a large monetary return." *Id.* at 895, quoting *Stanford Daily v. Zurcher*, 64 F.R.D. 680, 681 (N.D. Cal. 1974). The Court also held that, based on the strong evidence of Congress's intent to use market-based rates as the standard of compensation under § 1988, the defendant's "policy arguments" against using a market-based rate in pro bono litigation "should be addressed to Congress rather than to this Court." *Id.* at 895-96.  As such, Magistrate Judge Facciola was right in citing *Blum* as holding that "[p]ro bono counsel is entitled to be compensated at market rates." *Malede*, 252 F.R.D. at 65 (emphasis omitted).  Indeed, consistent with § 1988's broad remedial purpose and its design to attract private counsel to prosecute as private attorneys general civil rights violations, the Supreme Court has repeatedly rejected attempts to treat this work as inferior to work for fee-paying clients.  Thus, it has insisted that "counsel for a prevailing party [in civil rights litigation] should be paid, as is traditional with attorneys compensated by a fee-paying client, 'for all time reasonably expended on a matter.'" *Hensely v. Eckerhart*, 461 U.S. 424, 430 n.4 (1983) (citing S. Rep. No. 94-1011, p.6 (1976)).  *See also Missouri v. Jenkins*, 491 U.S. 274, 286 (1989) (reasonable fee under § 1988 "means a fee that would have been deemed reasonable if billed to affluent plaintiffs by their own attorneys") (citation omitted).

Likewise, in *Copeland v. Marshall*, 641 F.2d 880, 900 (D.C. Cir. 1980), the D.C. Circuit, sitting *en banc*, affirmed that a successful civil rights plaintiff could recover attorney's fees based on her counsel's (Wilmer, Cutler & Pickering's) usual rates for paying clients.  It held, *inter alia*, that no downward departure from the lodestar amount was warranted simply because the "law firm … originally undertook representation pro bono publico."  Similarly, in *Covington v. D.C.*, 57 F.3d 1101 (D.C. Cir. 1995), the D.C. Circuit held that attorneys who charge a

9

discounted rate to civil rights plaintiffs out of public-spiritedness are entitled to recover fees at the higher rate they would otherwise charge. *Id*. at 1107-11.

Defendants repackage this same argument by contending that plaintiff must show that her counsel's requested hourly rates "are consistent with rates charged by law firms … *working on pro bono civil rights litigation*." Opp. at 11 (emphasis in original). This argument is also barred by controlling precedent. In *Covington v. D.C.*, 839 F. Supp. 894 (D.D.C. 1993), the District argued, as it does here, that the plaintiff's attorneys should recover at the hourly rates supposedly prevailing in a submarket of plaintiffs' attorneys who handle civil rights and employment discrimination cases. This Court rejected that argument, holding that "defendants have not carried their evidentiary burden" to show the relevant hourly rates for such a submarket. *Id*. at 899-900. On appeal, the D.C. Circuit, looking to the statute, Congressional intent, and another circuit's analysis, likewise rejected that argument. 57 F.3d at 1103, 1111-12 ("Nor did the District Court err in determining that *complex federal litigation* was the relevant market for purposes of establishing the prevailing market rates in the District of Columbia.") (emphasis in original).

The District's argument that the relevant market is civil rights litigation, rather than complex federal litigation, is also barred by issue preclusion. In *Ricks,* the court expressly rejected the District's arguments "that Plaintiff's counsel did not prove that they had significant experience in civil rights litigation, or that the hourly rates requested for Mr. Moustakas and Mr. Huitema were customary in civil rights cases."[6] Likewise, the District advanced and lost this

---

[6] *See Ricks v. Barnes*, No. 1:05-cv-1756, Dkt. #35, 2007 WL 956940, at *5 (D.D.C. Mar. 28, 2007) (Robinson, Mag. J.), objections overruled, adopted without change at Dkt. #51 (D.D.C., May 12, 2008) (Kennedy, J.).

same issue in *Heard v. D.C.*, No. 1:02-cv-0296.[7]  As such, issue preclusion bars the District from arguing this issue yet again.

**D.**     **The Identity of the Defendants Does Not Warrant a Reduction From the Usual Hourly Rates**

Defendants argue (at 14-15) that plaintiff's fee award should not be based on her counsel's usual rates because the District of Columbia faces "difficult budgeting decisions." Defendants again cite no authority for this argument, which again is squarely foreclosed by binding precedent.  In *Copeland*, 641 F.2d at 894-96 (en banc), the D.C. Circuit specifically held that "we do not think that the amount of the fee should depend on the identity of the losing party" – and, even more specifically, that "fees should be neither lower, nor calculated differently, when the losing defendant is the government."  *Id*. at 894, 896.  Indeed, the basic goal of § 1983 is to address civil rights violations committed under color of law, and hence government is the usual and intended defendant in many such cases.  Thus, the fact that the defendant here is the District provides no basis for reducing plaintiff's counsel's hourly rates.[8]

**E.**     **Defendants' Argument Regarding "Career Opportunities" Does Not Justify Reducing Plaintiff's Counsel's Usual Rates**

Defendants argue that plaintiff should not be awarded Goodwin Procter's usual hourly rates because the case supposedly presented "tremendous career opportunities" for Goodwin Procter attorneys and helped Goodwin Procter attract recruits.  Opp. at 12-13, quoting *Pastre v. Weber*, 800 F. Supp. 1120, 1125 (S.D.N.Y. 1991).  As quoted above, however, the D.C. Circuit

---

[7]  *See Heard v. D.C.*, No. 1:02-cv-0296, Dkt. #178 at pp. 8, 10 (D.D.C., June 16, 2006) (Kay, Mag.J.) (rejecting the District's position that the hourly rate should be based on "hourly fees that have been claimed in §1983 cases" and holding that "[i]n *Covington*, the District of Columbia's attempt to define a sub-market of plaintiff attorneys who handle civil rights [and employment discrimination] cases, and who bill at lower rates than attorneys who practice complex federal litigation was rejected by the Court of Appeals"), adopted in pertinent part at Dkt. #189, 2006 WL 2568013 (D.D.C., Sept. 5, 2006) (Kollar-Kotelly, J.).

[8]  Defendants cite (at 3) to *Eureka Inv. Corp., N.V. v. Chicago Title Ins.*, 743 F.2d 932, 941-42 (D.C. Cir. 1984), but that case did not even involve a fee award against a governmental entity, much less hold that an attorney's usual billing rate does not apply where the defendant is a governmental entity.

has expressly rejected the argument that fees for public interest litigation should be awarded at rates below the attorneys' usual billing rates.  See pages 9-10 *supra*.  Moreover, the unrebutted evidence is that the work that the attorneys performed on this case was consistent with their respective level of experience.  Moustakas Declaration ¶¶ 19 and 20-23.

Defendants also cite a New York Times article as suggesting that some clients are concerned about the rates that law firms charge for junior associates.  Opp. at 13 & n.9.  That reference does not begin to satisfy defendants' evidentiary burden under controlling precedent.  As the D.C. Circuit has held, "[o]nce the fee applicant has provided support for the requested rate, the burden falls on the Government to go forward with .… equally specific countervailing evidence ... that the rate is erroneous."  *Covington*, 57 F.3d at 1109.  Here defendants have come forward with no specific evidence to rebut plaintiff's showing that the rates requested for the associates here are the usual rates charged to Goodwin Procter's paying clients for those associates and that each of those associates "displayed a level of skill and experience ... commensurate to the rates at which they are billed."  Moustakas Declaration ¶¶ 14, 19.  Of course, the rates for those associates are substantially less than for more experienced attorneys, such as Mr. Moustakas.[9]

### F. Plaintiff Has Presented Sufficient Evidence of Her Attorneys' Skill, Experience, and Reputation

Defendants argue (at 12) that plaintiff has not submitted sufficient evidence showing the extent of the Goodwin Procter associates' federal court experience.  But plaintiff bears no such burden.  Plaintiff's evidence established her attorneys' credentials and level of experience as litigation attorneys (Moustakas Declaration ¶¶ 19-24), as well as their usual hourly rates (*id*. ¶ 14

---

[9]  Likewise, the D.C. Circuit has expressly held that a fee award "should be based on the market value of services rendered, not on some notion of 'cost' incurred by the law firm.  That is the conclusion both of the courts that have spoken on the issue, and also Congress itself."  *Copeland v. Marshall*, 641 F.2d 880, 897 (D.C. Cir. 1980) (en banc).

and Exh. 1).  Nonetheless, to resolve any issue, further details regarding those associates' federal

court experience are included in ¶¶ 4-7 of the Supplemental Declaration of John Moustakas.

G.    **Summary**

Plaintiff has presented unrebutted evidence establishing (1) that the requested rates are

Goodwin Procter's usual rates billed to paying clients for similar work and (2) that those rates

are well within the range of rates charged by other D.C. law firms for such services.  Defendants'

argument that the Court should nevertheless apply the *Laffey* matrix rates is wrong and should be

rejected.

* * * * *

Although defendants' argument for the imposition of *Laffey* rates is meritless, it should

also be pointed out that defendants' assertion (at 7, 16) that the imposition of *Laffey* rates would

result in a reduction of $608,328.40 from the amount requested in plaintiff's fee petition is false.

As defendants admit (at 8), that calculation by defendants does not take into account that the

amount of plaintiff's fee petition incorporates a voluntary 10% reduction in Goodwin Procter's

hourly rates to reflect that some Goodwin Procter paying clients with substantial volumes of

work receive a modest discount.  Mem. at 6.  In other words, defendants derived their proposed

$608,328.40 reduction in the fee award by comparing the *Laffey* rates to the undiscounted

Goodwin Procter rates, even though defendants are well aware that the amount of plaintiff's fee

petition is based on discounted Goodwin Procter rates.  This is just another example of

defendants' patent overreaching in their effort to evade their obligations under § 1988.[10]

---

[10] Comparing the difference between the *Laffey* matrix rates and the discounted Goodwin Procter rates that are the
basis for plaintiff's fee petition, the difference would be $394,127.11, not $608,328.40.

## II.   No Across-the-Board Reduction Is Warranted, Especially In Light Of The Extensive Reductions Voluntarily Made by Plaintiff

As summarized on page 1 above, in submitting her fee petition in this case, plaintiff and her counsel exercised extensive, good faith billing judgment by voluntarily reducing her request to recovery Goodwin Procter fees by approximately $800,000 – amounting to some 30% – compared to the sum that plaintiff is entitled to request under applicable law.  In particular, plaintiff voluntarily (1) wrote off some 1,080 hours of time actually worked on this case, amounting to approximately $385,000 (Mem. 13-14); (2) implemented a 10% discount to Goodwin Procter's usual rates, reducing the free request by an additional $214,201.29 (Mem. at 6); and (3) is not seeking an adjustment for delay, which amounts to an additional approximately $200,000 (Mem. at 6-7, 12-13).  In addition, defendant does not dispute that, as plaintiff's memorandum showed (at 8-12), plaintiff's counsel staffed this case leanly, defendants' scorched-earth litigation tactics exacerbated the required amount of work, and this was a difficult case.

Defendants nevertheless argue (at 27-36) that several alleged inadequacies in the billing entries — vagueness, block-billing, and the presence of intra-office communications and allegedly clerical tasks — warrant an additional across-the-board reduction to the fee award of 15%.  These objections are unfounded and do not remotely justify any across-the-board reduction, much less one that adds a 15% reduction on top of the 30% reduction that plaintiff has already voluntarily taken.

### A.   Intra-office Communications

Defendants identify 375 billing entries that include separable time for "intra-office communications."  Defendants do not calculate how much of the time billed in these entries was spent on intra-office communications (although they could).  Instead, they merely assert that the amount of time spent communicating with other attorneys staffed on the case is "patently

unreasonable."  This fails to satisfy defendants' burden to come forward with specific rather than conclusory objections to plaintiff's time entries.[11]

Moreover, as a review of the entries demonstrates, neither the number nor the duration of the communications are unreasonable, and defendants offer no argument to the contrary.  *See McKenzie v. Kennickell*, 645 F. Supp. 437, 450 (D.D.C. 1986) (approving billing of internal meetings by more than one lawyer because they are "an essential part of effective litigation" and help to ensure "proper supervision and efficient staffing" of litigation); *Dorsett v. District of Columbia*, No. 00-00212 (LFO) , Doc. 26 at 6 (D.D.C. Sept. 13, 2000) ("Bi-weekly status reviews ... evidence diligent legal representation, not unreasonable or excessive use of time ....") (citing *Whatley v. District of Columbia*, No. 98 Civ. 2961 (D.D.C. Aug. 7, 2000)).

Defendants also assert in conclusory fashion (at 32) that "many" of the entries have "vague descriptions."  But defendants give no examples of what they consider impermissibly "vague" descriptions of intra-office communications.  A review of the entries themselves shows they describe both (a) the parties to the communication and (b) the subject and/or purpose of the communication.  The entries are not vague and do not defeat meaningful review, particularly in light of the Court's knowledge of the docket, other tasks performed by the attorney at the time, and the billing entries by other attorneys.  This conclusion is only borne out by the stark contrast between the descriptive entries of intra-office communications recorded by Goodwin Procter's attorneys and entries found impermissibly vague in other cases.[12]

---

[11]  Once plaintiff submitted her counsel's detailed billing records, the "burden of proceeding then shift[ed]" to defendants. *Nat'l Ass'n of Concerned Veterans v. Sec'y. of Def.*, 675 F.2d 1319, 1337-38 (D.C. Cir. 1982) (Tamm, J., concurring). Generic and conclusory claims do not suffice to meet that burden, and "[n]either broadly based, ill-aimed attacks, nor nit-picking claims" are sufficient. *Id.*  Instead, Defendant must "submit facts and detailed affidavits to show why [plaintiff's] request should be reduced or denied." *Id.*

[12]  *See, e.g., Fabi Constr. Co. v. Sec'y of Labor*, 541 F.3d 407, 411 (D.C. Cir. 2008) (citing, as impermissibly vague billing entries for intra-office communications, entries such as "Telephone conference with L. Daley regarding various matters" and "telephone conference with S. Perillo"); *Michigan v. EPA*, 254 F.3d 1087, 1094 (D.C. Cir. 2001) (citing, as impermissibly vague billing entries for intra-office communications, entries such as "two

**B.**    **Supposedly Clerical Tasks**

Defendants' opposition includes four paragraphs purporting to identify "clerical" tasks that are allegedly non-compensable. But defendants' listing sweeps in many kinds of tasks that the caselaw does not define as "clerical."[13] To the contrary, with a few exceptions, the tasks defendants identify are fully compensable.

First, defendants (at 33-34) identify five entries that they imply plaintiff already agreed to write off. Two of those entries in fact were inadvertently included in the petition, and excluding this time (1.1 hours) results in a deduction of $421.65.[14] See Moustakas Suppl. Decl. ¶¶ 8-9. But the other challenged entries involve discussions among litigation professionals and are compensable, as explained in Mr. Moustakas' supplemental declaration. *Id*. at ¶ 10.

Next, defendants object to entries where attorneys "assign[ed] tasks to other attorneys and non-lawyers" or supervised such tasks. Opp. at 34. Contrary to defendants' suggestion, delegating work to more junior attorneys and to non-attorneys, and supervising their work, is an appropriate part of the practice of law and a necessary part of efficiently staffing a case. Such time is fully compensable, and defendants cite no authority for their contrary position. *See McKenzie v. Kennickell*, 645 F. Supp. 437, 450 & n.19 (D.D.C. 1986) ("meetings between junior and senior lawyers to discuss the progress of research and review completed assignments are reasonable and appropriate means to secure proper supervision and efficient staffing …. Such supervision is necessary to avoid wasteful or disorganized efforts by inexperienced lawyers

---

conference calls"; and "write emails").

[13] Defendants cite *Friendship Edison Public Charter School Collegiate Campus v. Nesbitt*, 752 F. Supp. 2d 1, 9 (D.D.C. 2010), but that case holds only that (a) no reduction will be made for *de minimis* time spent e-filing documents, and (b) "putting documents in a file" is a clerical task. *Id*. at 9-10. Defendants also cite *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001). That court's inexplicable dictum, that various core features of the practice of law are not compensable at an attorney's normal hourly rate, is not the law in this Circuit.

[14] These fees initially sum to $468.50; accounting for the 10% discount, the deduction is $421.65.

keeping fee claims within reasonable bounds.").[15]

Third, defendants (at 34-35) list 18 entries in which attorneys billed for tasks that, defendants argue, could have been performed by a non-lawyer.  But a review of these entries, each of which involved a small amount of time, belies defendants' characterization of them.  See Moustakas Suppl. Decl. ¶¶ 11-14.  Roughly half reflect the kind of delegation or supervision defendants have already wrongly objected to, such as Mr. Skinner's entry for Jan. 26, 2010, "arrange for filing of response."[16]  Two are for brief calls with the court regarding a conference with Judge Kennedy — defendants fail to explain how a non-attorney could reasonably have been expected to make these calls on counsel's behalf.  And Mr. Skinner's entry for Nov. 10, 2010, "review ethics rules to determine whether client may use non-refundable ticket purchased by the firm," clearly could not have been performed by a non-attorney.  Only a handful of the cited entries arguably could have been appropriately performed by non-lawyers.  As to those entries, rather than litigate further, plaintiff is willing to have such time — a total of 0.8 hours and $297 — deducted from the fee award.[17]

Finally, defendants (at 35) lists entries in which Ms. Livingston, a paralegal, billed for tasks that, defendants argue, could have been performed by a secretary.  Plaintiff agrees that the one entry actually quoted by defendants – for hand delivering a document – describes a clerical task, and plaintiff will not seek recovery for it.[18]  But the other entries cited by defendants

---

[15]  Indeed, this position is inconsistent with defendants' second argument — that counsel billed for time spent on tasks that could have been performed by non-lawyers.  Defendants cannot chastise plaintiff's counsel both for delegating tasks and for failing to do so.

[16] See *Am. Petroleum Inst. v. EPA*, 72 F.3d 907, 912 (D.C. Cir. 1996) (refusing to reduce fees for entries for "filing" because counsel explained that in such cases, "the attorney [had] the documents actually filed by someone else").

[17] Moustakas Suppl. Decl. ¶ 12.  These fees initially sum to $330; accounting for the 10% discount, the deduction is $297.  Plaintiff also agrees to exclude $1,113.30 (after accounting for the 10% discount) for two other entries out of the 18, as explained in the Supplemental Declaration of Mr. Moustakas, at ¶ 13.

[18]  This results in a deduction of 1.3 hours.  The fee initially totals $208; accounting for the 10% discount, the deduction is $187.20.

involve tasks appropriate for a paralegal to undertake.  For example, defendants cite an entry

from August 27, 2010 for 0.8 hours to "[a]ssemble binder for exhibit documents for Mr.

Skinner."  Locating and organizing case documents into a readily accessible format requires

knowledge about the case and an understanding of how the documents will be used.  This kind of

task is properly delegated to a paralegal, and the same is true of the other cited entries.[19]

### C.      Supposedly Vague Entries

Defendants (at 28-29) identify 33 out of 1,283 billing entries in plaintiff's fee request –

less than 3% of the entries – as supposedly being vague.  For multiple reasons, this argument

does not warrant any additional reduction in plaintiff's fee award.

First, some of the 33 entries are not vague even standing alone.  For example, defendants

cite (at 29) to amply detailed entries for Mr. Hudson listed as "[r]esearching belated continuance

requests based on surgery" and "researching propriety of granting a late-requested continuance

for illness of a party or witness."[20]

Second, the substance of other entries is clear from their context within the full chart of

time entries and the lawsuit.  For example, Mr. Skinner's July 3, 2009 entry lists "[c]ommunicate

---

[19]  As Exhibit F to their Opposition, defendants have submitted a chart that includes both the various entries discussed in the Opposition (as just reviewed) and additional supposedly clerical or ministerial entries that are not even discussed in their Opposition.  Defendants give no explanation for their assertion that these additional entries involve non-compensable tasks, and hence defendants fail to satisfy their burden of objecting to the entries.  See caselaw cited in note 11 *supra*.  Moreover, the other entries on this chart do not involve clerical or ministerial tasks. For example, Mr. Skinner's entry for 5/31/2011 records 0.1 hours to "Communicate with client about status of case."  Mr. Moustakas' entry for 3/29/2011 states "Review cases forwarded by Mr. Spitzer regarding expungement (Abbate, Burgin) (0.5); review Connick v. Thompson (latest section 1983 decision just released by Supreme Court) for implications in Huthnance (2.1); email to Mr. Hudson regarding expungement and follow-on discussion regarding same (0.2)."  Defendants' conclusory objections to these and the other additional entries on defendants' chart are meritless.

[20]  To the extent defendants argue that this research was not reasonably undertaken because they "are unaware of any efforts by either party to continue the March 2010 trial date due to the illness of a party," they ignore that on March 12, 2010, defendants informed plaintiff that due to recent surgery, defendant Officer Antonio would not be available for trial and that defendants "will be moving for a continuance of the March 29, 2010 trial."  See March 12, 2010 Email from Eric Glover, attached hereto as Exhibit 3.  On March 16, 2010, defendants informed plaintiff they would not seek a continuance after all.  See March 16, 2010 Email from Eric Glover, attached hereto as Exhibit 4.

with Mr. Moustakas about case," but Mr. Moustakas's entry for the day clarifies this communication: "Meet with Mr. Skinner regarding comprehensive discovery plan."  Mr. Moustakas' March 5, 2010 entry states "[r]eview pleadings; edit response," but Mr. Skinner's entry for the same day includes: "meet with Mr. Moustakas to discuss Response to Defendants' Objections to Magistrate Judge Facciola's February 1, 2010, Order (0.3); edit and revise same (0.5); file same (0.1)."

Third, the accompanying supplemental declaration from Mr. Moustakas provides ample detail as to the entries in question and demonstrates that the tasks were fully appropriate and that the amounts of time were entirely reasonable.  *See* Moustakas Suppl. Decl. ¶¶ 20-22.  For example, defendants point (at 29) to several entries by Mr. Skinner for time spent drafting the plaintiff's trial memorandum.  As Mr. Moustakas explains, that 51-page document was a key part of plaintiff's counsel's preparation for trial — the document organized and analyzed all of evidence and legal issues, and was used to guide counsel's examinations at trial.  Creating the document was a reasonable task, as it ensured that knowledge gained and work done earlier in the case would not be lost, but readily accessible for trial preparation and trial itself.

Finally, and in any event, the 33 cited entries are more descriptive than the entries criticized in the cases on which defendants rely.  *See e.g., Michigan v. EPA*, 254 F.3d 1087, 1094-95 (D.C. Cir. 2001) (citing examples of inadequate descriptions such as "conference call," "conference with J. Knight," "write emails," and "review record"); *Kennecott v. EPA*, 804 F.2d 763, 767 (D.C. Cir. 1986) (reducing fee by 15% where counsel failed to provide contemporaneous billing records of any kind).

In sum, no further reductions are warranted based on defendants' groundless objections to the specificity of plaintiff's billing records.

19

**D.      Block Billing**

Defendants (at 30-31) argue for an additional reduction on the ground that entries totaling some $622,000 in time (approximately 25% of the total entries) were "block billed."  But defendants fail to rebut the demonstration already set forth in plaintiff's initial memorandum (at 15-16) that no further reduction is warranted on this basis.

First, defendants have included within their "block billing" calculation the time spent at trial, which amounts to some $75,000.  *See* Opp. Ex. D (entries for March 2011).  That makes no sense.  Defendants are well aware of the time that plaintiff's counsel spent in trial each day, and reasonable billing practices do not require subdividing the time spent in trial.  Plaintiff is aware of no case, nor do defendants cite any, that requires subdivision of the tasks that comprise each *public* trial day.

Second, a reduction for block billing is not warranted absent a real obstacle to the Court's assessment of the fee's reasonableness.  *See Laborers' Int'l Union of N. Am. v. Brand Energy Servs., LLC*, 746 F. Supp. 2d 121, 127 (D.D.C. 2010) ("The billing statements provide sufficient detail to permit the Court to 'make an independent determination whether or not the hours claimed are justified.'"); *Smith v. D.C.*, 466 F. Supp. 2d  151, 158 (D.D.C. 2006) (refusing to reduce fees for block billing where "sufficient detail has been provided so that [the court] can evaluate what the lawyers were doing and the reasonableness of the number of hours spent on those tasks").  Here, the entries from plaintiffs' billing records are sufficiently detailed to permit the Court to assess the reasonableness of the hours worked — particularly in the context of the surrounding entries and the Court's knowledge of the case.[21]  *See Laborers' Int'l Union of N.*

---

[21] For example, on 3/21/2008, Ms. Keast billed 2.5 hours for "Call with Art and Fritz, Mr. Moustakas, and Mr. Mohapatra regarding possible experts and case strategy; search internet for potential experts," but the same day, Mr. Moustakas billed 1.7 hours for "Telephone conference with Ms. Keast, Mr. Mohapatra, and ACLU co-counsel regarding expert witnesses, discovery, and strategy."

*Am.*, 746 F. Supp. 2d at 127 (refusing to make a reduction for block billing where "[t]he billing descriptions can be read in context, with clarification coming from surrounding billing entries as well as the docket").  Indeed, as noted above, defendants challenge fewer than 3% of plaintiff's entries as vague and even those objections are meritless.

Third, defendants' argument fails because this is not a case where the block-billed entries include non-compensable activities.  In such a case the use of block billing might hinder the court's ability to determine a reasonable fee for the compensable activities.  For example, in *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 971 (D.C. Cir. 2004), the court found a reduction for block-billing warranted where (a) every entry was block-billed, (b) entries included time spent on non-compensable tasks, and (c) many entries were too vague to assess the reasonableness of the task or the time spent on it.  Here, by contrast, (a) the great majority of entries were not block billed, (b) time spent on non-compensable tasks has already been excluded, and (c) the entries are sufficiently detailed.  In such circumstances, the mere fact that some entries were block-billed does not require a further reduction on top of the extensive reduction already voluntarily taken by plaintiff herself.  *See DL v. District of Columbia*, 256 F.R.D. 239, 245 (D.D.C. 2009) (refusing to reduce fees based on block billing where use of block billing did not prevent deduction of non-compensable time).[22]

**E.  <u>Summary</u>**

Defendants' request for an across-the-board reduction, on top of the 30% voluntary reduction that plaintiff already took to the Goodwin Procter fee request, both is meritless and would be highly inequitable.  Instead, to address the issues relating to a few of the specific time entries as just described, plaintiff is reducing her fee request by a total of $2,019.15.

---

[22]  Furthermore, even if the Court were to conclude that a reduction for block billing was warranted, it should not amount to more than $55,000, calculated as 10% of the approximately $550,000 in supposedly block billed time excluding time spent in trial.

**III.**    **Defendants' Specific Objections To Certain Time Entries Are Largely Meritless**

In addition to their request for an across-the-board reduction, defendants seek to deduct specific amounts from the fee award.  Opp. at 17-25.  Plaintiff has carefully reviewed each of these objections.  As now shown, the vast majority of the objections are plainly meritless.  To address the few specific entries that raise any genuine issues, plaintiff is reducing her fee request by an additional $10,098.

    **A.**    **The Time Spent on Two Challenged Tasks Was Not Excessive**

       1.    The Complaint and Amended Complaint

Defendants argue (at 19-20) that it was excessive for plaintiff's counsel to spend time totaling some $38,000 on the Complaint and Amended Complaint because plaintiff's counsel had previously litigated another disorderly conduct case, *Ricks*.  This argument is meritless. First, as the detailed time entries establish, the $38,000 included the time spent researching numerous legal issues as well as factual issues specific to this case, in addition to drafting the original and amended complaints.  See entries cited in Opp. at 19.  Second, both the original and amended complaints in fact included new or expanded claims that were not part of the complaint in *Ricks*.  These include the contention that the post and forfeit procedure allows officers to use arrests as a form of illegal punishment as well as *Monell* liability on the same basis, a respondeat superior claim for false arrest, a contention based on D.C. Code § 5-335.01, which was not applicable in *Ricks*, a First Amendment argument and *Monell* claim based on that argument, and a new Fourth Amendment contention regarding the use of arrest in combination with post-and-forfeit as a means of covering up violations of the First Amendment.  Compare Dkt. #1 (11/2/2006), with Dkt. #13 (5/7/2007), and *Ricks v. Barnes*, No. 1:05-cv-1756, Dkt. #1 (9/2/2005)**.**  Finally, spending a total of $38,000 to properly research the facts and law and to draft two complaints was plainly reasonable given that plaintiff's counsel were investing many

hundreds of thousands of dollars of litigation effort into the case.

At bottom, defendants argue that plaintiff's counsel should have practiced cookie cutter litigation, refiling an old complaint that was based on different facts and outdated law. Nothing in § 1988, or its caselaw, supports such an argument.

### 2.   Preparation for Mr. Gallagher's Cross-Examination

Defendants assert (at 20-21) that Messrs. Skinner and Hudson spent an excessive amount of time assisting Mr. Moustakas for the cross-examination of defendants' expert witness, G. Patrick Gallagher. This argument is meritless. First, Mr. Gallagher was a critically important witness and his cross-examination was a key part of the trial. Moustakas Suppl. Decl. ¶ 15. Second, defendants do not contest the amount of time that Mr. Moustakas spent preparing for the deposition, rendering nonsensical their argument that Mr. Skinner or Mr. Hudson spent too much time assisting Mr. Moustakas. Third, defendants' assertion that Mr. Skinner and Mr. Hudson spent too much time is purely conclusory; defendants do not point to any specific entries that they claim were excessive.[23] Fourth, defendants' argument that the time should be reduced because plaintiff was willing to have Mr. Gallagher's testimony come in through his videotaped deposition rather than live is meritless. Once defendants stipulated that Mr. Gallagher would testify live, plaintiff could not admit his videotaped deposition (see Fed. R. Civ. P. 32 (a)) and instead had to prepare an examination to elicit from a hostile witness such testimony through cross-examination – which, in fact, is precisely what occurred as a result of plaintiff's counsel's preparations. Moustakas Suppl. Decl. ¶¶ 16-19. But that was much harder, and more costly, than merely playing a videotape. Finally, defendants' assertion that Mr. Skinner and Mr. Hudson spent "no less than 206.3 hours" totaling $95,768 on these tasks is a gross exaggeration, since

---

[23] See *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1337-38 (Tamm, J., concurring) (stating that conclusory attacks do not meet the burden to show that fees should be reduced).

that calculation includes the entire amount of time they worked on this case on each day in question, even though they worked on numerous other tasks on those days, many of which were trial days.

B.      **The Time Spent On Supposedly Unsuccessful Tasks Is Compensable**

In submitting her fee request in this case, plaintiff already excluded all time spent by her counsel on unsuccessful <u>claims</u>.  See Mem. at 13, 16-17.  Those include plaintiff's claims under the Fifth and Eighth Amendments, negligence *per se*, and intentional infliction of emotional distress, as well as time spent on her sanctions motion reply brief.  *Id*.

Defendants now contend (at 21-22) that plaintiff is not entitled to fees for work spent on motions or other tasks involved in litigating her <u>successful claims</u> if those specific motions or other tasks were unsuccessful.  That argument is contrary to established law.  As this Court has held, time spent on unsuccessful motions or the like is nonetheless compensable if the attorney's efforts are "directed toward [a] successful resolution of the [litigation]."  *Miller*, 575 F. Supp. 2d at 31 n.53.  Indeed, in *Air Transport Ass'n of Canada v. F.A.A.*, 156 F.3d 1329 (D.C. Cir. 1998), the D.C. Circuit rejected the government's argument that the prevailing plaintiffs could not recover fees for time spent on an unsuccessful motion, holding that "a litigant 'who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage.'"  *Id*. at 1335 (citation omitted).  *See also Heller*, 2011 WL 6826278 at *16-17 (rejecting the District's objection to time spent on "various procedural motions" that were unsuccessful because "plaintiff's counsel reasonably expended time on these motions during the course of litigation on which plaintiff was ultimately successful") (citing *Air Transp. Ass'n*, 156 F.3d at 1335).  None of the cases cited by defendants

supports any contrary proposition.[24]

In sum, the recovery of fees under § 1988 is governed by the degree of success at the claims level:  fees are recoverable for all time reasonably spent litigating successful claims, but for no time spent litigating unsuccessful claims.  *See Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) (expressly holding that "the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit" as long as the plaintiff ultimately prevailed on the claim).  Because plaintiff's motion already excludes all fees relating to her unsuccessful claims, defendants' argument provides no basis for reducing plaintiff's fee request.

Defendants alternatively seem to imply (at 22-25) that, even if plaintiff is entitled to recover for all tasks that were reasonably undertaken, some of the tasks at issue were unwarranted.  As we now show, all of the tasks that defendants challenge were reasonably undertaken, and so are compensable.

      1.      Motion to Strike the District's Expert (Gallagher)

Plaintiff's motion to strike defendant's expert, which as a practical matter would have prevented the District from contesting *Monell* liability, was reasonable.  Indeed, the motion was granted.  Mem. Order, Dkt. #111 (2/1/2010) (Facciola, Mag. J.).  Defendants objected to that decision and were overruled.  Order, Dkt. #122 (3/5/2010).  Defendants then moved for reconsideration, admitting that Mr. Gallagher's disclosures were filed out of time, but pleading the result was unfair.  Dkt. #135 (3/18/2010).  Although Judge Kennedy showed mercy by letting

---

[24] Defendant cite (at 21-22) to *DL v. District of Columbia*, 256 F.R.D. 239, 245 (D.D.C. 2009), and (at 18) to *Tequila Centinela S.A. de C.V. v. Bacardi & Co.*, 248 F.R.D. 64, 71 (D.D.C. 2008), for the proposition that a plaintiff cannot recover fees relating to unsuccessful motions.  Both cases, however, dealt with fees awarded under Fed. R. Civ. P. 37(a)(5) for discovery violations, not 42 U.S.C. § 1988.  Unlike fee awards in civil rights cases governed by § 1988, fee awards under Rule 37 are limited to work "caused by the failure" of the other party to comply with discovery rules.  Defendants also cite (at 18) to *Ctr. for Biological Diversity v. Norton*, 2005 WL 6127286 , *2 (D.D.C. 2005), but that case reduced fees for inefficient and unnecessary work, not for unsuccessful motions.

the District call Mr. Gallagher despite the procedural default that had led to his exclusion,[25]

Judge Kennedy's decision to do so plainly does not mean that Plaintiff's motion to strike was

thereby rendered unreasonable.

### 2.   Time Relating to Mr. Danaher

Defendants argue (at 22-23) that plaintiff should not recover for time counsel spent

relating to her original expert, Mr. Danaher, because he subsequently had to be replaced by Mr.

Longo.  That argument is meritless.  The reason why Mr. Danaher could not continue with the

case and had to be replaced was that – as just described – the District was spared the effects of its

procedural default by Judge Kennedy's last-minute reversal of the order excluding Mr.

Gallagher's testimony, thereby necessitating a further delay of the trial date.  Dkt. #156

(7/2/2010).  The standard for recovery of fees is reasonableness.  *See Goos v. Nat'l Ass'n of*

*Realtors*, 68 F.3d 1380, 1386 (D.C. Cir. 1995) ("The key question is whether the work was

reasonably done in pursuit of the ultimate result.  In other words, would a private attorney being

paid by a client reasonably have engaged in similar time expenditures?").  It plainly ***was***

reasonable for plaintiff's counsel to spend time relating to Mr. Danaher while he was plaintiff's

expert.  Because the need to replace him was entirely attributable to a delay of the trial date

occasioned by defendants' procedural default, it would be unfair and inappropriate to disallow

the time spent by plaintiff's counsel relating to Mr. Danaher.

### 3.   Second Deposition of Inspector Williams

Defendants argue (at 23-24) that it was unreasonable for plaintiff to take a second

deposition of Inspector Keith Williams.  That argument is foreclosed at the outset by the fact that

this Court <u>granted</u> plaintiff leave to take that deposition.  Order, Dkt. #195 (11/18/2010)

---

[25] *See* Order, Dkt. #142 (3/24/2010) ("[W]hile the Court continues to be disappointed with the failure of the Office of the Attorney General to follow the rules, striking the defendants' expert's report is too harsh a sanction ….").

("ORDERED that discovery is reopened for the limited purpose of permitting plaintiff to re-depose Inspector Williams and conduct limited discovery about the 2009 Report").   In any event, this second deposition was undertaken because the District had wrongfully failed to produce, in time for a first deposition, a report that Inspector Williams had written in 2009, allegedly in fulfillment of one of the CCRB's crucial recommendations.  A second deposition was therefore appropriate to probe, among other things, the conclusions of the report and the methodologies employed to derive those conclusions.  It was also proper to provide a basis to either exclude the report and Inspector Williams' testimony regarding it, or permit effective cross-examination about it, particularly in light of the District's refusal to enter into a stipulation that would moot this issue.  *See* Emails Regarding Stipulations, attached hereto as Exhibit 5.  Indeed, in moving to exclude Inspector Williams and all testimony about the 2009 report, plaintiff relied on the second deposition regarding the 2009 report.  Trial Transcript AM, 3/7/2011, at 94-95, 101.  The Court granted that motion.  *Id.* at 104-105.  In short, the taking of Inspector Williams' second deposition was reasonable and is compensable.

### 4.    Third Requests for Admissions

Defendants seek to disallow the time spent on plaintiff's third requests for admission because they were overtaken by the trial date.  Those requests, however, were entirely reasonable.  The requests primarily related to documents produced in connection with the second deposition of Inspector Williams – which, as just discussed, occurred close to trial only because of defendants' discovery misconduct.  See above.  The Court granted plaintiff the right to take that deposition, as well as "limited discovery" related to it, and Plaintiff was justified in spending a small amount of time immediately after that deposition serving requests for admission designed

to avoid having to litigate certain issues at trial.[26]

>5.    Additional Motions/Oppositions

Defendants' memorandum includes (at 24-25) an additional list of supposedly unsuccessful motions or oppositions. As shown above, however, time spent on specific motions or oppositions in the overall course of successfully litigating a claim does not become non-compensable simply because the party's position on the specific motion or opposition was rejected by the court. See pages 24-25, *supra*. Because that is the only basis advanced by defendants for disallowing the work spent on these tasks, this listing provides no basis to reduce plaintiff's requested fees. In any event, the positions plaintiff took were reasonable, as described in ¶ 23 of Mr. Moustakas' Supplemental Declaration.

**C.    Duplicative Entry**

Defendants (at 25-26) suggest a reduction of 3.4 hours based on the existence of two time entries for Mr. Moustakas on February 19, 2011 (one for 3.4 hours and one for 6.4 hours). A careful review of the chart actually shows that the 6.4 hour entry for February 19, 2011 is a duplicate of the entry for February 20, 2011. Plaintiff's counsel apologizes to the Court for this inadvertent error and believes that 6.4 hours, totaling $3,888 (calculated as $4,320 minus the 10% voluntary discount), should be deducted to eliminate this duplicative entry.

**D.    Local Travel**

Plaintiff's motion already excluded half of the time spent on out-of-town travel. *See* Mem. 13; Moustakas Declaration ¶ 28 & Ex. 1. Defendants argue (at 26) that time spent on local travel, for going to the arrest site or to Court, should be cut in half as well. But the two are not the same. Out-of-town travel involves lengthy periods of time and an expectation that attorneys

---

[26] Plaintiffs' memorandum (at 24) once again wildly overstates the amount of time that plaintiff's counsel spent on these requests for admission by including all of the time spent on the days in question, even though they included many tasks besides the requests for admission.

can spread out papers and work.  Local taxi rides, by contrast, involve a few minutes with no

such opportunity.  Moreover, attorneys generally discuss their case during taxi rides to court.

Accordingly, no reduction should be made for these small amounts of time.

### E.    Work on "Discovery Motions"

Defendants argue that Plaintiff should not be compensated for time Mr. Moustakas spent

in August 2008 on discovery motions.  A review of counsel's records and files suggests that this

time was spent preparing motions regarding various discovery disputes.  Although this work was

reasonably undertaken at the time, plaintiff ultimately determined not to file the motions.

Plaintiff agrees to a deduction for this time, some 12 hours amounting to $ 6,210.00.[27]

### F.    Summary

The vast majority of defendants' requests that specific amounts of time be deducted from

plaintiff's fee petition are plainly meritless on the law, facts, or both.  In order to address the few

objections that raise genuine issues, as just described, plaintiff is reducing her fee request by an

additional $10,098.

### CONCLUSION

In accordance with the above, a total of $12,117.15 should be deducted from the amount

of attorney's fees plaintiff initially sought.[28]  Plaintiff's motion for an award of fees and costs

should therefore be granted in the following amounts:  $1,915,694.46 for Goodwin Procter fees,

$23,364.00 for ACLU fees, and $89,614.74 for expenses.

Attached hereto as Exhibit 6 is a chart showing the amount of Goodwin Procter fees to

which plaintiff would be entitled under controlling authority, the voluntary reductions from that

---

[27] The fee initially totals $6,900; accounting for the 10% discount, the deduction is $6,210.

[28] This amount is made up of $2,019.15 for the items addressed in Part II above and $10,098 for the items addressed in Part III.

amount taken in the original fee petition, the additional subtractions made herein, and the revised

amount requested by plaintiff for fees reasonably incurred by Goodwin Procter in this case.

Respectfully submitted,

DATED:  March 23, 2012

   **/s/  John Moustakas**
John Moustakas (DC Bar # 422076)
jmoustakas@goodwinprocter.com
Jeffrey D. Skinner (DC Bar # 494808)
jskinner@goodwinprocter.com
Andrew S. Hudson (DC Bar # 996294)
ahudson@goodwinprocter.com
Goodwin|Procter LLP
901 New York Avenue, NW
Washington, DC 20001
Tel:     (202) 346-4000
Fax:     (202) 346-4444

Arthur B. Spitzer (DC Bar #235960)
Frederick V. Mulhauser (DC Bar # 455377)
American Civil Liberties Union
   of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Tel:     (202) 457-0800
Fax:     (202) 457-0805

*Attorneys for Plaintiff Lindsay Huthnance*

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LINDSAY HUTHNANCE,　　　　　)
　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　 )
　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　)　　No. 06-cv-1871 (RCL) (JMF)
　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　)
DISTRICT OF COLUMBIA, *et al.*,　)
　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　)
_____)

**SUPPLEMENTAL DECLARATION OF JOHN MOUSTAKAS
IN SUPPORT OF PLAINTIFF'S MOTION FOR
AWARD OF ATTORNEYS' FEES AND EXPENSES/COSTS**

1.　　　I am a partner in the law firm of Goodwin Procter LLP and lead counsel for Plaintiff in

the above-captioned case.  The facts stated herein are based on my personal knowledge

and on the business records of Goodwin Procter LLP.

**Federal Court Litigation Experience of Associates**

2.　　　Plaintiff in this case retained myself and other attorneys in their capacity as attorneys of

the law firm of Goodwin Procter LLP.

3.　　　As a supplement to the information set forth in ¶¶ 19-24 of my Declaration previously

filed in this matter, a brief additional description of the federal court litigation experience

of each of the four associate attorneys follows.

4.　　　<u>Joshua Rosenstein</u>

Mr. Rosenstein began working on this case in January 2006.  His federal court litigation

experience at Goodwin Procter included substantial amounts of time spent litigating (1) a

suit in the U.S. District Court for the Northern District of Illinois during 2005-2006; (2) a

suit in the U.S. District Court for the District of Nebraska during 2005-2007; (3) a suit in

the U.S. District Court for the District of Kansas during 2005-2006; and (4) a suit in the

U.S. District Court for the Eastern District of Louisiana during 2005-2006.

5.    Sarah Keast

Ms. Keast began working on this case in September 2007.  Her federal court litigation

experience at Goodwin Procter included substantial amounts of time spent litigating (1) a

suit in the U.S. District Court for the Northern District of Illinois and the U.S. Court of

Appeals for the Seventh Circuit during 2004-2006; (2) a suit in the U.S. District Court for

the District of Columbia during 2004-2005; (3) a suit in the U.S. District Court for the

Western District of Oklahoma during 2006-2007; (4) a suit in the U.S. District Court for

the Eastern District of Louisiana during 2006-2008; and (5) a suit in the U.S. District

Court for the District of Columbia during 2006-2007.

6.    Jeffrey Skinner

Mr. Skinner has worked on this case from January 2009 through the present time.  Prior

to and during that period, his federal court litigation experience included: (1) beginning in

2005, representing numerous financial institutions in individual and class action litigation

arising under state and federal consumer lending statutes and regulations in federal trial

and appeals courts around the country; (2) beginning in 2005, representing the nation's

largest railroads in matters arising under the Railway Labor Act in federal trial courts in

Louisiana, Oklahoma, and North Dakota; (3) beginning in 2006, representing a major

manufacturing company in asbestos personal injury lawsuits during pre-trial proceedings

before the asbestos MDL in the U.S. District Court for the Eastern District of

Pennsylvania and in federal trial courts around the country; (4) beginning in 2007,

representing independently operated dealers of copy equipment in breach of contract

litigation against a leading copier manufacturer in New York federal court; (5) beginning in 2009, representing a major home builder in response to FTC civil investigative demand; (6) beginning in 2010, representing a major construction materials company in litigation over allegedly defective gypsum drywall before the Judicial Panel on Multidistrict Litigation and federal trial courts in Louisiana, Mississippi, and Florida; and (7) beginning in 2010, representing a major drug manufacturer in individual and class actions in Nevada federal court.

7.    <u>Andrew Hudson</u>

Mr. Hudson has worked on this case from February 2010 through the present time.  Prior to and during that period, his federal court litigation experience included (1) representing national banks in two suits, brought as nation-wide class actions, concerning alleged violations of the Real Estate Settlement and Procedures Act, beginning in January 2010; (2) representing a bank in a putative class action concerning violation of state lending laws, beginning in January 2010; (3) representing a corporation in a personal injury suit, beginning in April 2010; (4) representing national manufacturers of building materials in products liability actions in federal courts in various states, beginning in May 2010; and (5) representing a national insurance provider in a multi-state putative class action, beginning in January 2011.

**Response to Defendants' Arguments Regarding "Clerical" Tasks**

8.    Plaintiff voluntarily agreed not to seek fees for time spent supervising secretarial assistants or preparing notices of appearance.  Defendants cite five billing entries that, they allege, fall within that category.  See Opposition at 33-34.  These entries are as follows:

| | |
|---|---|
| Moustakas (4/16/2009) | discuss with Mr. Osher capacity to custom add files to MPD's CJIS system and integrate into Summation for increased productivity and searchability of PD-163 information and linking PDFs of PD-163s (.8) |
| Skinner (3/16/2009) | Meet with Mr. Osher and arrange for documents produced in discovery to be uploaded to Summation (0.6) |
| Skinner (4/24/2009) | Meet with Mr. Osher to discuss loading PD-163 forms and preparing them for searching and use (0.3) |
| Skinner (4/30/2009) | Assign Ms. Dysart to enter information from PD-163 arrest forms into Summation; assign Ms. Dolby to enter information from PD-163 arrest forms into Summation (0.6) |
| Hudson (1/11/2011) | file notice of appearance (0.5) |

9.      As to the final two of those entries, defendants are correct; they fairly fall within the category plaintiff agreed to exclude from her petition, and their inclusion was an inadvertent error. These deductions amount to 1.1 hours and $421.65.[1]

10.     However, the other three entries defendants cite (at 33-34) are not arguably "ministerial." Mr. Osher is not a secretary, but the head of Goodwin Procter's litigation technology department. Counsel's discussions with Mr. Osher explored the potential to use technology to organize, analyze, and eventually prepare and present to a jury, the large volume of PD-163s and other documents involved in this case. These discussions informed counsel's thinking on the feasibility of various uses of the documents, both in preparation for trial and at trial itself. Counsel could not have delegated the task of having these discussions with Mr. Osher to a paralegal or a secretary. Playing a significant role in plaintiff's presentation of expert testimony bearing on the District's

---

[1] These fees initially sum to $468.50; accounting for the 10% discount, the deduction is $421.65.

liability under *Monell*, the PD-163s and the ability to extract data from them electronically was very important to the case. Consequently, the discussions were a necessary and important part of litigating this case. Moreover, the time spent was reasonable. As a practical matter, the ability to organize, code, and seamlessly extract data from this seminal data set created enormous efficiencies that redounded to the defendants' benefit by reducing the time spent by counsel on this matter. In my professional experience attorneys typically bill and clients pay for such tasks. As a result, no deduction is warranted for these entries.

11.     There are 18 entries and partial entries identified in defendants' Opposition (at 34-35) as "describ[ing] clerical/ministerial tasks that more appropriately should have been performed by non-lawyers." I have reviewed the entries and assessed defendants' argument based on the surrounding entries and my knowledge of this case. The list below reflects my conclusions. In sum, in my judgment only five of the 18 tasks can be fairly described as clerical or ministerial tasks that should have been performed by non-lawyers. Two are non-compensable (or partially non-compensable) for other reasons, addressed below. And the remaining 11 tasks are compensable for the reasons described below.

12.     I agree that the following five entries describe tasks that could fairly be characterized as clerical or ministerial:

| | |
|---|---|
| Hudson (2/26/10) | Calling DC Council offices to locate record of Chief Lanier's testimony before the Council (0.1) |
| Skinner (3/5/10) | Communicate with Court's IT Specialist and Plaintiff about location for videoconference deposition in Wellington, New Zealand (0.2) |
| Hudson (8/4/10) | Confirm trial deadlines (0.1) |
| Hudson (1/25/11) | Review and approve billing request from Capitol Process |

Servers (0.1)

Hudson (4/8/11)          Research and calendar deadlines for post-trial matters (0.2);
                         coordinate disposal of returned and unused witness checks
                         (0.1)

I believe that it was more efficient — and cost effective — that the attorneys performed

these tasks themselves rather than spending the time to explain and assign them to non-

attorneys (a process that would in most cases have taken longer).  However, plaintiff does

not believe that this issue is worth litigating further.  The relevant time for these five

entries totals 0.8 hours and $297, which plaintiff is removing from her fee request.[2]

13.     Plaintiff agrees that two of the 18 entries or partial entries listed by defendants are non-

compensable for other reasons.  These entries or partial entries are:

Skinner (2/16/10)        file opposition (0.2)
Skinner (3/25/11)        communicate with client, trial team, firm, and press about
                         jury verdict (2.5)

Excluding the time for these two tasks (2.7 hours) results in a deduction of $1,113.30.[3]

14.     The remaining 11 entries out of the 18 criticized by defendants as involving clerical or

ministerial entries actually include time spent properly delegating tasks to more junior

attorneys or professionals and supervising their work, communicating with the Court, or

performing legal analysis, all of which are fully appropriate and compensable.  Those

entries are as follows:

Delegation or Supervision

Skinner (1/26/10)        arrange for filing of Response (0.2)
Hudson (3/24/10)         meeting with Ms. Leon regarding research on DC police
                         contract and police training materials (0.2)
Skinner (10/27/10)       Meet with Ms. Livingston to review exhibit binders (0.1)
Moustakas (3/17/10)      office conference with Mr. Osher regarding court visit
                         (0.5); telephone conference with Mr. Skinner regarding

_____

[2] These fees initially sum to $330; accounting for the 10% discount, the deduction is $297.

[3] These fees initially sum to $1237; accounting for the 10% discount, the deduction is $1,113.30.

|  | connectivity in electronic courtroom and other related issues (0.2) |
|---|---|
| Hudson (4/9/10) | coordinating documents for Mr. Moustakas's review (0.2); coordinating filing of reply and sur-reply with Ms. Waldron (0.3); coordinating exhibits for reply filing (1.0) |
| Skinner (2/28/11) | communicate with litigation technology personnel to discuss trial support matters (0.3) |
| Skinner (8/24/10) | arrange for paralegal support at trial (0.1) |
| Skinner (3/8/10) | arrange for paralegal and litigation technology support for trial (0.3) |

Communication with Court

| Skinner (3/10/10) | communicate with court regarding telephonic conference with Judge Kennedy (0.2) |
|---|---|
| Skinner (3/11/10) | call court to discuss telephonic conference (0.1) |

Legal Analysis

| Skinner (11/10/10) | review ethics rules to determine whether client may use non-refundable ticket purchased by the firm (0.4) |
|---|---|

In my professional experience attorneys typically bill and clients pay for such tasks.

Because it is fully appropriate for attorneys to perform this work, no reduction in plaintiff's fee request is warranted based on them.

**Work Preparing Mr. Gallagher's Cross-Examination**

15.   Defendants have asserted that that Mr. Skinner and Mr. Hudson spent too much time assisting me in connection with the cross-examination of defendants' expert witness, G. Patrick Gallagher.  Defendants are incorrect.  Mr. Gallagher was a critically important witness and his cross-examination was a key part of the trial.  Mr. Gallagher's testimony (regarding the adequacy of the District's policies and practices regarding training and supervision) followed the testimony of Mr. Eure and plaintiff's own expert, Mr. Longo. The testimony of Mr. Eure and Mr. Longo provided ample basis for the jury to find *Monell* liability against the District of Columbia.  As such, the testimony of Mr.

Gallagher represented the District's only realistic chance to disprove the predicates for *Monell* liability.  In other words, by the time of Mr. Gallagher's testimony, success or failure on *Monell* liability – one of the most important aspects of plaintiff's case and one of the most notoriously difficult standards to meet – very likely turned in significant measure on the jury's view of the reliability and persuasiveness of Mr. Gallagher's opinions.

16.    As discussed below, the work defendants object to was begun only after plaintiff was precluded from using the video-taped deposition testimony she had planned to rely on.

17.    Defendants assert (Opposition at 21) that the amount of time Messrs. Skinner and Hudson spent helping me prepare for the trial cross-examination of Mr. Gallagher was "particularly excessive in light of plaintiff's expressed willingness to forego the live examination of Mr. Gallagher entirely, in exchange for simply showing excerpts of Mr. Gallagher's videotaped deposition." Their assertion is both misleading and wrong. Having obtained extremely favorable testimony from defendants' expert at deposition, of course plaintiff would have been satisfied to introduce choice swaths of his testimony criticizing the District and agreeing that it was deliberately indifferent — the standard for liability under *Monell*.   Indeed, on the first day of trial plaintiff sought and obtained a ruling, over defendants' objections, that, given their unwillingness to stipulate that Mr. Gallagher would appear in their case, plaintiff could introduce the video-tape of Mr. Gallagher's deposition in her own case-in-chief.  Transcript, March 7, 2011, PM Session, pp. 123-128.  Two days later, plaintiffs overcame yet another objection to the use of the video-tape.  *Id.* at March 9, 2011, PM Session, pp. 4-5.

18.     Only at the last minute, after Mr. Skinner, in open court, announced plaintiff's intention

to introduce Mr. Gallagher's video-tape deposition excerpts, did defendants change their

position in response to an ultimatum from the Court, finally agreeing to stipulate that Mr.

Gallagher would testify live in their case.  As a result, plaintiff's right to use Mr.

Gallagher's deposition was lost, because he could no longer be deemed unavailable. *Id.*

at March 10, 2011, AM Session, pp. 2-4.

19.     Obviously, once precluded from using the highly favorable video-taped testimony which

plaintiff had planned to rely on, counsel had to prepare to elicit such testimony through

cross-examination of a hostile witness.  The defendants' last-minute about-face portended

that Mr. Gallagher would offer testimony ***more favorable*** to the District than elicited at

his deposition — as he in fact did.  As such, it was essential to plaintiff's case for her

counsel to be fully prepared for this critical cross-examination.  And the work done to

fulfill that obligation of proper preparation all succeeded defendants' last-minute about-

face.  In my experience as a trial lawyer, the value of not only neutralizing, but actually

turning an opposing expert and causing him or her to render significantly valuable

testimony for the opposing side is hard to overestimate.  It is likely to be outcome

determinative.  And, in fact, plaintiff elicited highly favorable testimony at trial in this

case precisely because of those preparations.

**Additional Explanation of Certain Billing Entries**

20.     Defendants have challenged various billing entries as vague or unexplained.  Below are

more detailed explanations for those such entries that seek compensation for relatively

larger amounts of time.  As demonstrated by the explanations below, counsel's work on

these tasks was reasonable and appropriate.

21.   Trial / Case Memorandum

Mr. Skinner recorded three entries for "Draft trial memorandum" — 2.6 hours on

6/02/10, 1.7 hours on 6/3/10, and 2.6 hours on 6/4/10 — and four entries for "Draft case

memorandum — 3.1 hours on 6/25/10, 6.5 hours on 6/27/10, 7.8 hours on 6/28/10, and

3.0 hours on 6/29/10.  These entries all reflect time spent working on a single document,

which I directed Mr. Skinner to prepare.  In its final form, the document was 51 single-

spaced pages long.  The document, which is covered by attorney work-product

protection, was prepared for purposes of trial and synthesized into a readily useable

format the information that we had assembled or generated through our work on the case

during the years leading up to trial.  For example, the memorandum collected and ordered

all the evidence regarding the facts of plaintiff's arrest.  It analyzed important disparities

and noted potential issues to be mindful of at trial.  It also served as an easy reference,

simplifying any further analysis needed of the variances and similarities in the stories of

the various witnesses, the PD-163, and the District's discovery responses.  The

memorandum similarly collected and synthesized evidence relating to plaintiff's *Monell*

liability claim against the District of Columbia, including the relevant portions of the

Citizen Complaint Review Board (CCRB)'s 2003 report on disorderly conduct, the many

relevant policies and/or General Orders of the Metropolitan Police Department, and

deposition testimony by the District's 30(b)(6) witnesses and the defendant officers'

supervisors, again, analyzing the evidence and noting potential issues to address at trial.

The memorandum also set out the elements of each of plaintiff's claims, defenses that

might be raised to those claims, relevant case law refining the issues, and the evidence

relevant to each claim and defense.  It analyzed the fit between the elements and the

evidence, and noted potential issues to be mindful of at trial and points of law on which

further research was necessary.  The memorandum was used as a guide for developing

examination outlines in preparation for trial.  The memorandum was also used during

trial, both as a checklist to ensure that counsel obtained all needed testimony and

evidence, and as a kind of quick-reference source for the facts about the evidence,

testimony, or law as to which issues might arise.

22.   <u>Certain Entries in October, 2010</u>

I recorded three entries in October, 2010 that defendants identify as impermissibly vague.

These entries are as follows: 10/04/10, Work on brief (7.6); 10/06/10, Trial prep and

briefing (8.9); 10/08/10, Work on brief and trial prep (10).  At the time, trial was set for

November 15, 2010.  My review of emails, my files, and Goodwin Procter's electronic

databases shows the following:

- On October 4, I began responding to the defendants' multi-front attempt to gut
  plaintiff's case.  Namely, on September 27, 2010, defendants filed a motion for
  leave to late file at least seven separate motions *in limine* designed to eliminate,
  on virtually every issue, critical evidence essential to proving plaintiff's case.
  They sought to exclude plaintiff's expert witness from testifying.  They sought to
  exclude any reference to or reliance upon Dr. Ginger's study of MPD arrest
  reports by plaintiff's expert witness or anyone else.  They sought to preclude
  plaintiff's negligence claim.  They sought to preclude plaintiff from calling the
  District's Fed. R. Evid. 30(b)(6) witnesses at trial, one of whom had testified
  falsely at deposition.  They also sought to preclude use of the District's PD-163
  police forms at trial, documents they had long known were at the heart of
  plaintiff's *Monell* claim.  With similarly long-standing knowledge of their
  significance, defendants sought to preclude the CCRB Reports that established
  both the negative findings central to plaintiff's case, but also the MPD's false
  promises to address those negative findings.  Finally, they sought to preclude
  evidence attacking the District's post-and-forfeit procedures and their use in
  connection with Ms. Huthnance's arrest.  In addition, I called a meeting with
  Messrs. Skinner and Hudson to discuss my theory about attacking defendants'
  belated motions, which only Mr. Hudson recorded time.  As Mr. Hudson's time
  entry indicates, that meeting lasted 1.3 hours.

- On October 6, 2010, I spent 8.9 hours on the instant matter: (1) 0.2 hours meeting
  with Mr. Skinner to discuss plaintiff's deposition, which the Court ordered that

day; (2) 0.6 hours discussing the deepostion with Mr. Skinner and plaintiff; (3) 0.6 hours discussing th e deposition with Mr. Skinner and plaintiff; (3) 2.5 hours participating in plaintiff's deposition; (4) 0.4 hours meeting with Mr. Skinner to plot strategy and discuss assignments for attacking defendants' omnibus motion to late-file multiple motions *in limine*. In addition, I spent 5.2 hours working on both plaintiff's motion to substitute witness and plaintiff's response to defendants' omnibus motion for leave to file motions *in limine* out-of-time.[4]

▪ On October 8, 2010, I spent 10 hours on this matter, working on the following tasks: editing and redrafting the declaration of Maria Fernandez (former CCRB chair); researching, conferring with co-counsel, and drafting substantive email to counsel for defendants concerning improper instructions to Mr. Eure not to cooperate with plaintiff's counsel; review of CCRB/OPC Reports for trial; and continued work on the motion to substitute and opposition to the omnibus motion for leave to late file motions *in limine*.

## Motions/Oppositions Challenged by Defendants

23.    Defendants cite five oppositions to motions, and two motions, filed by plaintiff at various points in this case. Opp. at 24-25. Although plaintiff did not prevail on these specific motions, plaintiff's positions on these motions amounted to an entirely reasonable strategy in the context of the litigation. Summary descriptions of these issues follows.

▪ *Opposition to Motion to Take Deposition* [Dkt. #169] (10/01/2010)

o Plaintiff opposed defendants' motion seeking relief from an order that set plaintiff's deposition for the day before trial. This Court held that despite the language of the original order (which supported plaintiff's position), it would not be enforced to the letter, as no prejudice would flow from allowing defendants to take a telephonic deposition. *See* Dkt. #171 (10/06/2010).

▪ *Opposition to Emergency Motion to Continue Trial Date* [Dkt. #191] (11/08/2010)

o Plaintiff's opposition sought details regarding Mr. Eric Glover's medical condition, as, absent any explanation, plaintiff was unable to evaluate the propriety of defendants' requested continuance. The Court, after *ex parte* consultation with other counsel for defendants at the Nov. 10, 2010 status conference, granted defendants' motion. *See* docket; Dkt. #195 (11/18/2010).

---

[4] Plaintiff's motion to substitute witness sought leave to substitute Philip Eure, executive director of the Office of Police Complaints (who has served that body in that capacity, through various name changes, since its establishment in 2000), for the five individuals who served on the board (then the CCRB) when it issued its 2003 report on disorderly conduct. See Dkt. #172 & 172-2.

- *Opposition to Motion for Extension of Time to File a Reply to Plaintiff's Opposition to the District's Motion to Dismiss* [Dkt. #11] (04/20/2007)

  o Plaintiff opposed defendants' request for an extension, as the only substantive reason given was defendants' counsel's workload, an excuse defendants had already employed on numerous prior occasions in seeking extensions.

- *Opposition to Motion for Extension of Time to File a Pleading in Response to Plaintiff's Amended Complaint* [Dkt. #16] (05/22/2007)

  o Plaintiff opposed the District's request for an extension to respond to the amended complaint, as the District had already had a month to conduct an investigation since identifying the officers involved, and had sought four other extensions in the previous four months without ever identifying a legitimate need for the same.

- *Opposition to Motion for Protective Order* [Dkt. #54] (06/28/2008)

  o Plaintiff opposed defendants' request for a protective order that would shield the personnel files and training records of the defendant officers, as those documents were relevant to her claims, and the statutes defendants cited did not create a privilege from discovery. Magistrate Judge Facciola ordered that certain documents be produced under an appropriate protective order.

- *Motion for Extension of Time to Take Depositions and Compel Deposition* [Dkt. #87] and *Motion for Hearing* [Dkt. #89] (11/24/2009)

  o Plaintiff sought an order requiring the District to produce various witnesses for depositions that plaintiff had properly noticed, and extending the discovery deadline to permit the same. In a separate motion, plaintiff sought a hearing to address these and other discovery issues. Magistrate Judge Facciola entered an order extending the discovery deadline, ordering the District to produce the witnesses, and denying plaintiff's motions as moot. Dkt. #101 (12/29/2009).

In my experience as a trial lawyer, these motions and oppositions were entirely reasonable in the circumstances and would have been undertaken for a "paying client" in the same circumstances. Moreover, these positions accorded with entirely reasonable instructions from plaintiff to oppose further unnecessary delays in a case that took 4 ½ years to bring to trial.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

23rd day of March, 2012, in Washington, D.C.

John Moustakas

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LINDSAY HUTHNANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-cv-1871 (RCL) (JMF) |
| | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF ARTHUR B. SPITZER IN SUPPORT OF
PLAINTIFF'S PETITION FOR ATTORNEYS' FEES AND EXPENSES/COSTS**

1.      I am over the age of 18, and if called to testify, I could and would testify to the contents of this declaration, which are personally known to me.  I file this declaration in support of plaintiff's motion for an award of attorney's fees and expenses/costs.

2.      I am a member of the bar of this Court.  I am employed as the Legal Director of the American Civil Liberties Union of the Nation's Capital, which is the Washington, D.C., affiliate of the American Civil Liberties Union, a nationwide nonprofit membership organization that, since its founding in 1920, has worked to protect the civil liberties and civil rights of all Americans.  I have held that position for 32 years, and during that time it has been my responsibility to supervise the office's legal program, including case selection and ongoing litigation in both federal and local courts.

3.      In my capacity as Legal Director, I have supervised the litigation of hundreds of civil rights cases.  While some cases are litigated entirely by ACLU staff, many are litigated in conjunction with attorneys at private law firms.  In such cases, I and other ACLU staff typically

take advisory or supervisory roles, with most of the research, drafting, and other day-to-day work being done by the team of outside attorneys.

      4.      I am responsible for evaluating cases and determining which are appropriate to litigate "in-house," which would be better suited to litigation by attorneys at a private law firm, and which kind of law firm would be best suited to handling the matter. In making this decision, I evaluate the number and complexity of the legal and factual issues, the likely duration of litigation, and the resources that may be needed to litigate the case through to conclusion. In my experience, some cases can be effectively litigated by smaller firms with a relatively low cost-structure, but others require the resources, tenacity, and broader base of expertise of a bigger firm, with an attendant higher cost structure and higher billing rates.

      5.      This case presented very important factual and legal issues, including whether the District has engaged in a pattern of depriving its citizens of their First Amendment rights and whether the current operation of the District's post-and-forfeit procedure prevents any meaningful judicial or prosecutorial review of police conduct in arrests for disorderly conduct and other minor offenses. These are practices that adversely affect hundreds of D.C. residents and visitors every year. Litigating these important issues foreseeably required an extensive process of collecting and analyzing, with the help of expert witnesses, information about the District's training policies and practices, its supervisory policies and practices, and the factual record regarding its arrests for disorderly conduct and related offenses. In addition, because Ms. Huthnance was to assert § 1983 and constitutional claims directly against the District, I foresaw that the District would likely engage in the kind of scorched-earth litigation tactics that it had exhibited in prior major cases. Furthermore, the claims to be advanced by Ms. Huthnance

against the District were quite challenging both factually and legally, and in my judgment required a firm of considerable expertise and skill in complex federal litigation.

6.      For the above reasons, I determined that this case would benefit from representation by a larger firm with greater resources, tenacity, and breadth of expertise with the issues presented.  I sought out attorneys from such a firm to act as lead counsel on the case — specifically, John Moustakas and his team.  Mr. Moustakas had previously worked with the ACLU on at least two matters.  One involved a wrongful arrest for disorderly conduct, and both were resolved successfully for our clients.  In addition to his deep experience handling jury trials in Washington, D.C. as a former Assistant United States Attorney, Mr. Moustakas also brought to the case an in-depth knowledge of the Metropolitan Police Department and police procedures.

7.      I believe that the facts have borne out my decision to engage Mr. Moustakas and his team to help litigate this case.  The District of Columbia has litigated every aspect of this case with an unyielding, take-no-prisoners attitude.  Achieving success has required a high level of tenacity, a willingness to invest large amounts of time over many years to this case and incur tens of thousands of dollars in unreimbursed expenses, and a consistently high level of skill and attention to detail.  Mr. Moustakas and his team, drawing on Goodwin Procter's extensive resources, were able to meet that challenge.  Based on my experience, I believe that had this case been litigated by a smaller firm, with fewer resources and a less tenacious approach, this important successful outcome would have been significantly less likely.

8.      Furthermore, based on my experience I do not believe that this case was likely to have been litigated at all without the help of an organization such as the ACLU or a firm such as Goodwin Procter willing to work with us.  Although private practitioners do also file lawsuits alleging police misconduct, lawyers in private practice who litigate police cases generally do so

on a contingent fee basis because their clients rarely have the financial ability to pay hourly rates on a current basis; people with substantial incomes or bank accounts are not often the victims of police abuse. A lawyer who makes his or her living from contingent fees, in turn, cannot afford to take cases where the dollar amount of the judgment or settlement may not be very large, because the lawyer's share of the recovery must be large enough to provide a reasonable hourly rate for the time it will take to litigate the case. Private practitioners therefore will not generally handle police cases that do not involve significant physical injuries or death.

9.      For the above reasons, I believe that some meritorious cases need counsel from the kind of law firm that, in today's market, charges its clients above the USAO *Laffey* Matrix schedule of rates. Unilaterally limiting recovery in all cases to rates set by the government-maintained *Laffey* Matrix would reduce incentives for such representation. Such a policy is, in my view, incompatible with Congress' goal under § 1988 of ensuring the availability of counsel able to vindicate meritorious civil rights claims. For the above reasons, I believe that effecting the purpose of § 1988 requires awarding rates based on the successful plaintiff's counsel's usual market rates, even if those rates exceed the *Laffey* Matrix rates. As also explained above, in my view this belief is fully borne out by the facts of this case — I believe that Goodwin Procter's usual rates were fully justified by, and consistent with, the quality of representation that they provided to Ms. Huthnance in this case.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 15 th day of March, 2012, in Washington, D.C.

_____
Arthur B. Spitzer

- 4 -

# Exhibit 3

**Skinner, Jeffrey D**

| | |
|---|---|
| **From:** | Glover, Eric (OAG) [eric.glover@dc.gov] |
| **Sent:** | Friday, March 12, 2010 4:21 PM |
| **To:** | Skinner, Jeffrey D |
| **Attachments:** | March 12 Ltr to Skinner.pdf |

Jeff,

Please find attached to this email a copy of the District's response to your March 5, 2010 letter.  The documents referenced in the letter will be enclosed in the District's mailing.

Further, as per our conversation yesterday, this office has recently learned that Officer James Antonio has recently had surgery and expected to be out of work in a full time capacity for the next 6 months.  As such, the defendants will be moving for a continuance of the March 29, 2010 trial.  I will be in my office until 5:00PM today and Monday morning to discuss.

**Eric S. Glover**
Assistant Attorney General
General Litigation Division, Section IV
Office of the Attorney General for the District of Columbia
441 Fourth Street, N.W. - Suite 600 North
Washington, D.C. 20001
Office: (202) 442-9754
Fax:  (202) 741-8939
eric.glover@dc.gov

3/23/2012

# Exhibit 4

**Skinner, Jeffrey D**

| | |
|---|---|
| **From:** | Glover, Eric (OAG) [eric.glover@dc.gov] |
| **Sent:** | Tuesday, March 16, 2010 12:15 PM |
| **To:** | Skinner, Jeffrey D |
| **Cc:** | tanya_johnson@dcd.uscourts.gov |
| **Subject:** | RE: Huthnance v. D.C. |

Jeff,

Please be advised that the defendants will not be seeking to continue the trial scheduled for March 29, 2010. As such, there is not need for today's telephone conference. Thank you.

**Eric S. Glover**
**Assistant Attorney General**
**General Litigation Division, Section IV**
**Office of the Attorney General for the District of Columbia**
**441 Fourth Street, N.W. - Suite 600 North**
**Washington, D.C. 20001**
**Office: (202) 442-9754**
**Fax: (202) 741-8939**
**eric.glover@dc.gov**

**From:** Skinner, Jeffrey D [mailto:JSkinner@goodwinprocter.com]
**Sent:** Tuesday, March 16, 2010 10:40 AM
**To:** Glover, Eric (OAG)
**Cc:** Moustakas, John; tanya_johnson@dcd.uscourts.gov
**Subject:** Huthnance v. D.C.

Eric,

It appears that you did not file a motion to continue the trial based on Officer Antonio's surgery. As I told you yesterday, I have asked for a telephonic conference with the Court about this matter and have arranged a call with Judge Kennedy at 2:00 this afternoon. Please confirm by replying to all that you (or Ms. Jones or Mr. Jefferson) will be available to participate.

Thanks,

Jeff

**Jeffrey D. Skinner**
Goodwin | Procter LLP
901 New York Avenue, NW
Washington, DC 20001

Tel: 202-346-4205
Fax: 202-346-4444
email: jskinner@goodwinprocter.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# Exhibit 5

## Skinner, Jeffrey D

| | |
|---|---|
| **From:** | Moustakas, John |
| **Sent:** | Sunday, March 21, 2010 8:40 AM |
| **To:** | Glover, Eric (OAG) |
| **Cc:** | 'Jones, Patricia  (OAG/GL)'; Skinner, Jeffrey D |
| **Subject:** | huthnance admissions re_CCRB.doc |
| | |
| **Attachments:** | huthnance admissions re_CCRB.doc |

Although the Court rescinded the order that we meet by 6 pm today to hammer out a solution to the issue of the "missing evidence" -- (1) training video, (2) the Chief of Police video and (3) the May 2009 survey/report about disorderly conduct arrests -- Plaintiff remains willing to try to resolve the matter by agreement.  To that end, I approached you and Mr. Jefferson about further discussing stipulations at the end of the Pretrial Conference.  You indicated that you were in no position to discuss them before "running the issue up the flagpole," referring to a meeting you would be having with superiors.  I expected to hear from you after that meeting on Friday, but did not get a call back. On the off chance that you had forgotten we were expecting to hear back from you, we left several voicemail messages (to you and Dwayne) on Friday and sent an email reconfirming our availability to discuss.  Still, we have not heard back from you.

To move matters along, we have drafted three admissions that we propose the District of Columbia agree to in order to establish the facts Mr. Glover conceded during Friday's Pretrial Conference.  (Among other things, these concessions come into evidence as admissions under Fed. R. Evid. 801(d)(2)(A), (C) and (D).)  The proposed admissions are attached to this email.

While the admissions may result in us dropping K. Williams from our witness list, that decision still turns on the result of a motion to compel production of the 2009 report that we expect to file -- a report as to which your assertion of privilege is legally and factually insufficient.  We ask that, to obviate the need for further motions practice, you voluntarily produce the report, recognizing that your privilege log is legally insufficient and that Williams' survey of a sample of DO arrests is not a policy deliberation protected by the privilege you assert.

We look forward to hearing back from you at your earliest convenience

John

PS:  Please forward to your colleague Dwayne Jefferson, whose email address is not in my system yet.




huthnance
missions re_CCRB.d

The District of Columbia admits that, contrary to Sergeant Ehrlich's deposition testimony, no videotaped training on disorderly conduct has been produced since 1994.  Consequently, the only videotaped training on disorderly conduct that D.C. police officers have been shown between 1995 and the present is the 1994 videotape that has been admitted into evidence in this case as Defendant's Exhibit 4.

The District of Columbia admits that, contrary to Sergeant Ehrlich's deposition testimony, MPD never distributed a videotaped message from the Chief of Police to all officers and supervisors reinforcing their responsibilities in conducting disorderly conduct arrests.

The District of Columbia admits that, as of December 31, 2008, MPD had not followed the Citizen Complaint Review Board's 2003 Recommendation to "examine a sample of the disorderly conduct arrests made by its officers that is significant enough to allow MPD to determine if there are any widespread problems in the entire pool of disorderly conduct arrests."

## Skinner, Jeffrey D

| | |
|---|---|
| **From:** | Glover, Eric (OAG) [eric.glover@dc.gov] |
| **Sent:** | Monday, March 22, 2010 3:47 PM |
| **To:** | Moustakas, John |
| **Cc:** | Jones, Patricia (OAG/GL); Jefferson, Dwayne C. (OAG); Skinner, Jeffrey D |
| **Subject:** | RE: Admissions |
| **Attachments:** | huthnance admissions re_CCRB (2).doc |

John,

Please find attached to this email a copy of the defendants' proposed admissions.

**Eric S. Glover**
**Assistant Attorney General**
**General Litigation Division, Section IV**
**Office of the Attorney General for the District of Columbia**
**441 Fourth Street, N.W. - Suite 600 North**
**Washington, D.C. 20001**
**Office: (202) 442-9754**
**Fax:  (202) 741-8939**
**eric.glover@dc.gov**

**From:** Moustakas, John [mailto:jmoustakas@goodwinprocter.com]
**Sent:** Monday, March 22, 2010 3:04 PM
**To:** Glover, Eric (OAG); Jones, Patricia (OAG/GL)
**Subject:** Admissions


Eric/Pat:

Can you please tell me where you guys are re: admissions sent this weekend?

Thanks
John

John Moustakas
**Goodwin Procter** LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
T: 202-346-4236
F: 202-346-4444
jmoustakas@goodwinprocter.com
www.goodwinprocter.com

_____

*****************************************************************

**IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the**

**IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.**


**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***


**This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.**


**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Plaintiff's version:

The District of Columbia admits that, contrary to Sergeant Ehrlich's deposition testimony, no videotaped training on disorderly conduct has been produced since 1994.  Consequently, the only videotaped training on disorderly conduct that D.C. police officers have been shown between 1995 and the present is the 1994 videotape that has been admitted into evidence in this case as Defendant's Exhibit 4.

District's version

The District of Columbia admits that Sergeant Richard Ehrlich erred when he testified that an updated videotape of the 1994 videotape was shown to District of Columbia police officers. Sergeant Ehrlich viewed a rough draft of a video that was being produced by MPD and believed that it had been completed and disseminated.  He subsequently learned that the video was not completed nor disseminated to MPD officers.  The District of Columbia further admits that as of November 16, 2005, the day of plaintiff's arrest, it was still using the 1994 videotape to train its officers on disorderly conduct.

Plaintiff's version:

The District of Columbia admits that, contrary to Sergeant Ehrlich's deposition testimony, MPD never distributed a videotaped message from the Chief of Police to all officers and supervisors reinforcing their responsibilities in conducting disorderly conduct arrests.

District's version.

The District of Columbia admits that Sergeant Ehrlich erred when he testified that a tape of the Police Chief was distributed to all officers and supervisors to reinforce their responsibilities in conducting arrests for disorderly conduct.

Plaintiff's version:

The District of Columbia admits that, as of December 31, 2008, MPD had not followed the Citizen Complaint Review Board's 2003 Recommendation to "examine a sample of the disorderly conduct arrests made by its officers that is significant enough to allow MPD to determine if there are any widespread problems in the entire pool of disorderly conduct arrests."

The District will not make an admission as it relates to the above.

# Exhibit 6

March 23, 2012                Huthnance v. District of Columbia et al.
                              Chart for Goodwin Procter LLP Fees

| | |
|---|---:|
| Total hours actually worked at usual rates | 2,528,593.80 |
| Potential adjustment for delay in payment | 200,000.00 |
| Subtotal: potential fee allowed under caselaw | 2,728,593.80 |
| | |
| Write off 1,080 hours actually worked | (386,580.90) |
| Forego adjustment for delay in payment | (200,000.00) |
| 10% discount to usual rates | (214,201.29) |
| Subtotal: discount reflected in fee petition | (800,782.19) |
| | |
| Amount requested in fee petition | 1,927,811.61 |
| | |
| Additional write-off for "clerical" tasks | (2,019.15) |
| Eliminate inadvertent duplicative entry | (3,888.00) |
| Eliminate time for unfiled discovery motion | (6,210.00) |
| Subtotal: reductions in fee petition reply | (12,117.15) |
| | |
| Revised amount requested | 1,915,694.46 |